# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

2007 MAY 15  P 3: 40

BOBBY WILLIAMS,                )
    #231210,              )
                      )
    Petitioner,            )
                      )
v.                             )     CASE NO. 2:07-CV-271-MHT
                      )                (WO)
                      )
CHERYL PRICE, WARDEN;          )
    *et al.*,             )
                      )
    Respondent.            )

## ANSWER

Comes now the Respondent by and through the Attorney General of the State of Alabama and in response to the petition for writ of habeas corpus makes the following answer to Williams's petition for writ of habeas corpus.

1. Williams is currently incarcerated in the Alabama state prison system at Bibb Correctional Facility. In his petition currently before this Court, Williams challenges his November 10, 2004 first degree robbery convictions in the Circuit Court of Pike County, Alabama.

2. Respondent asserts that Williams's claim that his right to a fair and impartial trial was violated when the trial court denied his motion to suppress his confession is due no federal habeas relief because he has failed to establish that the

state court's decision was contrary to established federal law or an unreasonable application of established federal law to the facts.

3. Respondent asserts that Williams's claim that his right to a fair and impartial trial was violated when he was convicted based on insufficient identification evidence is due no federal habeas relief because he has failed to establish that the state court's decision was contrary to established federal law or an unreasonable application of established federal law to the facts.

4. Respondent asserts that though Williams presently has a Rule 32 postconviction pending on appeal in state court (see Exhibits F and G), this petition need not be dismissed or stayed as a mixed petition because the two issues now raised in this federal habeas petition were presented in the state courts and rejected on the merits.

5. Respondent denies that Williams is innocent.

6. Respondent denies that any of Williams's federal constitutional rights have been violated by the State of Alabama incident to his convictions and sentences in this case.

7. Based on the record, the law, and this Answer, Williams's habeas petition is due to be denied with prejudice.

## CHRONOLOGY OF THE CASE

Bobby Williams was indicted on May 20, 2003 by the Pike County Grand Jury and charged with two counts of robbery in the first degree for the robbery of two convenience stores in Troy, Alabama. (Exhibit A, pgs. 162-163)

Williams proceeded to trial on November 9, 2004. (Exhibit A, pg. 1) Before the proceedings, Williams filed in open court a motion to suppress his statement on grounds that the statement was obtained by unlawful inducement. (Exhibit A, pgs. 7-17) Following a hearing on the issue, Judge Steven Blair denied Williams's motion. (Exhibit A, pg. 3-33)

Trial commenced immediately thereafter and on November 10, 2004, the jury returned a verdict of guilty of two counts of first degree robbery as charged in the indictment. (Exhibit A, pgs. 214-215; pgs. 255, 260) On March 11, 2005, Judge Blair sentenced Williams to twenty-five year sentences ordered to run concurrently. (Exhibit A, pg. 327)

Williams appealed his conviction to the Alabama Court of Criminal Appeals and his case was docketed as CR-04-0759. As grounds for relief, Williams claimed that:

> 1. The trial court erred in denying his motion to suppress his statement because the statement was obtained by improper promises made by the interrogating officers; and,
>
> 2. His conviction for robbery in the first degree was not supported by the weight of the evidence.

3

(Exhibit B, pgs. 3-4)

On December 16, 2005, the Court of Criminal Appeals affirmed Williams's conviction and sentence. (Exhibit C)  Williams applied for a rehearing.  His application was overruled and Williams petitioned the Alabama Supreme Court for a writ of certiorari.  The Supreme Court denied the writ, and issued a certificate of judgment on March 10, 2006.  (Exhibit D)  The same day, the Alabama Court of Criminal Appeals issued a certificate of judgment. (Exhibit E)

On April 25, 2006, Williams filed a petition for post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. (Exhibit F, pgs. 6-19)  As grounds for relief, Williams argued that his trial counsel was ineffective both at his trial and at his sentencing.

On June 7, 2006, the State responded to Williams's petition, alleging that Williams's claims of ineffective assistance of counsel were precluded because they could have been raised at trial or on direct appeal and were not. (Exhibit F, pgs. 33-36)  In addition, the State attached an affidavit from Williams's attorney, along with a letter written to defense counsel by Williams. (Exhibit F, pgs. 37-41)

On June 22, 2006, the trial court entered an order denying Williams's Rule 32 petition on grounds that Williams's claims of ineffective assistance of counsel were without merit and because no purpose would be served by further proceedings.

4

Williams appealed the dismissal of his Rule 32 petition to the Alabama Court of Criminal Appeals and his case was docketed as CR-05-2068. (Exhibit G) As of the date of this writing, no opinion has been rendered by the Alabama Court of Criminal Appeals.

On March 25, 2007, Williams filed this present Section 2254 petition raising the following grounds for relief:

1. His right to a fair and impartial trial was violated in that the trial court erred in denying his motion to suppress his statement because the statement was obtained by improper promises made by the interrogating officers; and,

2. His conviction for robbery in the first degree was not supported by the weight of the evidence, specifically the identification evidence.

## STATUTE OF LIMITATION

This present petition is not barred by the statute of limitation.

## EXHAUSTION

Though, as noted above, the appeal of the denial of Williams's latest Rule 32 petition is still pending before the Alabama Court of Criminal Appeals, the two issues raised in this present § 2254 petition are exhausted because they were presented to the state court on direct appeal.

5

Both of Williams's claims for which he seeks habeas review were raised on direct appeal in State court and were addressed by that court on their merits. The State appellate court held Williams's claims to be without merit, as discussed in the court's memorandum opinion. (Exhibit C)

Section 2254(d) provides that:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly establish Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on the unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Williams has failed to establish that the State's court's adjudication of the claim was contrary to or involved an unreasonable application of Federal law as announced by the United States Supreme Court, or that the State court's adjudication of the claim was based on an unreasonable determination of the facts. Thus, Williams's claims are entitled to no relief.

## CONCLUSION

Based on the foregoing, this petition is due to be denied and dismissed with prejudice.

## EXHIBIT LIST

Exhibit A -  Copy of the record on direct appeal to the Alabama Court of Criminal Appeals.  CR-04-0759.

Exhibit B -  Copy of Williams's brief on direct appeal of his convictions.  CR-04-0759.

Exhibit C -  Memorandum opinion of the Alabama Court of Criminal Appeals issued December 16, 2005.  CR-04-0759.

Exhibit D -  Certificate of judgment issued by the Alabama Supreme Court on March 10, 2006 . S. Ct. No.  1050563; (CR-04-0759.)

Exhibit E -  Certificate of Judgment issued by the Alabama Court of Criminal Appeals on March 10, 2006.  (CR-04-0759.)

Exhibit F -  Copy of the record on appeal to the Alabama Court of
Criminal Appeals regarding the appeal of the denial of
Williams's Rule 32 petition.  CR-05-2068.

Exhibit G -  Copy of Williams's brief on appeal of the denial of his
Rule 32 petition.  CR-05-2068.

Respectfully submitted,

Troy King, ID #KIN047
*Attorney General*
By-

*Nancy M. Kirby*

Nancy M. Kirby ID #KIR031
*Deputy Attorney General*

8

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May, 2007, I served a copy of the

foregoing (including exhibits) on the petitioner, by placing the same in the United

States mail, first class, postage prepaid and addressed as follows:

    Bobby Williams
    AIS # 231210
    Bibb Correctional Facility
    565 Bibb Lane
    Brent, AL 35034


                        Respectfully submitted,



                        *Nancy M. Kirby*
                        Nancy M. Kirby (KIR031)
                        Office of the Attorney General
                        Alabama State House
                        11 South Union
                        Montgomery, AL  36130-0152
                        Telephone:  (334) 242-7300
                        Fax:  (334) 242-2848
                        E-Mail: nancykirbylaw@bellsouth.net

269295/107808-001

9

COURT OF CRIMINAL APPEALS NO. _CR04-0759_____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _PIKE_____ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC03-382&383_____

CIRCUIT JUDGE _Steven E. Blair_____

Type of Conviction / Order Appealed From: _Robbery, 1st x 2_____

Sentence Imposed: _25 years in Penitintiary_____

Defendant Indigent: ☒ YES  ☐ NO

_Bobby Williams_____

_James "Jim" Thomas_____ _566·2181___   **NAME OF APPELLANT**
(Appellant's Attorney)              (Telephone No.)

_P.O. Box 974_____
(Address)

_Troy,_____ _AL____ _36081___
(City)          (State)      (Zip Code)

### V.

STATE OF ALABAMA

(State represented by Attorney General)            **NAME OF APPELLEE**

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____   _Volume 1 of 3_

(For Court of Criminal Appeals Use Only)



EXHIBIT

A

Index

Court Reporter's Transcript.................................................... 1-329
Court Reporter's Exhibit List............................................. 1
State's Exhibit 1.................................................................2
State's Exhibit 2............................................................3-12
State's Exhibit 3.............................................................13
State's Exhibit 4.............................................................14
Defendant's Exhibit 1..................................................... 15-16
Defendant's Exhibit 2...................................................... 17-108
Warrant for Defendant's Arrest (WR 03-17 & WR 03-20)............ 109-112
Arrest Report (WR 03-17 & WR 03-20)................................. 113-116
Notification of Rights...................................................... 117
Affidavit of Substantial Hardship........................................ 118-119
Order on Initial Appearance.............................................120
Release Order...............................................................121-122
Attorney Acceptance by James Thomas............................... 123
Motion Requesting Preliminary Hearing..............................124-125
Subpoena Request Form.................................................. 126
Order........................................................................ 127
Subpoena Request Form.................................................. 128
Motion for Pre-Approval of Extra-Ordinary Expense................. 129
Order Approving Extra-Ordinary Expense.............................. 130
Subpoena Request Form.................................................. 131-132
Orders Bounding Cases over to Grand Jury............................133-134
District Court Case Action Summaries..................................135-137
Indictment...................................................................138-139
Warrant of Arrest..........................................................140-141
Application for Youthful Offender Status...............................142
Motion for Discovery......................................................143-148
Discovery Order............................................................149-150
Subpoena Request Form.................................................. 151
YO-PSI Report..............................................................152-157
State's First Response to Defendant's Motion for Discovery.........158-188
Order........................................................................ 189
Subpoena Request Form.................................................. 190
Order........................................................................ 191
Subpoena Request Form.................................................. 192
Order........................................................................193
Plea of Not Guilty and Waiver of Arraignment.......................194
Motion for Final Disposition.............................................195-197
Motion for Fast and Speedy Trial.......................................198
Order........................................................................199
Letter to Clerk from Defendant..........................................200-201
Subpoena Request Form.................................................. 202
Request for Appointment of New Counsel...............................203-206

Index Continued:

Motion to Transfer Defendant to Pike County Jail.....................207-208
Order Granting Motion to Transfer......................................209
Jury Strike List...............................................................210-211
Defendant's Jury Charges (#1 & #2)....................................212-213
Verdicts.........................................................................214-215
Copy of Case Law.......................................................... 216-254
Orders..........................................................................255-256
Order to Transfer Defendant............................................ 257
Subpoena Request Form.................................................. 258
Notice of Appeal Package................................................ 259-263
Order............................................................................ 264-266
Transcript of Record.......................................................267-268
Letter to Court Clerk from Defendant................................... 269
Appeal Transmittal Forms................................................270-271
State's Motion to Set Restitution........................................272
Order............................................................................ 273
Order............................................................................ 274
Letter to Clerk from Defendant.......................................... 275
Notice from Court of Criminal Appeals................................ 276
Letter to Criminal Appeals from Court Reporter...................... 277
Case Action Summaries (CC03-382 & 383)............................ 278-282
Judgment...................................................................... 283
Certificate of Completion................................................. 613

1                     IN THE CIRCUIT COURT OF

2                     PIKE COUNTY, ALABAMA

3

4

5  BOBBY WILLIAMS,           )
        APPELLANT,       )

6                        )
  VS.                  )   CC-03-382;383

7                        )
  STATE OF ALABAMA,      )

8                        )
        APPELLEE.        )

9

10

11

12     The above referenced testimony was heard

13  before Honorable Steven Blair on the 9th and

14  10th days of November, 2004, at the Pike County

15  Courthouse, Troy, Alabama.

16

17

18                 *  *  *  *  *

19

20

21  APPEARANCES:

22  FOR THE APPELLANT:         FOR THE STATE:

23  MR. JIM THOMAS            MR. LARRY JARRELL
  Attorney at Law           Assistant D.A.

24  Troy, Alabama             Troy, Alabama

25

MAY 2005
Brenda Mccollon Peacock
Court Clerk
Pike Co., Ala.

COPY

1

2                        <u>REPORTER'S INDEX</u>

3

     PRELIMINARY HEARING..................PAGE   4

4

5    WITNESSES:           DIRECT   CROSS   REDIRECT RECROSS

6    Larry Ross              55       61
     Greg Wright             62       73      109       113
7                                            123
     Rebecca Holley         124      129      152       154
8    Edith Thomas           156      161      183       186
                                             187       188
9    Rebecca Holley                           199

10   Greg Wright                              200       204
                                             205
11   Larry Ross                               207       215
                                             218
12   Rebecca Holley                           222

13   JUDGES CHARGE TO JURY............Page            232

14   VERDICT OF THE JURY..............Page            255

15   SENTENCE HEARING.................Page            260

16

17

18

19

20

21

22

23

24

25

3

```
 1                     November 9, 2004

 2              (The following suppression hearing

 3    was heard out of the hearing and presence of

 4    the jury).

 5         THE COURT:   These cases are State of

 6                   Alabama versus Bobby Williams,

 7                   case numbers CC-2003-382 and

 8                   383.  We are here on Defendant's

 9                   oral motion to suppress a

10                   statement?  Is that my

11                   understanding?

12         MR. THOMAS:  Yes, sir.

13         THE COURT:  Is it one statement or two

14                   statements?

15         MR. THOMAS:  One statement.

16         THE COURT:  One statement.  The defendant

17                   is present with his Attorney,

18                   Mr. Thomas.  The State is

19                   represented by Mr. Jarrell.

20                        Is everybody ready for

21                   a hearing in this matter?

22         MR. THOMAS:  Yes, sir.

23         MR. JARRELL:  Yes, sir.

24         THE COURT:  Mr. Jarrell, call your first

25                   witness.
```

4

1          MR. JARRELL:   I call Greg Wright.

2                    GREG WRIGHT

3          Whereupon, this witness, after first

4    being duly sworn to tell the truth, the whole

5    truth, and nothing but the truth, testified as

6    follows, to-wit:

7                 DIRECT EXAMINATION

8    BY MR. JARRELL::

9          Q     State your name, sir, and where

10   you are employed?

11         A     Detective Greg Wright, Troy Police

12   Department.

13         Q     Were you so employed on the 13th

14   day of January of 2002?

15         A     Yes, sir, I was.

16         Q     And on that occasion did you have

17   opportunity or occasion to conduct an interview

18   with the Defendant here, Bobby Williams?

19         A     Yes, sir, I did.

20         Q     Where did that take place?

21         A     Montgomery County Detention

22   Facility.

23         Q     And, of course, Mr. Williams was in

24   custody?   That's correct?

25         A     Yes, sir.

1          Q       Did you go through what we normally

2    refer to as his Constitutional Rights according

3    to Miranda?

4          A       Yes, sir, I did.

5          Q       Did you present him with each one

6    of his rights individually?

7          A       Yes, sir, I did.

8          Q       Did you get from him an

9    acknowledgement, one way or the other, whether

10   he understood his rights as he read it?

11         A       Yes, I did.  He explained that he

12   had a 9th grade education.  I went through the

13   form.  I had him read along and initial off

14   each block as I read it to him.

15         Q       I show you what's been marked as

16   State's Exhibit No. 1 and ask if you recognize

17   that document, sir?

18         A       Yes, sir, I do.

19         Q       What is that?

20         A       It's a Montgomery County Sheriff's

21   Department Waiver of Rights form.

22         Q       Is that the form that you used when

23   you interviewed Mr. Williams?

24         A       Yes, sir, it is.

25         Q       Did you go over each one of those

1    rights listed and enumerated on that sheet?

2         A      Yes, sir, I did.

3         Q      Did you also assist -- well, let me

4    withdraw that.  Did you in any way apply any

5    force, leverage, coercion or in anyway get Mr.

6    Williams to talk with you?

7         A      No, sir, I did not.

8         Q      Did it appear that he was

9    voluntarily making the statement that he gave

10   you?

11        A      Yes, sir.

12        Q      During the course of that

13   statement, did he acknowledge his involvement

14   in the two robberies that occurred down here

15   December 21 and December 29, 2002?

16        A      Yes, sir, he did.

17        Q      And I think I mispoke when I asked

18   you the date that you were employed.  Were you

19   so employed on the 13th of January of 2003,

20   January after the December robberies?

21        A      That's correct.

22        Q      And I notice that you put on here

23   "'02."  Is that an error?

24        A      Yes, sir, it is.

25        Q      I have a problem with that myself

1    right after the first of the year.

2         MR. JARRELL:  Your witness.

3              CROSS EXAMINATION

4    BY MR. THOMAS:

5         Q    Detective Wright, when the

6    interview -- when you first arrived to meet

7    with Mr. Williams, did you have the opportunity

8    to sit down and talk with him before the formal

9    transcribed interview began?

10        A    Did I take a statement from him

11   before recording it?  Is that what you're

12   asking?

13        Q    Yes.

14        A    Yes, I did.

15        Q    Do you have the contents of that

16   interview on tape?

17        A    No, sir.

18        Q    Why did you not tape record that

19   first interview?

20        A    The first part of it was not an

21   interview.  It was non-accusitory type

22   interview explaining why I was there, the

23   circumstances of the case and basically going

24   over the rights.  That's a little in-depth for

25   someone to have to transcribe.  It was just

8

```
 1    basically stuff that was not irrelevant.

 2         Q     Is it your testimony that you

 3    elicited no information actually regarding

 4    these robberies prior to the tape recorder

 5    coming on?

 6         A     Yes, sir.

 7         Q     So it was more than just a

 8    formality of gathering certain information and

 9    having the waiver signed?

10         A     Somewhat, but not much.

11         Q     Information was gathered?

12         A     Yes, sir.

13         Q     When this information started being

14    gathered, were you eliciting the information?

15         MR. JARRELL:    Which time?

16         MR. THOMAS:    Prior to the tape starting.

17         Q     Were you asking questions about his

18    involvement in the robbery?

19

20         MR. JARRELL:  We offer we are not

21                   offering the statement made

22                   prior to the tape recording

23                   being turned on.

24         MR. THOMAS:  I understand that, but it

25                   goes as to the ultimate issue of
```

9

1              suppression.

2         THE COURT:  Overruled.  Go ahead.

3         Q      Were you eliciting information, or

4    was this information that the defendant

5    offered?

6         A      A little bit of both.

7         Q      Given the fact that you were

8    eliciting information or soliciting

9    information, did you not think it was the best

10   practice to go ahead and turn on the tape

11   recorder?

12        A      No, sir.

13        Q      Were you soliciting information

14   from the Montgomery robberies or Troy

15   robberies?

16        A      I knew nothing about the Montgomery

17   robberies until he started making the

18   statement.

19        Q      So your testimony is that Mr.

20   Williams offered statements to you about the

21   Montgomery robberies prior to the recorder

22   coming on?

23        A      I knew that he was arrested on the

24   Montgomery robberies.  That's why I was there,

25   but as far as the details of the robbery, I did

10

1    not know until he gave the statements, as I

2    said before.

3        Q    Okay.  Have you ever met Mr.

4    Williams prior to that day?

5        A    No, sir.

6        Q    Have you ever met a Mr. John Foster

7    prior to that day?

8        A    Yes, sir.

9        Q    And how do you know Mr. John

10   Foster?

11       A    From prior involvements with the

12   drug task force.

13       Q    Okay.  And what was your last

14   contact with Mr. Foster?  First of all, let me

15   establish this:  Do you know what Mr. John

16   Foster's relationship is with Mr. Williams?

17       A    At that time, I did not.

18       Q    Have you since learned of his

19   relationship to the defendant, Mr. Williams?

20       A    At the preliminary hearing, I was

21   approached, and I was advised by Mr. Foster

22   that Mr. Williams was his son.  That's how I

23   learned of it.

24       Q    So it's your testimony that prior

25   to the preliminary hearing, you did not know

1    that Mr. Foster was related to Bobby Williams?

2         A       No.

3         Q       Did you at any point -- at any

4    point did my client bring up Mr. Foster's name?

5         A       Now that you mentioned it, I think

6    he did.

7         Q       In the interview?

8         A       Yes.

9         Q       Is it safe to say that when he

10   brought up his name that he told you he was his

11   father?

12        A       Yes, sir, he did.

13        Q       In regard to Mr. Foster, what was

14   your exact interaction with him from a legal or

15   law enforcement perspective, and when did that

16   occur?

17        A       I don't understand the question.

18        MR. JARRELL:  Object to the relevance.

19        MR. THOMAS:  It will all come to light.

20        THE COURT:  The witness said that he

21              didn't understand the question.

22              I sustain the objection.

23              Rephrase.

24        Q       Do you recall how many months, days

25   or years ago that you had some

1  interaction with Mr. Foster?

2         A       No, sir, I do not.

3         Q       Has it been more than year?

4         A       As far as what type of interaction?

5  Law enforcement?

6         Q       Law enforcement?

7         A       Several years.

8         Q       Several years.  More than five?

9         A       Yes, sir.

10         Q       And what was your law enforcement

11  interaction with Mr. Foster?

12         A       We issued a search warrant for his

13  house for drugs.

14         Q       Was he arrested on that offense?

15         A       I can't recall whether he was

16  arrested initially.  But he did serve some

17  time, but I can't recall what he was arrested

18  for on that night.

19         Q       Did you have any interaction with

20  Mr. Foster on incidents for which he was

21  charged for drugs?

22         A       I don't understand your question.

23         Q       Were you a detective involved in a

24  case, or did you have interaction with Mr.

25  Foster on drug cases for which he was charged

1   and indicted?

2        A    Only just being with the search

3   warrant, is the only involvement that I had.

4        Q    At any point in time did you assist

5   Mr. Foster in obtaining a plea agreement on

6   those cases?

7        A    No.

8        Q    You had no interaction with the

9   District Attorney's Office regarding any plea

10  agreement reached with Mr. Foster?

11       A    On a drug case, no, sir.  I did

12  not.

13       Q    At the time those charges occurred,

14  were you a patrol officer or detective?

15       A    I was a patrol officer working

16  undercover.

17       Q    Was part of your duties to interact

18  with the drug task force?

19       A    Uh-huh.

20       Q    During the course of the statement,

21  did you not say to my client that you had

22  helped his father, Mr. Foster, in the past and

23  that you would like to help him, too?

24       A    Yes, sir.

25       Q    Okay.  You did say that.  And that

14

```
 1     would have been probably prior to the tape

 2     recording coming on?

 3           A     It may have been, or it may not be.

 4     I would have to look at the statement to see.

 5           Q     Can you be a little more specific?

 6     Was that the generalization of the statement,

 7     that you had helped Mr. Foster in the past, and

 8     that you would like to help him, as well?

 9           A     It had nothing to do with the drug

10     case, if that's what you are referring to.  As

11     far as me helping his dad?

12           Q     Yes, sir.

13           A     It had nothing to do with his drug

14     case whatsoever at all.

15           Q     What did it have to do with?

16           A     He had approached me several times

17     with misdemeanor cases that he's had, seeking

18     advice on whether he should plead guilty and

19     whatnot on things, problems that he's had with

20     people in his apartment complex, just

21     generalization type questions.  I know Mr.

22     Foster from the street, also.

23           Q     Okay.  At some point did you --

24     never mind.  Scratch that question.  You

25     acknowledge that the tape was not running the
```

15

1    whole time so the breathe of the entire

2    interview that you had with my client would not

3    have been captured with what we have in the

4    Clerk's file?  Is that correct?

5         A    No, sir, not the way you are

6    referring to it.  I don't tape any of my

7    interviews from beginning to end.

8         Q    Okay.  Were you specific in what

9    you might be able to do for my client to help

10   him?

11        A    Not that I recall.  I was not in a

12   position to make a deal.

13        Q    Okay.  You had just mentioned that

14   you had helped his father in the past, and that

15   you would like to help him?

16        A    Right.

17        Q    And that would be prior to the tape

18   coming on and the statement being given?

19   If that statement is not contained on this,

20   it's safe to say that would have been prior to

21   the tape coming on?

22        A    Yes.

23        Q    And did you ask my client in the

24   course of the interview if you had made any

25   threats or promises?

1        A      Uh-huh.

2        Q      Do you remember his response?

3        A      No, I don't.

4        Q      Okay.  If I hand you a copy of the

5  typed transcript would that refresh your

6  memory?

7        A      Uh-huh.

8        Q      Let me ask you to read this and the

9  response right here, please.  And I have the

10  asterisk beside it.  If you can read the

11  question out loud and then the response.

12       A      Where do you want me to start?

13       Q      With your question to him right

14  here.  Right there (indicating).

15       A      It says Wright speaking.  Okay.

16  Earlier, prior to turning the tape recorder on,

17  Corporal Ross read you your rights, and you

18  said that you understood what your rights were.

19  You told us what your address is.  You told us

20  that you've got a 9th grade education and that

21  you understand.  You can't read and write.

22      Williams:  Yes, sir, I -- I can read and

23  write.

24      Wright:  Okay.  Nobody made any promises

25  to you or threats to you to make a statement?

17

1    Is that correct?

2         Williams:  No, sir.

3         MR. THOMAS:  That's all I have, Your

4                   Honor.

5              REDIRECT EXAMINATION

6    BY MR. JARRELL:

7         Q    I'm going to offer what is marked

8    State's Exhibit No. 2 and ask if you can

9    identify that?

10        A    Yes, sir.

11        Q    And what is that?

12        A    It's a copy of the transcript taken

13   at the Montgomery County Jail

14   to interview Mr. Williams.

15        Q    And did you, or have you since it

16   was transcribed had an opportunity to go over

17   and see whether it accurately depicts what was

18   on the tape?

19        A    Yes, sir.

20        Q    Does it?

21        A    Yes, sir.

22        MR. JARRELL:  The State offers State's

23                  Exhibit No. 1 and 2 into

24                  evidenced.

25        THE COURT:  Any objection?

18

1          MR. THOMAS:  No objection.

2          THE COURT:  They are admitted.

3                         Does the state have any

4                  other testimony or witnesses?

5

6          MR. JARRELL:  No, sir.

7          THE COURT:  Mr. Thomas, do you have any

8                  other testimony or witnesses on

9                  your motion?

10         MR. THOMAS:  Yes, sir, I do.

11         THE COURT:  Call your witness.

12         MR. THOMAS:  I call Mr. Bobby Williams.

13         THE COURT:  Mr. Williams, will you raise

14                  your right hand.

15                    BOBBY WILLIAMS

16         Whereupon, this witness, after first

17  being duly sworn to tell the truth, the whole

18  truth, and nothing but the truth, testified as

19  follows, to-wit:

20         THE COURT:  Mr. Williams, do you

21                  understand you are the defendant

22                  in this case?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  And do you understand your

25                  right to remain silent?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Do you understand by giving

3                    testimony, you are waiving your

4                    right to remain silent?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Do you understand that you

7                    are subject to cross examination

8                    by the District Attorney?

9          THE WITNESS:  Yes, sir.

10         THE COURT:  You have discussed the fact

11                   that you are going to give

12                   testimony at this time with your

13                   attorney?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  And that's what you want to

16                   do?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  Okay.  Mr. Thomas.

19                   DIRECT EXAMINATION

20    BY MR. THOMAS:

21         Q    Mr. Williams, prior to the tape

22    coming on in the interview that was held by

23    Detective Wright, do you recall Mr. Wright

24    making a statement to you that he had helped

25    your father in the past with some trouble, and

20

1    that he would like to help you, if he could?

2         A    Yes, sir.

3         Q    After he made that promise, did

4    that induce you to go forward and make a

5    statement?

6         A    Yes, sir.

7         MR. JARRELL:  I am going to -- and he

8              answered real quick -- have to

9              object to the term, "make a

10             promise".

11        THE COURT:  Sustained as to form.

12        MR. THOMAS:  Well, the testimony is

13             certainly out there.

14        THE COURT:  His objection was to a

15             promise, but you can ask if he

16             made a statement.

17        Q    Mr. Williams, what did the

18   detective state to you that day prior to the

19   interview beginning?

20        A    He told me that -- he had asked me

21   what my father's name was, and did I know

22   anybody in Troy previous, before the robberies

23   took place.  And I told him that I had a father

24   staying in Troy which was John Foster.  And he

25   told me that he knew my father from previously

1    helping him with incidents in the past.  And he

2    told me that he was willing to help me if I was

3    willing to make a statement.

4              And I was already so emotionally

5    shook up about the situation I was already in.

6    So at the time we was talking, he was like,

7    well, tell me about your situation.

8         Q    Did this statement by Detective

9    Wright occur prior to the tape recorder coming

10   on?

11        A    Yes, sir.  That's before the

12   recorder came on.

13

14        MR. THOMAS:  That's all I have.

15        THE COURT:  Mr. Jarrell.

16              CROSS EXAMINATION

17   BY MR. JARRELL:

18        Q    Did he promise he was going to get

19   you off?

20        A    No.

21        Q    Did he promise that he was going to

22   get you a low sentence?

23        A    No.  He just said that he was going

24   to help me.

25        Q    He was going to help you?

```
 1        A      This was my first time being in the

 2   system.  I didn't know what he

 3   was capable of doing.

 4        Q      Well, it wasn't actually your first

 5   time, was it?

 6        A      It was my first time.

 7        Q      Well, you were under arrest in

 8   Montgomery County for robberies

 9   up there at that time.

10        A      I didn't know about the system.  I

11   wasn't sentenced or nothing.    I

12   didn't talk to nobody.

13        Q      He didn't promise you that he would

14   get you off?  Or he didn't

15   promise you that you would get

16   leniency, or anything of that

17   nature, did he?

18        A      No, sir.

19        Q      Thank you.  Did you commit these

20   robberies?

21        MR. THOMAS:  I object.

22        A      No, sir, I didn't.

23        MR. THOMAS:  He takes the Fifth as to any

24   further questions outside the

25   scope of the suppression.
```

1       MR. JARRELL:  He wasn't limited to that.

2                    MR. THOMAS:  It' by law

3              limited to that if it's a

4              suppression hearing.

5       THE COURT:  He took the Fifth.  Okay.  Do

6              you have any other questions?

7       MR. JARRELL:  No, sir.

8       THE COURT:  Redirect?

9       MR. THOMAS:  No, sir.

10      THE COURT:  Any arguments that we want to

11             make?

12      MR. THOMAS:  Your Honor, I can make legal

13             arguments, if I need to.  You

14             will need to give me a minute to

15             pull my file.

16      THE COURT:  Well, do you have any case

17             law in support of it?

18      MR. THOMAS:  Yes, sir.

19      THE COURT:  I would like to see it.

20             (Off record the record).

21      MR. THOMAS:  Judge, I think there's

22             enough case law out there to

23             support the proposition that if

24             a promise is made to help, that

25             in and of itself is enough to

1    suppress the statement, if the

2    statement was given after the

3    promise to help or to render

4    some type of assistance was

5    given.

6         McElory is pretty clear

7    on point, Section 200.07,

8    Subsection 6, a confession is

9    not admissible if it was induced

10   by a promise that the accused

11   would not prosecuted, or would

12   be released if the accused

13   confessed.

14        The Courts have taken

15   the traditional stand that if

16   the inducement of the profit or

17   benefit is held out or any hope

18   is engendered or encouraged that

19   the prisoner's case will be

20   lightened, enumerated or more

21   favorably dealt with if he

22   confesses, a confession thereby

23   induced is inadmissible.

24             And that cites

25   WTS v. State.  The actual cite

1    of the case was not published at

2    the time the book came out,

3    apparently, but CR-931354.

4         That case goes on to

5    state, holding that the

6    investigator for thereby

7    promising the accused leniency

8    if he cooperated, engineered,

9    encouraged the accused to think

10   the accused would be dealt with

11   more favorably by confessing.

12        Clearly the tape was

13   not running. We don't know

14   exactly what was said. But

15   anything should be -- any

16   benefit should be given to the

17   defendant given the fact that

18   the detective chose not to run

19   that tape. Both the defendant

20   and detective have testified

21   that, you know, he promised to

22   help him out because he had

23   helped his father out. That's

24   a pretty strong inducement. He

25   tied his own father to the

26

```
 1              inducement to give the

 2              statement.

 3                   Further, in his own

 4              statement, when the detective

 5              asked the question as follows:

 6              Okay.  Nobody made any promises

 7              to you or threats to you to get

 8              you to to make a statement?  Is

 9              that correct?  Is that correct?

10                        He said, no, sir.  He

11              answered in the negative that

12              that is not correct.  And then

13              the statement proceeds to take

14              place.  And that's contained on

15              page 1 of the statement.

16                        And I would offer

17              McElorys, the section I read

18              from.

19       THE COURT:  That's McElory's section

20              200.07(7)?  Is that right?

21              Right here?

22       MR. THOMAS:  To right here.  Promises of

23              leniency.  It's 200.07(6).

24       THE COURT:  Okay.  Mr. Jarrell?

25       MR. JARRELL:  Yes, sir.  If the very
```

```
 1              wording of McElory itself takes
 2              away their argument because
 3              there was no offer of leniency
 4              or promises of lighter sentence.
 5              There was no promise of
 6              reduction of charge.  And then,
 7              couple that with the defendant's
 8              own testimony just a few minutes
 9              ago, I specifically asked if
10              there were any promises of
11              leniency or reduction of charge.
12              And he said there was not.
13                   The statement that was
14              referred to in the transcript,
15              the question was asked that
16              nobody made it, made you any
17              promises, and he did kind of a
18              double negative in there.  When
19              you start talking like that,
20              it's easy to confuse.  He could
21              have meant that nobody -- no,
22              sir, no one has made me any
23              promises.  It is a confusing
24              statement.
25                   Very clearly here
```

```
 1                        today, unequivocally, he said
 2                        there was no leniency offered.
 3                        He keeps using the word that he
 4                        promised to help him, and that
 5                        was not the statement that the
 6                        officer made.  He said he would
 7                        like to help him, not I promise
 8                        to help, or that I will help
 9                        you.
10           MR. THOMAS:  Judge, I object to the
11                        speculation of the D.A.  The
12                        testimony is in the record as to
13                        what was said.  It's there.  We
14                        are not going to dispute -- we
15                        don't need to interpret what has
16                        already been put in the record.
17                        Both witnesses have testified.
18                             The case law, I think,
19                        is clear on this point.  And,
20                        again, given the fact that the
21                        investigating officer chose not
22                        to record the entire statement,
23                        I think we need to err on the
24                        side of caution here and
25                        suppress the statement.
```

```
 1                    And, again, in the

 2           statement itself, my client

 3           answers the question about

 4           promises and leniency.  Yes,

 5           there was a promise.  There was

 6           something there.  He answered it

 7           clearly.  It's there in black

 8           and white.  We will rest on

 9           that.

10      THE COURT:  Well, of course, his response

11           to that particular inquiry made

12           by the officer, has anyone

13           threatened you or made any

14           promises to you of any kind?

15                    And said, no, sir.

16                    That could be

17           interpreted a couple of

18           different ways.  I'll refer to

19           the case that counsel for

20           defendant cited the Court, that

21           being Ex Parte -- excuse me.

22           McCloud versus State.  It's

23           718So.2d.727.  Of course, it

24           states for a confession to be

25           admissible, the State must prove
```

1           by a preponderance of the

2           evidence that it was voluntary.

3           Of course, voluntariness is a

4           totality of the circumstances

5           type test.  And this case is

6           kind of similar to the situation

7           present in this case.

8                   But the true test is

9           whether or not any promise --

10          whether the defendant's will has

11          been overborn by any inducement.

12                  And based upon the

13          totality of the circumstances,

14          the Court finds that the

15          defendant's will was not

16          overborn by the nature of the

17          promise nonspecific in nature.

18          He testifies there was not any

19          promise of leniency or reduced

20          sentence or anything like that.

21                  Of course, in the

22          McCloud case, it says that

23          McCloud had no previous arrest

24          record, and he may have had

25          little experience with the

1       criminal justice system.  He is

2       an adult who can read and write.

3        And he signed a waiver form

4       indicating that he knowingly and

5       voluntarily waved his rights.

6       The evidence also indicates the

7       interrogation of McCloud was

8       conducted in a civil manner,

9       free of displays of force,

10      intimidation, or strong armed

11      tactics.

12           I understand the

13      defendant's position.  But based

14      upon the totality of the

15      circumstances, the Court finds

16      that the voluntariness of the

17      statement is not vitiated and

18      that his will was not overborn

19      by the nonspecific statement

20      that he helped his father, and

21      he would like to help him if he

22      could.

23           So that's the ruling of

24      the Court.  And, of course,

25      it's preserved ruling for appeal

```
 1                    if you should choose to do that.

 2

 3                      Can I keep these cases

 4                 and put them with the file?

 5      MR. THOMAS:  Yes, sir.  I would like the

 6                 record to reflect that I don't

 7                 limit my legal basis for

 8                 suppression stating to those

 9                 two cases.  I believe there is

10                 sufficient case law besides

11                 those under these stakes to

12                 suppress the statement.  And we

13                 take exception of the ruling.

14      THE COURT:  I understand.  But taking

15                 that statement as a whole, the

16                 first thing you have to consider

17                 is whether or not that is

18                 actually a promise, and what is

19                 it a promise of.  It's

20                 susceptible to different

21                 meanings.

22                      But based on the totality of

23                 the circumstances the Court

24                 finds that this defendant's will

25                 was not overborn by that
```

1    statement made by the officer at

2    that time and understand those

3    circumstances.

4            So that's the ruling.

5    And I understand you are not

6    limited to these cases which

7    you cite as authority for your

8    position.

9            Okay.  The jury is

10   upstairs.  Let's go on up there,

11   and let's get started.  Thank

12   you.

13   THE COURT:  Let the record reflect

14       that all jurors are present.

15            Good morning.  I'm

16   sorry for the delay this

17   morning.  But there were matters

18   that had to be taken up, and had

19   to be taken up outside of you

20   presence, which may frequently

21   happen throughout the day.

22            Let me just say this:

23   If at any time anyone becomes

24   uncomfortable, or needs to take

25   a break, or needs to have a few

1    minutes, or if you cannot hear

2    for some reason, if you will

3    just get my attention, we will

4    accommodate you in any way

5    possible.

6         Yesterday I read the

7    indictments in these cases and

8    for answer to these indictments,

9    the defendant has entered a plea

10   of not guilty.  As I explained

11   to you yesterday, the

12   indictments are not evidence in

13   this case, this is just a manner

14   by which this case is brought to

15   trial in the courtroom setting.

16        Before we begin this

17   trial, let me explain to you how

18   we will proceed in these

19   matters.  The District Attorney,

20   Assistant District Attorney, Mr.

21   Jarrell, representing the State

22   of Alabama, will make an opening

23   statement of his case.

24        Counsel for the

25   defendant, Mr. Thomas, will then

1  make an opening statement

2  outlining his defense.  Each

3  side in the opening statement is

4  confined to an outline of the

5  case and a statement of what

6  they expect the evidence to

7  show.  This statement is

8  intended to familiarize you and

9  the Court with the case so that

10  we will be familiar with the

11  theory of each side from the

12  beginning.

13  An attorney is an

14  officer of the Court.  It is the

15  attorney's duty to present

16  evidence on behalf of his

17  client, to make objections as he

18  deems proper and to fully argue

19  his client's cause.  An

20  attorney's statements and

21  arguments are intended to help

22  you understand the evidence and

23  apply the law.

24  However, they are not evidence.

25  And you should disregard any

1    remark, statement or argument

2    which is not supported by the

3    evidence or by the law as given

4    to you by the Court.

5         Likewise, statements

6    made by the Court are not

7    evidence and are not to be

8    considered by you as evidence.

9         Following the opening

10   statements by the attorneys,

11   witnesses will first be called

12   by the State to testify.  After

13   the State has presented

14   witnesses, the defendant will

15   then be permitted to call

16   witnesses to testify.  All of

17   the witnesses will be sworn and

18   will testify under oath.  The

19   testimony will be evidence.

20   There may be exhibits offered,

21   which if received by the Court

22   will also be evidence.  It will

23   be upon all the evidence that

24   you will arrive at your final

25   verdict.

1          When a Judge and jury

2     sit together as a Court of law,

3     it is the duty of the Judge to

4     see that the trial progresses in

5     an orderly fashion and to rule

6     upon all legal matters that are

7     presented, to define the issues

8     involved and instruct the jury

9     as to the law applicable to that

10    particular case.

11          It will be your duty as

12    jurors to follow the law as

13    stated to you by the Judge.

14          You will therefore

15    render a verdict in accordance

16    with the facts as you determine

17    them to be from the evidence and

18    the law as given to you by the

19    Court.

20          You will be the sole

21    and exclusive judges of the

22    facts.  It will be your duty to

23    attempt to reconcile the

24    testimony of all of the

25    witnesses so as to make them all

1 speak the truth, if this can

2 reasonably be done.  If you

3 cannot reasonably reconcile all

4 of the testimony, it is then

5 your duty to consider the

6 testimony with a view of

7 determining what the true facts

8 are.

9   In so doing, you may

10 accept or reject any part of the

11 testimony of any witness and

12 accept only the testimony that

13 you consider worthy of belief.

14   As I said, during this

15 trial, I will rule on objections

16 by the attorneys to the

17 admissibility of the testimony

18 and other witnesses.

19   It is the duty of the

20 attorneys to make objections to

21 the offer of evidence which

22 counsel deems illegal or

23 improper.  You must not concern

24 yourself with the reasons of my

25 rulings.  They are controlled

1    and required by the rules of

2    law.

3              Do not speculate as to

4    possible answers to questions

5    which I do not require to be

6    answered.

7              The overruling of

8    objections to evidence is not

9    intended to indicate the weight

10   to be given such evidence by

11   you.  Such admitted evidence

12   will be considered along with

13   all of the other evidence.

14              You are to disregard

15   all evidence which may be

16   excluded by the Court.

17              After all of the

18   testimony and evidence is

19   received in this case, the

20   attorneys will again address you

21   in closing arguments.  The

22   attorneys have the right to

23   discuss the evidence and all

24   reasonable inferences drawn

25   therefrom to help you arrive at

1    a just and true verdict.

2          The district attorney

3    has the right to open the

4    arguments.  Mr. Thomas then has

5    the right to follow the opening

6    arguments.  Then the district

7    attorney has the right to final

8    closing argument in the case.

9          Following the arguments

10   of the attorneys, it will be the

11   duty of the Court to state to

12   you the applicable rules to

13   guide you in arriving at your

14   verdict.  This case will then be

15   submitted to you for your

16   deliberation and verdict.

17          Upon retiring to the

18   jury room to consider your

19   verdict, you will select one of

20   your number as foreperson to

21   moderate and to sign and return

22   any verdict arrived at by you to

23   the Court.

24          Now, ladies and

25   gentlemen, while you are outside

1        of the jury box or outside of

2        the courtroom, no person has the

3        right to talk to you about

4        anything concerning this case.

5        If someone should try to talk to

6        you about this case, please tell

7        them you are on this jury and

8        cannot discuss this case with

9        them.  If they insist on talking

10       with you, please make that fact

11       known to the Court.

12       Let me caution you, do

13       not try to make up your minds

14       about this case until you have

15       heard all of the evidence, the

16       arguments of the attorneys and

17       the charges of the Court.

18       Do not discuss this

19       case among yourselves if we are

20       on break or taking a recess

21       until you are back in the jury

22       room as a body, and the case has

23       finally been submitted to you.

24       If members of your

25       family or friends or anyone

1    should try to talk to you about

2    the case, tell them you are

3    under the Court's instruction

4    not to discuss this case.  When

5    the trial is over and your

6    verdict is rendered, you will

7    then be released from this

8    instruction, and you will be

9    free to discuss this case and

10   your experience as a juror, if

11   you choose to.

12          The attorneys and

13   parties and witnesses are not

14   permitted to talk to you during

15   the trial.  Even a discussion

16   which has no relation to this

17   case might give a bad

18   appearance.

19          If the participants in

20   the trial fail to greet you or

21   converse with you during the

22   trial, it will be due to this

23   rule.

24          While acting as a

25   Judge, I'm not permitted by law

1          to express my opinion or comment

2          on the effect of the evidence

3          presented or credibility of any

4          witness in the case.  Therefore,

5          any ruling or statement, or

6          expression which may be made by

7          me during the course of this

8          trial is not to be considered by

9          you as an effort on my part to

10         convey my feelings or opinions

11         about the facts of this case or

12         the credibility of any witness.

13              Mr. Jarrell, you may

14         give your opening, sir.

15              OPENING STATEMENTS

16    BY MR. JARRELL:

17              Thank you, Your Honor,

18         if it pleases the Court, defense

19         counsel, ladies and gentlemen,

20         as I told you yesterday twice, I

21         won't go into that, again, but

22         it is my privilege to be here

23         this morning to represent

24         actually you.  You are the State

25         of Alabama.  And today you are

44

1      the conscience of your

2      community. You are the State of

3      Alabama in a lot of respects.

4      And this case should be

5      important to you as it is to the

6      State, as it is to Mr. Williams

7      and the District Attorney's

8      Office.

9          I thank you very much

10     for the fact that you have taken

11     time from your business or your

12     pleasure, whatever, that you

13     would be doing today, whether it

14     be fishing or hard work, to come

15     here and do your civic duty as a

16     juror. That's what makes our

17     system work. That's what makes

18     it the best there is.

19         And today we are here

20     to try to find some closure for

21     a couple of young ladies that

22     had the opportunity that I hope

23     most of us don't ever have, and

24     that's to look death in the

25     face.

1              This case is about a

2    group of young men coming to

3    Troy and going to two different

4    businesses.  This is two

5    separate cases.  I want to be

6    sure you realize that.  Two

7    separate times where they come

8    to Troy, and they take a gun,

9    weapon, a pistol, and with that,

10   they take the money that these

11   people are enjoying in the

12   businesses they are in.

13              These ladies had to

14   look down the barrel of a gun,

15   and I hope you appreciate that

16   fact.

17              On December 21, 2002,

18   this group of young men from

19   Montgomery -- I think there were

20   possibly four of them.  They

21   came down here in a blue Blazer,

22   went to the Sunny South Station

23   here on 231.  I'm sure all of

24   you are familiar with it.  It's

25   a real nice Conoco gas station,

1      and they go in, mill around,

2      pick up items like they are

3      going to purchase and wait until

4      any other customers that are

5      there leave.  And then they

6      proceed to the cashier.  And

7      with a gun pointed at them, at

8      her, demanded the money, to give

9      it up.  That clerk was Ms.

10     Rebecca Holley.  She will be in

11     here in just a few minutes.  She

12     was running a few minutes late.

13            On December 29th, at

14     the BeeLine Station over on

15     Brundidge Street, Edith Thomas

16     was confronted the same way, the

17     same scenario, the same type of

18     vehicle, the same group of guys.

19     They came in, waited until

20     everybody else was out.  And

21     then they pulled a gun on the

22     cashier and demanded the money.

23            This all occurred right

24     at Christmas, one just before

25     Christmas, and one just after,

1    in 2002.

2             The Troy Police

3    Department, in investigating

4    this case, put out notices to

5    the other agencies around the

6    State of what they knew and

7    looking for similarities, or

8    whatever would help.  And the

9    blue Blazer seemed to be the

10   connector.

11            The Montgomery County

12   Police Department or Sheriff's

13   Department one, contacted us and

14   said these are some suspects

15   that you might want to

16   interview.

17            Corporal Greg Wright of

18   the Troy Police Department goes

19   to Montgomery and interviews Mr.

20   Bobby Williams.  During the

21   course of that interview, Mr.

22   Williams admitted to the robbery

23   at Sunny South and admitted to

24   the robbery at the Beeline on

25   Brundidge Street.

48

```
 1              I think the evidence

 2     will bear out that he will be

 3     pointed out as being the actual

 4     person who had the gun.  Whether

 5     he was or not, he was an

 6     accomplice in the group.

 7              And the Judge will

 8     explain when he reads to you the

 9     law at the end of the case, that

10     one is just as guilty as the

11     other, if it's done in a certain

12     concert, if all four are

13     involved, then all four are

14     equally guilty, regardless of

15     who had the gun or who was the

16     backup man to look.  They are

17     all equal.

18              We had a jury down in

19     Enterprise a couple of weeks

20     ago, a case that was rather

21     clear, ask why are we here, if

22     he admitted to this?

23              He has a constitutional

24     right to a trial, and we are

25     going to give it to him.
```

```
 1                      Thank you.

 2          THE COURT:  Mr. Thomas, you may give

 3              your opening, sir.

 4              OPENING STATEMENTS

 5   BY MR. THOMAS:

 6          MR. THOMAS:  I represent the Defendant,

 7              Bobby Williams, and he is

 8              obviously here today for one

 9              reason, because he did not reach

10              a plea agreement with the State,

11              because he wants to tell you he

12              is innocent, innocent of these

13              charges.

14                     We are not going to

15              contest the nature of the

16              crimes.  The two young ladies

17              were in fact robbed at gun

18              point.  And what happened was

19              very tragic and sad.

20                     We are here to state to

21              you that my client is a victim.

22              He was, the evidence will bear

23              that out, put into a full lineup

24              or perhaps no lineup at all,

25              thereby leading the two victims
```

```
 1              to believe that it was him

 2              improperly.

 3                      My client in fact plead

 4              guilty to some robbery charges

 5              in Montgomery.  That part is

 6              true.  It's true that the Troy

 7              Police Department became aware

 8              of the robberies in Montgomery.

 9              I'm not sure if Montgomery

10              contacted Troy or if Troy

11              contacted Montgomery.  But Troy

12              was looking for the person who

13              committed the robberies, which

14              we did not contest.

15                      At any rate, I think

16              the evidence will bear out that

17              the detectives went to

18              Montgomery and obtained a

19              photograph of this individual,

20              inserted him in a lineup that

21              was improperly conducted and

22              thereby ending up identifying my

23              client as the perpetrator.

24          MR. JARRELL:  I am going to object, Your

25              Honor.  He's made a statement
```

```
 1                    here that is totally unsupported

 2                    by any prior motion to suppress

 3                    or anything else, saying that a

 4                    photo lineup was improper.

 5                    That's a burden of proof that

 6                    should not be brought up at this

 7                    point at all.

 8        MR. THOMAS:  Suppression issues can be

 9                    raised in trial.

10        MR. JARRELL:  We're not in trial.

11        THE COURT:  Ladies and gentlemen, as I

12                    explained to you earlier,

13                    opening statements are intended

14                    to be an outline of what these

15                    attorneys expect to show at

16                    trial.  They are confined to

17                    what they expect to show at

18                    trial.  And if your opinion of

19                    the testimony is any different

20                    from that, that would be for you

21                    to decide.

22                         But I think at that

23                    point since there has not been a

24                    determination as to whether or

25                    not that -- a threshold inquiry
```

```
 1                      to that, that would be improper

 2                      argument.  So, sustained, at

 3                      this time.

 4            MR. THOMAS:  This is going to be a

 5                      difficult case in terms of the

 6                      data that we have to keep up.

 7                      Because there is Ms. Edith

 8                      Thomas, who is employed by the

 9                      BeeLine; and Ms. Rebecca Holley,

10                      who is employed by Sunny South.

11                           Each of them will

12                      testify about identification.

13                      This will be a trial about

14                      identification.  There will be

15                      an officer testifying about

16                      identification, perhaps two

17                      officers.  So there will be a

18                      lot to follow.  And because of

19                      that, I am going to lay some

20                      pads and pens on the corner

21                      here.  If any of you want to use

22                      them, they are right here.  If

23                      you want to take notes, they are

24                      available.

25                           I tried to equal Troy
```

1     Bank and First National pens,

2     not to favor any of the local

3     banks.

4       I believe that when we

5     are done you are going to learn

6     that my client is a victim of a

7     misidentification.

8       Thank you.

9     (Off-record discussion)

10   THE COURT:  Since we have a courtroom to

11     use, we might as well use it.

12     This is a little uncomfortable

13     to say the least.  It's about 20

14     until.  Why don't we take about

15     10 minutes, and we will gather

16     up in the courtroom.  If y'all

17     will just have a seat in the

18     jury box, and we will move

19     around.  Thank you.

20     (Jurors exited).

21   THE COURT:  Let the record reflect we

22     are outside of the presence of

23     the jury.

24       Mr. Thomas.

25  MR. THOMAS:  Judge, yesterday Mr. Jarrell

```
 1              and myself reached an agreement

 2              that we would stipulate the use

 3              of the transcript of the

 4              preliminary hearing.  And I

 5              would like to go ahead and

 6              establish that so that when it

 7              comes out during the course of

 8              the trial, there will be no need

 9              to address that.

10       MR. JARRELL:  No problem.

11              (A short recess was taken).

12

13       THE COURT:  Maybe this will work a little

14              better.

15                   Mr. Jarrell, you may

16              call your first witness.

17       MR. JARRELL:  Larry Ross.

18

19

20

21

22

23

24

25
```

<u>LARRY ROSS</u>

1

2          Whereupon, this witness, after first

3   being duly sworn to tell the truth, the whole

4   truth, and nothing but the truth, testified as

5   follows, to-wit:

6                   <u>DIRECT EXAMINATION</u>

7   <u>BY MR. JARRELL:</u>

8          Q       State Your Honor, sir, and where

9   you were employed?

10         A       Larry Ross.  I'm a detective with

11  the Troy Police Department.

12         Q       And, Detective Ross, were you so

13  employed back in December of 2002?

14         A       Yes, sir.

15         Q       On that date were you called to be

16  involved in investigating a robbery that

17  occurred out at Sunny South?

18         A       Yes, sir.

19         Q       And what did you determine in the

20  course of your investigation that went on there

21  that day?

22         A       According to the clerk's testimony,

23  two black males came in, purchased a --

24         MR. THOMAS:  I object to hearsay, what

25                 the clerk said.

1        THE COURT:  Sustained.

2        Q        Were you involved in anyway in the

3    investigation in determining whether there was

4    any physical evidence left at the scene?

5        A        I processed the scene for

6    fingerprints.

7        Q        Were you able to determine any

8    match for the fingerprints?

9        A        There was one match from what I

10    raised that night.  And it was James Night.

11    That was the only print that they were able to

12    match up.

13        Q        Now, we see a lot of television

14    where they can get fingerprints off a

15    papersack.  Is it uncommon for you not to find

16    fingerprints --

17        A        No.

18        Q        -- that are usable?

19        A        It's very rare that you find some

20    that are.

21        Q        In the course of your

22    investigation, did you determine that there was

23    a vehicle or type of vehicle, that was used by

24    the person that came there?

25        A        The next day we had a subject call

1    the station that he had seen --

2         MR. THOMAS:    I object to what somebody

3    .cq 0 15 0

4    said.

5         MR. JARRELL:    It's not offered for the

6    truth of the matter asserted,

7    Your Honor, but the fact that

8    there was something that was

9    brought to the attention to a

10   particular vehicle.  We will

11   determine later on if that was

12   the vehicle.

13        THE COURT:    Sustained as to what he told

14   him.  The question was, did you

15   have a BOLO out on a particular

16   vehicle.

17        THE WITNESS:    Yes, we did.

18        Q      And was that BOLO or alert -- and

19   that's be on the look out for, is it not?

20        A      Right.

21        Q      Was that responded to by any other

22   agency?

23        A      Yes.    Montgomery.

24        Q  .   What agency?

25        A      Montgomery P.D. called us.

```
 1          Q      And based on the information from

 2    the Montgomery Police Department, did you

 3    develop any suspects?

 4          A      Yes.

 5          Q      And was Mr. Williams one of the

 6    suspects?

 7          A      Yes, he was.

 8          Q      Did you go to Montgomery to further

 9    investigate, to talk with Mr. Williams?

10          A      Myself and Detective Greg Wright

11    went to the Montgomery County Jail to talk to

12    them.

13          Q      Why did Greg Wright -- why was he

14    involved?

15          A      We had another robbery at the

16    BeeLine on South Brundidge Street.

17          Q      And were there similarities in

18    these robberies?

19          A      Not really.  I mean they basically

20    went and robbed the place.  You know, nothing

21    that you could tie the two together with, for

22    sure.

23          Q      At that point?

24          A      At that point, yes, sir.

25          Q      Were you present during an
```

1    interview of Mr. Williams?

2         A    The initial point of the interview,

3    I was there.

4         Q    And were you involved in any way in

5    informing the defendant of his rights?

6         A    When we first started the

7    interview, we didn't have a rights form with

8    us.  I read him his rights from memory.  We

9    decided to stop there.  We never questioned

10   him.  And myself and a Montgomery detective

11   went back to the Police Station.  And Mr.

12   Wright found a Right's Form at the jail and

13   read him his rights, again.

14        Q    I ask if you can identify this

15   form?  It's offered as State's Exhibit No. 1?

16        A    Yes.  That's the form that he

17   used.

18        Q    And are these the rights that you

19   went over with him?

20        A    They are the same, yes.

21        Q    Do you know whether anyone else

22   went over them, again?

23        A    Detective Wright read it from that

24   list.

25        Q    But you had gone over similar

1   rights just from memory?

2       A     Yes.

3       Q     And then you got this form, and

4   they were gone over with him, again?  Correct?

5       A     Yes.

6       Q     At any time did you apply any force

7   or coercion or anything of that nature to get

8   Mr. Williams to agree to talk to Detective

9   Wright?

10      A     No, sir.

11      Q     The Sunny South Station, who does

12  that belong to?  What is the legal name, if you

13  recall?

14      A     Norman Oil.  Is that it?  Is that

15  the legal name?

16      Q     Ms. Norman is here in the

17  courtroom.  It's her business.  But I believe

18  the indictment read that it was called Sunny

19  South, L.L.C?  Does that ring and bell?

20      A     Yes.

21      Q     Is that station located within Pike

22  County, Alabama?

23      A     Yes, it is.

24      MR. JARRELL:  Your witness.

25

1

2                        CROSS EXAMINATION

3    BY MR. THOMAS:

4         Q      Mr. Ross, you stated that there

5    were no fingerprints found at the scene?

6    Correct?

7         A      There was one fingerprint that

8    matched that belonged to James Night.

9         Q      But no fingerprints were found on

10   any of the three people who were accused of

11   participating in the robbery?  Is that a

12   correct statement.

13        A      That's correct.

14        Q      Is there any physical evidence

15   within the department's possession to prove or

16   tie Mr. Williams to this crime?

17        A      No.

18        Q      Is there any video surveillance at

19   the Sunny South that would have captured

20   anybody in the store that evening?

21        A      No.

22        Q      And it's your testimony that you

23   were not present for the entire interview with

24   Mr. Williams, in which you and Detective Greg

25   Wright were present in Montgomery?

1       A       That's right.

2       Q       And this interview did take place

3  in Montgomery?

4       A       Montgomery County Jail.

5       MR. THOMAS:  That's all I have.

6       THE COURT:  Redirect?

7       MR. JARRELL:  Nothing further.

8       THE COURT:  Call your next witness.

9       MR. JARRELL:  Greg Wright.

10                  GREG WRIGHT

11       Whereupon, this witness, after first

12  being duly sworn to tell the truth, the whole

13  truth, and nothing but the truth, testified as

14  follows, to-wit:

15                  DIRECT EXAMINATION

16  BY MR. JARRELL:

17       Q       State your name, sir, and where you

18  are employed?

19       A       Detective Greg Wright.  Troy Police

20  Department.

21       Q       And were you so employed on

22  December of 2002?

23       A       Yes, sir, I was.

24       Q       On that occasion, were you involved

25  in the investigation of a robbery at a business

```
1    here in Troy?

2         A     Yes, sir, I was.

3         Q     What business was that?

4         A     The BeeLine Store located on

5    Brundidge Street.

6         Q     And who was the clerk on duty

7    there?

8         A     Ms. Edith Thomas.

9         Q     Is Ms. Thomas here in court?

10        A     Yes.

11        Q     Is she the black lady there in --

12        A     In the red shirt, yes, sir.

13        Q     Was there any type of video

14   surveillance of that?

15        A     Yes, sir, there was.

16        Q     And do you have a copy of that

17   video?

18        A     Yes, sir, I do.

19        Q     Before we get to that, did this

20   station, or does this station or business, is

21   it in Pike County, Alabama?

22        A     Yes, sir, it is.

23        Q     And during the course of your

24   investigation, did you get some information

25   that lead you to Mr. Bobby Williams as a
```

1    suspect?

2          A        Yes, sir, I did.

3          Q        Did that come from Montgomery?

4          A        Yes, it did.

5          Q        Did you go to Montgomery to

6    interview Mr. Williams?

7          A        Yes, sir.  Myself and Corporal

8    Ross.

9          Q        And in the course of that

10   interview, did you go over with him his

11   constitutional rights?

12         A        Yes, sir, I did.

13         Q        And I am going to show you what is

14   marked as State's Exhibit No. 1 and ask if you

15   can identify that, sir?

16         A        Yes, sir, I can.

17         Q        And does that -- what is that form?

18         A        It is the Montgomery County

19   Sheriff's Department Miranda Rights form.

20         Q        When we say Miranda Rights, would

21   you explain to the ladies and gentlemen of the

22   jury what that is?

23         A        Your constitutional rights which

24   gives you the right to refuse to give a

25   statement to any law enforcement officer.

1    Q    And given each one of those rights.

2    A    Okay.  It reads, the constitutional

3    rights are according to Miranda Warnings, the

4    first question is:  You have the right to right

5    to remain silent.  Anything you say can and

6    will be used against you in a court of law.

7    You have a right to talk to a lawyer and have

8    one present while being questioned.  If you

9    cannot afford to hire a lawyer, one would be

10   appointed to represent you for those questions,

11   if you wish.  If you decide at any time to

12   exercise your right to not answer these

13   questions or give any statements.

14        Underneath there, it has two questions --

15   excuse me -- two statements that says, do you

16   understand each of these rights that I have

17   explained to you.  And we check off as they

18   answer.  If they say no, we check, no.  If,

19   they say, yes, we check, yes.

20        The second one says, having these rights

21   in mind, do you wish to talk to us now?

22   Depending on what the reply, we check that

23   particular block.

24        Q    Did you go over those rights with

25   Mr. Williams, individually?  Did you take each

```
 1   one of them separately?

 2         A     Yes, I did.

 3         Q     Did you determine from him with a

 4   response to each one of those?

 5         A     Yes, sir.

 6         Q     Were you satisfied with his

 7   response that he understood what that right

 8   was, when you give it to him?

 9         A     Yes.

10         Q     Did you determine prior to going

11   through these that he could read and right?

12         A     Yes, sir.  Also it asks for the

13   level of education completed, to circle.

14         Q     What was that in this case?

15         A     He indicated to me that he had a

16   9th grade education, and that he could read and

17   write.

18         Q     And he could read and write?

19         A     Yes, sir.

20         Q     Now, was there any force or

21   coercion or inducement applied to Mr. Williams

22   as to get him to talk with you?

23         A     No, not at all.

24         Q     In your opinion, based on your

25   conversation with him, did you determine that
```

```
1    he was doing what he was doing voluntarily?

2         A      Yes, sir.

3         Q      Did he make a statement to you?

4         A      Yes.

5         Q      What did he tell you about the

6    first time that he came to Troy?

7         MR. THOMAS:  We object to the statement.

8                   The audio tape would be the best

9                   evidence which would go to jury.

10        MR. JARRELL:  Your Honor, I was asking

11                  for a brief statement.  But I

12                  can offer the,  or I will be

13                  offering the transcribed

14                  statement, as well.  But I

15                  believe the jury is entitled to

16                  at least a similar synopsis, and

17                  then, they can refer to the

18                  written statement as to whether

19                  to believe the detective or not.

20        THE COURT:  Overruled.

21        Q      What did he tell you in the

22   statement?

23        A      About -- on the first one or the

24   second one?

25        Q      The first one.
```

1       A       He explained to me that he road

2   along with three other individuals.   They came

3   to Troy.   He couldn't basically describe the

4   area of Troy, because he said that he wasn't

5   familiar with Troy.   He said the best that he

6   knew it was across from K.F.C., the Conoco

7   Station.

8       Q       That would be the Sunny South?

9       A       Yes, sir.

10      Q       What did he tell you they did after

11  he got in?

12      A       They pulled in front of the store,

13  went inside, made some purchases, and waited

14  around until everybody left the store.

15      Q       Then what did he do?

16      A       They proceeded to rob the store.

17      Q       And the second occasion, on the

18  29th of December?

19      A       They returned back to Troy on the

20  same vehicle, a blue Blazer.   I asked him did

21  he recall where they parked.   He said that he

22  couldn't recall exactly where.   They got out of

23  the vehicle and went inside, made a purchase.

24      He was at the counter, and that's when he

25  basically -- didn't give a statement, I had it

1    on video tape.  The video tape shows a person

2    of his stature and description.  It picks up

3    and he's going to the counter, and it goes out

4    of range of the camera.  There is a persons

5    with the cap, that goes around behind the

6    counter and also goes out of camera view.  She

7    advised that the person that came behind her,

8    and took her purse and belongings.

9         Q    Did she -- Did he advise you that

10   he got proceeds from both of those robberies?

11        A    On the first one, he advised me

12   that they parked at a trailer park, split the

13   money up.  He said it was less than a hundred

14   dollars that they got out of the Conoco

15   Station, at Sunny South.

16             On the second one, he advised that

17   someone else brought the purse to the car.  He

18   advised that he had no participation as far as

19   taking the purse.  But I can't recall what he

20   said about how the money was distributed on the

21   second one.

22        Q    To clarify, he said that he didn't

23   take part in taking the purse?

24        A    Right.

25        Q    But you indicated a moment ago, if

1   I'm correct, that the video shows someone of

2   his description going to the cashier, and then

3   leaving, and somebody else goes around and gets

4   the purse?

5       A    Right.

6       Q    That does not match his

7   description?

8       A    Right.  According to her the

9   individual that she described came to the

10  counter, made a purchase.  And advised her to

11  give it up.  She said that she backed away from

12  the counter to see if he would touch the

13  register to get fingerprints.  She advised that

14  she back off the counter.  And he pointed a gun

15  and told her to give him the money.  And she

16  gave him the money.  And that's when the

17  individual came behind her, getting her purse.

18      Q    You said that you had a video tape

19  with you, I believe, here?

20      A    Yes, sir.

21      MR. JARRELL:  If you would get the

22          machine out.

23      Q    I show you what is marked as

24  State's Exhibit No. 2, which is a transcribed

25  statement of your interview, a transcription of

```
 1   the interview that you made in Montgomery, is

 2   it not?

 3          A      Yes, sir, it is.

 4          Q      Have you had the opportunity to

 5   review it for accuracy?

 6          A      Yes, sir.

 7          Q      Is it accurate?

 8          A      Yes, sir, it is.

 9          MR. JARRELL:  The State at this time

10                     offers State's Exhibit No. 1 and

11                     2.

12          MR. THOMAS:  Judge, we take exception to

13                     that.  The audio tape in and of

14                     itself is the best evidence of

15                     what was said, not the

16                     transcription, which is the

17                     recorder's interpretation of

18                     what he said was on the audio

19                     tape.  We move that the written

20                     statement be excluded, but we

21                     have no exceptions to the audio

22                     tape.

23          THE COURT:  If counsel will approach.

24                  (Counsel approached the bench, and

25   the following was heard out of the hearing of
```

```
 1   the jury).

 2         THE COURT:  Have you had an opportunity

 3                     to review the tape against the

 4                     transcript for accuracy?

 5     MR. THOMAS:  Yes, sir.

 6     THE COURT:  Is there anything on there

 7                     that is inaccurate?

 8     MR. THOMAS:  There are parts that are

 9                     hard to know, but I will concede

10                     that the majority of it, you can

11                     with a good set of headsets.

12                     But there are parts of it with a

13                     headset that I can't make out.

14     THE COURT:  Well, this police officer has,

15                     in my mind, authenticated that

16                     and identified that.  But I will

17                     allow you to introduce the tape

18                     recording.  And during cross

19                     examination you can bring out

20                     those points.  But, if you have

21                     reviewed it, and he says that he

22                     has reviewed it, and it's an

23                     accurate transcription of that

24                     tape, the objection is overruled

25                     and it's admitted.
```

1          (The following was heard in the hearing

2          of the jury).

3          THE COURT:  You may continue.

4          (The tape was played for the jury).

5          Q      (By Mr. Jarrell) The audio of that

6    tape doesn't show a whole lot, does it?

7          A      No, sir, it does not.

8          Q      Do you find that fairly common with

9    most video tapes on these surveillance cameras?

10         A      Yes.  It's very poor quality of

11   view.

12         MR. JARRELL:  Your witness.

13                CROSS EXAMINATION

14   BY MR. THOMAS:

15         Q      Mr. Wright, Detective Wright, you

16   drove to Montgomery to take that statement?

17   Correct?

18         A      Yes, sir, I did.

19         Q      And you testified earlier that you

20   had developed Mr. Bobby Williams as a possible

21   suspect based on some robberies in Montgomery

22   County?

23         A      Based upon the previous Sunny South

24   robbery and the robbery in Montgomery, yes.

25         Q      Had he already been charged with

1   those crimes in Montgomery County at the time

2   you were with him?

3       A     Yes, sir, he had.

4       Q     His statement that he provided, is

5   the entire statement contained on the

6   transcript and audio tape?

7       A     No, sir, it's not.

8       Q     How long had you spoken with

9   Mr. Williams prior to turning the tape recorder

10  on?

11      A     Fifteen or 20 minutes, maybe.

12      Q     During the course of that interview

13  with Mr. Williams, you discussed the Montgomery

14  robberies, as well?  Correct?

15      A     I asked him about what happened in

16  the Montgomery robberies and what the charges

17  were, and why he was there.

18      Q     Short of the dispatch from

19  Montgomery identifying him as a suspect in the

20  Montgomery robberies, did you have any evidence

21  tying him to the robbery at all?

22      A     We had evidence tying an individual

23  fitting his description.  As far as a name and

24  possible location, no, we did not and a vehicle

25  description.

1        Q        Now, you said that you had a name?

2        A        We did not have a name.

3        Q        You did not have a name.  So

4    basically he was developed as a suspect in this

5    robbery because he was identified as a possible

6    suspect in Montgomery County?

7        A        There was some other statements

8    that were given by juveniles that overheard

9    conversations of Mr. Williams and other

10   individuals about the robberies in Montgomery.

11   So all of that added up to that, also.

12       Q        In the course of your interview

13   with Mr. Williams, did you make a statement to

14   him that you knew his father?

15       A        Yes, sir, I did.

16       Q        Okay.  Is his father's name John

17   Foster?

18       A        Yes.  I asked who his father was.

19   And I said, yeah, I know your father.

20       Q        How did you know his father?  Mr.

21   Foster?

22       A        From previous -- as a police

23   officer.

24       Q        How many years ago would that have

25   been?

1      A       Several years ago.  Over five at

2   least.

3      Q       Okay.  And prior to turning the

4   tape recorder on and taking the statement, did

5   you make representations to Mr. Williams that

6   you had helped his father in the past, and that

7   you would like to help him, too?

8      A       Yes, sir.

9      Q       Prior to you turning the tape

10  recorder on, did you go over the evidence that

11  you had on this case, that you were

12  representing to be against my client?

13     A       I don't think I went over very much.

14  I explained why I was there, how I got the

15  information from the officers, as far as the

16  evidence I received.

17     Q       Did you represent to him that you

18  had a video tape?

19     A       During the taped statement, yes,

20  it's depicted on that, as well as being

21  transcribed.

22     Q       Did you represent to him that there

23  were two eye witnesses that could pick him

24  out?

25     A       No.  I don't recall saying that.

1      Q      But we don't know because we don't

2  have the full tape, do we?

3      A      I recall telling him that I had an

4  individual that overheard him bragging about

5  the robberies.  But as far as an eye witness, I

6  don't recall that.

7      Q      You don't recall mentioned that the

8  two store clerks got a full face view of the

9  robbers?

10     A      He knew that.

11     Q      He knew that?

12     A      Yes.

13     Q      And did you represent that as

14  possible evidence against him, prior to making

15  this promise to him to help him?

16     A      I may have.  I don't recall that.

17     Q      Was he already charged -- well,

18  we've answered that.  Had he already given

19  statements that he was in fact involved in

20  these Montgomery County robberies?

21     A      Specifically, to the detective in

22  Montgomery County, I'm not sure whether we got

23  in-depth about him confessing to the crimes or

24  not.  I think they had a video tape, also.  So

25  I'm not sure what the basis they would have

1    that.

2         Q    Isn't it true that he had already

3    given a statement to the Montgomery County

4    robberies priors to you taking his statement?

5         MR. JARRELL:  Object to the relevance,

6                    Your Honor.  We are not here on

7                    the Montgomery County robberies.

8         MR. THOMAS:  The relevance is the

9                    suppression.

10        THE COURT:  The weight to be afforded is

11                    certainly a jury issue, so

12                    overruled.

13        Q    Just so it's clear, do you know one

14   way or the other whether he had already given a

15   statement to the Montgomery County authorities?

16        A    No, sir, I do not.

17        Q    Mr. Wright, is it not possible that

18   he thought he was giving you a statement or

19   amplifying or clarifying a statement that he

20   had already given to the Montgomery County

21   authorities about a Conoco Station that he

22   robbed in Montgomery?

23        MR. JARRELL:  Objection.  That calls for

24                    speculation on the part of the

25                    witness.

1      MR. THOMAS:  Your Honor, if I can rebute?

2      THE COURT:  Go ahead.

3      MR. THOMAS:  The detective had knowledge

4      of the robberies in Montgomery,

5      is my understanding.  He had

6      discussed it with the Montgomery

7      County authorities.  So he does

8      have knowledge of what occurred

9      in Montgomery County.  And I

10      believe that's a basis for the

11      suppression.

12      THE COURT:  Well, you can go into that,

13      but I sustain as to the form of

14      that question.

15      Q    Could my client have been operating

16  under the belief that he was talking to you

17  about robberies that occurred in Montgomery

18  County?

19      MR. JARRELL:  Objection.  He cannot go

20      into the mind of the defendant.

21      THE COURT:  Sustained.  You need to

22      rephrase your question.

23      Q    He was interviewed in the

24  Montgomery County Jail?  Correct?

25      A    Yes, he was.

1        Q        And he was up there for robberies

2    that he was developed as a suspect on in

3    Montgomery County?  Correct?

4        A    Yes.

5        Q        Going back to the evidence, short

6    of the identification of a robbery in

7    Montgomery County, do you have any physical

8    evidence, with the exception of the video tape,

9    that ties my client to this BeeLine robbery?

10        A        Other than the statement I got from

11    the actual clerk that was there and the issue

12    that she picked him out of the photo lineup.

13    That's all I have.

14        Q        Okay.  Was a gun -- is there a gun?

15        A        There was a gun that was involved,

16    yes.

17        Q        Was there a gun physically

18    recovered?

19        A    No, sir.

20        Q        Were there fingerprints at the

21    BeeLine?

22        A    No, sir.

23        Q        Was Ms. Edith Thomas able to do any

24    type of sketch that would have identified my

25    client as the culprit in the crime?

1          A          No, sir.

2          Q          Did she provide you with a

3     description?

4          A          Yes, she did.

5          Q          I'm going to call this Sunny South

6     (indicating).  So no gun?  Is that correct?

7          A          We don't have one in our

8     possession.

9          Q          There were no fingerprints.

10    And the jury is about to learn that not only

11    am I bad with grammar, but I'm a bad speller,

12    too.  That's why I went to law school.

13               On the identification, can you

14    provide me with, from your file, the

15    description provided by Ms. Edith Thomas?

16         A          She gave a description of three

17    individuals that entered the store.  The very

18    first one was a black male, very slender,

19    5"9 to 5"10, light complexion, long hair pulled

20    back, at that particular date and time was

21    wearing baggy jeans with and emblem over the

22    pocket.

23         Q          Let me stop you right there, and

24    let me write these.  It's come to be very

25    difficult with so many people involved in these

1    two robberies, it's going to be very difficult

2    for us to keep us with where we are actually

3    talking about.

4            The description that you are going

5    through right now, is that tied to Mr. Williams

6    or one of the other two or three people who

7    were charged with the robbery.

8            A    Mr. Williams.

9            Q    Okay. So, let's start from the

10   beginning on that. Start over, please

11           A    Black male, very slender

12           Q    Okay. Slender.

13           A    5"9 to 5"10 in height. Light

14   completion.

15           Q    Light complexion. Okay. What

16   about clothes?

17           A    Do you want me to continue with

18   the description?

19           Q    Yes.

20           A    Long hair, pulled back.

21           Q    Long hair, pulled back.

22           A    Tattoo on the left hand or arm

23   area.

24           Q    Tattoo on arm. Okay. My writer

25   is going out. Okay. Go ahead.

83

```
1          A       Baggy jeans and Fat Albert emblem
2    on it.
3          Q       Baggy jeans?
4          A       uh-huh.
5          Q       What color were the jeans?
6          A       Didn't say.  I am assuming blue
7    jeans.
8          Q       So you don't know.  I am going to
9    put color, question mark, baggy jeans.  Okay.
10         A       Button-up short sleeve shirt with a
11   white thermal shirt.  Short.
12         Q       A short-sleeve shirt, you are
13   saying?
14         A       Right.
15         Q       What color?
16         A       The shirt was dark.  I believe
17   blue.
18         Q       Dark blue?
19         A       Possibly blue.
20         Q       I'm going to put a blue, question
21   mark.  Okay?
22         A       Tennis shoes.
23         Q       Tennis shoes.  Anything else?
24         A       That's all.
25         Q       No mention of anything else in
```

84

1    terms of clothing or body or build or weight?

2         A     I believe she said he had like

3    shadow, possibly a mustache.

4         Q     She said mustache.  Bear with me

5    just a second.  This is the BeeLine -- this is

6    identification provided by Mrs. Edith Thomas?

7    Correct?

8         A     That's correct.

9         Q     What about weight?  You have a

10   height.  Did we get a weight?

11        A     No, sir.

12        Q     No weight.  We will put right here

13   by this, no weight.  Okay.  In your looking at

14   your official, I guess your investigative notes

15   there?  Is that correct?

16        A     Yes, sir.

17        Q     Would those be the investigative

18   notes that you have had since this process

19   started?

20        A     This is a copy that we posted on

21   the bulletin board for our patrol officers to

22   see in relation to the robberies, so if they

23   came in contact with anyone fitting that

24   description, they would know to stop them and

25   notify us.

85

1        Q      Would there by any other notes that

2  you made besides those that you just read from?

3        A      That's it.

4        Q      That's it?

5        A      I don't understand what other type

6  of notes.

7        Q      I'm just trying to find out if you

8  had anything else in your file to reflect the

9  description besides what we just read to the

10  jury.

11        A      This is a typed copy.  I'm sure

12  there's a rough draft copy that I got from

13  here.

14        Q      I want to take you back a few

15  minutes to the preliminary hearing.  Do you

16  recall testifying at the preliminary hearing?

17        A      Very little.

18        Q      Okay.  What I'm going do is, call

19  this the BeeLine trial.  I'm going to call the

20  next one I.D. BeeLine preliminary hearing.

21        Detective Wright, I'm going to give you a

22  copy of the transcript of the preliminary

23  hearing that we've stipulated that would be

24  used.  Can you turn to page 40 for me, please,

25  sir.

86

1          A       Okay.

2          Q       Do you recall having testified at

3    the preliminary hearing that Ms. Edith Thomas

4    identified the suspect as 145 or 150 pounds?

5          A       That's what is here in the notes,

6    yes, sir.

7          Q       Beg your pardon?

8          A       That's what is in the notes.

9          Q       Would you agree that's your

10   testimony at the preliminary hearing.

11         A       If this is a true depiction of what

12   I said, yes, sir.

13         Q       Would it appear that she did give

14   an estimate of the weight in retrospect?

15        ' A      Yes.

16         Q       The preliminary hearing would have

17   been conducted on April the 8th of 2004, I

18   believe -- three?  April 8th of 2003.

19         A       Yes.

20         Q       That would have been closer in

21   time, I suppose, to the offenses for which my

22   client is charged with.  Now, then, let's go to

23   what he was wearing.

24         Here, you said that he was wearing a

25   white pullover sweater?  Is that correct?

87

```
1          A       Yes.

2          Q       Okay.   A white pullover sweater.

3    Okay.   And here you said bushy afro hair?   Is

4    that correct?   Did you describe -- In other

5    words, Edith Thomas identified this person as

6    having bushy afro hair?   Is that correct?

7          A       Yes.

8          Q       Now, then, at the time -- hold on

9    just a second, please.   And we will just put

10   dark jeans.   Now, at the time that you first

11   interviewed Ms. Edith Thomas, y'all did not

12   have a suspect?   Is that correct?

13         A       No, sir.

14         Q       At what point in time were you able

15   to obtain a picture of who you believed to be

16   the person that did it?

17         A       After I went to Montgomery County.

18         Q       What date would that have been on?

19         A       The same day of the interview.   Let

20   me look in my notes.   The 13th of January.

21         Q       Okay.   I'm going to write here that

22   the picture of Williams was discovered, you

23   said on the 13th?

24         A       The 13th.

25         Q       January the 13th?
```

88

```
 1          A       Right.

 2          Q       And that would have been on the

 3   13th.  So at the time that you conducted the

 4   interview with Ms. Thomas, you didn't have a

 5   picture to go by?  Right?

 6          A       That's correct.

 7          Q       She was describing him as best she

 8   knew how?

 9          A       Right.  Yes.

10          Q       Now, I want to take you back to the

11   video that we just played.  By the way, do you

12   have a picture there in your file of the

13   suspect from Montgomery?

14          A       You mean Mr. Williams?

15          Q       Mr. Williams, yes.

16          A       Yes, sir, I do.

17          Q       Can I see that please?

18          A       Sure.

19          Q       Who put this particular lineup

20   together that you just handed me?

21          A       The detective from Montgomery

22   County.

23          Q       So this is Montgomery County's

24   lineup?  Excuse me.  Montgomery Police

25   Department.
```

89

```
 1          A      Yes.

 2          Q      And which one of these -- is

 3   number 2, the middle top?

 4          A      Yes.

 5          Q      In that picture, I see -- I'm going

 6   to hand you the picture back.  I don't want to

 7   walk off with it -- I see that he has an afro,

 8   bushy hair?  Is that correct?

 9          A      That's correct.

10          Q      And when you interviewed my client,

11   you had no picture of the defendant?  Correct?

12   At the time you interviewed him after the

13   robbery?  No picture of the defendant?  Right?

14          A      No.

15          Q      And, Detective Wright, if you

16   can't see, you can walk around, sir.

17                 (The tape was played for the jury).

18          Q      Detective Wright, do you mind

19   coming around, sir, because I do want you to

20   see it.

21          A      I'm fine.

22          Q      You can see it okay?

23          A      Yes.

24          Q      We are on 1758, if that means

25   anything.
```

90

```
1          A       Do you want me to slow it down?

2          Q       Yes.  If you could slow it down

3    that would help a lot.

4                  This is where it starts?

5          A       Right.

6                  (Tape continued to play).

7          Q       Pause it right there for me.  And,

8    you can, just stand right there.

9                  This is the BeeLine on South

10   Brundidge Street?

11         A       Yes.

12         Q       And I'm assuming that as we look at

13   this picture, the entry door is right here?  Is

14   that correct?.

15         A       Yes, sir, it is.

16         Q       So if this is the building, this is

17   where you walk straight in, and the counter

18   would be immediately to your left?  Is that

19   correct?

20         A       Right.

21         Q       Right in there.  Okay.  The part

22   that you really don't get captured on the

23   camera?

24         A       There was a camera there, according

25   to the manager of the store, that didn't
```

91

1    function at that time.

2           Q       Now, my client was identified by

3    Ms. Edith Thomas as the person holding the gun?

4    Correct?

5           A       Correct.

6           Q       The very person that walked through

7    the door.

8           A       Right.

9           Q       My client is also identified as

10   wearing a pullover -- white pullover sweater?

11          A       No, sir.  That's not what I

12   testified to at the preliminary hearing.

13          Q       But you testified at grand jury she

14   gave a statement that the gunman --

15          MR. JARRELL:  Objection to what was

16                   testified to in grand jury.

17          MR. THOMAS:  It was the preliminary

18                   hearing.

19          MR. JARRELL:  The preliminary hearing is

20                   fine.  The grand jury is not.

21                   You know that's not proper.

22          MR. THOMAS:  It was an oversight on my

23                   part.

24          Q       At the preliminary hearing you

25   testified that the gunman, Mr. Bobby Williams,

92

1    was wearing a white pullover sweater?

2         A    Yes.

3         Q    You also testified that he had

4    bushy, afro hair and dark jeans.  And then

5    today at trial you testified slender, no

6    weight, 5'9", light complexion.  Now, light

7    complexion didn't come up at the preliminary

8    hearing, I don't think.

9         MR. JARRELL:  Page 41.

10        Q    Going back to the video right here,

11   and you are much better than I am.  Could you

12   rewind that for me a little bit, please?

13   Rewind it where all three come together.

14        A    I can't get it.

15        Q    Let's just continue to let it play.

16   This is the gentleman right here with the white

17   pullover shirt.  But he is wearing a hat, I

18   see.

19        A    Right.

20        Q    Okay.  And he walks around the back

21   right here.

22        MR. JARRELL:  We object to the narration

23             of the defense counsel.

24        MR. THOMAS:  It's necessary for the

25             record.

```
1              MR. JARRELL:  The jury can see the video.

2                            They can make their own

3                            interpretation.

4              MR. THOMAS:  Judge, there is no other way

5                            to get through this for the

6                            record.

7              THE COURT:  Objection overruled.  If

8                            that's not what is on the tape,

9                            and I can't see the tape, the

10                           witness can respond to that in

11                           some way or another.  Go ahead.

12                           Overruled.

13        Q      The gentleman with the white shirt,

14   was he the one that was walking around this

15   back wall?

16        A      Yes, sir.  But that is not the

17   white pullover shirt I was referring to at the

18   preliminary hearing.

19        Q      Okay.  Were any of the other two

20   individuals wearing a white pullover shirt?

21        A      Yes, sir, underneath another shirt.

22        Q      Okay.  Let's go back here.  I

23   don't recall or remember seeing any mention of

24   a white pullover shirt.

25        A      You didn't hear anything about that
```

1    because you referred that back to the

2    preliminary hearing.   I said earlier that he

3    had a white shirt described as being

4    thermal-type shirt.

5         Q     Okay.  A white thermal type shirt.

6         A     Underneath another shirt.

7         Q     But at the preliminary hearing, it

8    was a white pullover shirt?

9         A     That's what I said.  If I said that

10   it was an over statement.

11        Q     Did you see any of the three

12   gentlemen in that video not wearing a hat?

13        A     Not wearing a hat?

14        Q     Yes, sir.

15        A     No, sir.

16        Q     Did they all have hats on?

17        A     Sometimes.

18        Q     Did you see anybody in that video

19   with bushy, afro hair?

20        A     Yes.

21        Q     Okay.  Can you point out the one

22   with the bushy, afro hair?  Go to the video and

23   point out for us the one with bushy, afro hair.

24        A     This gentleman here, according to

25   her, had -- the hair was pulled back, and she

1    said it was a bushy style, possibly an afro,

2    along with long white sleeves sticking out from

3    underneath his shirt.  Baggy jeans and tennis

4    shoes.

5         Q     Could we play the tape, again?

6         A     Do you want me to go back more?

7               (Tape continued to play).

8         Q     That's fine.  Now, let's stop it

9    right there.

10        MR. JARRELL:  Are you referring to this

11              any more?

12        MR. THOMAS:  I may.  If you can leave it

13              for just another moment.

14        Q     Do you concede that there was no

15    mention at the preliminary hearing of anything

16    except for a white pullover sweater?

17        A     Yes.

18        Q     So that was your testimony back in

19    the preliminary hearing?

20        A     According to this, it was.

21        Q     Okay.  Now, this actual robbery

22    occurred at the BeeLine on the 29th?  Correct?

23        A     Yes.

24        Q     The identification took place about

25    15 days later, approximately?  Is that correct?

96

```
 1           A      I don't understand what you mean by
 2    identification.
 3           Q      The photographic lineup that was
 4    conducted with the picture from Montgomery?
 5           A      The photo lineup was on the 14th of
 6    January.
 7           Q      The picture was discover on the
 8    13th?
 9           A      Yes.
10           Q      And lineup was conducted on the
11    14th?
12           A      Right.
13           Q      One more point.  Going back to the
14    preliminary hearing.  At the preliminary
15    hearing, you didn't testify about any hats?  Is
16    that correct?
17           A      I don't recall testifying about any
18    hats.
19           Q      You simply testified that according
20    to the victim he had bushy, afro hair?
21    Correct?
22           A      I responded to the questions that
23    were asked at the preliminary hearing.  I don't
24    know why that was not included in there.
25    That's what I testified to.
```

97

1          Q       It's contained on page 40 of the

2     transcript.  I looked it up there.  Let's go

3     through and talk about the photo lineup a

4     minute.  The incident at the BeeLine, 12-29?

5     Let me write B. L. right here for BeeLine.  The

6     picture was discovered on 1-13.  The lineup was

7     on 1-14-03.  So we are about 17 days between

8     the date of the BeeLine robbery and the photo

9     lineup?  Correct?  Fourteen days had lapsed?

10         A       Okay.

11         Q       Okay.  From the time of the

12    incident on 12-29 until the photo lineup that

13    was done by Montgomery, was from the 14th, were

14    there any attempts on the part of your

15    department to sit down with Ms. Edith Thomas

16    and go through photographs to try to identify

17    somebody?

18         A       Normally, there is.  With this

19    situation, whether we did or not, I do recall

20    her being very upset and needed some time to

21    compose herself.  Most of the time there is an

22    attempt to go through the photos to see if she

23    can recall anybody.

24         Q       This is important.  Can you take a

25    minute and look through your file and see what

98

1    those attempts were, if any?

2         A    The photos that I have here are the

3    photos that I know for a fact that she looked

4    at.

5         Q    Okay.  So you are certain that she

6    was not shown any other photographs?

7         A    She was not shown any other

8    photographs, nor composite drawings.

9         Q    No other photos shown.  And,

10   logically, I am assuming that's because you

11   didn't know who it was?  Is that correct?

12        A    No, sir.  Ms. Thomas is from Troy.

13   She is familiar with Troy.  In our

14   conversations, she stated she had never seen

15   the guy before.  So I didn't confuse her by

16   looking at any unnecessary photos.  We decided

17   to look at her description alone and see if we

18   had one.

19        Q    You did not want to confuse her.

20   Again, that lineup was duplicated by

21   Montgomery on the other lineup?  Is that

22   correct?

23        A    Yes.

24        Q    I need to cover one more point.

25   Facial hair.  Did Ms. Thomas, was she able to

1    tell you if the defendant had facial hair?

2        A    I remember asking her that when we

3    asked for a BOLO, I always ask about facial

4    hair, gold teeth, sideburns, stuff like that.

5    And I remember her saying something about a

6    light mustache or a shadow mustache.

7        Q    Okay.  If I showed you in the

8    preliminary hearing right here, on Page 40,

9    where I asked you if the victim stated anything

10   about the defendant having facial hair -- let

11   me read the question and ask if it is an

12   accurate representation.

13            Did she give anything about facial

14   hair, would be the question.

15            And you said I asked about facial

16   hair.  And I don't think that she could

17   remember whether or not he had facial hair.

18       Q    Do you see that reflected on lines

19   20 to 23?

20       A    Yes, sir.

21       Q    Okay.  Going back to the

22   preliminary hearing, we are going to put  Edith

23   Thomas could not remember if there was facial

24   hair.

25            Q    Do you have the lineup in color?

1       A     No, sir.

2       Q     Would it be in anywhere in any of

3  the department's files, perhaps in Detective

4  Ross's file or any other file?

5       A     We've got basically a copy of what

6  was provided, which would be the same copy.

7       Q     So this would be the same copy that

8  you used to go over with Ms. Edith Thomas?

9       A     Right.

10      Q     In fact, you are saying that it's

11  the identical one?  Is that correct?

12      A     She has her signature here that she

13  identified.  Signature, date and time.

14      Q     And in that photograph, can you

15  tell if the defendant has facial hair?

16      A     Yes, you can.

17      Q     And what would that be described

18  as?

19      A     It would be a mustache.

20      Q     The picture doesn't show anything

21  else.  But do you remember from interviewing

22  him if he had side facial hair, too?

23      A     During the interview?

24      Q     Yes, sir.

25      A     I can't recall if he did.

1          MR. THOMAS:  Your Honor, we would move to

2    admit this as Defendant's Exhibit No. 1.

3          MR. JARRELL:  No objection.

4          THE COURT:  It's admitted.

5          Q     Sitting here today do you have an

6    explanation as to how this victim described

7    this person as saying afro-type hair, when the

8    video shows them all wearing hats?

9          A     Afro-type hair does not necessarily

10   mean that your hair has to stand out.  It's the

11   type of hair that you have.

12         Q     I believe the term was used bushy?

13

14         A     Right.  Bushy, afro-type hair.

15   It's the same term.

16         Q     In the picture that we just looked

17   at that your department did not have in their

18   possession until January 13th, describe the

19   hair of the defendant for me, please?

20         A     Bushy.

21         Q     Is it afro?

22         A     Yes.  Uncombed.

23         Q     Is it possible that Ms. Thomas

24   misidentifies the person with the white shirt

25   and --

```
 1              MR. JARRELL:  Object to the form of that

 2                   question.

 3         THE COURT:    Sustained.

 4              Q      In your opinion, given the fact

 5    that the person who went around the counter --

 6    are you willing to acknowledge that the person

 7    wearing the white shirt in this video tape was

 8    not the gunman?

 9              A      Which person?

10              Q      Yes.   The person who walked around

11    the back wearing the white shirt?

12              A      According to her statement, he was

13    not.

14              Q      According to her statement?

15              A      Right.   According to what she told

16    me.

17              Q      That's your interpretation of it?

18              A      What she told me is that the guy

19    that went behind the counter did not have a

20    gun.

21              Q      You will acknowledge that at the

22    preliminary hearing when you testified that Mr.

23    Bobby Williams was wearing a white pullover

24    sweater?

25              A      Is that a question.
```

```
 1          Q      Do you acknowledge that was your

 2   testimony at the preliminary hearing?

 3          A      That I said a white pullover

 4   sweater?  Yes, I did.

 5          Q      Is it possible that the man wearing

 6   the white pullover sweater --

 7          MR. JARRELL:  Object to the form of the

 8                    question.

 9       THE COURT:  Rephrase your question.

10          Q      Did the gentleman that walked

11   around the counter in fact have on a white

12   pullover sweater?

13          A      Yes, he did.

14          Q      Is it possible for that --

15          MR. JARRELL:  Object to the form.

16       THE COURT:  Sustained.

17          Q      Did the man wearing the white

18   pullover sweater who walked around the counter,

19   was he in fact the gunman?

20          A      No, sir, he was not.

21          Q      And I may need clarification on

22   this next point.  Did you interview Ms. Rebecca

23   Holley in regards to the photographic lineup?

24   Or was that Detective Larry Ross?

25          A      On the second?
```

1          Q        Yes, sir.

2          A        No, I didn't.

3          Q        So that was Detective Ross?

4          A        That's correct.

5          Q        How many pictures were contained

6   in the photographic lineup that was performed?

7          A        Six.

8          Q        I want to revisit your earlier

9   testimony.  The reason that you didn't show Ms.

10  Thomas any photographs prior to obtaining the

11  defendants picture was because you were

12  concerned that it might confuse her to see more

13  evidence?  Is that it in a nutshell?  Is that

14  an accurate statement?

15         A        As she stated that she worked at

16  the store, and I believe she grew up in Troy,

17  and knows people.  Nobody she described she

18  knew.

19         Q        Okay.  Did you take it upon

20  yourself to go through some photos on your own,

21  without her assistance?

22         A        Sure.

23         Q        And you weren't able to develop

24  anything based on those photos?

25         A        No, sir.

1    Q    Prior to you conducting the

2 photographic lineup -- let me rephrase that.

3 Did you show Ms. Edith Thomas the video tape

4 prior to the photograph lineup?

5    A    She saw the video tape, I believe

6 the same day, if not the next day.

7    Q    The same day as the video tape or

8 the next day?

9    A    Yes.

10    Q    Prior to you conducting the

11 photographic lineup from Montgomery County, did

12 she have an opportunity to view the video?

13    A    I don't understand the question.

14    Q    Did the two of you sit down and

15 view the video, and then do the photographic

16 lineup?

17    A    No, sir.

18    Q    Was she able to -- how much time

19 did it take to pick Mr. Williams out of the

20 photographic lineup?

21    A    I went to her place of employment.

22 I walked to the counter.  I laid them out.  I

23 asked her to look at the photos in a matter of

24 a few seconds.

25    Q    A few seconds.  I have probably

1    asked you this, and I apologize for having to

2    re-ask it, if I have.  But after the BeeLine,

3    was there anything tying Mr. Williams to it,

4    with the exception of the photograph taken in

5    Montgomery?

6          A     And video tape, no.

7          Q     No fingerprints.  Was there money

8    recovered?

9          A     No, sir.

10         Q     No money.  I can't recall if you

11   said about the weapons were located?

12         A     No weapon from the robberies during

13   -- during the initial interview with myself and

14   Mr. Williams, Mr. Ross excused himself for the

15   interview to try to get the weapon or a

16   photograph of the weapon and a photograph of

17   the car.  And we didn't get that from the

18   Montgomery City Police Department.

19         Q     Okay.  And just so I understand, is

20   the gun in custody of anybody right know?

21         A     It's supposed to be in the custody

22   of the Montgomery City Police Department.

23         Q     Can it be located?

24         A     We are not sure if it's the gun

25   used in the robbery.

```
 1         Q       Not sure.  Okay.  Has the gun been

 2    fingerprinted?

 3         A       I couldn't answer that for you.

 4         Q       I'm going to write, no gun,

 5    question mark.  Were there any other witnesses

 6    in the store who might have seen this happen?

 7         A       Besides Ms. Thomas?

 8         Q       Yes.

 9         A       No one else in the store.

10         Q       Okay.  Was there anybody else in

11    the parking lot that could have seen this

12    happen?

13         A       No, sir.

14         Q       This was on the 29th.  What time

15    was it?  Do you recall the time?

16         A       Like, between five and six hours

17    later in the evening.

18         Q       Okay.  12-29-02, between five and

19    six.  Did Ms. Thomas ever state that she was

20    able to make an identification of Mr. Williams

21    to that video tape?

22         A       You mean after I showed the lineup

23    and she compared the two photos?

24         Q       Yes, sir.

25         A       I don't think that she looked at
```

1    the video.

2         Q    I think you testified earlier that

3    she only saw the video the day after or the day

4    of?

5         A    Sometime around that time frame.

6    .cq 0 15 0

7         MR. THOMAS:  That's all I have at this

8    time.

9         THE COURT:  Before you redirect, let me

10   give the jury a short break.  We

11   have been here for a little over

12   an hour.

13                    Ladies and gentlemen,

14   we are going to take a break.

15   It's about a quarter after.  We

16   are going to take about a 10

17   minute break until 11:25.

18                    Please remember my

19   instructions not to discuss this

20   case among yourselves, nor allow

21   anyone to discuss it with you.

22   I will mention that these clocks

23   are an hour fast.  So take about

24   ten minutes.  Thank you.

25                    (A short recess was taken).

1          THE COURT:  Mr. Jarrell, redirect?

2

3

4                REDIRECT EXAMINATION

5   BY MR. JARRELL:

6          Q      During your testimony you indicated

7   that this was in fact the lineup, the original

8   lineup, that was used when you went to Ms.

9   Thomas for identification purposes for who the

10  gunman was?  Is that correct?

11         A      Yes.   That's correct.

12         Q      And who did she pick out?

13         A      Number two.

14         Q      Would that be the one in the center

15  on top?

16         A      Yes.

17         Q      How long did it take to look at

18  these before she decided that was the person?

19         A      A few seconds.

20      MR. JARRELL:  At this time I am going to

21              ask the defendant to come and

22              stand before the jury.

23                   Look at picture No. 2

24              that the witness just identified

25              and compare.

```
 1                           If you will also show

 2                     your left hand and wrist.

 3              That's all.  Thank you.

 4       Q      In the course of your

 5  investigation, did you find that, after

 6  speaking to Mr. Williams, anything that

 7  correlated with what we said, and what you

 8  discovered in your previous investigation?

 9       A      You mean statements?  Several

10  things, yes, sir.

11       Q      Would you point those out?

12       A      He described the blue Blazer that

13  they were on.

14       MR. THOMAS:  Can you repeat the question.

15              I apologize.

16       MR. JARRELL:  Basically, I don't think I

17              can ask it exactly the same way,

18              but I was asking him to compare

19              what he had, in the previous

20              investigation learned, with what

21              he learned from the defendant.

22       A      Yes, sir.  The description of the

23  vehicle that they were on, on both trips.  He

24  gave details of other events that they

25  participated in after leaving Troy.  He didn't
```

 1   like to call out the names of the individuals,

 2   but he made inferences to them, even pointing

 3   out some photos that I had, some still shots of

 4   the video tape.

 5        Q     What about the pistol?  Did he

 6   describe the pistol?

 7        A     Yes, sir.

 8        Q     How did he describe it?

 9        A     A thirty-five automatic.  He

10   described that it was unloaded, that they

11   didn't have intentions on hurting anybody.  The

12   gun was not loaded.

13              I wanted to make sure it was a

14   semi-automatic.  And I said, does it have a

15   magazine that goes on each side.

16              He said, yes, sir, that's right.

17

18        Q     Did that compare with what the

19   victims had indicated to you or the victim, Ms.

20   Thomas, had indicated to you?

21        A     Yes, sir.

22        Q     Compared to her statement?

23        A     Yes, sir.

24        Q     In the course of his statement,

25   did he acknowledge that at some point during

1  one of these robberies that he was the one with

2  the gun?

3          A       On the BeeLine robbery when we got

4  to that point, he described, like I said

5  earlier, the guy behind the counter got her

6  purse.  And he remembered seeing the purse when

7  he got back in vehicle, but he did not want to

8  admit that he was the one with the gun.

9          Q       I want to refer you to State's

10 Exhibit No. 2, the last page of the statement,

11 and ask you to use that to refresh your memory

12 of what was said about the gunman.

13         A       Okay.

14         Q       Does that change your answer that

15 you just gave?

16         A       Are you asking me at any time that

17 he admitted to me having possession of the gun?

18 Okay.  Yes.

19         Q       Read that statement that Mr.

20 Williams stated there.

21         A       This is the statement from Mr.

22 Williams.  It says, it was just brought to me

23 at the time of the scene, at the time, what we

24 used it for, but other than that --

25         Q       So it was brought to him at the

1   time of the scene?

2          A      Yes.

3          Q      He was talking about the gun?  Is

4   that correct?

5          A      Yes.

6          Q      MR. JARRELL:  That's all, Your

7   Honor.

8          THE COURT:  Mr. Thomas?

9                   RECROSS EXAMINATION

10  BY MR. THOMAS:

11         Q      Mr. Wright, do you still have that

12  statement?

13         MR. THOMAS:  Your Honor at this time, I

14                 would like to move to admit a

15                 couple of the pages from the

16                 preliminary hearing transcript

17                 that the detective has already

18                 testified to.  This is in

19                 respect to the description of

20                 the defendant offered at the

21                 preliminary hearing.

22                         Judge, we would move to

23                 introduce that.

24         MR. JARRELL:  I object to the admission

25                 of just two pages.  If he wants

```
 1                    to submit the entire transcript,

 2                    that's fine.

 3         MR. THOMAS:  That may be easier just to

 4                    admit the entire transcript.  We

 5                    have no objection to that.

 6         THE COURT:  Then the entire transcript

 7                    will be admitted as, what?

 8                    Defendant's Exhibit No. 2?

 9         MR. THOMAS:  Yes, sir.

10         Q    Detective Wright, earlier the

11    district attorney asked you a question in

12    respect to evidence that led you to Mr.

13    Williams, I guess independent of the

14    photographic line up.

15              Is it your testimony that that

16    evidence that the victim provided to you that

17    lead you to the arrest of Mr. Williams, in

18    other words.  And I believe that you testified

19    one of the elements was the blue Blazer?

20    Is that correct?

21         A    Yes, sir.

22         Q    And we are specifically talking

23    about the BeeLine incident.  Did Ms. Edith

24    Thomas see this blue Blazer?

25         A    No, sir.
```

1       Q     She did not?

2       A     No, sir.

3       Q     Did she see the car that the

4  robbers were driving?

5       A     No, sir.

6       Q     So, in terms of the BeeLine, there

7  really is no the between the Blazer and the

8  defendant, because there was no vehicle

9  identification at that time?

10      A     No, sir.

11      Q     Okay.  I may be mistaken about this

12  fact, but there were a total of four people

13  originally charged?  Is that correct??

14      A     Three or four, yes, sir.

15      Q     I believe it's at least three, but

16  I believe it's actually four.  Now, then, in

17  terms of the tattoo, do you have any evidence

18  with you today that would show that none of

19  these other three individuals have tattoos on

20  them?

21      A     No, sir.

22      Q     And I believe the clerk, and it's

23  in the preliminary hearing transcript, had

24  testified that the tattoo was on the arm? Is

25  that correct?

1          A      Yes.

2          Q      And in the video, did it show

3    everybody wearing long sleeve shirts?

4          A      Yes, sir.

5          Q      Okay.  Let's go back to the gun for

6    a moment.  Did Ms. Edith Thomas ever make an

7    identification of the weapon?

8          A      No, sir.  She never saw the weapon

9    in the light.

10         Q      So she was not able to describe the

11   characteristics of the weapon?

12         A      Detailed characteristics, the type

13   of weapon.  She said it was small.

14         Q      Yes, sir.  Color, automatic,

15   revolver, small or large?

16         A      Small.

17         Q      It is your testimony that you were

18   able to take the description provided by Mrs.

19   Edith Thomas to tie that robbery to the

20   Montgomery gun?

21         A      No, sir.

22         Q      Okay.  So there is no tie on that

23   point?

24         A      No, sir.

25         MR. THOMAS:  Bear with me just one

1          moment, please.

2          Q     Now, in terms of this BeeLine

3    robbery, does my client ever admit to having

4    used any gun or even having been in the store?

5          A     He admits to being in the store.

6    He doesn't admit --

7          Q     He admitted in that statement of

8    being in that store?

9          A     Yes.

10         Q     Are you certain of that?

11         A     Yes.

12         Q     But it's your testimony that he

13   says that he was not the one holding the gun?

14         A     He denies having the gun.

15         Q     Can you show me where he testifies

16   that he was actually in that store at the

17   BeeLine?

18         A     When he was talking about

19   separating the two robberies, he described the

20   clerk as being dark black female.

21              I made sure that I asked if he was

22   sure she was not a white female, again, because

23   we were talking about two robberies.  He

24   described a black female.

25              I asked him, did anybody stay in

1   the car at the Sunny South robbery and --

2           Q       Now, we are talking about the

3   BeeLine.

4           A       I understand.  He explained there

5   was someone stayed in the vehicle parked --

6           MR. THOMAS:  I Object.  Nonresponsive.

7           THE WITNESS:  I'm not sure I understand.

8           Q       I'm looking for the statement

9   where he says that he went into the BeeLine in

10  that statement, right there, where he actually

11  said that he was in the store.

12          A       Here it is, right here.

13          Q       Okay.  Start reading right here,

14  please, Detective Wright.

15          A       Right here?

16          Q       Yes, sir.  Right there.

17          A       You are telling me it's not --

18  that's why -- that's why I'm getting the

19  statement from you now.

20                  Williams:  I'm saying, I can't say

21  what went down, because after I made the

22  purchase, I exited the store.  I'm saying that

23  she is saying that I'm the one that pulled the

24  pistol, whatever, so I'm saying that I can't

25  make a statement.

```
 1        Q        So when you asked him about being

 2   in the store, he said no, that he exited the

 3   store?

 4        A        No.  He told me that he was in the

 5   store, but not in the store at the time the gun

 6   was pulled.

 7        Q        Well, he tells you that he went in

 8   the store and made a purchase.  That's all he's

 9   saying.

10              Again, this statement was taken in

11   Montgomery County?  Correct?

12        A        That's correct.

13        Q        And he was charged with robberies

14   in Montgomery County?  Correct?

15        A        That's correct.

16        Q        Of convenience stores?  Correct?

17        A        That's correct.

18        Q        And you had discussed with him

19   prior to turning on that tape recorder those

20   robberies in Montgomery County?  Correct?

21        A        I don't remember discussing it with

22   him.  I asked him a question about those, yes.

23        Q        We don't have the benefit of all of

24   that being transcribed, do we?

25        A        No, sir, we do not.
```

1        Q       Is it not possible that he thought

2    you were talking about the Montgomery County

3    robberies in that statement?

4        A       No, sir.  That was the purpose of

5    me having the recorder on then.  I explained

6    who I was, and where I was from, and what

7    robbery we were talking about, I asked if you

8    will give a description of where they were in

9    relation to 231.

10       Q.      Okay.  To your knowledge, is this

11   the first time this man has been in trouble

12   with exception to the Montgomery County

13   robberies that you've already addressed?

14       A       I don't know.

15       Q       Again, revisiting the statement,

16   you can see that you agreed to help this young

17   man out because you knew his father, and you

18   would try to help him?  Is that correct?

19       A       That's in the statement I made,

20   yes, sir.

21       Q       Do you not think that could have

22   induced him?

23       MR. JARRELL:  Objection.

24       MR. THOMAS:  He is an experienced

25                     detective.

1      THE COURT:  I sustain as to form, but you

2                 can rephrase your question.

3      Q      Is it possible that his belief that

4  you might try to assist him lead him to --

5      MR. JARRELL:  Objection to the form.

6                 Anything is possible.

7      THE COURT:  Sustained as to form.

8      Q      Detective Wright, you made a

9  representation to this young man that you were

10  going to try to help him because you helped his

11  father out?  Correct?

12     A      That wasn't the way that I made the

13  statement, but to answer your question, yes.

14     Q      In a nutshell, is that the bottom

15  line of it, though?

16     A      No, sir.

17     Q      Tell me what is your testimony in

18  that respect?

19     A      Him denying the obvious, that he

20  was.  The video shows he was there.

21     Q      No.  Sir, my question is, what did

22  you say to him in terms of you trying to help

23  him because you knew his father?

24     A      I made inference to him that I knew

25  his dad.  He didn't know me.  I didn't know

1    him, but he didn't think that I was trying to

2    screw him over, I guess is the word. And no

3    promises were made as far as any type of deal,

4    or no charge would be suppressed or any of

5    that.

6           Q      Did you not tell him that you had

7    helped his father in the past?

8           A      Yes, I did.

9           Q      Did you not tell him that you would

10   also like to help him out?

11          A      Yes, I did.

12          MR. THOMAS:  That's all I have.

13          THE COURT:  Redirect?

14          MR. THOMAS:  Actually, I do have one more

15   question.

16          Q      (By Mr. Thomas) Why would you tell

17   the defendant, Mr. Williams, something like

18   that?

19          A      I was building a rapport with Mr.

20   Williams.

21          Q      You were building a rapport with

22   him?

23          A      Uh-huh.

24          Q      You weren't trying to lead him to

25   believe that if he would just confess to this

1  crime, you would take care of it?

2          A    No.

3          Q    That wasn't your intent?

4          A    No.

5          Q    You weren't trying to leave him

6  with the impression that if you would help him,

7  he would help you?

8          A    No.

9      MR. THOMAS:  That's all.

10     THE COURT:  Mr. Jarrell?

11              REDIRECT EXAMINATION

12  BY MR. JARRELL:

13         Q    One thing that I want to make sure

14  that the ladies and gentlemen are keeping

15  straight in their mind.  You interviewed him

16  basically about both the December 21st robbery

17  at Sunny South and the December 29th robbery at

18  the BeeLine?  Is that correct?

19         A    That's correct.

20         Q    But as far as you investigating

21  what they wore at the time of the Sunny South

22  robbery, what they had on, or anything of that

23  nature, that wasn't a part of your

24  investigation, was it?

25         A    No, sir.

1          Q       So whatever they might have had on

2    or whatever, you don't have any knowledge of

3    that?

4          A       No, sir.

5    MR. JARRELL:   Thank you.

6    THE COURT:   Mr. Thomas, anything else?

7                 MR. THOMAS:   Nothing

8                 further at this time.

9    THE COURT:   Okay.

10   MR. THOMAS:   But I reserve the right to

11                recall him.

12   THE COURT:   Please step down.

13                Mr. Jarrell, please

14                call your next witness, sir.

15   MR. JARRELL:   I call Rebecca Holley.

16   THE COURT:   Raise your right hand.

17                REBECCA HOLLEY

18        Whereupon, this witness, after first

19   being duly sworn to tell the truth, the whole

20   truth, and nothing but the truth, testified as

21   follows, to-wit:

22                DIRECT EXAMINATION

23   BY MR. JARRELL:

24         Q       State your name, please.

25         A       Rebecca Holley.

1      Q      Ms. Holley, were you employed at

2   the Sunny South Station out here on 231 back in

3   December of 2002?

4      A      Yes, sir.

5      Q      And were you on duty on the 21st

6   day of December?

7      A      Yes, sir.

8      Q      And do you recall a special event

9   that happened on that date?

10     A      Yes, sir, I do.

11     Q      Can you give us a -- can you tell

12  us how things went down, that ultimately ended

13  up in a robbery?

14     A      Yes, sir.  The gentleman sitting at

15  the table, he had came in the store about three

16  times that day, on three different occasions.

17  And he was -- the first time I seen him he was

18  alone.  And the second time he came in with

19  another guy.  And on the third time, he came in

20  with a different gentleman.  And the third time

21  is when they robbed me.

22     Q      And tell us how the robbery

23  actually occurred.

24     A      They was, like -- he and -- when he

25  was before, and I had talked to him.  He was

1    walking around, you know, just looking and

2    stuff.  And then there was some customers, and

3    whenever they cleared out, him and another

4    gentleman come up to the counter, and he had

5    the gun.

6         Q      Are you positive that the gentleman

7    sitting there in the colored shirt is the

8    person that had the gun?

9         A      Yes, sir.

10        MR. JARRELL:  Again, if the defendant

11                    would, I would like for him to

12                    show his arm.

13        (Defendant did as requested).

14        Q      You told those Detectives that you

15   recalled the gunman having a tattoo on his

16   wrist and hand?  Is that correct?

17        A      No, sir.  I didn't see his arm.  He

18   had on a black jacket.

19        Q      Did you not see the tattoo?

20        A      No, sir.

21        Q      Maybe I got you confused.  So how

22   was he dressed at the time that he came to the

23   BeeLine?

24        A      No.  To the Sunny South.  I was at

25   the Sunny South.

1      Q     I'm sorry.  I'm getting confused

2  myself,  At the Sunny South, how was he

3  dressed?

4      A     He was dressed very nice.  He --

5  there wasn't nothing out of the way.  He had on

6  a black jacket.

7      Q     He had on a black jacket on that

8  date?

9      A     Yes, sir.

10      Q     But you didn't see the tattoo?

11      A     No, sir.

12      Q     Do you recall which hand he had the

13  gun in?

14      A     In his right hand.

15      Q     In his right hand?

16      A     Yes, sir.

17      Q     Did he ever point that gun at you?

18      A     Yes, sir.

19      Q     What did he say when he came to the

20  cash register and pointed the gun at you?

21      A     He told me that he wanted the

22  money.

23      Q     To give him the money?

24      A     Yes, sir.

25      Q     How did you feel about looking at

1    that gun?

2         A    It scared me.

3         Q    Had you ever been in a position

4    like that before?

5         A    No, sir.

6         Q    Do you ever care to, again?

7         A    No, sir.

8         Q    And did you have any idea whether

9    that gun was loaded or unload?

10        A    No, sir, I did not.

11        Q    Did you figure it was time to

12   argue with him?

13        A    No.  I didn't say nothing.

14        Q    Did you give him the money?

15        A    Yes, sir.  They took the money.

16        Q    Did you hand it to them, or did

17   they --

18        A    No, sir.  They took it.

19   they asked me to step back from the cash

20   register, and they took the money.

21        Q    You are positive, looking here at

22   this young man sitting at the table, that's the

23   man that held the gun on you?

24        A    Yes, sir, I am positively sure.

25        MR. JARRELL:  Thank you.

1    THE COURT:  Mr. Thomas?

2         CROSS EXAMINATION

3    BY MR. THOMAS:

4         Q     Ms. Holley, in trying to keep this

5    all straight.  I'm going to use another easel,

6    because it's a different store, to make sure

7    that we keep things straight.

8              Is your testimony that only two

9    people entered the store that day?

10        A     Yes, sir.

11        Q     Do you know who the second

12   individual was?

13        A     No, sir.

14        Q     Sitting here today, you don't know

15   his name?

16        A     No, sir, not right off the top of

17   my head.

18        Q     Have you seen the second individual

19   since the day of the robbery?

20        A     Yes, sir, I have.

21        Q     Was that at the preliminary

22   hearing?

23        A     It was a hearing.

24        Q     About a year ago?

25        A     Yes, sir.

1    Q      Two people?  Were they both black

2  males?

3    A      Yes, sir.

4    Q      Can you describe as best you can,

5  recall the information that you gave the police

6  in terms of the weight?

7    A      The other man that was with him, he

8  was --

9    Q      No, ma'am, not the other man.  Mr.

10  Williams, the one who is here with us today.

11    A      Okay.  I think I described between

12  135 and 145 pounds.

13    Q      Can you recall his weight, I'm

14  sorry, his height that you gave the detective?

15    A      Probably between 5'7 and a 5'8.

16    Q      And you testified that there were

17  no tattoos?  Rights?

18    A      No, sir.  I didn't see his arm.  He

19  had on a black jacket.

20    Q      Okay.  So you weren't aware of him

21  having the tattoo at any time?

22    A      (Shaking head in the negative).

23    Q      How close -- I don't think I'm

24  spelling tattoo right, but it's the best I can

25  do.  Facial hair.  Do you remember what you

1    told the Detective in terms of facial hair?

2             A      I don't remember.

3             Q      Do you recall if they had facial

4    hair?

5             A      No, sir.

6             Q      You don't know one way or the

7    other?

8                    (Shaking head in the negative).

9             Q      So you just don't know.  How close

10   was this individual to you when it happened?

11            A      Like, that's the counter

12   (indicating).  He was standing on the other --

13            Q      Let's say if you're the counter,

14   and you are behind it.  You are saying the

15   distance from you to the table?

16            A      No.  Closer than that.

17            Q      A little bit closer.  Maybe like

18   right there?

19            A      Let's say this is the counter.

20            Q      Okay.

21            A      He was standing right here next to

22   the counter.

23            Q      So he was right up here where I'm

24   standing.  And I don't mean to invade your

25   privacy.

1      A      Yes, sir.

2      Q      So he was really only a foot or two

3 feet away from you?

4      A      Yes, sir.

5      Q      And it's your testimony that he

6 held a gun on you?

7      A      Yes, sir.

8      Q      And let's call this physical

9 evidence.

10            Do you remember what he was wearing

11 that day?

12      A      I remember the black jacket he had

13 on.

14      Q      Okay.  He was wearing a black

15 jacket.  Okay.  And what else did he have on

16 that day in terms of clothes?

17      A      I don't really remember.  I

18 remember that he was dressed -- I mean there

19 was not nothing out of the ordinary.

20      Q      So at this point in time you only

21 remember the coat?

22      A      Uh-huh.

23      Q      Now, if I showed you a transcript

24 from the hearing that you were at, it's been

25 about a year ago, would that help you refresh

1    your memory?

2              A       Yes, sir.

3              Q       I'm going to hand that page to you

4    right there.  If you will, just bear with me

5    here.  Look at where it says lines 1 through 7,

6    and just read those to yourself.

7              A       (Witness did as requested).

8              Q       Does that help you remember what he

9    was wearing that day, because this was pretty

10   close to the time of the event at the other

11   hearing.  What do you recall that he was

12   wearing that day?

13             A       Bright blue pants.

14             Q       What else?

15             A       A black jacket.  He had on a hat.

16             Q       What?

17             A       A hat.

18             Q       What kind of hat was it?

19             A       Just like, you know, how the

20   hunter's wear that came --

21             Q       Did it have a visor on it like a

22   baseball cap?

23             A       No.  It was like black.

24             Q       It did not have a visor.

25             A       No, sir.  Just a toboggan.

1    Q        I can't spell toboggan.  I will put

2  a T hat.  What else?  Anything else.

3    A        No, sir.

4    Q        Now this incident happened on

5  December 21st?  Is that correct?

6    A        Yes, sir.

7    Q        Okay.  Do you know when the first

8  time was that you were shown a photographic

9  lineup of Mr. Williams?

10    A        No, sir.  I'm not sure of the date.

11    Q        Your testimony was that he was

12  about two feet away?

13    A        Yes, sir.

14    Q        There was one other thing.  Let me

15  go back to the transcript here.  I ask you to

16  reread lines 5 through 8.  Right now, we have

17  got -- we don't have the shirt.  Would you

18  identify the kind of shirt he had on that day?

19    A        It might have been blue, also.

20    Q        Okay.  Going back to the hat, what

21  color was the hat?

22    A        Black.

23    Q        Black.  On the photo lineup, what

24  was the first time that the detective attempted

25  to conduct a photographic lineup with you?

135

1    A    You mean when they brought some
2 pictures by?  I don't remember the date.  It
3 has to be -- maybe it was the next day.

4    Q    The next day?

5    A    The next day?  I think I went down
6 to the police station.

7    Q    Was that at the police station or
8 the store?  Do you recall?

9    A    I want to say at the police
10 station.

11    Q    So on 12-22-02, the first photo
12 lineup.  Okay.  How many pictures were you
13 shown that day?

14    A    That day I was shown several
15 pictures.

16    Q    Do you remember sitting here today
17 approximately how many pictures?

18    A    No.  I just know it was several.

19    Q    If I took you back to the
20 preliminary hearing, it was more closer to
21 time, would that help refresh your memory?

22    A    Yes, sir.

23    Q    Let me do that.  Just bear with me
24 for a second.  If you will flip to Page 67
25 there, and I believe if you start reading

1    towards the bottom of that page, that might

2    help you remember that, the number of pictures

3    you were shown.

4            A       Okay.

5            Q       Okay.  Drop down to page 68, lines

6    20 and 25.  I think that my help refresh your

7    memory?

8            A       Okay.

9            Q       Do you now remember the number you

10   were shown?

11           A       Uh-huh.

12           Q       How many were there?

13           A       Whenever they brought them to the

14   store, it was like 18.

15           Q       So on the 22nd, the day after, and

16   I don't know the day of the week.  Do you

17   remember the day of the week the event happened

18   on?

19           A       It seems like it was a Saturday

20   night.

21           Q       Saturday.  So we are going to say a

22   Sunday, then.

23           A       But it would have been Monday when

24   I went back down there.

25           Q       But you believe you were shown 18

1    photographs on Sunday?

2          A      That was later during the week.

3          Q      Okay.  It was Monday.  You are

4    correct, according to the prior testimony.

5          A      Yes, sir.

6          Q      On Monday you were shown the 18

7    photographs?  Is that a correct statement?

8          A      Yes, sir, it's correct.

9          Q      Okay.  And I believe you stated

10   that you were able to make an identification

11   out of those 18 pictures?

12         A      That's correct.

13         Q      So we had a positive I. D. on

14   Williams on the Monday.  And I am going to

15   write it 12-23.  I believe that would be the

16   right date, 12-23-02.

17               Now, then, you selected his

18   photograph out of that.  But prior to that --

19   there was actually another view?  Correct?

20   Where they showed you a video tape?  Did they

21   show you some video tape prior to Monday?

22         A      Prior?

23         Q      I believe it was the next day,

24   according to your testimony.  You can look

25   there and see.  You said that the Detective

1    came by and showed you some video tape.

2         A    I remember going down to the police

3    station. And he was viewing several pictures

4    on a computer. I'm not sure about a video

5    tape.

6         Q    And just for clarification, when he

7    took the photos on Monday, that was at the

8    store? Right? If you look on Page 69 at line

9    -- if you look at line 20 on Page 68, and read

10   that. Does that refresh your memory?

11        A    Yes.

12        Q    Okay. So was it at the store?

13        A    Yes.

14        Q    Okay. That's where you made the

15   first I.D. Then it's irrelevant, but do you

16   recall having seen the video tape prior to

17   having viewed those 18 photographs? The

18   BeeLine video tape?

19        A    No, sir I'm thinking that was

20   after.

21        Q    Okay. If we take page 69, if you

22   read there. Actually, start at the bottom of

23   68 and start reading there and read through

24   line 17. And see if that will refresh your

25   memory?

1    A    Okay. I know it says that I looked

2  at the video tape in here, but this would have

3  been a different time than when I picked out

4  the pictures.

5    Q    Okay. Was it your testimony at the

6  preliminary hearing that your first video,

7  photo lineup was the night of -- well, it could

8  not have been the night of the robbery. This

9  video was from the BeeLine. So video --

10  physically it's impossible for you to have seen

11  the video, you were just mistaken in that?

12    A    Uh-huh.

13    Q    Is there -- so when were you shown

14  the video? Were you shown the video after or

15  before the third or second lineup? I'm afraid

16  we are getting confused here. Let me start all

17  over. We have the 18 photographic lineup on a

18  Monday at the store. At some point the police

19  came back to you? Is that correct?

20    A    Yes.

21    Q    With a new set of photos or some

22  more photos?

23    A    More.

24    Q    Okay. And do you recall about when

25  that happened?

1    A    No, sir, I do not.

2    Q    But it was definitely after the 18

3    photos?  Correct?  Approximately 18 photos?

4    A    Yes, sir.

5    Q    Okay.  Now, then, shortly before

6    you viewed this second photo lineup, did you

7    see the video tape from the BeeLine.

8    A    I'm not sure.

9    Q    Okay.  Let's go back, because I

10   think it's been a long time.  We can easily

11   forget things.  And I think you remember a lot

12   more from the preliminary hearing.  Let's go

13   back to that.

14                Is it a safe assumption that it

15   must have been several weeks?  Is that

16   accurate?

17   A    It might have been about two weeks

18   or somewhat like that.

19   Q    The robbery was on 12-21?

20   A    Uh-huh.

21   Q    You think it could have been two

22   weeks?

23   A    Uh-huh.

24   Q    Could it have been more?

25   A    Yes, sir, it could have been.

1       Q     So the second lineup was at a

2  minimum two weeks from December 23rd, the time

3  you saw the first 18 photographs?

4       A     Yes, sir.

5       Q     Okay.  And in that second -- and

6  your testimony is clear.  You just don't

7  remember when you saw the video tape?  You

8  don't recall if it was before this second one

9  or after the second lineup?  Correct?

10      A     That's correct.

11      Q     So on this second or third video,

12  slash, photo lineup, we are not sure if it's

13  number 2 or number 3, you were able to

14  reidentify the defendant?  Correct?

15      A     Yes, sir.  That's correct.

16      Q     And the third lineup, how many

17  pictures were in the third lineup?

18      A     I don't recall for sure.

19      Q     Your best approximate guess will be

20  fine.

21      A     I'll say six.

22      Q     Okay.  So at this point, you have

23  identified him twice?

24      A     Yes, sir.

25      Q     That would have to be on or after

1    January 7th, because you know it was at least

2    two weeks?  Is that a correct statement?

3    We know that that second lineup, where there

4    were six photos, was some time on or after

5    January the 7th of 2003?

6         A      To the best of my knowledge, yes.

7         Q      Okay.  Now, then, there was

8    actually third identification, and we are not

9    sure if it came before the six photo

10   identification or after?  You have testified

11   that you just don't remember?  And I believe

12   that was your testimony at the preliminary

13   hearing, as well.

14        Now, then, it was your testimony -- or is

15   it your testimony that you were able to

16   identify Mr. Williams from the video?

17        A      Yes, it is.

18        MR. THOMAS:  Your Honor, I need to bring

19             the video tape back in.

20        THE COURT:  That being the case, why

21             don't we give the jury a lunch

22             break.

23        MR. THOMAS:  I'll be through in just a

24             second.  I promise.  I'm kind of

25             in a little of a crucial point.

1          THE COURT:   I understand.   Let's do it.

2                  (Attempt was made to play video).

3                  (Off record discussion).

4          THE COURT:   Why don't we take a break

5                  here.

6                      Ladies and gentlemen, it's

7                  now actually 12:30.   We will be

8                  in recess until 1:30.

9                      Please remember my

10                  instructions.   Do not discuss

11                  this case?

12                      Nor allow anyone to discuss

13                  this case among you, nor allow

14                  anyone to discuss it with  you.

15

16                      (A lunch recess was taken).

17

18

19

20

21

22

23

24

25

144

1        THE COURT:  Ma'am, you remain under oath.

2            Please have a seat.

3              Mr. Thomas?

4      MR. JARRELL:  Judge, we are going to

5            allow Mr. Thomas to use this

6            copy of the tape.  We ask that

7            you instruct the jury that there

8            could be some difference in the

9            quality just from, one,

10           reproducing the tape.  It may or

11           may not be.  I have not seen

12           this copy, but just for them to

13           to be aware of that, it is a

14           copy.

15     THE COURT:  Ladies and gentlemen, this

16           particular video tape is a copy,

17           I think, of a copy.  So the

18           quality might not be as sharp

19           and clear as the one you viewed

20           earlier.  But, nevertheless, in

21           the interest of conserving time,

22           the State has consented to the

23           use of this tape.  So we will go

24           forward from there.  Thank you.

25

145

1          MR. THOMAS:  Maybe I will do better on

2                    the second time.  Can you, Ms.

3                    Holley, see the television?

4          THE WITNESS:  Yes, sir.

5          Q     (By Mr. Thomas) Now, I believe that

6     you have already testified that you were shown

7     the video tape of -- and we are uncertain of

8     the time?  Is that correct?  In other words, we

9     are uncertain if that was before or after the

10    second photographic lineup?

11         A     Yes, sir.

12         Q     But you testified earlier that you

13    were able to identify the Defendant, Bobby

14    Williams, from the video?  Correct?

15         A     Yes, sir.

16         Q     Okay.  And just because we have

17    already covered this, we may have had a long

18    lunch and forgotten some things, but I believe

19    it was your testimony that the defendant

20    entered the store and was wearing a black

21    jacket, light blue pants, a toboggan hat,

22    black, and a blue shirt?

23         A     That's correct.

24         Q     Okay.  I am going to play the

25    video, and ask you to watch it.  And see if you

146

1    can now in court identify the person on there

2    that I represent is Mr. Williams.

3            And if you want to step out of the

4    witness stand.  I'm trying to kind of get

5    everybody to see this at the same time.

6            (Video was played).

7            Were you able to determine from

8    that picture which one of the three people --

9    A      May I see it one more time?

10   Q      Absolutely.

11          (Video was played).

12   A      I can show you which one he is.

13   Q      Well, let me play it one more time

14   for you.

15   A      It wasn't going that fast.

16   Q      I know.  I don't know how to set

17   it.

18   A      This is him right there

19   (indicating).

20   Q      Which one?

21   A      That one.

22   Q      This one?

23   A      Uh-huh.

24   Q      I'm going to let you continue

25   standing there, because we need to play the

1    video one more time.

2                Did you notice the person in the

3    middle aisle?

4         A     I don't know.

5         Q     The individual in the middle aisle?

6    Not the one that went around the camera with

7    the black shirt on, but the one in the middle.

8    Not the one that you identified.

9         A     Play it one more time.

10        Q     Okay.  Look, this one right here,

11   the one in the middle.  Do you notice what he

12   is wearing?

13        A     He has a black jacket.

14        Q     And could you tell on the pants?

15        A     Huh-uh.

16        Q     What about the hat?  What kind of

17   hat is he wearing?

18        A     Looked like a black hat.

19        Q     Was it a black toboggan hat?

20        A     Do you know what a toboggan hat is?

21   It's like a wool hat.  That looks more like a

22   hood.

23        Q     Let's play it one more time and see

24   what happens.

25                If you look at the color of his

1    shirt and pants, and ...

2         (Court reporter indicated she could not

3    hear).

4         MR. THOMAS:  I asked her to look at the

5                    color of the his pants, his

6                    shirt, his hat, to include his

7                    jacket, to look at all those

8                    colors.

9         Q     Could you tell that time what color

10   his hat was?

11        A     Yeah.  It did look like a

12   toboggan.

13        Q     What color was his jacket?

14        A     Black.

15        Q     What color were the pants?

16        A     A dark color.

17        Q     Okay.  Could they have been blue?

18        A     They could have been.

19        Q     And what about the shirt?  What

20   color did that appear to be?

21        A     I didn't see the color of the

22   shirt.

23        Q     That's okay.  Let's look at it one

24   last time.

25        A     I see there better.  I can see them

149

1    walking around there.

2         Q      This is the video tape from your

3    work.  And you work at the Sunny South.

4         A      That's correct.

5         Q      And do you understand this was from

6    the BeeLine?

7         A      Yes, sir.

8         Q      Do you understand these happened on

9    two different days?

10        A      Yes, sir.

11        Q      Do you see the pants?

12        A      Uh-huh.  You can't really tell what

13   color his shirt is.  I mean, I can't.

14        Q      But we can agree that he was

15   wearing a --

16        A      Black leather jacket.

17        Q      -- black jacket?

18        A      Yes.

19        Q      Dark colored pants?

20        A      And blue pants.

21        Q      Well, we can't really tell what

22   color the pants are, like it is.  But we know

23   they are not white pants?  Is that correct?

24        A      Correct.

25        Q      And then a black toboggan hat?

1        A        Uh-huh.

2        Q        Does this individual appear to be

3    dressed the same as the person that you

4    identified in the Sunny South Store that day?

5        A        Yes, sir.  He would be dressed

6    similar.

7        Q        Is there anything on this checklist

8    that you could see that you have identified,

9    that did not appear on that video right there

10   at the BeeLine?

11       A        Well, let's suppose that his friend

12   and him swapped jackets or something.

13       Q        I will rephrase the question.  Is

14   there any item that you wrote down that would

15   appear to be different?

16       A        No, sir.

17       Q        Okay.  You can take the stand.

18   Thank you.

19                (Witness did as requested).

20       Q        Do you recall the -- you have been

21   in court, and you have heard the testimony.  Do

22   you recall the day that the BeeLine robbery

23   happened?

24       A        No, sir, I don't.

25       Q        But do you recall the date that

151

1    Sunny South happened on?

2        A     Yes, sir.

3        Q     What date was that?

4        A     It was on December 21st.

5        Q     And are you aware of the fact that

6    the BeeLine occurred after the Sunny South?

7        A     That's correct.

8        Q     Is it possible that the middle

9    person who was wearing that toboggan and the

10   black jacket was in fact the person that was in

11   the Sunny South?

12       MR. JARRELL:  Object to the form.

13       THE COURT:  Sustained as to form.

14        Q     Could you have made a mistake in

15   your initial identification on the video?

16        A     No, sir.  The one I seen at the

17   police station was clear and slower.

18        Q     Okay.  Moving back, do you recall

19   having provided the detectives with a

20   complexion of the person who was in your store

21   on the 21st?

22        A     I believe I said he was lighter,

23   that he was not dark.

24        Q     You believe that you stated that he

25   was light complected, that he was not dark?

1          A       Yes, sir.

2          Q       And which detective would you have

3    told that to?  Mr. Ross is the white detective.

4    And Detective Wright is black?

5          A       Oh.  Yes.  I know who they are.

6          Q       Okay.

7          A       The first gentleman that I spoke

8    to, he was a uniform police officer.  So he was

9    the one that I initially gave the information

10   to.

11         Q       Do you recall having given that

12   information to Detective Ross?

13         A       Yes, sir, I believe I did.

14         MR. THOMAS:  That's all I have at this

15   time.  I would like to possibly recall.

16         THE COURT:  Sure.

17                         Mr. Jarrell.

18                  REDIRECT EXAMINATION

19   BY MR. JARRELL:

20         Q       Ms. Holley, just for clarification

21   purposes, you were shown a six picture

22   composite, six different individuals with

23   numbers under them at one time by one of the

24   officers, were you not?

25         A       That's correct.

```
 1          Q      And you picked out who you said was

 2   the person that had the gun?

 3          A      That is correct.

 4          Q      What person did you pick out?

 5          A      I picked out the defendant.

 6          Q      And did you record that on this

 7   piece of paper and sign your name to it?

 8          A      Yes, I did.

 9          MR. JARRELL:  Let's mark this State's

10   Exhibit No. 3.

11          Q      And that's your signature?

12          A      (Nodding in the affirmative).

13          Q      What date is that?

14          A      1-14-03.

15          Q      So about three weeks after --

16          A      Yes, sir.

17          MR. JARRELL:  We move to admit State's

18               Exhibit 3.

19          MR. THOMAS:  What is it?

20          MR. JARRELL:  It's the sheet where she

21               identified him.

22          MR. THOMAS:  Okay.

23          THE COURT:  Any objection?

24          MR. THOMAS:  None, Your Honor.

25          THE COURT:   It's admitted.
```

1          MR. JARRELL:  That's all.  Thank you.

2                    RECROSS EXAMINATION

3    BY MR. THOMAS:

4          Q     Take a look at that form for me,

5    please?

6          A     Yes, sir.

7          Q     When is that form dated?

8          A     January 14th.

9          Q     Okay.  We had a question mark, I

10   believe, of when the last identification was

11   made.  You said you thought around two weeks?

12   Is that correct?

13         A     Yes, sir.  That's what I said.

14         Q     Okay.  Here it is.  You testified

15   earlier that you I.D'd Mr. Williams in a second

16   photo lineup some time after January 7th of

17   '03?

18         A     Yes, sir.

19         Q     Okay.  But you also testified that

20   you identified him in an earlier photo lineup

21   on the Monday after the actual event?

22         A     Sir, I'm honestly not that good

23   with those dates.

24         Q     You were pretty clear before lunch.

25   You said, did you not --

```
 1          MR. JARRELL:  Objection.  Being

 2               argumentative.

 3          THE COURT:  Sustained.

 4          Q     Did you testify at lunch, prior to

 5     to lunch, that the first lineup was done on the

 6     Monday following the incident?

 7          A     Yes, sir.

 8          Q     Okay.  Do you recall having signed

 9     a form acknowledging that lineup?

10          A     Yes, sir, I do.

11          Q     So you have signed two of those

12     forms?  One there for the 14th, the lineup done

13     on the 14th?  And you specifically remember

14     signing a form for the fist lineup that was

15     done on Monday?

16          A     No, sir.  I may not have signed the

17     form on the first one, because that was down at

18     the police station when I done the first one, I

19     believe.

20          Q     So you don't remember signing,

21     acknowledging, for the first lineup?

22          A     Sir, I don't even remember signing

23     this one.

24          Q     Okay.  That's fine.  It's been a

25     long time?
```

1          A      Yes, sir.

2          Q      I agree.  Are you aware of when the

3    defendant was first arrested for these crimes?

4          A      No, sir.

5          MR. THOMAS:  That's all I have at this

6               point, Your Honor.

7          THE COURT:  Mr. Jarrell?

8          MR. JARRELL:  I don't have anything

9               further.

10         THE COURT:  Please step down.  Call your

11              next witness.

12                    EDITH THOMAS

13         Whereupon, this witness, after first

14   being duly sworn to tell the truth, the whole

15   truth, and nothing but the truth, testified as

16   follows, to-wit:

17                 DIRECT EXAMINATION

18   BY MR. JARRELL:

19         Q      State your name, please?

20         A      Edith Thomas.

21         Q      And Ms. Thomas, you speak softly,

22   so I need you to speak right into the

23   microphone or speak a little louder.  Okay?

24   Back in December of 2002, were you employed at

25   the BeeLine on Brundidge Street?

1          A       Yes, sir.

2          Q       And on that particular day, do you

3    recall the events that lead up to the robbery?

4          A       Yes, sir.

5          Q       And can you tell us in the

6    courtroom here today, if anyone of those

7    persons that was involved in that robbery is in

8    this courtroom?

9          A       Yes.

10         Q       Where is he?

11         A       Sitting right over there

12   (indicating).

13         Q       Are you positive about that?

14         A       Yes.

15         Q       At some time you were shown a photo

16   lineup, were you not?

17         A       Yes, sir.

18         Q       Did you pick him out of the

19   lineup?

20         A       Yes.

21         Q       Did you have to think about it, or

22   was it obvious?

23         A       I didn't have to think about it.

24         Q       It was done very quickly, am I

25   right?

158

1          A       Yes.

2          Q       When the persons came in there,

3    were there one or more that came in the store?

4          A       There were three.

5          Q       Three?

6          A       Yes.

7          Q       And what did they do while they

8    were in the store?

9          A       They was just acting like they were

10   customers, at first.

11         Q       Were there other people in the

12   store when they first came in, if you recall?

13         A       I'm thinking there were, but I'm

14   not for sure if they were when they came in.

15         Q       So they walked around just like

16   regular customers do?

17         A       Yes.

18         Q       When did you first realize

19   something was not right?

20         A       Well, when I realized, I thought

21   they were stealing, not be robbing, because

22   they were trying to purchase some things.  And

23   he was like going to buy some things.  When

24   they got up there to buy, I didn't see it

25   anymore.  I said I need it, so I can put it

1   back on the shelf.

2       Q     What happened next?  Did they ask

3   about those items?

4       A     They passed by me, it was clear

5   that they wasn't willing to purchase.

6       Q     Then what happened?

7       A     I told them they needed to pay for

8   the items.  When I told them, they all -- they

9   give me $2.00, and I opened the register, and

10  that's when it happened.

11      Q     When you opened the register,

12  that's when something happened?

13      A     Yes.

14      Q     What happened.

15      A     The guy pulled a gun and pointed it

16  at me.

17      Q     The guy pulled a gun and pointed it

18  at you?

19      A     (Nodding in the affirmative).

20      Q     Can you describe the gun?

21      A     I'm not familiar with guns.  I know

22  it was a small black gun.

23      Q     A small handgun?

24      A     Yes.

25      Q     Did you know whether or not that

160

```
 1    gun was loaded?

 2          A      No, I didn't.

 3          Q      How did you feel when you saw that

 4    gun pointed at you?

 5          A      I was scared.

 6          Q      When they pointed the gun, you said

 7    that you saw the gun pointed, did anybody say

 8    anything?

 9          A      The person with the gun said, give

10    it here.  I stepped back and told him if they

11    wanted it, they could get it.

12                 And they said, give it here, a

13    second time.  And that's when I gave the money.

14          Q      You actually gave them the money?

15          A      I actually gave them the money.

16          Q      And would you have done that had it

17    not been for the gun?

18          A      No.

19          Q      What did you think they were going

20    to do with that gun?

21          A      I didn't know.

22          MR. THOMAS:  I object.  Speculation.

23          THE COURT:    Sustained.

24          Q      Now, did you notice anything in

25    particular about the hand of the guy that had
```

1  the gun?

2          A      He had a tattoo.

3          Q      Where was it?

4          A      On the left wrist.

5          Q      On the wrist?

6          A      Uh-huh.

7          MR. JARRELL:  And I'm going to ask the

8  defendant, if he would, to show her his wrist.

9              (Defendant did as requested).

10         MR. JARRELL:  She can probably see it

11 from here.

12         Q      Was that what you saw?

13         A      Yes.  That's what I saw.

14         MR. JARRELL:  Your witness.

15                    CROSS EXAMINATION

16 BY MR. THOMAS:

17         Q      How many people came in the store

18 all together that day?

19         A      Three.

20         Q      Three.  Do you know if they had

21 tattoos on their arms?

22         A      No.

23         Q      It's possible that any one of the

24 three of them could have had tattoos on their

25 arms?

162

1          A      It's possible.

2          Q      And I apologize if this has been

3     asked, but was the person holding the gun left

4     handed or right handed?

5          A      I'm  assuming right hand.  I didn't

6     pay attention to which hand it was in.  Just

7     the gun.

8          Q      Well, if I'm the gunman and I'm

9     facing you, does that help you visualize how it

10    happened in terms of how they were holding the

11    gun?  This way or this way?

12         A      I am not for sure.  I can't.

13         Q      You had an opportunity to watch the

14    the video tape prior to this?  Is that

15    correct.

16         A      I watched it the night of be

17    robbery.  And that's the only time that I have

18    seen it.

19         Q      Were you able to provide a

20    description of the firearm to the authorities.

21         A      Say that again.

22         Q      Were you able to provide a

23    description of the firearm that was used?

24    Any identifying marks, and automatic,

25    revolver?

163

```
 1.        A       Just, as I said, just a black small

 2    handgun.   That's all I know.

 3         Q       So it was a black handgun, you say?

 4         A       Yes.

 5         Q       Was it a revolver or automatic?

 6         A       I don't know anything about a gun,

 7    but it was black.

 8         Q       Your second description was it was

 9    small?  Is that correct?

10         A       Yes.

11         Q       Did you provide a description to, I

12    guess it would have been Detective Greg Wright?

13    Did you provide a description to Detective Greg

14    Wright?

15         A       Yes.

16         Q       And do you remember what you told

17    him in terms of what he was wearing?  His

18    clothing?

19         A       I'm not for sure if -- how it was.

20    I mean, I described some of the guys.  You

21    know, each one, but I don't know at that time

22    which one I said was wearing what.

23         Q       Okay.  Well, let me provide you

24    with a copy of the transcript from the

25    preliminary hearing, because it was pretty
```

1   close to the time that the actual incident

2   occurred.

3           I want to ask you to follow along

4   with me on that.  That may refresh your memory

5   as what the clothing was.  Turn to Page 81 with

6   me on that please.

7       Q       Page 81?

8       A       Yes, ma'am.

9       Q       And if you look at Page 81,

10  starting on line 12, and read from line 12 to

11  to 25.  See if that will refresh your memory.

12      A       Okay.

13      Q       Have you had a chance to read

14  through that?  Does that refresh your memory?

15      A       Some.

16      Q       Okay.  What color were -- what type

17  of pants was he wearing?

18      A       Like I said, it was blue jeans.

19      Q       Blue jeans.

20      A       They was blue and he had a little

21  --

22      Q       I'm having a hard time hearing

23  you.

24      A       They was blue, had a logo on the

25  pocket.

165

1          Q      Were they baggy or tight fitting?

2          A      They were kind of baggy.  They

3      wasn't fitted.

4          Q      Okay.  Now, then, what color shirt

5      was he wearing?

6          A      Right now, I can't remember.

7          Q      Does the transcript help you?

8          A      It says a white shirt.

9          Q      Okay.  I don't believe you gave any

10     further identifying information at the

11     preliminary hearing in terms of clothing.

12             Can you recall anything else

13     sitting here today in terms of clothing?

14         A      Other than, I think it was the

15     jacket.  It was a dark colored jacket.

16         Q      Dark jacket.  Okay. Now, in terms

17     of physical appearance, you mentioned a tattoo?

18         A      Yes.

19         Q      I'm sure somebody is going to get

20     me on my spelling of this.

21             Do you know -- and we have already

22     gone through this, but do you know what arm

23     that tattoo was on?

24         A      Left arm.

25         Q      Left arm.  But you don't know which

166

1    hand the gun was in?

2         A      Correct.

3         Q      You initially thought right, but

4    you are not certain?  Is that your testimony?

5         A      I'm not certain.

6         Q      Okay.  I believe you identified him

7    as having afro-type hair?  Is that correct?

8         A      Yes.

9         Q      Okay.  We have tattoo.  Gun, not

10   certain.  Afro hair.  What about height and

11   weight?  Do you recall giving the height and

12   weight?

13        A      I don't recall now, but let me see

14   if it's in the transcript.

15        A      I said about 5"7 or 5"8.

16        Q      Okay.  And your testimony was 150

17   to 160 pounds?  Is that right?

18        A      Yes, sir.

19        Q      And I believe it was also your

20   testimony that you were shown, or that you

21   watched the BeeLine video?

22        A      Yes, the night of --

23        Q      And are you able to identify from

24   that video Mr. Williams?

25        A      I am not sure how I did that night.

167

```
 1    I don't remember if I identified him right

 2    then.

 3         Q     Okay.  Have you seen the video?

 4    Have you been able to watch it sitting here

 5    today?

 6         A     No.

 7         Q     Or were you block from it?

 8         A     I was blocked.

 9         Q     You were blocked from it.  Let's

10    replay it for you.

11         THE COURT:  Yes, sir.

12         JUROR:  If I can make a suggestion that

13                   might help with the video.

14                   Whenever the video was taped, it

15                   was set on fast.  There's a

16                   place on the back of that is a

17                   setting, S.L.P, that stands from

18                   super long play.  The reason it

19                   is fast is because it was

20                   playing at normal speed.  There

21                   should be a setting on the VCR.

22                   Just put it on opposite of

23                   S.L.P, and it should play

24                   properly.

25         THE COURT:  Mr. Thomas, see if you can
```

```
 1                     find that S.L.P on there.
 2          MR. THOMAS:  If Mr. Sanders is willing to
 3                     volunteer, and the Judge will
 4                     allow him, I invite him down
 5                     here.
 6          THE COURT:  If y'all can find it, yes.
 7                  (Juror attempted to find setting.
 8                  (Off-record discussion).
 9          Q     Ms. Thomas, if you want to come
10  around and watch, that will help you, so we can
11  all see it.
12          THE COURT:  Mr. Jarrell, do you see a
13                     setting back there?
14          Q     Okay.  Ms. Thomas, were you able to
15  ascertain anything from that video?
16          A     (Shaking head negatively.)
17          THE COURT:  Mr. Thomas, Greg is out here.
18                  Do you want him to adjust that?
19          MR. THOMAS:  Yes.  Absolutely.
20                  (The video was played).
21          Q     At this point in time, have you
22  seen anything identifying Mr. Williams?
23          A     On the tape, it looks like the one
24  in the black jacket.  I don't see.  I'm sure --
25          Q     Was the one wearing the black
```

169

1   jacket the one that held the gun on you?

2       A    I don't know what I said in the

3   preliminary hearing.  Because the person that

4   came to the counter, is not the one that I

5   think -- it was the other one on the other

6   side.  That was the one that didn't have the --

7   one person that was doing -- I'm not sure.  It

8   seems like the one doing the purchasing on the

9   video was the one that was right there, but the

10  other one with the black jacket, that handed

11  him whatever it was, I'm not sure.  He walked

12  right there to the counter, right in front of

13  the counter.

14      Q    Okay.  And it's hard for us all to

15  be on the same page here.  We are going to

16  attempt to.  Clearly, one individual was

17  wearing a white shirt, and some type of ball

18  cap?  Correct?

19      A    Yes.

20      Q    Was that individual holding the

21  gun?

22      A    That's the one that came around the

23  counter on the video?  Right?

24      Q    Do you want me to replay the tape

25  for you?

```
 1          A      Yes.  I'm sorry.

 2          Q      That's okay.  Now, you can come

 3   back around.

 4                 (Video was played).

 5          Q      Having watched the video, again --

 6          A      The one with the white shirt, that

 7   last one coming with the colored cap is not the

 8   one that had the gun.

 9          Q      That leaves us with the gentleman

10   in the jacket and the gentlemen without the

11   jacket?

12          A      Right.

13          Q      Which of those two?

14          A      I don't -- it's the one -- I'm

15   trying to see how they were standing when they

16   came to the counter.  Okay.  The one with the

17   black jacket, that's the one that came right

18   there where the opening is, to put the items on

19   the counter.  That's the one that had the gun.

20   That's where I could see his left hand when he

21   was putting items on the counter.

22          Q      So your testimony is that he was

23   the one with the black jacket?

24          A      That's the one putting things on

25   the counter.
```

171

1    Q    Okay.  Do you know why in your

2    statement to Detective Wright, you did not

3    state that the gunman was wearing a black

4    jacket?

5    A    I do not know why.

6    Q    Do you know why in your statement

7    to Detective Wright you stated that he was

8    wearing a white pullover sweater?

9    A    I don't know.

10    Q    Did you see the gentleman with the

11    white pullover sweater walk behind the counter?

12    A    Yes.

13    Q    How can you be sure sitting here

14    today that it was my client holding the gun, if

15    the gentleman that was wearing the white

16    pullover sweater was the gentlemen that walked

17    around the counter?

18    A    I mean, I was nervous the night

19    that I gave my statement, so I'm not for sure.

20    I just -- that's the one I just saw.  I just

21    told what I remembered.

22    Q    Did you notice anybody in the video

23    with afro-type hair?

24    A    On the video, I couldn't tell.

25    Q    Would you acknowledge in the video

1    all three people were in fact wearing hats?

2         A       Yes.  But, with a cap on, you could

3    still see that on the side.  That's not covered

4    up.

5         Q       So your description at the

6    preliminary hearing, without the benefit of the

7    video being played for you, that they had large

8    afro hair, is incorrect?

9         A       You can still have a cap and see if

10   someone's hair, see if it's nappy or not.

11        Q       You can tell if somebody has

12   afro-type hair, and they are wearing a hat?

13        A       Afro-type hair is -- to me, it's

14   not combed.  That's the way I look at it.

15        Q       I'm going to refer you to Page 82

16   of the transcript, line 12.  In the preliminary

17   hearing, do you recall testifying as to what

18   you see on line 12?

19        A       I made the statement, so I mean

20   --

21        Q       Was your testimony at the

22   preliminary hearing that his hair was standing

23   up?

24        A       Well, it can be standing out, and

25   it could be outside the hat.  That's why I'm

1    not sure how I stated it here.

2         Q    Let's talk about the photographic

3    lineup a minute.  What was the first time that

4    you went to the -- let me rephrase the

5    question.  What was the first opportunity that

6    you had to attempt a photographic lineup of the

7    suspects that night?

8         A    Detective Wright brought them to my

9    work place.  Yeah.  He showed them to me.

10        Q    And do you recall, working from

11   memory here, the incident was 12-28, or 12-29?

12        A    29.

13        Q    12-29?

14        A    Yes.

15        Q    Okay.  So in relation to the 29th

16   of December of 2002, when was the first time

17   Detective Wright brought you some photographs?

18        A    I don't know.  It was after the

19   incident, but it was -- I don't know how long

20   prior.  I don't know the exact dates.

21        Q    Okay.  If I refer you back to that

22   transcript, which was done a lot closer to the

23   event, on Page 82, if you will read lines 14

24   through 25, that may refresh your memory.

25        A    On Page 82?

```
 1          Q      Yes, ma'am.  Page 82.  If you will
 2   review lines 14 through 25.
 3          Q      Have you had a chance to review
 4   that, Ms. Thomas?
 5          A      Yes.
 6          Q      Does that help give you a date or
 7   time to tie to the 29th?
 8          A      I said about a week or so, yes.
 9          Q      Okay.  So that's no later than
10   January 5th of '03?  Is that correct?
11          A      Somewhere around there.
12          Q      Okay.  How many photographs were
13   present in that lineup?
14          A      There were several.
15          Q      Can you recall, after having read
16   the transcript, how many were there?  If you
17   look at Page 83, line 5, that may refresh your
18   memory.
19          A      It says 18 to 24.
20          Q      Okay.  That's 18 to 24 photographs
21   on  January 5.  Were there any other
22   photographs or lineups done, performed?
23          A      I'm not for sure if there were.
24          Q      Did the detective ever follow up
25   with any additional?  Let me backtrack a little
```

175

```
 1   bit.  From this line, from 18 to 24 people,

 2   were you able to identify my client?

 3        A     Yes.

 4        Q     Okay.  After the time that you made

 5   that positive I.D., did the detectives ever

 6   come back with another photo lineup?

 7        A     I don't remember.

 8        Q     But you are certain of 18

 9   photographs?  Correct?

10        A     Uh-huh.

11        Q     You are certain that it could not

12   have been later than January 5?  Correct?

13        A     Around that time.

14        Q     Around that time.  Okay.  Plus or

15   minus two days?

16        A     I don't know how many, but just

17   around that time.  Two or three.  I don't know.

18        Q     Plus or minus three days.

19   Were you able to use the video to identify my

20   client as well once you saw the photographs?

21        A     I don't know.  I can't remember if

22   I identified him right then or on the video the

23   day it showed.

24        Q     If you will turn to Page 84 and

25   look at line 21.  That might refresh your
```

1    memory.

2          MR. JARRELL:   That question has already

3                been asked and answered.

4          Q     Can you recall that after having

5    read that?

6          A     I mean, this was what I said.

7    That's all I remember.

8          Q     So, is your testimony that you were

9    shown the video tape prior to the lineup?

10         A     I saw the video the night of the

11   robbery.

12         Q     Okay.  Do you know, or are you

13   aware that the police actually obtained a

14   photograph of the defendant who's sitting right

15   there from that video lineup?

16         A     They didn't tell me where they got

17   the photograph.  Just when he came to my job,

18   he just showed me the photograph and asked me

19   to identify the person.

20         Q     Do you recall hearing the testimony

21   sitting in the room that the photograph was not

22   available until January 13th?

23         A     I mean that's what he said.

24         Q     Would you agree that the photograph

25   was not available of the defendant until

```
 1   January 13th?

 2        A      Whatever they said they got.

 3        Q      You heard their testimony?  Right?

 4   You heard the officer say, they didn't have

 5   the defendant's picture in their possession

 6   until January 13th?

 7        A      Yes.

 8        Q      That being the case, is it possible

 9   that you were able to identify this person on

10   January 5th?

11        A      I told you I don't know how long it

12   was.  He presented the picture to me.  I looked

13   at it.  I don't keep up with dates.  I don't

14   know the exact date when he did that.

15   Q        Did you hear the testimony that there

16   were a total of six pictures in the

17   photographic lineup to use?

18        A      That's what he said.

19        Q      But your testimony was that he was

20   --

21        A      The ones I seen, if I'm not

22   mistaken the one I seen, there was three

23   different sheets.  The first sheet I identified

24   that person.  On the second sheet I -- Each

25   sheet had a robber on each sheet.  I picked
```

1    them for a sheet.  They was six people on each

2    sheet.  I identified the people on each sheet.

3         Q       Okay.  Is it not possible, because

4    the other store clerk testified that --

5         MR. JARRELL:  Object to the form of that

6    question.

7         THE COURT:  Sustained as to form.

8         Q       Could there not have been a another

9    lineup conducted after this date whereby you

10   actually found my client?

11        A       I don't remember but one time.

12   What's in my head is one time.  I'm not saying

13   that it didn't happened.  That's what I

14   remember, seeing those three different sheets

15   with different pictures on each sheet.  That's

16   what I remember.

17        Q       Okay.  The detective testified that

18   you were shown the lineup on the 14th.  That

19   being the case, is it not possible that you

20   were also shown previously --

21        MR. JARRELL:  Object to the form.

22        Q       Do you recall having seen a

23   previous lineup around January 5th of 2003,

24   which also contained my client's picture?

25        A       I don't recall.  I can't say.  I

1    don't know.  I will tell you what I said, I

2    don't know what date this was on that I saw

3    those pictures.  I don't know what date this

4    was.

5         Q    But it's possible that you

6    identified this person twice?  Once on the 5th

7    and once on the 14th?  Is that possible?

8         A    Well, anything's possible.  I don't

9    know.  That's what I have in my head.

10        Q    Is it possible that you could have

11   been mistaken about the identification?

12        MR. JARRELL:  I object to the form of the

13             question.

14        THE COURT:  Sustained.

15        Q    Ms. Thomas, do you acknowledge that

16   the person that you identified was in fact

17   wearing a hat in the store at the time

18   according to the video?

19        A    That's all of them.  They had on a

20   hat.

21        Q    Do you acknowledge that you never

22   told the detective that he was wearing a coat?

23        A    I don't -- I'm thinking that -- I'm

24   thinking whatever it was, it was, you know,

25   where you didn't see the whole thing, that you

1    just see right at the wrist part.  So right in

2    here.  I don't know if that was a coat or

3    shirt.  And that's probably what I told him

4    then.  I don't know what I told them.

5         Q     But you have testified that he was

6    wearing a coat?

7         A     Yes, sir.  That's what I said.

8         Q     And do you acknowledge that you

9    never told the detective that he was wearing a

10   coat?

11        MR. JARRELL:  That has been asked and

12   answered.  How many times do you have to hear

13   it.

14        THE COURT:  Overruled.  This is cross

15             examination.

16        Q     Do you acknowledge that you heard

17   the officer testify that they didn't have the

18   defendant's picture in this courtroom until

19   January the 13th of 2003?

20        A     That's what they said.

21        Q     Do you acknowledge that in that

22   picture shown to you on that date marked

23   Defendant's Exhibit 1, that the suspect on the

24   top row in the middle has a large afro hair

25   that is standing up?

```
 1        A      Yes.   That's what I said.   That's

 2   what -- that's the set that was shown to me.

 3        Q      Do you know how you were able to

 4   ascertain the fact that he had a tattoo when he

 5   was wearing a coat?

 6        A      Right now, you can still see it.

 7   If he had a coat on, I could still see part of

 8   the tattoo.  With his hands there, you can

 9   still see part of that.   That's what I seen.

10        Q      But sitting here today, you don't

11   know if the other two people had tattoos, do

12   you?

13        A      No.

14        Q      Do you know why you failed to tell

15   the Detective he was wearing a hat?

16        A      No.

17        Q      Do you know why you told the

18   detective that he was wearing a white pullover

19   shirt?

20        A      No.

21        Q      Do you acknowledge that the video

22   showed the individual with a white pullover

23   shirt walk behind the counter?

24        A      Yes.

25        Q      Given all these acknowledgements
```

1    that you just made, do you not think it's

2    possible that you made a mistake in the

3    identification of my client?

4         A     I mean, I met the identification of

5    what I assumed at that time.  That's what I --

6    what I saw is what I gave the police officers.

7         Q     And you acknowledge that it's

8    possible that the police brought you a lineup

9    prior to the 14th?  Correct?

10        A     Like I said, anything is possible.

11        Q     Prior to this one.  What date did

12   you sign the lineup there?

13        A     This was on the 14th of January.

14        Q     Okay.  Could it be that you were

15   shown another set of photographs on this date,

16   the 5th, plus or minus two days?

17        MR. JARRELL:  Your Honor, I am going to

18                  object.  And I would like to

19                  take this witness on voir dire,

20                  if I could, because there is

21                  being a misinterpretation of her

22                  testimony, and even testimony

23                  that he has presented here in

24                  the form of his evidence, the

25                  transcript.

```
1            MR. THOMAS:  We put the entire transcript
2                   in the record.
3         THE COURT:  More properly in my mind,
4                   it's subject of redirect, so
5                   overruled.  I will let you bring
6                   it out on redirect.
7                        Go ahead, Mr. Thomas.
8         MR. THOMAS:  That's all I have.
9         THE COURT:  Mr. Jarrell.
10               REDIRECT EXAMINATION
11   BY MR. JARRELL:
12        Q    I believe it was Page 83 or 4.  We
13   were talking about where he brought and showed
14   you the -- yeah.  Page 82, line 18.  You were
15   asked, how long after the robbery did that
16   occur, referring to the photo lineup.
17                   What was your answer?  Read line
18   18?
19        A    I believe a week or so.
20        Q    You never said the 5th, did you?
21        A    No, sir.
22        Q    That's Mr. Thomas's testimony?
23   Right?  He said it, not you?
24        MR. THOMAS:  Your Honor, I clearly took
25                   her through the testimony, line
```

1                        by line, word by word.

2           MR. JARRELL:  And every time he did, Your

3                        Honor, he injected his numbers

4                        for her answers.

5           THE COURT:  Well, her testimony at the

6                        preliminary hearing is whatever

7                        it was in that transcript.

8           Q       And that testimony was a week or

9  so?  Is that correct?

10          A       Yes.  A week or so.

11          Q       Do you have any reason to disavow

12 that the 14th of January was the date that you

13 saw this lineup sheet?

14          A       That's the date I saw it.  The date

15 I signed it is the date I saw it.

16          Q       The date you saw it.  Okay.  Thank

17 you.  Now, not only did someone come up to the

18 front with a gun, someone went around and got

19 your purse during that time, didn't they?

20          A       Yes.

21          Q       When the man was standing there

22 holding the gun, you don't recall whether it

23 was the right or left hand?  Is that correct?

24          A       Right.

25          Q       But he demanded the money?  Is that

```
1    correct?

2          A      Yes.

3          Q      And when he demanded the money, did

4    he reach for it?  Or did you hand it to him?

5    How did he get the money?

6          A      First, he did not reach for it.  He

7    asked me.  And I told him if he wanted it, to

8    take it.

9          Q      What did he do then?

10         A      Then he pointed the gun at me and

11   said, give it here.

12         Q      What did do?

13         A      That's when I got the money.

14         Q      What did you do with it?

15         A      I handed it to him.

16         Q      You handed it to him.  Did he reach

17   for it with the gun hand or the other hand?

18         A      The other hand.

19         Q      So he had both hands at you, didn't

20   he?

21         A      Yes.

22         Q      You had full view of both hands?

23         A      Yes.

24         Q      Did you have full view of his face?

25         A      Yes.
```

1       Q       Were you worried about what he was

2   dressed in or what he looked like?

3       A       What he looked like.

4       Q       Is there any question in your mind

5   today that that individual is the one that

6   robbed you (indicating)?

7       A       There is no question.

8       Q       Who pointed a gun at you?

9       A       Yes.

10      MR. JARRELL:  Thank you.

11      THE COURT:  Mr. Thomas.

12              <u>RECROSS EXAMINATION</u>

13  <u>BY MR. THOMAS</u>:

14      Q       Ms. Thomas, is it your testimony

15  that there is no question in your mind that

16  this is the man holding the gun?  Is that your

17  testimony?

18      A       Yes.

19      Q       But it is true to say that you are

20  not sure if he was wearing a coat or white

21  shirt?  You are not sure if he had on a

22  toboggan or didn't have on a toboggan?  Or afro

23  hair or no afro hair?

24      A       I'm not sure.

25      Q       You are not sure about any of that,

1    are you?

2        A    Looking a person in the face, you

3    know that you remember.

4        Q    You are sure that it was him, but

5    you are not sure about anything else, are you?

6        A    Yes.  I'm sure it was him.

7        MR. THOMAS:  That's all I have.

8        THE COURT:  Anything else of this

9              witness?

10       MR. JARRELL:  Yes, sir I have a few more

11             questions.

12             REDIRECT EXAMINATION

13   BY MR. JARRELL:

14       Q    Correct me if I'm wrong, but you

15   indicated that the person, and I believe it was

16   on page 82 had an afro-type hair?  Right?

17       A    Yes.

18       Q    And that that hair was sticking out

19   or up, however you said it?  Is that correct?

20       A    Yes.

21       Q    I show you this picture that you

22   have identified as being the person who had the

23   gun.  Is his hair what you would call afro or

24   bushy or long?

25       A    Yes.

1       Q      If you crammed a hat down on that

2    hair, where would it go?

3       A      It would go down and out.

4       Q      It would be sticking out, wouldn't

5    it?

6       A      (Nodding head in the

7    affirmative).

8       Q      It would be easy for you to see

9    what it was?

10       A      (Nodding head in the affirmative).

11       Q      It obviously wasn't close cut like

12    it is now?

13       A      No.

14       MR. JARRELL:  That's all.

15       THE COURT:  Mr. Thomas, anything else of

16              this witness?

17              RECROSS EXAMINATION

18    BY MR. THOMAS:

19       Q      Ms. Thomas, prior to you seeing

20    that picture on January the 14th, did you have

21    any way of knowing that man had afro hair?

22       A      Say that again.

23       Q      Prior to seeing the photograph that

24    was obtained by the police on January 13th, did

25    you have any way of knowing that this man had

1   afro hair, standing up?

2         A       Yes.  You could see it, even with a

3   hat on, you can still see the hair.

4         Q       In the video you could see afro

5   hair standing up?

6         A       I didn't in the video.

7         Q       You don't know, do you, if the

8   other people in that store had tattoos on them

9   or not, do you?

10        A       No.

11        Q       It's possible that one of them

12  could have had tattoos on their left or their

13  right arm?

14        A       It's possible.

15        MR. THOMAS:  That's all I have.

16        MR. JARRELL:  The State rests.

17        THE COURT:  Ladies and gentlemen, I've

18                   got a couple of different things

19                   that I need to take up out of

20                   your presence.  And I have some

21                   people waiting for me in the

22                   back room.  So we are going to

23                   to take about 15 minutes.  It's

24                   about ten until 3:00.  We will

25                   be in recess until at least 10

```
 1              after 3:00.
 2                        Let me remind you, do
 3              not discuss this case among
 4              yourselves, nor allow anyone to
 5              discuss it with you.
 6                        Everyone that is in the
 7              courtroom will remain.  The jury
 8              may be excused.
 9          (The jury exited the courtroom).
10     THE COURT:  Let the record reflect that
11              we were outside the presence of
12              the jury.
13                        Y'all can have a seat.
14                        Those of you who are
15              sitting out here, I've heard
16              some comments made in this
17              courtroom.  I had better not
18              hear another one.
19                        Young lady?
20     YOUNG LADY:  I won't say nothing no more.
21     THE COURT:  Ma'am, this is a court of
22              law.  And the next time that
23              happens, I will clear the
24              courtroom, and whoever says that
25              will go to jail.
```

```
 1                      Do you understand me?
 2        YOUNG LADY:  (Nodding in the
 3              affirmative).
 4        THE COURT:  Well, acknowledge it, ma'am.
 5        YOUNG LADY:  Yes, sir.
 6        THE COURT:  Now, y'all are excused, and
 7              you need to leave right now.  I
 8              need to take up some matters
 9              with these attorneys.  If you
10              are sitting out there in the
11              gallery, you need to step out.
12              Thank you.  I had better not
13              hear another peep out of anybody
14              back there, I will clear this
15              courtroom.  That is unnecessary.
16                      Okay.  We are
17              outside presence of the jury and
18              all spectators, with the
19              exception of defense counsel,
20              D.A., D.A. investigator and the
21              two victims.
22                      Mr. Thomas, is there
23              anything that you want to put
24              on the record?
25        MR. THOMAS:  Yes, sir, there is.  Can we
```

```
 1              approach the bench, sir?

 2         THE COURT:  Sure.

 3                   Mr. Jarrell, come on

 4              up.

 5    MR. THOMAS:  I thought it would be wise

 6              to put on the record my client

 7              has made several statements to

 8              me in the past that he would

 9              like for it to come out in court

10              that one of the Co-defendants

11              who was dismissed by the grand

12              jury, I believe Mr. Marcus

13              Williams, he wants it to come

14              out through cross examination

15              that they were dismissed.

16                   I have informed my

17              client that I do not believe

18              that is relevant or admissible

19              under the Alabama Rules of

20              Evidence or any statutes that

21              I'm aware of.  In fact, I think

22              it could possibly lead to a

23              mistrial.  I have informed him

24              of that, and he has been adamant

25              about it.  I just want to get a
```

```
 1                        ruling from the Court on that
 2                        point before we go forward for
 3                        the record.
 4         THE COURT:  Mr. Jarrell, what would be
 5                        the response of the State?
 6         MR. JARRELL:  The State would object out
 7                        of an abundance of precaution,
 8                        not that really the effect,
 9                        outcome of the case, but it
10                        could, I think be a problem as
11                        far as a Rule 32 against Mr.
12                        Thomas.
13         MR. THOMAS:  If the State is willing to
14                        stipulate to it coming in, I'm
15                        certainly willing to argue it.
16         MR. JARRELL:  I don't see any reason for
17                        it to come.  In it's not
18                        admissible.  It's irrelevant.
19         THE COURT:  Well, in my mind it would be
20                        irrelevant.  The fact that the
21                        grand jury acts or doesn't act,
22                        that's within their discretion.
23                        It has no bearing on your case.
24                        None whatsoever.  But the grand
25                        jury is an independent body that
```

1        makes a determination of

2        probable cause or no probable

3        cause. I don't know how that

4        helps or hurts your case at all.

5        But I can see where it might be

6        -- in my mind it just clouds the

7        issue. And the issue in this

8        case, quite simply, sir, whether

9        or not you are guilty or not

10       guilty of this offense. It does

11       not matter that Marcus Williams

12       may be guilty or may not be

13       guilty. It does not matter if

14       somebody else participated or

15       did not participate in this

16       crime, sir. The question before

17       this Court in this case is

18       whether or not you are guilty or

19       not guilty of the offense for

20       which you are charged with, not

21       whether or not the grand jury

22       indicted or did not indict

23       somebody else, sir. That has

24       absolutely nothing to do with

25       it.

1      MR. THOMAS:  Your Honor, just so the

2            record is crystal clear, we

3            would have offered that

4            testimony in respect to the

5            credibility of the eye witness

6            testimony, which is what this

7            case is all about.  We would

8            have offered it to say that the

9            grand jury did not buy into --

10            we are theorizing, of course,

11            but that would have been the

12            argument.

13      THE COURT:  And that would have been

14            substantially logic in theory,

15            because grand jury proceedings

16            are secret, so I don't know what

17            testimony was presented or not.

18            But I can tell you that it

19            doesn't help you that somebody

20            else wasn't indicted.  You were,

21            sir.  The Grand Jury of Pike

22            County determined that there was

23            probable cause to believe that a

24            crime had been committed, and

25            you were the one that committed

```
 1                    the offense.  Whether somebody
 2                    else is prosecuted or not
 3                    prosecuted does not weigh into
 4                    this matter at all, sir.
 5         MR. THOMAS:  And, Judge, while we are
 6                    here on the record, I don't
 7                    think Mr. Jarrell would have any
 8                    objection.  We would like, if
 9                    the State will stipulate, for
10                    the original video tape coming
11                    into evidence.  I don't see what
12                    that's going to hurt.  We've
13                    seen it a thousand times.
14         MR. JARRELL:  I have no objection.
15         THE COURT:  Then it will be admitted.  Do
16                    y'all want to put it in as a
17                    State Exhibit or Defendant's
18                    Exhibit?
19         MR. JARRELL:  It doesn't matter.
20         THE COURT:  Let's admit it as a State's
21                    Exhibit, State's Exhibit No. 4.
22                    The tape will be admitted as
23                    State's Exhibit No. 4.
24                         I have some things I need
25                    to take up with some people in
```

1          the back, and then we will get

2          back to it.

3        (Off-record discussion).

4        (The following was heard out of the

5          hearing of the jury).

6     THE COURT:  I'm sorry.  I was back in

7          the back taking up another

8          matter.  Okay.  It is my

9          understanding that the State has

10          rested.  And we have agreed to

11          admit the video tape as State's

12          Exhibit No. 4, by agreement.  Is

13          that right?

14     MR. JARRELL:  Yes, sir.

15     MR. THOMAS:  Yes, sir.

16     THE COURT:  All right.  Now, the State

17          rests.  We need to take up any

18          motions.

19     MR. THOMAS:  We move for a motion of

20          judgment of acquittal.

21     THE COURT:  That motion is denied.

22              Now, do you have any

23          testimony of witnesses that you

24          wish to present?

25     MR. THOMAS:  Yes, Judge.  We are going to

```
 1                    recall some of the witnesses and

 2                    reserve the right to recall

 3                    them.

 4               (The following was heard in the

 5                    presence of the jury).

 6      THE COURT:  Ladies and gentleman, at this

 7                    point the State has rested,

 8                    which means that the State has

 9                    presented evidence in support of

10                    its case.  And now the defense

11                    has the right to call witnesses.

12

13                    Call your first

14                    witness, Mr. Thomas.

15      MR. THOMAS:  Your Honor, we would like to

16                    recall Ms. Rebecca Holley, just

17                    briefly.

18      THE COURT:  If there are any other

19                    spectators that were formerly in

20                    here that want to be in here,

21                    they are welcome to come in

22                    here, just as long as we have an

23                    understanding about what we will

24                    and won't do.  So I don't know

25                    if there are any more out there.
```

1

2                              Ma'am, you remain under

3              oath.  Please have a seat.

4                  DIRECT EXAMINATION

5    BY MR. THOMAS:

6        Q    Ms. Holley, I just want to confirm

7    it was your prior testimony that it was the

8    gentleman with the white shirt that you

9    identified?  Is that correct?

10       A    Yes, sir.

11       Q    That was the person at Sunny South

12   that day, I believe?  That was your prior

13   testimony?  Correct?  The gentleman wearing the

14   white shirt was in the Sunny South that day?

15       A    It looked like he was the gentleman

16   that was in there to me.

17       MR. THOMAS:  That's all I have.

18       MR. JARRELL:  I don't have anything

19              further.

20       THE COURT:  You may step down.

21                      Call your next witness.

22       MR. THOMAS:  We would like to call

23              Detective Greg Wright.

24       THE COURT:  Detective, you remain under

25              oath.

1

2                          GREG WRIGHT

3                  REDIRECT EXAMINATION

4    BY MR. THOMAS:

5         Q       Detective Wright, do you recall

6    having testified at the preliminary hearing

7    some time ago?  Correct?

8         A       Yes.

9         Q       Do you recall having testified in

10   there that Ms. Edith Thomas -- who Ms. Edith

11   Thomas identified the gentleman wearing only

12   the white shirt?  The solid white shirt?  Do

13   you recall what her statement to you was?

14        A       I still don't understand your

15   question.

16        Q       Do you recall who Ms. Edith Thomas

17   identified at the BeeLine as wearing the white

18   shirt?  In other words, let's just go through

19   to make sure we are all clear who the parties

20   are.  There is one individual in the video with

21   a jacket.  There is one individual in the video

22   with no jacket, but a dark colored shirt, and

23   that's really all we can tell.  And then,

24   there's another individual in the video that's

25   wearing a solid white shirt.  And he would have

COURT OF CRIMINAL APPEALS NO. CR04-0759

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF PIKE COUNTY, ALABAMA

CIRCUIT COURT NO. CC03-382&383

CIRCUIT JUDGE Steven E. Blair

Type of Conviction / Order Appealed From: Robbery, 1st x2

Sentence Imposed: 25 years in Penitintiary

Defendant Indigent: ☒ YES ☐ NO

Bobby Williams

NAME OF APPELLANT

James "Jim" Thomas          566-2181
(Appellant's Attorney)          (Telephone No.)
P.O. Box 974
(Address)
Troy,          AL          36081
(City)          (State)          (Zip Code)

V.

STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____          Volume 2 of 3

(For Court of Criminal Appeals Use Only)



EXHIBIT
A

1    been the gentleman that walked around the

2    counter?

3        A       (Nodding in the affirmative).

4        Q       Do you recall who Ms. Edith Thomas

5    identified as the person wearing a solid white

6    shirt that walked around the counter?

7        A       Brad Kinner (sic).

8        Q       Now, Mr. Kinner, was he at some

9    point charged with a crime in this case?

10        A       Yes, he was.

11        Q       A couple more questions going back

12    to the photographic line up.  When did the

13    photograph first become available of the

14    Defendant, Mr. Bobby Williams?

15        A       To us?  Or period?

16        Q       To the Troy Police Department?

17        A       The day we went out for the

18    interview.

19        Q       What day would that have been?

20        A       The 13th, I believe.  On the 13th.

21        Q       Did you conduct any previous

22    lineups -- let me stop there.  You conducted

23    the lineup with Ms. Thomas?  Correct?

24        A       Yes, sir.

25        Q       Did you conduct the lineup with Ms.

1    Holley?

2          A       No.

3          Q       Was the same lineup used in both

4    lineups?

5          A       I got a copy of Corporal Ross's

6    lineup.  I'm assuming that was the same one.

7          Q       That would have been the one in

8    Montgomery?

9          A       That's correct.

10         Q       And, again, that lineup became

11   available on January 13th?  Correct?

12         A       Yes.

13         Q       Okay.  Prior to January the 13th,

14   were there any other -- did you conduct any

15   other lineups with Mrs. Thomas?

16         A       Not that I recall.  I would like to

17   look in my file of the individuals that worked

18   at Wiley Sanders to get an idea of possibly if

19   someone that worked out of town that may be

20   employed with Wiley Sanders but I have  nothing

21   that shows that.

22         Q       Okay. I'm not sure if I followed

23   all of that.  And I apologize.  Are you saying

24   that you did show her some photographs?

25         A       No, sir.  I said I supplied photos

1    in preparation to show her of individuals that

2    we thought may have been either in the Troy

3    area or probably worked in the Troy area.   I

4    don't have anything to show that I showed her

5    that particular lineup.

6           Q      So there was only one photograph

7    lineup conducted, you are saying, with Ms.

8    Thomas at the BeeLine?

9           A      That's correct.

10          Q      And you are saying that that

11   picture did not become available to you or

12   anybody else down here in Troy until the 13th?

13   Correct?

14          A      Correct.

15          Q      Do you know how it's possible that

16   she could have seen a prior photograph lineup

17   -- let me rephrase the question.  Do you have

18   knowledge of any other detectives or police

19   officers showing her a prior photographic

20   lineup on or about around -- probably it would

21   have been December?   Late December?

22          A      No, sir, not to my knowledge.

23          Q      Would you be aware of that if

24   another officer had done that?

25          A      I should, because I'm the case

```
1    agent.

2          MR. THOMAS:  You are the case agent.

3    Okay.  That's all I have.  Thank you.

4                RECROSS EXAMINATION

5    BY MR. JARRELL:

6          Q    Just to clarify something for

7    myself.  You said that you compiled some

8    photographs of local people that worked at

9    Wiley Sanders that may have lived out of the

10   area?  Is that right?

11         A    Yes, sir.

12         Q    Did you show those to her?

13         A    No.

14         Q    You never did get around to doing

15   that?

16         A    No, sir.

17         Q    But at the time that you were

18   working this case, you weren't just showing her

19   lineups of this defendant, were you?

20         A    No.

21         Q    You had three other suspects you

22   were showing her the lineup on?

23         A    That's correct.

24                REDIRECT EXAMINATION

25   BY MR. THOMAS:
```

205

1       Q      Mr. Wright, what date were the

2  other lineups?  Were they all conducted

3  together?

4       A      I couldn't answer that.  I don't

5  have the case file with me.

6       Q      Well, is it safe to say that your

7  first contact with Montgomery Police was

8  January 13th?

9       A      Yes.

10      Q      Is it safe to say that January the

11 13th is the first date that any of those other

12 pictures could have become available to you?

13      A      On that particular case, yes, sir.

14      Q      So it's not impossible that Ms.

15 Rebecca Holley could have been confused from

16 having been shown other photos at an earlier

17 date, prior to January 13th?

18      A      I couldn't tell you about what she

19 was shown and what she was not shown.

20      Q      Is this statement true:  There were

21 no photos available to your department, period,

22 for this gentlemen or any of the co-defendants

23 prior to January 13th?

24      A      There were no photos available on

25 him prior to January 13th, but Corporal Ross

1    may have gotten from Montgomery Police

2    Department, I couldn't tell you.  But I know we

3    physically went and retrieved this lineup.

4         Q    Okay.  But my questions was for him

5    or any other co-defendants as of January 13th.

6    So is it possible that there were pictures of

7    other co-defendants brought to the Troy City

8    Police Department prior to, not including him,

9    Mr. Williams, prior to January 13th?

10        A    As far as I know, all of the photos

11   that he have on him and on the co-defendants

12   were on the 13th.  If he showed any other

13   lineup priors to the 13th, I couldn't answer.

14        MR. THOMAS:  That's all we have.

15        MR. JARRELL:  Nothing further.

16        THE COURT:  You may call your next

17                  witness.

18        MR. THOMAS:  We recall Detective Larry

19                  Ross.

20        THE COURT:  Sir, you remain under oath.

21                  Please have a seat.

22

23

24

25

1

2                         LARRY ROSS

3                   REDIRECT EXAMINATION

4    BY MR. THOMAS:

5         Q    Mr. Ross, Detective Ross, did you

6    have occasion to develop a photo lineup for the

7    robbery, referring to the Sunny South robbery?

8         A    The lineup was made at the

9    Montgomery Police Department.

10        Q    Okay.  And what date would that

11   picture of Mr. Williams have become available

12   to the Troy Police Department?

13        A    The same day we did the interview

14   at the Montgomery County Jail.

15        Q    Okay.  Do you remember the date?

16        A    No.

17        Q    Do you have your file?

18        A    No.

19        Q    Would you stipulate that it was

20   January 13th?

21        A    Okay.

22        Q    Does that sound reasonable?

23        A    Yes, sir.

24        MR. JARRELL:  The State will stipulate

25                that the photograph and the

1               photographs of the other

2               suspects were not in the hands

3               of the Troy Police Department

4               until the 13th of January.

5       Q       What was the first occasion that

6   you had to conduct a photographic lineup with

7   Ms. Rebecca Holley in respect to this crime?

8       A       Some time past the 13th.  I don't

9   know what date I went out there.   Mr. Thomas,

10  I'm sorry.  I didn't bring the file with me.

11      Q       Is it in the building or back at

12  the police station?

13      A       It's back at the police station.

14      Q       How long would it take?

15      A       Ten minutes.

16      MR. THOMAS:  Judge, is that acceptable to

17              you?  I think it will go a lot

18              smoother if he had his file.

19      THE WITNESS:  I'm sorry I didn't bring

20              it.

21      MR. JARRELL:  I will stipulate that he

22              showed whatever date is on the

23              form.  I think it was the 13th

24              or 14th.

25      THE WITNESS:  Whatever date is on that

209

```
 1                        form is when I showed them to

 2                        her.

 3            Q       Okay.  Again, your testimony is

 4    there were no lineups prior to the 14th with

 5    Rebecca Holley?

 6            A       If that's the date on that form,

 7    that's the first day I showed them.

 8            Q       Is it a safe statement to say, that

 9    it was physically impossible for Ms. Holley to

10    identify this person prior to the 14th, because

11    she did not have any photo in her possession?

12            A       She picked him out that date in

13    that lineup.

14            Q       But is it safe to say it physically

15    is impossible for it to happen any sooner than

16    that?

17            A       No.  She didn't -- I didn't show

18    her the lineup before that date.

19            Q       Okay.  Are you the managing case

20    agent over the Sunny South case?

21            A       Yes.

22            Q       Do you know if any officer, whether

23    they were street officers or other detectives,

24    may have conducted any other lineup with Ms.

25    Holley?
```

210

1          A       I did them all.

2          Q       You did them all.  Okay.  The date

3     of the incident was 12-22-02?

4          A       21st, wasn't it?

5          Q       12-21.  Okay.  How do you explain

6     Ms. Holley having testified that she was shown

7     two photographic lineups in this case, one

8     being on a Monday, 12-23, and the other one

9     being on whatever the 14th of January of '03

10    is?

11         A       I can't explain that.

12         Q       Are you looking at a form where she

13    saw a lineup that day?  Do we have a form where

14    she saw a lineup that day?

15         A       I don't have possession of the

16    file.

17         MR. JARRELL:  It's not in the possession

18              of the State.

19         Q       Are you in possession of any type

20    of form showing that she had seen a lineup on

21    that date?

22         A       I have all my forms at the station

23    in the file, which I failed to bring.  But I

24    don't think she saw a lineup that day.

25         Q       So if she testified that she made

1    two positive identifications of the defendant,

2    one of them specifically December 23rd, that

3    being a Monday, where you didn't even have the

4    defendant's picture, she would be mistaken?

5         A    I would say so.

6         Q    Is it not possible that if you went

7    out there with another group of pictures or

8    your first group of pictures on the 23rd, that

9    you showed her, and that that group of pictures

10   did not contain the defendant that she

11   positively identified somebody out of the first

12   group on 12-23?

13        A    We had no suspects on Monday.

14        Q    How do you explain the testimony

15   that she identified --

16        A    I can't explain that.

17        MR. JARRELL:  He answered that.  He

18            doesn't know.

19        Q    How many photos were contained in

20   the lineup that you showed her on the 14th?

21        A    Of your client?

22        Q    Yes, sir.

23        A    All of the lineups that we do are

24   six photos, Mr. Thomas.

25        Q    Okay.  So if she was shown six

1    photos, is it possible that she could have been

2    shown 18?

3            A       At one time?

4            Q       Yes, sir?

5            A       At one time, no.

6            Q       Okay.  So this six-photo lineup was

7    1-14.  That would have been about 24 days?  Is

8    that correct?  After the incident?

9            A       That's close.

10           Q       Close enough?

11           A       (Nodding in the affirmative).

12           Q       Going back to your interview with

13   Ms. Holley, do you recall if she provided you

14   with a description of the suspect?

15           A       She gave height and weight.

16           Q       Height and weight.  Do you remember

17   what that was?

18           A       No.

19           Q       Do you recall having testified at

20   the preliminary hearing?

21           A       Yes.

22           Q       If I showed you the transcript,

23   would that help refresh your memory on that

24   point?  I'm going to let you see that defense

25   exhibit.

```
 1        A       Okay.   Where?
 2        Q       I think if you start around Page
 3   12.  Do you remember if she said anything about
 4   this defendant having facial hair?
 5        A       I'm reading here.  I don't remember
 6   that.
 7        Q       If you look at line 21, does that
 8   help?  Line 2 is on Page 12.
 9        A       No.  According to that, she didn't
10   say anything about facial hair.
11        Q       Okay.  So she did not mention
12   facial hair.  Do you know if -- did the
13   Defendant, Mr. Williams, have facial hair at
14   the time of your interview with him?
15        A       I don't remember any facial hair.
16   I didn't stay with him a real long time.
17        Q       I understand.  If I showed you
18   Defendant's Exhibit No. 1, that's a
19   photographic lineup that was done on the 14th,
20   that might refresh your memory.
21        A       He had facial hair in that picture.
22        Q       Thank you.  Do you recall if she
23   described the defendant as being dark or light
24   complected for a black person.
25        A       I don't remember her saying
```

1    anything about the complexion.

2         Q    Okay.  I think if you look at Page

3    13, and read lines 6 through 14, that might

4    help refresh your memory.

5         A    Okay.  According to this, she said

6    his complexion was dark.  Both subjects were

7    dark complected.

8         Q    Okay.  Do you recall if she was

9    able to give you any information about what he

10   was wearing?

11        A    She -- well, I see it right down

12   here.  A black jacket and black pants and black

13   hat?  Is that right?

14        Q    Yes, sir.  That's what I read of

15   it.

16        A    Okay.

17        Q    Black jacket, black pants and hat?

18        A    That's what this says.

19        Q    Were you able to recover any of

20   the clothes from the defendant that the witness

21   had described?

22        A    No.

23        Q    Okay.  And I believe we covered

24   this this morning, but, short of the

25   identification from Montgomery County, where my

```
 1    client concedes to some prior robberies, do you

 2    have any physical evidence that will tie this

 3    gentleman to these robberies?

 4         A    Nothing but his confession.

 5         Q    You don't have a handgun?

 6         A    No.

 7         Q    You don't have fingerprints?

 8         A    No.

 9         Q    You don't have any store video from

10    from the Sunny South?

11         A    No.

12         Q    Do you have any eye witnesses who

13    were in the parking lot or in the store?

14         A    No.

15         MR. THOMAS:  That's all I have.

16         THE COURT:  Any questions of this

17              witness?

18         MR. JARRELL:  Yes sir, I do.

19                   RECROSS EXAMINATION

20    BY MR. JARRELL:

21         Q    Mr. Thomas referred you to Page 12,

22    and ask you to look at that?

23         A    I've already handed it back.

24         Q    I will give it back to you.

25         A    Okay.
```

```
 1           Q      I will give you a moment to find

 2    Page 12.

 3           A      Okay.

 4           Q      Now, he wants to make a point

 5    about, that she did not mention any facial

 6    hair.  And he asked you to read one line, which

 7    I believe was line 21.  No, she didn't?  Is

 8    that right?

 9           A      Yes.

10           Q      If you go on down to line 23, it

11    says:  I don't remember her saying anything

12    about facial hair.  Is that right?

13           A      (Nodding in the affirmative).

14           Q      Does that mean there wasn't and

15    facial hair?  Or she didn't say anything about

16    it?

17           A      I don't remember her saying

18    anything about facial hair.

19           Q      Does that mean that he did have

20    facial hair or didn't have facial hair?  You

21    don't know, do you?

22           A      Can I say something?

23           Q      Sure.

24           A      She was very upset that day.  Very

25    distraught.
```

```
 1        Q      The point being she didn't say that
 2   he did not have facial hair.  She said -- you
 3   don't remember her saying anything about it?
 4   Is that right?
 5        A      That's right.
 6        Q      Now, on Page 13, talking about
 7   complexion.  Let's see the answer she gave.
 8   And I'm going to read, I've told you.
 9        Question:  complexion black?
10        And this was Mr. Thomas.  Question, and
11   you say hold on a minute.  I don't see it now.
12   The complexion of the first subject was dark.
13   Both subjects were dark completed is what she
14   told us.
15        Question:  In your normal scheme of
16   identifying black perpetrators, would you
17   normally ask if they were black, if they were
18   fair, light or dark skinned?
19        And your Answer:  I don't ask that
20   question.
21        A      I don't, no, sir.
22        Q      You had a white victim?  Right?
23        A      Uh-huh.
24        Q      You had a black suspect?
25        A      (Nodding head in the affirmative).
```

1        Q        And didn't get into degree of

2    blackness or shade of his skin, did you?

3        A        No, I didn't.

4        Q        As far as the lineup was concerned,

5    when you were showing her the lineup, you

6    didn't show her 18 or 20 full pictures that

7    contained the defendant, did you?

8        A        No, I didn't.

9        Q        But would it be fair to say that

10   you showed 18 or 24 pictures, six of each,

11   which each one had a suspect?

12       A        I did that.

13       Q        There were four suspects, and you

14   were looking four for different I.'D.'s?

15   Right?

16       A        Yes, sir.

17       Q        And you showed them all to to her?

18       A        Yes, sir.

19       MR. JARRELL:    Thank you.    That's all.

20                REDIRECT EXAMINATION

21   BY MR. THOMAS:

22       Q        Detective Ross, I'm assuming from

23   the testimony that you gave earlier that you do

24   not normally ask if black people are dark skin,

25   median skin, light skin.    I'm not remembering

```
 1     the wording exactly, but that Ms. Holley

 2     offered that to you, that he was dark

 3     complected?

 4          A    Okay.

 5          Q    Is that a fair assessment?

 6          A    I think that's what it says, yes,

 7     sir.

 8          Q    Therefore, she must have found it

 9     significant that he was dark complected?

10          MR. JARRELL:  Objection to what she

11                might have thought.

12          THE COURT:  Sustained.

13          Q    Is that an identifying

14     characteristic that she provided you

15     spontaneously, without a question from you,

16     that the person with the gun was dark

17     complected?

18          A    You are asking me?  I don't really

19     remember.  I think that was on the report that

20     she made, that he was dark complected.

21          Q    In other words, is it your

22     testimony that you believe that came off the

23     report?

24          A    I'm not sure.

25          Q    If you --
```

1          A       I don't remember questioning her

2     about complexion.

3          Q       And I can understand why you

4     wouldn't remember.  Quiet frankly, I wouldn't

5     remember after this much time either.  But if I

6     refer back to the transcript on Page 13, which

7     was done shortly after the robbery, right there

8     on Page 13, do you see where it says that was

9     in the report?  Line 6?

10         A       Hold on just a minute.  I do see it

11    now.  The complexion of the first subject was

12    dark.  Both subjects were dark complected, is

13    what she told us.

14                 Where I got that from, I don't

15    know, unless it was off the report.

16         MR. THOMAS:  I understand.  That's all I

17              have.

18         MR. JARRELL:  Nothing further.

19         THE COURT:  Please step down.

20                          Call your next witness,

21              Mr. Thomas.

22         MR. THOMAS:  Your Honor, we are at a

23              point where we may be close to

24              wrapping up.  Is it possible for

25              me to get a couple of minutes?

```
1          THE COURT:  Sure.

2                          Ladies and gentlemen,

3                 it's about 10 minutes until

4                 4:00.  We will take another

5                 10-minute recess.  And we may

6                 have an announcement for the

7                 then.

8                          As I have instructed

9                 you earlier, please do not

10                discuss this case among

11                yourselves, nor allow anyone to

12                discuss it with you.  Thank you.

13              (A short recess was taken).

14         THE COURT:  Mr. Thomas, call your next

15                witness, sir.

16          MR. THOMAS:  We recall Ms. Rebecca

17                Holley for just a moment.

18         THE COURT:  Ms. Holley, you remain under

19                oath.  You may have a seat.

20

21

22

23

24

25
```

1

2                    REBECCA HOLLEY

3              REDIRECT EXAMINATION

4    BY MR. THOMAS:

5        Q    Ms. Holley, there has only been

6    one point of confusion that I want a

7    clarification on.  You had testified that on

8    the Monday after the event, you viewed -- and I

9    believe the event was on Saturday?  Correct?

10       A    Yes, sir.

11       Q    Okay.  And then the Monday after

12   the Saturday, you testified that you went

13   through a series of photographs.  I'm not

14   certain if we knew with clarity where you went

15   through photographs?  Do you recall?

16       A    At the police station.

17       Q    So the Monday after the Saturday,

18   that would have been around December 23, 2002,

19   you sat down and saw the photographs at the

20   police station?

21       A    I saw some photographs.

22       Q    And that was the first time that

23   you identified the defendant?

24       A    No, sir.  I did not identify him

25   there.

1          Q        Well, you testified earlier that on

2    that first lineup you identified the defendant.

3          A        That night that it happened, I went

4    down to the police station.  We was looking

5    through pictures then.  The Monday I went back

6    down there to see if I could identify, but I

7    did not identify him then.  And then, at some

8    point in time --

9          Q        Let me stop you right there.  Your

10   testimony has changed?  Is that correct?

11         A        I suppose it has.

12         Q        So, now you are telling me and the

13   jury that you did not identify the defendant on

14   the 23rd?

15         A        That is correct.  But I did look at

16   the pictures.  I may have misunderstood the

17   first time that you asked me the question, but

18   I did --

19         Q        Ma'am, are you aware that you are

20   under oath right now?

21         A        Yes, sir.  And I am telling you the

22   truth.

23         Q        Were you telling me the truth the

24   first time or now?

25         MR. JARRELL:  Object to that.

1          THE COURT:  Sustained.

2          Q      Okay.  So you were -- now your

3    testimony is that you were shown some

4    photographs when?

5          A      That Saturday night, after I got

6    robbed, I went down to the police station.  I

7    seen photographs on a computer like-thing,

8    because they don't have them on the books

9    anymore.  And then I went back down there that

10   Monday.

11         Q      You went down there on that Monday,

12   and you saw more photographs?

13         A      Yes, sir.  I believe that is

14   correct.

15         Q      And on that Monday, what happened

16   with those photographs?  This would have been

17   on December the 23rd.

18         A      Nothing.  I mean I don't remember

19   picking out the fellow that day.

20         Q      Okay.  Earlier, would you admit

21   that you testified that you picked him out on

22   December 23rd?

23         A      I must have misunderstood your

24   question.

25         Q      Ma'am, have you had any

1   conversations with any police detectives or

2   agents of the District Attorney's Office in the

3   past two hours?

4        MR. JARRELL:  I object to that.

5        A       No, sir.

6        THE COURT:  Wait a minute.

7                       Rephrase your question.

8        Q       Have you had any conversation with

9   anybody about your viewing of this photographic

10  lineup in the past two hours?

11       A       No, sir, I have not.

12       Q       Now, then, let's go back to the

13  preliminary hearing.  I want you to start

14  reading, and this is your testimony, which was

15  taken in April of 2003.  That would have been

16  about three months, three-and-a-half months

17  after the time of the incident.  Your testimony

18  was taken on April the 8th.  The event occurred

19  on December 21st, 22nd, some time around there,

20  of '02.

21       Now, I'm going to read a question to you.

22  And I'm going to ask you to read the response.

23       Okay.  So six separate photographs were

24  presented to you?  How long did it take you to

25  identify the suspect from those photographs?

1            And I am going to ask you to read lines 9

2    through 10.

3            MR. JARRELL:   What page is that on?

4            MR. THOMAS:   On Page 68.

5        A     Do you want me to do the response?

6

7        Q     Yes, ma'am, if you will just read

8    it out loud.

9        A     It says the one that had the gun on

10   me, I identified him right away.

11       Q     And then, let's back track so that

12   we are clear on this.  Okay.  I'm going to ask

13   you to start reading, because you referenced

14   seeing some pictures on the computer.  I'm

15   going to ask you to start reading from line 7

16   and read through line 25.  And tell me if

17   that's your testimony at the preliminary

18   hearing.

19            And I'll tell you what.  I will

20   read the question.  And I will have you read

21   the response.

22       MR. JARRELL:  Your Honor, this document

23                   is in evidence.  The jury can

24                   read from it.  I'm sure they are

25                   all capable of reading.

227

```
 1            THE COURT:  I understand.  I will allow

 2                    him to go into this.

 3                    Go ahead.

 4        Q     I'm going to start on line 7.

 5            So you're saying the night you were

 6   shown some photographs, you're saying -- let me

 7   start all over.

 8            So you're saying that night you

 9   were shown some photographs that were

10   computerized?

11            Would you please read your

12   response?

13        A     That was on computer, yes, sir.

14        Q     Did you identify anybody from that

15   session?

16        A     No.

17        Q     And then you were shown another

18   lineup at what point in time?

19        A     It was Monday because I came down

20   here Monday morning.

21        Q     How many individuals were on the

22   lineup?

23        A     That I picked out?

24        Q     Yes, ma'am.  The second lineup.

25   That would have been on Monday.
```

228

```
 1            A       Two.   I know for sure.

 2            Q       Okay.   Let me rephrase the

 3    question.   Was the lineup all contained on one

 4    sheet of paper?

 5            A       No, sir.

 6            Q       Question:   Or was it individual

 7    photographs?

 8            A       I didn't answer it.   It says it was

 9    --

10            Q       It goes over to Page 68, line 1?

11            A       Yes.

12            Q       Okay.   Then I say:   On two separate

13    photographs?

14            A       No.   I know there was at least six

15    separate photographs.

16            Q       Okay.   So six separate photographs

17    were presented.   How long did it take you to

18    identify the suspect from those photographs?

19            A       The one that had the gun on me, I

20    identified him right away.

21            Q       Were you ever -- were you shown

22    what the video tape present -- that doesn't

23    make any sense.

24            A       When?

25            Q       In the store at Sunny South?
```

1          A       They didn't have a tape in the

2     machine.

3          Q       Okay.  We are going to stop it

4     right there.  So, are you saying that your

5     testimony at the preliminary hearing about

6     having seen and identified this man on the

7     Monday after the Saturday is incorrect?  At the

8     Preliminary hearing that was done just three

9     months after this happened?

10         A       I don't remember, sir.

11    MR. THOMAS:  That's all I have of the

12                 witness.

13    THE COURT:  Mr. Jarrell?

14                      MR. JARRELL:  Nothing.

15    THE COURT:  Please step down.

16                      Call your next witness, Mr.

17                      Thomas.

18    MR. THOMAS:  We rest.

19    THE COURT:  Does the State have rebuttal?

20                      MR. JARRELL:  No, sir.

21    THE COURT:  If Counsel will approach.

22              (counsel approached the bench, and

23                 the following was heard out of

24                 the hearing of the jury).

25    THE COURT:  Motions?

230

1              MR. THOMAS:  Motion for judgment of

2                    acquittal renewed.

3         THE COURT:  Denied.

4                         We will recess them

5                    until 9:00 o'clock in the

6                    morning.

7              (Off-record discussion).

8                         Is there anything else

9                    that y'all want to take up on

10                   the record before we recess the

11                   jury?

12             MR. THOMAS:  No, sir.

13             MR. JARRELL:  No, sir.

14        (The following was heard in the hearing

15                    of the jury).

16        THE COURT:  Okay.  Ladies and gentlemen,

17                   at this time all of the

18                   testimony and evidence has been

19                   presented.  And both sides have

20                   now rested.

21                        Because of the late

22                   hour and the necessity that

23                   certain things must occur, I'm

24                   going to put you in recess until

25                   9:00 a.m.

```
 1              At that time the

 2     attorneys as i indicated will

 3     address you in closing

 4     arguments.  The Court will give

 5     you its charge.  And then, you

 6     will begin your deliberations.

 7              As I have mentioned

 8     throughout the day, please do

 9     not discuss this matter with

10     anyone, among yourselves, family

11     or friends or anyone until the

12     case is submitted to you some

13     time tomorrow morning.  We will

14     see you here at 9:00 o'clock.

15              Thank you so much.

16

17     (Court was recessed until the

18     following morning).

19

20

21

22

23

24

25
```

1          <u>November 10, 2005</u>

2     THE COURT:  All jurors are present.

3                    Mr. Jarrell, you may

4          begin your closing.

5          (Closing Statements were heard).

6     THE COURT:  Ladies and gentlemen, the

7               charge will take probably about

8               15 minutes or so.  We haven't

9               had a break in some time.  so

10              I'm going to give you a

11              ten-minute break.  And then, I

12              will give the charge and you

13              will begin your deliberations.

14                   Let me remind you,

15              please don't discuss this case,

16              nor allow anyone to discuss it

17              with you until the case is

18              submitted to you.

19         (A short recess was taken)

20              <u>JUDGE'S CHARGE</u>

21                   Ladies and gentlemen of

22              the jury, you have now heard all

23              of the evidence in this case,

24              and, you have heard the

25              arguments of the attorneys.  Now

1    is the time in these proceedings

2    when the Court instructs you of

3    the applicable law in this case.

4    Everything that I say to you is

5    necessary, and I ask that you

6    bear with me.

7    You have been very,

8    very patient, and for that, I am

9    appreciative of your service.

10    And I know I express that for

11    both the State and the defendant

12    in this case.

13    Please remember that

14    much of what I say is couched in

15    legal language.  I will try to

16    say it as simply as I can.  It

17    may at times appear confusing.

18    If you listen as a whole to the

19    charge, taking the separate

20    elements as I instruct you, the

21    end result will be that you

22    understand.

23    When a Judge and jury

24    sit together in a Court of law,

25    it's the duty of the jury to see

234

```
 1              that the trial progresses in an

 2              orderly fashion, to rule on all

 3              matters or objections that are

 4              presented and instruct you, the

 5              jury, as to the law that

 6              pertains to that particular

 7              case.  It will be your duty as

 8              jurors to follow the law as

 9              given to you by the Court.  You

10              will also be required to render

11              a verdict in accordance with

12              the evidence and law as I give

13              it to you.

14                   As the Judge, I'm not

15              permitted by law to express my

16              opinions or to comment on the

17              effect of the evidence presented

18              to you or on the credibility of

19              any witness in this case.

20                   Therefore, a ruling by

21              me or any statement made by me

22              or any expression that I may

23              have made during the course of

24              this trial should not be

25              considered by you as an
```

```
 1              indication that I have an

 2              opinion about the case or the

 3              credibility of any witness.

 4                   You are the sole and

 5              exclusive judges of the evidence

 6              in this case.  And it is

 7              completely within your province

 8              to render a verdict in this

 9              case.

10                   In passing upon the

11              evidence, you must know what

12              evidence is and what it is not.

13              Evidence is the testimony of the

14              witnesses from the witness stand

15              under oath, any exhibits which

16              are received into evidence and

17              any presumption of innocence not

18              refuted by the law of evidence.

19              Evidence is not the indictment,

20              arguments or statements or

21              assertions of attorneys or the

22              rulings of the Court on

23              objections or matters of law.

24              You are the sole and exclusive

25              judges of the credibility of the
```

1  witnesses in this case.  It is

2  your duty to attempt to

3  reconcile the testimony of all

4  of the witnesses so as to make

5  them all speak the truth if this

6  can reasonably be done.  If you

7  cannot reasonably reconcile all

8  of the testimony, you may accept

9  or reject any part of the

10  testimony of any witness and

11  accept only the part of

12  testimony that you consider

13  worthy of your belief. You may

14  take into consideration the

15  interest or bias a witness may

16  have in connection with the

17  case.  You may take into

18  consideration the interest or

19  bias a witness may have shown

20  while testifying.  You may take

21  into consideration the demeanor

22  of any witness as to whether or

23  not the witness has testified

24  frankly or evasively. You may

25  take into consideration any

1    matter which you ordinarily

2    would consider in your everyday

3    affairs in passing upon the

4    truthfulness and accuracy of

5    such matter.  Weigh the

6    testimony in light of you common

7    observation and experience and

8    reach a verdict that will be

9    based upon the truth as you

10   determine it to be from all of

11   the evidence.

12        In passing upon the

13   evidence, you may use your

14   common sense.  You may use your

15   common sense in considering the

16   evidence and the credibility of

17   any witnesses during your

18   deliberations.

19        Now, involved in this

20   case, ladies and gentlemen, is a

21   question of identity.  You may

22   consider the possibility of

23   human error or mishaps and

24   likeness or dislike,

25   similarities of a person.  You

1    may consider these factors in

2    passing upon the credibility of

3    the witnesses and the weight you

4    would give testimony and the

5    accuracy of identification made

6    by the witness.

7             Now, in this case the

8    defendant has not testified in

9    this matter.  I wish to make it

10   perfectly clear that a

11   defendant has an absolute,

12   unequivocal constitutional right

13   not to take the witness stand in

14   his own behalf.  You are

15   instructed that this is a fact

16   from which you can draw no

17   inference.  It's not to be

18   considered by you as a fact in

19   the defendant's favor, nor is

20   it to be applied to the

21   defendant's detriment.  You may

22   not draw conclusions of any sort

23   from the defendant's failure to

24   take the stand and testify.

25             With regard to the

1    statement of the defendant, you

2    may consider all of the facts

3    and circumstances surrounding

4    the statement in determining

5    the weight or credibility, if

6    any, which you give the

7    statement in this case.

8            The Defendant, Bobby

9    Williams, is charged by

10   indictment with two separate

11   offenses of robbery in the

12   first degree.

13           The first offense by

14   indictment charges that Bobby

15   Williams, whose name is

16   otherwise unknown to the grand

17   jury, did in the course of

18   committing a theft of property,

19   to-wit, unlawful United States

20   currency and/or coinage, a

21   better description of which is

22   to the Grand Jury otherwise

23   unknown, the property of,

24   to-wit:  Pro-Marketing L.L.C,

25   doing business as BeeLine Store

1 No. 614, used force or

2 threatened the imminent use of

3 force against the persons of the

4 said Edith Thomas, or any other

5 person present, with the intent

6 to overcome her physical power

7 of resistance or to compel

8 acquiescence to the taking of or

9 escaping with the property,

10 while the said Bobby Williams

11 was armed with a deadly weapon

12 or dangerous instrument, to wit:

13 a pistol, in violation of

14 Section 13A-8-41, of the Code of

15 Alabama, Against the Peace and

16 Dignity of the State of Alabama.

17  Offense two charges

18 that the Grand Jury of said

19 county charges that before the

20 finding of this indictment that

21 Bobby Williams, whose name is

22 otherwise unknown to the Grand

23 Jury, did, in the course of

24 committing a theft of property,

25 to-wit:  Unlawful United States

1   currency and/or coinage, a

2   better description of which is

3   to the Grand Jury otherwise

4   unknown, the property of,

5   to-wit:  Sunny South, L.L.C.,

6   used force or threatened the

7   immanent use of force against

8   the person of said Rebecca

9   Holley, or another person

10  present, with the intent to

11  overcome her physical resistance

12  or physical power of resistance

13  or to compel acquiescence to the

14  taking of or escaping with the

15  property, while the said Bobby

16  Williams was armed with a deadly

17  weapon or dangerous instrument,

18  to-wit:  a pistol, in violation

19  of Section 13A-8-41 of the Code

20  of Alabama.

21          The fact that the

22  defendant has been arrested and

23  indicted by the Grand Jury is

24  not to be taken by you as

25  evidence of his guilt.

1           The indictment is

2     merely a method of getting a

3     case in this court.  It should

4     not be considered as any

5     evidence of guilt of the

6     defendant regardless of the

7     defendant's plea of not guilty.

8           The State has the burden

9     of proving each and every

10    allegation of the indictment of

11    the defendant beyond a

12    reasonable doubt.

13          The defendant for plea

14    of and his answer to the

15    indictment says that he is not

16    guilty.  This places upon the

17    prosecution the burden of

18    proving his guilt beyond a

19    reasonable doubt.  The burden of

20    proof never rests with the

21    defendant to establish his

22    innocence or to disprove a fact

23    tending to establish his guilt.

24          I instruct you that

25    the defendant is presumed to be

1    innocent.  And this presumption

2    of innocence remains with him

3    until at some time each of you

4    are convinced from the evidence

5    that defendant is guilty beyond

6    a reasonable doubt.  This

7    presumption of innocence is to

8    be regarded by you as at matter

9    of evidence and benefit from

10   which the defendant is entitled.

11   And it attends the defendant

12   throughout trial.  Only when you

13   are not convinced from the

14   evidence that the defendant is

15   guilty beyond a reasonable doubt

16   does the presumption that he is

17   innocent leave him.

18        As I said, the burden of

19   proof is on the State to prove a

20   defendant guilty as charged

21   before a conviction can be had

22   in this case.

23        The State must satisfy

24   each and every member of the

25   jury of the defendant's guilt

1    beyond a reasonable doubt.  Even

2    if the State demonstrates the

3    probability of guilt, but does

4    not establish that beyond a

5    reasonable doubt, you must

6    acquit the defendant.

7           The phrase reasonable

8    doubt is self explanatory.

9    Efforts to define it do not

10   always clarify it.  It is not a

11   mere possible or fanciful doubt

12   found because everything

13   relating to human affairs is

14   impossible of forming an

15   possible or imaginable doubt.  A

16   reasonable doubt is a doubt

17   after a fair-minded jury

18   honestly seeking the truth after

19   careful and impartial

20   consideration of all of

21   the evidence in this case.  It's

22   a doubt upon reason and common

23   sense.  It does not mean a vague

24   or conjecture or notion.  A

25   reasonable doubt is based upon

1       the evidence or the lack of

2       evidence, a conflict in the

3       evidence or combination thereof.

4       It is a doubt that remains after

5       going over in your mind the

6       entire case and taking

7       consideration of all of the

8       testimony.  It's distinguished

9       from a doubt arising from the

10      mere possible or fanciful

11      conjecture.

12              If, after

13      consideration of all of the

14      evidence, you are convinced of

15      the defendant's guilt beyond a

16      reasonable doubt, then it would

17      be your duty to convict the

18      defendant.  However, if you

19      still have a reasonable doubt,

20      then the defendant is entitled

21      to, and you must acquit him.

22              The defendant is

23      charged with robbery in the

24      first degree.  A person commits

25      the crime of robbery in the

```
 1            first degree if, in the course

 2            of committing a theft, he uses

 3            or threatens the immanent use of

 4            force against the person or

 5            owner of property or any other

 6            person present with intent to

 7            overcome that person's physical

 8            resistance or physical power of

 9            resistance.  And in so doing he

10            is armed with a deadly weapon or

11            dangerous instrument.

12                    Therefore, to

13            convict the defendant, the State

14            must prove beyond a reasonable

15            doubt that the Defendant, Bobby

16            Williams, committed or attempted

17            to commit the theft of property,

18            that being United States

19            currency and/or coinage, and

20            that in the course of committing

21            or attempting to commit the

22            theft the defendant either used

23            force against the persons of

24            Edith Thomas or Rebecca Holley

25            with intent to overcome their
```

1    physical resistance or physical

2    power of resistance of Rebecca

3    Holley or Edith Thomas to compel

4    acquiescing to the taking or

5    escaping with the property and

6    that the Defendant, Bobby

7    Williams, was armed with a

8    deadly weapon or dangerous

9    instrument.

10         A person commits

11   the crime of theft of property

12   if he knowingly obtains control

13   of the property of another with

14   intent to deprive the owner of

15   his property.

16         A deadly weapon

17   is a fireman or anything

18   manifestly designed or made, or

19   adapted for the purpose of

20   inflicting death or serious

21   physical injury.

22         A person acts

23   knowingly with respect to a

24   result or conduct when his

25   purpose is to cause that result

248

1          or engage in that conduct.

2                    A person acts

3          knowingly with respect to

4          conduct or circumstance when he

5          is aware of that conduct or

6          circumstance and is aware that

7          that conduct or that

8          circumstance existed.

9                    If you find from

10         the evidence that the State has

11         proven beyond a resonable doubt

12         each of the above elements of

13         robbery in the first degree as

14         charged, you shall find the

15         defendant guilty of robbery in

16         the first degree.

17                    If you find that

18         the State has failed to prove

19         beyond a reasonable doubt any

20         one or more of the elements of

21         robbery in the first degree,

22         then you cannot find the

23         defendant guilty of robbery in

24         the first degree and you must

25         acquit him.

```
 1                    Under Alabama
 2          law, a person is legally
 3          accountable for behavior of
 4          another constituting a criminal
 5          offense if, with the intent to
 6          promote or assist the commission
 7          of the offense he procures,
 8          induces or causes such other
 9          person to commit the offense, or
10          he aids or abets that other
11          person in committing the
12          offense.
13                    Ladies and
14          gentlemen, as I mentioned to
15          you, your verdict must be
16          unanimous.  Each and every
17          juror, all 12, must agree before
18          you can render a verdict in this
19          case.  Your verdict should not
20          be based on sympathy, prejudice
21          or emotion, but should be based
22          solely on the law and facts.  To
23          do otherwise would be in
24          violation of your solemn oath.
25                    To aid you in
```

```
 1              this case we have various

 2              verdict forms prepared for you.

 3              You will return one verdict for

 4              each offense charged.  There is

 5              one verdict form for the offense

 6              concerning the BeeLine store,

 7              and one for the Sunny South

 8              store.  And I made a note which

 9              one they relate to, so that will

10              help you in getting the

11              differences between the two

12              offenses.

13                   If after you have

14              considered all of the evidence

15              in this case and all of the

16              proper and reasonable inferences

17              therefrom, you are satisfied

18              beyond a reasonable doubt that

19              the defendant is guilty of

20              robbery in the first degree,

21              then it will be your duty to

22              find the defendant guilty and

23              have the foreperson sign the

24              verdict form which reads:  We,

25              the jury, find Bobby Williams
```

1    guilty of robbery in the first

2    degree, in violation of section

3    13A-8-41 of the Code of Alabama,

4    as charged in the indictment.

5           If, on the other

6    hand, you have considered all of

7    the evidence in this case and

8    all proper and reasonable

9    inferences therefor, you are not

10   satisfied beyond a reasonable

11   doubt that the defendant is

12   guilty of robbery in the first

13   degree, then it would be your

14   duty to find the defendant not

15   guilty and have the foreperson

16   sign the verdict form which

17   reads, we, the jury, find the

18   defendant, Bobby Williams, not

19   guilty of robbery in the first

20   degree in violation of Section

21   13A-8-41 of the Code of Alabama

22   as charged in the indictment.

23           Again, I want to

24   mention that your verdict must

25   be unanimous, and you are the

```
 1              sole judges as to the weight

 2              that should be given all of the

 3              testimony in this case.  You

 4              should take the testimony of the

 5              witnesses together with all of

 6              the proper and reasonable

 7              inferences, apply your common

 8              sense so as to make them all

 9              speak the truth.  You should

10              weigh all of the evidence and

11              reconcile all of the facts to

12              the evidence.  But if it cannot

13              be reconciled, you should take

14              that evidence that you think

15              worthy of credibility and give

16              such weight as you believe

17              worthy of belief.

18                   You may take into

19              consideration any interest of

20              any witness may have had in the

21              outcome of this case.  If you

22              believe that any part of the

23              testimony of any witness was

24              willfully, intentionally

25              untruthful, or testified
```

1    falsely, you may consider all or

2    part of that witness's

3    testimony.

4                    Now, ladies and

5    gentlemen, when you go back in

6    the jury room, your first duty

7    should be to select one of your

8    number as foreperson.  The duty

9    of the foreperson is to proceed

10   over the deliberations and sign

11   the verdict form of the jury.

12                   The verdict, as

13   I've told you, must be the

14   verdict of all 12 of you.

15                   When you arrive

16   at a verdict, you may notify the

17   bailiff by knocking on the door.

18   And at that time, you will be

19   required to return your verdict.

20   In the meantime, until you have

21   returned with your verdict, it's

22   absolutely necessary that you

23   all stay together.

24                   If you need to

25   take a break or go visit the

```
 1                          bathroom, just let the bailiff

 2                          know, and he will make

 3                          arrangements for you to do so.

 4                                   If counsel will

 5                          approach.

 6                          (Counsel approached the bench,

 7                          and the following was heard out

 8                          of the jury's hearing).

 9          THE COURT:  What says the State?

10          MR. JARRELL:  Satisfied.

11          THE COURT:  Mr. Thomas?

12          MR. THOMAS:  Satisfied.

13          THE COURT:  You may begin your

14                          deliberations.

15                          (Jury began deliberating).

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Let the record reflect that

2                      the jury has reached a verdict.

3          THE FOREPERSON:  Yes, sir.

4          THE COURT:  And for the benefit of the

5                      record, would the foreperson

6                      give us your name for the

7                      record, please?

8          FOREPERSON:  Steven Sanders.

9          THE COURT:  Okay.  If you will hand the

10                     verdict to the deputy.

11                         Is this the verdict of

12                     all 12 members of this jury?

13         FOREPERSON:  Yes, sir, it is.

14         THE COURT:  The verdict reads:  The State

15                     of Alabama versus Bobby

16                     Williams, defendant.

17                     CC-2003-382.  We, the jury, find

18                     the defendant, Bobby Williams,

19                     guilty of robbery in the first

20                     degree in violation of Section

21                     13A-8-41 of the Code of Alabama

22                     as charged in the indictment.

23                     Case number CC-2003-383, reads:

24                     We, the jury, find the

25                     defendant, Bobby Williams,

1          guilty of robbery in the first

2          degree in violation of Section

3          13A-8-41 of the Code of Alabama

4          as charged in the indictment.

5                    Ladies and gentlemen

6          of the jury, if this is your

7          verdict, let me ask that you

8          raise your right hand.

9                    Let the record reflect

10         all 12 jurors indicated that was

11         their verdict.

12                    Is there anything that

13         the State wishes to take up?

14    MR. JARRELL:  No, sir.

15    THE COURT:  Is there anything from the

16         defendant?

17    MR. THOMAS:  No, sir.

18    THE COURT:  Ladies and gentlemen, Thank

19         you for your service.  Let me

20         advise you that we will be

21         selecting more juries on Monday,

22         so I ask you to report back to

23         the this courtroom at 9:00

24         Monday morning.  I don't know

25         how many we going to have.

```
 1              Maybe we won't have too many
 2         cases left to be tried.  I thank
 3         you for your service, as I
 4         stated to you earlier.
 5              You are now released
 6         from my instructions of not
 7         discussing this case, and you
 8         are free to, if you choose to do
 9         so.  If you don't wish to
10         discuss it, you do not have to.
11         Thank you for your time.  You
12         are excused until Monday Morning
13         at 9:00 o'clock.  If anyone
14         needs a job excuse, if you will
15         stop by the Clerk's Office and
16         we will get that to you.
17    (Jurors exited the courtroom).
18    THE COURT:  For the record, the
19         Court finds that the verdict of
20         the jury is supported by the
21         legal and competent evidence.
22              Mr. Thomas, with regard
23         to adjudication of sentence, do
24         you wish to go forward with that
25         today or do you want to request
```

```
 1                      a pre-sentence report?
 2          MR. THOMAS:  We ask that a pre-sentence
 3                      report be done.  And since you
 4                      are the trying Judge in such a
 5                      fashion that you would be
 6                      available for sentencing, as
 7                      well.
 8          THE COURT:  I think we can get that done.
 9                      Because I think they did a C.O.
10                      report on this, didn't they?
11          MR. JARRELL:  Yes, sir.  There was a
12                      report done, a C.O. report, so
13                      I don't think it would take too
14                      long to get a pre-sentence
15                      report.
16          MR. THOMAS:  We will just have to produce
17                      the information.
18          MR. JARRELL:  We just remind the Court
19                      that whatever sentence he gets
20                      will not start until he is
21                      sentenced since he is already
22                      incarcerated serving time.
23                      We will defer upon your request
24                      at the ajudication of guilt
25                      until the time of sentencing,
```

1              and order that pre-sentence

2              investigation be done.

3                     Okay.  Anything else

4              that we need to take up on the

5              record at this time?

6      MR. THOMAS:  No, sir.

7      THE COURT:  Anything from the State?

8      MR. JARRELL:  No, sir.

9      THE COURT:  That concludes this hearing.

10             Thank you.

11                    (End of hearing).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>SENTENCE HEARING</u>

1

2    THE COURT:  This is the State of Alabama

3              versus Bobby Williams, case

4              numbers:  CC-2003-382 and 383.

5                   The defendant was found

6              guilty of robbery in the first

7              degree in each of two separate

8              counts by a jury.  I think that

9              was November 10, 2004.

10   MR. THOMAS:  That sounds correct.

11   THE COURT:  The defendant requested a

12             presentence report and

13             sentencing hearing.

14             Adjudication was deferred until

15             today.  The defendant is present

16             with his Attorney, Mr. Thomas.

17             The State is represented by Mr.

18             Jarrell.  At this time the Court

19             enters its judgment of

20             conviction and finds and

21             adjudges Bobby Williams guilty

22             of robbery in the first degree

23             in each of the two separate

24             cases as found by the jury in

25             these cases.

```
 1                          Has both, the State and

 2                    the defendant, received copies

 3                    of the pre-sentence

 4                    investigation?

 5        MR. THOMAS:  Yes, sir, I have received

 6                    mine.

 7        MR. JARRELL:  The State has not -- Judge,

 8                    I have it.

 9        THE COURT:  Do you want a second to look

10                    it over, Mr. Jarrell?

11        MR. JARRELL:  No.  We can proceed.

12        THE COURT:  Does the State have anything

13                    to offer at sentencing, except

14                    the pre-sentence investigation?

15        MR. JARRELL:  Judge, the State would ask

16                    the Court to consider the

17                    evidence that was presented at

18                    trial, and particularly, the

19                    evidence that was presented by

20                    the two victims, especially as

21                    to their state of mind at the

22                    time they were being robbed, the

23                    fear that they experienced.

24                    They have requested not to have

25                    to be before him again.  And,
```

```
 1                        therefore, we would just ask

 2                        this Court to reconsider that

 3                        testimony.

 4          THE COURT:  All right, sir.

 5          MR. JARRELL:  And, of course, obviously

 6                        the pre-sentence report, too.

 7          THE COURT:  Okay.  Does the defendant

 8                        have anything to offer at

 9                        sentencing?

10          MR. THOMAS:  Yes, sir.  We have some

11                        witnesses that we would like to

12                        call as character witnesses.

13          THE COURT:  Call your witness.

14          MR. THOMAS:  Mr. Roy Brooks, if you would

15                        take the stand, please.

16          THE COURT:  Raise your hand, sir.

17                        ROY BROOKS

18          Whereupon, this witness, after first

19   being duly sworn to tell the truth, the whole

20   truth, and nothing but the truth, testified as

21   follows, to-wit:

22                    DIRECT EXAMINATION

23   BY MR. THOMAS:

24          Q     State your name for the record,

25   please?
```

263

```
 1          A       Roy Brooks, Jr.

 2          Q       What is your current status in

 3   terms of --

 4          A       Presently I'm retired at Dorsey

 5   Trailers, and I'm assistant to arbitrary cases,

 6   and I also pull duty train.

 7          Q       Have you retired from Dorsey

 8   Trailers?

 9          A       I am retired from Dorsey Trailers.

10          Q       In Elba?

11          A       In Elba.

12          Q       About how long were you employed at

13   Dorsey Trailers?

14          A       Thirty years.

15          Q       How long have you resided in Pike

16   County?

17          A       I've been in Pike County all my

18   life.  And I am 56 years old.

19          Q       How long have you known Bobby

20   Williams?

21          A       When he fist came down from

22   Montgomery, his dad was staying in one of my

23   houses.  And that's how I got to know Bobby.

24          Q       How many years would that have

25   been?
```

```
 1         A        He -- Bobby was -- I don't know.

 2   He was young then.  I can't remember how many,

 3   you know, how old he was, but he was real

 4   young, then.  And he stayed in town until he

 5   got grown like he is now.

 6         Q        Okay.  So you would characterize

 7   your relationship with Mr. Williams as a

 8   friendship relationship?

 9         A        Right.  Right.

10         Q        You are not related to him?

11         A        No, sir.  No.

12         Q        Are you aware of the fact that

13   Mr. Williams has been convicted of two

14   robberies in Pike County, and, also, some

15   robberies in Montgomery County, as well?

16         A        Yeah, I heard that.

17         Q        Were you surprised when you learned

18   of that?

19         A        I really was.  I was surprised.  It

20   hurt me, too, you know, because I know Bobby

21   was not the type of individual that had a lot

22   going for him.  And I was really very surprised

23   about that.

24         Q        And have you had the opportunity to

25   work with Bobby as an employer?
```

```
 1         A      Yes.   I got used houses, rental

 2   houses on Hubbard Street and Open Heights.   And

 3   I had a lot of repairs to do.   And I would get

 4   Bobby and his cousin to come and help me, you

 5   know, so they could make a little change to go

 6   to school with.

 7         Q      How would you characterize Bobby's

 8   performance as an employee for you?

 9         A      He was always there on time.   I

10   would tell him, he was a hard little worker.

11         Q      Okay.   Did he do everything to your

12   satisfaction as you instructed him to do?

13         A      He did.

14         Q      During your relationship with

15   Mr. Williams, both as a friend, confidant, and

16   as an employer, did he ever strike you as a

17   person who was capable of violence?

18         A      No.   No.

19         Q      Did you ever see him act

20   aggressive, either verbally or physically?

21         A      No.   I have ran into him from time

22   to time.   You know, Bobby don't let people run

23   over him and stuff like that.   But he was one

24   of them kind that, you know, he liked to be

25   quiet and easy.   He was not an aggressive-type
```

1    person.

2         Q    Is it safe for me to describe you

3    as -- you know a lot of people in the community

4    of Troy, don't you?

5         A    Right.  Right.

6         Q    Have you ever heard from any of

7    your friends in the community that Mr. Williams

8    is a trouble maker or the type of person that

9    would --

10        MR. JARRELL:  Object to the form.

11        MR. THOMAS:  Judge, it's character.

12        MR. JARRELL:  It's not in the proper form

13             of character evidence.

14        THE COURT:  Well, it's not in proper form

15             for character evidence.

16             Rephrase it.

17        MR. THOMAS:  Okay.

18        Q    Did you ever know of Mr. Williams

19   to be in any kind of trouble in your dealings

20   in Pike County?

21        A    No, I didn't.

22        Q    So not only was he never in any

23   trouble with you as a friend or employer, you

24   never knew of him to have any trouble in the

25   community prior to these events?

```
 1          A      Never.

 2          Q      Okay.  What do you think about

 3   Bobby's aptitude, his intelligence?

 4          A      I think Bobby is a very intelligent

 5   young man.  And he's got a great future ahead

 6   of him.  You know, if Bobby had the right

 7   opportunity, there's a lot of things that he

 8   can do for humanity and himself.

 9                 I used to take Bobby to church with

10   me on Sunday.  I'm the organist and pianist at

11   Bethlehem Missionary Baptist Church.  And when

12   I would go to church, I would take Bobby to

13   church with me on Sunday.  And he enjoyed the

14   church and Sunday School.  And he would look

15   forward to going every Sunday.

16                 "You gonna come by and get me,

17   Mr. Brooks"?

18                 "Yeah.  Be ready.  I'm gonna come

19   by and get you".

20                 And then he come up one day and

21   said, "Mr. Brooks, we are going to be moving

22   back to Montgomery."

23                 I kind of knew how Montgomery was,

24   and I hated to see him go.  I really would have

25   liked to kept him down here with me.  That's
```

```
 1    what I wish I could have done.

 2          Q      Mr. Brooks, do you feel like

 3    Mr. Williams is the kind of person who could

 4    complete his high school education in prison

 5    and gain some job skills so that when he gets

 6    out, he can put his past behind him and become

 7    a productive member of society?

 8          A      Yes, I do.

 9          Q      What about him makes you believe

10    that when he gets out, he could put himself to

11    good use?

12          A      Well, I used to talk to Bobby.  And

13    he would tell me all these things.  I would ask

14    him, "Bobbie, what you want to be"?

15                 And he would tell me about how he

16    wanted to work on computers, and he wanted to

17    do a lot of -- he wanted to get some big jobs

18    and skilled jobs.

19                 And he also mentioned one time that

20    he might want to go into the ministry.

21          Q      Mr. Brooks, do you think that the

22    Court should consider these attributes that you

23    have described in making a decision today?

24          A      I hope and pray that the State and

25    the Judge would please consider these.  I just
```

1    -- I hate that I was not there to really talk

2    to him, and that he would have had me to come

3    to him and talk to him.

4              If I could have been there, I

5    believe that he never would have went and did

6    what they said that he done.

7         MR. THOMAS:  Thank you.  Mr. Brooks,

8                   that's all I have for you.  If

9                   there is anything else that you

10                  want to say when the State gets

11                  through, you can feel free to

12                  say it to the Judge.

13        THE WITNESS:  Judge, Your Honor, I just

14                  -- as I stated that I really

15                  regret this happened.  I was

16                  really hoping that I could adopt

17                  Bobby, but he had a momma, and I

18                  understand that she wanted to

19                  keep the children together.  But

20                  I do believe if I could have

21                  kept him down here with me that

22                  he would have been a productive

23                  -- If I kept him some time --

24                  you know the enviornment that

25                  you get in causes you to do a

```
 1                        lot of things.  And I think this

 2                        is what happened to Bobby.  He

 3                        got with the wrong people,

 4                        because he was just a good young

 5                        man.  It really hurt me bad,

 6                        because I just -- I just never

 7                        would see something like this

 8                        happening.

 9            MR. THOMAS:  Thank you, Mr. Brooks.  The

10                        D.A. may have some questions.

11            MR. JARRELL:   I do have some questions.

12                        CROSS EXAMINATION

13      BY MR. JARRELL:

14            Q      I have known you for a long time.

15            A      Yes, sir.

16            Q      And I know you to be a good man.

17      How long was Bobby up in Montgomery when that

18      investigation came up?

19            A      Say what, now?

20            Q      You say he went back to Montgomery,

21      and you hated to see him go, and you wanted to

22      keep him here.  How long was he up there?

23            A      He has been up there now three or

24      four years.

25            Q      And during that time, you are
```

1  attributing his problems today to just getting

2  in with the wrong crowd up there?

3          A       Yes, sir.

4          Q       Do you believe that every man

5  should be accountable for his judgment?

6          A       I do.  But they are -- a lot of

7  times you got people that, they influence you,

8  and they just overpower your ability to think.

9  And I teach my children to do their own

10 thinking, if they make a mistake -- but a lot

11 of people let influences and their peers, and

12 people coming around.  If they ain't got no

13 money, and people coming around with money, and

14 flashy clothes; and they tell you to do the

15 things that you really wouldn't do.

16         Q       But to answer my question, do you

17 think that a person is responsible for the

18 judgments he makes?

19         A       Yeah.  We are all responsible.

20         Q       And he should have to pay for those

21 judgments if they are incorrect?

22         A       That's what the Bible says.

23         Q       That's right.  Now, you said that

24 Bobby always appeared to you to be quiet, easy

25 and not aggressive?

```
1          A      Yes.

2          Q      You weren't here during the trial?

3          A      I came a couple of times, but I

4   didn't testify.

5          Q      Did you hear the testimony that

6   Mr. Williams was in fact the gunman in both of

7   these robberies?

8          A      No, I didn't.

9          Q      Does that influence you in any way

10  as to how you see him as being aggressive or

11  not aggressive?

12         A      I'm surprised that he would, you

13  know, would have done that.  I'm surprised.

14  Because, you know, I just figured his conduct

15  wouldn't do that.

16         Q      It's certainly not conduct that is

17  comparable to what you knew of him?  Is that

18  what you are saying?

19         A      Right.  Right.

20         Q      And people do change, do they not?

21         A      Yeah, they change.

22         Q      Have you ever been a victim of a

23  robbery?

24         A      No.

25         Q      You've never had a gun put in your
```

1    face and they demanded money?

2         A    I had a little cash.  I had a

3    couple, and I looked up and a girl had a gun in

4    my face.  I remember that part.

5         Q    When was that?

6         A    It was not long ago.

7         Q    It wasn't pleasant, was it?

8         A    Uh?

9         Q    It wasn't pleasant, was it?

10         A    No, sir.  No.

11         MR. JARRELL:  No further questions.

12                   REDIRECT EXAMINATION

13    BY MR. THOMAS:

14         Q    Mr. Brooks, you are not here to

15    excuse what he did, are you?

16         A    No.

17         Q    You are just here to let the Judge

18    know that you think that Mr. Williams is a

19    person that can be rehabilitated with minimum

20    time?

21         A    Right.

22         Q    Is that correct?

23         A    Right.

24         Q    And you think what he did was

25    wrong?  Is that true?

```
1          A      I do.

2          Q      But you think if given a chance,

3   when he gets out, he can straighten his life

4   out and make things right with society?

5          A      Yes, sir.  If he doesn't have to

6   stay in the place with a bunch of bad people,

7   you know, to mess up his mind, he could be a

8   good, productive person.

9          Q      Mr. Brooks, let me ask you this

10  question:  Have you ever known this man to have

11  a drug or alcohol problem?

12         A      No, I haven't.

13         MR. THOMAS:  Thank you.  That's all I

14              have.

15         MR. JARRELL:  Nothing further.

16         THE COURT:  Thank you, sir.  Call your

17              next witness.

18                    JOHN FOSTER

19         Whereupon, this witness, after first

20  being duly sworn to tell the truth, the whole

21  truth, and nothing but the truth, testified as

22  follows, to-wit:

23                DIRECT EXAMINATION

24  BY MR. THOMAS:

25         Q      State your name for the record,
```

1    please?

2         A      John Foster.

3         Q      How old are you,

4         A      Fifty-seven.

5         Q      And what is your relationship to

6    Mr. Williams?

7         A      Father.

8         Q      You are his father?

9         A      Yes.

10        Q      Okay.  In your own words, do you

11   feel like your son has the ability -- and tell

12   me why -- do you think your son has the ability

13   to go to prison, based on what he's done, to

14   come back out, and live a productive life?

15        A      Yes, indeed.

16        Q      Why do you feel that way,

17   Mr. Foster?

18        A      Because I know there's a lot of

19   good about him.  And I never known of him to do

20   anything wrong with him.  He never used drugs.

21        Q      Mr. Foster, let me stop you right

22   there.  I'm having a hard time hearing you, and

23   I think the court reporter is.  If you get a

24   little closer to that microphone and speak up a

25   little bit, please.  And tell us, again, why

1    you think that he can be rehabilitated?

2         A       Because I know there is a lot of

3    good in him.  And I was very surprised when I

4    heard this, and what he done.  But, actually

5    speaking, I asked Bobby myself, you know, did

6    he do this.  And he always tells me no.  And I

7    find it hard to believe myself, you know what I

8    mean, to believe they said he had the gun and

9    this and that.  I don't know.  He never -- I'm

10   confused.

11        Q       Mr. Foster, we are not here to

12   discuss whether he did or did not do it.  Do

13   you feel like that your son can, when he gets

14   out of prison -- do you think that he has the

15   intelligence and the drive to rebuild his life

16   and reenter society as a productive person?

17        A       Yes, sir.

18        Q       And what about him makes you feel

19   that way?

20        A       Well, he's just a good boy.  That's

21   all I can say.  And he is going to have to do a

22   lot of -- and he's always been intelligent.

23   And I just feel that if he has a chance, give

24   him the opportunity, he would -- he could go to

25   work.

```
 1          Q       Okay.  Did he make good grades when

 2    he was in school?

 3          A       Oh.  Yeah.

 4          Q       What kind of grades did he make

 5    when he was in school?

 6          A       It was mostly A's, B's.  Honor roll

 7    student.

 8          Q       And what got him out of school?  Do

 9    you know?

10          A       Well, actually, I think he had some

11    problems with dress code stuff.  And, actually,

12    he just couldn't afford to dress the way he

13    should have, because I didn't have the funds,

14    you know.

15          Q       So he violated the dress code, and

16    he was removed from school?  Is that your

17    answer?

18          A       Yeah.

19          Q       Okay.  But he has the aptitude to

20    apply himself to a job skill, if he wants to?

21          A       Oh.  Yes, sir.

22          Q       Have you ever known him -- prior to

23    hearing about these robberies, have you ever

24    known him to have violent propensities?

25          A       No, sir.
```

1          Q       Have you ever know him to lash out
2    at anybody?
3          A       No, sir.
4          Q       Have you ever seen him verbally
5    lash out at anybody?
6          A       No.
7          Q       Did he always get along good with
8    his brothers and sisters at home?
9          A       Very good.
10          Q       Okay.
11          A       I think everybody that knew him
12    liked him and is surprised that he is now here,
13    because he never had problems until this.
14          Q       Did he ever have any juvenile
15    trouble?
16          A       No, sir, not that I know of.
17          Q       Did he ever have any disciplinary
18    issues at school outside the dressing
19    violation, his clothing violation?
20          A       No.  Everybody liked him.
21          Q       Was he ever exspelled from school
22    for fighting?
23          A       Never.
24          Q       That's all I have.
25

1

2

3                      CROSS EXAMINATION

4    BY MR. JARRELL:

5          Q      Mr. Foster --

6          A      Yes, sir.

7          Q      -- you described him as a good boy?

8    Is that right?

9          A      Yes, sir.

10         Q      Do good boys put guns in people's

11   faces and take their money?

12         A      No, they don't.

13         Q      And are you aware that he not only

14   was convicted here, but, also, of four

15   armed-robberies in Montgomery?

16         A      I sure do.

17         Q      Is that consistent with a good boy?

18         A      That's what I'm saying.  Before

19   this, he always has been a good boy, until he

20   moved to Montgomery, I will put it like that.

21         Q      And you testified that he was

22   intelligent and that he had some skills and

23   that sort of stuff?  And he could have made it

24   without having to steal, couldn't he?

25         A      That's right.

1      Q      But he made some very, very bad

2   judgments, wouldn't you say?

3      A      That's right.

4      Q      And do you believe that a person

5   ought to have to pay for their judgments?

6      A      If a person makes a mistake, he

7   should have to pay for it.  I will put it that

8   way.

9      Q      Have you ever been robbed at gun

10  point?

11     A      No, I haven't.

12     Q      Can you even imagine the fear that

13  would be put in for somebody, especially a

14  woman working on a job by herself, to have

15  someone come in and put a gun in her face and

16  demand money?

17     A      Yes, sir, I can imagine.

18     Q      That's pretty serious, isn't?

19     A      Somewhat.

20     MR. JARRELL:  No further questions.

21                REDIRECT EXAMINATION

22  BY MR. THOMAS:

23     Q      Mr. Foster, do you believe that

24  your son was capable of hurting anybody on the

25  days of those robberies?

1          A        No, I never believed that.  I never

2  believed it.

3          MR. THOMAS:  That's all I have.

4                    RECROSS EXAMINATION

5  BY MR. JARRELL:

6          Q        Do you think those ladies had any

7  idea that he wouldn't?

8          A        No, they couldn't have.  No way

9  they'd know that.

10          MR. JARRELL:  Thank you.  That's all.

11          THE COURT:  Do you have anything else?

12          MR. THOMAS:  No, sir.

13          THE COURT:  Thank you, Mr. Foster.  You

14                    can step down, sir.

15                              Call your next

16                    witness.

17          MR. THOMAS:  We call Ms. Harris.

18                    JAVONIA HARRIS

19          Whereupon, this witness, after first

20  being duly sworn to tell the truth, the whole

21  truth, and nothing but the truth, testified as

22  follows, to-wit:

23                    DIRECT EXAMINATION

24  BY MR. THOMAS:

25          Q        State your name for the record,

1    please?

2         A        Javonia Harris.

3         Q        What is your relationship to Bobby

4    Williams?

5         A        My bother-in-law.

6         Q        And how long have you known him?

7         A        Eleven years.

8         Q        Eleven years.  Okay.  You've heard

9    the testimony in the courtroom.  Obviously, you

10   are aware of the fact that he has been

11   convicted of robberies of two stores in Troy,

12   and some in Montgomery, as well.  Were you

13   surprised when you heard that news about your

14   brother-in-law?

15        A        Yes.

16        Q        Why was that?

17        A        Because the years that I have known

18   Bobby, Bobby always had a job.  I worked with

19   Bobby.

20        Q        Let me stop you right there.  You

21   worked with Bobby?  Where did you work with

22   Bobby?

23        A        We worked at McDonald's together.

24        Q        How long did y'all work at

25   McDonald's together?

1       A       About three years.

2       Q       Okay.  Go ahead.

3       A       Bobby never got in any trouble.  He

4   was off to himself.  He never bothered

5   anybody.

6       Q       You never saw him in the home or

7   at work strike out in anger either physically

8   or verbally at anybody?

9       A       No, I didn't.

10      Q       Do you think that Bobby has the

11  aptitude, intelligence, so that when he is

12  released from prison, to get out in life and

13  become a productive member of society?

14      A       Yes.

15      Q       Why is that?

16      A       Bobby can do whatever he wants to

17  do.  Bobby has a mind on him.  Bobby made A's

18  and B's in school.  Bobby can fix whatever he

19  wants.  Bobby's got a mind.  If he wants to go

20  out and make a life -- and he always talked

21  about what he wanted to do when he got out of

22  school or whatever, what he wanted to do.  He

23  had a mind sight.

24      Q       Did Bobby have goals in life?

25      A       Yes.

1       Q       What kind of goals did he happen to

2   tell you about?

3       A       He used to tell me that he wanted

4   to be a singer.  He loved soul music.  He used

5   to love to sing slow songs, work on computers.

6       Q       Did you ever know Bobby to have a

7   drug problem or alcohol problem?

8       A       No.

9       Q       Did he ever have any trouble

10  growing up as a child, juvenile troubles or

11  legal trouble?

12      A       No.

13      Q       Was he ever arrested by the police?

14      A       No.

15      Q       Did you know of him ever causing

16  any fights in the home?

17      A       No.  Bobby stayed off to himself at

18  home, either it was me and him sitting in the

19  living room looking at TV together or we'd be

20  outside.

21      Q       And Bobby had a very good record,

22  didn't he?

23      A       Uh-huh.

24      Q       What caused him to get off track in

25  school?

```
 1          A       The dress code.

 2          Q       What?

 3          A       His dress codes.

 4          Q       So, what grade was he in when he

 5  was removed from school?

 6          A       The 9th.

 7          Q       Okay.  And he was making good

 8  grades when that happened?

 9          A       Yes.

10          Q       And after he was removed from

11  school, did he go out and get a job?

12          A       Yes, he did.

13          Q       Where did he work?

14          A       He started working at McDonald's

15  when he got out of school.

16          Q       Is that where he worked for three

17  years?

18          A       Yeah.

19          Q       So he was 14 or 15 when he was

20  removed from school?

21          A       Well, somewhere about that age.

22          Q       You said he was in the 9th grade,

23  so he should have been 14 or 15, in that area.

24  And he worked at McDonald's until he was, what,

25  17 or 18?
```

```
 1          A      Yes.

 2          Q      Okay.  Where did he work after

 3    that?

 4          A      He left there and then he went to

 5    Krystal's.

 6          Q      How long did he work there?

 7          A      Eight months.

 8          Q      And did he work anywhere else?

 9          A      Not that I know of.

10          Q      Bobby has children, doesn't he?

11          A      Yes, he do.

12          Q      How many children does he have?

13          A      Two.

14          Q      Okay.  Do you know his children?

15          A      Yes.

16          Q      Did he always provide financially

17    for those children?

18          A      Yes, he did.

19          Q      What about emotionally?  Did he

20    provide emotionally for those children?

21          A      Yes.  He loved the kids.

22          Q      Did he see his kids often?

23          A      His little boy, he stayed with his

24    little boy every day.  But his little girl, she

25    was born when he was in prison.
```

1        Q       Okay.  But his boy, he actually

2   lived with his boy, kept him in his house?

3        A       Yes, he did.

4        Q       Did you ever see that child?  How

5   old is the boy today?

6        A       He's two.

7        Q       Did you ever see that child go

8   without?

9        A       No, I didn't.

10        Q       Describe Bobby's personality for

11   the Court, please?

12        A       Bobby has a nice personality.

13   Bobby is not mean to anybody.  And this

14   situation about the robbery, I don't know how

15   that come about, because Bobby is, I mean, he's

16   nice to everybody.  He never has a bad attitude

17   against nobody.  He don't talk back to anybody.

18   And I don't see how he managed to get into

19   trouble like that.

20        Q       And let me stop you right there,

21   Ms. Harris.  He didn't have a drug or alcohol

22   problem?  Right?

23        A       No, he didn't.

24        Q       He held a job?  Right?

25        A       Uh-huh.

1        Q        He took care of his kids?  Right?

2        A        Yes.

3        Q        What got him sitting in this chair?

4        A        I have no idea.  I can't say that.

5    I mean, he just only hang with the wrong crowd,

6    because when they make a mistake, it's their

7    mistake, not everybody's.

8        Q        How old is Bobby right now?

9        A        Bobby is about 22, because me and

10   him are around the same age.

11       Q        Okay.  Is there anything today with

12   you sitting in that chair that would lead you

13   to believe that Bobby cannot get out of prison

14   and rebuild his life, (a), finish his high

15   school degree while he is in prison, and (b),

16   get some jobs skills while he is there, and

17   (c), get out and enter society without causing

18   anybody any harm or getting in any more

19   trouble?

20           Is there anything in your mind today,

21   that would lead you to believe that he can't do

22   that?

23       A        No, there's not, not at all.

24       MR. THOMAS:  That's all I have.  If there

25               is anything else that you would

```
 1                            like to tell the Court
 2                            specifically, feel free to speak
 3                            freely.
 4              THE WITNESS:  No, sir.  That's it.
 5                         CROSS EXAMINATION
 6   BY MR. JARRELL:
 7         Q      Mr. Harris --
 8         A      Uh-huh.
 9         Q      -- now, you indicated that Bobby
10   always had a job?  Are you talking about after
11   he was put out of the school, or did he try to
12   get a job while he was in school?
13         A      Well, in school he had a summer job
14   down here at TSU.  He worked over there.  Then
15   he moved back to Montgomery, when he got kicked
16   out of school.  After that, he started working
17   at McDonald's.
18         Q      He got kicked out of school?
19         A      Uh-huh.
20         Q      What for?
21         A      He had pants sagging.  That's just
22   the way Bobby dressed.  And I guess the
23   principal was telling him every other day, you
24   know, tighten up his belt and pull up his
25   clothes.  They just got tired of telling him.
```

1    And they told him that he couldn't return back

2    to school.

3         Q    Were his clothes decent?

4         A    Yes, they were.  But to the school

5    dress code, they didn't want him sagging.

6         Q    So, he just refused to abide by the

7    rules, didn't he?

8         A    Uh-huh.

9         Q    You said that he was smart and made

10    good grades and was capable of doing a lot of

11    things?

12         A    Uh-huh.

13         Q    So he was capable and had the

14    intelligence to make his way in this world

15    without having to take a gun and take other

16    people's money, didn't he?

17         A    Yes.

18        MR. JARRELL:  No further questions.

19        MR. THOMAS:  I have one more question,

20           Your Honor.

21           REDIRECT EXAMINATION

22    BY MR. THOMAS:

23         Q    Sitting here today do you believe

24    that it's possible for Bobby Williams to have

25    committed any violence on the individuals that

```
 1   were robbed?

 2        A     Repeat that.

 3        Q     Sitting here today do you think

 4   that it was possible, even remotely possible,

 5   for Bobby Williams to have committed violence,

 6   actually used that gun or another weapon on any

 7   of the people that were robbed?

 8        A     No.

 9        Q     That's all I have.

10        MR. JARRELL:  Nothing further.

11        THE COURT:   A quick question.  The

12                     pre-sentence report doesn't

13                     reflect three years employment

14                     at McDonald's.  Are you sure

15                     about that?

16        THE WITNESS:  Probably.

17        THE COURT:  The employment history states

18                    that Bobby lists his prior

19                    employment as a dishwasher at

20                    H & P (sic).  Do you remember

21                    that?

22        THE WITNESS:  I remember he was working

23                    there.

24        THE COURT:  And as a cook at Krystal's.

25                    You testified to that and as a
```

```
 1                      packer at Websters, Inc.  Do you

 2                      recall that?

 3          THE WITNESS:  Yes, I remember that.

 4          THE COURT:  But you said he worked three

 5                      years at McDonald's?

 6          THE WITNESS:  I think so.

 7          THE COURT:  Okay.  Thank you.  Please

 8                      step down.

 9                           Call your next witness,

10                      sir.

11          MR. THOMAS:  I call Ms. Williams.

12          THE COURT:  Raise your right hand.

13                      DONNA WILLIAMS

14          Whereupon, this witness, after first

15  being duly sworn to tell the truth, the whole

16  truth, and nothing but the truth, testified as

17  follows, to-wit:

18                   DIRECT EXAMINATION

19  BY MR. THOMAS:

20          Q     State your name for the record,

21  please?

22          A     My name is Donna Williams.

23          Q     And you are going to have to speak

24  up and speak into the microphone.

25          A     Donna Williams.
```

1          Q       What is your relationship to

2    Mr. Williams?

3          A       His mother.

4          Q       Of course, you are aware of what

5    Mr. Williams has been convicted of, these

6    robberies?  Were you surprised to learn of that

7    when the news broke about the Montgomery and

8    Troy robberies?

9          A       No.

10         Q       You were not surprised?

11         A       I was surprised.  He never did

12   nothing like that.

13         Q       My question is were you surprised?

14   Were you shocked about the robberies?

15         A       Yes, it did.

16         Q       It did shock you?

17         A       It shocked me.

18         Q       Ms. Williams, you are his mother.

19   How many children do you have?

20         A       I have six children.

21         Q       And did you raise Bobby?

22         A       I raised Bobby.

23         Q       And how many other children did you

24   raise in your house?

25         A       I raised Bobby, Erika, Lamar and

```
 1    Tams (sic).

 2         Q     Okay.  Were you, for the most part,

 3    a single parent?

 4         A     Yes.

 5         Q     Being a single parent must have

 6    been difficult, but despite that, Bobby's

 7    academic records when he was in school, from

 8    the first grade to the 9th grade, did he

 9    normally perform well in school?

10         A     Yes.

11         Q     What kind of grades did he make?

12         A     He made A's and B's.

13         Q     And that was throughout his

14    academic career?

15         A     Yes.

16         Q     Do you think Bobby is the kind of

17    person who can pretty much do whatever he sets

18    his mind to do?

19         A     Yes.

20         Q     Do you think that he is the kind of

21    person who can set goals for himself?

22         A     Yes, I do.

23         Q     Do you think that he is the kind of

24    person that can go to prison and obtain a

25    G.E.D.?
```

```
 1        A      Yes, I do.

 2        Q      Do you think that he is the kind of

 3   person that can go to prison and get some job

 4   skills while he is in there?

 5        A      Yes, I do.

 6        Q      Has Bobby ever talked to you about

 7   what he would like to do?

 8        A      He told me he wanted a good job and

 9   to buy a nice home and live happy.  And he

10   wanted to help raise the children and stuff

11   like that.  After that he didn't say too much

12   more to me.

13        Q      Did you always know him to be a

14   good father to -- well, the one child was born

15   while Bobby was actually behind bars.  Did you

16   know him to be a good father to his two-year

17   old boy?

18        A      Yes.

19        Q      Did he always make sure that his

20   child was taken care of, clothed and fed?

21        A      Yes.

22        Q      Did he come home at night from work

23   and spend time with his family?

24        A      He'd came home every night, because

25   he lived with me.
```

1       Q     How would you describe your family,

2  as your children were growing up?  How would

3  you characterize it?

4       A     Oh.  It was loving.

5       Q     Were the brothers and sisters

6  close?  Was it a close family?

7       A     Yes, it was.

8       Q     Did they have good family support

9  in their years of growing up?

10      A     Yes.

11      Q     And do you know, sitting there

12  today, why Bobby had to leave school in the 9th

13  grade?

14      A     Because he was -- I was not able to

15  buy him no decent clothes.  And the clothes he

16  had was sagging.  And they put him out of

17  school.

18      Q     But, basically, he was violating

19  the dress code, wasn't he?

20      A     Yes.

21      Q     He was removed for that?  Right?

22      A     That's right.

23      Q     You are not excusing him for

24  violating the dress code, are you?

25      A     No, I am not.

```
1          Q       And you feel like Bobby has what it
2    takes to finish that degree in prison, don't
3    you?
4          A       Yes, I do.
5          Q       Did you ever know bobby to be a
6    violent individual at home?
7          A       No, sir.  He was not violent at
8    all.
9          Q       And were his siblings younger or
10   older?
11         A       Sir?
12         Q       Were his brothers and sisters
13   younger or older?
14         A       They was -- two of the them was
15   older.  They're grown.
16         Q       The ones that are living in the
17   house, what are their ages today?  What are
18   their ages?
19         A       Martha (sic) is 13 and his bother
20   is 11 years old.
21         Q       How was he with his younger brother
22   and sister?
23         A       He was real close to them.
24         Q       Okay.  Did you ever see them
25   verbally lash out at them or you or anybody?
```

1         A      No.

2         Q      Have you ever seen him do anything

3    that lead you to believe that he could rob

4    somebody at gun point prior to this happening?

5         A      No.

6         Q      Tell me about your family growing

7    up?  Did y'all make it to church?

8         A      Yes, we did.

9         Q      Did Bobby make it to church with

10   you?

11        A      Yes, sir, he did.

12        Q      And how often would y'all attend

13   and where did you attend church?

14        A      We went to church on Troy Highway

15   at New Liberty Baptist Church.

16        Q      And how many years did y'all go to

17   that church?

18        A      We went about every Sunday.  We

19   went every Sunday about three or four years.

20        Q      Did Bobby ever have a drug or

21   alcohol problem?

22        A      No, he didn't.

23        Q      In other words you never saw drugs

24   or alcohol in your house?

25        A      No, sir.

1      Q      You always knew him to be sober?

2      A      That's right.

3      Q      And I guess I just need some

4   clarification here.  Where was he living before

5   all of this happened?  Was he living with you?

6      A      Yes, sir.

7      Q      So you would have known it if he

8   had any kind of substance abuse problems?

9      A      Yes, sir.

10      Q      Okay.  So he was making good

11   grades?

12      A      Yes, sir.

13      Q      He was holding down a full-time

14   job?

15      A      Yes, sir.

16      Q      He was taking care of his kids?

17      A      Yes, sir.

18      Q      He was not abusing drugs or

19   alcohol?

20      A      No, sir.

21      Q      How did he get here today?  Why is

22   he sitting here today?  What happened?

23      A      I don't exactly know what happened,

24   because he didn't talk to me much.

25      Q      Sitting in that stand today, is

1    there any reason that you can think -- is there

2    anything in your mind that would lead you to

3    believe that he could not get out of prison

4    with a high school degree and a new set of job

5    skills, and go to work, and be a father and

6    take care of his family and stay out of

7    trouble?

8            A        Yes, I do believe that.

9            Q        You believe that he can do that?

10           A        Yes, sir.

11           MR. THOMAS:  That's all I have.

12           THE COURT:  Mr. Jarrell

13                    CROSS EXAMINATION

14    BY MR. JARRELL:

15           Q        Ms. Williams, how did Bobby get

16    along with other children in the neighborhood

17    when he was growing up?

18           A        He got a along real fine.

19           Q        Real fine?

20           A        Uh-huh.

21           Q        And when they played games, and you

22    would see him interact with other kids, did he

23    kind of -- since he was pretty smart, did he

24    kind of take charge?

25           A        No, not that I know of.

1          Q       Was he a leader or a follower?

2          A       No, he was not a leader.

3          Q       He wasn't a leader?

4          A       Huh-uh.

5          Q       Now, you testified that you

6    couldn't provide him real good clothes.  Is

7    that right?

8          A       Yes.

9          Q       Is that the reason he had problems

10   with the dress code, too?

11         A       Yes.

12         Q       Is there -- that's the reason he

13   had problems with the dress code at school?

14         A       I was not able to.

15         Q       He was working, wasn't he?

16         A       When he was going to school, he

17   wasn't working.  He was living with me.

18         Q       He was not working while he was

19   going to school?

20         A       No, he was not.

21         MR. THOMAS:  That's been the testimony.

22         MR. JARRELL:  No more questions.

23

24

25

```
1

2

3                  REDIRECT EXAMINATION

4    BY MR. THOMAS:

5         Q    Very quickly.  Bobby got a job at

6    McDonald's, his first real job, after he was

7    removed from school?  Correct?

8         A    Uh-huh.

9         Q    But when he was in school, it's

10   fair to say that he only held summer jobs at

11   Troy State?

12        A    Yes.

13        Q    He would come back and live with

14   his father?

15        A    He was living in Troy.

16        Q    I'm sorry?

17        A    He was living down here in Troy.

18        Q    Oh.  He was living down here?  But

19   those were summer jobs?  Correct?

20        A    Yes.

21        Q    And he was working at TSU in the

22   summertime --

23        A    Yes

24        Q    -- to earn a little spare cash?

25        A    Uh-huh.
```

```
 1            MR. THOMAS:   That's all I have.

 2

 3                 RECROSS EXAMINATION

 4    BY MR. JARRELL:

 5         Q      Did he use that money to buy

 6    clothes with or to blow it?

 7         A      He bought his clothes.

 8         Q      So he had some good clothes?

 9         A      He had decent clothes, I'm sure.

10    They put him out because of sagging.

11         Q      He was sagging?

12         A      Right.

13         Q      And that's just a matter of not

14    living up according to the rules, isn't it?

15    He could have pulled his britches up, couldn't

16    he?

17         A      Sure.

18         Q      He could have worn suspenders?  He

19    could have worn a belt?

20         A      He had on a belt.

21         Q      But the problem was he just didn't

22    want to go along with the rules, was it not?

23         A      I don't know.

24         Q      You don't know?

25         A      I don't know.
```

```
1          Q      Did you tell him to keep his pants

2   pulled up while he was at school?

3          A      When he got home, he was.

4          Q      What?

5          A      When he come home he was suspended.

6          Q      He just got suspended one time?

7          A      He got suspended one time, and that

8   was it.

9          Q      How long was that suspension for?

10         A      He couldn't go back to school no

11  more.

12         Q      He never could go back to school no

13  more?  And that was because of sagging

14  britches?

15         A      That's what the principal said.

16         Q      And that was the first time that

17  you ever heard of it?

18         A      That was my first time.

19  MR. THOMAS:  We are not here to try the

20                clothes.  And I object to these

21                questions on this line.

22  MR. JARRELL:  It goes to his state of

23                mind, Judge.

24  THE COURT: Overruled.  I mean, this was

25                discussed on direct of this
```

```
 1                            witness.
 2            MR. THOMAS:  Well, we will put Mr.
 3                    Williams on the stand, and he
 4                    will address it all.
 5            THE COURT:  Overruled.  Go ahead.
 6            MR. JARRELL:   No further questions.
 7            MR. THOMAS:  That's all.
 8            THE COURT:  Thank you, ma'am.  You may
 9                    step down.
10                            Call your next witness,
11                    sir.
12            MR. THOMAS:  We call Mr. Bobby Williams.
13                    DIRECT EXAMINATION
14    BY MR. THOMAS:
15            Q      State your name for the record,
16    please?
17            A      Bobby Williams.
18            Q      And how old are you, sir?
19            A      Twenty-two years old.
20            Q      Mr. Williams, let's talk about this
21    whole clothing thing for a minute and see if we
22    can shed some light on it.  You were attending
23    school in Montgomery.  What was the name of the
24    school?
25            A      Brewbaker Junior High.
```

1          Q       And the testimony has been

2     consistent that you were removed from school

3     because you had a dress code violation?

4          A       Yes, sir.

5          Q       Can you tell us exactly what the

6     violation was?

7          A       Basically, it was a violation

8     because the school required you to touch your

9     shirt.  One morning, I came in late.  And the

10    principal asked me to tuck in my shirt.

11              And there was another gentleman

12    with the same situation.  And I was like, if

13    you going to tell me to tuck in my shirt, why

14    not tell this gentleman to tuck in his shirt.

15              So he was basically, like, the

16    issue was not on this gentleman.  It's on you.

17    So he basically said that we had a disagreement

18    about the situation.

19         Q       Okay.  So you are 14 years old and

20    you started arguing with the man in charge?

21         A       Yes, sir.

22         Q       And in hindsight that was a

23    mistake, wasn't it?

24         A       Yes, sir.  Well, basically, I

25    didn't argue.  He told me to tuck in my shirt,

1    and I did.  But the simple fact that I

2    prolonged, he withdrawed me from the school,

3    even though --

4         Q     You are not here telling the Court

5    that you made these robberies because you were

6    a victim of getting booted out of school, are

7    you?

8         A     No, sir.

9         Q     You are just here trying to tell the

10   Court that you were a good, active student

11   until the time that you got removed.

12        A     Yes, sir.

13        Q     Tell me what kind of grades you

14   made in school?

15        A     I made A's and B's.

16        Q     You don't think you committed these

17   crimes because you got booted out of school in

18   the 9th grade, do you?

19        A     No, sir.

20        Q     But you would like a chance to

21   finish your high school degree --

22        A     Yes, sir.

23        Q     -- and get your G.E.D.?

24        A     Yes, sir.

25        Q     And you want to do that while you

1    are in prison?

2        A    Yes, sir.  I'm taking the program

3    now while I'm in prison.

4        Q    What kind of program are you

5    taking?

6        A    Continuing education (inaudible).

7    I was taking on-line classes.  I'm taking a

8    trade course, but I got transferred to another

9    facility.  And they don't have trade schools

10   there.  All they have is the G.E.D. program.

11       Q    Mr. Williams, you have two

12   children?  Right?

13       A    Yes, sir.

14       Q    And before you were locked up for

15   these robberies, you had one child?  Correct?

16       A    Yes, sir.

17       Q    Did you take care of that child?

18       A    Yes, sir.

19       Q    Tell me about how you took care of

20   that child.

21       A    I took care, physically and

22   financially.  I was staying at my mom's house.

23   Right after I left Troy, I was going to

24   Brewbaker, I got kicked out of school.  I

25   started working at McDonald's.

```
 1          Q      Okay.  Let me stop you right
 2    there.  Did you tell the intake officer who
 3    prepared the report that I mailed to you about
 4    a week ago, the pre-sentence report, that you
 5    worked at the time?
 6          A      Yes.  I told him that I worked at
 7    McDonald's, then Krystal's, then I was working
 8    at Websters.  After Websters, I was working at
 9    H & P (sic).  That was my last job.
10          Q      And with the exception of I guess a
11    few months, as best I can do the math in my
12    mind, between jobs, you always held a full-time
13    job?
14          A      Right.  To say full-time, it was
15    off and on.  I worked at McDonald's about
16    three years.  Then after I left there, I went
17    to Krystal's about eight months.  Then after
18    that I was basically going from work force to
19    work force.  And then I got a lot going on,
20    then I started working at H & P (sic) as a
21    dishwasher.
22          Q      Mr. Williams, have you ever had a
23    problem with alcohol?
24          A      No, sir.
25          Q      Have you ever had a problem with
```

```
 1   drugs?
 2        A     No, sir.
 3        Q     Have you ever had a problem with
 4   authority in general, with the exception of the
 5   mistake that you made when you were in the 9th
 6   grade?
 7        A     No, sir.
 8        Q     Have you ever bullied anybody
 9   around?
10        A     No, sir.
11        Q     Did you ever push anybody around?
12        A     No, sir.
13        Q     Mr. Williams, the night of those
14   robberies -- and I heard Mr. Larry Jarrell
15   characterize that you held the gun on both
16   times.  We are not going to retry the case.
17             But we know there was strong
18   testimony in one of the cases that that was not
19   true, not from the victim, however.
20             Would you have hurt anybody in the
21   course of those robberies?
22        A     No, sir.
23        Q     Were you on drugs in those
24   robberies?
25        A     No, sir.
```

```
 1        Q      Were you under the influence of

 2   alcohol?

 3        A      No, sir.

 4        Q      What got you to that point in your

 5   life?

 6        A      It's just being with the wrong

 7   crowd, making mistakes.  I was young, wanted to

 8   live the good life.  And really that's

 9   basically what it was, being around the wrong

10   crowd and admiring what everybody else had.  I

11   was not capable of being myself.  And then what

12   got me was the situation I can't say that I

13   didn't do the situation.  That I did it

14   wouldn't matter, but being with the people that

15   I was with got me in the situation that I am in

16   now.

17        Q      Did you ever have -- were you ever

18   arrested growing up for anything?

19        A      No, sir.  I've never been arrested

20   before.

21        Q      Were you ever in any trouble in

22   school with the exception of your clothing

23   violation?

24        A      No, sir.  I've never been suspended

25   from school.  None of that.
```

312

```
 1          Q        And we've heard several people say
 2   growing up you had a good family.  Tell me
 3   about your family.
 4          A        My mom, she really -- my mom, she
 5   raised me and my younger sister and my younger
 6   brother and my middle sister to the best of her
 7   ability.
 8                   And my dad was not around.  My dad
 9   when he came around, he showed me love.  He
10   rightly did what a father was supposed to do.
11   And my older brothers, they been big brothers,
12   we been knowing each other all our life.
13          Q        Did y'all do a lot of things
14   together growing up?
15          A        We did.
16          Q        Did you ever have any problems
17   with your siblings at all?
18          A        No, sir.
19          Q        And then when you were growing up
20   in Troy, before you moved to Montgomery, when
21   you were in school, what did you do during the
22   summertime?
23          A        I was working Vo-Tech (sic) during
24   the summer, then I was doing odd jobs around
25   the school.
```

```
 1          Q      Okay.  So you worked at Vo-Tech at
 2   Troy State?
 3          A      Yes, sir.
 4          Q      So you held a job when you were not
 5   in school in Troy?
 6          A      Yes, sir.
 7          Q      You are not here today to tell the
 8   Court, to ask this Court to forgive you for
 9   what you did, are you?
10          A      Yes, sir.
11          Q      You are not here to deny that you
12   are responsible for your acts?
13          A      No, sir.
14          Q      Mr. Williams, do you really believe
15   that if the Judge grants you leniency, when you
16   get out of prison you can come out in society
17   with a college education and a set of job
18   skills and stay out of trouble?
19          A      Yes, I do.
20          Q      Can you look at the Judge and tell
21   him that?
22          A      Yes, sir.  I just ask that -- I'm
23   sorry for the situation that took place in your
24   community, but I can't really say that what I
25   did was wrong, because the simple fact that the
```

1    situation wasn't my gun -- if you find in your

2    heart to believe me and give me a chance and

3    take care of -- give me a chance to take care

4    of my kids and be with my family.

5          Q    Mr. Williams, sitting in that

6    chair, do you know what you want to do with

7    your life when you get out of prison?

8          A    Yes, sir.

9          Q    What is that?

10         A    Well when I get my G.E.D., I would,

11   like my sister-in-law said, I would like

12   singing.  And I would really want to get

13   computer work.  I love computer and video

14   games.  So I really just want get out and find

15   me a way to be a computer technician.

16         Q    Do you think that you can get some

17   computer skills while you are in prison?

18         A    Yes, sir, I can.

19         Q    And then when you get out, you want

20   to repair computers?

21         A    Yes.

22         Q    And you may want to sing on the

23   side?

24         A    Yes, sir.

25         Q    I'm not going to ask you to sing

1    for the Court.

2         Mr. Williams, you were sentenced to some

3                   robberies in Montgomery, weren't

4                   you?

5    A    yes, sir.

6    Q    And you received a twenty, split

7    four on those charges?  Is that correct?

8    A    Yes, sir.

9    Q    Would you like for the Court to

10   consider that when he sentences you to these

11   charges?

12   A    Yes.  And find in your heart to

13   forgive me.  Please show leniency.  I would

14   appreciate that.  If they can please split the

15   sentence.

16   Q    Mr. Williams what can you tell the

17   the Court to satisfy this Judge, that when you

18   get out, you can be straight and narrow.

19   A    Well, Your Honor, I have two young

20   kids that I really love.  And I've only

21   experienced one.  I haven't seen my daughter

22   since I've been in prison.  But I've seen her

23   twice since I have been in the county.  I ask

24   that you find in your heart to forgive me and

25   so I can finish my time and get an education to

316

```
1    get out and spend the time with family and

2    kids.

3              MR. THOMAS:   That's all I have.

4                    CROSS EXAMINATION

5    BY MR. JARRELL:

6         Q     Mr. Williams, how old were you when

7    you were kicked out of school?

8         A     About 15 or 16.

9         Q     And you were still in junior high?

10        A     Yes, sir.

11        Q     What grade?

12        A     Ninth.  When I was staying in Troy,

13   I was going to Charles Henderson High.  When I

14   got -- when I left and came back to Montgomery,

15   I went to Brewbaker Junior High, which is 6th

16   through 9th.

17        Q     So you transferred sometime during

18   your 9th grade year?

19        A     Yes, sir.

20        Q     And you are telling this Court the

21   only reason that you got kicked out is because

22   of that one incident of talking back to the

23   principal?

24        A     A violation of dress code.  That's

25   exactly why I got kicked out of school.
```

```
 1          Q       How long have you been in prison?

 2          A       Going on two years.  This month,

 3   two years.

 4          Q       How old is your son?

 5          A       Two years left.

 6          Q       Now, how old is your son?

 7          A       About two years old.

 8          Q       So you really haven't had much time

 9   to spend with that son.  I was out.  He was one

10   year old.  I stayed with him a year.

11          Q       And he just now turned two?

12          A       Yes, sir.

13          Q       And you have been in prison for two

14   years?

15          A       Going on two years.  He just turned

16   two.  But when I got locked up, he was a year

17   old.

18          Q       Your math is different from mine.

19   But it's irrelevant.  If I understood you a

20   moment ago, you really don't accept

21   responsibility for what you've done?  You blame

22   it on the crowd?

23          A       I can't basically blame it on the

24   crowd because I was responsible for my own

25   knowledge.  But the situation I was in and the
```

```
 1    situation that took place on me -- I don't want

 2    to bring up the issue, again, but the simple

 3    fact that you said that I was the gunman and

 4    the witnesses, that doesn't fit the evidence,

 5    but there's nothing that I can say that they

 6    can take back the verdict.  I do say the

 7    situation that I'm in now was because of the

 8    crowd I was around.

 9         Q    Well, you had a choice whether to

10    be with that crowd or not, didn't you?

11         A    I really did have a choice.  At the

12    time they were friends I had known all my life.

13         Q    You had known them all of your

14    life?

15         A    Exactly.

16         Q    Were they from Troy?

17         A    No.  They were from Montgomery.

18    I grew up in Montgomery.  I just moved to Troy

19    at the time.  And then I moved back to

20    Montgomery.

21         Q    Well, now, I believe Mr. Brooks

22    testified that you were in Montgomery about

23    three years?

24         A    I stayed -- I was born in

25    Montgomery.  And then I moved to Troy.  And
```

```
 1    then I moved back to Montgomery.  I was not

 2    moving to Troy.

 3         MR. JARRELL:  Nothing further.

 4                   REDIRECT EXAMINATION

 5    BY MR. THOMAS:

 6         Q     Bobby, I need to understand

 7    something for my own purposes.  I want to

 8    readdress something that Mr. Jarrell addressed

 9    earlier.

10                   You have a boy that is two years

11    old today?

12         A     He is three years old.

13         Q     Oh.  He is three years old today?

14         A     Yes, sir.

15         Q     So he is not two today?  He is

16    three years old?

17         A     He's three years old.

18         Q     And you have been in prison or jail

19    for two years?

20         A     Two years this month.

21         Q     So you, in fact, were with your boy

22    the first year of his life?

23         A     Yes, sir.

24         Q     So you were mistaken earlier when

25    you said two?
```

```
1              A      He was born October 30th of 2001.
2         MR. THOMAS:  Okay.  That's all I have.
3         MR. JARRELL:  Nothing further.
4         THE COURT:  Thank you, sir.  Please step
5                  down.
6         THE COURT:  Anything else?
7         MR. THOMAS:  Judge, I would just like to
8                  say that, on a personal note,
9                  not that it's relevant, but that
10                 I have had a chance to sit down
11                 and talk with this family.  And
12                 I feel like he has a good
13                 support structure, that when he
14                 is done doing his time, he is
15                 placed to come back to folks
16                 that want to help him.  I have
17                 talked to them.  And I believe
18                 that his testimony is true, that
19                 he is sincere, that he wants to
20                 do something with his life while
21                 he serves his time.  And I
22                 believe he is sincere from
23                 talking with his family, that he
24                 does in fact want to build a
25                 career when he gets out. He is
```

```
 1        22 years old.  He was 20 when
 2        this happened.  Prior to this
 3        happening, he had no juvenile
 4        record.  He had no arrest.  He
 5        had no problems with anybody.  I
 6        didn't put everybody on the
 7        stand because it would have been
 8        redundant.  The testimony would
 9        have been that he is a
10        non-violent, layed back relaxed
11        individual who is -- and it's
12        very out of character for him to
13        be physically aggressive.  He is
14        not here to say that he did not
15        commit these robberies.  He did.
16              Everybody that I have
17        talked to said they were
18        shocked.  He did what he did,
19        but everybody is surprised by
20        that.  We just ask that the
21        Court consider his sentence that
22        he was given in Montgomery on
23        the split, along with all of the
24        other mitigating factors
25        involved.
```

```
 1          THE COURT:  Thank you, sir.

 2                        Mr. Jarrell?

 3      MR. JARRELL:  Judge, I think that the

 4                    most significant thing of all of

 5                    this hearing came from Mr.

 6                    Williams's own mouth when he

 7                    basically sat on the stand, and

 8                    really denies responsibility for

 9                    his actions, blaming it on

10                    somebody else, the crowd.  And

11                    that tells me that he is making

12                    excuses for his life and what he

13                    has done instead of facing up to

14                    that.  And until that day comes

15                    that he is willing to face that

16                    responsibility and admit to

17                    himself, if not to the Court,

18                    that what he did was a horrible,

19                    horrible thing to put a gun in

20                    somebody's face and demand their

21                    money.  Because he is too lazy

22                    to use the intelligence that the

23                    good Lord gave him.  He is an

24                    A-B student capable of doing

25                    well, a good worker according to
```

```
 1              Mr. Brooks.  According to his

 2              sister in law, he was a hard

 3              worker, held down a job, but,

 4              yet, instead of applying that

 5              towards good, he has applied

 6              that towards evil.

 7                   Those two ladies that

 8              sat here on this witness stand

 9              and testified to the fear that

10              they had in their heart when a

11              gun was put in their face by a

12              young man that they totally

13              described with tattoos and

14              described the tattoos.  There's

15              no question as to who did it,

16              and who had the gun.

17                   And I ask this Court to

18              sentence him to life in prison.

19     MR. THOMAS:  Your Honor, I do want to

20              address a couple of points that

21              Mr. Jarrell made.

22                   I heard the words of

23              Mr. Bobbie Williams up there, as

24              well.  And I think he came back

25              and later clarified what he
```

```
 1        earlier said, because the topic

 2        picked up again about

 3        responsibility.  And I think,

 4        Judge, when he clarified it, he

 5        was staying, "I was there.  I

 6        was responsible for what I did,

 7        but the reason I got to where I

 8        was, was because I got hooked up

 9        with the wrong people.  I got

10        hooked up with the wrong

11        people."

12             I agree with Mr.

13        Jarrell, his first testimony did

14        sound like he was denying any

15        responsibility.  Then he came

16        back and clarified that a couple

17        of three minutes later.

18             In respect to the gun

19        issue, Judge, we are not here to

20        debate whether he held the gun

21        or not.  You were at the trial.

22        I was at the trial.

23             We can't argue with the

24        only eye witness in the Sunny

25        South Robbery, because there was
```

```
 1              no video.  But, anybody that
 2              watched the video can tell that
 3              it was not Mr. Williams that
 4              held the gun.  I know that the
 5              eye witness testimony was, but
 6              you can go back and look at the
 7              video and come to that
 8              conclusion for yourself.  I
 9              think the video is irrefutable
10              on that point.
11                   And that's all we have'
12              to offer, Your Honor, along with
13              what I said earlier about a man
14              with a family, who was 22 years
15              old.  He was smart.  He still is
16              smart.  He has some drive in
17              him, and he wants to rebuild his
18              life.
19         MR. JARRELL:  Nothing further.
20         THE COURT:  Mr. Thomas, do you know of
21              any reason why the sentence of
22              the law should not at this time
23              be imposed?
24         MR. THOMAS:  No, sir.
25         THE COURT:  Mr. Williams, except for what
```

```
1                    you have already testified from
2                    the stand, is there anything
3                    that you wish to say to the
4                    Court before I impose sentence
5                    in the case?
6       THE DEFENDANT:  I would like to ask if
7                    you find it in your heart to
8                    have mercy on me, to  please
9                    forgive me for what I did.  I
10                   know I can't change the past,
11                   but I can make the best of a
12                   situation.
13      THE COURT:  Anything else from anyone?
14      MR. JARRELL:  Nothing from the State.
15      MR. THOMAS:  No, Judge.
16      THE COURT:  Mr. Williams, I have heard
17                   what you have had to say, and I
18                   have heard what your family had
19                   to say.  And, of course,
20                   everybody understands that the
21                   minimum sentence that can be
22                   imposed in these cases is 20
23                   years?  Right?
24      MR. THOMAS:  Yes, sir.
25      THE COURT:  It's a class A with the use
```

```
 1              of a handgun.  What I'm going to
 2              do in these cases is this:  I'm
 3              going to sentence you to 25
 4              years to run concurrent with the
 5              time that you are serving in
 6              Montgomery County.
 7      MR. THOMAS:  Thank you, Your Honor.
 8      THE COURT:  Of course, it being more than
 9              twenty years, I won't split it,
10              but that gives you in my mind
11              some incentive to do well while
12              you are in prison.  And you
13              represented to the Court that
14              you intend to do well.  I tax
15              you with cost of court in each
16              case, $50.00 Crime Victim's
17              Compensation Assessment in each
18              case, plus, attorney fees or
19              reimburse the State of Alabama
20              for indigent attorney fees upon
21              release from prison.
22                   I advise you of your
23              right to appeal within 42 days.
24              I'm not telling you to appeal.
25              I'm telling you that you have
```

1          right to appeal.  If you are

2          determined to be indigent, you

3          can be provided a free

4          transcript of the trial and

5          this hearing for the purposes of

6          appeal and be appointed an

7          attorney to represent you on

8          appeal.

9               I give you credit for

10         any time that you have served

11         while awaiting trial or

12         disposition in your cases.

13               Anything else that we

14         want to put on record at this

15         time?

16    MR. THOMAS:  No, sir.

17    THE COURT:  Anything from the State?

18    MR. JARRELL:  No, sir.

19    THE COURT:  That concludes this hearing.

20         Thank you.

21               (End of sentence hearing).

22

23

24

25

| State of Alabama<br>Unified Judicial System<br>Form ARAP-13          9/91 | CERTIFICATE OF COMPLETION OF<br>REPORTER'S TRANSCRIPT | Case Number |
|---|---|---|

| TO THE CLERK OF THE: | COURT OF CRIMINAL<br>APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL: |
|---|---|---|

ON APPEAL FROM THE:

☑ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF _____*Pike*_____ COUNTY

_____*Bobby Williams*_____ , APPELLANT

v.  ☑ STATE OF ALABAMA  ☐ MUNICIPALITY OF _____

I certify that I have this date completed and filed with the clerk of the trial court¹ the original of a true and correct transcript of the proceedings designated in the reporter's transcript order. All pages are numbered serially, in the upper right corner of each page, prefaced by a copy of the reporter's transcript order and an index, and ending with the number appearing in the upper right corner of this certificate (page number _321_).

I certify that a copy of this certificate is this date being served (on counsel for defendant) (defendant, if not represented), the attorney general of Alabama, and the district attorney or the municipal prosecutor in lieu of the attorney general and the district attorney if the appeal is from a municipal conviction, along with a copy of the index.

DATED this _16th_ day of _May_ , 19 _2005_

_Sheila Hanson_
Court Reporter

(Amended October 1, 1991.)



¹The clerk of the trial court is reminded to assemble the record on appeal in volumes of not more than 200 pages each, and to send certified photocopies of the record on appeal to counsel for defendant and to the attorney general of Alabama as required by Rule 11(b) or to the municipal prosecutor in lieu of the attorney general if the appeal is from a municipal conviction.

AP FORM 24-2                                                                                    (CIVIL / CRIMINAL)

## COURT REPORTER'S INDEX OF TRIAL EXHIBITS — ARAP RULE 11(e)

IN THE CIRCUIT COURT OF _Pike_ COUNTY

_Troy_, ALABAMA

APPELLANT - _Bobby Williams_

VS.                                                          appellant

STATE OF ALABAMA - or -

                                                            appellee

ACTION (Case)
No. _CC 2003-383_
                _392_

[ ] State Criminal
[ ] Civil (Law)
[ ] City Appeal (Crim.)
[ ] Civil (Equity)

TO:   (name) _Brenda Peacock_  CLERK - REGISTER OF CIRCUIT COURT OF _____ COUNTY.

FROM: (name) _Sheila Hanson_  COURT REPORTER OF _____ JUDICIAL CIRCUIT OF ALABAMA

### REPORTER'S INDEX TO EXHIBITS

The following EXHIBITS were received by the Court Reporter in above Action and same have been properly marked and identified. Where capable said exhibit(s) have been assembled herein (in flat file); where incapable of being assembled herein such exhibit(s) placed in suitable separate container. This index includes all exhibits (herein assembled or separately housed - or - other, as indicated) and further indicates those offered, admitted or not admitted into evidence, etc...: -

[NOTE: (√) check appropriate]

| Party | Exhibit No. | BRIEF DESCRIPTION OF EXHIBIT | (√) Admitted Yes | No | Iden. Only (√) | With-drawn (√) | Released By Court To Party (√) | Original Released By Copy (√) | In File (√) | In Container (√) | REMARKS, etc. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S | 1 | Waiver | | | | | | | | | |
| | 2 | Statement | | | | | | | | | |
| | 3 | Photo line up signature | | | | | | | | | |
| | 4 | Tape | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| D | 1 | Photo line up | | | | | | | | | |
| | 2 | Prelim transcript | | | | | | | | | |

NOV 2004
Brenda M. Peacock
Court Clerk
Pike Co., Ala.

NOTE: ARAP RULE 11(e)... Reporter shall file all exhibits with trial Court Clerk within 14 days (2 weeks) of date of the Notice of Appeal in Criminal and Civil Actions, assembled in a flat file (not shuck) and if incapable then assembled in a suitable container... with index.

1) ABOVE INDEX RECEIVED & FILED _11-10_, _2004_
2) EXHIBITS IN FILE &/OR CONTAINER VERIFIED (except as noted)

/s/ _Brenda M. Peacock_
CLERK - REGISTER - or - AUTHORIZED ASS'T.
CLERK'S OFC. [ ] — REGISTER'S OFC. [ ]

DATED THIS _10th_ DAY OF _Nov_, _19 200 4_

/s/ _Sheila Hanson_
COURT REPORTER
JUDICIAL CIRCUIT

2

# MONTGOMERY COUNTY SHERIFF DEPARTMENT

ame of Officer _CPL Ross   CPL Wright_

Title _DETECTIVE_

Place _Montgomery Co. Jail_

Date _13 Jan. 02_

Time _2:15 pm_

# YOUR CONSTITUTIONAL RIGHTS ACCORDING TO THE MIRANDA WARNING

*Before we ask you any questions, you must understand your rights.*

1. You have the right to remain silent.

2. Anything you say can and will be used against you in a court of law.

3. You have the right to talk to a lawyer and have him present with you while you are being questioned.

4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.

5. You can decide at any time to exercise these rights and not answer any questions or make any statement.

Do you understand each of these rights I have explained to you?     Yes __✓__ No_____

Having these rights in mind, do you wish to talk to us now?     Yes __✓__ No_____

# WAIVER OF RIGHTS

I have read, (or had read to me), this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promise or threats have been made to me and no pressure of any kind has been used against me to get me to make a statement.

Witness: _OFFICER BROWN_

Signed: _Bobby Williams_

Witness: _____

Date: _01/13/02_

Time: _____

Defendant's Name: _BOBBY WILLIAMS_     Age: _20_     D.O.B. _10-19-1982_

ess: _1817 Dixie Court Montgomery AL._

Education: Grade completed  1  2  3  4  5  6  7  8 (9) 10  11  12

College:      1  2  3  4  5  6

STATE'S
EXHIBIT
4

STATE'S
EXHIBIT
2   3

WRIGHT:      This is Detective Greg Wright, Troy Police Department, uh speaking with a Bobby Williams, a black male, date of birth 10/19 of 1982 uh reference to two burglaries that occurred in Troy, one of them is case number 0212-2840 uh robbery first degree of the Bee-Line in Troy, another one is robbery of the uh Conoco Station uh that occurred in Troy across from the uh Kentucky Fried Chicken. Bobby, I'm at the Montgomery County Jail, you've been read your rights and got a form up in front of you uh says your rights, do you understand what your rights are?

WILLIAMS:   Yes sir.

WRIGHT:      Okay, earlier, prior to turning the tape recorder on Corporal Ross read you your rights and uh you said you understood what your rights were. You told us what your address is, you told us that you've got 9th grade education and that you understand you can't read and write, right?

WILLIAMS:   Yes sir, I, I can read and write.

WRIGHT:      Okay, nobody's made any promises to you or threats to you to get you make a statement, is that correct?

WILLIAMS:   No sir.

WRIGHT:      Okay, you've read your rights, you understand what your rights are, right?

WILLIAMS:   Yes sir.

WRIGHT:      Okay, what we're talking about is your involvement and I understand that you wasn't by yourself, is your involvement at robbery that occurred in Troy over at, during the holidays. I don't have the file in front of me as far as the date goes uh but prior to turning the tape recorder on uh you stated to me that you were riding with some friends and y'all, y'all were on your way to Troy, is that correct?

WILLIAMS:   Yes sir.

WRIGHT:      Okay, did y'all plan where y'all were gonna stop?

WILLIAMS:   No sir.

WRIGHT:      How did y'all determine you were gonna stop at the uh Sunny South or the Conoco Station in Troy?

WILLIAMS:   We just stopped.

WRIGHT:      What did y'all do after you stopped?

WILLIAMS:   Uh went in, made a purchase or whatever.

WRIGHT:   What did you purchase?

WILLIAMS:   I'm not sure about it.

WRIGHT:   You can't remember?

WILLIAMS:   Uh uh.

WRIGHT:   Uh what did you, when you first came in did you park the vehicle in front of the store or y'all uh parked it behind and just waiting on folks to leave or what happened?

WILLIAMS:   Uh uh, we had, we had parked right in front of the store, uh, uh uh.

WRIGHT:   Y'all did park in front of the store?

WILLIAMS:   No sir.

WRIGHT:   Uh you parked into the trailer park behind the store?

WILLIAMS:   Probably not right at the, not right at the moment, I'm not sure, but eventually we did park behind the uh trailer park area.

WRIGHT:   Okay, then what happened then?

WILLIAMS:   We walked in, walked around or whatever and then made a purchase, after the store got kinda clear.

WRIGHT:   After the store got kinda clear?

WILLIAMS:   Yes sir.

WRIGHT:   Okay.

WILLIAMS:   And that's, that's basically it, then

WRIGHT:   How much money was taken out of the store?

WILLIAMS:   Not, not nearly a hundred dollars.

WRIGHT:   Did y'all split the money up?

Page 2 of 10 Pages

5

WILLIAMS:  I'm, I'm saying not, you, you can't really say we split it up because it wasn't, it wasn't really nothing to split up, everybody just did a part or whatever what, what they had to do with it.  I'm saying everybody had they own little portion of it.

WRIGHT:     What kind of gun, what kind of gun was used that you see used in the robbery?

WILLIAMS:  Uh a, a twenty-five, I'm not for sure if it was a, how would you describe the semi-automatic or a automatic?

WRIGHT:     It was a new semi-automatic.  Did it have, did it have a clip that went in it?

WILLIAMS:  Yes sir.

WRIGHT:     Okay, was the gun loaded?  You said something earlier before I turned the tape recorder on that the gun wasn't loaded.

WILLIAMS:  No sir.

WRIGHT:     How do you know it wasn't loaded?

WILLIAMS:  Because I'm saying it, the gun was checked, it wasn't the intention to hurt nobody, it was just the intention of doing, doing whatever to get the money.  I'm saying it wasn't the point to hurt nobody.

WRIGHT:     Okay, so the decision was made to go in the store and just kinda, like you said, purchase some things and kinda wait 'til the store cleared out.

WILLIAMS:  Yes sir.

WRIGHT:     Describe to me, best you can understand, what type of clerk was there?

WILLIAMS:  Uh it was a, a dark-skinned female.

WRIGHT:     No, no, I'm talking about on the first one.

WILLIAMS:  Oh, she, she, I think, she wasn't no colored female, but I, I do recall it being a female though.

WRIGHT:     A white female?

WILLIAMS:  Yes sir.

WRIGHT:     Okay, was she the only one working in the store at the time?

WILLIAMS:  Yes sir.

WRIGHT:    She was working by herself?  Huh?

WILLIAMS:  Yes sir.

WRIGHT:    Okay, uh how many other people in this, was in the store besides you?  Just think back in your mind and count how many in the store with you.  Who else was in the store with you?  Count.

WILLIAMS:  (Unintelligible).

WRIGHT:    One other person is in the store with you?

WILLIAMS:  Yeah.

WRIGHT:    Did the other two wait in the car?  How many, how many more, how many came to Troy period that time?

WILLIAMS:  Well, it, it wasn't no, no other two with us.

WRIGHT:    It was just two of y'all that came to Troy?

WILLIAMS:  It was basically three, the driver and the two others already in the store, whatever.

WRIGHT:    You got a problem with naming their names?  You've already looked at their pictures and nodded to me and said yes, the pictures I got of the ones.  You got a problem with telling me who they were?

WILLIAMS:  Yes, basically, what I'm saying that if they want to give their statement or whatever, I'm saying they don't, okay, they really wanted, I'm saying, I'm not, I'm not trying to give a hard time or whatever but I'm saying

WRIGHT:    But you don't want to give their names is what you're saying?

WILLIAMS:  No sir, I don't.

WRIGHT:    Okay, that's fine, uh but the pictures I have here, you've already acknowledged to me, I've got pictures of Bobby Williams, which is you,

WILLIAMS:  Yes sir.

WRIGHT:    Christopher McGee uh Kenyatta Johnson and Marcus Williams.  Let me ask you this, there's one out of these names that I named that wasn't there, which one was he?

WILLIAMS:   The uh the youngest.

WRIGHT:   The youngest one wasn't with y'all?

WILLIAMS:   Uh uh.

WRIGHT:   Okay, you said after y'all got the money, it wasn't less than, it was less than a hundred dollars, y'all left, got back in the truck, and came back to Montgomery, is that right?

WILLIAMS:   Yes sir.

WRIGHT:   Okay, then some time later on y'all made the decision to come back to Troy again.  This is the one at the Bee-Line where you talked about the black female, the real dark-skinned black chick that worked there.  Okay, tell me what happened on that one, where y'all parked at?

WILLIAMS:   Well, really we, we parked in the area, you know what I'm saying?

WRIGHT:   Did y'all leave somebody else in the truck?

WILLIAMS:   Uh uh.

WRIGHT:   Nobody was in the truck?  How far away was the truck parked?

WILLIAMS:   Uh

WRIGHT:   When I say truck I'm talking about a Blazer, right, y'all were still on the blue Blazer, right?

WILLIAMS:   (Unintelligible) I'm not sure where we parked.

WRIGHT:   You don't remember where y'all parked, but y'all were still on the blue Blazer, correct?

WILLIAMS:   You could say that, yes sir.

WRIGHT:   I mean, you were or you weren't.

WILLIAMS:   Yes sir.

WRIGHT:   You were, so you was on a Blazer on the first one, you was on the Blazer on the second?

WILLIAMS:   Yes sir.

WRIGHT:     Does that vehicle belong to you?

WILLIAMS:  No sir.

WRIGHT:     Okay, so you were riding with somebody.  Were you driving that day?

WILLIAMS:  No sir.

WRIGHT:     Okay, uh tell me what happened when you went in the store on the one at the Bee-Line where the black, dark-skin chick was.  Tell me the truth.

WILLIAMS:  Well, I went in and made the purchase whatever.

WRIGHT:     Do you remember what you purchased?

WILLIAMS:  No sir.

WRIGHT:     You don't remember?  Okay, then what happened?

WILLIAMS:  I can't really say what happened uh except the fact she saying that I pulled, that I drawed the pistol out or whatever on her and, and took the commissary and, and keys from the scene.

WRIGHT:     Well, tell me what happened.  What you're referring to is I explained to you that on the video tape uh excuse me the clerk says that you're the one that's on the video tape.  She says that you're the one

WILLIAMS:  That

WRIGHT:     she believes that pulled the gun.

WILLIAMS:  Yes sir.

WRIGHT:     You're telling me it's not you?  Then explain to me how it went down.  That's why, that's why I'm getting a statement from you now.

WILLIAMS:  I'm saying, I can't say what went down because after I made the purchase I exit the store, I'm saying, but she's saying that I was the one pulled the pistol whatever so I'm saying I can't really give any statements.

WRIGHT:     Let me ask you this then.  Were you there when the gun was pulled?

WILLIAMS:  No sir, I wasn't.

9

WRIGHT:    Since you're saying, since you're saying you weren't there, you weren't one of them, you weren't there when the gun was pulled?  You weren't there?

WILLIAMS:  No sir, all I did was made a purchase but other than the gun being pulled or whatever in there, her purse coming up missing, that didn't have nothing to do with me right there.

WRIGHT:    So you're saying you had went back to the truck during that time?

WILLIAMS:  Yes sir.

WRIGHT:    When they got to the truck did they tell you they had robbed the store then?

WILLIAMS:  I'm saying basically it was, it was obvious that, that, they came out with the purse or whatever.

WRIGHT:    But I'm saying you knew what was going on?

WILLIAMS:  I didn't at the time but I knew after the crime scene at what had went on.

WRIGHT:    Okay, now you're in Montgomery County Jail now charged with what other, what other, you're charged with three other robberies?

WILLIAMS:  Yes sir, one that I admitted to and then the other two I had

WRIGHT:    You were just there?

WILLIAMS:  Yes sir.

WRIGHT:    Let me ask you a question.  Why is it, what was the deal with the other two?  And the reason I'm asking cause before we turned the recorder on you admitted to being in the store during the robbery.

WILLIAMS:  Yes sir.

WRIGHT:    At the Bee-Line?

WILLIAMS:  What, I'm saying, what you mean by the other two that happened in Montgomery?

WRIGHT:    The other two that happened in Montgomery, how did you, I mean, did it happen the same way it happened at the Bee-Line?  You just happened to be in there when they pulled the gun out?

Page 7 of 10 Pages

**10**

WILLIAMS:    Yes sir.

WRIGHT:    Okay, where did y'all go after y'all left the Bee-Line?

WILLIAMS:    Home.

WRIGHT:    Y'all came back to Montgomery?

WILLIAMS:    Yes sir.

WRIGHT:    Do y'all know anybody in Troy? Y'all didn't stay around in Troy anywhere?

WILLIAMS:    No sir.

WRIGHT:    Did y'all ever go anywheres besides Troy and do any more robberies?

WILLIAMS:    No sir.

WRIGHT:    Y'all didn't go to Ozark or Dothan, any other place like that?

WILLIAMS:    I don't even, I don't know nothing about Ozark and Dothan.

WRIGHT:    Okay, but you know something about Troy cause you use to live in Troy?

WILLIAMS:    Yes sir.

WRIGHT:    Okay, what kept y'all from coming back to Troy again?

WILLIAMS:    I'm saying, didn't nothing really keep us from coming back cause I'm saying we probably would had came back but it wouldn't been any no, no intention of, of what I'm saying, doing anything that's bad or whatever.

WRIGHT:    Okay, now on the first one we talked about, the one at Sunny South, the one across from KFC, first one that y'all did in Troy, you said y'all made sure the gun was empty, why was that? Y'all didn't want nobody to get hurt?

WILLIAMS:    No sir, it wasn't the intention to hurt nobody.

WRIGHT:    Okay, why didn't you cover your faces up?

WILLIAMS:    I don't even know.

WRIGHT:    Why didn't you cover your faces up on the one at the Bee-Line?

Page 8 of 10 Pages

WILLIAMS:  Uh, uh I don't know.  We, well, our face wasn't really covered up on none of them.  That's how it led this far.

WRIGHT:    So in other words, the ones you did in Montgomery, your faces wasn't covered up on any of them either?

WILLIAMS:  No sir, they just claimed they had us on tape or whatever.

WRIGHT:    You got any kids?

WILLIAMS:  Yes sir, I got one kid and one on the way.

WRIGHT:    And one on the way?  Do you care about those kids?

WILLIAMS:  Yes sir, I, I love my kids.

WRIGHT:    Okay.

WILLIAMS:  And I can't, I'm saying I don't want to put my, my child in this predicament to say I did it for him because I know the court probably wouldn't, wouldn't even want to hear it like that, you know what I'm saying.  It was a, a time of need, I'm saying, and then by me being the man of the house or whatever I just had to do whatever it took to strive my family and then like I tried to kill nobody or whatever you do, what I'm saying, push just came to shove is what I'm saying.

WRIGHT:    On one of the guns, one of the guns they have in custody, you told me earlier before the tur, tape recorder was turned on that uh was it, you said it was a twenty-five?

WILLIAMS:  Yes sir, was probably one of the guns that was used in the scenes.  (Unintelligible).

WRIGHT:    One of the ones that was used in the scene?

WILLIAMS:  Yes sir.

WRIGHT:    What you, what, what you mean, the ones that was used in the, the two robberies in Troy?

WILLIAMS:  Yes sir.

WRIGHT:    Describe what it looked like.

WILLIAMS:  It's like a, a dull, a dull chrome, it wasn't

12

WRIGHT:        Dull, chrome-looking gun?

WILLIAMS:   (Unintelligible).

WRIGHT:        Kinda silver, dull, silver-looking gun?

WILLIAMS:   Yes sir, nothing like she explained in the

WRIGHT:        Nothing like what you saw in the statement I let you read over?

WILLIAMS:   Uh uh.

WRIGHT:        Okay, let me ask you this question, I'm not concerned about where the gun came from as far if you bought it off the street but at one time you had possession of one of those guns, is that correct?

WILLIAMS:   Uh, it was just brought to me at the time of the uh, uh scene.  At the time of what we used it for but other than that

WRIGHT:        You hadn't seen it prior to that?

WILLIAMS:   Uh uh.

WRIGHT:        Okay, is there anything else you want to tell me about this on your side of the story?

WILLIAMS:   No sir, that's all.

WRIGHT:        That's it?  Okay, this is Detective Wright, this is end of statement.

Transcribed 1/16/03 by Jacqueline R. Carlisle

**13**

TROY POLICE DEPARTMENT PHOTO LINE-UP

CASE # *0212-2060*

YOU WILL BE ASKED TO LOOK AT A GROUP OF PHOTOGRAPHS. THE FACT THAT THE PHOTOGRAPHS ARE SHOWN TO YOU SHOULD NOT INFLUENCE YOUR JUDGEMENT. YOU SHOULD NOT CONCLUDE OR GUESS THAT THE PHOTOGRAPHS CONTAIN THE PICTURE OF THE PERSON WHO COMMITTED THE CRIME. YOU ARE NOT OBLIGED TO IDENTIFY ANYONE. IT IS JUST AS IMPORTANT TO FREE INNOCENT PERSONS FROM SUSPICION AS TO IDENTIFY GUILTY PARTIES. PLEASE DO NOT DISCUSS THE CASE WITH OTHER WITNESSES NOR INDICATE IN ANY WAY THAT YOU HAVE IDENTIFIED SOMEONE.

SIGNED *Rebecca Holley*

DATE: *1-14-03*

TIME: _____

DETECTIVE CONDUCTING LINE-UP *L Ross*

TO BE FILLED IN AFTER LINE-UP COMPLETE:

RESULTS OF THE PHOTO LINE-UP    (PHOTO 1-6)

1. *NO*
2. *Yes*
3. *NO*
4. *NO*
5. *NO*
6. *NO*





3



# State's Exhibit #4

# Video Tape— Not Copiable

15

TROY POLICE DEPARTMENT PHOTO LINE-UP

CASE # 0212-2840

YOU WILL BE ASKED TO LOOK AT A GROUP OF PHOTOGRAPHS. THE FACT THAT
THE PHOTOGRAPHS ARE SHOWN TO YOU SHOULD NOT INFLUENCE YOUR JUDGE-
MENT. YOU SHOULD NOT CONCLUDE OR GUESS THAT THE PHOTOGRAPHS CONTAIN
THE PICTURE OF THE PERSON WHO COMMITTED THE CRIME. YOU ARE NOT OBLIG-
ED TO IDENTIFY ANYONE. IT IS JUST AS IMPORTANT TO FREE INNOCENT PER-
SONS FROM SUSPICION AS TO IDENTIFY GUILTY PARTIES. PLEASE DO NOT
DISCUSS THE CASE WITH OTHER WITNESSES NOR INDICATE IN ANY WAY THAT
YOU HAVE IDENTIFIED SOMEONE.

SIGNED _Edith Thomas_

DATE: 14 JAN. 03

TIME: _____

DETECTIVE CONDUCTING LINE-UP _Greg Wright_

TO BE FILLED IN AFTER LINE-UP COMPLETE:

RESULTS OF THE PHOTO LINE-UP    (PHOTO 1-6)

1.  No
2.  YES    Edith Thomas
3.  No
4.  No
5.  No
6.  No









DEFENDANT'S EXHIBIT





IN THE DISTRICT COURT OF THE

TWELFTH

JUDICIAL CIRCUIT OF ALABAMA

- PIKE COUNTY -

STATE OF ALABAMA,              *

        Plaintiff,         *

                    *

VS.                           *     CASE NUMBERS:

                    *

MARCUS WILLIAMS               *     DC-03-144

BOBBY WILLIAMS                *     DC-03-145

BRAD KENNER                   *     DC-03-147

BOBBY WILLIAMS                *     DC-03-149

        Defendants.        *

                    *

* * * * * * * * * * * * * * * * * * * * * * *

COURT REPORTER'S OFFICIAL TRANSCRIPT ON

PROCEEDINGS

THE ABOVE ENTITLED CAUSE came on to be heard

before the Honorable Judge William Hightower, in

Courtroom Number Two, Pike County Courthouse, Troy,

Alabama, on the 8th day of April, 2003, beginning at

1:30 p.m. following which the following occurred,

to-wit:

ORIGINAL


DEFENDANT'S EXHIBIT
2

2

18

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE STATE:

 4        Larry C. Jarrell, Esquire

 5        Pike County District Attorney's Office

 6        Post Office Box 812

 7        Troy, Alabama 36081Larry Jarrell

 8

 9   FOR THE DEFENDANT, Bobby Williams:

10        James N. Thomas, Esquire

11        Post Office Box 974

12        Troy, Alabama 36081-0974

13

14   FOR THE DEFENDANT, Marcus Williams:

15        Timothy J. Magee, Esquire

16        Post Office Box 992

17        Troy, Alabama 36081-0992

18

19   FOR THE DEFENDANT, Brad Kenner:

20        William B. Key, III, Esquire

21        116 North Three Notch Street

22        Troy, Alabama 36081-2009

23

24

25
```

3

I N D E X

CAPTION . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . 2

INDEX . . . . . . . . . . . . 3, 4


EXAMINATION OF OFFICER ROSS

BY MR. JARRELL . . . . . . . . . . . . 5

BY MR. THOMAS . . . . . . . . . . . 11

BY MR. MAGEE . . . . . . . . . . . 19

BY MR. KEY . . . . . . . . . . . . 21

BY MR. JARRELL . . . . . . . . . . . 26

BY MR. THOMAS . . . . . . . . . . . 27

BY MR. MAGEE . . . . . . . . . . . 29

BY MR. THOMAS . . . . . . . . . . . 31


EXAMINATION OF DETECTIVE WRIGHT

BY MR. JARRELL . . . . . . . . . . . 31

BY MR. THOMAS . . . . . . . . . . . 35

BY MR. MAGEE . . . . . . . . . . . 44

BY MR. KEY . . . . . . . . . . . . 49

BY MR. THOMAS . . . . . . . . . . . 53

BY MR. MAGEE . . . . . . . . . . . 55

4

20

1    (Index, Page Two)

2

3    EXAMINATION OF MS. REBECCA HOLLEY

4    BY MR. THOMAS    . . . . . . . . . . . 59

5    BY MR. MAGEE    . . . . . . . . . . . 72

6    BY MR. KEY    . . . . . . . . . . . . 75

7

8    EXAMINATION OF MS. EDITH THOMAS

9    BY MR. THOMAS    . . . . . . . . . . . 77

10    BY MR. MAGEE    . . . . . . . . . . . 86

11    BY MR. THOMAS    . . . . . . . . . . . 88

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

21

P R O C E E D I N G S

1
2          THE COURT:  It's my understanding that all
3    of the parties have agreed that because each of
4    these three defendants is charged in -- or have
5    one case in common that we would conduct these
6    preliminary hearings, all three of those
7    preliminary hearings, together jointly at the same
8    time?

9          MR. MAGEE:  Yes, sir, Your Honor, they have
10   a large degree in common and we stipulate to
11   consolidate.

12         MR. KEY:  Mr. Brad Kenner so stipulates.

13         MR. THOMAS:  Mr. Bobby Williams stipulates.

14         THE COURT:  And that suits the State too?

15         MR. JARRELL:  Yes, sir.

16         THE COURT:  All parties ready?  We'll ask
17   the State to begin.

18                OFFICER LARRY ROSS

19             A witness for the State,

20        was sworn and testified as follows,

21             DIRECT EXAMINATION

22   BY MR. JARRELL:

23   Q.   State you name, sir and where you are employed.

24   A.   Larry Ross.  Troy Police Department.

25   Q.   Are you an investigator?

1    A.    Yes, sir.

2    Q.    Did you have an occasion to investigate a

3    robbery that occurred on December the 21st of last

4    year at Sunny South?

5    A.    Yes, I did.

6    Q.    And what initiated this investigation?

7    A.    What initiated it?  I was the on-call detective

8    that night.  They called me out because two black

9    males had come in and robbed the clerk there at Sunny

10   South.

11   Q.    And in the course of your investigation did you

12   determine, kind of, the sequence of events that

13   occurred in this robbery?

14   A.    I talked with her and got statements from her.

15   Q.    "Her" is who?

16   A.    Rebecca Holley.  She is a clerk at Sunny South.

17   Q.    Okay.  Go ahead.

18   A.    We talked to some witnesses in Barron's Trailer

19   Park behind the store that night.  And they told us

20   they'd seen a black or dark blue Chevy Blazer parked

21   there with several black males in it.

22   Q.    And did Ms. Holley tell you what happened as

23   these individuals, if they did enter the store,

24   what they did?

25   A.    They came in the store and picked up like a two

7

1  liter drink, came to the counter, gave her a twenty

2  dollar bill.  She opened up the cash register and one

3  of them pulled a gun and she just stepped back at that

4  time.

5  Q.    And what did they do at that point?

6  A.    The other one, the one that didn't have the gun,

7  reached over the counter and got the cash drawer.

8  They got the money out and ran out of the store.

9  Q.    And we have three people charged with that

10  event.  How did we come about charging a third party?

11  What was his involvement?

12  A.    He didn't go in the store at the time of the

13  robbery but he was with them in the vehicle that

14  night.

15  Q.    And how did you find that out?

16  A.    We put out to the local agencies about the dark

17  blue or black Chevy Blazer and Montgomery PD caught

18  the subjects in Montgomery doing the same thing to a

19  convenience store up there.  They were robbing a

20  convenience store up there.

21  Q.    Did they catch them in the act up there?

22  A.    I'm not sure about being caught in the act but

23  they were charged with robbery in Montgomery.

24  Q.    Were there any statements or anything made by

25  any of them that connected them with this robbery down

1   here?

2   A.   They notified us that they had these gentlemen

3   in jail and we went to Montgomery County Jail and

4   talked with one of the subjects there.  We talked with

5   Bobby Williams and he gave us a statement that he did

6   do the robbery in Troy.

7   Q.   Did he also indicate whether he had done any

8   other robberies in Troy besides Sunny South?

9   A.   I believe he did talk about the other robbery we

10  had here in Troy that time.  Detective Greg Wright

11  actually did the interview that day but I know he did

12  admit to doing the one I was investigating.

13  Q.   And did he name any other defendants?

14  A.   No, he was real tight-lipped about that.  He

15  wouldn't --

16  Q.   Did you interview any of the other individuals?

17  A.   We interviewed another subject that was with

18  them that night and he pretty well told us what all

19  happened.

20  Q.   What was that person's name?

21  A.   Christopher McGee.

22  Q.   Did you interview Marcus Williams?

23  A.   Marcus didn't want to talk to us.

24  Q.   What about the individual Mr. Brad Kenner?

25  A.   He didn't want to talk to us.

9

25

1    Q.    Did you conduct any type of lineup for the

2    persons at the Sunny South to view?

3    A.    I took the lineup with Bobby Williams out and

4    Ms. Holley picked him out of the lineup.  That was

5    after we had talked to him and gotten the confession

6    from him.

7    Q.    What about any of the other individuals?

8    A.    When we talked to Mr. McGee he gave us a name of

9    Dale, first name of Dale.  That's all he would say.

10    That's all he knew he said.  And we never could find

11    any information on him.  We were working with the

12    detectives in Montgomery PD.  They sent me a picture

13    of Mr. Kenner and said, you know, check him out and

14    see what you can find because he was with them in

15    Montgomery.  I put him in a lineup and took him out

16    and Ms. Holley picked him out of the lineup as the

17    second one that came in the store that night.

18    Q.    So Mr. Kenner and Mr. Bobby Williams were

19    identified by the store clerk?

20    A.    Right.

21    Q.    And did either of those or both of those

22    individuals -- Excuse me, let me back up.  I believe

23    you said Mr. McGee?

24    A.    Right.

25    Q.    And Mr. Williams, Bobby Williams were the only

10

26

```
 1   ones you talked to?

 2   A.    Right.

 3   Q.    And did their statements corroborate each other

 4   in terms of did they tell the story the same way?

 5   A.    Yes, sir.

 6   Q.    Did they indicate that Mr. Kenner was the one

 7   that went in the store with Mr. Williams?

 8   A.    Well, we get back to the thing that Mr. McGee

 9   said it was Dale.

10   Q.    Have you ever shown Mr. McGee a picture of Mr.

11   Kenner?

12   A.    No.  I couldn't find any information on anybody

13   named Dale.

14   Q.    What ultimately led you to charge Marcus

15   Williams?

16   A.    The statement from Mr. McGee saying that he was

17   with them.

18   Q.    Did he name Marcus Williams?

19   A.    Yes, sir.

20   Q.    Okay.

21   A.    And he shared in the money.

22   Q.    Did that -- Was that corroborated by Bobby

23   Williams?

24   A.    Bobby wouldn't name anybody.

25   Q.    He wouldn't name anybody?
```

1    A.    Right.

2    Q.    Have you ever interviewed Mr. Marcus Williams

3    subsequent to bringing him from Montgomery?

4    A.    We tried to talk to him but he wanted his

5    lawyer.  He didn't want to talk to us.

6          MR. JARRELL:  That's all.

7              E X A M I N A T I O N

8    BY MR. THOMAS:

9    Q.    Detective Ross, when you spoke with the victim

10   who was present that day at the robbery was that the

11   person who was on duty at the convenience store?

12   A.    That's right.

13   Q.    Were there any other people present in the store

14   at the time of the robbery?

15   A.    Just her and the two gentleman that came in the

16   store.

17   Q.    Okay.  And she identified two, not three people?

18   A.    Right.

19   Q.    Okay.  And the two people she identified were

20   who?

21   A.    Bobby Williams and Brad Kenner.

22   Q.    Did she, the victim, at any time provide you

23   with a statement as to their appearance?

24   A.    She gave us approximate sizes and weights and

25   stuff like that.

1    Q.    Can you share with me height, weight, age,

2    etcetera, from your report in regards to my client Mr.

3    Bobby Williams?

4    A.    Well, I have --

5    Q.    -- other clients.  The two that would have been

6    present.

7    A.    Okay.  The description she gave us on both

8    subjects were approximately 5'6", 145 pounds.

9    Q.    So this is identifying both suspects?

10   A.    That's what she gave us, yes, sir.

11   Q.    Did she provide you with any other identifying

12   information?

13   A.    The subject that had the gun she told us had on

14   a black jacket, black pants and a black hat.

15   Q.    Did she provide you with an age or estimated

16   age?

17   A.    In their twenties.  Both subjects in their

18   twenties.

19   Q.    Did she provide you with facial hair?  Facial

20   hair or no facial hair?

21   A.    No, she didn't.

22   Q.    Did she know?

23   A.    I don't remember her saying anything about any

24   facial hair.

25   Q.    Do you recall having asked her?

13

29

```
 1    A.    No.

 2    Q.    Complexion.  Did she give you anything in

 3    regards to complexion of the two robbers?

 4    A.    All she gave me is what I've already told you.

 5    Q.    Complexion being black?

 6    A.    Hold on just a minute.  I do see it now.  The

 7    complexion of the first subject was dark.  Both

 8    subjects were dark complexioned is what she told us.

 9    Q.    In your normal scheme of identifying black

10    perpetrators would you normally ask if they were black

11    if they were fair, light or dark skinned?

12    A.    I don't ask that question, no, sir.

13    Q.    Do you recall having asked that question in this

14    interview?

15    A.    No.

16    Q.    Did she identify specifically in regards to Mr.

17    Bobby Williams what he was wearing?  And you may

18    already that and if you have I apologize.

19    A.    According to -- After she saw the lineup and

20    picked Mr. Williams out she stated he was the one that

21    had the handgun.

22    Q.    Okay.

23    A.    And she said he was the one that had on the

24    black jacket, black pants and a black hat.

25    Q.    Were any clothes recovered from the suspects to
```

1  your knowledge?

2  A.    No.

3  Q.    How soon after this robbery were the defendants

4  arrested by Montgomery police?

5  A.    I don't have the date that they were arrested.

6  I do know that I took one of the lineups out on

7  January the 14th of 2003.

8  Q.    And what was the date of the incident?

9  A.    December 21st, 2002.

10  Q.    Would anything in your file that was subpoenaed

11  for you to bring today reflect the day of the arrest?

12  A.    In Montgomery?

13  Q.    Yes, sir.

14  A.    No.

15  Q.    The lineup conducted was a photo lineup?

16  A.    Yes, it was.

17  Q.    Was an in-person lineup ever conducted on the

18  case?

19  A.    No.

20  Q.    Okay.  Who was present when the lineup was done?

21  A.    I went out to the store.  She was working and it

22  was just her and I.

23  Q.    Did the victim identify my client on the first

24  review of the lineup?

25  A.    Yes.

15

31

```
 1   Q.    Was the lineup contained on one page, two pages?

 2   A.    One page.

 3   Q.    And how many people were on the lineup?

 4   A.    Six.

 5   Q.    How long did it take her to make the

 6   identification?

 7   A.    Not very long, less than five seconds.

 8   Q.    Who assembled the photographic lineup?

 9   A.    The particular lineup on your client was done in

10   Montgomery by Montgomery police officers or

11   detectives.

12   Q.    So Troy PD did not assemble the lineup?

13   A.    We didn't have a picture of him.

14   Q.    Okay.

15   A.    When we went up that day to talk to Mr. Williams

16   we went by the PD and they did us a lineup at the PD

17   that day.

18   Q.    Was the victim able to identify the vehicle that

19   was used?

20   A.    We didn't -- We never got pictures of the

21   vehicle.   I never saw the vehicle.

22   Q.    Did you ask the victim if she saw the vehicle

23   that pulled up that day?

24   A.    She didn't remember seeing the vehicle.

25   Q.    She didn't remember?
```

16

1    A.    That I know of.  She didn't remember seeing the

2    vehicle.

3    Q.    Now, earlier you testified that some people that

4    live in a mobile home park behind the Sunny South saw

5    a vehicle?

6    A.    Right.

7    Q.    Okay.  And that was a blue late model Blazer?

8    A.    Black or dark blue Blazer is what -- the way

9    they described it.

10    Q.    How did you make the connection between the

11    Montgomery robbery -- Was it the vehicle that made the

12    connection between the Montgomery robbery and this

13    robbery?

14    A.    Right.

15    Q.    Okay.  Is it safe to say that you basically

16    issued a BOLO type of report that goes out to all

17    areas describing this vehicle?

18    A.    We called Montgomery PD and told them what we

19    had and if they, you know, had anything similar to

20    that.

21    Q.    And they informed you they had a blue --

22    A.    They informed us later.  When we called them

23    they did not have these three in custody.

24    Q.    Did you call them the same -- Did you conduct

25    your interview the day of the robbery or the day

17

1  after?

2  A.    The interview with who, sir?

3  Q.    The victim.

4  A.    I interviewed her that night when I went out.

5  Q.    That night?

6  A.    She went to the station with me and we talked

7  and she looked at some mug shots, that kind of thing.

8  Q.    And when did you interview the people in the

9  mobile home park?

10  A.    The next day.

11  Q.    Do you recall their names?

12  A.    Their names -- They actually called and a police

13  officer went out and talked to them the next day.  And

14  I have it here if you will give me just a minute.

15  Q.    Okay, take your time.

16  A.    One of gentleman's names was Leroy Elder and the

17  other subject was Willie Knight.

18  Q.    Did they tell you where the vehicle was parked?

19  A.    They just said it was parked there in the --

20  close to the entrance the trailer park.

21  Q.    Did they at any time identify anybody either

22  leaving that vehicle or coming to the vehicle?

23  A.    They witnessed the vehicle picking up two black

24  males and leaving the area is the way they stated it.

25  Q.    Did they give you a time?

18

34

```
1    A.     No.  I don't have a time here.

2    Q.     Would that question have been asked?  You did

3    not personally conduct the interview?

4    A.     I didn't personally talk to those two.  They

5    called the station and an officer went out and talked

6    to --

7    Q.     And responded.

8    A.     Right.

9    Q.     I understand.  Did they obtain a tag number that

10   they were able to give you to the vehicle?

11   A.     No, they didn't.  Didn't get a tag number.

12   Q.     Has the vehicle since been obtained and searched

13   by the State?

14   A.     I think Montgomery Police Department had control

15   over it for a while.  We never got to see it or

16   anything.

17   Q.     Do you know if any photos of the vehicle were

18   provided to the two witnesses who identified it from

19   the mobile home park?

20   A.     We asked for a photo of the vehicle from

21   Montgomery PD but we never did get it.

22   Q.     What type of firearm was the defendant armed

23   with?

24   A.     She described it as a silver semi-automatic.

25   Q.     Was she able to identify a caliber or a size?
```

1   A.    No.

2   Q.    Was there any other identifying information on

3   the weapon?

4   A.    No, that's all I had on that.  Silver

5   semi-automatic.

6   Q.    Is there video tape from the store?

7   A.    No.

8   Q.    Does the store have video capabilities?

9   A.    They do but they didn't have a tape in the

10  machine.

11        MR. THOMAS:  That's all I have at this time.

12        THE COURT:  Mr. Magee?

13              E X A M I N A T I O N

14  BY MR. MAGEE:

15  Q.    Officer Ross, you've given some testimony that

16  you talked to Brad Kenner and Marcus Williams and

17  neither one of them wanted to talk to y'all or didn't

18  provide anything substantive; is that right?

19  A.    Yes, sir.

20  Q.    And then you talked to Bobby Williams and

21  Christopher McGee?

22  A.    We talked to Bobby first and then we talked to

23  Chris McGee second.

24  Q.    Okay.  And I think you earlier testified that

25  Bobby Williams indicated their involvement in this

20

1    robbery, in the Sunny South robbery; is that right?

2    A.    Right.

3    Q.    But he didn't go in to the detail about the

4    robbery or who was involved but Christopher McGee did?

5    A.    That's true.

6    Q.    In reflecting back on your -- Let me back up

7    just a minute.  Did you actually personally interview

8    Bobby Williams?

9    A.    No.  Detective Greg Wright interviewed him.

10    Q.    Were you present with Officer Wright?

11    A.    No.

12    Q.    And I would also ask you that question as to the

13    interview with Christopher McGee.  Did you actually

14    personally handle that?

15    A.    Detective Greg Wright talked to all four

16    suspects.

17    Q.    Were you present at the Christopher McGee

18    interview?

19    A.    Not the entire interview I was not.

20    Q.    Do you recall or do you know or do your records

21    reflect or your investigative report or whatever

22    you're maintaining on your investigation, does it

23    reflect whether or not Bobby Williams identified

24    Marcus Williams as being involved in this robbery?

25    A.    No, he did not.

21

1    Q.    Was it fair to say the Christopher McGee was the

2    only one that implicated or identified Marcus

3    Williams --

4    A.    Yes, sir.

5    Q.    -- as being involved in the Sunny South robbery?

6    A.    That's true.

7    Q.    Is there any -- Did you receive any evidence or

8    statements from either the clerk or the mobile home

9    park witnesses or any other source other than the

10   co-defendants showing that Marcus Williams entered the

11   store?

12   A.    No, I did not.

13   Q.    Do you have any other evidence that Marcus

14   Williams was involved in this robbery other than the

15   statement of Christopher McGee?

16   A.    No, I do not.

17          MR. MAGEE:   That's all.

18             E X A M I N A T I O N

19   BY MR. KEY:

20   Q.    Officer Ross, approximately what time did this

21   robbery take place?

22   A.    It was 8:56 according to the report, at night,

23   p.m.

24   Q.    8:56 p.m.?

25   A.    Right.

1   Q.    I'll ask you a similar question that Mr. Magee

2   asked.  I believe that Christopher McGee is the only

3   one that stated that Brad Kenner was involved in

4   this?

5   A.    Let me correct you.  Chris McGee gave us the

6   name Dale.  I cannot find any information on a Dale.

7   I've talked to Montgomery detectives.  They don't know

8   who I'm talking about but they sent me Mr. Kenner's

9   picture because he was involved in the ones in

10  Montgomery and said, you know, look at him.

11  Q.    All right.  So none of the parties, Bobby

12  Williams, Marcus Williams or Christopher McGee has

13  stated that Mr. Brad Kenner was involved in the

14  robbery at Sunny South?

15  A.    That's true.

16  Q.    Is that true?  Okay.  Now, you stated that he

17  was involved in the ones in Montgomery.  Do you have

18  any record showing that Brad Kenner was involved with

19  the robbery with any of these parties in Montgomery,

20  Alabama?

21  A.    Let me correct that statement.  I was working

22  with a Montgomery detective.  I was trying to find out

23  who Dale was because that was all we had.  He sent me

24  a picture of Mr. Kenner.  I don't know how he came up

25  with it.  I'm sorry if I have confused you there.

1    Q.    So, we don't -- There's no connection here with

2    Mr. Kenner other than just the Montgomery department

3    sent a picture --

4    A.    Right.

5    Q.    -- is that correct?

6    A.    And I put it in a lineup.

7    Q.    Okay.  But there is no statement by any of these

8    other parties that he was involved in this robbery?

9    A.    That's true.

10   Q.    Okay.  And we don't have anything that states

11   that -- no evidence that you have today that states he

12   was involved in robberies that these individuals were

13   involved in in Montgomery?

14   A.    No, I don't have any evidence.

15   Q.    Those individuals that were at the trailer park

16   here in Troy at Barron's Trailer Park, did they give

17   you any kind of identification of these individuals

18   that they saw going to this vehicle?

19   A.    They told the officer that they were unable to

20   identify anybody.  They just saw the vehicle parked in

21   the trailer park.

22   Q.    By the way, who owns that vehicle?

23   A.    I don't know, sir.

24   Q.    So, nothing was done to determine who the owner

25   of the vehicle is?

24

1   A.    Somebody knows.  I don't know.

2   Q.    But you don't know?

3   A.    Right.

4   Q.    The police department didn't run a check on it,

5   right?

6   A.    We never got access to the vehicle, the tag

7   number or anything else.

8   Q.    You just put out your BOLO that this is what you

9   had and this is what you think is there and that's

10  what Montgomery Police Department went on; is that

11  correct?

12  A.    Right.  But now they didn't pick them up on our

13  BOLO.

14  Q.    Okay.

15  A.    They -- Some or all of these gentleman were

16  arrested in Montgomery for robbery on a separate case

17  from what we had.  That's when they contacted us.

18  Q.    But you don't know if this gentleman, Brad

19  Kenner, was one of them.  Do you?

20  A.    No, I don't.

21        THE COURT:  One of who?  Was one of whom?

22     You said was one of "them".

23  BY MR. KEY:

24  Q.    Mr. Kenner was not to your knowledge -- You

25  don't have any evidence of the fact of him being

1    involved in the robberies in Montgomery Alabama with

2    Mr. Marcus Williams, Bobby Williams or Mr. McGee; is

3    that correct?

4    A.    No, sir, I don't.

5          MR. KEY:  I'm sorry, Your Honor.  Thank you.

6    BY MR. KEY:

7    Q.    Do you have any knowledge of this person Dale

8    being related to anyone of these individuals,

9    specifically the Williams brothers?

10   A.    It seems to me and Mr. McGee stated that he said

11   that Dale was Bobby and Marcus' brother.

12   Q.    But you have not been able ascertain any

13   location of this individual?

14   A.    Nobody in Montgomery PD was -- the guy that I

15   worked with in Montgomery PD was not familiar with

16   Dale Williams or he couldn't come up with anybody that

17   was -- I didn't have a last name on him.

18   Q.    Was anything else, any other statement regarding

19   this individual Dale made to you about his looks or

20   anything?

21   A.    No.

22   Q.    I believe you stated, if you have answered this

23   please excuse me, but the photo lineup was sent by

24   Montgomery PD?

25   A.    Now, on your client's lineup the detective in

1   Montgomery e-mailed me a picture of Mr. Kenner and I

2   took that picture and put it in a lineup myself.  Now

3   with the other lineup it was done at Montgomery PD.

4   Q.    Okay.  But you placed that picture in the lineup

5   yourself?

6   A.    Right.

7         MR. KEY:  I have no further questions.

8   Thank you.

9         THE COURT:  Would it be a correct statement

10  to say that the only evidence that you have

11  connecting Mr. Kenner to this offense is the fact

12  that the clerk picked -- selected his picture out

13  of that lineup?

14        THE WITNESS:  That's true.

15        THE COURT:  Any other questions from the

16  State?

17        MR. JARRELL:   Yes, sir.

18              E X A M I N A T I O N

19  BY MR. JARRELL:

20  Q.    Larry, isn't it a fact that you weren't present

21  during the entire interview with Mr. Williams, that

22  you went and did something else?

23  A.    Right.  I was there to start with.

24  Q.    So, there could be some parts of that interview

25  where names were named that you don't know about?

27

A3

```
 1    A.    It's possible.  I have a copy of it but I can't

 2    remember exactly what was said in it.

 3              MR. JARRELL:  Thank you.  No further

 4        questions.

 5              MR. THOMAS:  I'd like a moment.

 6              THE COURT:  Okay.

 7                    E X A M I N A T I O N

 8    BY MR. THOMAS:

 9    Q.    Mr. Ross, Detective Ross, I apologize if I

10    missed it.  What is Mr. Christopher McGee's

11    involvement in the robberies?

12    A.    According to his statement he drove the truck

13    down here that night.  He was the driver of the

14    vehicle.

15    Q.    Okay.  And that was for Sunny South?

16    A.    Right.

17    Q.    And he provided a statement?

18    A.    Yes.

19    Q.    And in that statement did he name my client Mr.

20    Bobby Williams?

21    A.    Yes.

22    Q.    Did he give -- When was he interviewed?  Let me

23    ask it this way, was he interviewed on the same trip

24    you had to Montgomery to interview my client or, I

25    guess, it was actually Mr. Greg Wright who went?
```

```
 1    A.    No, he was not interviewed that day.  It was

 2    later.

 3    Q.    It was a later date.  Was --

 4    A.    He was actually brought down to Troy Police

 5    Department and we interviewed him there.

 6    Q.    So, Mr. Christopher McGee was interviewed in

 7    Troy?

 8    A.    Right.

 9    Q.    Mr. Bobby Williams was interviewed in

10    Montgomery?

11    A.    Right.

12    Q.    Was there some reason you had for bringing one

13    to Troy and going to Montgomery for the other?  Was it

14    just logistics?

15    A.    I don't think there was any particular reason.

16    It just worked out that way.  Montgomery brought him

17    down for us that day and we interviewed him.

18    Q.    Has the -- Did the store clerk at Sunny South,

19    she did not identify him as being in the store or she

20    did?

21    A.    Who now?

22    Q.    The store clerk at Sunny South.

23    A.    Who are you saying she identified?  What are you

24    asking?

25    Q.    Mr. McGee.
```

1     A.     No.

2     Q.     Mr. Christopher McGee.

3     A.     No, I showed her a lineup of him.  She said he

4     -- She didn't pick him out of the lineup as being in

5     the store.

6     Q.     Was his photo placed in a separate series of

7     pictures than my client?

8     A.     Right.

9     Q.     So, it was a group of six, one of which was my

10    client and then Mr. McGee was on a separate set of

11    six?

12    A.     That's true.

13    Q.     Okay.

14            MR. THOMAS:  That's all I have.

15            MR. JARRELL:  Nothing further.

16                    E X A M I N A T I O N

17    BY MR. MAGEE:

18    Q.     At any time did you or Officer Wright or any

19    other investigating officer ever show the clerk,

20    Rebecca Holley, a picture of Marcus Williams or was he

21    part of any kind of lineup?

22    A.     He was in a separate lineup and the only -- Hold

23    on just a minute.

24    Q.     A separate photo lineup?

25    A.     He was in a separate photo lineup of Montgomery

1  PD and she could not pick him out of the lineup.

2  Q.    And do you have any witness including your

3  Barron's Mobile Home Park witnesses, Leroy Elder and

4  Willie Mathis?

5  A.    Willie Knight.

6  Q.    Willie Knight?

7  A.    Yes, sir.

8  Q.    Not Mathis, Knight.  Okay, Willie Knight.  Or

9  any other witness that could identify or actually

10  observed Marcus Williams in that dark colored black or

11  dark blue Chevy Blazer?

12  A.    No.

13  Q.    Did you have any other statement from

14  Christopher McGee that -- I should say, other than

15  Marcus Williams was involved in the Sunny South

16  robbery and that he shared in the money?

17  A.    If there was any other statement I don't know

18  about it right now.  That's all I had from Mr.

19  Christopher McGee that your client was with them the

20  night they went to Troy and did the robbery.

21  Q.    That he was with them and he did share the

22  money.  Is that where you got that information from

23  that he shared the money?  Did that come --

24  A.    Yes.

25  Q.    -- from Christopher McGee as well?

31

47

```
1    A.    Yes, sir.

2    Q.    Okay.

3          MR. MAGEE:  That's all.  Thanks.

4          MR. THOMAS:  I have one more question, Your

5     Honor, if you don't mind.

6                  E X A M I N A T I O N

7    BY MR. THOMAS:

8    Q.    Was Mr. Christopher McGee made any offers in

9    connection with his statement that he provided you

10   regarding the three defendants or two co-defendants?

11   A.    No.

12   Q.    He was not told in any way that it would be

13   beneficial for him to provide a statement?

14   A.    No.

15         MR. THOMAS:  That's all I have

16         THE COURT:  Any more questions for this

17    witness?

18         MR. JARRELL:  No, sir.

19         MR. MAGEE:  No, Your Honor.

20         MR. KEY:  No, sir.

21         THE COURT:  You can step down.  Thank you.

22    Other evidence from the State?

23         MR. JARRELL:  We call Greg Wright.

24              OFFICER GREG WRIGHT

25          A witness for the State
```

32

1              was sworn and testified as follows,

2               DIRECT EXAMINATION

3 BY MR. JARRELL:

4 Q.    State your name and where you are employed, sir.

5 A.    Greg Wright. Troy police department.

6 Q.    And were you part of the investigation team on

7 these robberies that occurred at Sunny South? I

8 believe it was on December 21st of last year and also

9 a robbery of Beeline Station number 614 on the 29th of

10 December?

11 A.    Yes, that's correct.

12 Q.    Previous testimony has indicated that you had

13 conducted the interview of a Mr. Bobby Williams when

14 you were in Montgomery; is that correct?

15 A.    Yes, sir.

16 Q.    And did you conduct that interview alone?

17 A.    Initially it started out with myself and

18 Corporal Ross and also Julita Brown was also present

19 with us. They left to go to Montgomery PD to get the

20 photo lineup. I finished the interview with Mr.

21 Williams.

22 Q.    Did Mr. Wright -- Bobby Wright. Bobby Williams,

23 excuse me. Did Mr. Bobby Williams admit to you his

24 involvement in the robberies in both the Sunny South

25 station on the 12th -- it would be on the 21st and the

33

1   Beeline station on the 29th?

2   A.    Yes, he did.

3   Q.    Did he indicate to you who else was involved in

4   those robberies?

5   A.    Yes, sir, he did.

6   Q.    Can you tell me who he indicated to you was in

7   on those robberies?

8   A.    Christopher McGee, Marcus Williams.  And that

9   was it.

10  Q.    So, he did indicate Marcus --

11  A.    Yes, sir.

12  Q.    -- in one of the robberies?

13  A.    Yes, sir.

14  Q.    Did he say which one or both?

15  A.    Let's see.  That would be the Beeline.

16  Q.    The Beeline?

17  A.    Yes, sir.

18  Q.    On the 29th.  Did you ever conduct any sort of a

19  lineup with the attendant at the Beeline station --

20  A.    Yes, sir.

21  Q.    -- of any of these suspects?

22  A.    Yes, sir, I did.

23  Q.    And did that person -- Who was that person?

24  A.    Ms. Edith Thomas.

25  Q.    Did Ms. Thomas pick out anyone from the lineup

34

1 as being involved in the robbery at her store?

2 A. I did two separate lineups. She picked out

3 Marcus as being one and Bobby being the one -- Bobby

4 was the one she said had the gun.

5 Q. That was at the Beeline store?

6 A. Yes.

7 Q. As far as the Sunny South robbery, in your

8 speaking with Bobby did you also speak with Mr. McGee?

9 A. Yes, sir, I did.

10 Q. And did he indicate to you who was involved in

11 the Sunny South robbery?

12 A. Yes, sir he did.

13 Q. What did he indicate to you?

14 A. He's the one that gave us Brad's name as being

15 there. Also Bobby and also Marcus.

16 Q. He named Bobby, Marcus and Brad Kenner?

17 A. Yes, sir.

18 Q. As well as himself?

19 A. Let me check and make sure but I believe that's

20 correct. On the Beeline he named Bobby, Marcus, Brad

21 and himself. On the Sunny South it was Dale, Bobby,

22 Chris and Marcus -- himself and Marcus.

23 Q. Bobby --

24 A. Himself and Marcus.

25 Q. Dale?

1    A.    Dale was the guy that Detective Ross mentioned

2    earlier.  We haven't been able to identify him.

3    Q.    Did he name this Dale in the previous Beeline

4    robbery?

5    A.    Dale didn't go on the Beeline robbery.

6    Q.    Okay.

7          MR. JARRELL:  Your witness.

8                E X A M I N A T I O N

9    BY MR. THOMAS:

10    Q.    Detective Wright, starting with Sunny South.

11    You made a trip to Montgomery to meet with Mr. Bobby

12    Williams, correct?

13    A.    Yes, that's correct.

14    Q.    And on that trip you took a recorded statement

15    from Mr. Williams?

16    A.    Yes, that's correct.

17    Q.    Was the entire statement recorded?

18    A.    From the -- No, sir.  The rights that I read to

19    him was not recorded.  I made mention to it on the

20    recorder that he had been read his rights and so forth

21    and I had him sign the rights form and stuff.  That

22    part was not recorded.

23    Q.    Has Mr. Bobby Williams to you or to your

24    knowledge or to any other law enforcement officer made

25    any statements outside of the recording?

1   A.     As far as the robbery goes you mean?  Our

2   robberies?

3   Q.     Correct.

4   A.     Not that I know of.

5   Q.     Okay.  Did you, knowing that he had been charged

6   with a robbery of a Montgomery Conoco as well as a

7   Troy Conoco, did you clarify with Mr. Bobby Williams

8   that you were discussing with him a Conoco located in

9   Pike County?

10  A.     Yes, sir.  Realizing that he had been charged

11  with several robberies in Montgomery I did not want

12  him to get misunderstood where we were at.  I gave him

13  landmarks, described to him the Kentucky Fried Chicken

14  across from the Conoco -- I'm sorry, the Sunny South.

15  He described the trailer park that's behind it and so

16  forth.  He understood.

17  Q.     Did you at any point -- Is it safe to say that

18  the extent of your involvement with the Sunny South

19  robbery was your taking of the statement?

20  A.     Yes, basically.  Yes, sir.

21  Q.     Detective Larry Ross handled the remainder of

22  that investigation?

23  A.     He is the primary detective on that case, yes,

24  sir.

25  Q.     Was anybody present with you when the statement

37

53

1   was made by Mr. Bobby Williams?

2   A.     At some point in time Officer Julita Brown was

3   in the room.

4   Q.     Is she a Montgomery officer?

5   A.     She used to be a Montgomery officer, she's a

6   Troy police officer.  She wasn't that day.

7   Q.     Is she a detective or --

8   A.     No, sir.

9   Q.     Was she present at the beginning or at the end

10  or in between?

11  A.     She was present at the beginning part and

12  sometime during the interview, I can't recall, she

13  left the room.

14  Q.     Would anybody else have been present in the

15  room?

16  A.     No, sir.

17  Q.     And on that trip up there you obtained a photo

18  lineup?

19  A.     Officer Ross was getting the lineup as I was

20  doing the interview with Mr. Williams that day.

21  Q.     So, Mr. Ross went up to Montgomery with you that

22  day.

23  A.     Yes, sir.

24  Q.     Were you present when the photo lineup was shown

25  to the victim?

1    A.    To the Sunny South victim?

2    Q.    Correct.

3    A.    No, sir.

4    Q.    Have you interviewed the victim of the Sunny

5    South?

6    A.    No, sir.

7    Q.    Moving on to the Beeline robbery.  You stated

8    earlier that statements were given by Mr. McGee,

9    correct?

10    A.    Yes, sir.

11    Q.    Okay.  And who all did those statements

12    implicate?

13    A.    On the Beeline you're speaking of?

14    Q.    Correct.

15    A.    Okay.  Bobby, Marcus and Brad.

16    Q.    Okay.  And those individuals have been charged

17    with the robbery of the Beeline?  All of them?

18    A.    No, sir, not all.

19    Q.    Is there some reason why they had not been

20    charged, given those statements?

21    A.    At the time during the investigation we saw fit

22    to finding out the other two individuals that were

23    involved to go ahead and present those to the next

24    grand jury.

25    Q.    So you're saying it's simply a matter that you

1    did not have enough evidence at the time?

2    A.    No, sir.    At the particular time -- Yes, sir.

3    We were still gathering information, yes, sir.

4    Q.    You're waiting to present them to the grand jury

5    at this point?

6    A.    Yes, sir.

7    Q.    Okay.    What was the name of the victim at

8    Beeline?

9    A.    Edith Thomas.

10    Q.    Did she make any kind of identification of the

11    defendant?

12    A.    Yes, sir.

13    Q.    Mr. Bobby Williams?

14    A.    Yes, sir.    It was also captured on video.

15    Q.    It was also captured on video on the Sunny

16    South?

17    A.    At the Beeline.

18    Q.    At the Beeline it was.    Okay.    You're not saying

19    the Sunny South was captured?

20    A.    No, sir.

21    Q.    Who did she identify as being present?

22    A.    She didn't.    Later she did at a photo lineup.

23    She didn't know who it was initially if that's what

24    you are asking.

25    Q.    Okay.    So, you showed her a photo lineup.    Was

1    it the same photo lineup that was used at Sunny South?

2    A.    Yes, the same exact one.

3    Q.    And was she able to make an identification upon

4    her first review?

5    A.    Yes, sir.

6    Q.    How long did it take her to make an

7    identification?

8    A.    Two seconds at the most for Mr. Williams' body.

9    Q.    Did she state how many people were present at

10   the Beeline robbery?

11   A.    Three.

12   Q.    Can you tell me if she gave you describing

13   characteristics of my client Mr. Bobby Williams?

14   A.    Yes, sir she identified him as being the one

15   with the gun, having a tattoo on his left

16   wrist forearm area.  His hair was rather bushy, it was

17   an Afro-type, real wild looking at the time.  Giving a

18   description of 5'9" or 5'10", 145 to 150 pounds,

19   wearing dark jeans and a white pullover sweater.

20   Q.    Did she give anything about facial hair?

21   A.    I asked about facial hair and I don't think she

22   could remember whether he had facial hair or not.

23   Q.    So, you did ask and she could not recall?

24   A.    Yes, sir.

25   Q.    Did she state anything about the complexion of

1    Mr. Bobby Williams?

2    A.    Medium to light.

3    Q.    Medium to light, okay.  Did she give a -- She

4    gave a height and weight, okay.  What about an age?

5    Did she give an estimated age?

6    A.    That was something that was asked.  I can't

7    recall what she told me as far as the age but she said

8    young.

9    Q.    What is the date of the Beeline incident?

10   A.    The 29th.

11   Q.    The 29th.  And what was the date of the Sunny

12   South incident, do you recall?

13   A.    I believe it was on the 21st.

14   Q.    So about eight days apart?

15   A.    Uh-huh (affirmative response).

16   Q.    Did the victim that was present at the Beeline

17   identify any vehicle?

18   A.    No, sir.  She never saw a vehicle.

19   Q.    Did anybody else identify a vehicle that may

20   have been present?

21   A.    Other than Mr. McGee describing the vehicle they

22   were on, no, sir.

23   Q.    Were there any other people present in the store

24   at the time of the incident?

25   A.    No, sir.

1   Q.    What was the connection -- What connection did

2   you have on this particular robbery without

3   identification?

4   A.    Similarity.  The way that the Sunny South had

5   happened, the time span near the Christmas holidays.

6   The subjects were real adamant about not covering

7   their faces up when they walked in has led us to

8   believe they weren't from Troy and the description of

9   the vehicle that Officer -- I'm sorry, Detective Ross

10  had, basically all of that.

11  Q.    Is it correct to say that no one there present

12  at the Beeline was able to provide any kind of

13  description of the vehicle?

14  A.    No, sir.

15  Q.    Okay.  Did the victim there identify the weapon

16  with any amount of specific detail?

17  A.    I can't recall.  She was very upset.  We did ask

18  her about the weapon but I can't recall her statement

19  she made.

20  Q.    At what time did the interview take place in

21  relation to the robbery, the day of, the following

22  day?

23  A.    The day of the robbery.

24  Q.    Okay.  Did you ask her about an identification

25  on the weapon or was she too upset to ask?

1    A.    No, I asked her.  She didn't know anything about

2    firearms at all.  We tried to differentiate between

3    whether it was an automatic or semi-automatic.  And I

4    think --

5    Q.    She was not able to distinguish between a

6    revolver and an automatic?

7    A.    No, we were able to distinguish that.

8    Q.    And so did she say it was an automatic or a

9    revolver?

10   A.    As far as her guesstimation was she said that

11   she thought it was an automatic.  It had a clip is the

12   way she described it.

13   Q.    Did she give a color?

14   A.    I can't recall.  It wasn't shiny but somewhat

15   dull.  Kind of a stainless-type look basically.

16   Q.    Would that be silver or a mat black?  Did she

17   characterize either way?

18   A.    No, sir.

19   Q.    Do you have the video in your possession from

20   the Beeline?

21   A.    Here with me?

22   Q.    Well, in the custody of the police department.

23   A.    Yes, sir.

24           MR. THOMAS:  That's all I have.

25           THE COURT:  Mr. Magee, any questions?

1          MR. MAGEE:  Yes, sir, Your Honor.

2              E X A M I N A T I O N

3    BY MR. MAGEE:

4    Q.    Officer Wright, when you interviewed Bobby

5    Williams in Montgomery -- And I believe you said that

6    was a recorded statement?

7    A.    Yes, sir, it was.

8    Q.    Okay.  You mentioned starting out with Officer

9    Junetta Brown and who was the other officer?

10   A.    Julita Brown.

11   Q.    Julita Brown and --

12   A.    Detective Ross.

13   O.    Officer Ross?  And was it your testimony that

14   Bobby Williams in his interview indicated his

15   involvement in Beeline, Christopher McGee, Brad Kenner

16   and Marcus Williams?

17   A.    No, sir.  Christopher McGee and Marcus Williams.

18   The question that was asked to him, I named off the

19   three individuals also a juvenile that was also

20   somewhat involved in the case, Kenyatta Johnson.  I

21   named off all three individuals and said which one of

22   those individuals was not present and he said Kenyatta

23   Johnson.

24   Q.    Okay.  And this was to the Beeline robbery?

25   A.    Yes, sir.

1    Q.    Did you inquire of Bobby Williams as to his

2    involvement with the Sunny South robbery?

3    A.    Let me make sure I understood you correctly.

4    Did I ask him was he involved in the Sunny South

5    robbery?

6    Q.    Yes, sir.  He identified who was involved in the

7    Beeline robbery and then did you go to the Sunny South

8    robbery then?

9    A.    Actually the Sunny South robbery was where I

10   basically started with Mr. Williams.  He told us about

11   who shared in the money.  I believe someone went in

12   and bought a pizza at first and then went back in and

13   did the robbery, basically casing out the store.

14   Q.    As to the Sunny South robbery who did he

15   identify as being involved with that?

16   A.    Just a second.

17   Q.    Was it Bobby Williams, Marcus Williams or Brad

18   Kenner or did he even talk about the Sunny South?

19   A.    Yes, sir, he did talk about the Sunny South.  I

20   believe the question that I just mentioned to you that

21   I asked was generalized in both of the robberies and

22   wasn't clarified until I talked to Mr. McGee is, he

23   was real reluctant about naming people who were there

24   so that's why I did the name thing.  I named out --

25   just tell me who was not there then.

```
1    Q.    Okay.  Was that asked to Christopher McGee or

2   Bobby Williams?

3    A.    I'm sorry, I didn't understand you.

4    Q.    Was that asked of Christopher McGee or Bobby

5   Williams that you were interviewing?

6    A.    No, it was Bobby Williams.

7    Q.    Bobby Williams?

8    A.    Yes, sir.

9    Q.    Okay.  And you said that he did identify the

10   other individuals that he claimed were involved with

11   the Sunny South robbery?

12   A.    Yes, sir.

13   Q.    And who were those individuals?

14   A.    Christopher McGee and Marcus Williams.

15   Q.    Did he indicate as to the Sunny South robbery

16   who shared in the monies?

17   A.    He basically said they all did.  He said there

18   wasn't very much.  I believe I did ask him a dollar

19   amount.  Basically all I got out of him there was that

20   he was real adamant about the weapon that was used.

21   It was not loaded.  They didn't intend to hurt

22   anybody.

23   Q.    Okay.  And the video that exists as to the

24   Beeline robbery have you actually personally reviewed

25   it?
```

47

1   A.    Several times.

2   Q.    The video tape?

3   A.    Several times, yes, sir.

4   Q.    Okay.  Does that video tape, based on your

5   multiple review, does that clearly indicate these

6   individuals?

7   A.    I wouldn't say it shows it clearly but it does

8   let me -- It did let me know when I first started

9   interviewing that I was in the right direction, yes,

10  sir.

11  Q.    Is there -- How many individuals are there on

12  that video tape?

13  A.    Three.

14  Q.    Three that came in the Beeline?

15  A.    Yes.

16  Q.    On the video tape?

17  A.    On the video tape.

18  Q.    You also earlier testified that Edith -- Is it

19  Edith Thomas?

20  A.    Yes, sir.

21  Q.    The Beeline clerk?

22  A.    Yes, sir.

23  Q.    Said that there were three people present and

24  she ID'd how many of those people and which ones were

25  they?

1   A.    She identified Bobby and Marcus.  I do remember

2   showing her a photo lineup of Brad.  I don't think I

3   have that file with me.  But she -- Brad was the one

4   that went behind the counter and actually took the

5   purse.  That was the same thing that was corroborated

6   by Mr. McGee.

7   Q.    Okay.  And then were you the principle officer

8   that did the interview with Christopher McGee?  I

9   think you earlier testified that you spoke with him

10  but were you the principal officer that did the

11  interview?

12  A.    The interview was both -- Well, it was initially

13  started out by myself and Detective Ross who had to

14  leave and go answer a call and I finished the

15  interview up.

16  Q.    And that was in Troy?

17  A.    Yes, sir.

18  Q.    With Christopher McGee?

19  A.    Yes, sir.

20  Q.    As to the Sunny South robbery who did he

21  indicate was involved with it?

22  A.    Who did Mr. McGee --

23  Q.    Bobby Williams?

24  A.    Bobby, Marcus, Dale and himself.

25           THE COURT:  That was Sunny South?

49

1      THE WITNESS:  That was Sunny South.  He

2      advised Dale was the one who went in and purchased

3      the pizza and the beer.  He was driving the

4      vehicle.

5  BY MR. MAGEE:

6  Q.    You stated that you never interviewed the Sunny

7  South victim?

8  A.    No, sir.

9  Q.    Rebecca Holley?

10  A.    No, sir.

11      MR. MAGEE:  That's all.  Thank you.

12          E X A M I N A T I O N

13  BY MR. KEY:

14  Q.    Was there any indication from your interviews

15  with Bobby Williams that Brad Kenner was involved with

16  the Sunny South robbery?

17  A.    Not from Bobby, no, sir.

18  Q.    The only individual then that you spoke with or

19  interviewed was Chris McGee and he alleges that Mr.

20  Kenner was involved?

21  A.    Yes, sir.

22  Q.    Correct me if I'm wrong on this but on the

23  Beeline robbery did you not say that Bobby Williams, I

24  believe, stated or -- Excuse me, I got my names mixed

25  up.  Not Bobby Williams but McGee was involved in that

```
 1    one, correct?

 2    A.    McGee was the one that drove the vehicle, yes,

 3    sir.  He stayed in the vehicle.

 4    Q.    All right.  And he did not identify Brad Kenner

 5    as being involved in that, did he?

 6    A.    Yes, he did.

 7    Q.    He did  --

 8    A.    Yes, sir.

 9    Q.    -- in fact, do that?

10    A.    He said he's the one that came back to the

11    vehicle with the purse.  It coincides with the same

12    thing the clerk said.

13    Q.    And you said that the clerk identified Mr.

14    Kenner?

15    A.    I'm trying remember which photo lineup I showed

16    her on Mr. Kenner because I don't have any charges

17    against Mr. Kenner.  I can't recall now what the

18    circumstances of that lineup -- I mean, the details of

19    that lineup were.

20    Q.    Let me ask you about Sunny South for a minute.

21    You went up, you held interviews with those

22    individuals, Mr. Williams, I believe, Bobby and Marcus

23    Williams?

24    A.    I'm sorry now?

25    Q.    Both Bobby and Marcus Williams?
```

1    A.    No, sir.  The first interview I had was with

2    Bobby.  I went back on a later date and attempted to

3    interview your client and Bobby.

4    Q.    Did you say anything to my client?  Did you have

5    an opportunity to talk to him at all too?

6    A.    Yes, sir.

7    Q.    Okay.  What was said?

8    A.    Basically --

9    Q.    What did he tell you?

10   A.    I'm sorry?

11   Q.    What did he tell you?

12   A.    He told me that he was not involved and that I

13   needed to look at the Williams brothers.  They had

14   another brother that looked somewhat like him.  There

15   was some other individuals in Montgomery that looked

16   like him.  At that point in time, giving him the

17   benefit of the doubt, that's why I chose to present my

18   case to the grand jury.

19   Q.    Had there also been others that told you about

20   another individual that maybe looked like him?

21   A.    One of the defendant's that's here mom has

22   called me and mentioned something about someone else

23   looking like him.  Yes, sir, someone has called and

24   told me that.

25   Q.    Do you have knowledge of or are you familiar

1    with any robberies that Mr. Kenner has been involved

2    with in Montgomery or charged for that would also

3    include Bobby Williams, Marcus Williams or Christopher

4    McGee?

5    A.    Charges they have in Montgomery I know very

6    little about.    There's some charges that Montgomery

7    County has on these individuals that I don't know the

8    circumstances about.

9    Q.    So, the answer to that is no?

10   A.    I don't know.

11   Q.    I believe earlier you alluded to the fact that

12   one of the connections here was the fact that they had

13   all been charged with robberies in Montgomery, did you

14   say that?

15   A.    I believe Detective Ross said that.

16   Q.    So other than Mr. McGee's statement to you and

17   interviews, you have no one else that says that Mr.

18   Kenner was involved in this?

19   A.    Other than the similarity of him, his facial

20   features in the video showing that he is the one that

21   went back and got the purse.

22   Q.    I'm speaking of Sunny South.  I'm speaking of

23   Sunny South.  I'm sorry I didn't clarify that.

24   A.    No, sir.

25   Q.    Okay.

1          MR. KEY:  Thank you.  That's all of the

2     questions I have.

3          MR. JARRELL:  Nothing else from the State.

4          THE COURT:  Any other questions for this

5     witness?

6          MR. THOMAS:  I have one very quick question.

7                   E X A M I N A T I O N

8     BY MR. THOMAS:

9     Q.    In the Beeline robbery was a handgun recovered

10    by Troy PD or Montgomery PD?

11    A.    Montgomery Police Department recovered a

12    handgun.  That's what I mentioned about the juvenile.

13    That's how he was tied in.  He was the one caught with

14    the handgun that was used in our robbery in Troy.

15    Q.    The juvenile being?

16    A.    Kenyatta Johnson.

17    Q.    Kenyatta Johnson.  Okay.  And who has possession

18    of the handgun?

19    A.    Montgomery PD.

20    Q.    What type of handgun is it?

21    A.    They've never furnished us that information as

22    far as a picture of the gun nor the vehicle.

23    Q.    Was that handgun under police control at the

24    time of the interview of Mr. Bobby Williams?

25    A.    By Montgomery PD it was.

54

```
 1    Q.      Have you made any attempts to trace the handgun

 2    in any way?

 3    A.      As far as?

 4    Q.      As far as identifying ownership?

 5    A.      No, sir.

 6    Q.      Have you inquired at the Montgomery PD whether

 7    they've attempted to trace the handgun?

 8    A.      They mentioned that they were processing it.  Of

 9    course, like I said earlier they have a string of

10    robberies and they were all kind of in the middle of

11    investigations so as of this time, no, sir we don't

12    have that information.

13    Q.      Have you taken a statement from Mr. Kenyatta

14    Johnson?

15    A.      Yes, sir.

16    Q.      Okay.  And what did he state when you

17    interviewed him?

18    A.      He was the first individual that we interviewed

19    at Montgomery Police Department and implicated that --

20    I can't recall the name that he called out but he said

21    that they were playing video games and they were

22    bragging about doing a robbery at a truck stop which

23    was the one that took place after they left the

24    Beeline here in Troy.  There was another robbery that

25    they committed, they confessed to.  I'm sorry, that
```

1   Mr. McGee told us about.  But after interviewing Mr.

2   Johnson he said that they tried to get him to go to

3   Troy and he would not go but he did go with them on

4   another robbery.  I think that's how he was caught.

5   Q.    Okay.  And how was this handgun obtained?

6   A.    At the time that Mr. Johnson was arrested he had

7   it in his possession.

8   Q.    And for what purpose was Mr. Johnson arrested?

9   A.    I couldn't tell you that.  I believe it -- From

10  what I understood it was in connection with the other

11  robberies they were doing in Montgomery.

12  Q.    And so you are saying you believe he was

13  developed as a suspect and arrested for that reason as

14  far as --

15  A.    I'm sure he was.  That's why we interviewed him

16  first.

17         MR. THOMAS:  That's all I have.

18              E X A M I N A T I O N

19  BY MR. MAGEE:

20  Q.    Officer Wright, did you personally interview

21  Kenyatta Johnson?

22  A.    Yes, sir.

23  Q.    Did he indicate being himself involved in either

24  the Beeline robbery or the Sunny South robbery?

25  A.    No, sir, not at all.

COURT OF CRIMINAL APPEALS NO. _CR04-0759_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _PIKE_ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC03-382 & 383_

CIRCUIT JUDGE _Steven E. Blair_

Type of Conviction / Order Appealed From: _Robbery, 1st x 2_

Sentence Imposed: _25 years in Penitentiary_

Defendant Indigent: ☒ YES ☐ NO

_Bobby Williams_

_James "Jim" Thomas_ _566·2181_     NAME OF APPELLANT

(Appellant's Attorney)     (Telephone No.)

_P.O. Box 974_

(Address)

_Troy,_ _AL_ _36081_

(City)     (State)     (Zip Code)

V.

STATE OF ALABAMA

(State represented by Attorney General)

NAME OF APPELLEE

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_Volume 3 of 3_

(For Court of Criminal Appeals Use Only)



EXHIBIT

A

1   Q.    The only information you gleaned from Kenyatta

2   Johnson as to either one of these robberies, the

3   Sunny South or the Beeline robbery, is that he heard

4   some of these defendants bragging about robbing a

5   truck stop?

6   A.    They had told him that they had been to Troy and

7   committed a robbery and they'd also did one at a truck

8   stop which they described -- he described them

9   dropping the money in the parking lot.

10   Q.    Okay.  Did he indicate when that conversation

11   took place while they were playing video games?

12   A.    Yes, sir.  During the Christmas holidays during

13   the time all these robberies were occurring, yes, sir.

14   Q.    Did he indicate where?

15   A.    He didn't know.  He knew nothing about Troy.  We

16   tried to describe to him the area but he didn't know

17   anything about it.

18   Q.    Let me back up.  Did he indicate where this

19   discussion took place?  Where were they playing video

20   games?

21   A.    Oh, at his house.

22   Q.    His house?

23   A.    Yes, sir.

24   Q.    Did he indicate specifically who was bragging or

25   telling of coming to Troy and robbing?

1    A.    I do remember him calling a name.   I can't

2    recall it.   It was video taped at Montgomery police

3    department.   They still have custody of that tape.

4    Q.    Your interview of Kenyatta Johnson?

5    A.    Yes, sir.

6    Q.    The video.   Officer Wright, did you interview or

7    attempt to interview Marcus Williams?

8    A.    Yes, sir.

9    Q.    Okay.   You personally?

10    A.    Sure did, yes, sir.

11    Q.    And how many times?

12    A.    Just once.

13    Q.    Do you remember the date of that interview?

14    A.    No, sir, I don't.   It was some time after

15    interviewing Mr. McGee and Bobby Williams.

16    Q.    Was it, that interview of Marcus Williams by

17    you, did that take place after he was arrested in

18    Montgomery County but before he was arrested on the

19    Sunny South robbery in Troy or do you recall?

20    A.    The date that I interviewed Mr. Williams I

21    believe it was the same date I executed the warrants

22    on another Sunny South robbery.

23    Q.    That was at Montgomery County Jail?

24    A.    Yes, sir.   I did all of that in one trip.

25    Q.    On that date did he deny involvement with the

```
 1    Sunny South robbery?

 2    A.     Yes, sir.

 3    Q.     On that particular occasion did you inquire of

 4    Marcus Williams any involvement with the Beeline

 5    robbery?

 6    A.     He didn't want to talk to me about anything.

 7    Q.     But you say he did deny involvement in the Sunny

 8    South robbery?

 9    A.     He denied both Beeline and Sunny South and that

10    was the extent of the interview.

11    Q.     To your knowledge did anybody else, any other

12    law enforcement from your department interview or

13    attempt to interview Marcus Williams as to the Sunny

14    South robbery?

15    A.     As far as I know as of this date no one has

16    besides me.

17    Q.     Was that interview with him either recorded or

18    video taped?

19    A.     No, sir.

20           MR. MAGEE:  That's all.

21           MR. KEY:  I don't have anything further.

22           MR. JARRELL:  I have nothing further, Your

23     Honor.

24           THE COURT:  You may step down.  Thank you.

25     Anything else from the State?
```

```
 1            MR. JARRELL:  No, sir, the State rests.

 2            THE COURT:  Anything else?

 3            MR. THOMAS:  We're going to call the victim

 4      from each of the stores to testify briefly, Your

 5      Honor.  If you would bear with us.

 6                  MS. REBECCA HOLLEY

 7            A witness for the Defendant,

 8      was sworn and testified as follows,

 9                  DIRECT EXAMINATION

10   BY MR. THOMAS:

11   Q.    State your name for the record, please, ma'am.

12   A.    Rebecca Ann Holley.

13   Q.    Back in December of 2002 where were you

14   employed?

15   A.    At the Sunny South.

16   Q.    Do you recall an incident in which a robbery

17   took place?

18   A.    Yes, sir.

19   Q.    Okay.  Do you recall the date on which it took

20   place?

21   A.    Not the exact date, no.

22   Q.    Do you recall the day of the week?

23   A.    It was on a Saturday night.

24   Q.    Saturday night?  Do you recall the time?

25   A.    It was about 8:30.
```

```
 1    Q.    How many people were present during the robbery?

 2    A.    Just me and the two boys.

 3    Q.    Okay.

 4    A.    Or two young men.

 5    Q.    Were there any other people in the store besides

 6    yourself and the two individuals who were

 7    participating in the robbery.

 8    A.    No, sir.

 9    Q.    Were the robbers in any way attempting to

10    conceal their identity?

11    A.    No, sir.

12    Q.    There were no masks worn?

13    A.    No, sir.

14    Q.    Okay.  Did you provide the investigating

15    detective, Mr. Larry Ross, with descriptions of the

16    robbers?

17    A.    Yes, sir.

18    Q.    And can you share with me what type of

19    description you gave in terms of height?

20    A.    I don't really remember what I said.  I just was

21    trying to describe them.

22    Q.    As best as your memory recalls, do you recall

23    the height of the gentleman to my right here?

24    A.    Like maybe 5'9".

25    Q.    And do you recall what weight you used to
```

1    describe him?

2    A.    I think I said between 145 and 150 pounds.

3    Q.    And do you recall if he had any facial hair?

4    A.    No, sir.

5    Q.    Okay.  Did the detective ask you if he had any

6    facial hair?

7    A.    I don't really remember.

8    Q.    So, you don't recall if he had a mustache, a

9    beard or goatee?

10   A.    Oh, the young man?  That night he didn't have no

11   mustache.  He didn't have no unusual markings or

12   nothing like that.

13   Q.    So, he did not have any unusual markings meaning

14   he did not have any tattoos?

15   A.    No, sir.

16   Q.    Did he have a goatee?

17   A.    No, sir.

18   Q.    Did he have a mustache?

19   A.    No, sir.

20   Q.    Did he have sideburns?

21   A.    No, sir.

22   Q.    Was his hair short or long Afro-style?

23   A.    I can't tell you that because he had a -- like a

24   -- not a regular hat but, like, a wool cap over his

25   head.

62

78

```
 1    Q.    What color was the cap?

 2    A.    Black.

 3    Q.    What color were his pants?

 4    A.    I believe a light blue.

 5    Q.    Okay.  And what color was his shirt?

 6    A.    I don't know.  He had on a black jacket.

 7    Q.    Black jacket.  Blue pants and a black jacket?

 8    A.    Yes, sir.  But the shirt might have been blue

 9    also.

10    Q.    Was the jacket buttoned?

11    A.    No, sir.

12    Q.    Was a gun used?

13    A.    Yes, sir.

14    Q.    Was the individual carrying the weapon present

15    in this room right now?

16    A.    Yes, sir.

17    Q.    Which individual would that be?

18    A.    This one.

19    Q.    This one being?

20    A.    The one beside you.

21    Q.    The one beside me.  Okay.  What type of gun was

22    used?

23    A.    I'd say between a .25 and a .22.

24    Q.    Was it a revolver or automatic?

25    A.    It was an -- Well, it was one that you pull back
```

```
1    on.  It weren't no revolver.

2    Q.    It did not have a cylinder on it?

3    A.    Right.  Correct.

4    Q.    How long was the gun?

5    A.    It wasn't very big.  I mean, he held it in the

6    palm of his hand.

7    Q.    Was it under six inches?

8    A.    I can't really say.

9    Q.    Was it silver or black?

10   A.    It was silver.

11   Q.    And you said it was between a .25 and a .32

12   caliber?

13   A.    No, a .25 and a .22.

14   Q.    A .25 and a .22.  I see.

15   A.    Yes, sir.

16   Q.    Did you recognize this as being a certain make

17   of gun, a certain model, a certain manufacturer?

18   A.    No, sir, but I had seen a gun like that before.

19   So --

20   Q.    Were you injured during the robbery?

21   A.    No, sir.

22   Q.    Did any of the men present that day make any

23   statements to you?

24   A.    They just told me that they wanted the money.  I

25   can't remember if they said lady or ma'am.
```

64

```
 1    Q.    Did they make any statements to you besides
 2    that?
 3    A.    When?
 4    Q.    During the course of the robbery.
 5    A.    No, that was just it.
 6    Q.    And they in no way harmed you during the course
 7    of the robbery?
 8    A.    No.
 9    Q.    Did they at any point tell you that they didn't
10    intend on harming you or the gun was unloaded?
11    A.    No, sir, not neither one.
12    Q.    How close was the person holding the gun to you
13    when this occurred?
14    A.    Probably, like I would be standing on the other
15    side of the counter and he was on the other of the
16    table.
17    Q.    Would that be four or five feet?
18    A.    No, it was closer than that.
19    Q.    Okay.  Under four feet?
20    A.    Uh-huh (affirmative response).
21    Q.    Okay.  Did you ever have an opportunity to see a
22    vehicle that they may have arrived in?
23    A.    No, sir.  They was walking each time.
24    Q.    They were walking.  Have you ever seen any of
25    these individuals prior to the robbery?
```

```
 1    A.    They had been in and out of the store about

 2   three times that day.

 3    Q.    And this happened around 8:30 at night?

 4    A.    Yes, sir.  I believe it was about 8:30.

 5    Q.    When was the first time you recall them coming

 6   in?

 7    A.    Probably about three o'clock.

 8    Q.    And then they --

 9    A.    It was after 3:00 because I come on to work at

10   3:00.

11    Q.    Did all of them come in that time?

12    A.    No, sir.  The first time that young -- was the

13   young man who came in first.

14    Q.    Would that be the gentleman to my right?

15    A.    Yes, sir.

16    Q.    Okay.  And then the second time who came in?

17    A.    It seems like him and this other boy.

18    Q.    Okay.  What time of the day would that have

19   been?

20    A.    Probably about forty-five or an hour later.

21    Q.    What did they do there the first time?  The

22   gentleman to my right, what did he do when they were

23   there the first time?

24    A.    He just bought pizza.

25    Q.    Bought a slice of pizza?
```

1    A.    Uh-huh (affirmative response).

2    Q.    And the second time when the two individuals

3    came in what did they do?

4    A.    Well, they was looking around and everything.

5    And like I said, the second time there was three of

6    them.  I don't really remember the third one but the

7    other two I do, the two that robbed me.  But anyway,

8    they was looking around.  They was talking about

9    buying some more pizza and stuff.

10   Q.    Did they buy any pizza or did they just leave

11   the store?

12   A.    They bought something I think.  I'm not -- I

13   don't remember.

14   Q.    And about what time would that have been again?

15   A.    I would say about 5:00.

16   Q.    How long did it take for them to enter the

17   store, take the money and leave?

18   A.    I would say probably about two or three minutes.

19   Q.    At some point were you shown a photo lineup of

20   some individuals?

21   A.    Yes, sir.

22   Q.    And was it presented to you in terms of for and

23   purposes of picking out the people present at the

24   store?

25   A.    Yes, sir.

67

```
 1    Q.    At what point in time did that occur after the

 2    robbery?

 3    A.    I went to the police station that night.

 4    Q.    Did the photo lineup occur that night?

 5    A.    I had looked at some on the computer but I think

 6    it was the next day that they brought them.

 7    Q.    So you're saying that night you were shown some

 8    photographs that were computerized?

 9    A.    That was on the computer, yes, sir.

10    Q.    Did you identify anybody from that session?

11    A.    No.

12    Q.    And then you were shown another lineup at what

13    point in time?

14    A.    Oh, it was Monday because I come down here

15    Monday morning.

16    Q.    How many individuals were on the lineup?

17    A.    That I picked out?

18    Q.    Yes, ma'am.  The second lineup that would have

19    been on Monday.

20    A.    Two I knew for sure.

21    Q.    Okay, let me rephrase the question.  Was the

22    lineup all contained on one sheet of paper?

23    A.    No, sir.

24    Q.    Or was it individual photographs?

25    A.    It was --
```

1    Q.    Would it have been six separate photographs?

2    A.    Yeah.

3    Q.    Or two separate photographs?

4    A.    No, I know there was at least six separate

5    photographs.

6    Q.    Okay.  So six separate photographs were

7    presented.  How long did it take you to identify the

8    suspect from those photographs?

9    A.    The one that had the gun on me, I identified him

10    right off.

11    Q.    Were you ever -- Were you shown the -- Was there

12    video tape present?

13    A.    When?

14    Q.    In your store at Sunny South.  Any video at all?

15    A.    They didn't have a tape in the machine.

16    Q.    At any point prior to the video lineup did y'all

17    discuss the appearance of any of the defendants again?

18    A.    Me and the policeman?

19    Q.    Yes, ma'am.

20    A.    I know I come down here and looked at some

21    pictures and then I think he come by the store and

22    brought me some pictures for me to reidentify, you

23    know, because it was like maybe eighteen different

24    pictures and then I come down and looked at a video.

25    Q.    Let's step through that chronologically one more

69

1    time.  The night of the robbery you were shown some

2    photographs at the police station here?

3    A.    Correct.

4    Q.    You did not select any individuals from that

5    lineup?

6    A.    Correct.

7    Q.    Okay.  The following Monday you were shown an

8    estimate of how many photographs at the station?

9    A.    I'm not sure.  I know it was like a little stack

10   of them.

11   Q.    A little stack.  Okay.

12   A.    Uh-huh (affirmative response).

13   Q.    And from that session you were able to identify

14   the gentleman to my right?

15   A.    That's correct.

16   Q.    And then was there a third photographic

17   identification process?

18   A.    Uh-huh (affirmative response).

19   Q.    When did that occur?

20   A.    I'm not sure.  He come by the store one day

21   while I was working.

22   Q.    It had been a week?

23   A.    No, sir, I don't think it had been a week.

24   Q.    In that third session who did you identify?

25   A.    That young man to your right and then the young

```
 1    man next to him to the left.  I mean, to his right.
 2    I'm sorry.
 3    Q.    Were those individuals in any of the prior
 4    lineups that you looked at?  The other two individuals
 5    besides the gentleman to my right?
 6    A.    They was in those stack of pictures.  They
 7    wasn't on the computer.
 8    Q.    They were not on the computer but they were in
 9    the stack of pictures that you saw that Monday at the
10    police station?
11    A.    Yes, sir.
12    Q.    From the time of the robbery until the time of
13    the photographic identification did at any point in
14    time did either you or/and Detective Larry Ross or
15    Detective Greg Wright discuss what these defendants
16    looked like?  Their appearance?
17    A.    I know I talked to some policeman that night.
18    And it seems like that Monday when I come down here
19    and talked to Mr. Ross it seems like we discussed it
20    then.  He was asking me about their height and, you
21    know, how old they was and everything.
22    Q.    Did this happen just prior to your viewing of
23    these photographs?
24    A.    I don't remember if it was before or after, sir.
25    Q.    Were you ever shown any video?  You mentioned
```

1    video earlier I believe.  Were you ever shown any

2    video of suspects?

3    A.    Yes, sir.

4    Q.    And where was that video made from?

5    A.    I believe they said the Beeline.

6    Q.    In that video were you able to identify the

7    gentleman to my right?

8    A.    Yes, sir.

9    Q.    What day was the video shown?

10    A.    I don't remember the exact date, sir.

11    Q.    Would it have been prior to the Monday

12    viewing --

13    A.    Huh-uh (negative response).

14    Q.    -- where you identified my defendant or after?

15    A.    It was after.

16    Q.    It would have been after?

17    A.    Uh-huh (affirmative response).

18    Q.    Okay.  But you are certain that you were able to

19    identify my client from the Beeline video?

20    A.    Yes, sir.  The man to your right.  Yes, sir.

21    Q.    During the course of the photographic lineup did

22    the detective ever make any motions or gestures

23    regarding the photos that were present in the lineup?

24    A.    No, sir.

25    Q.    Can you describe to me how he presented the

```
 1   photos?

 2   A.    When I come down here, like I said, they just

 3   gave me a stack and I looked at them.  You know, just

 4   went through them, sat there and looked through them.

 5   And then when he come by the store he had them in a

 6   folder and I was looking at them at the store and he

 7   just stood on the other side of the counter.

 8   Q.    And you at that time selected a photograph?

 9   A.    Yes, sir.

10   Q.    After the robbery occurred did you make any

11   attempts to identify a vehicle that may have left?

12   A.    No, sir, because I had talked to the young man

13   beforehand.  They told me they had just moved in the

14   trailer park so I figured they was just walking back

15   and forth from the trailer park.

16   Q.    Okay.

17         MR. THOMAS:  That's all I have at this time.

18         THE COURT:  Okay.  Mr. Magee?

19              E X A M I N A T I O N

20   BY MR. MAGEE:

21   Q.    Ms. Holley, would it be fair to say that until

22   today you have never seen this man sitting right here?

23   A.    Until today?

24   Q.    Yes, ma'am.

25   A.    No, sir, he was one of the ones in the store.
```

1    Q.    Your testimony is that he came in the store?  At

2    what time?  At the time of the robbery or earlier that

3    day or specifically when?

4    A.    He came in there twice.

5    Q.    Okay.

6    A.    He came in the second time with the young man

7    right there and then with the robber.

8    Q.    Do you remember if he came in with the other

9    individual at approximately 3:00 p.m. or soon

10    thereafter when the pizza was bought?

11    A.    No, sir, he didn't come in that time.

12    Q.    Okay.  It was the time approximately 5:00 p.m.  I

13    think is what you testified to.

14    A.    Yes, sir.

15    Q.    And you said that the video recorder is there

16    but there was no tape in the video recorder.

17    A.    That's correct.

18    Q.    Was there anybody else present at the first time

19    that you say that this individual entered the store at

20    approximately five o'clock?  Was anybody else in the

21    store at that time?

22    A.    Oh, yes, sir.  Yes, sir.

23    Q.    Any other employees?

24    A.    No, sir, there wasn't no other employees.

25    Q.    Just other customers?

1    A.    Uh-huh (affirmative response).

2    Q.    And nobody else was in the store at the time of

3    the robbery other than you and the individuals that

4    came in and how many individuals came in at the time

5    of the robbery?

6    A.    Just two.

7    Q.    Two.  And your testimony now is that it was this

8    individual and the one sitting beside Mr. Thomas --

9    A.    Uh-huh (affirmative response).

10    Q.    -- came in at the time of the robbery.

11    A.    Uh-huh (affirmative response).

12    Q.    When the officers went to show you the video

13    tape -- I assume over at the Troy Police Department;

14    is that correct?  Is that where you were when you saw

15    the video tape?

16    A.    Yes, sir.

17    Q.    Did they tell you that the video tape was from

18    the Beeline?  Did they identify where this video tape

19    came from?  Because you knew it wasn't from your

20    store, right?

21    A.    Right.

22    Q.    Do you remember if they identified it?

23    A.    I might have assumed that it came from the

24    Beeline.  I'm not for sure.  I mean, because I had

25    heard that the Beeline had got robbed.

75

91

```
1    Q.    So your answer is you just don't remember
2    whether or not they --
3    A.    No, sir, I don't remember.
4    Q.    Okay.  How many times did you watch the video
5    tape, did you review it?
6    A.    Once.
7    Q.    Just one time?
8    A.    (The witness then nodded affirmatively).
9    Q.    And it's your recollection that you identified
10   this individual here to my left to the officers at the
11   lineup?
12   A.    Yes, sir.
13   Q.    Did you identify him on the video tape as
14   well --
15   A.    Yes, sir.
16   Q.    -- or do you recall?
17   A.    Yes, sir.
18         MR. MAGEE:  That's all.
19              E X A M I N A T I O N
20   BY MR. KEY:
21   Q.    Ms. Holley, of course we've got the individual
22   with the gun and I'm sure that scared you to death.
23   A.    Yes, sir.
24   Q.    Okay.  Did you have an opportunity to observe
25   that second person, what that second person was doing?
```

```
 1    A.    Oh, when he had the gun?

 2    Q.    No, ma'am.  There was one individual there with

 3    a gun; is that correct?

 4    A.    That's correct.

 5    Q.    Can you identify that person?

 6    A.    Yes, sir.

 7    Q.    Okay.  And who is a that person?

 8    A.    That young man sitting next to the -- his

 9    lawyer.  Right over here.

10    Q.    Okay.  Then the other person that you have

11    identified as the one to his immediate right; is that

12    correct?

13    A.    Correct.

14    Q.    And he was there in the robbery.  What was he

15    doing?

16    A.    He was telling him to get the money?

17    Q.    He was telling him to get the money?

18    A.    Uh-huh (affirmative response).

19    Q.    And these two individuals you had seen prior to

20    that time in your store?

21    A.    Yes, sir.

22    Q.    The gentleman sitting here to my left --

23    A.    Uh-huh (affirmative response).

24    Q.    -- do you recognize him at all?

25    A.    No, sir, I honestly don't.
```

1      MR. KEY:  I have no further questions, Your

2    Honor.

3         MR. THOMAS:  No questions.

4         THE COURT:  Any other questions for this

5    witness?

6         MR. MAGEE: No more questions, Your Honor,

7    for Marcus Williams.

8         THE COURT:  You may step down.  Thank you.

9    Any reason for her to stay?  Can she be excused?

10        MR. THOMAS:  She can be excused.  We're

11   done.

12        THE COURT:  You may go.  Thank you.

13        MR. THOMAS:  We're going to call Edith

14   Thomas from the Beeline robbery.

15                MS. EDITH THOMAS

16             A witness for the Defendant,

17        was sworn and testified as follows,

18             DIRECT EXAMINATION

19   BY MR. THOMAS:

20   Q.   State your name for the record, please, ma'am.

21   A.   Edith Thomas.

22   Q.   And who were you employed with back in December

23   of 2002?

24   A.   Beeline.

25   Q.   And do you recall an event where a robbery took

```
1   place that day?

2   A.      Yes, sir.

3   Q.      Do you recall the date it took place?

4   A.      The last Sunday in December.

5   Q.      The last --

6   A.      Sunday.  The last Sunday in December.

7   Q.      And do you recall the time that it took place?

8   A.      Around 7:00.

9   Q.      Around 7:00 in the evening?

10  A.      Evening.

11  Q.      Who all was present besides the people

12  conducting the robbery and yourself in the Beeline

13  when it took place?

14  A.      No one else.

15  Q.      So there were no witnesses to the crime but you?

16  A.      Right.

17  Q.      How many people were present that day or how

18  many people participated in the robbery that day?

19  A.      Three.

20  Q.      Three?  Was a gun used?

21  A.      Yes.

22  Q.      Can you describe the gun for me, please?

23  A.      A silver small handgun is all I know.

24  Q.      It was --

25  A.      Silver.
```

79

1    Q.    Silver?

2    A.    A handgun.

3    Q.    Small sized?

4    A.    Uh-huh (affirmative response).

5    Q.    Would it have been less than six inches long?

6    A.    I'm not sure.  I'm not familiar with those.  I

7    don't know.  I was just --

8    Q.    Would you describe it as a compact gun or a

9    large gun?

10   A.    Compact as in -- I have seen some as small as

11   your hand but --

12   Q.    Was it as small as your hand, the kind that

13   would be as small as your hand that you could put in

14   your pocket?

15   A.    You probably can put it in your pocket.

16   Q.    Was it an automatic or a revolver?

17   A.    It was a semi-automatic.

18   Q.    Well, did it have a barrel on it?

19   A.    Yes, it did have a --

20   Q.    A revolving barrel tube, cylinder, I mean.  Did

21   it have a cylinder on it?

22   A.    As where you put --

23   Q.    A round cylinder where you load bullets?

24   A.    No, it did not have one.

25   Q.    Okay.  Were there any other describing

80

1    characteristics of the weapon that you can relate to

2    the Court?

3    A.    No.

4    Q.    Okay.  Would you be able to identify its

5    caliber?

6    A.    No.

7    Q.    Can you describe for me physically the person

8    who was holding the gun that day?

9    A.    That person had a tattoo on his left arm.

10   Q.    Okay.

11   A.    Right in here.

12   Q.    What height was he?

13   A.    About 5'7", 5'8".

14   Q.    About how much would he have weighed?

15   A.    About 150 or 160, I'm not for sure.

16   Q.    Can you estimate his age?

17   A.    In his twenties.

18   Q.    Did he have any facial hair?

19   A.    I'm not for sure.

20   Q.    Did he have a goatee?

21   A.    I understand what you are asking about facial

22   hair but I can't remember.  It happened so fast I

23   couldn't remember.

24   Q.    Was he black or white?

25   A.    Black.

81

97

```
1    Q.    Would you describe him as a light complected

2    black person, a dark complected black person or just

3    medium?

4    A.    About medium.

5    Q.    Is the person holding the gun present in this

6    room?

7    A.    Yes.

8    Q.    Where is he located?

9    A.    The one to your right.

10   Q.    The one to my right, okay.  Can you identify the

11   clothes that he was wearing when it happened?

12   A.    He had on blue jeans.  I think it was baggy

13   fitting jeans.

14   Q.    What color would they have been?

15   A.    Blue I'm thinking.

16   Q.    Blue?

17   A.    Uh-huh (affirmative response).

18   Q.    What color was his shirt?

19   A.    White.

20   Q.    Was he wearing a coat?

21   A.    Yes.

22   Q.    What color would the coat have been?

23   A.    I can't remember.

24   Q.    Did he have any distinctive features, scars,

25   marks?
```

```
1    A.    The only thing I recognize was the tattoo.

2    Q.    Did he have a close hair cut or long hair?

3    A.    It was kind of long hair, Afro-type.  I mean, it

4    was long hair.

5    Q.    It was Afro-type hair?  Was it --

6    A.    It looked like --

7    Q.    Was it sticking up or coming down?

8    A.    I'm not thinking it was combed so it was there I

9    guess.

10   Q.    Do you know either way?

11   A.    It was not combed.  It wasn't combed down.

12   Q.    So it was standing up?

13   A.    Yes.

14   Q.    At some point in time was a photo lineup

15   presented to you?

16   A.    Yes.

17   Q.    And how long after the robbery did that occur?

18   A.    About a week or so after.

19   Q.    About a week?

20   A.    (The witness then nodded affirmatively).

21   Q.    And describe to me what this photo lineup

22   consisted of.  Was it a page with multiple

23   photos on it or was it individual photographs?

24   A.    A page with multiple pictures.

25   Q.    So it was one page containing --
```

```
1    A.    It was more than one page that day.

2    Q.    How many pictures in total did you look at?

3    A.    I'm not sure.  It seemed like three or four

4    pages with six or eight pictures on each page.

5    Q.    Okay.  So around eighteen to twenty-four

6    photographs?

7    A.    Yes.

8    Q.    Were you able to identify from those photographs

9    the gentleman to my right and to your left?

10   A.    Yes.

11   Q.    Were you able to perceive him immediately?

12   A.    Yes.

13   Q.    At any point between the time of the robbery and

14   the photographic identification, that one week period,

15   did you and the detective ever have any discussions of

16   physical appearances of the defendant?

17   A.    They asked me but I'm not -- The same thing, I

18   couldn't remember if they had facial hair.

19   Q.    I'm sorry.  Repeat your answer again.  I

20   couldn't hear it.

21   A.    When they asked me -- they did ask me about

22   their appearance, but I couldn't, you know, of them --

23   the few details but I couldn't --

24   Q.    So, let me rephrase the question.  Did you at

25   any point between the time after the robbery and the
```

```
 1    time of the photographic identification that one week

 2    period --

 3    A.    Oh, no.

 4    Q.    -- did y'all at any point discuss the appearance

 5    of any of the defendants?

 6    A.    No.  The night of the robbery and then he just

 7    showed me pictures.

 8    Q.    Can you describe to me what took place in the

 9    photographic identification process?

10    A.    He told me he was going to show me a few

11    photographs and asked me to see if I could identify

12    anyone from any of the photographs that were in the

13    robbery.

14    Q.    Was there any discussion of appearance of any of

15    the defendants prior to you identifying those photos?

16    A.    What?

17    Q.    Was there any discussion of the physical

18    appearance of any of the defendants contemporaneous

19    with your viewing of those photographs along with

20    right before or during?

21    A.    I'm not for sure.  I'm not for sure.

22    Q.    Were you shown a video tape prior to you going

23    through the photographic lineup?

24    A.    The video tape out of my store that night?

25    Q.    Yes, ma'am.
```

85

101

```
 1   A.    That's the only time I seen the video.

 2   Q.    You saw it that night?

 3   A.    That night.

 4   Q.    The night of the robbery?

 5   A.    Right.

 6   Q.    Okay.  Did you ever have an opportunity to see

 7   if the defendants were on a vehicle that night?

 8   A.    No, I didn't.

 9   Q.    Did any of the people, any of the robbers that

10   were present that night say anything to you?

11   A.    Not just saying anything to me, I mean, as far

12   as the little incident that happened.  When I saw the

13   two of them come up with items in their hand but when

14   they got to the counter only one of them had items

15   their hand and I asked them where the other item was

16   and they told me they just passed it to the other one.

17   I asked them if they were going purchase it and they

18   passed it to another one that was behind them, the

19   other man but other than that, no.

20   Q.    Was this prior to the robbery or during the

21   robbery?

22   A.    During the robbery.

23   Q.    Did they harm you during the robbery?

24   A.    No.

25   Q.    Did they threaten to harm you during the
```

1    robbery?

2    A.    No.

3    Q.    How long were they in the store altogether?

4    A.    A good five minutes.

5    Q.    And had you seen any of the defendants prior to

6    the robbery taking place that evening?

7    A.    If they were I didn't recognize them but, no.

8    Q.    What time did you go on that evening?

9    A.    I'm not for sure.  I usually go in at either

10    2:00 or 4:00 but I'm not for sure that day what time I

11    went in.

12    Q.    Were you able to identify anybody from the video

13    tape that was made?

14    A.    Yes, I did recognize all three of them.

15    Q.    From the video tape?

16    A.    Uh-huh (affirmative response).  It was kind of

17    -- Yeah, I did recognize them.

18    Q.    Did you attempt to follow any of them outside

19    the store?

20    A.    No, sir.

21            MR. THOMAS: That's all I have.

22            MR. KEY:  No questions.

23                  E X A M I N A T I O N

24    BY MR. MAGEE:

25    Q.    Ms. Thomas how many times did you watch the

87

103

```
 1    video tape that night when you reviewed it?

 2    A.    Two or three times.

 3              MR. JARRELL:  Judge, I'm going to object to

 4        any more questions.  Their client is not charged.

 5              THE COURT:  Okay.

 6              MR. MAGEE:  So you object to our questions?

 7              MR. JARRELL:  Yes.

 8              MR. MAGEE:  Our questions altogether?

 9              MR. JARRELL:  Yes.

10              MR. MAGEE:  We withdraw the question.  Go

11        ahead and indict him and get it over with.

12              THE COURT:  I have a question.  It seems

13        like a dumb question but humor me.  How did you

14        know it was a robbery?

15              THE WITNESS:  Oh, they had a gun.

16              THE COURT:  They came up with those items in

17        their hands?

18              THE WITNESS:  I didn't know it was a robbery

19        until they pulled the gun out on me and told me to

20        give it here.

21              THE COURT:  They said give it here?

22              THE WITNESS:  Uh-huh (affirmative response).

23              THE COURT:  So they had some items like they

24        were going to purchase them in their hand?

25              THE WITNESS:  Yes.
```

```
1              THE COURT:  They approached the counter?

2              THE WITNESS:  Yes.

3              THE COURT:  Pulled out a gun?

4              THE WITNESS:  Well, after the register came

5      open that's when they pulled the gun.

6              THE COURT:  Okay.  So they put it down and

7      you rang up those items?

8              THE WITNESS:  Uh-huh (affirmative response).

9              THE COURT:  And then when the drawer

10     opened --

11             THE WITNESS:  I was getting ready to give

12     them the change and I looked up and the person was

13     saying give it here.

14             THE COURT: All right.  Do you have any

15     questions?

16             MR. THOMAS:  Well let me, since I'm the only

17     one able to ask questions I guess maybe I'll ask

18     one.

19                 E X A M I N A T I O N

20     BY MR. THOMAS:

21     Q.   Did you identify the other two gentleman at this

22     table as being present that day?

23     A.   I identified two out of three.

24     Q.   Two out of three?

25             MR. KEY:  Wait a minute.  Wait a minute.
```

```
 1              THE COURT:  I think Mr. Key says don't make
 2         it worse than it is.
 3              MR. KEY:  Yeah, don't make it any worse than
 4         what it is.
 5              MR. THOMAS:  Well, I trust the Judge to
 6         leave that to the grand jury.
 7    BY MR. THOMAS:
 8    Q.   Who else did you identify?
 9    A.   I identified two people sitting right there
10    together.  It was the guy right there to your right.
11    Q.   Okay.
12    A.   And I'm thinking that guy right there to his
13    right.
14    Q.   Okay.
15              MR. THOMAS:  That's all I have.
16              THE COURT:  Thank you, ma'am.  You can step
17         down and you can go.  Nothing further from the
18         State?
19              MR. JARRELL:  No further questions.
20              THE COURT:  Anything else from Mr. Thomas?
21         Further evidence, any other evidence?
22              MR. THOMAS:  No, Your Honor.
23              THE COURT:  Mr. Magee, is there any other
24         evidence you would like to present?
25              MR. MAGEE:  No, sir, Your Honor, we don't
```

1   have any.

2        THE COURT:  Mr. Key do you have any

3   evidence?

4        MR. KEY:  No, sir, Your Honor.

5        THE COURT:  Okay.  On the basis of the

6   evidence presented in cases, two cases of Mr.

7   Bobby Williams, the Court finds probable cause and

8   I order that Mr. Bobby Williams be bound over to

9   the grand jury on those two charges of robbery in

10  the first degree for its consideration of those

11  charges.

12       And Mr. Marcus Williams is charged in one

13  case of the robbery of the Sunny South.  And the

14  Court finds probable cause in that case and Mr.

15  Marcus Williams is bound over to the grand jury on

16  the charge of robbery first agree.

17       Now as to Mr. Kenner, it appears that the

18  only remaining evidence is the statement of

19  Christopher McGee, a co-conspirator or an

20  accomplice.

21       MR. JARRELL:  Judge, the officer indicated

22  that in the lineup the clerk picked out Mr. Kenner

23  as the second person.

24       THE COURT:  I recall that and that was

25  fairly well undermined I would say today.

1        MR. JARRELL: That's a jury question. Who

2    do they want to believe.

3        THE COURT: Well, right now it's my

4    question.  It may get to be a jury's question one

5    day but today I have to answer it and I find that

6    there is not probable cause, sufficient evidence

7    to lead a reasonable person to believe that this

8    defendant committed this offense and therefore as

9    to Mr. Kenner I order that this case be dismissed.

10   Okay, thank you all.

11

12

13       WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.

14

15              *  *  *  *  *  *  *  *  *

16               *  *  *  *  *  *  *  *

17                *  *  *  *  *  *

18                 *  *  *  *

19                  *  *

20                   *

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2   STATE OF ALABAMA:

 3   COUNTY OF PIKE:

 4

 5       I, Randy A. Longcrier, Special Court Reporter for

 6   Pike County, Alabama, hereby certify that at said time

 7   and place I reported in stenotype all testimony

 8   adduced and other oral proceedings had in the

 9   foregoing matter; that thereafter my notes were

10   reduced to typewriting under my direction; and that

11   the foregoing transcript contains a full, true and

12   correct record of all such testimony adduced and oral

13   proceedings had and of the whole thereof.

14       Witness my hand at Troy, Alabama, this 8th

15   day of January, 2004.

16

17   _____

18   Randy A. Longcrier (LON002)

19

20   My Commission Expires September 29, 2007

21

22

23                  * * * * * * * * * * *

24

25
```

109

W A R R A N T

STATE OF ALABAMA                    PIKE COUNTY                    DISTRICT COURT
AGENCY NUMBER:
                                    WARRANT NUMBER: WR 2003 000017.00
                                    OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST    BOBBY WILLIAMS    AND BRING
HIM/HER BEFORE THE DISTRICT  COURT OF PIKE COUNTY TO ANSWER THE STATE
ON A CHARGE(S) OF:
        ROBBERY 1ST  CLASS: A  TYPE: F  COUNTS: 001
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
_____ DAY OF _____ _____, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 17 DAY OF JANUARY, 2003.

BOND SET AT: (1)    $50,000.00  BOND TYPE:
             (2)  _____
             (3)  _____

_Brenda M Peacock_
JUDGE/CLERK/MAGISTRATE OF DISTRICT COURT

----

CHARGES: ROBBERY 1ST          13A-008-041              F  FELONY

----

NAME: BOBBY WILLIAMS                    ALIAS:
ADDRESS: 1817 DIXIE CT                  ALIAS:
ADDRESS:
CITY: MONTGOMERY          STATE: AL     ZIP: 36110 0000
                                        PHONE: 000 000 0000 EXT: 000

EMPLOYMENT:
DOB: 10/19/1982    RACE: B    SEX: M    HAIR:
EYE:    HEIGHT: 6'01"   WEIGHT: 150
SID: 000000000  SSN: 423132904  DL NUM:

----

E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

( ✓ )  PLACING DEFENDANT IN THE PIKE COUNTY JAIL

(   )  RELEASING DEFENDANT ON APPEARANCE BOND

_____

THIS ___24___ DAY OF ___FEB___                    2003

                    SHERIFF  _Russell Thomas_

                    BY  _____

COMPLAINANT:   MONICA LITTLE KING
               BEELINE 614
               BRUNDIDGE ST
               TROY  AL  36081

OPERATOR: BRP        DATE: 01/17/2003

ALABAMA JUDICIAL INFORMATION SYSTEM

* * * IN THE DISTRICT COURT OF PIKE COUNTY * * *

AGENCY NUMBER:                          WARRANT NUMBER: WR 2003 000017.00
                                        OTHER CASE NBR:

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT  COURT OF
PIKE COUNTY, ALABAMA, PERSONALLY APPEARED   MONICA LITTLE KING
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    BOBBY WILLIAMS                DEFENDANT,
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINANT, DID WITHIN THE ABOVE
NAMED COUNTY AND

DID ON OR ABOUT DECEMBER 29, 2002 , WHILE IN THE COURSE OF COMMITTING  OR
ATTEMPTING TO COMMIT A THEFT OF UNITED STATES CURRENCY,
THE PROPERTY OF, TO-WIT: PROMARKETING DBA BEELINE 614
USE FORCE OR THREATEN THE IMMINENT USE OF FORCE AGAINST THE PERSON OF THE
SAID EDITH THOMAS   , OR ANOTHER PERSON PRESENT, WITH THE
INTENT TO OVERCOME HIS/HER PHYSICAL RESISTANCE OR PHYSICAL POWER OF
RESISTANCE OR TO COMPEL ACQUIESCENCE TO THE TAKING OF OR ESCAPING WITH
THE PROPERTY,
          WHILE THE SAID BOBBY WILLIAMS   , WAS ARMED WITH A
          DEADLY WEAPON OR DANGEROUS INSTRUMENT, TO-WIT: A PISTOL
IN VIOLATION OF 13A-008-041                      OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_Monica L. King_
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 17 DAY OF JANUARY, 2003.

_Brenda Peacock_
JUDGE/CLERK/MAGISTRATE OF DISTRICT  COURT

CHARGES: ROBBERY 1ST            13A-008-041            F  FELONY

WITNESS FOR THE STATE

MONICA LITTLE KING/BEELINE 614/BRUNDIDGE ST/TROY/36081

GREG WRIGHT/TPD/TROY/36081
EDITH THOMAS/306 GRIFFIN ST/TROY/36081
LARRY ROSS/TPD/TROY/36081

OPERATOR: BRP    DATE: 01/17/2003

W A R R A N T

STATE OF ALABAMA            PIKE COUNTY                    DISTRICT COURT

AGENCY NUMBER:                          WARRANT NUMBER: WR 2003 000020.00
                                        OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:

YOU ARE HEREBY COMMANDED TO ARREST    BOBBY WILLIAMS   AND BRING
HIM/HER BEFORE THE DISTRICT  COURT OF PIKE COUNTY TO ANSWER THE STATE
ON A CHARGE(S) OF:
          ROBBERY 1ST   CLASS: A   TYPE: F   COUNTS: 001
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN  THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
_____ DAY OF _____ _____, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 22 DAY OF JANUARY, 2003.

BOND SET AT: (1)    $50,000.00   BOND TYPE:
             (2) _____
             (3) _____

_Brenda M Peacock_
JUDGE/CLERK/MAGISTRATE OF DISTRICT  COURT

---

CHARGES: ROBBERY 1ST        13A-008-041            F  FELONY

---

NAME: BOBBY WILLIAMS                  ALIAS:
ADDRESS: 1817 DIXIE CT                ALIAS:
ADDRESS:
CITY: MONTGOMERY           STATE: AL      ZIP: 36110 0000
                                         PHONE: 000 000 0000 EXT: 000

EMPLOYMENT:
DOB: 10/19/1982   RACE: B    SEX: M       HAIR:
EYE:      HEIGHT: 6'01"   WEIGHT: 150
SID: 000000000  SSN: 423132904  DL NUM:

---

E X E C U T I O N

    EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND

    (∠)  PLACING DEFENDANT IN THE PIKE COUNTY JAIL

    ( )  RELEASING DEFENDANT ON APPEARANCE BOND

_____

_____

THIS ____24____ DAY OF ___FEB_____ 2003

                    SHERIFF  Russell Thomas

                    BY  Guy C Wright

---

COMPLAINANT:  MARTHA NORMAN
              SONNY SOUTH

              TROY  AL  36081

OPERATOR: BRP       DATE: 01/22/2003

ALABAMA JUDICIAL INFORMATION SYSTEM

* * * IN THE DISTRICT COURT OF PIKE COUNTY * * *

AGENCY NUMBER:                          WARRANT NUMBER: WR 2003 000020.00
                                        OTHER CASE NBR:

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT  COURT OF
PIKE COUNTY, ALABAMA, PERSONALLY APPEARED  MARTHA NORMAN
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT    BOBBY WILLIAMS            DEFENDANT,
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINANT, DID WITHIN THE ABOVE
NAMED COUNTY AND

DID ON OR ABOUT DECEMBER 21, 2002 , WHILE IN THE COURSE OF COMMITTING  OR
ATTEMPTING TO COMMIT A THEFT OF UNITED STATES CURRENCY____, TO-WIT: SUNNY SOUTH,
THE PROPERTY OF, TO-WIT: SUNNY SOUTH,
USE FORCE OR THREATEN THE IMMINENT USE OF FORCE AGAINST THE PERSON OF THE
SAID  REBECCA HOLLEY   ; OR ANOTHER PERSON PRESENT, WITH THE
INTENT TO OVERCOME HIS/HER PHYSICAL RESISTANCE OR PHYSICAL POWER OF
RESISTANCE OR TO COMPEL ACQUIESCENCE TO THE TAKING OF OR ESCAPING WITH
THE PROPERTY,
        WHILE THE SAID BOBBY WILLIAMS          , WAS ARMED WITH A
        DEADLY WEAPON OR DANGEROUS INSTRUMENT, TO-WIT  A PISTOL,
IN VIOLATION OF 13A-008-041                  OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

_Martha F. Norman_
COMPLAINANT'S SIGNATURE

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 22 DAY OF JANUARY, 2003.

_Brenda M Peacock_
JUDGE/CLERK/MAGISTRATE OF DISTRICT  COURT

CHARGES: ROBBERY 1ST          13A-008-041          F  FELONY

WITNESS FOR THE STATE

MARTHA NORMAN/SONNY SOUTH/TROY/36081

LARRY ROSS/TPD/TROY/36081
REBECCA HOLLEY/131 GRIMES ST/TROY/36081

OPERATOR: BRP    DATE: 01/22/2003

113

# ALABAMA UNIFORM ARREST REPORT

| Fingerprinted | R84 Completed |
|---|---|
| ☐ Yes | ☐ Yes |
| ☐ No | ☐ No |

**OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION**

## IDENTIFICATION

| 1 ORI # | 2 AGENCY NAME | 3 CASE # | 4 SFX |
|---|---|---|---|
| 5 5 0 1 0 0 | Troy Police Dept. | 0 2 1 2 - 2 8 4 0 | |

5 LAST, FIRST, MIDDLE NAME: Williams, Bobby

6 ALIAS AKA:

| 7 SEX | 8 RACE | 9 HGT. | 10 WGT. | 11 EYE | 12 HAIR | 13 SKIN | 14 |
|---|---|---|---|---|---|---|---|
| ☒M ☐F | ☒1 W ☐2 B ☐3 A ☐4 I | 6'1 | 150 | BRO | Blk | | ☐1 SCARS  ☐2 MARKS  ☒3 TATTOOS  ☐4 AMPUTATIONS |

15 PLACE OF BIRTH (CITY, COUNTY, STATE): Montgomery, Montgomery, Al.

15 SSN: 4 2 3 - 1 1 3 - 2 9 0 4

17 DATE OF BIRTH: 1 0 1 9 8 2

18 Age: 20

19 MISCELLANEOUS ID #:

| 20 SID # | 21 FINGERPRINT CLASS | KEY | MAJOR | PRIMARY | SCDV | SUB-SECONDARY | FINAL | 22 DL # | 23 ST |
|---|---|---|---|---|---|---|---|---|---|
| 24 FBI # | HENRY CLASS / NCIC CLASS | | | | | | | 25 IDENTIFICATION COMMENTS | |

26 ☐ RESIDENT  ☒ NON-RESIDENT

27 HOME ADDRESS (STREET, CITY, STATE, ZIP): 1817 DIXIE COURT Mont. Al. 36110

28 RESIDENCE PHONE: ( )

29 OCCUPATION (BE SPECIFIC):

30 EMPLOYER (NAME OF COMPANY/SCHOOL): None

31 BUSINESS ADDRESS (STREET, CITY, STATE):

32 BUSINESS PHONE:

## ARREST

33 LOCATION OF ARREST (STREET, CITY, STATE, ZIP): Montgomery Co. Jail Montgomery, Al

34 SECTOR:

35 ARRESTED FOR YOUR JURISDICTION: ☒ IN STATE ☐ OUT STATE AGENCY   ☒ YES  ☐ NO

| 36 CONDITION OF ARRESTEE | 37 RESIST ARREST? | 38 Injuries? | 39 ARMED? | 40 DESCRIPTION OF WEAPON |
|---|---|---|---|---|
| ☐ DRUNK ☒ SOBER ☐ DRINKING ☐ DRUGS | ☐ YES ☒ NO | ☐ 2 OFFICER ☒ 1 NONE ☐ 3 ARRESTEE | ☐ Y ☒ N | ☐ 1 HANDGUN ☐ 2 RIFLE ☐ 3 SHOTGUN ☐ 4 OTHER FIREARM ☐ 5 OTHER WEAPON |

| 41 DATE OF ARREST | 42 TIME OF ARREST | 43 DAY OF ARREST | 44 TYPE ARREST | 45 ARRESTED BEFORE? |
|---|---|---|---|---|
| M D Y | ☐ 1. AM ☐ 2. PM ☐ 3. MIL | S M ☒W T F S | ☐ 1 ON VIEW ☐ 2 CALL ☒ 3 WARRANT | ☒ YES ☐ NO ☐ UNKNOWN |

46 CHARGE—1  ☒ FEL  ☐ MISD: Robbery 1st

47 UCR CODE:

48 CHARGE—2  ☐ FEL  ☐ MISD:

49 UCR CODE:

50 STATE CODE/LOCAL ORDINANCE: 13A-008-004 1-14-1

51 WARRANT #: 2003000017.00

52 DATE ISSUED: 0 1 1 7 0 3

53 STATE CODE/LOCAL ORDINANCE:

54 WARRANT #:

55 DATE ISSUED: M D Y

56 CHARGE—3  ☐ FEL  ☐ MISD:

57 UCR CODE:

58 CHARGE—4  ☐ FEL  ☐ MISD:

59 UCR CODE:

60 STATE CODE/LOCAL ORDINANCE:

61 WARRANT #:

62 DATE ISSUED: M D Y

63 STATE CODE/LOCAL ORDINANCE:

64 WARRANT #:

65 DATE ISSUED: M D Y

66 ARREST DISPOSITION: ☒ HELD  ☐ BAIL  ☐ RELEASED  ☐ TOT-LE  ☐ OTHER

67 IF OUT ON RELEASE WHAT TYPE?

68 ARRESTED WITH (1) ACCOMPLICE (FULL NAME):

69 ARRESTED WITH (2) ACCOMPLICE (FULL NAME):

## Vehicle

| 70 VYR | 71 VMA | 72 VMO | 73 VST | 74 VCO TOP / BOTTOM | 75 TAG # | 76 LIS | 77 LIY |
|---|---|---|---|---|---|---|---|

71 VIN:

79 IMPOUNDED? ☐ YES ☐ NO

80 STORAGE LOCATION/IMPOUND #:

81 OTHER EVIDENCE SEIZED/PROPERTY SEIZED:

## JUVENILE

82 JUVENILE DISPOSITION: ☐ HANDLED AND RELEASED  ☐ REF. TO JUVENILE COURT  ☐ REF TO WELFARE AGENCY  ☐ REF. TO OTHER POLICE AGENCY  ☐ REF. TO ADULT COURT          ☐ CONTINUED IN NARRATIVE

83 RELEASED TO:

84 PARENT OR GUARDIAN (LAST FIRST, MIDDLE NAME):

85 ADDRESS (STREET, CITY, STATE, ZIP):

63 PHONE: ( )

87 PARENTS EMPLOYER:

88 OCCUPATION:

89 ADDRESS (STREET, CITY, STATE, ZIP):

90 PHONE: ( )

## RELEASE

91 DATE AND TIME OF RELEASE: M D Y  ☐ 1. AM ☐ 3. MIL ☐ 1. PM

92 RELEASING OFFICER NAME:

93 AGENCY/DIVISION:

94 ID #:

95 RELEASED TO:

95 AGENCY/DIVISION:

97 AGENCY ADDRESS:

98 PERSONAL PROPERTY RELEASED TO ARRESTEE: ☐ YES  ☐ NO  ☐ PARTIAL

99 PROPERTY NOT RELEASED/HELD AT:

100 PROPERTY:

102 SIGNATURE OF RECEIVING OFFICER:

103 SIGNATURE OF RELEASING OFFICER:

LOCAL USE:

STATE USE:

| MULTIPLE CASES CLOSED | 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE # | 109 SFX | 110 ADDITIONAL CASES CLOSED ☐ Y ☐ N |
|---|---|---|---|---|---|---|---|

111 ARRESTING OFFICER (LAST, FIRST, M): Wright, Greg C.

112 ID #: 143

113 ARRESTING OFFICER (LAST, FIRST, M):

114 ID #:

115 SUPERVISOR ID #:

116 WATCH CMDR ID #:

114

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| ADDITIONAL ARREST NARRATIVE CONTINUED | 117 DATE AND TIME OF ARREST | | | ☐ AM ☒ PM ☐ MIL | 118 CASE # 0 2 1 2 - 2 8 4 0 | 119 SFX |
|---|---|---|---|---|---|---|
| | M | D | Y | | | |

120 ADDITIONAL ARREST INFORMATION

SUBJECT ARRESTED ON OUTSTANDING WARRANT  (see cid case files).

N
A
R
R
A
T
I
V
E

# ALABAMA UNIFORM ARREST REPORT

| Fingerprinted | R84 Completed |
|---|---|
| ☐1 Yes | ☐1 Yes |
| ☒2 No | ☒2 No |

115

**OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION**

## IDENTIFICATION

| 1 ORI # 0,5,5,0,1,0,0 | 2 AGENCY NAME TROY POLICE DEPT. | 3 CASE # 02,12,-20,60 | 4 SFX |
|---|---|---|---|

LAST, FIRST, MIDDLE NAME — **WILLIAMS, BOBBY**

6 ALIAS AKA

| 7 SEX ☒1 M ☐2 F | 8 RACE ☐1 W ☒2 B ☐3 A | 9 HGT 6'1" | 10 WGT 150 | 11 EYE BRO | 12 HAIR BLK | 13 SKIN | 14 | ☐1 SCARS ☐2 MARKS ☐3 TATOOS ☐4 AMPUTATIONS |
|---|---|---|---|---|---|---|---|---|

| 15 PLACE OF BIRTH (CITY, COUNTY, STATE) | 16 SSN 423-113-2904 | 17 DATE OF BIRTH 14,0,1982 | 18 AGE 20 | 19 MISCELLANEOUS ID # |
|---|---|---|---|---|

| 20 SID # | 21 FINGERPRINT CLASS | KEY | MAJOR | PRIMARY | SCDV | SUB-SECONDARY | FINAL | 22 DL # | 23 ST |
|---|---|---|---|---|---|---|---|---|---|

| 24 FBI # | | HENRY CLASS | | | | 25 IDENTIFICATION COMMENTS |
|---|---|---|---|---|---|---|
| | | NCIC CLASS | | | | |

| 26 ☐1 RESIDENT ☒2 NON–RESIDENT | 27 HOME ADDRESS (STREET, CITY, STATE, ZIP) 1817 DIXIE COURT MONTGOMERY, AL | 28 RESIDENCE PHONE | 29 OCCUPATION (BE SPECIFIC) |
|---|---|---|---|

| 30 EMPLOYER (NAME OF COMPANY/SCHOOL) | 31 BUSINESS ADDRESS (STREET, CITY, STATE, ZIP) | 32 BUSINESS PHONE |
|---|---|---|

## ARREST

| 33 LOCATION OF ARREST (STREET, CITY, STATE, ZIP) MONTGOMERY CO. JAIL | 34 SECTOR # | 35 ARRESTED FOR YOUR JURISDICTION? ☒ YES ☐ NO ☐1 IN STATE ☐2 OUT STATE ☐3 OTHER AGENCY |
|---|---|---|

| 36 CONDITION OF ARRESTEE: ☐1 DRUNK ☐3 DRINKING ☒2 SOBER ☐4 DRUGS | 37 RESIST ARREST? ☐1 YES ☒2 NO | 38 INJURIES? ☐1 OFFICER ☒2 NONE ☐3 ARRESTEE | 39 ARMED? ☐1 YES ☒2 NO | 40 DESCRIPTION OF WEAPON ☐1 HANDGUN ☐4 OTHER FIREARM ☐2 RIFLE ☐5 OTHER WEAPON ☐3 SHOTGUN |
|---|---|---|---|---|

| 41 DATE OF ARREST 0,2,24,0,3 | 42 TIME OF ARREST 12:27 ☐1 AM ☒2 PM ☐3 MIL. | 43 DAY OF ARREST S ☒M T W T F S | 44 TYPE ARREST ☒1 ON VIEW ☐2 CALL ☐3 WARRANT | 45 ARRESTED BEFORE? ☐1 YES ☐2 NO ☐3 UNKNOWN |
|---|---|---|---|---|

| 46 CHARGE–1 ☐ FEL ☐2 MISD ROBBERY 1st | | 47 UCR CODE | 48 CHARGE–2 ☐1 FEL ☐2 MISD | | 49 UCR CODE |
|---|---|---|---|---|---|

| 50 STATE CODE/LOCAL ORDINANCE 13A-8-41 | 51 WARRANT # WR2003000020 | 52 DATE ISSUED 04,22,03 | 53 STATE CODE/LOCAL ORDINANCE | 54 WARRANT # | 55 DATE ISSUED M D Y |
|---|---|---|---|---|---|

| 56 CHARGE–3 ☐1 FEL ☐2 MISD | | 57 UCR CODE | 58 CHARGE–4 ☐1 FEL ☐2 MISD | | 59 UCR CODE |
|---|---|---|---|---|---|

| 60 STATE CODE/LOCAL ORDINANCE | 61 WARRANT # | 62 DATE ISSUED M D Y | 63 STATE CODE/LOCAL ORDINANCE | 64 WARRANT # | 65 DATE ISSUED M D Y |
|---|---|---|---|---|---|

| ARREST DISPOSITION ☐1 HELD ☐2 BAIL ☐3 RELEASED ☐4 TOT–LE ☐5 OTHER | 67 IF OUT ON RELEASE WHAT TYPE? | 68 ARRESTED WITH (1) ACCOMPLICE (FULL NAME) |
|---|---|---|
| | | 69 ARRESTED WITH (2) ACCOMPLICE (FULL NAME) |

## VEHICLE

| 70 VYR | 71 VMA | 72 VMO | 73 VST | 74 VCO TOP BOTTOM | 75 TAG # | 76 LIS | 77 LIY |
|---|---|---|---|---|---|---|---|

| 78 VIN | 79 IMPOUNDED? ☐1 YES ☐2 NO | 80 STORAGE LOCATION/IMPOUND # |
|---|---|---|

| 81 OTHER EVIDENCE SEIZED/PROPERTY SEIZED | ☐ CONTINUED IN NARRATIVE |
|---|---|

## JUVENILE

| 82 JUVENILE DISPOSITION: ☐1 HANDLED AND RELEASED ☐2 REF. TO JUVENILE COURT ☐3 REF. TO WELFARE AGENCY ☐4 REF. TO OTHER POLICE AGENCY ☐5 REF. TO ADULT COURT | 83 RELEASED TO |
|---|---|

| 84 PARENT OR GUARDIAN (LAST, FIRST, MIDDLE NAME) | 85 ADDRESS (STREET, CITY, STATE, ZIP) | 86 PHONE |
|---|---|---|

| 87 PARENTS EMPLOYER | 88 OCCUPATION | 89 ADDRESS (STREET, CITY, STATE, ZIP) | 90 PHONE |
|---|---|---|---|

## RELEASE

| 91 DATE AND TIME OF RELEASE M D Y : ☐1 AM ☐2 PM ☐3 MIL. | 92 RELEASING OFFICER NAME | 93 AGENCY/DIVISION | 94 ID # |
|---|---|---|---|

| 95 RELEASED TO | 96 AGENCY/DIVISION | 97 AGENCY ADDRESS |
|---|---|---|

| 98 PERSONAL PROPERTY RELEASED TO ARRESTEE ☐1 YES ☐2 NO ☐3 PARTIAL | 99 PROPERTY NOT RELEASED/HELD AT: | 100 PROPERTY # |
|---|---|---|

| 101 REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE) |
|---|

| SIGNATURE OF RECEIVING OFFICER | 103 SIGNATURE OF RELEASING OFFICER | LOCAL USE |
|---|---|---|
| | | STATE USE |

| MULTIPLE CASES CLOSED | 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE # | 109 SFX | 110 ADDITIONAL CASES CLOSED ☐ BY ☐ IN NARRATIVE |
|---|---|---|---|---|---|---|---|

| 111 ARRESTING OFFICER (LAST, FIRST, M.) Wright, Greg C | 112 ID # 143 | 113 ARRESTING OFFICER (LAST, FIRST, M.) | 114 ID # | 115 SUPERVISOR ID # | 116 WATCH CMDR ID # |
|---|---|---|---|---|---|

**TYPE OR PRINT IN BLACK INK ONLY**

116

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| | 117 DATE AND TIME OF ARREST | | | 118 CASE # | 119 SFX |
|---|---|---|---|---|---|
| ITIONAL ARREST NARRATIVE CONTINUED | 04 27 03 | ☐ AM ☐ PM ☐ MIL | | 62 12-2060 | |

120 ADDITIONAL ARREST INFORMATION

SUBJECT WAS SERVED WARRANT AT THE
MONTGOMERY COUNTY JAIL WITHOUT INCIDENT.

NARRATIVE

NARRATIVE

NARRATIVE

☐ CONTINUE ON ADDITIONAL SUPPLEMENT

TYPE OR PRINT IN BLACK INK ONLY

117

## NOTIFICATION OF RIGHTS

STATE OF ALABAMA v. _Bobby Dean Williams_

I understand that I am charged with the crime of _Robbery, First Degree_.
I understand that I have the right to remain silent and that if I give up that right, what I
say may be used against me. I understand that I have the right to be represented by an
attorney; that I may retain an attorney of my choice; and that I will be given time and
opportunity to retain my own attorney. I understand that if I am indigent and unable to
afford an attorney, an attorney will be appointed to represent me.

DATE: _02/25/03_  SIGNATURE: _Bobby Williams_

--------------------------------------------------------------------------------

### FELONY CASES

I understand that since I am charged with a felony, I have a right to demand a preliminary
hearing before the District Court to determine whether there is probable cause to hold me
in jail or under bond on the charge in this case. I understand that this demand must be
made within 30 days of my arrest.

DATE: _02/25/03_  SIGNATURE: _Bobby Williams_

--------------------------------------------------------------------------------

### RIGHT TO AN ATTORNEY

I do not want an attorney, and I hereby waive my right to be represented by an
attorney.

DATE: _____  SIGNATURE: _____


I expect to retain my own attorney.

DATE: _____  SIGNATURE: _____


I cannot afford an attorney, and I want the Court to appoint an attorney for me. I
understand that I am required to complete an affidavit of hardship to assist the Court in
determining whether I am indigent and entitled to an appointed attorney.

DATE: _02/25/23_ SIGNATURE: _Bobby Williams_

118

| State of Alabama<br>Unified Judicial System<br>Form C-10<br>Page 1 of 2    Rev. 2/95 | AFFIDAVIT of SUBSTANTIAL<br>HARDSHIP and ORDER | Case Number<br>*OC2003-145,149* |

IN THE _____ *District* _____ COURT OF *Pike County* _____ ALABAMA
(Circuit, District, or Municipal)    (Name of County or Municipality)

STYLE OF CASE: _____ *State* _____ v. *Bobby Dean Williams*
Plaintiff(s)    Defendant(s)

TYPE OF PROCEEDING: _____ CHARGE(S) (if applicable): *Robbery 1st*

☐ CIVIL CASE-- I, because of substantial hardship, am unable to pay the docket fee and service fees in this case.
I request that payment of these fees be waived initially and taxed as costs at the conclusion of the case.

☐ CIVIL CASE--(such as paternity, support, termination of parental rights, dependency) - I am financially unable to
hire an attorney and I request that the Court appoint one for me.

☑ CRIMINAL CASE--I am financially unable to hire an attorney and request that the Court appoint one for me.

☐ DELINQUENCY/NEED OF SUPERVISION - I am financially unable to hire an attorney and request that the Court
appoint one for my child/me.

SECTION I.                  AFFIDAVIT

1.  IDENTIFICATION
Full Name _____ *Bobby Dean Williams* _____ Date of Birth *10/19/82*
Spouse's Full Name (if married) _____ *None*
Complete Home Address _____ *1817 Dixie Ct., Montgomery, AL*
_____
Number of People Living in Household _____ *6*
Home Telephone No. _____
Occupation/Job _____
Driver's License Number _____ Length of Employment _____
Employer _____ *None* _____ * Social Security Number _____
Employer's Address _____ Employer's Telephone No. _____
_____

2.  ASSISTANCE BENEFITS
Do you or anyone residing in your household receive benefits from any of the following sources? *(if so, please check those which apply.)*

☐ AFDC        ☐ Food Stamps        ☐ SSI        ☐ Medicaid        ☐ Other _____

3.  INCOME/EXPENSE STATEMENT
Monthly Gross Income:

| | |
|---|---|
| Monthly Gross Income | $ *∅* |
| Spouse's Monthly Gross Income *(unless a marital offense)* | |
| Other Earnings: Commissions, Bonuses, Interest Income, etc. | |
| Contributions from Other People Living in Household | |
| Unemployment/Workmen's Compensation, | |
| Social Security, Retirement, etc. | |
| Other Income (be specific) _____ | |

TOTAL MONTHLY GROSS INCOME        $ _____

Monthly Expenses:

| | |
|---|---|
| A.  Living Expenses | |
| Rent/Mortgage | $ _____ |
| Total Utilities: Gas, Electricity, Water, etc. | _____ |
| Food | _____ |
| Clothing | _____ |
| Health Care/Medical | _____ |
| Insurance | _____ |
| Car Payment(s)/Transportation Expenses | _____ |
| Loan Payment(s) | _____ |

* OPTIONAL

119

Form C-10
Page 2 of 2        Rev. 2/95

AFFIDAVIT of SUBSTANTIAL HARDSHIP and ORDER    Case Number

Monthly Expenses: (cont'd from page 1)
   Credit Card Payment(s) _____
   Educational/Employment Expenses _____
   Other Expenses (be specific) _____ _____
   _____ _____

       Sub-Total                                    A  $ _____

B.  Child Support Payment(s)/Alimony            $ _____

       Sub-Total                                    B  $ _____

C.  Exceptional Expenses                        $ _____

      TOTAL MONTHLY EXPENSES (add subtotals from A & B monthly only)    $ _____

Total Gross Monthly Income less total monthly expenses:
      DISPOSABLE MONTHLY INCOME    $ _____

4.  LIQUID ASSETS:
   Cash on Hand/Bank (or otherwise available such as stocks, bonds,
   certificates of deposit)                        $ _____Ø_____

   Equity in Real Estate (value of property less what you owe) _____

   Equity in Personal Property, etc. (such as the value of motor vehicles, stereo,
   VCR, furnishings, jewelry, tools, guns less what you owe) _____

   Other (be specific) Do you own anything else of value? ☐ Yes ☑ No
   (land, house boat, TV, stereo, jewelry)
   If so, describe _____ _____

      TOTAL LIQUID ASSETS                        $ _____

5.  Affidavit/Request
I swear or affirm that the answers are true and reflect my current financial status. I understand that a false statement or answer to any question in the affidavit may subject me to the penalties of perjury. I authorize the Court or its authorized representative to attain records or information pertaining to my financial status from any source in order to verify information provided by me. I further understand and acknowledge that, if the Court appoints an attorney to represent me, the Court may require me to pay all or part of the fees and expenses of my court-appointed counsel.

Sworn to and subscribed before me this
_25th_ day of _Feb 2003_ 19___ .                    _Bobby Williams_
_N. McKenzie_                                       Affiant's Signature
Judge/Clerk/Notary                                  _____
                                                    Print or Type Name

SECTION II.                    ORDER OF COURT

IT IS THEREFORE, ORDERED AND ADJUDGED BY THIS COURT AS FOLLOWS:

☐  Affiant is not indigent and request is DENIED.
☐  Affiant is partially indigent and able to contribute monetarily toward his defense; therefore, defendant is ordered to pay $ _____
    toward the anticipated cost of appointed counsel. Said amount is to be paid to the Clerk of Court or as otherwise ordered and disbursed
    as follows: _____

☐  Affiant is indigent and request is GRANTED.
☐  The prepayment of docket fees is waived.

IT IS FURTHER ORDERED AND ADJUDGED that _____, is hereby appointed as counsel to represent affiant.

IS FURTHER ORDERED AND ADJUDGED that the Court reserves the right and may order reimbursement of attorney's fees and expenses, approved by the Court and paid to the appointed counsel, and costs of court.

Done this _____ day of _____, 19 _____.

_____
Judge

120

| State of Alabama<br>Unified Judicial System | ORDER<br>ON INITIAL APPEARANCE | Case Number |
|---|---|---|
| Form C-80     Rev. 8/2000 | | *OC 2003 - 145, 149* |

IN THE ___*District*___ COURT OF ___*Pike County*___, ALABAMA
(Circuit, District or Municipal)                     (Name of County or Municipality)

☑ STATE OF ALABAMA
☐ MUNICIPALITY OF _____ v. ___*Bobby Williams*___
                                                                                  Defendant

The above-named defendant, charged with the criminal offense(s) of ___*Robbery First Degree*___ was duly brought before the Court for initial appearance on ___*Feb 25 2003*___, at ___*2:54*___ o'clock ___*p*___.m., whereupon the Court did the following, as checked in the appropriate blocks:
*(CHECK AS APPLICABLE)*:

☑ 1. Name and address of defendant.
   ✓ (a) Ascertained the true name and address of the defendant to be:
   *Bobby Dean Williams*
   *1817 Dixie Ct. Montgomery, AL*
   ✓ (b) Amended the formal charges to reflect defendant's true name.
   ✓ (c) Instructed the defendant to notify the Court promptly of any change of address.

☑ 2. Informed the defendant of the charges against him/her and ensured that the defendant was served with a copy of the charges.

☑ 3. Informed the defendant of the right to be represented by counsel, that he/she would be afforded time and opportunity to retain an attorney, and further advised the defendant that, if he/she were indigent and unable to obtain counsel, an attorney would be appointed by the Court to represent him/her.
   Defendant ☑ requested   ☐ did not request court-appointed counsel. If requested counsel, defendant ☑ was ☐ was not given a copy of the Affidavit of Substantial Hardship to complete in order for indigency to be determined.

☑ 4. Informed the defendant that he/she had the right to remain silent and that anything that he/she said could be used against him/her.

☑ 5. Bail
   _____ (a) Determined that the defendant shall not be released from custody since charged with a non-bailable capital offense.
   ✓ (b) Determined that the defendant shall be released from custody pending further proceedings, subject to the mandatory conditions prescribed in Rule 7.3(a), A.R.Cr.P., and subject to the following additional conditions:
       ✓ 1.) Execution of an appearance bond (recognizance) in the amount of $ *50,000 each case*
       _____ 2.) Execution of a secured appearance bond in the amount of $ _____
       _____ 3.) Other conditions (specify) _____
       _____

☑ 6. If charged with a felony offense, informed the defendant of right to demand a preliminary hearing under Rule 5.1, A.R.Cr.P., and of the procedure by which that right may be exercised.

☐ 7. If charged with a felony offense a preliminary hearing was demanded with 30 days of date of arrest by the above named defendant, set a preliminary hearing to be held in the District Court of _____ an _____ (date) at _____ o'clock ____.m.
   _____ (a) Notified the District Court that such demand was made.
   ✓ (b) Defendant made no demand for a preliminary hearing at the initial appearance hearings.

☐ 8. Other: _____

___*2/25/03*___                                    ___*Wm. H. Robbins*___
Date                                                         Judge/Magistrate

FEB 2003
FILED

121

STATE OF ALABAMA,                    *      IN THE DISTRICT COURT OF

          PLAINTIFF,                 *      PIKE COUNTY, ALABAMA

vs.                                  *

*Bobby Dem Williams*                 *      CASE NO. *PC2003 - 145,149*

          DEFENDANT.                 *

## RELEASE ORDER

On application of the defendant, *Bobby Dem Williams*
charged with the offense(s) of *Robbery, First Degree*, and
it appearing to the Court that the offense(s) charged is/are bailable as a matter
of right:

____ the Court being reasonable assured that the defendant will appear as
required and that the defendant's being at large does not pose a real and
present danger to others or to the public at large, the defendant is Ordered
released on his personal recognizance subject to the conditions enumerated
in this form.

✓ the Court not being reasonable assured that the defendant will appear as
required and/or that the defendant's being at large does not pose a real
and present danger to others or to the public at large, it is Ordered that
the defendant be released, but only with the following condition(s), as well
as the additional conditions appearing in this form:

__ execution of a secured appearance bond in the amount of $_____,
and $_____ deposit with the Clerk of cash or certified funds in an
amount equal to _____% of the appearance bond.

✓ execution of an appearance bond in the amount of $ *50,000 each case*

__ defendant's being released only into the custody of _____
_____, who/which has agreed to supervise the defendant.

__ the following restrictions being placed on the defendant's travel,
associations, or place of abode during the period of release:
_____
_____

__ return of the defendant to custody no later than _____; a.m./p.m.

__ other conditions which the Court deems reasonable necessary:
_____
_____



THE FOLLOWING CONDITIONS APPLY TO ALL PERSONS RELEASED WHETHER ON PERSONAL RECOGNIZANCE OR OTHERWISE:

1. The defendant must appear to answer and must submit to the orders and process of the Court having jurisdiction of this case, as directed.
2. The defendant must refrain from committing any criminal offense.
3. The defendant may not leave the State of Alabama without permission of the Court having jurisdiction of this case.
4. The defendant must promptly notify the Court of any change of the defendant's address.

THE FOLLOWING CONDITIONS ALSO APPLY TO THIS DEFENDANT:

_____
_____
_____

The provisions of this release order may be revoked or modified by the Court for cause. This release order and any appearance bond executed in compliance with it will continue in force and effect until the dismissal, acquittal, or conviction of the defendant of the charges, unless sooner revoked or modified by the Court. Upon report of a violation of any one of the above conditions, a warrant for your arrest will be issued.

Date  2/25/03                        _____
                                                        Judge

ACKNOWLEDGEMENT BY DEFENDANT

I understand the conditions of my release and the penalties that apply in the event that I violate any conditions imposed herein, and I also understand that failure to appear as required may subject me to additional charges and the revocation of release.

Date 02/25/03                        Bobby Williams
                                                  Defendant

                                                  _____
                                                  Address

                                                  _____
                                                  City              State        Zip

                                                  (      )_____
                                                  Telephone

FEB 2003
FILED
Brenda Manning Research
Court Clerk
Pike Co., Ala.

123

| State of Alabama<br>Unified Judicial System | REQUEST/APPOINTMENT/ACCEPTANCE<br>OF ATTORNEY/GUARDIAN AD LITEM | Case Number<br>DC2003-145, 149 |
|---|---|---|
| Form C-11          Rev 6/88 | | |

**Part I**

IN THE ____District____ COURT OF ____Pike County____, ALABAMA
(Circuit or District)                                    (Name of County)

____State____ v. ____Bobby Dean Williams____
(Plaintiff)                              (Defendant)

In the Matter of: _____
(Juvenile Case)

I request that a    [✓] Attorney      [ ] Guardian Ad Litem      be appointed for:

_____
(Name)

02/25/03                          Bobby Williams
Date                              Signature

**Part II**

The court appoints ____James Thomas____ as
(Name of Attorney or Guardian Ad Litem)

[✓] Attorney
[ ] Guardian Ad Litem

2/25/03                          Wm. H. Lightoot
Date                              Judge

**Part III**

I accept the above appointment as [ ] Attorney   [ ] Guardian Ad Litem

2/26/03                          J Thomas
Date                              Attorney or Guardian ad Litem

FEB 2003



### IN THE DISTRICT COURT OF
### PIKE COUNTY, ALABAMA

THE STATE OF ALABAMA      \*

                         \*

VS.                         \*      CASE NO:    *DC 2003-145&149*

                         \*

BOBBY DEAN WILLIAMS    \*

                         \*

## MOTION REQUESTING PRELIMINARY HEARING

Comes now the defendant in the above-styled cause, and by and through his attorney Petitions this Honorable Court to set a Preliminary Hearing pursuant to Rule 5.1 of the Alabama Rules of Criminal Procedure.

WHEREFORE, THE PREMISES CONSIDERED, the defendant prays for an Order setting a hearing within 21 days of this Motion at such time and date the Court deems appropriate.

<u>RESPECTFULLY SUBMITTED,</u>

James N. Thomas, (THO148)
Attorney for Defendant

OF COUNSEL:

James N. Thomas
P.O. Box 974
Troy, Alabama 36081
(334) 566-2181



FEB 2003

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion was served upon the District Attorney's Office, Pike County Courthouse, Troy, Alabama, by hand delivery on this the 27TH Day of February, 2003.

James N. Thomas

126

State of Alabama
Unified Judicial System

SUBPOENA REQUEST FORM

CASE NUMBER
DC03-145

Form C-12  Rev 10/86

IN THE _____ DISTRICT _____ COURT OF _____ PIKE _____ COUNTY, ALABAMA

PLANTIFF:          STATE          V.          DEFENDANT: WILLIAMS, BOBBY

In the matter of _____

Court Date _03/18/2003_          Court Time _1:30 p.m._          Date Requested _03/06/2003_

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:

☒ Plaintiff / State    ☐ Defendant    ☐ Grand Jury    ☐ Other _____

|  | Date Issued | Date Executed | Remarks |
|---|---|---|---|
| Name:   GREG WRIGHT          ( ) - | 3/6/03 | _____ | _____ |
| Address: TPD, TROY, AL  36081 |  |  |  |



METHOD OF SERVICE REQUESTED
☐ Personal  ☐ Mail

Party Requesting Subpoena  DA OFFICE (JD)
                                              03/06/2003

B. Mathews

127

| | | |
|---|---|---|
| STATE OF ALABAMA | * | IN THE DISTRICT COURT OF |
| | * | PIKE COUNTY, ALABAMA |
| vs. | * | |
| BOBBY WILLIAMS, | * | CASE NO. DC 2003-145, 149 |
| DEFENDANT. | * | |

## ORDER

These cases having come before the Court for preliminary hearing, the Court determined that the defendant's desire for additional witnesses justified delay in conducting the preliminary hearings in these cases.

**IT IS, THEREFORE, ORDERED** as follows:

1.    The preliminary hearings in these cases are continued to 1:30 P. M. on April 8, 2003.

**DONE AND ORDERED** this 18th day of March 2003.

DISTRICT JUDGE
PIKE COUNTY, ALABAMA

MAR 2003



**128**

| State of Alabama<br>Unified Judicial System<br>Form C-12  Rev 10/86 | SUBPOENA REQUEST FORM | CASE NUMBER<br>DC03-145 |

IN THE _____ DISTRICT _____ COURT OF _____ PIKE _____ COUNTY, ALABAMA

PLANTIFF: _____ STATE _____ V. _____ DEFENDANT:WILLIAMS, BOBBY

In the matter of _____

Court Date __04/08/2003_____     Court Time __1:30 p.m._____     Date Requested __03/25/2003__

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:

[X] Plaintiff / State    ☐ Defendant    ☐ Grand Jury    ☐ Other _____

|  |  | Date Issued | Date Executed | Remarks |
|---|---|---|---|---|
| Name:   GREG WRIGHT<br>Address: TPD, TROY, AL  36081 | ( )  - | 3/25/03 | _____ | _____ |

MAR 2003
CLK.
Brown Robinson Services
Court Clerk
Pike Co., AL

METHOD OF SERVICE REQUESTED
☐ Personal   ☐ Mail

Party Requesting Subpoena __DA OFFICE__
03/25/2003

*B. Mathews*



# IN THE DISTRICT COURT OF
# PIKE COUNTY, ALABAMA

THE STATE OF ALABAMA

vs.                                    CASE NO:    *DC 2003-145*

BOBBY WILLIAMS

## MOTION FOR PRE-APPROVAL OF EXTRA-ORDINARY EXPENSE

COMES NOW **Bobby Williams,** by and through the undersigned Attorney, and,

pursuant to Ala. Code 15-12-21(d) (1975) and May v. State, 672 So. 2d 1307 (Ala. Cr. App.

1993), moves this Honorable Court for the entry of an Order authorizing and pre-approving the

payment/reimbursement of the specific extraordinary expense(s) incurred in the **hiring of a**

**Court Reporter.** For grounds the Defendant would state that the services of a Court Reporter

are necessary and essential to his defense in the charge of Robber 1st. Moreover, the Defendant

states that he is indigent and , therefore, unable to pay for said court reporting services.

WHEREFORE. the undersigned respectfully requests that this Honorable Court enter an

Order approving, as an extraordinary expense, the payment for a Court Reporter as may be

needed in the above-styled case.

DATE this the 2 6 of March, 2003



Respectfully submitted,

*James N. Thomas*
James N. Thomas (THO 148)
405 Elm Street
Troy, Alabama 36081
(334)566-2181

130

## IN THE DISTRICT COURT OF
## PIKE COUNTY, ALABAMA

THE STATE OF ALABAMA

    vs.

BOBBY WILLIAMS

\*
\*
\*
\*
\*
\*
\*

CASE NO:   _DC 2003-145_

### ORDER APPROVING EXTRA-ORDINARY EXPENSE

The Motion/Request for Pre-Approval of Extra-Ordinary Expense having been presented by legal Counsel for the above-named indigent defendant, and the Court having considered said Motion/Request, finds the same to be well taken and due to be GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED, that the reasonable and necessary expense(s) incurred by James N. Thomas, Esq., legal counsel for the above named indigent defendant, in securing and utilizing the services of a certified court reporter(s) be hereby made payable in the above-referenced case.

DONE AND ORDERED this the _26_ day of March, 2003.

_Wm. G. Hightower_
William Hightower



# SUBPOENA REQUEST FORM

131

State of Alabama
Unified Judicial System
Form C-12        Rev. 8/98

Case Number
DC-03-145

I.  E_____ District_____ COURT OF _____ PIKE _____, ALABAMA
          (Circuit, District or Municipal)                                    (County or Municipality)

Civil: _____ v. _____
                    Plaintiff                                     Defendant

Juvenile: In the matter of _____, a
child
Criminal: [X]State of Alabama
          [ ]Municipality of _____ v. _____ Bobby Williams _____
                                                              Defendant

Court Date:  April 8, 2003      Court Time:   1:30 AM/PM   Date Requested: March 26, 2003

## TO BE COMPLETED BY REQUESTER

The Clerk is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:
[ ]Plaintiff/State   [X]Defendant   [ ]Grand Jury   [ ]Other

|  |  | Date issued | Date Executed |
|---|---|---|---|

1. Name: Ms. Edith Thomas
   Home Address:                                   27
   Troy, AL                    Zip: 36104     3/26/03
   Telephone Number:                              Remarks:
   Alternate Address:Burger King
   Troy, AL                    Zip:
   Telephone Number:

2. Name: Ms. Rebecca Holly
   Home Address:                                   27
   Troy, AL                    Zip: 36079     3/26/03
   Telephone Number:                              Remarks:
   Alternate Address: Sunny South
   Troy, AL                    Zip: 36081
   Telephone Number:

3. Name:
   Home Address:
                               Zip: 36081     Remarks:
   Telephone Number:
   Alternate Address:
   Troy, AL 36081              Zip: 36081
   Telephone Number:

4. Name:
   Home Address:
                               Zip:           Remarks:
   Telephone Number:
   Alternate Address:
   Troy, AL                    Zip: 36081
   Telephone Number:

METHOD OF SERVICE REQUESTED:
[ ]Personal   [ ]Other

Party Requesting Subpoena
_James M. Thomas_ (signature)
Signature

_____   _____
  Date        Clerk

334-566-2181
Requester Phone Number

# SUBPOENA REQUEST FORM

132

| State of Alabama | Case Number |
|---|---|
| Unified Judicial System | DC-03-145 |
| Form C-12        Rev. 8/98 | |

IN THE _____ District _____ COURT OF _____ PIKE _____, ALABAMA
                    (Circuit, District or Municipal)                          (County or Municipality)

Civil: _____ v. _____
                    Plaintiff                                      Defendant

Juvenile: In the matter of _____, a
child

Criminal: [X]State of Alabama
        [ ]Municipality of _____ v. _____ Bobby Williams _____
                                                              Defendant

Court Date:  April 8, 2003      Court Time:      1:30 AM/PM    Date Requested: April 7, 2003

---

## TO BE COMPLETED BY REQUESTER

The Clerk is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:
[ ]Plaintiff/State    [X]Defendant    [ ]Grand Jury    [ ]Other

                                                           Date issued        Date Executed

1. Name: Det. Greg Wright
   Home Address:                                                4/7/03 ✓
   Troy, AL                        Zip: 36104
   Telephone Number:                                           Remarks:
   Alternate Address: Troy Police Dept.
   Troy, AL                        Zip:
   Telephone Number:

2. Name: Det. Larry Ross
   Home Address:                                                4-7-03
   Troy, AL                        Zip: 36079    ~~3/26/03~~
   Telephone Number:                                           Remarks:
   Alternate Address: Troy Police Dept.
   Troy, AL                        Zip: 36081
   Telephone Number:

3. Name:
   Home Address:
                                   Zip: 36081
   Telephone Number:                                           Remarks:
   Alternate Address:
   Troy, AL 36081                  Zip: 36081
   Telephone Number:

4. Name:
   Home Address:
                                   Zip:
   Telephone Number:                                           Remarks:
   Alternate Address:
   Troy, AL                        Zip: 36081
   Telephone Number:

---

METHOD OF SERVICE REQUESTED:                      Party Requesting Subpoena
    [x]Personal    [ ]Other

                                                  _____
                                                  Signature

                                                  334-566-2181
_____    _____               Requester Phone Number
    Date                Clerk

APR 2003
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala

133

STATE OF ALABAMA,             \*        IN THE DISTRICT COURT OF

      PLAINTIFF,             \*

vs.                          \*        PIKE COUNTY, ALABAMA

BOBBY WILLIAMS,               \*

      DEFENDANT.             \*        DC 03-145

ORDER

    Upon the preliminary examination held on this day on behalf of Bobby Williams, charged with the offense of Robbery, First Degree, it appears that such offense has been committed, and there is probable cause to believe the defendant is guilty thereof.

    Based on the evidence presented in open court the defendant is bound over to await action of the Grand Jury of Pike County, Alabama.

**DONE AND ORDERED this 8th day of April, 2003.**

DISTRICT JUDGE
PIKE COUNTY, ALABAMA
COMMITTING MAGISTRATE

**134**

|  |  |  |
|---|---|---|
| STATE OF ALABAMA, | * | IN THE DISTRICT COURT OF |
| PLAINTIFF, | * | |
| vs. | * | PIKE COUNTY, ALABAMA |
| BOBBY WILLIAMS, | * | |
| DEFENDANT. | * | DC 03-149 |

## ORDER

Upon the preliminary examination held on this day on behalf of Bobby Williams, charged with the offense of Robbery, First Degree, it appears that such offense has been committed, and there is probable cause to believe the defendant is guilty thereof.

Based on the evidence presented in open court the defendant is bound over to await action of the Grand Jury of Pike County, Alabama.

**DONE AND ORDERED** this 8th day of April, 2003.

APR 2003

DISTRICT JUDGE
PIKE COUNTY, ALABAMA
COMMITTING MAGISTRATE

**135**

```
ACRO372              ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: DC 2003 000145.00
OPER: PEM                   CASE ACTION SUMMARY
PAGE:   1                   DISTRICT  CRIMINAL              RUN DATE: 02/24/2003
===============================================================================
      THE DISTRICT COURT OF      PIKE
                                                                  JUDGE: WGH
STATE OF ALABAMA                   VS      WILLIAMS BOBBY
                                           1817 DIXIE CT
CASE: DC 2003 000145.00                    c/o Mont. Co. Jail.
                                           MONTGOMERY, AL  36110 0000

DOB: 10/19/1982         SEX: M   RACE: B  HT: 6 01  WT: 150    HR: BLK EYES: BRO
SSN: 423132704   ALIAS NAMES:
===============================================================================
CHARGE01: ROBBERY 1ST          CODE01: ROB1  LIT: ROBBERY 1ST    TYP: F #: 001
OFFENSE DATE: 12/21/2002                AGENCY/OFFICER: 0550100 TPD ROS

DATE WAR/CAP ISS:                       DATE ARRESTED: 02/24/2003
DATE     INDICTED:                      DATE     FILED: 02/24/2003
DATE    RELEASED:                       DATE   HEARING:
BOND     AMOUNT:       $50,000.00          SURETIES:

DATE 1:              DESC:            TIME: 0000
DATE 2:              DESC:            TIME: 0000

TRACKING NOS: WR 2003 000020 00  /                          /

     DEF/ATY:  Jim Thomas -A          TYPE:                     TYPE:

                          00000                          00000

PROSECUTOR: FULLER MARK EVERETT
-------------------------------------------------------------------------------
OTH CSE: WR2003000002000 CHK/TICKET NO:                   GRAND JURY:
COURT REPORTER:                    SID NO:     000000000
   STATUS: JAIL                    DEMAND:                      OPER: PEM
===============================================================================
DATE          ACTIONS,  JUDGEMENTS,  AND NOTES
```

| Date | Actions, Judgements, and Notes |
|---|---|
| 2-25-03 | Judge held Interview - Thomas appointed |
| 2-26-03 | Atty. acceptance by Thomas |
| 2-27-03 | Mot Req. Prel Hearing. |
| 3-3-03 | DEMAND FOR PRELIMINARY HEARING FILED, PRELIMINARY HEARING WGH SET FOR March 18 2003 AT 1:30 P.M. cc: DA & Thomas |
| 3-3-03 | Return paperwork to PCSO for △ to be transported from Mont Co Jail |
| 3/18/03 | Gordon |
| 3-24-03 | Prelim. to PCSO & cont'd to 4-8 cc: DA & Thomas *paperwork to PCSO to return △* |
| 3-25-03 | Issued State Subp. |
| 3-26-03 | Mot. for Pre-Apprial of Extra-Exp. |
| 3-31-03 | Order approving Extra-Exp. cc: Thomas + DA |
| 4-4-03 | Issued State Subp (X1) WRONG FILE |
| -7-03 | Issued △ subps (X2) |

| State of Alabama | CASE ACTION SUMMARY | Case Number |
|---|---|---|
| Unified Judicial System | CONTINUATION | DC03-145 130 |
| Form C-7    Rev 2/79 | | |

Style:

*State of Alabama vs. Bobby Williams*     Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 4-9-03 | Order to GJ cc: DA + Thomas |

137

```
ACR0372            ALABAMA JUDICIAL INFORMATION SYSTEM        CASE: DC 2003 000149.00
OPER: PEM                     CASE ACTION SUMMARY
  E:   1                    DISTRICT  CRIMINAL                    RUN DATE: 02/24/2003
  THE DISTRICT COURT OF     PIKE
                                                                              JUDGE: WGH
STATE  OF  ALABAMA             VS        WILLIAMS BOBBY
                                         1817 DIXIE CT
CASE: DC 2003 000149.00                  % Mont. Co. Jail
                                         MONTGOMERY, AL  36110 0000

DOB: 10/19/1982        SEX: M  RACE: B  HT: 6 01  WT: 150   HR:      EYES:
SSN: 423132904   ALIAS NAMES:
CHARGE01: ROBBERY 1ST          CODE01: ROB1  LIT: ROBBERY 1ST    TYP: F #: 001
OFFENSE DATE: 12/29/2002                 AGENCY/OFFICER: 0550100 TPD WRI

DATE WAR/CAP ISS:                      DATE ARRESTED: 02/24/2003
DATE    INDICTED:                      DATE    FILED: 02/24/2003
DATE    RELEASED:                      DATE  HEARING:
BOND       AMOUNT:     $50,000.00          SURETIES:

DATE 1:              DESC:                       TIME: 0000
DATE 2:              DESC:                       TIME: 0000

TRACKING NOS: WR 2003 000017 00  /                      /

   DEF/ATY: Jim Thomas          TYPE:                         . TYPE:

                          00000                        00000

PROSECUTOR: FULLER MARK EVERETT
```

```
   CSE: WR200300001700 CHK/TICKET NO:                   GRAND JURY:
 RT REPORTER:                    SID NO:     000000000
  F STATUS: JAIL               DEMAND:                        OPER: PEM
DATE      ACTIONS,  JUDGEMENTS,   AND  NOTES
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|------|-------------------------------|
| 2-25-03 | Judge held (Upon arree) - Thomas appointed. |
| 2-27-03 | Emot Reg. Prel Hearing |
| 3-3-03 | DEMAND FOR PRELIMINARY HEARING / FILED PRELIMINARY HEARING  SET FOR March 18, 2003  AT 1:30 P.M.    cc: DA + Thomas |
| 3-3-03 | Return paperwork to PCSO for △ to be returned from Mont. Co. Jail |
| 3-24-03 | Order cont prel. to 4-8 cc: DA + Thomas  *Paperwork to PCSO to return △ * |
| 3-25-03 | Received state subp. |
| 4-9-03 | Order to GJ cc: DA + Thomas. |



INDICTMENT

# THE STATE OF ALABAMA
## PIKE COUNTY

### IN CIRCUIT COURT
### MAY TERM, 2003

**The Grand Jury of said County charges that before the finding of this indictment that,**

BOBBY WILLIAMS, whose name is otherwise unknown to the Grand Jury, did, in the course of committing a theft of property, to-wit: lawful United States currency and/or coinage, a better description of which is to the Grand Jury otherwise unknown, the property of, to-wit: ProMarketing L.L.C, doing business as Beeline Store #614, use force or threaten the imminent use of force against the person of the said Edith Thomas, or another person present, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said BOBBY WILLIAMS was armed with a deadly weapon or dangerous instrument, to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama, Against the Peace and Dignity of the State of Alabama; and,

### OFFENSE 2

The Grand Jury of said county charges that before the finding of this indictment that, BOBBY WILLIAMS, whose name is otherwise unknown to the Grand Jury, did, in the course of committing a theft of property, to-wit: lawful United States currency and/or coinage, a better description of which is to the Grand Jury otherwise unknown, the property of, to-wit: Sunny South, L.L.C., use force or threaten the imminent use of force against the person of the said Rebecca Holley, or another person present, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said BOBBY WILLIAMS was armed with a deadly weapon or dangerous instrument, to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama,

Against the Peace and Dignity of the State of Alabama.

for Gary L. Mc Aliley District Attorney for Twelfth Judicial Circuit



GRAND JURY NO. 03-73, 74

A TRUE BILL

*Sherman W Stafford*

GRAND JURY FOREPERSON

Presented in open Court by the
Foreperson of the Grand Jury in the
presence of at least twelve other
members of the Grand Jury

*Brenda M Peacock*

Brenda M. Peacock, Clerk of the
Circuit Court of Pike County, Twelfth
Judicial Circuit of Alabama.

Filed this the _20_ day of
_May_ 2003.

Bail in each offense in this indictment is
fixed at $ _5,000 each_ for a total bail
for this indictment of $ _100,000_ .

[   ] Continuing bond

*Robert W Barr*

Judge Presiding

---

THE STATE OF ALABAMA
PIKE COUNTY

CIRCUIT COURT
MAY        TERM, 2003

THE STATE
vs.

BOBBY WILLIAMS

ALIAS

---

OFFENSE(S)
ROBBERY 1


OFFENSE 2
ROBBERY 1

---

INDICTMENT

ACR375                  ALABAMA JUDICIAL DATA CENTER
                    GRAND  JURY  OF     PIKE     COUNTY
                          WARRANT OF ARREST                    ORIGINAL
                                                        GJ 2003 000073.00
                                                        TERM #:

TO ANY LAW ENFORCEMENT OFFICER OF THE STATE OF ALABAMA:

AN INDICTMENT HAS BEEN RETURNED BY THE  GRAND  JURY OF    PIKE    COUNTY

AGAINST          WILLIAMS BOBBY
                 % MONTGOMERY COUNTY JAIL
                 MONTGOMERY     AL 36110-0000

CHARGING THE OFFENSE OF:

      ROBBERY 1ST          13A-008-041         CNTS:     1

YOU ARE THEREFORE ORDERED TO ARREST THE PERSON NAMED ABOVE AND BRING THAT
PERSON BEFORE A JUDGE OR MAGISTRATE OF THIS COURT TO ANSWER THE CHARGES
AGAINST THAT PERSON AND HAVE WITH YOU THEN AND THERE THE WARRANT OF ARREST
WITH YOUR RETURN THEREON.  IF A JUDGE OR MAGISTRATE OF THIS COURT IS
UNAVAILABLE, OR IF THE ARREST IS MADE IN ANOTHER COUNTY, YOU SHALL TAKE
THE ACCUSED PERSON BEFORE THE NEAREST OR MOST ACCESSIBLE JUDGE OF
MAGISTRATE IN THE COUNTY OF ARREST.


  BOND SET AT:        $50,000.00

DATE ISSUED: 05/21/2003     BRENDA M. PEACOCK        BY _Brenda M Peacock_
                                CLERK

----

      EXECUTED THIS ___8th___ DAY OF __July_____, 2003, BY
ARRESTING THE WITHIN NAMED DEFENDANT _____Bobby Williams_____.

                              _____Loren E. Will_____
                              LAW ENFORCEMENT OFFICER
                              BY: _____

----

 DEFENDANT'S FEATURES:

   HT: 6'01"  HAIR: BLK   DOB: 10/19/1982
   WT: 150  SEX: M    EYE: BRO   RACE: B
   SSN: 423133904                              MAY 2003
                                               RECEIVED
   ADDTL COMMENTS: _____            SHERIFF'S
                                                 DEPT.
   _____          PIKE COUNTY

   _____

   _____

05/21/2003 JOP

ACR375

ALABAMA JUDICIAL DATA CENT
GRAND  JURY OF    PIKE    COUNTY
WARRANT OF ARREST

ORIG...AL

GJ 2003 000074.00
TERM #:

TO ANY LAW ENFORCEMENT OFFICER OF THE STATE OF ALABAMA:

AN INDICTMENT HAS BEEN RETURNED BY THE  GRAND  JURY OF    PIKE    COUNTY

AGAINST        WILLIAMS BOBBY
               % MONTGOMERY CO JAIL

               MONTGOMERY      AL 36110-0000

CHARGING THE OFFENSE OF:

     ROBBERY 1ST          13A-008-041          CNTS:   1

YOU ARE THEREFORE ORDERED TO ARREST THE PERSON NAMED ABOVE AND BRING THAT
PERSON BEFORE A JUDGE OR MAGISTRATE OF THIS COURT TO ANSWER THE CHARGES
AGAINST THAT PERSON AND HAVE WITH YOU THEN AND THERE THE WARRANT OF ARREST
WITH YOUR RETURN THEREON.  IF A JUDGE OR MAGISTRATE OF THIS COURT IS
UNAVAILABLE, OR IF THE ARREST IS MADE IN ANOTHER COUNTY, YOU SHALL TAKE
THE ACCUSED PERSON BEFORE THE NEAREST OR MOST ACCESSIBLE JUDGE OF
MAGISTRATE IN THE COUNTY OF ARREST.

 BOND SET AT:       $50,000.00

DATE ISSUED: 05/21/2003      BRENDA M. PEACOCK      BY _Brenda M Peacock_
                             CLERK

     EXECUTED THIS ___8th___ DAY OF __July__ 2003, BY
ARRESTING THE WITHIN NAMED DEFENDANT __Bobby Williams__

                          _Tren S Wll_
                          LAW ENFORCEMENT OFFICER

                          BY: _____

DEFENDANT'S FEATURES:

 HT: 6'01"  HAIR:      DOB: 10/19/1982
 WT: 150 SEX: M  EYE:      RACE: B
 SSN: 423132904

 ADDTL COMMENTS: _____

MAY 2003
RECEIVED
SHERIFF'S
DEPT
PIKE COUNTY

05/21/2003 JOP

142

| State of Alabama<br>Unified Judicial System | APPLICATION FOR YOUTHFUL OFFENDER STATUS<br>AND ORDER OF INVESTIGATION | Case Number |
|---|---|---|
| m C-54      Rev. 8/97 | | 03-382-383 |

IN THE __Circuit__ COURT OF __Pike__ , ALABAMA
(County)

STATE OF ALABAMA v. __Bobby Williams__ , DEFENDANT

Comes now the defendant in the above-styled cause and makes application for youthful offender treatment:

1. I am __20__ years of age. Date of Birth: __10-19-82__

2. I am represented by my attorney and he has discussed my case with me. I have had enough time to talk with my attorney about the facts of my case and he/she has explained my constitutional rights to me (see reverse side). I am satisfied with the services of my attorney and I have no complaints as to the way he/she has handled my case.

3. I understand that I am eligible to apply for treatment as a youthful offender. I understand that if I waive my right to a trial by jury and consent to be tried by the court without a jury and treated as a youthful offender, the court will cause me to be investigated and examined by the court and the court, in its discretion, may direct that I be arraigned and tried as a youthful offender.

4. I understand that if I am adjudged by the court to be a youthful offender, the court, in its sole discretion, may do any of the following:
   a. Suspend the imposition or execution of sentence with or without probation; or
   b. Place me on probation not to exceed three (3) years, prescribing such terms of probation as the court, in its sole discretion, may deem proper; or
   c. Impose a fine as provided by law with or without probation or commitment; or
   d. Commit me to the custody of the Board of Corrections for a term of three (3) years or for a lesser term or where a sentence or fine is not otherwise authorized by law, in lieu of or in addition to any such fine, the court may also impose a fine not to exceed $1,000.
   e. If the underlying charge is a misdemeanor, I may be given correctional treatment as provided by law for such misdemeanor.

5. I certify that I have not been threatened or abused or offered any inducement or reward to get me to make this application. I further understand that the punishment I receive is in the sole discretion of the court, although the court may in its discretion accept recommendations of punishment from the District Attorney.

6. With a full understanding of the foregoing, I hereby waive my right to a trial by jury and consent to be examined by the court, or such agency as the court may direct, and I further consent to be tried by the court, without a jury, should the court direct that I be treated as a youthful offender.

__7/9/03__
Date

__Bobby Williams__
Defendant

Comes the attorney for the above named defendant and certifies that on this date, the above information was read by the defendant in my presence, or was read to him/her by me, that I discussed these matters with the defendant in detail, and that I concur in this petition.

__7/9/03__
Date

__James N. Thomas__
Attorney
Attorney Code __Tho 148__

---

**ORDER**

It is ORDERED that the Parole and Probation Office in this County make an investigation of the defendant in accordance with the Code of Alabama 1975.

It is further ORDERED that a hearing is set on said Petition on (date) __October 16, 2003__
(time) __10:00am__

__07-09-03__
Date

__Stu S___
Judge

__DA, Thomas, Prob__



IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                    *

      Plaintiff,                    *

      vs.                    *          Case No: CC 03-382

                      *

BOBBY WILLIAMS                    *

## MOTION FOR DISCOVERY

Comes now the above-named Defendant, by and through his court-appointed counsel of record, James N. Thomas, and moves the Honorable Court to require the State, through the District Attorney, to produce for inspection, copying, testing and examining the following:

DEFINITIONS:

1.  "State" refers not only to the prosecuting District Attorney's Office, but also to every governmental and quasi-governmental office, agency, bureau, official employee, employee agent or other entity of this state or of any County or municipality within its boundaries , including, but not limited to, all agencies having responsibility for the investigation, deterrence, punishment and reporting of unlawful activity.

2.  "Indictment" refers to Criminal Case Number **CC 03-382** and any other indictment or attempted indictment relating in any way.

3.  "Document" refers to the original and any copy, regardless of origin or location, of any written or recorded materials including computerized, tape recorded, printed, handwritten or stenographic material.

4.  "Evidence" is used in its generic as well as legal sense.

5.  "Recorded" not only signifies recording by electronic apparatus, but included preservation by any artificial means whatsoever, the precise meaning to be gained from the context.

6.  "Witness" includes, in addition to any person whose testimony the state intends to use, any other person who has provided the State with the information relevant to this case or

1

whom the State is seeking in connection with this case.

## REQUESTS

1.    Any written or recorded statements made by the Defendant to any law enforcement officer, agency, or agent thereof.

2.    To disclose the substance of any oral statements made by the Defendant before and after arrest to any law enforcement officer, agency, or agent thereof.

3.    Any written or recorded statements made by any co-defendant or accomplice made before or after arrest to any law enforcement officer, agency, or agent thereof.

4.    To disclose the substance of oral statements made by any co-defendant or accomplice made before or after arrest to any law enforcement officer, agency, or agent thereof.

5.    To permit the Defendant to analyze, inspect, and copy or photograph books, papers, documents, photographs, tangible objects, controlled substances, buildings or places, or portions of any of these things in any way material to the preparation of the defense, or which are intended for use by the State as evidence at the trial or which were obtained from or belong to the Defendant.

6.    To disclose any and all results or reports of physical or mental examinations, scientific tests or experiments.

7.    To disclose any and all exculpatory materials, items, evidence, statements, including statements of witnesses, reports, identities of witnesses, physical evidence, photographs and any other evidence, whether described herein or not, which is exculpatory in nature or which could lead to the discovery of any exculpatory evidence of any type, form or fashion.

8.    **Without limiting the foregoing in any manner, the Defendant specifically requests that the Court order the District Attorney to produce the following specific items:**

9.    In addition, the Defendant, who has been determined to be indigent, and has appoint co-counsel and has had no resources such as those of the State and the District Attorney for the full and complete investigation of the alleged offense, needs the following in order to provide the Defendant with due process of law as required by the Alabama and United States

2

Constitutions, viz:

a.   Copies of all reports and memoranda connected with the said charge or charges against the named Defendant.

b.   All written statements of witnesses in the possession of the prosecutor relating to the charges against the named defendant in the above-styled case as well as all statements relating to any other Defendants named in the above-styled case.

c.   Names, addresses, telephone numbers and whereabouts of all witnesses to be called by the State in the trial of the named Defendant named in the above-styled case.

d.   Statements of all persons including memoranda, summaries or recordings of such statements of any person, including the Defendant, made to any law enforcement officer or the investigative staff of any prosecutor in any way connected with the above-styled case.

e.   All memoranda, documents and reports of all law enforcement officers connected with subject matter of the case referred to above as well as the name of the investigative person making such.

f.   Results of all reports of any scientific tests or experiments or studies made in connection with the above-styled case and all copies of such reports.

g.   All fingerprint, shoeprint, or footprint documents and reports relating to the alleged charge or charges against the named Defendant.

h.   Names and addresses of all persons who may have some knowledge of facts of the present case in addition to names and addresses given to the Attorney of the named Defendant.

i.   Full names and addresses of all informers and other persons who gave information which is served as a basis for any aspect of this case, including said informant's past record of reliability and the corroboration, if any, of the information furnished by said informant.

j.   Full names and addresses of all persons who have given information to the prosecuting attorney or law enforcement officers relating to the arrest of the

3

Defendant and the charge or charges against the Defendant.

k.  All, reports, documents, letters, and memoranda which were a basis of affidavits for search warrants for the named Defendant.

l.  The criminal records, NCIC reports, and any list, computer printout or summary reflecting criminal records of all persons whom the State intends to call as witnesses in the trial of the named Defendant.

m.  All diagrams, sketches, and pictures which have been made by or shown to any witnesses or prospective witness in the above-styled case.

n.  A detailed description of all physical items other than documents and pictures which the prosecutor anticipates using in the trial of the named Defendant or which is relevant to the factual matters in this case and the exact place where and under whose custody such items or being held.

10.  Any and all information about the Defendant's prior criminal record, including, but not limited to, arrests, convictions, periods of incarceration and present probationary or parol status.

11.  Results of any polygraph, sodium penathol or similar "truth-finding" test of the Defendant or of any other person which is relevant or material to this case.

12.  Any and all arrest or search warrants, whether executed or not, together with supporting affidavits, which were sought in connections with this case.

13.  Any and all evidence taken from the Defendant.

That the aforesaid documents or items are in the possession of the State or are available to the District Attorney and are favorable or arguably favorable to the Defendant as to the issue of innocence and/or punishment, should the latter issue ever present itself.

That all of said documents, pictures and articles are relevant, significant and constitute substantial, material evidence and will be useful and necessary to the named Defendant as evidence at trial.

That the named Defendant cannot safely go to trial without the production of said documents and in their absence will be denied due process of law as guaranteed by Article I, Section VI, of the Constitution of the United States of America made applicable to the States

4



through the Fourteenth Amendment to the Constitution of the United States Constitution.

That without the production of the documents and items referred to above, the Defendant's counsel will not be able to effectively represent Defendant in the above-styled case; and thus, Defendant will be denied the right of counsel which is guaranteed under the provision of Article I, Section VI, of the Alabama Constitution and the Sixth Amendment of the united Stated Constitution made applicable to the States through the due process clause of the fourteenth Amendment of the United states Constitution.

Further, said production must be without delay so as to allow adequate time for preparation for trial of this cause by Defendant's attorney. Delay in production will result in denial of Defendant's Constitutional rights to a speedy trial, due process of law and right to effective assistance of counsel.

WHEREFORE, the Defendant prays for the following relief:

a.    That the State be required to produce all documents and other evidence referred to above promptly.

b.    Without waiving the right to have Defendant's Counsel examine said documents, picture and articles, if the Court does not permit this to be done, that the Court conduct an in camera examination of said documents, pictures and articles, and Defendant's counsel be permitted to see and copy or reproduce any of said documents, pictures and articles, which the Court determines to be favorable to the named Defendant as to the question of guilt or punishment or for the purpose of impeaching any of the witnesses to be called by the State in the trial of the named Defendant/

c.    That if any part of said documentary evidence is not made available to the named Defendant promptly and in any event prior to the commencement of trial, then without waiving the right to production of said evidence prior to trial, Defendant respectfully moves for an order directing that such unsubmitted evidentiary matters be withheld from introduction at the trial by the District Attorney without the express consent of the Defendant.

d.    Without waiving the foregoing, the Defendant requests that an exact copy be

5

made of each item which is not presented to defense counsel and that the same be
sealed and included in the record of this case for the purpose of insuring effective
review of the Court's denial of the Defendant's previous request for disclosure.

e.     That the duty of the District Attorney to disclose pursuant to this motion be
considered as continuing up until and through the trial and post judgement
proceedings.



James N. Thomas, (THO148)
Attorney for Defendant

James N. Thomas, LLC
Attorney at Law
P.O. Box 974
Troy, Alabama 36081
(334) 566-2181

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion for Discovery was served upon
District Attorney's Office, Pike County Courthouse, Troy, Alabama, by hand delivery on this the
29th Day of July, 2003.

James N. Thomas

6

149

IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                            *

      PLAINTIFF,                          *

VS.                                          *          CASE NO(S). *CC03-382*

*Bobby Williams,*                            *

      DEFENDANT.                          *

<u>DISCOVERY ORDER</u>

IT IS HEREBY ORDERED:

    1.    The District Attorney or his representative shall produce or make available to the Defendant/Defendant's attorney the following:

    (a)    all statements of the Defendant which are reduced to writing;

    (b)    all statements of the Defendant which are electronically recorded or taped and any transcribes thereof;

    (c)    the substance of any oral statements made by the Defendant which are not included within (a) and (b) hereof or if the District Attorney knows of any statements or spontaneous remarks made while the Defendant was/is in the custody of law enforcement and during the investigation;

    (d)    any and all evidence tending to exculpate the guilt of the Defendant;

    (e)    the results of any scientific or expert tests, experiments, or examinations to be used by the Prosecution at trial;

    (f)    all physical evidence or documentary evidence which the Prosecution will offer into evidence in its case in chief, including any search warrant and search affidavits upon which the Prosecution will rely on its case in chief;

    (g)    all physical evidence or documentary evidence seized from the Defendant by law enforcement officers, whether or not the same will be offered into evidence at trial;

    (h)    in prosecutions under the Alabama Uniform Controlled Substance Act, the Defendant may procure the examination and testing of controlled substance or other prosecution evidence by his own expert, upon request to the District Attorney or his assistants. Such examination and testing shall only take place in the presence of the District Attorney or his authorized representative, and the same shall be done at the Defendant expense unless otherwise directed; and,

    (i)    the name and the last known address of all confidential government informants who are more than passive observers, probided, however, the Defendant meets the burden that the Defendant does not know the identity of the informant and that the disclosure is necessary to the Defendant in formulating defenses in that the informant is a participant in or an eyewitness to the criminal act.



2.    The Defense Attorney of his representative shall produce or make available to the District Attorney the following:

(a)    the results of any scientific or expert tests, experiments, or examinations or reports of physical or mental examinations to be used by the defense at trial or which were prepared by a witness whom the Defendant intends to call at trial if such relates to the witness's testimony;

(b)    all physical evidence or documentary evidence which the defense will offer into evidence at the trial;

(c)    in connection with the offense with which the Defendant is charged for the Defendant to appear in a line-up, speak for identification by witnesses, be finger printed, palm printed, foot printed, or voice-printed, pose for photographs not involving re-enactment of an event, try on clothing, provide hand writing samples/exemplars, permit the taking of hair, blood, saliva, urine or other specified materials involving no unreasonable body intrusions, and to submit to physical or medical exams not including psychiatric or psychological examination.

3.    In all instances where physical or documentary evidence tape recordings and the like are to be inspected, examined or copied by the prosecution or the defense counsel, the parties shall insure that such procedures are used as will safeguard and maintain the integrity of said evidence.

4.    The District Attorney and the Defense Attorneys are under an obligation and are hereby ORDERED to disclose to opposing counsel any evidence subject to this Order which they subsequently discover to exist, and they are FURTHER ORDERED to do so within a reasonable time after the existence is discovered.

5.    Any disagreements of the parties concerning the scope, identify or existence of discoverable matter are to be submitted to the Court for resolution upon motion of either party a reasonable time before trial.  Any party who does not so submit any unresolved discovery issue to the Court will be precluded from raising the same at trial.

If the Court finds that either party has failed to use good faith in complying with this Order, the Court may in the case of the State or the Defendant, bar the State or the Defendant from using at trial any non-disclosed matter and the Court may hold any objection to the use of said matter at trial, based upon prior non-disclosure, to be waived.

This Order is to be placed in any criminal file by the Clerk when criminal discovery is requested.

DONE AND ORDERED THIS THE 22nd day of January, 2003.

ROBERT W. BARR
Circuit Judge

THOMAS E. HEAD, III
Circuit Judge

STEVEN E. BLAIR
Circuit Judge



State of Alabama
Unified Judicial System

Form C-12, Rev 10/86

SUBPOENA REQUEST FORM

CASE NUMBER
CC03-S-382,383

IN THE _____ CIRCUIT _____ COURT OF _____ PIKE _____ COUNTY, ALABAMA

PLANTIFF:      STATE      V.      DEFENDANT:    WILLIAMS, BOBBY

In the matter of _____ ROBBERY 1 _____

Court Date __10/16/2003_____    Court Time __10:00 am__    Date Requested __08/14/2003__

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:

☒ Plaintiff / State    ☐ Defendant    ☐ Grand Jury    ☐ Other _____

| | | | Date Issued | Date Executed | Remarks |
|---|---|---|---|---|---|
| Name:   EDITH THOMAS | ( ) - | | 8-18-03 | _____ | _____ |
| Address: 306 GRIFFIN STREET, TROY, AL 36081 | | | | | |
| Name:   REBECCA HOLLEY | ( ) - | | 8-18-03 | _____ | _____ |
| Address: 131 GRIMES STREET, TROY, AL 36081 | | | | | |
| Name:   GREG WRIGHT | ( ) - | | 8-18-03 | _____ | _____ |
| Address: TPD, TROY, AL 36081 | | | | | |

METHOD OF SERVICE REQUESTED

☐ Personal   ☐ Mail

_Terry L. Jarrell_
Party Requesting Subpoena   DA OFFICE

08/14/2003



## ALABAMA BOARD OF PARDONS AND PAROLES

## REPORT OF INVESTIGATION

Type of Investigation   Youthful Offender Report - PSI                    Date Dictated   8/26/03

Name   BOBBY WILLIAMS                           True name   _____

Alias   _____

RSA   B/M   20          DOB   10/19/82          Height and Weight   6'1"   150

Complexion   _____   Color of Hair   BLACK          Color of Eyes   BROWN

Bodily Marks   _____

Driver's License #   _____   SSN   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

AIS#   _____   FBI#   _____   SID#   _____

Address   _____   Phone #   _____

          _____

County   Pike                           Case #   CC03-382/383

Offense(s)   ROBBERY I (2 CASES)

Sentence(s)   _____

Date of Sentence   _____   Date Sentence Began   _____

Date of Arrest   2/24/03          Date of Bond   _____   Bond Amount $   100,000.00

Judge   STEVEN E. BLAIR                 D.A.   GARY L. MCALILEY

Attorney   JIM THOMAS                     Retained   ☐     Appointed   ☒

Court Ordered Restitution $   _____

Barred From Parole          Yes   ☐                     No   ☒

Date Copies Sent to Central Records   _____

NOTES:   _____

PBF 203





## PRESENT OFFENSE(S)

**County, Court, and Case Number**

CC03-382

**Offense:**

Robbery I

**Sentence:**


**Date of Sentence:**


**Details of Offense:**

The circumstances of this offense are alleged to have occurred as follows:

On 12/21/02 at about 8:55 p.m., Troy Police Officer Jason Youngblood responded to a possible robbery at the Sunny South Gas Station located at 102 U. S. Highway 231 North in Troy, Alabama. Upon arrival, Officer Youngblood spoke with the store clerk Rebecca Holley. Ms. Holley stated two black males came into the store two times within a twenty to thirty minute time span. She stated that on the third time they came into the store, they picked up a two liter Mountain Dew and walked to the cash register.

Holley said that the black male with the Mountain Dew requested a cigar and handed her a twenty-dollar bill to pay for the items. When she opened her register to make change, the second black male produced a small semi-automatic handgun. Holley told Officer Youngblood that the man with the gun then said, "give me all your money." She said the other black male said to the man holding the gun "get it man, get it." Holley said the armed suspect was holding the handgun in his right hand and could not reach the cash drawer so the first subject then reached over the counter, grabbed the cash drawer, and took approximately $440.00 in cash. Both men both left the store.

Investigation by the Troy Police Department subsequently led to the arrests of Bobby Williams and Christopher McGhee on 2/24/03 for Robbery I.

154

**Serious Physical Injury:**

None.

**Subject's Statement:**


**Case Status of CoDefendants:**

A charge of Robbery I is currently pending against Christopher McGhee in Pike County case CC03-380.

Marcus Williams was arrested for Robbery I in Pike County DC03-144. This case was bound over to the grand jury on 4/9/03 and no further action is shown.

**Victim Notification Information:**

The victims in this case are Sunny South Gas Station and store clerk, Rebecca Holley.

**Victim Impact:**

The loss to the gas station was monetary. Rebecca Holley was reportedly robbed at gunpoint.

**Location of Offense:**

Troy, Alabama.

**Court Ordered Restitution:**


**********************************************************************

**County, Court, and Case Number**

CC03-383

**Offense:**

Robbery I

**Sentence:**



**Date of Sentence:**

**Details of Offense:**

The circumstances of this offense are alleged to have occurred as follows:

On 12/29/02 Edith Thomas, a clerk at the BeeLine Number 614 located on Brundidge Street in Troy, Alabama notified the Troy Police Department of a robbery. Ms. Thomas told Troy Police Investigator Greg Wright that the first subject selected an item and brought it to the counter. As she was ringing up the item, he told her to "give it up." Ms. Thomas stated she backed away from the register hoping he would touch the drawer but he produced a gun and told her to do it. At this point she noticed the second subject behind her taking her wallet. After taking approximately $550.00 from the cash register and Ms. Thomas's wallet containing between sixty and seventy-five dollars, the subjects fled the area.

Bobby Williams and Christopher McGhee were subsequently arrested for Robbery I by Troy Police Investigator Greg Wright on 2/24/03.

**Serious Physical Injury:**

None.

**Subject's Statement:**

**Case Status of CoDefendants:**

A charge of Robbery I is currently pending against Christopher McGhee in Pike County case CC03-381.

**Victim Notification Information:**

The victims in this case are the BeeLine Store and store clerk, Edith Thomas.

**Victim Impact:**

4



The loss to the store was monetary.  Ms. Thomas was reportedly robbed at gunpoint.


**Location of Offense:**

Troy, Alabama.

**Court Ordered Restitution:**


································································································

### RECORD OF ARREST(S)

Montgomery Co. CC03-496     Robbery I (4 cts.)     Pending

### PERSONAL / SOCIAL HISTORY

Unknown.  Williams is currently confined in the Montgomery County Jail and was unavailable for interview.

### EVALUATION OF OFFENDER

**Psychological Reports:**

Unknown.

**Reputation and Community Activities:**

Unknown.

**Probation and Parole Officer's Remarks:**

Bobby Williams is currently charged with six separate counts of Robbery I.  Neither youthful offender nor probation is recommended.

157

## PROBATION PLAN

**Home:**

Unknown/

**Employment:**

Unknown.

Signed and dated in Troy, Alabama on this the 26th day of August 2003.

*Melinda D. Heath*

Melinda D. Heath
State Probation & Parole Officer



<u>IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA</u>

STATE OF ALABAMA,
    PLAINTIFF,

VS.                      CASE NO.:  CC 2003-S-382, 382

BOBBY WILLIAMS,
    DEFENDANT.

<u>STATE'S FIRST RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY</u>

COMES NOW the State of Alabama, by and through the undersigned Assistant District Attorney, and in response to the defendant's request for discovery, pursuant to Rule 16.1, A.R.Crim.P., states as follows:

(1) The State objects to disclosure of witness lists, memoranda and reports beyond the dictates of *Brady v. Maryland*, 373 U.S. 83 (1963, and exculpatory material beyond the scope of *Curry v. State*, 502 So.2d 836 (Ala. Crim. App. 1986).

(2) The State objects to the disclosure of the identity of witnesses who might be informants unless the Defendant meets the heavy burden of showing that the information is required to be identified. *Ex parte Lester*, 493 So.2d 393, (Ala. 1986), *Sanders v. State*, 629 So.2d 57 (Ala. Crim. App. 1988).

(3) The Defendant is reminded that there is no general constitutional right to discovery in a criminal case, and *Brady* did not create one. *Pennsylvania v. Ritchie*, 107 S.Ct. 989 (1987). This response by the State is made pursuant to the dictates of *Kyles v. Whitley*, 115 S. Ct. 1555 (1995), which recognized the Constitution had never been held to demand an open file policy of discovery involving the police and the recognition that the prosecution has the discretion and burden of determining if evidence is due to be disclosed.

(4) The State objects to furnishing the Defendant any criminal record of witnesses or jurors. *Parker v. State*, 587 So.2d 1072 (Ala. Crim. App. 1991).

(5) This response to the Defendant's discovery request is made pursuant to *Benton v. State*, 536 So.2d 162 (Ala. Crim. App. 1988), which holds that evidence made available to the Defendant for inspection or copying at the police department satisfies the discovery requirements imposed upon the State.

With the limitations and objections set forth above, and specifically intended to act as a Motion for Protective Order pursuant to Rule 16.4, A.R. Crim.P., if the need arises, the State makes the following responses to the Defendant's request for discovery subject to the receipt of the costs of making copies of the discoverable materials requested by the Defendant as is further set forth in paragraph (6) below:

1. Copy of Indictment.
2. Copy of Defendant's Waiver of Rights form.
3. Copy of Defendant's picture.
4. Copy of statement from Chris McGhee.
5. Copy of Defendant's statement.

(6) Copies of the items referenced herein were delivered to the attorney for the Defendant on this the 9 September 2003. The undersigned, on behalf of the District Attorney's Office, request reimbursement for copying costs in the amount of 10 cents per copy for a total of $2 50. Payment for copies should be made payable to:

Gary L. McAliley, District Attorney
Post Office Box 812
Troy, Alabama 36081

## STATE'S REQUEST FOR DISCOVERY FROM DEFENDANT

Comes now the State of Alabama and hereby requests the Defendant to comply with all aspects of Rule 16.2 of *Alabama Rules of Criminal Procedure*, and requests the defendant to, within 14 days, produce the following for inspection, analysis or copying:

2

A.    Any and all documents, photographs, books, papers, tangible objects, buildings, places or portions of any of these things which are in the possession, custody, or control of the defendant and which the defendant intends to introduce in evidence at trial.

B.  To make defendant (solely in connection with the particular offense with which the defendant is charge) available for:

(1) Appear in a line-up;
(2) Speak for identification by witnesses;
(3) Be fingerprinted, palm-printed, foot-printed or voice-printed;
(4) Pose for photographs not involving re-enactment of an event.
(5) Try on clothing.
(6) Permit the taking of samples of defendant's hair, blood, saliva, urine, or other specified materials which involve no unreasonable intrusions into the body;
(7) Provide specimens of defendant's hand-writing; or
(8) Submit to a reasonable physical inspection or medical examination of defendant's body, but such inspection or examination will not include a psychiatric or psychological examination, unless such psychiatric or psychological examination is authorized under the provisions of Rule 11.2(a)(1) and (2), Rule 25.4, or Rule 26.4.  The defendant shall be entitled to the presence of counsel at the taking of such evidence. This section shall supplement and not limit any other procedures established by law.

C.  Any results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with this particular case which are within the possession or control of the defendant and which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at trial, if the results or reports relate to the witness's testimony.

Done this the 9 September 2003

Larry C. Jarrell    (JAR001)
Assistant District Attorney
P. O. Box 812
Troy, AL  36081
(334) 566-6896

3

161

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been placed in the receptacle reserved in the following name:  **HON. JAMES N. THOMAS** in the Pike County Office of the Circuit Clerk at the Pike County Courthouse on this the 9th day of September 2003.

Larry C. Jarrell
Assistant District Attorney

162

INDICTMENT

# THE STATE OF ALABAMA
## PIKE COUNTY

IN CIRCUIT COURT
MAY TERM, 2003

**The Grand Jury of said County charges that before the finding of this indictment that,**

BOBBY WILLIAMS, whose name is otherwise unknown to the Grand Jury, did, in the course of committing a theft of property, to-wit: lawful United States currency and/or coinage, a better description of which is to the Grand Jury otherwise unknown, the property of, to-wit: ProMarketing L.L.C, doing business as Beeline Store #614, use force or threaten the imminent use of force against the person of the said Edith Thomas, or another person present, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said BOBBY WILLIAMS was armed with a deadly weapon or dangerous instrument, to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama, Against the Peace and Dignity of the State of Alabama; and,

## OFFENSE 2

The Grand Jury of said county charges that before the finding of this indictment that, BOBBY WILLIAMS, whose name is otherwise unknown to the Grand Jury, did, in the course of committing a theft of property, to-wit: lawful United States currency and/or coinage, a better description of which is to the Grand Jury otherwise unknown, the property of, to-wit: Sunny South, L.L.C., use force or threaten the imminent use of force against the person of the said Rebecca Holley, or another person present, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said BOBBY WILLIAMS was armed with a deadly weapon or dangerous instrument, to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama,

Against the Peace and Dignity of the State of Alabama.

_for_ Gary L. Mc Aliley District Attorney for Twelfth Judicial Circuit

163

# INDICTMENT

THE STATE OF ALABAMA
PIKE COUNTY
CIRCUIT COURT
MAY    TERM, 2003

THE STATE
vs.
BOBBY WILLIAMS

ALIAS

## OFFENSE(S)

ROBBERY 1

OFFENSE 2
ROBBERY 1

GRAND JURY NO. 03-73, 74

A TRUE BILL

_Shannon W. Holland_
GRAND JURY FOREPERSON

Presented in open Court by the
Foreperson of the Grand Jury in the
presence of at least twelve other
members of the Grand Jury

_Brenda M. Peacock_
Brenda M. Peacock, Clerk of the
Circuit Court of Pike County, Twelfth
Judicial Circuit of Alabama.
Filed this the _20_ day of
_May_ 2003.

Bail in each offense in this indictment is
fixed at $ _50,000 each_    for a total bail
for this indictment of $ _100,000_

[  ] Continuing bond

_[signature]_
Judge Presiding

164

# MONTGOMERY COUNTY SHERIFF DEPARTMENT

Name of Officer _CPL Ross   CPL Wright_

Title _DETECTIVE_

Place _Montgomery Co. Jail_

Date _13 Jan 02_

Time _2:15 pm_

## YOUR CONSTITUTIONAL RIGHTS ACCORDING TO THE MIRANDA WARNING

*Before we ask you any questions, you must understand your rights.*

1. You have the right to remain silent.

2. Anything you say can and will be used against you in a court of law.

3. You have the right to talk to a lawyer and have him present with you while you are being questioned.

4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.

5. You can decide at any time to exercise these rights and not answer any questions or make any statement.

1. Do you understand each of these rights I have explained to you?     Yes ___✓___ No ___

   Having these rights in mind, do you wish to talk to us now?     Yes ___✓___ No ___

## WAIVER OF RIGHTS

I have read, (or had read to me), this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promise or threats have been made to me and no pressure of any kind has been used against me to get me to make a statement.

Witness: _OFFICER BROWN_

Signed: _Bobby Williams_

Witness: _____

Date: _11/13/02_

Time: _____

Defendant's Name: _Bobby Williams_   Age: _20_   D.O.B. _10-19-1982_

Address: _1817 Dixie Court Montgomery AL._

Education: Grade completed  1  2  3  4  5  6  7  8  ⑨  10  11  12

College:  1  2  3  4  5  6

165

Greg Wright

| | |
|---|---|
| From: | "Special Victims Unit" <mpdsvu@ci.montgomery.al.us> |
| To: | <gwright@troycable.net> |
| Sent: | Friday, January 10, 2003 11:42 AM |
| Attach: | BOBBY WILLIAMS.JPG; CHRISTOPHER MCGEHEE.JPG; KENYADA JOHNSON.JPG; MARCUS WILLIAMS.JPG |
| Subject: | Robbery suspect photos (Montgomery) |



BOBBY
Williams

1/13/2003



# STATEMENT OF CHRISTOPHER L. MCGHEE

## STATEMENT MADE JANUARY 16, 2003

### CORPORAL GREG WRIGHT

CASE NUMBER 0212-2840
CASE NUMBER 0212-2060

WRIGHT:    This is Detective Greg Wright, the Troy Police Department, it is, date is 16 January 2003, uh I'm speaking with a Christopher L. McGhee, M-C-G-H-E-E, uh date of birth 7/29 of 80, black male, in reference to case number 0212-2840 and case number 0212-2060. Also present uh in and out of the room is Corporal Larry Ross uh who is also uh case agent on one of things uh robberies.  Chris, prior to turning the tape recorder on you've been read your rights, is that correct?

MCGHEE:    Yes.

WRIGHT:    Okay, you said you understood what your rights are, you had no problem giving us a statement, is that correct?

MCGHEE:    Yes.

WRIGHT:    Okay, uh we've got two robberies that we told you about uh we've talked to some other people, they're involved in the rob, in the robberies and we want to get your side of the story about what happened in the robberies and you said you're willing to give us your side of the story about what happened, is that correct?

MCGHEE:    Yes.

WRIGHT:    Okay, the first robbery we're talking about is the one at the Conoco Station uh it's the one that I described to you, it's across the street from uh, uh Kentucky Fried Chicken.  Prior to turning the tape recorder on we talked to you briefly uh you told me that Bobby, Marcus, Chris, which is yourself, and Dale is the one that was in on doing that one.  You know what I'm talking about?

MCGHEE:    (~~Unintelligible~~). uh huh
                          *scw*

WRIGHT:    Tell me what happened on that one when y'all left Montgomery, when y'all came to Troy.  When y'all pulled into the gas station, what happened?

MCGHEE:    Uh Dale went in and purchased some pizza.

WRIGHT:    Dale went in and purchased some pizza, okay.  Who, who went in with Dale?  He go in by himself?  The first time when he just went in and got the pizza and I think you said somebody got some beer also, did he go in by hisself?  You shaking your head yes?  You need to speak up where the tape recorder can hear you.

MCGHEE:    Yes.

WRIGHT:    So he went in by himself?  Y'all parked out front at the gas pumps.  Who went back in the second time?

Page 1 of 11 Pages

1&8

MCGHEE:      I believe Dale.

WRIGHT:      Dale went back in by himself the second time, huh?  I can't hear you.

MCGHEE:      Yes.

WRIGHT:      Okay, okay, at what point did you pull into the back of the store?

MCGHEE:      After

WRIGHT:      Did he go in more than two times?  Now he went in and got pizza, then he went back in and got some Black & Mild or something like that?

MCGHEE:      (Unintelligible).

WRIGHT:      Is that when you pulled back behind the store and y'all ate the pizza and drank the beer?

MCGHEE:      No, uh I was up at the uh he wanted when I first turned in, pulled up, he went in and purchased a pizza and came back.  I left and pulled behind the store.  All three of them got out then.

WRIGHT:      Which three got out?

MCGHEE:      Dale, Marcus and Bobby.

WRIGHT:      Okay.

MCGHEE:      And uh went to the store and that when uh Dale came back, all of them came back.  One with some pizza and beer, okay.  Dale, Dale stayed in the truck and, and Bobby and Marcus went back in the store.  Then that's when they committed it.

WRIGHT:      Okay, what, at what point did you see the uh the gun?  The one that you described in here earlier?

MCGHEE:      After.

WRIGHT:      After they did it?  Who had it?

MCGHEE:      I believe Marcus had it.

WRIGHT:      Why do you say you believe Marcus had it?

MCGHEE:      I seen Marcus have it.

Page 2 of 11 Pages

WRIGHT:      Okay, describe what it looked like.

MCGHEE:      It was a little deuce fire.

WRIGHT:      A twenty-five?  Okay, what did it look like?

MCGHEE:      Like alloy.

WRIGHT:      An alloy, kinda like a, almost like the color of this tape recorder, kinda a faded chrome?

MCGHEE:      Uh huh.

WRIGHT:      Okay, was it uh a semi-automatic or revolver, did it have a clip to go in it?  It had a clip that went in it?  You're shaking your head yes?

MCGHEE:      Yes.

WRIGHT:      Okay, was it loaded?

MCGHEE:      I don't know.

WRIGHT:      You don't know?

MCGHEE:      I'm not sh, I don't believe so.

WRIGHT:      Did, did any of anybody else have any, any other gun?  That was the only gun that you saw at that time?

MCGHEE:      Uh yes.

WRIGHT:      Okay, uh so after y'all did that one or they did that one, you were just driving the vehicle, you were just sitting in the vehicle, okay, how much money do you think was gotten out of that one?

MCGHEE:      I'm not sure.

WRIGHT:      How much did you get?

MCGHEE:      About fifty dollars.

WRIGHT:      Okay, when did you get that, then or once y'all were back to Montgomery?

MCGHEE:      When we was uh headed back to Montgomery.

WRIGHT:      Y'all headed back to Montgomery, okay, uh you couldn't remember uh but it's obvious from looking at uh some other evidence that we got that Bobby was wearing the same thing on one of the robberies he committed down here as he was at Merle's Truck Stop.  You said you wanted to be cleared out of Merle's Truck Stop because you did not go inside the store, is that correct?

MCGHEE:      Yes.

WRIGHT:      Okay, tell me what happened on the one at Merle's.

MCGHEE:      Well, I pulled up, I was just headed back to Montgomery.

WRIGHT:      On that same day?

MCGHEE:      Uh, uh no, I don't know.

WRIGHT:      You can't remember?

MCGHEE:      I can't remember, no, I don't believe it was the same night.

WRIGHT:      Okay, but y'all had been out of Montgomery and y'all was heading back into Montgomery when that happened, is that what you're saying?

MCGHEE:      Yes.

WRIGHT:      Okay, so y'all been out of Montgomery and was headed back in and you pulled in.  Did you pull in to get gas or y'all pulled in with that intention or just what?

MCGHEE:      I pulled in and uh I mean, Dale's with us that night, Dale, Dale went into the store and purchased something to drink or something and I, I precede to leave the store and uh Dale was, was, was telling, telling Bobby and them that money, you know, it was some money in the register and so Bobby was like, he told me to pull over and say he was gone, go on and get them.

WRIGHT:      So it was just Dale, Bobby and you and who else?

MCGHEE:      Marcus.

WRIGHT:      Okay, uh so other words, did you go in and buy anything or just Dale went in?

MCGHEE:      Dale.

WRIGHT:      Dale went in?



MCGHEE:      Yes.

WRIGHT:      And so when he went in to buy something is when he notice there's some money in register.  He came back out and said something to Bobby then they told you to pull over and then what did you do then?  Where did you pull over at?

MCGHEE:      I pulled over behind a truck.

WRIGHT:      Okay and then who had the gun on this one?

MCGHEE:      Bobby.

WRIGHT:      Bobby had the gun?  Did Marcus go in with them?

MCGHEE:      No.

WRIGHT:      Marcus stayed in the truck with you?  How much money did they, they get or did you hear them say they got a, amounts?

MCGHEE:      I don't know.

WRIGHT:      How much did you get?

MCGHEE:      Uh bout the same.

WRIGHT:      About fifty?

MCGHEE:      Yes.

WRIGHT:      Where did y'all go after y'all left there?

MCGHEE:      Well, I dropped them off.

WRIGHT:      Where did you drop them off at?

MCGHEE:      Uh I dropped Dale at Smiley Court and I dropped Dale, I mean, uh Bobby and Marcus off at Dixie Court.

WRIGHT:      Dixie Court?

MCGHEE:      Uh huh.

Page 5 of 11 Pages

172

WRIGHT:    When did y'all hook back up again, a bit later on?  When y'all came back to do the second robbery in Troy?  When did y'all hook up?  Where was y'all at?  This is the one that happened on the Sunday afternoon on the 29th in December.

MCGHEE:    Well, we had, when we hooked back up?

WRIGHT:    Uh huh.

MCGHEE:    Up there, I went to Dixie Court, I believe, I went in Dixie Court uh with Mia, Mia was at work, no,

WRIGHT:    Y'all working on Sunday?

MCGHEE:    Yeah, we work on Sunday.

WRIGHT:    Okay, so all of y'all work together, mostly?  Is that where you know uh Brad from, I mean, Dale, that's how you know Dale from?

MCGHEE:    Well, yes, (unintelligible) brother.  I know

WRIGHT:    Dale's Bobby's brother you said?

MCGHEE:    Uh huh, and I, I, I uh and I go with they sister, she's my baby mother.

WRIGHT:    Okay.

MCGHEE:    (Unintelligible).

WRIGHT:    Now does Brad work with y'all?

MCGHEE:    No.

WRIGHT:    Brad didn't work with y'all?  Brad's the one you said lived at Ridgecrest?

MCGHEE:    Uh huh.

WRIGHT:    Okay, with his girlfriend's Darleen?

MCGHEE:    No, it's just a lady he stay with.

WRIGHT:    Lady he stays with, how old is she?

MCGHEE:    Probably forty-something, thirty-something.

Page 6 of 11 Pages

173

WRIGHT:      How old is Brad?

MCGHEE:      About twenty.

WRIGHT:      Okay, now when the uh the other one, y'all left Montgomery, came to Troy uh you said it was uh Bobby, Marcus and Dale?  I showed you a photo uh or some photos I should say of my robbery at the Bee-Line and you pointed out to a particular picture of a gentleman in a white shirt, I'm not, excuse me, a white sweater, the baseball cap,

MCGHEE:      Yes.

WRIGHT:      standing next to a coke machine, you said that's Brad.

MCGHEE:      Uh huh.

WRIGHT:      Okay, uh so four of y'all came down and did this one and you stayed in the truck and parked behind the store on this one?

MCGHEE:      Uh yes.

WRIGHT:      Who had the gun in this one?

MCGHEE:      Bobby or Marcus.

WRIGHT:      Okay, let me ask you this, who got uh the clerk identified Bobby as the one that had the gun because she said she remembered the tatoo on his left hand, you know what I'm talking about, the little tatoo I'm talking about he's got, uh he's got one all up his arm and all on the back of his hand?  The pellet gun that y'all were caught with

MCGHEE:      Pellet gun?

WRIGHT:      There's a pellet gun that Kenyatta had when y'all got caught up there somehow or Kenyatta got caught with it, was that, was that gun ever used in any of the robberies at all that you know of?

MCGHEE:      Not that I know of.

WRIGHT:      You don't

MCGHEE:      It wasn't a pellet gun.

WRIGHT:      What kind of gun was it?

MCGHEE:      It was a twenty-five, too.

Page 7 of 11 Pages

174

WRIGHT:     That was a twenty-five?  So that wasn't a pellet gun?

MCGHEE:     No.

WRIGHT:     What color was it?

MCGHEE:     It was, it was shiny chrome.

WRIGHT:     It was a real shiny chrome?  Uh did you ever, did anybody ever have that one at all?

MCGHEE:     No, not to my knowledge.

WRIGHT:     How much money did they get out of the uh, the Bee-Line, that little store up here on the corner?

MCGHEE:     I don't know.

WRIGHT:     How much did you?

MCGHEE:     I don't, I don't

WRIGHT:     How much did you get?

MCGHEE:     The Bee-Line?

WRIGHT:     That's the little Exxon Station over here.

MCGHEE:     It's one at

WRIGHT:     Right here, this one here.

MCGHEE:     Shew, uh twenty dollars, something like that.

WRIGHT:     So why, why did y'all get less than that?

MCGHEE:     I don't know, I mean, I'm not the person that, that went in the store.

WRIGHT:     But I'm saying, uh why did you, I mean, why did they say you only gonna get, get twenty dollars when you was getting fifty on the other ones?

MCGHEE:     I'm just saying uh I don't, I'm not sure how much money they got but I thought they got about, they got about thirty dollars.

Page 8 of 11 Pages

175

WRIGHT:    Okay, but what did they say when they got back in the truck cause you know they talked?

MCGHEE:    They was like, it wasn't that much money in there.

WRIGHT:    Did they say anything about knowing the clerk that was in the store?  Have they ever seen this girl before?  They didn't know her, never laid eyes on her?

MCGHEE:    Not that I know of.

WRIGHT:    Okay, what else, they took something else from the store, what else did they take out of the store?

MCGHEE:    I don't know anything.

WRIGHT:    Bobby told me they took a purse.

MCGHEE:    The uh yeah.

WRIGHT:    Uh huh.

MCGHEE:    Yeah, yeah, they did.

WRIGHT:    Who told you that?

MCGHEE:    Uh I believe Brad had the purse.

WRIGHT:    Okay, Brad is the one that's walking right here in this picture behind the counter to go get the purse?

MCGHEE:    Yes.

WRIGHT:    Brad is the one that took the purse?

MCGHEE:    Yes, that's Brad.

WRIGHT:    Okay.

MCGHEE:    I don't wear long caps, I, and I haven't entered the, neither store.

WRIGHT:    Okay, so in all the robberies that occurred in Montgomery County and in Pike County all you did was supplied the vehicle and drive and they gave you money for driving?

Page 9 of 11 Pages

MCGHEE:     Yes.

WRIGHT:     Okay, do you know of any other ones that y'all did in, on this side of Troy or anything other, other than, than these?

MCGHEE:     That wasn't any others.

WRIGHT:     There is, there wasn't any others? Did y'all break, did they break in any vehicles that you know of?

MCGHEE:     No.

WRIGHT:     They didn't break into any vehicles? All y'all did was store robberies? That was

MCGHEE:     Well, all they did was store robberies.

WRIGHT:     Right, you was with them, cause I'm just saying, all, all that was done was store robberies, let me put it that way then?

MCGHEE:     Yes.

WRIGHT:     Now, I explained to you earlier uh about how all this work, did I, did I not? As far as you telling your side of the story, you getting a copy of everything that we've got here as far as evidence that's against you, so you're not saying that someone's charging you with some, excuse me, charging you with something that you're not guilty of, you understand what I'm saying? Uh you giving me this statement uh stating your participation in how all this went down, is that correct? Okay, so the vehicle that was used is yours?

MCGHEE:     My mother's.

WRIGHT:     Your mother's, what kind of vehicle is it?

MCGHEE:     It was a blue Blazer.

WRIGHT:     A blue Blazer, has she got her vehicle back now? What year is it?

MCGHEE:     A '89.

WRIGHT:     '89 Chevrolet Blazer. Who do y'all know in Troy?

MCGHEE:     No one.

WRIGHT:     Bobby knows somebody in Troy.

MCGHEE:     Well, Bobby might know someone so I

WRIGHT:     So y'all never, y'all never visited them when y'all were down here?

MCGHEE:     No.

WRIGHT:     So y'all came right down, came down just strictly to do the robberies, y'all weren't hanging out with nobody, visiting nobody during the holidays or nothing like that? Huh?

MCGHEE:     We just a riding.

WRIGHT:     Y'all just riding, okay, uh prior to turning this on

MCGHEE:     Well, it's, none of these robberies was plan, we just riding.

WRIGHT:     Just riding, okay, so that explains why their faces weren't covered at all when they went in?

MCGHEE:     I guess, yes.  They just, they just did them.

WRIGHT:     Well, had they been drinking or were they smoking weed or what, I mean?

MCGHEE:     They just did them.

WRIGHT:     Just did them, okay, uh prior to uh we were talking about this and you showed, you, you expressed to me that you wanted to cooperate fully in this, to do what you can do to help yourself out in this situation, is that correct?

MCGHEE:     Yes.

WRIGHT:     Okay, now after we turn this off I'm gonna drive you to these two locations where these robberies occurred and to the best of your knowledge I want you to show me where you parked at, okay?  So uh again, your rights have been read to you, is that correct?  Nobody's forced you to sign this, is that correct?

MCGHEE:     Yeah.

WRIGHT:     Okay and the statement you've given me on your own free will, is that correct? Okay, this is end of statement.

Transcribed 1/27/03 by Jacqueline R. Carlisle

Page 11 of 11 Pages

178

# STATEMENT OF BOBBY WILLIAMS

## CORPORAL GREG WRIGHT

179

WRIGHT:    This is Detective Greg Wright, Troy Police Department, uh speaking with a Bobby Williams, a black male, date of birth 10/19 of 1982 uh reference to two burglaries that occurred in Troy, one of them is case number 0212-2840 uh robbery first degree of the Bee-Line in Troy, another one is robbery of the uh Conoco Station uh that occurred in Troy across from the uh Kentucky Fried Chicken.  Bobby, I'm at the Montgomery County Jail, you've been read your rights and got a form up in front of you uh says your rights, do you understand what your rights are?

WILLIAMS:   Yes sir.

WRIGHT:    Okay, earlier, prior to turning the tape recorder on Corporal Ross read you your rights and uh you said you understood what your rights were.  You told us what your address is, you told us that you've got 9th grade education and that you understand you can't read and write, right?

WILLIAMS:   Yes sir, I, I can read and write.

WRIGHT:    Okay, nobody's made any promises to you or threats to you to get you make a statement, is that correct?

WILLIAMS:  No sir.

WRIGHT:    Okay, you've read your rights, you understand what your rights are, right?

WILLIAMS:   Yes sir.

WRIGHT:    Okay, what we're talking about is your involvement and I understand that you wasn't by yourself, is your involvement at robbery that occurred in Troy over at, during the holidays.  I don't have the file in front of me as far as the date goes uh but prior to turning the tape recorder on uh you stated to me that you were riding with some friends and y'all, y'all were on your way to Troy, is that correct?

WILLIAMS:   Yes sir.

WRIGHT:    Okay, did y'all plan where y'all were gonna stop?

WILLIAMS:  No sir.

WRIGHT:    How did y'all determine you were gonna stop at the uh Sunny South or the Conoco Station in Troy?

WILLIAMS:  We just stopped.

WRIGHT:    What did y'all do after you stopped?

Page 1 of 10 Pages



WILLIAMS:    Uh went in, made a purchase or whatever.

WRIGHT:    What did you purchase?

WILLIAMS:    I'm not sure about it.

WRIGHT:    You can't remember?

WILLIAMS:    Uh uh.

WRIGHT:    Uh what did you, when you first came in did you park the vehicle in front of the store or y'all uh parked it behind and just waiting on folks to leave or what happened?

WILLIAMS:    Uh uh, we had, we had parked right in front of the store, uh, uh uh.

WRIGHT:    Y'all did park in front of the store?

WILLIAMS:    No sir.

WRIGHT:    Uh you parked into the trailer park behind the store?

WILLIAMS:    Probably not right at the, not right at the moment, I'm not sure, but eventually we did park behind the uh trailer park area.

WRIGHT:    Okay, then what happened then?

WILLIAMS:    We walked in, walked around or whatever and then made a purchase, after the store got kinda clear.

WRIGHT:    After the store got kinda clear?

WILLIAMS:    Yes sir.

WRIGHT:    Okay.

WILLIAMS:    And that's, that's basically it, then

WRIGHT:    How much money was taken out of the store?

WILLIAMS:    Not, not nearly a hundred dollars.

WRIGHT:    Did y'all split the money up?

Page 2 of 10 Pages



WILLIAMS:  I'm, I'm saying not, you, you can't really say we split it up because it wasn't, it wasn't really nothing to split up, everybody just did a part or whatever what, what they had to do with it. I'm saying everybody had they own little portion of it.

WRIGHT:    What kind of gun, what kind of gun was used that you see used in the robbery?

WILLIAMS:  Uh a, a twenty-five, I'm not for sure if it was a, how would you describe the semi-automatic or a automatic?

WRIGHT:    It was a new semi-automatic. Did it have, did it have a clip that went in it?

WILLIAMS:  Yes sir.

WRIGHT:    Okay, was the gun loaded? You said something earlier before I turned the tape recorder on that the gun wasn't loaded.

WILLIAMS:  No sir.

WRIGHT:    How do you know it wasn't loaded?

WILLIAMS:  Because I'm saying it, the gun was checked, it wasn't the intention to hurt nobody, it was just the intention of doing, doing whatever to get the money. I'm saying it wasn't the point to hurt nobody.

WRIGHT:    Okay, so the decision was made to go in the store and just kinda, like you said, purchase some things and kinda wait 'til the store cleared out.

WILLIAMS:  Yes sir.

WRIGHT:    Describe to me, best you can understand, what type of clerk was there?

WILLIAMS:  Uh it was a, a dark-skinned female.

WRIGHT:    No, no, I'm talking about on the first one.

WILLIAMS:  Oh, she, she, I think, she wasn't no colored female, but I, I do recall it being a female though.

WRIGHT:    A white female?

WILLIAMS:  Yes sir.

WRIGHT:    Okay, was she the only one working in the store at the time?

182

WILLIAMS:    Yes sir.

WRIGHT:    She was working by herself?  Huh?

WILLIAMS:    Yes sir.

WRIGHT:    Okay, uh how many other people in this, was in the store besides you?  Just think back in your mind and count how many in the store with you.  Who else was in the store with you?  Count.

WILLIAMS:    (Unintelligible).

WRIGHT:    One other person is in the store with you?

WILLIAMS:    Yeah.

WRIGHT:    Did the other two wait in the car?  How many, how many more, how many came to Troy period that time?

WILLIAMS:    Well, it, it wasn't no, no other two with us.

WRIGHT:    . It was just two of y'all that came to Troy?

WILLIAMS:    It was basically three, the driver and the two others already in the store, whatever.

WRIGHT:    You got a problem with naming their names?  You've already looked at their pictures and nodded to me and said yes, the pictures I got of the ones.  You got a problem with telling me who they were?

WILLIAMS:    Yes, basically, what I'm saying that if they want to give their statement or whatever, I'm saying they don't, okay, they really wanted, I'm saying, I'm not, I'm not trying to give a hard time or whatever but I'm saying

WRIGHT:    But you don't want to give their names is what you're saying?

WILLIAMS:    No sir, I don't.

WRIGHT:    Okay, that's fine, uh but the pictures I have here, you've already acknowledged to me, I've got pictures of Bobby Williams, which is you,

WILLIAMS:    Yes sir.

WRIGHT:    Christopher McGee uh Kenyatta Johnson and Marcus Williams.  Let me ask you this, there's one out of these names that I named that wasn't there, which one was he?

Page 4 of 10 Pages



WILLIAMS:    The uh the youngest.

WRIGHT:    The youngest one wasn't with y'all?

WILLIAMS:    Uh uh.

WRIGHT:    Okay, you said after y'all got the money, it wasn't less than, it was less than a hundred dollars, y'all left, got back in the truck, and came back to Montgomery, is that right?

WILLIAMS:    Yes sir.

WRIGHT:    Okay, then some time later on y'all made the decision to come back to Troy again. This is the one at the Bee-Line where you talked about the black female, the real dark-skinned black chick that worked there. Okay, tell me what happened on that one, where y'all parked at?

WILLIAMS:    Well, really we, we parked in the area, you know what I'm saying?

WRIGHT:    Did y'all leave somebody else in the truck?

WILLIAMS:    Uh uh.

WRIGHT:    Nobody was in the truck? How far away was the truck parked?

WILLIAMS:    Uh

WRIGHT:    When I say truck I'm talking about a Blazer, right, y'all were still on the blue Blazer, right?

WILLIAMS:    (Unintelligible) I'm not sure where we parked.

WRIGHT:    You don't remember where y'all parked, but y'all were still on the blue Blazer, correct?

WILLIAMS:    You could say that, yes sir.

WRIGHT:    I mean, you were or you weren't.

WILLIAMS:    Yes sir.

WRIGHT:    You were, so you was on a Blazer on the first one, you was on the Blazer on the second?

WILLIAMS:    Yes sir.

184

WRIGHT:    Does that vehicle belong to you?

WILLIAMS:  No sir.

WRIGHT:    Okay, so you were riding with somebody.  Were you driving that day?

WILLIAMS:  No sir.

WRIGHT:    Okay, uh tell me what happened when you went in the store on the one at the Bee-Line where the black, dark-skin chick was.  Tell me the truth.

WILLIAMS:  Well, I went in and made the purchase whatever.

WRIGHT:    Do you remember what you purchased?

WILLIAMS:  No sir.

WRIGHT:    You don't remember?  Okay, then what happened?

WILLIAMS:  I can't really say what happened uh except the fact she saying that I pulled, that I drawed the pistol out or whatever on her and, and took the commissary and, and keys from the scene.

WRIGHT:    Well, tell me what happened.  What you're referring to is I explained to you that on the video tape uh excuse me the clerk says that you're the one that's on the video tape.  She says that you're the one

WILLIAMS:  That

WRIGHT:    she believes that pulled the gun.

WILLIAMS:  Yes sir.

WRIGHT:    You're telling me it's not you?  Then explain to me how it went down.  That's why, that's why I'm getting a statement from you now.

WILLIAMS:  I'm saying, I can't say what went down because after I made the purchase I exit the store, I'm saying, but she's saying that I was the one pulled the pistol whatever so I'm saying I can't really give any statements.

WRIGHT:    Let me ask you this then.  Were you there when the gun was pulled?

WILLIAMS:  No sir, I wasn't.

Page 6 of 10 Pages

WRIGHT:    Since you're saying, since you're saying you weren't there, you weren't one of them, you weren't there when the gun was pulled? You weren't there?

WILLIAMS:  No sir, all I did was made a purchase but other than the gun being pulled or whatever in there, her purse coming up missing, that didn't have nothing to do with me right there.

WRIGHT:    So you're saying you had went back to the truck during that time?

WILLIAMS:  Yes sir.

WRIGHT:    When they got to the truck did they tell you they had robbed the store then?

WILLIAMS:  I'm saying basically it was, it was obvious that, that, they came out with the purse or whatever.

WRIGHT:    But I'm saying you knew what was going on?

WILLIAMS:  I didn't at the time but I knew after the crime scene at what had went on.

WRIGHT:    Okay, now you're in Montgomery County Jail now charged with what other, what other, you're charged with three other robberies?

WILLIAMS:  Yes sir, one that I admitted to and then the other two I had

WRIGHT:    You were just there?

WILLIAMS:  Yes sir.

WRIGHT:    Let me ask you a question. Why is it, what was the deal with the other two? And the reason I'm asking cause before we turned the recorder on you admitted to being in the store during the robbery.

WILLIAMS:  Yes sir.

WRIGHT:    At the Bee-Line?

WILLIAMS:  What, I'm saying, what you mean by the other two that happened in Montgomery?

WRIGHT:    The other two that happened in Montgomery, how did you, I mean, did it happen the same way it happened at the Bee-Line? You just happened to be in there when they pulled the gun out?



WILLIAMS:    Yes sir.

WRIGHT:    Okay, where did y'all go after y'all left the Bee-Line?

WILLIAMS:    Home.

WRIGHT:    Y'all came back to Montgomery?

WILLIAMS:    Yes sir.

WRIGHT:    Do y'all know anybody in Troy?  Y'all didn't stay around in Troy anywhere?

WILLIAMS:    No sir.

WRIGHT:    Did y'all ever go anywheres besides Troy and do any more robberies?

WILLIAMS:    No sir.

WRIGHT:    Y'all didn't go to Ozark or Dothan, any other place like that?

WILLIAMS:    I don't even, I don't know nothing about Ozark and Dothan.

WRIGHT:    Okay, but you know something about Troy cause you use to live in Troy?

WILLIAMS:    Yes sir.

WRIGHT:    Okay, what kept y'all from coming back to Troy again?

WILLIAMS:    I'm saying, didn't nothing really keep us from coming back cause I'm saying we probably would had came back but it wouldn't been any no, no intention of, of what I'm saying, doing anything that's bad or whatever.

WRIGHT:    Okay, now on the first one we talked about, the one at Sunny South, the one across from KFC, first one that y'all did in Troy, you said y'all made sure the gun was empty, why was that?  Y'all didn't want nobody to get hurt?

WILLIAMS:    No sir, it wasn't the intention to hurt nobody.

WRIGHT:    Okay, why didn't you cover your faces up?

WILLIAMS:    I don't even know.

WRIGHT:    Why didn't you cover your faces up on the one at the Bee-Line?

Page 8 of 10 Pages

187

WILLIAMS:  Uh, uh I don't know.  We, well, our face wasn't really covered up on none of them.  That's how it led this far.

WRIGHT:      So in other words, the ones you did in Montgomery, your faces wasn't covered up on any of them either?

WILLIAMS:  No sir, they just claimed they had us on tape or whatever.

WRIGHT:      You got any kids?

WILLIAMS:  Yes sir, I got one kid and one on the way.

WRIGHT:      And one on the way?  Do you care about those kids?

WILLIAMS:  Yes sir, I, I love my kids.

WRIGHT:      Okay.

WILLIAMS:  And I can't, I'm saying I don't want to put my, my child in this predicament to say I did it for him because I know the court probably wouldn't, wouldn't even want to hear it like that, you know what I'm saying.  It was a, a time of need, I'm saying, and then by me being the man of the house or whatever I just had to do whatever it took to strive my family and then like I tried to kill nobody or whatever you do, what I'm saying, push just came to shove is what I'm saying.

WRIGHT:      On one of the guns, one of the guns they have in custody, you told me earlier before the tur, tape recorder was turned on that uh was it, you said it was a twenty-five?

WILLIAMS:  Yes sir, was probably one of the guns that was used in the scenes.  (Unintelligible).

WRIGHT:      One of the ones that was used in the scene?

WILLIAMS:  Yes sir.

WRIGHT:      What you, what, what you mean, the ones that was used in the, the two robberies in Troy?

WILLIAMS:  Yes sir.

WRIGHT:      Describe what it looked like.

WILLIAMS:  It's like a, a dull, a dull chrome, it wasn't

WRIGHT:      Dull, chrome-looking gun?

WILLIAMS:   (Unintelligible).

WRIGHT:      Kinda silver, dull, silver-looking gun?

WILLIAMS:   Yes sir, nothing like she explained in the

WRIGHT:      Nothing like what you saw in the statement I let you read over?

WILLIAMS:   Uh uh.

WRIGHT:      Okay, let me ask you this question, I'm not concerned about where the gun came from as far if you bought it off the street but at one time you had possession of one of those guns, is that correct?

WILLIAMS:   Uh, it was just brought to me at the time of the uh, uh scene.  At the time of what we used it for but other than that

WRIGHT:      You hadn't seen it prior to that?

WILLIAMS:   Uh uh.

WRIGHT:      Okay, is there anything else you want to tell me about this on your side of the story?

WILLIAMS:   No sir, that's all.

WRIGHT:      That's it?  Okay, this is Detective Wright, this is end of statement.


Transcribed 1/16/03 by Jacqueline R. Carlisle



IN THE TWELFTH JUDICIAL CIRCUIT
PIKE COUNTY, ALABAMA

STATE OF ALABAMA,          *

    Plaintiff,           *

                        *

vs.                    *     CASE NO.    CC 2003-382

                        *       thru      CC 2003-383

BOBBY WILLIAMS,        *

    Defendant.         *

## ORDER

Upon motion of Defendant, hearings on the Defendant's application for treatment as a youthful offender are continued and rescheduled for the 7th day of January, 2004, at 10:00 o'clock a.m., in the Pike County Courthouse, Troy, Alabama. Notice shall issue to State and Hon. James Thomas.

DONE THIS THE 16th day of October, 2003.

STEVEN E. BLAIR
CIRCUIT JUDGE

190

State of Alabama
Unified Judicial System

SUBPOENA REQUEST FORM

CASE NUMBER
CC03-S-382,383

Form C-12  Rev 10/86

IN THE _____ CIRCUIT _____ COURT OF _____ PIKE _____ COUNTY, ALABAMA

PLAINTIFF:      STATE      V.    DEFENDANT:    WILLIAMS, BOBBY

In the matter of _____ ROBBERY 1 _____

Court Date__01/07/2004__    Court Time__10:00 am__    Date Requested__10/22/2003__

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:

[X] Plaintiff / State    [ ] Defendant    [ ] Grand Jury    [ ] Other _____

| | | Date Issued | Date Executed | Remarks |
|---|---|---|---|---|
| Name:   EDITH THOMAS<br>Address: 306 GRIFFIN STREET, TROY, AL 36081 | ( ) - | 10-23-03 | _____ | _____ |
| Name:   REBECCA HOLLEY<br>Address: 131 GRIMES STREET, TROY, AL 36081 | ( ) - | | _____ | _____ |
| Name:   GREG WRIGHT<br>Address: TPD, TROY, AL 36081 | ( ) - | | _____ | _____ |
| Name:   LARRY ROSS<br>Address: TPD, TROY, AL 36081 | ( ) - | 10-23-03 | _____ | _____ |

METHOD OF SERVICE REQUESTED
[ ] Personal   [ ] Mail

*Larry A. Jarrell*

Party Requesting Subpoena__DA OFFICE__
10/22/2003



IN THE TWELFTH JUDICIAL CIRCUIT
PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
     Plaintiff,                      *
                                     *
vs.                                  *          CASE NO.    CC 2003-382
                                     *            thru      CC 2003-383
BOBBY WILLIAMS,                      *
                                     *
     Defendant.                      *


## ORDER


    Hearing on Defendant's application for treatment as a youthful offender is continued and rescheduled for the 2nd day of February, 2004, at 9:00 o'clock a.m., in the Pike County Courthouse, Troy, Alabama.   The Sheriff of Pike County is directed to transport the Defendant from the Lunston Correctional Facility (AIS #231210), 28779 Nick Davis Road, Harvest, Alabama 35749.  Notice shall issue to State, Hon. James Thomas, and the Pike County Sheriff's Office.

    DONE THIS THE 7th day of January, 2004.


_____
STEVEN E. BLAIR
CIRCUIT JUDGE

192

State of Alabama
Unified Judicial System

SUBPOENA REQUEST FORM

CASE NUMBER
CC03-S-382,383

Form C-12  Rev 10/86

IN THE _____ CIRCUIT _____ COURT OF _____ PIKE _____ - COUNTY, ALABAMA

PLAINTIFF:          STATE                    V.        DEFENDANT:     WILLIAMS, BOBBY

In the matter of _____ ROBBERY 1 _____

Court Date  02/02/2004 _____     Court Time  9:00 a.m. _____  Date Requested   01/20/2004

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:

[X] Plaintiff / State     [ ] Defendant     [ ] Grand Jury     [ ] Other _____

|  | | Date Issued | Date Executed | Remarks |
|---|---|---|---|---|
| Name:   GREG WRIGHT<br>Address: TPD, TROY, AL  36081 | ( ) - | 1-2L-04 | _____ | _____ |

JAN 2004

_Larry O. Jarrell_

Party Requesting Subpoena   DA OFFICE
01/20/2004

METHOD OF SERVICE REQUESTED
[ ] Personal   [ ] Mail



IN THE TWELFTH JUDICIAL CIRCUIT
PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
   Plaintiff,                      *
                                     *
vs.                                  *      CASE NO.    CC 2003-382
                                     *       thru       CC 2003-383
BOBBY WILLIAMS,                      *
                                     *
   Defendant.                      *

## ORDER

     The Defendant this day appeared with counsel, Hon. James Thomas. The Defendant's application for treatment as a youthful offender, based upon the reasons stated of record, is withdrawn.

     Notice shall issue to State and Hon. James Thomas.

     DONE THIS THE 2nd day of February, 2004.

                                            STEVEN E. BLAIR
                                          CIRCUIT JUDGE

194

| State of Alabama Unified Judicial System | PLEA OF NOT GUILTY AND WAIVER OF ARRAIGNMENT | Case Number |
|---|---|---|
| m CR-9    Rev. 3/95 | | 2003-S-382 383 |

IN THE _Circuit_ COURT OF _Pike_ , ALABAMA
(Circuit, District, or Municipal)          (Name of County or Municipality)

☑ STATE OF ALABAMA v. _Bobby Williams_ , Defendant

Comes now, the defendant in the above-styled matter, and to the offense charged enters a plea of

☑ Not Guilty
☐ Not Guilty by Reason of Mental Disease or Defect
☐ Not Guilty and Not Guilty by Reason of Mental Disease or Defect

Defendant acknowledges receipt of the copy of the charge against him/her and further waives the right to have an arraignment at which the defendant is present in person, or at which the defendant is represented by an attorney.

But, the defendant specifically and expressly reserves the right upon the filing hereof to hereafter, but before trial or before such date as may be set by the court, to interpose any defenses, objections, or motions which the defendant had the right as a matter of law or rule to interpose in this cause, prior to the filing hereof.

Defendant's date of birth is _10 19 82_    Defendant's age is _21_
The defendant is not eligible for consideration by the court for youthful offender status as provided by law.

_2 2 04_
Date                                        X _Bobby Williams_
                                             Defendant
_2 2 04_
Date                                        _James n. Thom_
                                             Attorney for Defendant

This is to certify that I am the attorney for the defendant in this matter, and that I have fully explained this form and all matters set forth herein, and pertaining hereto, to the defendant. I further state to the court that I have explained to the defendant his right to be arraigned in person and his right to have me represent him at arraignment. I further certify to the court that my client hereby knowingly, voluntarily, and intelligently waives these rights after a full and complete explanation of each and every one of them to him/her by me. BOTH MYSELF AND THE DEFENDANT UNDERSTAND THAT I AM RESPONSIBLE FOR ASCERTAINING WHAT DATE, IF ANY, HAS BEEN SET BY THE COURT FOR THE MAKING OR FILING OF ANY DEFENSES, OBJECTIONS, OR MOTIONS. I FURTHER UNDERSTAND THAT I AM RESPONSIBLE FOR NOTIFYING MY CLIENT OF THE DATE HIS/HER CASE IS SET FOR TRIAL, AND THAT I HAVE ADVISED AND INFORMED HIM/HER THAT IN THE EVENT HE/SHE FAILS TO APPEAR ON THE DATE HIS/HER CASE IS SET FOR TRIAL, ALL APPROPRIATE LEGAL ACTION WILL BE TAKEN BY THE COURT AGAINST THE DEFENDANT AND HIS/HER BOND. I further certify to the court that I have advised my client that he/she is responsible for obtaining the date his/her case is set for trial in this matter and that in the event he/she fails to appear on the date his/her case is set for trial all appropriate legal action will be taken by the court against the defendant and his/her bond, and I hereby certify that the defendant knows that he/she is personally responsible for obtaining the date his/her case is set for trial and for being present in court on that date.

_2 2 04_
Date                                        _James n. Thom_
                                             Attorney for Defendant Signature

I certify that I served a copy of the foregoing     _James n. Thomas_
plea and waiver of arraignment on the Prosecutor     Printed or Typed Attorney's Name
by mailing/delivering a copy of the same to him/her on:
                                             _405 E. Elm St Troy_
_____              Address
          Date

This is to certify that my attorney has explained each and every matter and right set forth in this form and I have completely and fully read and do so understand each and every matter set forth in this form. I further state to the court that I do not wish to be personally present at an arraignment in this case and that I do not want to have an attorney represent me at an arraignment and WITH FULL KNOWLEDGE OF EACH OF THESE RIGHTS, I HEREBY EXPRESSLY WAIVE SUCH RIGHTS. I further state to the court that I have been informed of the charge against me and have received a copy of the charge.

_2 2 04_
ate                                          X _Bobby Williams_
                                             Defendant Signature

Filed in office this date _____
                                             Clerk



IN THE CIRCUIT COURT OF _Pike_____ COUNTY, ALABAMA

STATE OF ALABAMA,                    )

      COMPLAINTANT,              )

VS.                                  )

                                        )    CASE NO: _CC 2003-S-382,382___

                                        )

_Bobby Williams_____,     )

      DEFENDANT.                   )

## MOTION FOR FINAL DISPOSITION

Comes now the Defendant, _Bobby Williams_____, by and through himself, in the above-styled cause, and moves this Honorable Court pursuant to Section 15-9-64, Code of Alabama(1975), to request a final disposition of any and all untried indictment(s), information(s), or complaint(s), currently pending within the jurisdiction of this Court against the above named defendant. In support of said request, Defendant show unto the Court as follows:

1. The Defendant is presently incarcerated at Limestone Correctional Facility in Capshaw, Alabama.

2. Defendant has knowledge, information or belief that an untried indictment(s), information(s), or complaint(s) is pending against him within this Court's jurisdiction.

-1-



3. Defendant avers that it is essential that the accused must be imprisoned in this state and must have pending against him an untried indictment, information, or complaint in this state in order to invoke the provisions of Section 15-9-64, <u>Code of Alabama</u>(1975); and/or Article III of Section 15-9-81, <u>Code of Alabama</u>(1975).   (see   <u>Manning   v   State</u>,   612   So.2d 1262[Ala.Crim.App.1992]).

4. The detainer hold created by this untried charge is prohibiting the Defendant from becoming eligible for less restrictive custody, work release, and other programs available through the Alabama Department of Corrections. Therefore, Defendant requests a final disposition of this matter.

WHEREFORE, premises considered herein, Defendant prays this Honorable Court to grant this request and issue an order accordingly in the interest of justice and law.

Respectfully submitted on this the _19th____ ___, day of _April_____, 2003.

_Bobby Williams_
                        Defendant, pro se

Defendant's Name: _Bobby Williams_        AIS# _231210_

Limestone Correctional Facility
28779 Nick Davis Road Harvest ACA, 35749

-2-



## CERTIFICATE OF SERVICE

I, _Bobby Williams_ , certify that I have served the foregoing Motion for Final Disposition to the Court and a copy upon the District Attorney's Office being properly addressed as follows:

_Pike_ County Courthouse

_Circuit Court  120 Church Street_

_Troy AL, 36081_

_Pike_ County District Attorney's Office

by placing the same in the U.S. Mail, First Class, postage pre-paid on this the _19th_ day of _April_ , 2003.

_Bobby Williams_
Defendant, pro se

-3-



198

IN THE CIRCUIT COURT OF _Pike_ _____ COUNTY, ALABAMA

STATE OF ALABAMA, )
    Complaintant, )
               )
               )
VS.          )   CASE NO. _CC-2003-S-382,382_
               )
               )
_Bobby Williams_ ___, )
    Defendant. )

## MOTION FOR FAST AND SPEEDY TRIAL

COMES NOW, your Defendant, _Bobby Williams_ ___, in the above-styled cause, pro-se and without the benefit of counsel and motions this Honorable Court pursuant to Rule 8, of the Alabama Rules of Criminal Procedure, to grant him a fast and speedy trial at the earliest possible date with this Court.

RESPECTFULLY SUBMITTED this _19th_ day of _April_ ___, 20_04_.

_Bobby Williams_
Signature of Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served a true and correct copy of the aforegoing pleading upon:

_Circuit Clerk; Brenda M. Peacock_
_120 Church Street_
_Pike Cn. Court House_
_Troy Al. 36081_

by placing the same in the United States Mail, postage prepaid and properly addressed on this _19th_ day of _April_ ___, 20_04_.

_Bobby Williams_
Signature of Defendant
_Limestone Correctional Facility_

Address confined at: _28779 Nickdavid Rd_
_Harvest Al. 35749_



IN THE CIRCUIT COURT FOR
THE TWELFTH JUDICIAL CIRCUIT
PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
   Plaintiff,                       *
                                     *
vs.                                  *        CASE NO.    CC 2003-382
                                     *          thru      CC 2003-383
BOBBY WILLIAMS,                      *
                                     *
   Defendant.                       *

## ORDER

    Upon consideration of the Defendant's pro se "Motion For Fast And Speedy Trial," this case is set for trial on the next scheduled criminal jury term of November 8, 2004. Docket call is scheduled for the 7th day of October, 2004, at 9:00 o'clock a.m., in the Pike County Courthouse, Troy, Alabama. Notice shall issue to State, Defendant and Hon. James Thomas.

    DONE THIS THE 28th day of April, 2004.


STEVEN E. BLAIR
CIRCUIT JUDGE

DA
James



In The Circuit Court of
Pike County, Alabama
Judicial Circuit

*CC 03-382*
*03-38 3*

From: Inmate: Mr. Bobby Deon Williams
AIS# 231210
Limestone Correctional Facility
28779 nickdavid rd. Harvest AL, 35749


To: Mrs. Brenda M. Peacock, Clerk
office of the clerk
120 church st. pike county courthouse

To Whom It May Concern:
I am writing presently preparing to pursue
Pre-conviction remedies in case no.
CC 2003-382,382/There are some documents I must have
to complete this endeavor , these documents, At least
a portion of them ,may have been furnished previously,
However I am constrained due to circumstances beyond my
control from obtaining them in any other way at this time
It has been established in the Circuit Court that I am
indigent and this status has not changed.
I respectfully request that the following documents, records,
&writings be sent to me pursuant to code of alabama, section
(36 12-40:; of Alabama Rules of Criminal Procedures and
the first and fourteenth Amendment of the United States
Constitution providing , access to the court, due process,
and equal protection under the law.

If you are unable to provide these documents please
explain why and under what provision of law,you feel can not
(A) Would you forward  copies of the followings:

1. Case Action Summary Sheet& Transcript of Records. *None*
2. Arrest Report& Pre-Sentence Investigation Report *— Not done yet*
3. Police Investigation Report *— Not contained in file*
4. Indictments
5. Ireland Forms *— Not yet*
6. Complaints or Affidavit and writ of Arrest
10. And all other reports, and documents that was filed
in this District Circuit Court. *Anything further is 25¢ per page*
*anyone may get copies for you.*

*Mailed*
*7-19-04*

the materials requested,  I pray that I am not a burdensome
and seriously ask for your assistance in this matter.
Respectfully Submitted
Bobby Williams  AIS# 231210



Certificate of Service

I hereby certify that I have served a copy of the
following   by placing the name in the U.S mail on
this said 8th day of July  2004 upon the Circuit Clerk
of Pike County, Alabama36081at 120 church street.


Sincerely Bobby Williams
Limestone C.F 28779 Nickdavid rd.
35749 Harvest AL,



*202*

State of Alabama
Unified Judicial System

**SUBPOENA REQUEST FORM**

CASE NUMBER
CC03-S-382

Form C-12  Rev 10/86

IN THE _____CIRCUIT_____ COURT OF _____PIKE_____ COUNTY, ALABAMA

PLANTIFF:         STATE         V.    DEFENDANT:    WILLIAMS, BOBBY

In the matter of _____ROBBERY 1_____

Court Date  11/08/2004 _____ Court Time  9:00 a.m. _____ Date Requested  10/11/2004

The Clerk/Register is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:

☒ Plaintiff / State   ☐ Defendant   ☐ Grand Jury   ☐ Other _____

|  | | Date Issued | Date Executed | Remarks |
|---|---|---|---|---|
| Name: EDITH THOMAS  ( ) - | | 10-12-04 | | |
| Address: 103 MINCHNER ST, TROY, AL 36081 | | | | |
| Name: MONICA KING  ( ) - | | 10-12-04 | | |
| Address: BEELINE 614, BRUNDIDGE STREET, TROY, AL 36081 | | | | |
| Name: REBECCA HOLLEY  ( ) - | | 10-12-04 | | |
| Address: 131 GRIMES STREET, TROY, AL 36081 | | | | |
| Name: GREG WRIGHT  ( ) - | | 10-12-04 | | |
| Address: TPD, TROY, AL 36081 | | | | |
| Name: LARRY ROSS  ( ) - | | 10-12-04 | | |
| Address: TPD, TROY, AL 36081 | | | | |

METHOD OF SERVICE REQUESTED
☐ Personal  ☐ Mail

Party Requesting Subpoena  DA OFFICE
10/11/2004



OCT 2004
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala.



IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                    )

    Plaintiff.                    )

VS.                                  )    CASE #CC-03-382 & 383

                                     )

BOBBY WILLIAMS,                      )

    Defendant.                    )

## REQUEST FOR APPOINTMENT OF NEW COUNSEL

COMES now the Defendant, pro se, and moves this Honorable Court to appoint Defendant new counsel to represent him in this cause. In support thereof, Defendant shows unto the Court as follows:

1. Defendant's current attorney, James N. Thomas, is not providing the assistance Defendant feels he needs given the seriousness of these charges. Defendant is receiving mixed signals from his attorney indicative that a working relationship is not possible between attorney and client.

2. In support of this motion, Defendant attaches hereto his sworn affidavit setting out his grounds and reasons for asking for another lawyer.

3. The Sixth Amendment requires effect representation creating an adversarial process. Defendant is not receiving representation sufficient to meet the Sixth Amendment standard.

[1]

204

WHEREFORE, premises considered, Defendant prays that the Court will remove James N. Thomas as counsel for the Defendant and appoint new counsel for good cause shown.

Respectfully submitted,

*Bobby Williams*
Bobby Williams #231210
Limestone C.F. Dorm
28779 Nick Davis Road
Harvest, Alabama 35749-7009

[2]



## CERTIFICATE OF SERVICE

I, Bobby Williams, do hereby certify that the foregoing motion was served upon the district attorney for Pike County, Alabama, by placing the same in the United States mail, postage prepaid and addressed correctly this _____ day of October, 2004.

Bobby Williams
Bobby Williams, Defendant, pro se
#231210 L.C.F. Dorm 8
28779 Nick Davis Road
Harvest,    Alabama    35749-7009



[3]



## A F F I D A V I T   O F   B O B B Y   W I L L I A M S

STATE OF ALABAMA        )
COUNTY OF LIMESTONE   )

Before the undersigned authority, a NOTARY PUBLIC, in and for said county and state appears Bobby Williams, who after first being duly sworn, swears under oath that;

My name is Bobby Williams, and I am the Defendant is Pike County Circuit Court case #CC-03-382 & 383. I am asking to be appointed another lawyer in these cases. My appointed attorney, James N. Thomas, is not providing what I believe is the effective assistance to which I am entitled. I no longer trust Mr. Thomas to act in my best interest. I believe court appearances have been conducted without my knowledge or presence which have been detrimental to me. The mixed messages I have received from Mr. Thomas have me concerned that Mr. Thomas is indifferent to the seriousness of my situation and that Mr. Thomas and I can no longer exist in an attorney-client relationship. I am not attempting to delay the proceedings or cause trouble with the Court. I simply cannot put my trust in Mr. Thomas and no longer have faith in his ability to advocate my cause.

SWORN TO AND SUBSCRIBED BEFORE
ME THIS _____18th_____ DAY OF OCTOBER, 2004.

_____          _____
NOTARY PUBLIC                                           BOBBY WILLIAMS - AFFIANT

MY COMMISSION EXPIRES 8 / 16 / 06



IN THE CIRCUIT COURT OF
PIKE COUNTY, ALABAMA

|                        |   |                          |
|------------------------|---|--------------------------|
| STATE OF ALABAMA       | * |                          |
| Plaintiff              | * |                          |
|                        | * | CASE NO:    CC 2003-S-382 |
|                        | * |             AND 383       |
| BOBBY WILLIAMS         | * |                          |
| Defendant.             | * |                          |

## MOTION TO TRANSFER DEFENDANT TO PIKE COUNTY JAIL

COMES NOW James N. Thomas, legal counsel for Bobby Williams, the defendant in the

above styled case, and hereby petitions the Court to enter an Order transferring the Defendant from

the Bullock County Correctional Facility to the Pike County Jail and for grounds in support, Counsel

states the following:

1. Counsel for the Defendant has been unable to communicate with the Defendant given

   his incarceration in the Limestone Correctional Facility since his time of arrest.

2. Counsel cannot effectively settle or prepare the case for trial without the Defendant

   being brought to the Pike County Jail prior to October 27, 2004.

3. Counsel respectively request that the Defendant be Transported no later than October

   27, 2004 to the Pike County Jail so that the case may be properly prepared for trial

   or resolved.

RESPECTFULLY SUBMITTED:

_James N. Thomas_
James N. Thomas, THO148
Attorney for the Defendant

OCT 2004
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala.



OF COUNSEL:

James N. Thomas, LLC
James N. Thomas
P.O. Box 974
Troy, Alabama 36081
(334) 566-2181

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that a copy of the foregoing Motion for Transfer was served upon the

D.A. at the, Pike County Courthouse, Troy, Alabama, by hand delivery on this the 26th    Day of

October, 2004.


                                        James N. Thomas



IN THE CIRCUIT COURT OF
PIKE COUNTY, ALABAMA

STATE OF ALABAMA                    *
   Plaintiff                        *
                                    *
BOBBY WILLIAMS                      *      CASE NO:    CC 2004-178  03-382
ROBERT ENGLISH                      *                                383
   Defendant.                       *

## ORDER GRANTING MOTION TO TRANSFER

The Motion/Request for the Defendant, **Bobbie Williams AIS 231210,**  to be transferred

from the Limestone Correctional Facility; 28779 Nickdavid Rd;Harvest, Al 35749 to the Pike

County Jail having been presented by legal Counsel for the above-named indigent defendant, and

the Court having considered said Motion/Request, finds the same to be well taken and due to be

GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED, that the Pike County

Sheriff transport the Defendant to the Pike County Jail on the ~~October~~ *no later than 11-5-04* where he is to be held

until completion of his case.

DONE AND ORDERED this the ___28___ day of ___Oct___, 2004.

_____
Judge Steve Blair

cc:   D.A.
      Thomas



```
UR250                        ALABAMA JUDICIAL INFORMATION SYSTEM            PAGE    1
OPER: PEM                              PIKE COUNTY                     RUN DATE: 11/08/2004
                            STRIKE LIST BY: STRIKE#                    RUN TIME: 10:03:24

TERM DATE: 11/08/2004     PANEL: ALL     STATUS: A
```

| STRIKE | JUROR'S NAME | STRIKE | JUROR'S NAME |
|---|---|---|---|
| 0005 | ALLARD CATHERINE LOUISE | 0093 | HUSSEY MARILEE DICHIARA |
| 0009 | ANDERSON GLORIA BELL | 0101 | ~~HUTTO PATTERSON~~ |
| 0010 | ANDRESS KENNETH WAYNE | ~~0103~~ | ~~JOHNSON WILLIE~~ |
| ~~0011~~ | ~~ARNOLD~~ | 0105 | JONES CHARLIE L |
| 0013 | BAKER AMY SMITH | 0106 | JONES JAMES E |
| ~~0020~~ | ~~BISHOP~~ | 0110 | JORDAN MARVIN PETE |
| 0021 | BLAIR MATTIE DELORES | 0114 | KINNEY GAYLA GIBSON |
| 0022 | BLAIR TOMMY RUFUS | 0115 | KIRKLAND KENNITH WAYNE |
| 0028 | BROWN JUDITH SIMMONS MA | 0118 | LEVERETT JOHN WILSON |
| 0030 | BROWN MICHELL HATFIELD | ~~0132~~ | ~~McLENDON~~ |
| 0038 | CAIN WENDY LYNN | 0133 | McLEOD LAMON L      on |
| 0042 | CHILDS HAROLD KEVIN | ~~0135~~ | ~~PASTOR THOMX~~ |
| 0048 | CUMMINGS SARAH | 0137 | MOULTRY SHARON WALLACE |
| ~~0053~~ | ~~KENNEDY~~ | 0139 | NALL KIMBERLY K |
| 0054 | DICKEY JIMMY RAY | ~~0143~~ | ~~PRINCE S~~ |
| 0058 | EDWARDS JON PAUL | 0144 | PATTERSON JOE CEPHUS |
| ~~0059~~ | | 0152 | POBANZ CATHERINE M |
| 0060 | EVANS MARY DIANA | 0153 | PORTER CURTIS HUNTER |
| 0061 | EVERS JOHN ALLEN | 0158 | REGISTER WILLIAM JUSTIN   on |
| 0064 | FLOYD ELEISE SHEFFIELD | 0161 | RICHARDSON DANITA THARP |
| 0067 | FOSTER MAYA LATASHA   Chal | ~~0163~~ | ~~RICHARDSON NATHANIEL~~ |
| 0068 | FOWLER SAMMYE | 0164 | ROBERTS KELLY PADGETT |
| 0069 | FURR CHRISTOPHER RAY | 0170 | SANDERS WILEY STEPHEN |
| 0070 | FURR FREDA MARIE | 0172 | SCARBROUGH THOMAS HERRI |
| 0072 | GLOVER ERIC DANYEL | 0178 | SMILEY JENNIFER ROSE |
| 0077 | HAHN TONIA R | 0180 | SNEED APRIL G |
| 0078 | HAMPTON BETHENA THOMAS | 0188 | STEPHENS ARCH LARKIN |
| 0082 | HAYES WILLIAM RANDALL | 0190 | STEWART ANGELA D |
| 0083 | HELMS JEFFERY ARNOLD | 0191 | STOLTZE HOLLY LUNSFORD |
| 0085 | HENNE PAMELA W | 0192 | STRINGER DEVINE JAMAR |
| ~~0087~~ | | 0198 | THOMPSON CHARLES A |
| 0088 | HICKS LARRY JACK | 0199 | THOMPSON RANDALL K |

OPER: PEM
PIKE COUNTY
STRIKE LIST BY: STRIKE#
RUN DATE:
RUN TIME: 10:03:24

TERM DATE: 11/08/2004    PANEL: ALL    STATUS: A

211

STRIKE    JUROR'S NAME                    STRIKE    JUROR'S NAME

59

~~0202   TILLERY JOHNNY ANDREW~~ $\pi$

58
12
46
23

0209   WALTERS IMOGENE REESE

~~0211   WATERS GREGORY DEWAYNE~~ $\pi$

~~0218   WILLIAMS LINDA SCOTT~~ $\pi$

~~0222   WINN ASHLEY AMANDA~~ $\pi$

|     | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|-----|---|---|---|---|---|---|---|---|---|----|----|----|----|----|----|----|----|----|----|----|
| P.  | 05 | 22 | 28 | 38 | 58 | 68 | 72 | 83 | 77 | 93 | 110 | 69 | 137 | 178 | 180 | 190 | 202 | 211 | 218 | 22 |
| D.  | 10 | 13 | 30 | 42 | 54 | 61 | 70 | 78 | 82 | 88 | 105 | 115 | 139 | 144 | 153 | 172 | 191 | 192 | 199 | 19 |

|     | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 |
|-----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| P.  | 118 | 152 | 188 | X | | | | | | | | | | | | | | | | |
| D.  | 64 | 85 | X | X | | | | | | | | | | | | | | | | |

CC03-382    State of Alabama vs   Bobby Williams
383

Judge   Steve Blair
Ct Rep   Shelia Hanson
ADA   Larry Jarrell
Def.   Jim Thomas

Selection Monday
Trial Tues 9:00
Law Lib

JURY INSTRUCTIONS - STATE OF ALABAMA V. BOBBY WILLIAMS
CC-03-382

212

### III-E-4.3  FALSE TESTIMONY

IF YOU BELIEVE THAT ANY MATERIAL PART OF THE EVIDENCE OF ANY

WITNESS WAS WILLFULLY FALSE, YOU MAY DISREGARD ALL OF THE TESTIMONY

OF SUCH WITNESS.


REFERENCE:        PATTERN JURY INSTRUCTIONS CRIMINAL - 1-1-80 IIIE-11;

INSTRUCTION GRANTED:      _____

INSTRUCTION DENIED:       _____

△ Charge # a1    

## JURY INSTRUCTIONS - STATE OF ALABAMA V. BOBBY WILLIAMS
### CC-03-382

### EYE WITNESS TESTIMONY

NOW, INVOLVED IN THIS CASE, LADIES AND GENTLEMEN, ~~WAS~~ IS A QUESTION OF IDENTITY. ~~YOU ALL~~

~~ARE FAMILIAR WITH THE UPS AND DOWNS OF IDENTIFICATION. YOU HAVE TO AND YOU DO AND~~

~~YOU WILL,~~ YOU ~~HAVE TO~~ may CONSIDER THE POSSIBILITY OF HUMAN ERROR OR MISTAKE AND THE

~~PROBABLE~~ LIKENESS OR SIMILARITY OF OBJECTS ~~, OR~~ OR PERSONS. ~~LOTS OF TIMES WE WALK DOWN~~

~~THE STREET AND YOU THINK YOU SAW SOMEONE YOU KNOW AND YOU COME UP TO THEM AND SAY~~

~~HI OR SOMETHING AND YOU FIND OUT YOU DON'T KNOW THEM. I GUESS WE ALL HAVE BEEN IN~~

~~THAT SITUATION ONE TIME OR ANOTHER. THAT'S JUST ONE OF THE ELEMENTS THAT WE MUST ACT~~

~~ON IN CONSIDERING THE TESTIMONY AS TO IDENTIFICATION.~~ YOU ~~MUST CAREFULLY~~ may CONSIDER

THESE FACTORS in ~~/~~ PASSING ON THE CREDIBILITY OF THE WITNESSES, THE WEIGHT YOU ~~WOULD~~

ATTACH TO THEIR TESTIMONY, AND ~~YOU MUST BE CONVINCED BEYOND A REASONABLE DOUBT AS~~

~~TO~~ THE ACCURACY OF the IDENTIFICATION BY ~~A~~ the WITNESS.

REFERENCE:      CARTER V. STATE, 627 So.2d 1027

INSTRUCTION GRANTED:  _____ ✓ (as amended) _____

INSTRUCTION DENIED:      _____



IN THE CIRCUIT COURT FOR
THE TWELFTH JUDICIAL CIRCUIT
PIKE COUNTY, ALABAMA

STATE OF ALABAMA,              *

                          *

    Plaintiff,             *

                          *

vs.                        *      CASE NO.    CC 2003-382

                          *      (Beeline Store / Edith Thomas)

BOBBY WILLIAMS,          *

                          *

    Defendant.          *


## VERDICT 1

We, the jury, find the Defendant, BOBBY WILLIAMS, "**GUILTY**" of ROBBERY in the

FIRST DEGREE, in violation of Section 13A-008-041, <u>Code of Alabama, 1975</u>, as charged

in the Indictment.


                            _____

                            FOREPERSON


## VERDICT 2

We, the jury, find the Defendant, BOBBY WILLIAMS, "**NOT GUILTY**" of ROBBERY

in the FIRST DEGREE, in violation of Section 13A-008-041, <u>Code of Alabama, 1975</u>, as

charged in the Indictment.


                            _____

                            FOREPERSON



IN THE CIRCUIT COURT FOR
THE TWELFTH JUDICIAL CIRCUIT
PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
    Plaintiff,                      *
                                     *
vs.                                  *          CASE NO.    CC 2003-383
                                     *          (Sunny South / Rebecca Holley)
BOBBY WILLIAMS,                      *
                                     *
    Defendant.                      *


## VERDICT 1

We, the jury, find the Defendant, BOBBY WILLIAMS, "**GUILTY**" of ROBBERY in the

FIRST DEGREE, in violation of Section 13A-008-041, Code of Alabama, 1975, as charged

in the Indictment.


                         _____
                         FOREPERSON


## VERDICT 2

We, the jury, find the Defendant, BOBBY WILLIAMS, "**NOT GUILTY**" of ROBBERY

in the FIRST DEGREE, in violation of Section 13A-008-041, Code of Alabama, 1975, as

charged in the Indictment.


                         _____
                         FOREPERSON

Westlaw Attached Printing Summary Report for THOMAS, JIM 4763785

216

| | |
|---|---|
| Your Search: | PROMISES OF LENIENCY IN EXCHANGE OF STATEMENT |
| | Restrictions: DA(AFT 11/06/1994) |
| Date/Time of Request: | Saturday, November 06, 2004 13:59:00 Central |
| Client Identifier: | 1000132761 |
| Database: | AL-CS |
| Citation Text: | 795 So.2d 753 |
| Lines: | 1989 |
| Documents: | 1 |
| Images: | 0 |

(C) 2004. Copyright is not claimed as to any part of the original work prepared by a U.S. government officer or employee as part of that person's official duties. All rights reserved. No part of a Westlaw transmission may be copied, downloaded, stored in a retrieval system, further transmitted or otherwise reproduced, stored, disseminated, transferred or used, in any form or by any means, except as permitted in the Westlaw Subscriber Agreement, the Additional Terms Governing Internet Access to Westlaw or by West's prior written agreement. Each reproduction of any part of a Westlaw transmission must contain notice of West's copyright as follows: "Copr. (C) 2004 West, a Thomson business. No claim to orig. U.S. govt. works." Registered in U.S. Patent and Trademark Office and used herein under license: KeyCite, Westlaw and WIN. WIN Natural Language is protected by U.S. Patent Nos. 5,265,065, 5,418,948 and 5,488,725.



Westlaw.

795 So.2d 753                                                                                              Page 1
795 So.2d 753
(Cite as: 795 So.2d 753)

H

Court of Criminal Appeals of Alabama.

Marcus Bernard WILLIAMS
v.
STATE.

CR-98-1734.

Dec. 10, 1999.
Rehearing Denied Jan. 28, 2000.

Defendant was convicted in the St. Clair Circuit Court, No. CC-97-57, Robert E. Austin, J., of murder made capital because it was committed during rape or attempted rape and sentenced to death. Defendant appealed. The Court of Criminal Appeals, Baschab, J., held that: (1) defendant was not entitled to funds to perform independent deoxyribonucleic acid (DNA) tests on blood samples taken from other suspects; (2) probative value of testimony of victim's mother that victim's children were in residence when mother found victim's body was not substantially outweighed by danger of unfair prejudice; (3) defendant's inculpatory statements were admissible; (4) DNA evidence was admissible; (5) evidence was sufficient to support conviction; and (6) death sentence was neither excessive nor disproportionate.

Affirmed.

Affirmed, Ala., 795 So.2d 785.

West Headnotes
[1] Criminal Law ☞1030(1)
110k1030(1) Most Cited Cases
Although a capital-murder defendant's failure to object to an issue at trial will not bar appellate review of the issue, it will weigh against any claim of prejudice the defendant may allege.
[2] Criminal Law ☞1030(1)
110k1030(1) Most Cited Cases
The plain-error exception to the contemporaneous-objection rule is to be used

sparingly and solely in those circumstances in which a miscarriage of justice would otherwise result. Rules App.Proc., Rule 45A.
[3] Costs ☞302.4
102k302.4 Most Cited Cases
Indigent defendant was not entitled to funds to perform independent deoxyribonucleic acid (DNA) tests on blood samples taken from other suspects, where defendant failed to show after independently testing his own blood that there was reasonable probability that independent DNA testing of suspects' blood would aid his defense and that denial of such opportunity would result in fundamentally unfair trial and his defense was that he entered victim's apartment with intent to have sex with her but that he did not intend to kill her.
[4] Costs ☞302.2(2)
102k302.2(2) Most Cited Cases
For an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial.
[5] Criminal Law ☞1036.1(3.1)
110k1036.1(3.1) Most Cited Cases
Capital-murder defendant's claim that trial court erroneously allowed victim's mother to testify that victim's children were in residence when mother found victim's body was subject to plain-error review, where defendant did not object during opening arguments when state referred to children's presence at crime scene, defendant did not object during state's case-in-chief when state elicited testimony about children's presence at the crime scene, and record did not reflect that trial court agreed that subsequent objection would not be necessary. Rules App.Proc., Rule 45A.
[6] Homicide ☞975
203k975 Most Cited Cases
(Formerly 203k171(1))
Testimony of capital-murder victim's mother that victim's children were in residence when mother found victim's body was relevant to explain condition of crime scene when mother arrived, to explain why mother removed child from crime

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

scene, to explain what happened to children after mother left crime scene, and to corroborate defendant's statements.

**[7] Criminal Law ⬤338(7)**
110k338(7) Most Cited Cases
Sympathy
Probative value of testimony of capital-murder victim's mother that victim's children were in residence when mother found victim's body was not substantially outweighed by danger of unfair prejudice. Rules of Evid., Rule 403.

**[8] Criminal Law ⬤899**
110k899 Most Cited Cases
**[8] Criminal Law ⬤1036.1(1)**
110k1036.1(1) Most Cited Cases
**[8] Criminal Law ⬤1043(2)**
110k1043(2) Most Cited Cases
A party who suffers an adverse ruling on a motion in limine can preserve the ruling for postjudgment and appellate review only by objecting to the introduction of the proffered evidence and assigning specific grounds at the time of trial, unless he obtains the express acquiescence of the trial judge that a subsequent objection and assignment of grounds are not necessary.

**[9] Criminal Law ⬤338(7)**
110k338(7) Most Cited Cases
**[9] Criminal Law ⬤1153(1)**
110k1153(1) Most Cited Cases
The power to determine whether the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice is vested in the trial court, and an appellate court will not disturb such a determination unless it is clearly an abuse of discretion. Rules of Evid., Rule 403.

**[10] Criminal Law ⬤338(1)**
110k338(1) Most Cited Cases
A fact is admissible if it has any probative value, however slight, upon a matter in the case.

**[11] Homicide ⬤975**
203k975 Most Cited Cases
(Formerly 203k171(1))
Evidence as to the scene of a homicide, as to objects found thereat, and as to the condition of the body is admissible and relevant evidence when reasonably proximate to the scene in time and location.

**[12] Criminal Law ⬤414**
110k414 Most Cited Cases
Defendant's inculpatory statements were admissible; although defendant contended that

investigator told him things would be easier if he made statement and that investigator promised to talk to judge on his behalf if he made statement, on cross-examination defendant admitted that officers did not make promises or threats and did not coerce him or force him to make statements, investigator denied making such statements, and second investigator testified that defendant waived *Miranda* rights and agreed to talk about his involvement in offense without threats or promises.

**[13] Criminal Law ⬤412.1(1)**
110k412.1(1) Most Cited Cases
**[13] Criminal Law ⬤412.1(4)**
110k412.1(4) Most Cited Cases
**[13] Criminal Law ⬤519(1)**
110k519(1) Most Cited Cases
**[13] Criminal Law ⬤520(1)**
110k520(1) Most Cited Cases
A confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency.

**[14] Criminal Law ⬤412.1(1)**
110k412.1(1) Most Cited Cases
**[14] Criminal Law ⬤519(1)**
110k519(1) Most Cited Cases
The test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by apprehension of harm or hope of favor.

**[15] Criminal Law ⬤412.1(1)**
110k412.1(1) Most Cited Cases
**[15] Criminal Law ⬤519(1)**
110k519(1) Most Cited Cases
To determine if a defendant's will was been overborne when he made a confession or any other inculpatory statement, a court must assess the conduct of the law enforcement officials in creating pressure and the defendant's capacity to resist that pressure, including the defendant's personal characteristics and prior experience with the criminal justice system.

**[16] Criminal Law ⬤412.1(1)**
110k412.1(1) Most Cited Cases
The mere promise to make cooperation known to law enforcement authorities, as opposed to a direct promise of a reduced sentence, generally is not considered an illegal inducement.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



795 So.2d 753
795 So.2d 753
(Cite as: 795 So.2d 753)

Page 3

**[17] Criminal Law ☜1158(4)**
110k1158(4) Most Cited Cases
Absent clear error, a trial court's credibility choices at suppression hearings are binding on the Court of Criminal Appeals.

**[18] Criminal Law ☜1158(4)**
110k1158(4) Most Cited Cases
The standard of review of conflicting evidence at a motion to suppress a confession is whether the trial court's finding was manifestly contrary to the great weight of the evidence.

**[19] Criminal Law ☜388.2**
110k388.2 Most Cited Cases
Evidence was sufficient to establish reliability of theory and techniques used in polymerase chain reaction (PCR) method for testing deoxyribonucleic acid (DNA) and in population frequency statistical analysis, for purpose of determining whether DNA evidence was admissible, where expert testified that National Research Council's (NRC's) studies about PCR method have been very complimentary, that he was not aware of any error in any DNA testing performed in his laboratory, that results from proficiency tests were 100% in agreement with those obtained by other laboratories, that PCR method is widely accepted in scientific community, that controls did not indicate any error in calculating population frequency characteristics, that statistical methods used are also used by other laboratories that comply with NRC requirements and are generally accepted in scientific community. Code 1975, § 36-18-30.

**[20] Criminal Law ☜388.2**
110k388.2 Most Cited Cases
Deoxyribonucleic acid (DNA) evidence was relevant to establishing defendant's identity as perpetrator of murder, to corroborating defendant's statements to police, and to supporting state's theory that defendant raped or attempted to rape victim. Code 1975, § 36-18-30.

**[21] Criminal Law ☜388.2**
110k388.2 Most Cited Cases
For deoxyribonucleic acid (DNA) evidence to be admissible under *Daubert*, it must be reliable and relevant, and some factors that are germane in determining whether evidence is reliable include the following: (1) that the technique has been tested; (2) testimony that the technique has been subjected to peer review and publication; (3) testimony about the known or potential rate of error and quality controls associated with the technique; and (4) testimony

that the technique is generally accepted in the relevant scientific community. Code 1975, § 36-18-30.

**[22] Criminal Law ☜388.2**
110k388.2 Most Cited Cases
In assessing the reliability of deoxyribonucleic acid (DNA) evidence under *Daubert*, the trial court should focus on the principles and methodology underlying the technique, not the conclusions they generate. Code 1975, § 36-18-30.

**[23] Criminal Law ☜388.2**
110k388.2 Most Cited Cases
In determining whether deoxyribonucleic acid (DNA) evidence is relevant under *Daubert*, the trial court should decide whether the evidence will help the factfinders understand the evidence or decide a fact that is in issue. Code 1975, § 36-18-30

.

**[24] Criminal Law ☜1036.6**
110k1036.6 Most Cited Cases
Capital-murder defendant's claim that trial court improperly limited scope of his cross-examination of state expert was subject to plain-error review, where defendant failed to present this objection to trial court. Rules App.Proc., Rule 45A.

**[25] Criminal Law ☜489**
110k489 Most Cited Cases
Sustaining state's objection to defense counsel's question to state expert regarding another court case was not an abuse of discretion, where expert stated that he was not familiar with case and, although trial court sustained objection to form of question, trial court did not prevent defense counsel from pursuing that line of questioning.

**[26] Criminal Law ☜1153(4)**
110k1153(4) Most Cited Cases
**[26] Witnesses ☜267**
410k267 Most Cited Cases
The scope of cross-examination in a criminal proceeding is within the discretion of the trial judge and it is not reviewable except for the trial judge's prejudicial abuse of discretion.

**[27] Witnesses ☜267**
410k267 Most Cited Cases
While rather wide latitude is allowed on cross-examination, the court has reasonable discretion in confining the examination to prevent diversion to outside issues.

**[28] Homicide ☜1165**
203k1165 Most Cited Cases
(Formerly 203k235)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



Evidence was sufficient to support conviction for murder made capital because it was committed during rape or attempted rape; defendant's statement indicated that he entered victim's apartment with intent to rape victim and that he took knife with him to facilitate rape, lower half of victim's body was unclothed, victim's stomach had semen stain, blood and semen found at crime scene were consistent with defendant's genetic profile, and medical examiner testified that cause of death was smothering or strangulation. Code 1975, § 13A-5-40(a)(3).

[29] Homicide ☞581
203k581 Most Cited Cases
(Formerly 203k9)
An accused is not guilty of a capital offense where the intent to commit the accompanying felony was formed only after the victim was killed.

[30] Criminal Law ☞738
110k738 Most Cited Cases
The question of a defendant's intent at the time of the commission of a crime is usually a jury question.

[31] Rape ☞1
321k1 Most Cited Cases

[31] Rape ☞15
321k15 Most Cited Cases
It is not necessary to show an injury to prove that a rape or an attempted rape occurred.

[32] Criminal Law ☞312
110k312 Most Cited Cases
Intent, being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.

[33] Criminal Law ☞24
110k24 Most Cited Cases
Where one assaults another by the use of a deadly weapon, the law will infer from that fact that he designed to accomplish the probable and natural results of his act, in the absence of proof to the contrary.

[34] Criminal Law ☞312
110k312 Most Cited Cases
Intent may be inferred from the use of a deadly weapon, the character of the assault, or other attendant circumstances.

[35] Criminal Law ☞1144.13(3)
110k1144.13(3) Most Cited Cases

[35] Criminal Law ☞1144.13(4)
110k1144.13(4) Most Cited Cases

[35] Criminal Law ☞1144.13(5)
110k1144.13(5) Most Cited Cases
In determining the sufficiency of the evidence to sustain a conviction, the Court of Criminal Appeals must accept as true the evidence introduced by the state, accord the state all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.

[36] Criminal Law ☞1159.2(1)
110k1159.2(1) Most Cited Cases
The role of appellate courts is not to say what the facts are, but to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury.

[37] Criminal Law ☞1159.2(2)
110k1159.2(2) Most Cited Cases
An appellate court may interfere with the jury's verdict only where it reaches a clear conclusion that the finding and judgment are wrong.

[38] Criminal Law ☞1144.13(2.1)
110k1144.13(2.1) Most Cited Cases

[38] Criminal Law ☞1159.2(2)
110k1159.2(2) Most Cited Cases
Evidence.
A verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust.

[39] Criminal Law ☞1159.3(3.1)
110k1159.3(3.1) Most Cited Cases
Where there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense.

[40] Criminal Law ☞552(3)
110k552(3) Most Cited Cases
Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.

[41] Criminal Law ☞552(4)
110k552(4) Most Cited Cases
Circumstantial evidence is not considered inferior evidence and is entitled to the same weight as direct evidence, provided it points to the guilt of the accused.

[42] Criminal Law ☞1037.1(2)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

795 So.2d 753
795 So.2d 753
(Cite as: 795 So.2d 753)

110k1037.1(2) Most Cited Cases
Capital-murder defendant's challenge to prosecutor's guilt phase closing argument comments that these are kinds of things you see on television and this case deserves capital-murder verdict was subject to plain-error review, where defendant failed to object at trial to comments. Rules App.Proc., Rule 45A.

**[43] Criminal Law ⚖723(2)**
110k723(2) Most Cited Cases
Prosecutor's guilt-phase closing-argument comments that these are kinds of things you see on television and this case deserves capital-murder verdict were permissible appeal for justice.

**[44] Criminal Law ⚖1171.1(2.1)**
110k1171.1(2.1) Most Cited Cases
In reviewing a prosecutor's closing argument, the standard is whether the argument so infected the trial with unfairness as to make the resulting conviction a denial of due process. U.S.C.A. Const.Amend. 14.

**[45] Criminal Law ⚖720(6)**
110k720(6) Most Cited Cases
During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.

**[46] Criminal Law ⚖713**
110k713 Most Cited Cases
In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, each case must be judged on its own merits and the remarks must be evaluated in the context of the whole trial.

**[47] Criminal Law ⚖1171.1(2.1)**
110k1171.1(2.1) Most Cited Cases
In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.

**[48] Criminal Law ⚖1171.1(2.1)**
110k1171.1(2.1) Most Cited Cases
To justify reversal because of an attorney's argument to the jury, the Court of Criminal Appeals must conclude that substantial prejudice resulted.

**[48] Criminal Law ⚖1171.1(2.1)**
110k1171.1(2.1) Most Cited Cases
To justify reversal because of an attorney's argument to the jury, the Court of Criminal Appeals must conclude that substantial prejudice resulted.

**[48] Criminal Law ⚖1171.1(2.1)**
110k1171.1(2.1) Most Cited Cases

To justify reversal because of an attorney's argument to the jury, the Court of Criminal Appeals must conclude that substantial prejudice resulted.

**[48] Criminal Law ⚖1171.1(2.1)**
110k1171.1(2.1) Most Cited Cases
To justify reversal because of an attorney's argument to the jury, the Court of Criminal Appeals must conclude that substantial prejudice resulted.

**[49] Criminal Law ⚖725**
110k725 Most Cited Cases
There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty.

**[50] Criminal Law ⚖1144.15**
110k1144.15 Most Cited Cases
The jury is presumed to have followed the trial court's instructions.

**[51] Criminal Law ⚖805(1)**
110k805(1) Most Cited Cases
A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case.

**[52] Criminal Law ⚖822(1)**
110k822(1) Most Cited Cases
A trial court's oral charge to the jury must be construed as a whole and must be given a reasonable, rather than a strained, construction.

**[53] Criminal Law ⚖809**
110k809 Most Cited Cases
**[53] Criminal Law ⚖829(1)**
110k829(1) Most Cited Cases
**[53] Criminal Law ⚖830**
110k830 Most Cited Cases
When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges.

**[54] Criminal Law ⚖1038.2**
110k1038.2 Most Cited Cases
**[54] Criminal Law ⚖1038.3**
110k1038.3 Most Cited Cases
Capital-murder defendant's claim that trial court erred by failing to instruct jury that it could find him not guilty by reason of mental disease or defect was subject to plain-error review, where defendant failed to request such instruction and did not object when trial court did not give instruction. Rules App.Proc., Rule 45A.

**[55] Criminal Law ⚖824(4)**

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

795 So.2d 753
795 So.2d 753
**(Cite as: 795 So.2d 753)**

110k824(4) Most Cited Cases
(Formerly 203k294.1)
**[55] Homicide ☞1502**
203k1502 Most Cited Cases
(Formerly 203k294.1)
Capital-murder defendant was not entitled to instruction that jury could find him not guilty by reason of mental disease or defect, where defendant admitted that defense did not request such instruction, that defense had abandoned this strategy before trial, and that current status of law would not agree with this argument.
**[56] Criminal Law ☞1038.2**
110k1038.2 Most Cited Cases
(Formerly 203k325)
Capital murder defendant's claim that trial court erred by failing to instruct jury on manslaughter as lesser included offense was subject to plain-error review, where defendant failed to object when trial court stated that it would not give instruction and did not object after trial court gave oral charge.
Rules App.Proc., Rule 45A.
**[57] Homicide ☞1457**
203k1457 Most Cited Cases
(Formerly 203k309(3))
There was no reasonable theory to support giving of manslaughter instruction in capital-murder prosecution, where defendant's statement indicated that he entered victim's apartment with intent to rape her, defendant contended that he did not intend to kill victim, and trial court instructed jury on felony murder.
**[58] Criminal Law ☞795(2.5)**
110k795(2.5) Most Cited Cases
No error occurs in not giving a charge on a lesser included offense when there is no reasonable theory to support the lesser offense.
**[59] Criminal Law ☞1038.1(4)**
110k1038.1(4) Most Cited Cases
(Formerly 203k325)
Capital-murder defendant's claim that trial court improperly instructed jury on voluntary intoxication was subject to plain-error review, where defendant failed to present argument to trial court. Rules App.Proc., Rule 45A.
**[60] Criminal Law ☞53**
110k53 Most Cited Cases
**[60] Homicide ☞821**
203k821 Most Cited Cases
(Formerly 203k81, 203k28)
In a homicide or an assault and battery case,

voluntary intoxication is no defense unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure.
**[61] Homicide ☞821**
203k821 Most Cited Cases
(Formerly 203k28)
The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill.
**[62] Sentencing and Punishment ☞1789(3)**
350Hk1789(3) Most Cited Cases
(Formerly 203k325)
Capital-murder defendant's claim that trial court erroneously instructed jury on aggravating circumstances was subject to plain error review, where defendant failed to raise claim in trial court. Rules App.Proc., Rule 45A.
**[63] Sentencing and Punishment ☞1780(3)**
350Hk1780(3) Most Cited Cases
(Formerly 203k311)
Trial court's penalty-phase instructions did not allow jury to find existence of additional aggravating circumstances, but properly provided that only aggravating circumstance jury could find was that defendant committed murder during rape or attempted rape and that, by virtue of returning capital-murder verdict, jury had already found that state proved that aggravating circumstance beyond a reasonable doubt.
**[64] Sentencing and Punishment ☞1789(3)**
350Hk1789(3) Most Cited Cases
(Formerly 110k1037.1(2))
Capital-murder defendant's claim that prosecutor engaged in improper argument about applicable aggravating circumstance was subject to plain-error review, where defendant failed to object to prosecutor's comment at trial. Rules App.Proc., Rule 45A.
**[65] Sentencing and Punishment ☞1780(2)**
350Hk1780(2) Most Cited Cases
(Formerly 110k730(6))
Prosecutor was not misleading in arguing that state was relying on aggravating circumstance that capital offense was committed during rape, burglary, or robbery and that if jury found that defendant committed rape and murder of victim while he was engaged in rape, burglary, or robbery, or attempt thereof, that state proved aggravating circumstance,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

where trial court properly instructed jury that only applicable aggravating circumstance was that defendant committed murder during rape or attempted rape.

[66] Criminal Law ⚖═►1171.1(2.1)
110k1171.1(2.1) Most Cited Cases
To justify reversal because of an attorney's argument to the jury, the Court of Criminal Appeals must conclude that substantial prejudice resulted.

[67] Sentencing and Punishment ⚖═►1789(3)
350Hk1789(3) Most Cited Cases
(Formerly 203k325)
Capital-murder defendant's claim that victim's mother improperly gave overly emotional victim impact testimony during sentencing hearing was subject to plain-error review, where defendant failed to present claim to trial court. Rules App.Proc., Rule 45A.

[68] Sentencing and Punishment ⚖═►1763
350Hk1763 Most Cited Cases
[68] Sentencing and Punishment ⚖═►1780(2)
350Hk1780(2) Most Cited Cases
A prosecutor may present and argue evidence relating to the victim and the impact of the victim's death on the victim's family in the penalty phase of a capital trial.

[69] Sentencing and Punishment ⚖═►1796
350Hk1796 Most Cited Cases
(Formerly 110k1213.8(8))
Death penalty is not per se cruel and unusual punishment and electrocution is not a cruel and unusual method of capital punishment. U.S.C.A. Const.Amend. 8.

[70] Criminal Law ⚖═►1063(5)
110k1063(5) Most Cited Cases
Capital murder defendant's ineffective assistance of counsel claims were subject to plain error review, where defendant did not first present claims to trial court in new trial motion. U.S.C.A. Const.Amend. 6 ; Rules App.Proc., Rule 45A.

[71] Criminal Law ⚖═►641.13(7)
110k641.13(7) Most Cited Cases
Capital-murder defendant failed to establish ineffective assistance of counsel based upon failure to present mitigation expert and documentary evidence during penalty phase, where defendant did not allege what additional evidence expert could have presented or what documentary evidence existed that counsel did not present. U.S.C.A. Const.Amend. 6.

[72] Criminal Law ⚖═►641.13(6)

110k641.13(6) Most Cited Cases
Capital-murder defendant failed to establish ineffective assistance of counsel based upon failure to have expert testify as to effects of marijuana and alcohol, where defendant did not show what additional evidence expert could have presented or that there was reasonable probability that such evidence would have altered trial's outcome. U.S.C.A. Const.Amend. 6.

[73] Criminal Law ⚖═►641.13(2.1)
110k641.13(2.1) Most Cited Cases
Capital-murder defendant failed to establish ineffective assistance of counsel based upon abandonment of plea that defendant was not guilty by reason of mental disease or defect, where there was no evidence defendant was suffering from mental disease or defect. U.S.C.A. Const.Amend. 6.

[74] Criminal Law ⚖═►641.13(6)
110k641.13(6) Most Cited Cases
Capital-murder defendant failed to establish ineffective assistance of counsel based upon failure to have own deoxyribonucleic acid (DNA) expert to testify at trial and to assist counsel in cross-examining state's DNA expert, where counsel thoroughly cross-examined state's DNA expert and there was no indication that additional expert would have aided defense. U.S.C.A. Const.Amend. 6.

[75] Criminal Law ⚖═►641.13(6)
110k641.13(6) Most Cited Cases
Capital-murder defendant failed to establish ineffective assistance of counsel based upon not having forensic pathology expert testify that there was no evidence of rape or attempted rape, where coroner testified that he could not determine whether rape or attempted rape had occurred. U.S.C.A. Const.Amend. 6.

[76] Sentencing and Punishment ⚖═►1681
350Hk1681 Most Cited Cases
[76] Sentencing and Punishment ⚖═►1708
350Hk1708 Most Cited Cases
[76] Sentencing and Punishment ⚖═►1718
350Hk1718 Most Cited Cases
Death sentence was appropriate for defendant, who was convicted of murder made capital because it was committed during rape or attempted rape, where aggravating circumstance was that defendant committed capital murder while engaged in or attempting to commit rape and mitigating circumstances were no significant history of criminal activity, defendant's upbringing, defendant's problem resulting from end of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

795 So.2d 753
795 So.2d 753
(Cite as: 795 So.2d 753)

Page 8

promising athletic career, defendant's attainment
GED after failing to graduate, and defendant's
remorse. Code 1975, §§ 13A-5-40(a)(3),
13A-5-49(4), 13A-5-51(1), 13A-5-53(b)(2).

[77] Sentencing and Punishment ☞1657
350Hk1657 Most Cited Cases

[77] Sentencing and Punishment ☞1681
350Hk1681 Most Cited Cases

Sentencing defendant, who was convicted of
murder made capital because it was committed
during rape or attempted rape, to death was not
excessive or disproportionate when compared to
penalties imposed in similar cases. Code 1975, §§
13A-5-40(a)(3), 13A-5-53(b)(3).

*761 Joe Morgan III, Birmingham; and Dennis L.
Rushing, Ashville, for appellant.

Bill Pryor, atty. gen., and A. Vernon Barnett IV,
asst. atty. gen., for appellee.

BASCHAB, Judge.

The appellant, Marcus Bernard Williams, was
convicted of capital murder for the killing of
Melanie Dawn Rowell. The murder was made
capital because the appellant committed it during a
rape or an attempted rape. See § 13A-5-40(a)(3),
Ala.Code 1975. After a sentencing hearing, the
jury recommended, by a vote of 11-1, that the
appellant be sentenced to death. The trial court
accepted the jury's recommendation and sentenced
the appellant to death by electrocution.

The trial court prepared the following summary of
the relevant facts of this case:

"On November 6th, 1996, the defendant had been
out with friends, drinking and smoking marijuana.

  Upon returning home that evening, the
defendant's thoughts turned to a young female
neighbor of his, Melanie Dawn Rowell, and his
desire to have sexual relations with her.

"At approximately 1:00 a.m. that night, Williams
attempted to enter Rowell's back door, but the
door was locked. He then noticed a kitchen
window beside the door. He removed the screen
from the window and found that the window was
not locked. It was through that window that
Williams obtained entrance to the apartment.

"Williams proceeded through the kitchen to the
stairs leading to the upstairs bedroom. Before
exiting the kitchen, Williams removed a knife

from a set of knives in a holder on a kitchen
countertop. Part way up the stairs, knife in hand,
Williams removed his pants. Upon reaching the
upstairs area, Williams crossed over a 'baby gate'
which protected Rowell's two children, ages 15
months and 2 years, from the stairs. Williams
looked into the children's room and found them
both asleep.

"Williams then entered the room of Melanie
Rowell. He climbed in bed on top of her. When
he began removing Rowell's clothes, a struggle
ensued. Rowell *762 fought Williams and began
screaming despite [his] being armed with a knife.

  Williams placed his hand over her mouth to
silence her and once again attempted to remove
her clothes. As Rowell continued to struggle,
Williams placed his hands around her neck.
Eventually Rowell ceased to struggle as Williams
continued to strangle her. When she was
motionless, Williams proceeded to have sexual
intercourse with her for 15 to 20 minutes. Prior to
ejaculation, Williams pulled out and ejaculated
on Rowell's stomach. There was a small cut
inflicted upon Rowell's throat that was
determined to be post-mortem. The cause of
death was asphyxia due to strangulation.

"As he left Rowell's apartment, Williams took her
purse. According to his statement, he threw the
purse and the knife into a dumpster outside the
apartment, although a search of the dumpster the
next day by law enforcement failed to find either.

"The defendant was subsequently arrested after
being identified by the elderly female victim in a
subsequent break-in in the Ashville area. Upon
being taken into custody for that offense, the
defendant gave a statement admitting his
involvement in the death of Melanie Rowell."
(C.R.105-07.) Additional facts are included, as
necessary, throughout this opinion.

[1][2] In his brief, the appellant raises several
issues that he did not first present to the trial court.
His failure to object will not bar our review of an
issue in a case involving the death penalty.
However, it will weigh against any claim of
prejudice he may allege. See Ex parte Kennedy,
472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975,
106 S.Ct. 340, 88 L.Ed.2d 325 (1985). Rule 45A,
Ala. R.App. P., provides:

  "In all cases in which the death penalty has been
  imposed, the Court of Criminal Appeals shall

. Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

795 So.2d 753
795 So.2d 753
(Cite as: 795 So.2d 753)

Page 9

notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant."

"[This] plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 n. 14 (1982)).

I.

[3][4] The appellant's first argument is that the trial court erred by not allowing the defense to perform independent DNA tests on blood samples taken from other suspects. (Issue I in the appellant's brief to this court.) At a pretrial hearing, the State indicated that, during the course of the investigation in this case, law enforcement officials had gathered blood samples from approximately 14 other suspects and had had DNA tests performed on those samples. The appellant requested funds to perform an independent analysis of each of those samples. The trial court granted the defense's request for funds to have independent tests performed on his own blood, but denied the request to independently test the samples from the other suspects. The trial court explained its ruling as follows:

"I will allow you to re-run the matching sample of the defendant to the sample found on the victim.

I don't believe I'm going to let you run all the other potential samples unless you show me some strong evidence. Normally, evidence that another person may have committed the offense is not admissible in the defense of an individual."

*763 (R. 9.) The appellant did not subsequently present this request to the trial court again.

"In [*Ex parte*] *Moody,* [684 So.2d 114 (Ala.1996) ,] the Alabama Supreme Court defined the standard by which a trial court must assess an indigent defendant's request for expert assistance.

" 'Although the [United States] Supreme Court has not specifically stated what "threshold showing" must be made by the indigent defendant with regard to the need for an expert, the Court refused to require the state to pay for certain experts when the indigent defendant "offered little more than undeveloped assertions that the

requested assistance would be beneficial." *Caldwell v. Mississippi,* 472, U.S. 320 at 323, 105[,] S.Ct. 2633 at 2637, 86 L.Ed.2d 231 (1985) . As we stated in *Dubose [v. State,* 662 So.2d 1189 (Ala.1995) ] the Supreme Court cases of *Ake [v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) ] and *Caldwell,* viewed together, seem to hold that an indigent defendant must show more than a mere possibility that an expert would aid in his defense. "Rather, the defendant must show a reasonable probability that an expert would aid in his defense and [must show that] a denial of an expert to assist at trial would result in a fundamentally unfair trial." *Dubose,* 662 So.2d at 1192, citing *Moore v. Kemp,* 809 F.2d 702 (11th Cir.), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).

" '....

" 'Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense.'

"684 So.2d at 119. *See also Burgess v. State,* [723] So.2d [742] (Ala.Cr.App.1997); *MacEwan v. State,* 701 So.2d 66 (Ala.Cr.App.1997); *Ex parte Dobyne,* 672 So.2d 1354, 1357 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996)."

*Finch v. State,* 715 So.2d 906, 910-11 (Ala.Cr.App.1997). In this case, the trial court gave the appellant an opportunity to make such a showing, but the appellant did not satisfy his burden of proof. After independently testing his own blood, he did not show that there was a reasonable probability that independent DNA testing of the samples from the other suspects would aid his defense and that a denial of the opportunity to have independent DNA testing performed would result in a fundamentally unfair trial. He did not specifically show that independent testing was

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

absolutely necessary to answer a substantial issue or question raised by the State or to support a critical element of the defense. In fact, throughout the trial, his defense was that he entered the victim's apartment with the intent to have sex with her, but that he did not intend to kill her. Therefore, the trial court did not err in denying the appellant's request to have the samples from the other suspects independently tested.

## II.

[5][6][7][8] The appellant's second argument is that the trial court erroneously allowed the victim's *764 mother to testify that the victim's children were in the residence when she found the victim's body. (Issue II in the appellant's brief to this court.) Specifically, he contends that the trial court should have excluded the testimony because its probative value was substantially outweighed by its prejudicial effect on the jury. Prior to trial, the appellant filed a motion in limine to prevent any reference to the presence of the children at the crime scene. After jury selection, the trial court conducted an extensive hearing regarding the admissibility of such testimony. In denying the appellant's motion in limine, the trial court stated:

"She can testify. We are not going into it and rehash it and delve into her emotional feelings or the child's emotional feelings. That has nothing to do with the case. As far as her being the first witness on the scene--that that is what she observed; that the presence of the child in the room may have some materiality concerning the evidence or what was there or what was not there.

I don't think you can extricate that without, in effect, altering the testimony at trial. I don't think there is any way to conveniently leave that out, and still present truthful, competent evidence to the jury."

(R. 158-59.) After additional argument, the trial court further explained its ruling:

"I don't think there is any way to remove this and present a coherent--I'm talking an honest and truthful portrait of the crime scene. I think to do otherwise would, in essence, be playing games with the jury. I mean taking what, in any other case, would be a crucial piece of evidence that the crime scene was disturbed and having an opportunity to be disturbed by another person between the time of the offense and the time the

investigators got there, in any other case, that would be a huge piece of evidence that the defendant would be urging in. In this case, it just happens to be an 18-month-old child."

(R. 163.) In conclusion, the trial court said,

"In that kind of situation, I think the jury has a right to know what happened to the crime scene between the time of the offense and the time the investigators got there. I think the fact the mother went into the crime scene. I don't find any way you could separate that. It may be prejudicial, but in order to preserve--I think the integrity of the trial itself and the witnesses. To require them to somehow excise a whole portion of the facts leading up to the investigation--as I say, I think it would be playing games with the jury doing that."

(R. 164.)

" 'A party who suffers an adverse ruling on a motion in limine can preserve the ruling for post-judgment and appellate review *only* by objecting to the introduction of the proffered evidence and assigning specific grounds at the time of trial, unless he or she obtains the express acquiescence of the trial judge that a subsequent objection and assignment of grounds are not necessary.'

"*Miles v. State,* 650 So.2d 583, 586 (Ala.Cr.App.1994), quoting, *Parks v. State,* 587 So.2d 1012 (Ala.1991)."

*Grimsley v. State,* 678 So.2d 1197, 1208 (Ala.Cr.App.1996) (emphasis in original). The appellant did not object during opening arguments when the State referred to the children's presence at the crime scene or during the State's case-in-chief when the State elicited testimony about the children's presence at the crime scene. Furthermore, the record does not reflect that the trial court agreed that a subsequent objection would not be necessary. Accordingly, *765 we review this issue under the plain error rule. *See* Rule 45A, Ala. R.App. P.

[9][10][11] Under Rule 403, Ala. R. Evid., relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of *unfair prejudice.*" (Emphasis added.) Furthermore, "[t]he power to make this determination is vested in the trial court. We will not disturb such a determination unless it is clearly an abuse of discretion." *Hayes v. State,* 717 So.2d 30, 37

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

795 So.2d 753
795 So.2d 753
(Cite as: 795 So.2d 753)



(Ala.Cr.App.1997) (citations omitted).
" 'Under the liberal test of admissibility in Alabama, "a fact is admissible if it has any probative value, however slight, upon a matter in the case." *McElroy's* § 21.01 at 34. "Evidence as to the scene of a crime, to objects found thereat, and as to the condition of the body, is admissible and relevant evidence, when reasonably proximate to the scene in time and location." *Petty v. State*, 40 Ala.App. 151, 154, 110 So.2d 319, 322 (1958), cert. denied, 269 Ala. 48, 110 So.2d 325 (1959).'....

"*Parker v. State*, 587 So.2d 1072, 1090 (Ala.Cr.App.1991)."

*Land v. State*, 678 So.2d 201, 210 (Ala.Cr.App.1995), aff'd, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). Donna Rowell, the victim's mother, testified that she baby-sat the victim's children while the victim worked. The victim would take the children to Rowell's house around 11:30 a.m. on the days she worked. In the evening, Rowell would take the children back to the victim's apartment, put them to bed, and wait for the victim to return. Rowell testified that she had kept the victim's children on November 5, 1996, and that she left the victim's apartment around 11:15 p.m. According to Rowell, the victim was supposed to work on the following day, and Rowell became concerned when the victim did not bring the children to her house. Around 2:00 p.m., Rowell went to the victim's apartment to check on her. She testified as follows about what happened after she entered the apartment:

"[Rowell]: I went up the stairs. When I got to the top, I had to crawl over the child's gate.

"[Prosecutor]: What is a child's gate?

"[Rowell]: A gate to keep children from going down the stairs. She put it up every night so they wouldn't go down the stairs.

"[Prosecutor]: So when you got up the stairs, you found the child's gate?

"[Rowell]: Yes, sir, and I had to step over it.

"[Prosecutor]: What room did you go into then, Mrs. Rowell?

"[Rowell]: Melanie's.

"[Rowell]: Can you tell us what you saw or did when you went into Melanie's room?

"[Rowell]: I glanced in and at first I saw her little girl, Kirsten, sitting on the bed. As I walked closer, I could see some feet and legs lying on the other side of the bed on the floor. They were blue and white and straddled slightly. She didn't have any underwear on.

"[Prosecutor]: Did you go over to where she was?

"[Rowell]: Yes, sir, I did. I knelt down and I had to touch her. I touched her on the shoulder. She was cold and hard.

"[Prosecutor]: She was cold?

"[Rowell]: And hard.

"[Prosecutor]: And hard?

"[Rowell]: Yes, sir. I looked--she had her head turned slightly to the side and she had a cut across her neck.

"[Prosecutor]: What did you do then, Mrs. Rowell?

*766 "[Rowell]: I remember saying, 'Oh, no, Dear God.' She was wearing a white, like a nightshirt with little blue teddy bears on it, and it was pulled up above her belly button. I had a cellular phone. I got it out of my purse and I couldn't use it.

"[Prosecutor]: You couldn't use it?

"[Rowell]: No, sir. I knew there was not anything I could do for her at the time.

"[Prosecutor]: Was she alive, Mrs. Rowell?

"[Rowell]: No, sir, she was not.

"[Prosecutor]: How do you know?

"[Rowell]: She was not breathing. She was hard and cold and blue and white. I picked up Kirsten and as I turned to go out, I didn't see her little boy, William. I started to worry. I called his name and he didn't answer. I got in the hall and I went in his room, which is directly across from Kirsten's. He was standing on the bed just staring at me. I picked him up and I carried them over the gate. I went downstairs. I don't know why, but I looked from her living room to the kitchen to see if her back door was locked, and it was. I took them out the front door and I went to a neighbor's and I asked her if she would help me call the police."

(R. 190-91.)

In a statement he made to law enforcement officers, the appellant said that the children were across the hallway during the rape and the murder and that they never woke up. He said that he had "peeked in" at the children before he went into the victim's room. Finally, the appellant also said that he had stepped over a "child gate" at the top of the stairs in

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

795 So.2d 753
795 So.2d 753
(Cite as: 795 So.2d 753)

Page 12

the victim's apartment.

The testimony concerning the presence of the children was relevant to explain the condition of the crime scene when Rowell arrived and to explain why Rowell removed the child from the crime scene. This testimony was also relevant to explain what happened to the children after the appellant left the victim's home. Finally, the evidence was relevant because it corroborated details contained in the appellant's statements about the offense. Furthermore, the testimony was not unduly prejudicial. The testimony did not address the emotional state of the children and did not imply that the children had witnessed their mother being raped and murdered. Rather, Rowell simply described the crime scene as she found it and explained her actions after discovering her daughter's body. For the foregoing reasons, the trial court did not abuse its discretion in determining that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. Therefore, we do not find any plain error in this regard.

### III.

[12] The appellant's third argument is that the trial court erred in admitting into evidence three statements he contends law enforcement officers coerced him to make. (Issue III in the appellant's brief to this court.) During the suppression hearing, the appellant stated that Investigator Tommy Dixon told him things would be easier for him if he made a statement about his involvement in the offense. He also contended that Dixon promised to talk to the judge on his behalf if he made a statement. He explained that he took Dixon's statement to mean that he would receive a lighter sentence if he made a statement about his involvement in the offense. However, on cross-examination, the appellant admitted that the officers did not make any promises or threats and did not coerce him or force him to make the statements. He also admitted that Dixon did not tell him he would receive a lighter sentence if he made a statement.

*767 [13][14][15][16][17][18] Dixon testified that he did not tell the appellant that things would be better for him if he made a statement or worse for him if he did not. He also testified that he did not

tell the appellant he would talk to the judge on his behalf. In addition, Investigator Randy Wall testified that, after the officers advised the appellant of his *Miranda* [FN1] rights, he waived his rights and agreed to talk to them about his involvement in the offense. He further testified that the officers did not make any promises, threats, or offers of benefits or rewards, and that they did not tell the appellant that things would be easier for him if he made a **statement** or worse for him if he did not make a **statement**. At the conclusion of the hearing, the trial court denied the appellant's motion to suppress his **statements** and allowed the State to admit them into evidence during the trial.

>    FN1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

"It has long been held that a confession, or any inculpatory **statement**, is involuntary if it is either coerced through force or induced through an express or implied **promise of leniency.** *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In *Culombe [v. Connecticut],* 367 U.S. [568] at 602, 81 S.Ct. [1860] at 1879[, 6 L.Ed.2d 1037 (1961) ], the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, 'if his *will has been overborne* ' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. *Id.* (emphasis added).

"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the 'totality of the circumstances.' *Boulden v. Holman,* 394 U.S. 478, 480, 89 S.Ct. 1138, 1139- 40, 22 L.Ed.2d 433 (1969); *Greenwald v. Wisconsin,* 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see *Beecher v. Alabama,* 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See *Ex parte Matthews,* 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

(1992); *Jackson v. State,* 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); *Eakes v. State,* 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is 'whether the defendant's will was *overborne* at the time he confessed') (emphasis added). Thus, to determine whether McLeod's confession was improperly induced, we must determine if his will was 'overborne' by an implied **promise** of leniency.

"Instead of applying the 'overborne' test, the Court of Criminal Appeals applied a more stringent 'bargained with' test. It held that because Officer Burch 'bargained with' McLeod to obtain his confession--if McLeod cooperated, the police would make his cooperation known to the district attorney--the confession 'was improperly induced by a promise made by Officer Burch that reasonably engendered a hope of favor in McLeod's mind.' *McLeod,* 718 So.2d at 727. We disagree.

*768 "In *[Ex parte] Gaddy,* 698 So.2d [1150] at 1154 [ (Ala.1997) ], this Court expressly disapproved the 'bargained with' test used by the Court of Criminal Appeals and held that a court should examine the totality of the circumstances to determine if an implied promise of leniency caused the defendant to make the confession--i.e., if it overbore the will of the defendant. Thus, the test of involuntariness of a confession, or other inculpatory **statement,** is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by 'apprehension of harm or hope of favor.' See *Gaddy,* 698 So.2d at 1154 (quoting *Ex parte Weeks,* 531 So.2d 643, 644 (Ala.1988)); *Culombe,* 367 U.S. at 602, 81 S.Ct. at 1879; *Jackson,* 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess 'the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; '[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' *Jackson,* 562 So.2d at 1380-81 (citations

omitted)."
*McLeod v. State,* 718 So.2d 727, 729-30 (Ala.), cert. denied, 524 U.S. 929, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998) (footnote omitted) (emphasis in original). Also,

"we note that the mere promise to make cooperation known to law enforcement authorities, as opposed to a direct promise of a reduced sentence, generally is not considered an illegal inducement. In *United States v. Nash,* 910 F.2d 749, 752-53 (11th Cir.1990), the United States Court of Appeals for the Eleventh Circuit held:

" 'We find that the district court was not clearly erroneous in accepting [the officer's] testimony that he only promised to make [the defendant's] cooperation known to the United States Attorney's office and gave no guarantee of a reduced sentence. Although [the officer] told [the defendant] that cooperating defendants generally "fared better time-wise," this statement did not amount to an illegal inducement: "telling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government." '

"(Quoting *United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir.1978)). Accord *United States v. Levy,* 955 F.2d 1098, 1105 (7th Cir.1992) (holding that federal agent's indication to defendant that his cooperation would be reported to the United States Attorney did not make defendant's confession involuntary); *United States v. Meirovitz,* 918 F.2d 1376, 1380 (8th Cir.1990) (holding that confession was voluntary although agents had promised to inform prosecutor of defendant's cooperation); *United States v. Guerrero,* 847 F.2d 1363 (9th Cir.1988) (holding that agent's promise to inform prosecutor of defendant's cooperation does not render a subsequent confession involuntary); *United States v. Baldacchino,* 762 F.2d 170, 179 (1st Cir.1985) (holding that an officer's promise to bring defendant's cooperation to the attention of the prosecutor did not make confession involuntary)."

*Id.* at 730 n. 4. Finally,

" ' "[a]bsent clear error, the [circuit] court's credibility choices at suppression hearings are

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

binding on this court." *Walker v. State,* 551 So.2d 449, 451 (Ala.Cr.App.1989). The standard of review of conflicting evidence *769 at a motion to suppress a confession is whether the trial court's finding was "manifestly contrary to the great weight of the evidence." *Ex parte Matthews,* 601 So.2d 52 (Ala.1992), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). *See also Ex parte Singleton,* 465 So.2d 443, 445 (Ala.1985) (whether the finding is "palpably contrary to the weight of the evidence.").'

"*Thompson v. State,* 611 So.2d 476, 478 (Ala.Cr.App.1992)."

*D.M.M. v. State,* 647 So.2d 57, 61 (Ala.Cr.App.1994).

Based on the conflicting evidence in the record before us, we conclude that the trial court did not err in admitting the appellant's statements into evidence. Accordingly, the appellant's argument is without merit.

### IV.

[19][20] The appellant's fourth argument is that the State did not satisfy its burden of proving the admissibility of DNA evidence, as required by *Ex parte Perry,* 586 So.2d 242 (Ala.1991). (Issue IV in the appellant's brief to this court.) Specifically, he contends that the testing procedures are not controlled and that the population frequency statistics are not realistic. Therefore, he argues that the trial court erred in admitting testimony about DNA testing into evidence at trial.

[21][22][23] Initially, we note that

"[a]t the time of the appellant's trial, § 36-18-30, Ala.Code 1975, not *Perry,* governed the admissibility of DNA evidence. That section provides:

" 'Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, that the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme Court in Daubert, et ux., et al., v. Merrell Dow Pharmaceuticals, Inc., decided on

June 28, 1993."

"For DNA evidence to be admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589-95, 113 S.Ct. 2786, 2795-97, 125 L.Ed.2d 469 (1993), it must be reliable and relevant. Some factors that are germane in determining whether evidence is reliable include testimony 1) that the technique has been tested, 2) that the technique has been subjected to peer review and publication, 3) about the known or potential rate of error and quality controls associated with the technique, and 4) that the technique is generally accepted in the relevant scientific community. *Daubert,* 509 U.S. at 593-94, 113 S.Ct. at 2796-97. In assessing reliability, the trial court should focus on the principles and methodology underlying the technique, not the conclusions they generate. *Daubert,* 509 U.S. at 594-95, 113 S.Ct. at 2797.

In determining whether DNA evidence is relevant, the trial court should decide whether the evidence will help the factfinders understand the evidence or decide a fact that is in issue. *Daubert,* 509 U.S. at 591, 113 S.Ct. at 2795. Thus, to be admissible, the DNA evidence must relate to some issue in the case."

*Maples v. State,* 758 So.2d 1, 47 (Ala.Cr.App.1999). Therefore, we will assess the admissibility of the DNA evidence under the *Daubert* standard.

In this case, Larry Huys, a forensic scientist employed by the Alabama Department of Forensic Sciences in its Birmingham laboratory, testified for the State as an expert in the field of DNA analysis. *770 He testified about both polymerase chain reaction (PCR) matching and population frequency statistics.

Regarding the PCR method, Huys testified that his laboratory uses a three-step process to perform DNA testing. First, scientists extract the DNA from the sample and purify, or clean, it. Second, they amplify, or make copies of, ten portions of the DNA molecule that have variation. Third, they perform a visualization, using dots or blots, to read or interpret the DNA molecule. Huys also testified that, before it started using the PCR method, the department performed a series of validation steps. In fact, he testified that the scientists probably worked with the method for one year before they

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

795 So.2d 753
795 So.2d 753
(Cite as: 795 So.2d 753)

started using it on actual cases.

Huys testified that other forensics laboratories throughout the United States use the PCR testing method, and added that the scientists "are constantly exchanging ideas, having meetings, going to various seminars to be sure everyone in the forensic community is on the same wavelength." (R. 367.) He stated that this type of testing is also widely used in areas other than forensics.

Regarding peer review and publication, Huys testified that the National Research Council (NRC) has performed two studies about the PCR method and that its conclusions have been very complimentary. He also testified that the Technical Working Group on DNA analysis sets forth guidelines for each laboratory to follow so it will be in compliance with other forensics laboratories throughout the world. He added that one of the department's scientists is a member of the board of the Technical Working Group on DNA analysis and that the department complies with that group's guidelines. He further testified that the department has published its data in various publications and that several agencies and scientists have scrutinized the department's testing process. Finally, he testified that the department's laboratory is accredited by the National Forensic Science Training and Research Center.

Regarding the known rate of error, Huys testified that he was not aware of any errors that had occurred in any of the DNA testing performed in the department's laboratory. He further stated that the department undergoes proficiency testing every 180 days, and added that, on nationwide proficiency tests, the results the department has obtained have been in 100 percent agreement with those obtained by other laboratories. He also testified that the department uses several quality controls to assure that the tests are performed properly, including testing blanks and known samples to detect contamination. Additionally, scientists duplicate the procedures on unknown samples to assure that they obtain the same results every time. They also process known and unknown samples on different days to avoid cross-contamination, and they use additional clean-up techniques to test for contamination. He testified that, to safeguard a sample, the sample is submitted in a sealed condition, maintained in a dry environment, and placed in a locked storage area. Finally, he testified that, in this case, the controls did not indicate that any errors had occurred during the testing process.

Finally, Huys testified that the PCR testing procedures used by the Alabama Department of Forensic Sciences are widely accepted in the scientific community as being reliable. Also, he noted that the department complies with the guidelines the DNA Advisory Board sets forth for the entire forensics community to follow.

Regarding population frequency statistics, Huys testified that, once a scientist has a match, he looks at a series of ten genetic traits or characteristics. Using *771 between 100 and 150 samples from the Alabama population, he determines in what proportions those traits occur. He then multiplies those proportions to determine how rare the combination of traits is in the general population. When doing such an analysis, the scientist also factors in a number that accounts for situations in which close relatives may reproduce.

Huys testified that the department compiled a database from the population within the state of Alabama, including samples from approximately 100 Caucasians and 100 black people. He explained that scientists have compared the Alabama database to other databases around the country and determined that the Alabama population is very consistent with those other populations. Regarding controls, Huys testified that the analyst who is in charge of the case would not produce the statistics independently. Rather, two analysts would calculate the statistics independently and compare their results. He stated that the resulting statistics could be published only if the two analysts independently obtained the same result. In this case, these controls did not indicate that any error occurred in calculating the population frequency statistics. Finally, Huys testified that the statistical methods the department uses to estimate the significance of a match have been used for years, are used by other laboratories that comply with NRC requirements, and are generally accepted in the scientific community.

At the conclusion of the hearing on the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



admissibility of the DNA evidence, the trial court stated:

"The court finds that the PCR testing process is reliable and generally accepted by the scientific community and the results of those tests are relevant to this case. As to the population frequency statistics, the court finds overwhelmingly throughout the country these statistics are accepted. The court takes judicial knowledge of caselaw from states all over the country-- Massachusetts, Arizona, and Mississippi--that allow these results in. The question that needs to be focused on is whether these statistics are generally accepted in the scientific community. The court finds that whereas in the early '90's, there was some general debate as indicated by the report that the attorney for the defendant referred to, based on the caselaw around the country as of today's date, there is no debate as to the use of these statistics. For this court to reject the use of those population statistics would be in itself a decision that would probably be a vast minority of the cases. The court finds these statistics are based on valid scientific principles. The court further finds that these statistics are generally accepted principles in the community. The court finds that, based on both literature and caselaw, these are accepted by experts in the field and that the interpretation of these statistics and what they mean and the weight and credibility to be given to them are certainly jury questions. The court finds that the DNA evidence in this case and the population frequency statistics are relevant to the issues in this case based upon the location of the stains involved and the proximity to the crime scene in this case. Based upon that, the court will allow this expert to testify as to the DNA test results under the PCR system as used and the court will further allow this expert to testify as to the population frequency statistics."

(R. 423-25.)

Based on the evidence presented, we conclude that the trial court did not err in admitting into evidence testimony regarding the PCR testing method and population frequency statistics. In this case, the State presented sufficient evidence to establish the reliability of the theory and *772 techniques used in the PCR testing method and in the population frequency statistical analysis. Furthermore, in

*Simmons v. State,* [Ms. CR-97-0768, September 17, 1999] --- So.2d ---- (Ala.Cr.App.1999), this court took judicial notice of the reliability of the theory and techniques used in the PCR method of DNA analysis. Additionally, the DNA evidence was relevant to establishing the appellant's identity as the perpetrator of the murder, to corroborating the appellant's statements to police, and to supporting the State's theory that the appellant raped or attempted to rape the victim. Therefore, the trial court did not err in admitting into evidence testimony about the results of DNA testing.

V.

[24][25][26][27] The appellant's fifth argument is that the trial court improperly limited the scope of his cross-examination of Larry Huys. (Issue V in the appellant's brief to this court.) During defense counsel's cross-examination of Huys, the following occurred:

"[Defense counsel]: Are you familiar with the case of [*Cauthen v.*] *Yates,* [716 So.2d 1256 (Ala.Civ.App.1998) ] that came out last year concerning DNA testing?

"[Huys]: No.

"[Defense counsel]: You are not familiar with a lab in Birmingham having a probability of paternity in a case, and getting independent tests run and it--

"[Prosecutor]: Judge, I object to this line of questioning. He is testifying before the jury the results of some case holding such and such. If he wants to offer a copy of that--

"The Court: I'll sustain as to the form of that question.

"[Defense counsel]: Are you familiar with people getting up and testifying concerning DNA evidence when it can change next week or next month or next year--new testing could be developed?

"[Huys]: Certainly.

"[Defense counsel]: And these probabilities aren't accurate, are they?

"[Huys]: They either go up or they go to zero. Every test you add, you would either get a much rarer statistic or it becomes an exclusion."

(R. 454-55.) Because the appellant did not present the objection he raises on appeal to the trial court, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

" ' "The scope of cross-examination in a criminal proceeding is within the discretion of the trial judge and it is not reviewable except for the trial judge's prejudicial abuse of discretion....
" 'While rather wide latitude is allowed on cross-examination, the court has reasonable discretion in confining the examination to prevent diversion to outside issues.' "

*Steeley v. State*, 622 So.2d 421, 423-24 (Ala.Cr.App.1992), cert. quashed, 622 So.2d 426 (Ala.1993) (quoting *Beavers v. State*, 565 So.2d 688, 690 (Ala.Cr.App.1990)) (other citations omitted). Based on the record before us, we conclude that the trial court did not abuse its discretion in sustaining the State's objection to defense counsel's question. Huys stated that he was not familiar with the case to which defense counsel was referring. Thus, rather than limiting defense counsel's right to cross-examine Huys, the trial court simply prevented defense counsel from testifying as to, and questioning Huys about, the facts of a case with which Huys was not familiar. Furthermore, although the trial court sustained the prosecutor's objection as to the form of defense counsel's question, it did not prevent defense counsel from pursuing that line of questioning. In fact, defense counsel subsequently elicited testimony *773 that DNA evidence may change over time and that the probabilities could change as the testing procedures become more advanced. Therefore, we do not find any plain error in this regard.

VI.

[28][29][30][31][32][33][34][35][36][37]    [38][39] [40][41] The appellant also argues that the trial court erred in denying his motion for a judgment of acquittal because the evidence was allegedly insufficient to support his conviction for capital murder. (Issues VI, VII, IX, and X in the appellant's brief to this court.) Specifically, he contends that the State did not prove that he committed a rape or an attempted rape and did not prove that he had a particularized intent to kill the victim.

"Intentional murder becomes capital murder when the killing occurs during a rape. Section 13A-5-40, Code of Alabama 1975. 'During' is defined in the Code as meaning 'in the course of or in connection with the commission of, or in immediate flight from the commission of the

underlying felony or attempt thereof.' Section 13A-5-39(2), Code of Alabama 1975. An accused is not guilty of a capital offense where the intent to commit the accompanying felony, in this case rape, was formed only after the victim was killed. *Connolly v. State*, 500 So.2d 57, 62 (Ala.Crim.App.1985), *aff'd*, 500 So.2d 68 (Ala.1986). An accompanying felony committed as a 'mere afterthought' and unrelated to the murder will not sustain a conviction of capital murder; the question of the defendant's intent at the time of the commission of the crime is usually a jury question. *See Smelley v. State*, 564 So.2d 74, 86-87 (Ala.Crim.App.1990), *cert. denied, Ex parte Green*, 564 So.2d 89 (Ala.1990); *Connolly,* supra at 63."

*Padgett v. State*, 668 So.2d 78, 83 (Ala.Cr.App.), cert. denied, 668 So.2d 88 (Ala.1995). Nevertheless,

"[e]ven if we were to concede that the death occurred even before the rape, another doctrine stands in the way of the appellant. This court has held that if an accused had the intent to commit the underlying offense at the time he murdered and the offense is committed immediately after the murder, he is guilty of murder while committing the underlying offense, and the capital murder statute still applies. *Halford v. State*, 548 So.2d 526, 534 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). It seems to be generally understood that it is impossible to say with certainty whether intercourse immediately preceded or immediately followed the murder of a female victim."

*Thompson v. State*, 615 So.2d 129, 133 (Ala.Cr.App.1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993). It is not necessary to show an injury to prove that a rape or an attempted rape occurred. *See Greathouse v. State*, 650 So.2d 599 (Ala.Cr.App.1994). Additionally, " '[i]ntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.' " *French v. State*, 687 So.2d 202, 204 (Ala.Cr.App.1995), rev'd on other grounds, 687 So.2d 205 (Ala.1996) (quoting *McCord v. State*, 501 So.2d 520, 528-29 (Ala.Cr.App.1986)).

" 'The question of intent is hardly ever capable of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

direct proof. Such questions are normally questions for the jury. *McMurphy v. State,* 455 So.2d 924 (Ala.Crim.App.1984); *Craig v. State,* 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.1981).' *Loper v. State,* 469 So.2d 707, 710 (Ala.Cr.App.1985). 'Where one assaults another by the use of a deadly weapon, the law will infer from that fact that he designed to *774 accomplish the probable and natural results of his act, in the absence of proof to the contrary.' *Snipes v. State,* 364 So.2d 424, 426 (Ala.Cr.App.1978)."

*Oryang v. State,* 642 So.2d 989, 994 (Ala.Cr.App.1994). Further, "[i]ntent may be inferred from the use of a deadly weapon, the character of the assault, or other attendant circumstances." *DeRamus v. State,* 565 So.2d 1167, 1171 (Ala.Cr.App.1990). Finally,

" '[i]n determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' *Faircloth v. State,* 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, *Ex parte Faircloth,* [471] So.2d 493 (Ala.1985).

" '....

" ' "The role of appellate courts is not to say what the facts are. Our role, ... is to judge whether the evidence is *legally* sufficient to allow submission of an issue for decision by the jury." *Ex parte Bankston,* 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury's verdict only where it reaches "a clear conclusion that the finding and judgment are wrong." *Kelly v. State,* 273 Ala. 240, 244, 139 So.2d 326 (1962) . "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust." *Bridges v. State,* 284 Ala. 412, 420, 225 So.2d 821 (1969).... A verdict on conflicting evidence is conclusive on appeal. *Roberson v. State,* 162 Ala. 30, 50 So. 345 (1909). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence

offered by the defendant is in sharp conflict therewith and presents a substantial defense." *Fuller v. State,* 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, *Fuller v. Alabama,* 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).' *Granger[ v. State* ], 473 So.2d [1137] at 1139 [ (Ala.Cr.App.1985) ].

"... 'Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' *White v. State,* 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). 'Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' *Cochran v. State,* 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, *Ex parte Cochran,* 500 So.2d 1179 (Ala.1985)."

*White v. State,* 546 So.2d 1014, 1017 (Ala.Cr.App.1989).

During the investigation of this case, the appellant made the following statements about his participation in the offense:

"The night started off with a drink and smoking marijuana. I had a lot to drink and smoke this night. I was on the hill at about this time when I decided to leave and go home. It was about 10:30 pm or so. On my way home I stopped off at Russell's trailor and sat in there for a while and time passed by it was about 12:30 or 1 a.m when I left and headed home. When I crossed the ditch going into the apartments I decide to go see Melody but instead I went in *775 through the back window. (This occurs at about 1 or 1:30 a.m.) Once inside I grab an ordinary kitchen knife and headed upstairs. All I wanted was sex that was all I could think about at the time. About 1/3 the way up the stairs I pulled off my pants. When I went into the bedroom and stuck the knife at her neck and started undoing her shorts and by this time she jumps up and the knife I had in my hand cut her and so I panicked and she let out a little scream before she started to get loud I cover he mouth with my hand but she bit me. So we tussle around and I finally got her to keep still by putting my hand at her neck and proceeded to remove her shorts after I got the shorts off I

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

realized that she had stop breathing so not being in my right state of mind I had sex and ejaculated outside of the vagina. I never meant to kill those were not my intentions. I have a problem and I want help. After I did what I did I left out of the back door and let the window down. I removed her purse from the apartment there was nothing in it worth anything to me so I throw the knife and purse in the dumpster out front of the apartments this was about 2:30-3:00am. So after I went home and slept on it. I never did anything like this before, I have let drugs, alcohol, and sex ruin my life."

(C.R.124.)

"The couch was at the back window. Took screen off back window laid it on couch. Climb through window onto a kitchen table. Saw and grabbed a knife off the counter. Proceed to go upstairs. First set of stairs. I removed my pants and shoes and went upstairs crossed over a kiddie rail or fence at top of the stairs. Just peeked in at the two kids. Went in to Melody's room stuck the knife in her neck. Proceeded remove her shorts. She awoke and jumped. The knife cut her neck I panicked we tussle off the bed onto the floor then there was no movement from her and no breathing so I had sex with her for about 15 or so minutes no condom I pulled out, shot off. When I panicked and she started to scream I grab her around her throat and proceeded to choke her that is when she stopped moving So I leave as I was leaving I grab her purse and go through it. Found nothing valuable. I leave out the back door putting my clothes back on. I let the window back down shut the door. I had the knife and purse in my hand threw both objects into dumpster in the apartments. The purse was green and black it was a flip top button in front with straps that you could wear like a back pack."

(C.R.126.) In addition, the evidence showed that the appellant left the lower half of the victim's body unclothed and left a semen stain on her stomach area. DNA testing confirmed that blood and semen found at the scene were consistent with the appellant's genetic profile. Other evidence found at the crime scene also corroborated the appellant's statements about the offense. Finally, the medical examiner testified that the cause of the victim's death was asphyxiation, either by smothering or strangulation, and that the other wounds inflicted upon the victim were consistent with a beating but

were not the cause of death.

The appellant's statements showed that he entered the victim's apartment with an intent to rape the victim and that he took a knife upstairs with him to facilitate the rape. Thus, the State presented sufficient evidence from which the jury could have reasonably concluded that the appellant raped or attempted to rape the victim and that he intentionally killed her. Accordingly, the trial court properly denied the appellant's motions for a judgment of acquittal and properly submitted the case to *776 the jury. Finally, the evidence clearly supports the jury's verdict. Therefore, the appellant's arguments in this regard are without merit.

VII.

[42][43] The appellant contends that the prosecutor made an improper comment during his guilt-phase closing arguments. (Issue XIII in the appellant's brief to this court.) During the State's rebuttal arguments, the following occurred:

"On behalf of the State and the family, we don't want any sympathy in this case. It is over and done with. It is too late for sympathy. Sympathy has no place in this case. We don't want any. We do want justice. *These are the kinds of things that you can see on TV that happens somewhere else--not in Ashville, Alabama. This is a horrendous case and it deserves a capital-murder verdict.*"

(R. 513) (emphasis added). The appellant argues that the prosecutor's comment encouraged the jury to find as an aggravating circumstance that the crime was especially heinous, atrocious, or cruel compared to other capital offenses. *See* § 13A-5-49(8), Ala.Code 1975. Because he did not object to the prosecutor's comment at trial, we review this argument for plain error. [FN2] *See* Rule 45A, Ala. R.App. P.

> FN2. During the rebuttal portion of the State's penalty-phase instructions, the prosecutor referred to the crime as "horrible." (R. 579.) At the close of the trial court's instructions, the appellant asked for a curative instruction, alleging that the use of the word "horrible" implied that the especially heinous, atrocious, or

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

795 So.2d 753
795 So.2d 753
(Cite as: 795 So.2d 753)

Page 20

cruel aggravating circumstance was present. However, the appellant subsequently withdrew the request and announced that he was satisfied with the trial court's instruction. (R. 595.)

[44][45][46][47][48][49][50] In reviewing a prosecutor's closing argument, the standard is whether the argument " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. *Whitlow v. State,* 509 So.2d 252, 256 (Ala.Cr.App.1987); *Wysinger v. State,* 448 So.2d 435, 438 (Ala.Cr.App.1983); *Carpenter v. State,* 404 So.2d 89, 97 (Ala.Cr.App.1980), *cert. denied,* 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. *Orr v. State,* 462 So.2d 1013, 1016 (Ala.Cr.App.1984); *Sanders v. State,* 426 So.2d 497, 509 (Ala.Cr.App.1982)."
*Bankhead v. State,* 585 So.2d 97, 106-07 (Ala.Cr.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev'd on other grounds, 625 So.2d 1146 (Ala.1993).
" 'During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' *Rutledge v. State,* 523 So.2d 1087, 1100 (Ala.Cr.App.1987) , rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. *Racine v. State,* 290 Ala. 225, 275 So.2d 655 (1973). 'In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' *777 Hooks v. State,* 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371

(Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting *Barnett v. State,* 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, *Duren v. State,* 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). 'In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' *Mitchell v. State,* 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). 'To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' *Twilley v. State,* 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted)."
*Coral v. State,* 628 So.2d 954, 985 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).
"There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty. ' "We view the comments as a call for justice, not sympathy, and, thus, conclude that they are within the wide latitude allowed prosecutor's in their exhortation to the jury to discharge its duty." *Ex parte Waldrop,* 459 So.2d 959 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); *Rutledge v. State.' Gentry v. State,* 689 So.2d 894, 906 (Ala.Cr.App.1994), reversed on other grounds, 689 So.2d 916 (Ala.1996)."
*Price v. State,* 725 So.2d 1003, 1033 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). Finally, we presume that the jury followed the trial court's instructions. *See Taylor v. State,* 666 So.2d 36 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).

After reviewing the prosecutor's comment in context, we conclude that the comment was no more than a permissible appeal for justice. *See Price,* supra. Furthermore, during the penalty phase of the trial, the State informed the jury that the only aggravating circumstance it would rely on would be that the appellant committed the murder during the commission of a rape or an attempted rape. (R.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



546-47, 569.) Additionally, the trial court instructed the jury as follows:

"The aggravating circumstance that is relied upon by the State in this case is the following: That the capital offense was committed while the defendant was engaged in commission of or attempt to commit rape, robbery, burglary, or kidnapping. You may not consider in your deliberation any other aggravating circumstance other than the one that I have just read to you."

(R. 584.) We presume the jury followed the trial court's instructions. See Taylor, supra. Therefore, we do not find any plain error in this regard.

VIII.

[51][52][53] The appellant also argues that the trial court made several errors during its guilt-phase jury instructions.

"A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App.1991). A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonable--not a strained--construction. King v. State, 595 So.2d 539 (Ala.Cr.App.1991); Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984)."

*778 Williams v. State, 710 So.2d 1276, 1305 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).

" 'A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App.1986). When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala.1986).'

"Ward v. State, 610 So.2d 1190, 1194 (Ala.Cr.App.1992)."

Hemphill v. State, 669 So.2d 1020, 1021 (Ala.Cr.App.1995). See also Dill v. State, 600 So.2d 343, 353-54 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992)

, cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

A.

[54][55] First, the appellant contends that the trial court erred because it did not instruct the jury that it could find him not guilty by reason of mental disease or defect. (Issue XVI in the appellant's brief to this court.) However, he did not request such an instruction and did not object when the trial court did not give such an instruction. Accordingly, we review this claim for plain error. See Rule 45A, Ala. R.App. P.

Before trial, the appellant entered a special plea of "not guilty by reason of mental disease or defect." (C.R.54.) However, he admits in his brief on appeal that the defense did not request such an instruction and, in fact, had "abandoned this strategy before the trial started." (Appellant's brief at p. 70.) Additionally, he concedes that "the current status of the law would not agree with this argument." (Appellant's brief at p. 70.) Nevertheless, he argues that the trial court should have seen that "the situation ... clearly featured a crazy man that had done a crazy and insane act," and should therefore have instructed the jury on his plea that he was not guilty by reason of mental disease or defect. (Appellant's brief at p. 70.) After thoroughly reviewing the record, we conclude that there was no evidence on the record that would support giving an instruction on the special plea. See Williams, supra; Hemphill, supra. Accordingly, we do not find any plain error in this regard.

B.

[56][57][58] Second, the appellant contends that the trial court erred by not instructing the jury on manslaughter as a lesser included offense. (Issues XIV and XXI in the appellant's brief to this court.) Although the prosecutor, defense counsel, and the trial court discussed whether the trial court should give such a charge, defense counsel did not object when the trial court stated that it would not instruct the jury on manslaughter. Likewise, counsel did not object after the trial court had given its oral charge. Therefore, we review this contention for plain error. See Rule 45A, Ala. R.App. P.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

795 So.2d 753
795 So.2d 753
(Cite as: 795 So.2d 753)

Page 22

"No error occurs in not giving a charge on a lesser included offense when there is no reasonable theory to support the lesser offense....' "A trial judge may refuse to charge on a lesser included offense when it is clear to the judicial mind that there is no evidence to support the jury's being charged on the lesser included offense." ' "

*Williams v. State,* 601 So.2d 1062, 1075 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, *779506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992) (citing *Dill v. State,* 600 So.2d 343, 360 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993), and *Gurganus v. State,* 520 So.2d 170, 174 (Ala.Cr.App.1987)). When it refused to give the instruction on manslaughter, the trial court acknowledged that there was no basis for giving such an instruction because the appellant's statements showed that he entered the victim's apartment with the intent to rape her. Furthermore, during his guilt-phase closing argument, defense counsel admitted that, when the appellant entered the victim's apartment, he intended to rape her. (R. 498.) However, he contended that the appellant did not intend to kill the victim. Accordingly, he argued that the appellant was guilty, at most, of murder. During its guilt-phase oral charge, the trial court instructed the jury on the lesser included offense of felony murder. Thus, if the jury believed defense counsel's contention that the appellant intended to rape but did not intend to kill the victim, it could have found him guilty of felony murder. However, there was simply no reasonable theory from the evidence to support giving an instruction on manslaughter. Moreover, we have held that it is not plain error for a trial court not to give an instruction on a lesser included offense when that instruction would be inconsistent with the defense's trial strategy. *See Bush v. State,* 695 So.2d 70, 113 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). Therefore, we do not find any plain error in this regard.

C.

[59] Third, the appellant contends that the trial court improperly instructed the jury on voluntary intoxication. (Issues XIV and XX in the appellant's

brief to this court.) Specifically, he argues that the trial court's statement that, for intoxication to negate the specific intent that is necessary to sustain a capital murder conviction, it must be "so great as to amount to insanity," was confusing and misleading. (R. 530.) Because the appellant did not present this argument to the trial court, we review it for plain error. *See* Rule 45A, Ala. R.App. P.

[60][61] We rejected a similar claim in *Williams v. State,* 710 So.2d 1276, 1332 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), stating as follows:

" 'Bankhead contends that the court's instruction requiring that the jury, in order to find a drunkenness defense applicable, had to find Bankhead insane due to intoxication, was prejudicial. We disagree. In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. *Lister v. State,* 437 So.2d 622 (Ala.Cr.App.1983). The same standard is applicable in homicide cases. *Crosslin [v. State,* 446 So.2d 675 (Ala.Cr.App.1983), appeal after remand, 489 So.2d 680 (Ala.Cr.App.1986) ]. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. A jury is capable of determining whether a *780 defendant's intoxication rendered it impossible for the defendant to form a particular mental state.'

"*Ex parte Bankhead,* 585 So.2d 112, 121 (Ala.1991)."

Furthermore, the appellant concedes that his argument is contrary to current law. Therefore, we do not find any plain error in the trial court's voluntary intoxication instruction.

IX.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



The appellant argues that, during the penalty phase of the trial, the trial court and the prosecutor made misleading references to the only applicable aggravating circumstance. (Issues XV and XVII in the appellant's brief to this court.) The aggravating circumstance the State relied on was that the appellant committed the murder during a rape or an attempted rape. *See* § 13A-5-49(4), Ala.Code 1975

### A.

[62][63] First, the appellant argues that the trial court erroneously instructed the jury on the aggravating circumstance. During the penalty phase of the trial, the trial court instructed the jury as follows:

"The law provides a list of circumstances that may be considered by the jury as aggravating. In this case, the State relies on one aggravating circumstance. Before a jury could find an aggravating circumstance exists, you, the jury, must find beyond a reasonable doubt that aggravating circumstance does exist. The aggravating circumstance that is relied upon by the State in this case is the following: *That the capital offense was committed while the defendant was engaged in the commission of or attempt to commit rape, robbery, burglary, or kidnapping.* You may not consider in your deliberations any other aggravating circumstance other than the one that I have just read to you. The fact you have heretofore found the defendant guilty beyond a reasonable doubt of the capital offense of intentional murder during rape in the first degree establishes for the purpose of this hearing the existence beyond a reasonable doubt of the aggravating circumstance relied upon by the State. Because the circumstance that the State relies on for aggravation, is the capital offense was committed while the defendant was engaged in the commission of or attempt to commit rape. By your verdict yesterday, you have found beyond a reasonable doubt that that aggravating circumstance does exist. So the State has proven beyond a reasonable doubt the existence of one aggravating circumstance, and that is the circumstance [it relies] on."

(R. 584-85) (emphasis added). The appellant contends that, under the trial court's instruction, the jury could also have found as aggravating

circumstances that he committed the murder during the course of a burglary, a robbery, and a kidnapping. However, he did not raise this issue at trial. Therefore, we review it for plain error. *See* Rule 45A, Ala. R.App. P.

A trial court has broad discretion when formulating its jury instructions. *See Williams v. State,* 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court's instructions, " 'the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.' " *Self v. State,* 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting *Porter v. State,* 520 So.2d 235, 237 (Ala.Cr.App.1987)); *see also Beard v. State,* 612 So.2d 1335 (Ala.Cr.App.1992); *Alexander v. State,* 601 So.2d 1130 (Ala.Cr.App.1992). After reviewing the trial court's instruction in its entirety, we conclude that the trial court instructed the jury that the *only* aggravating circumstance it could find in this case was that the appellant committed *781 the murder during a rape or an attempted rape. Furthermore, the trial court instructed the jury that, by virtue of returning a capital murder verdict, it had already found that the State had proven that aggravating circumstance beyond a reasonable doubt. Finally, when instructing the jury on weighing the aggravating and mitigating circumstances, the trial court reiterated that only one aggravating circumstance existed. (R. 591.) Therefore, the trial court's penalty-phase instructions did not allow the jury to find the existence of additional aggravating circumstances. Thus, we do not find any plain error in this regard.

### B.

[64][65] The appellant also contends that the prosecutor engaged in improper argument about the applicable aggravating circumstance. *During his* penalty-phase opening arguments, the prosecutor stated:

"That aggravating circumstance that the State is relying on ... is that this crime--this capital offense which you have already found, was committed during the time that the defendant, Marcus Williams, was engaged in a rape, burglary, or robbery. That is set out in the Code. It sounds a lot like the charge and basically, that is why we submit the evidence at the trial as

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



evidence in the sentencing hearing. If you find that Marcus Williams committed this capital offense--the rape and murder of Melanie Rowell while he was engaged in a rape, burglary or robbery or attempt thereof, then the State of Alabama has proved to you an aggravating circumstance. That is the aggravating circumstance on which we will rely."
(R. 546-47.) The appellant contends that "[i]t was wrong and misleading to argue to the jury that an aggravating circumstance could be one with which there had been no proof and for which Marcus Williams had not been charged." (Appellant's brief at p. 71.) Because he did not object to the prosecutor's comment at trial, we review this argument under the plain error rule. *See* Rule 45A, Ala. R.App. P.

[66] As we stated earlier, we evaluate the comments made by the prosecutor in the context of the entire proceeding. *See Duren v. State,* 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). Furthermore, " '[t]o justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' *Twilley v. State,* 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted)." *Coral v. State,* 628 So.2d 954, 985 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).

When viewed in context of the entire sentencing hearing, the prosecutor's comment was not misleading. During the State's penalty-phase closing arguments, the prosecutor stated:
"In this case, there is one of those [aggravating circumstances that] we are relying on. The judge will read it to you. It basically says that if you commit the crime of murder during the commission of rape or an attempt of a first-degree rape, then that in itself is aggravating. I would submit to you Judge Austin will tell you simply by virtue that you returned a guilty verdict in this case of capital murder, then that aggravating circumstance was found by this jury to exist, and he will charge you it does exist, and therefore you can consider it in returning a death penalty."
(R. 569-70.) Also, as we discussed in Part A of this issue, the trial court properly instructed the jury

that the only applicable aggravating circumstance was that the appellant committed the murder during a rape or an attempted rape. Accordingly, *782 we do not find any plain error in this regard.

X.

[67] The appellant argues that the victim's mother improperly gave overly emotional victim impact testimony during the sentencing hearing before the trial court. (Issue XVIII in the appellant's brief to this court.) Because he did not present this claim to the trial court, we review it for plain error. *See* Rule 45A, Ala. R.App. P.

[68] In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held that victim impact evidence is admissible during the sentencing phase of a capital trial. "[A] prosecutor may present and argue evidence relating to the victim and the impact of the victim's death on the victim's family in the penalty phase of a capital trial." *McNair v. State,* 653 So.2d 320, 331 (Ala.Cr.App.1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). The State did not present victim impact evidence to the jury during the guilt or penalty phases of the trial. Furthermore, the record does not indicate that the victim's mother was overly emotional when presenting victim impact evidence to the trial court. Finally, the appellant concedes that his argument is contrary to current law. (Appellant's brief at p. 74.) Therefore, we do not find any plain error in this regard.

XI.

[69] The appellant further contends that "the manner of death used in Alabama is *per se* cruel and that the death penalty law, as it is applied, is unusual." (Issue XII in the appellant's brief to this court, at p. 65.) However, courts have repeatedly held that the death penalty is not per se cruel and unusual punishment and that electrocution is not a cruel and unusual method of capital punishment. *See Williams v. State,* 627 So.2d 985 (Ala.Cr.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976);

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



795 So.2d 753
795 So.2d 753
**(Cite as: 795 So.2d 753)**

Page 25

*Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Boykin v. State,* 281 Ala. 659, 207 So.2d 412 (1968), rev'd on other grounds, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Therefore, the appellant's argument is without merit.

### XII.

[70][71][72][73][74][75] Finally, the appellant contends that his attorneys rendered ineffective assistance during his trial. (Issues XIX, XXII, XXIII, XXIV, XXV, and XXVI in the appellant's brief to this court.) Specifically, he contends that his attorneys:

> 1) erred by abandoning his plea that he was not guilty by reason of mental disease or defect;
> 2) erred by not presenting a mitigation expert during the penalty phase of the trial;
> 3) erred by not presenting documentary evidence during the penalty phase of the trial;
> 4) erred by not having its own DNA expert to testify at trial and to assist counsel in cross-examining the State's DNA expert;
> 5) erred by not having an expert testify as to the effects of marijuana and alcohol; and
> 6) erred by not having a forensic pathology expert testify that there was no evidence of a rape or an attempted rape.

However, the appellant did not first present these claims to the trial court in a motion for a new trial. Therefore, we review them for plain error. *See* Rule 45A, Ala. R.App. P.

*783 "[T]o prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged test set out by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

" 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted

from a breakdown in the adversary process that renders the result unreliable.'

"*Id.* at 687, 104 S.Ct. at 2064.

" 'The performance component outlined in *Strickland* is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances." ' *Daniels v. State,* 650 So.2d 544, 552 (Ala.Cr.App.1994) (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065). Once a defendant has identified the specific acts or omissions that allegedly were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall outside the wide range of professionally competent assistance. *Id.*

"When reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. *Hallford v. State,* 629 So.2d 6 (Ala.Cr.App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); *Luke v. State,* 484 So.2d 531 (Ala.Cr.App.1985).

" 'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'

"*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See *Ex parte Lawley,* 512 So.2d 1370, 1372 (Ala.1987).

"And, even if an attorney's performance is

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

determined to be deficient, the petitioner is not entitled to relief unless it is also established that 'there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

*784 "In an ineffective assistance of counsel claim, the burden is on the claimant to show that his counsel's assistance was ineffective. *Ex parte Baldwin,* 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985) ."

*McNair v. State,* 706 So.2d 828, 839 (Ala.Cr.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998).

After reviewing the appellant's claims, we conclude that he has not satisfied his burden of proving that his counsel's performance was deficient and that that deficient performance prejudiced him. Although he makes broad allegations, he has not supported them factually. For example, although he contends that counsel should have presented a mitigation expert and documentary evidence during the penalty phase of his trial, he has not alleged what additional evidence an expert could have presented or what documentary evidence existed that counsel did not present. In addition, he has not shown what additional evidence an expert could have presented about the effects of alcohol and marijuana, and has not shown that there is a reasonable probability that such evidence would have altered the outcome of his trial. Furthermore, the record refutes some of his claims. First, as stated in Part VIII of this opinion, there is no evidence that he was suffering from a mental disease or defect. Second, counsel thoroughly cross-examined the State's DNA expert, and there is no indication that an additional expert would have aided the defense in this area. Finally, the appellant alleges that an independent forensic expert was necessary to testify that the autopsy of the victim did not show that there had been a rape or an attempted rape. However, the coroner testified that, based on his examination of the victim's body, he could not determine whether anyone had raped or attempted to rape the victim. Thus, although he has made several allegations, the appellant has not shown that his attorneys

performed in a deficient manner and that their allegedly deficient performance prejudiced him. Accordingly, we do not find any plain error in this regard.

XIII.

[76] Pursuant to § 13A-5-53, Ala.Code 1975, we must address the propriety of the appellant's conviction and sentence of death. [FN3] The appellant was indicted for, and convicted of, capital murder because he killed a person during the course of a rape. See § 13A-5-40(a)(3), Ala.Code 1975.

> FN3. In Issues VIII and XI in his brief to this court, the appellant makes general allegations that his rights have been violated and that the death penalty is being imposed arbitrarily. Because he has not alleged his claims with sufficient specificity, we will incorporate our discussion of these issues into this portion of our opinion.

The record does not reflect that the sentence of death was imposed as a result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.

The trial court found that the aggravating circumstances outweighed the mitigating circumstances. The trial court found that one aggravating circumstance existed: that the capital offense was committed while the appellant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary, or kidnapping. See § 13A-5-49(4), Ala.Code 1975. The trial court found that one statutory mitigating circumstance existed: the appellant had no significant history of prior criminal activity, § 13A-5-51(1), Ala.Code 1975. The trial court also found that the following were non-statutory mitigating circumstances: 1) the appellant's upbringing, 2) *785 the appellant's problem resulting from the end of a promising athletic career, 3) the appellant's attainment of his GED after failing to graduate from high school, and 4) the appellant's remorse. The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death. Its decision is

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

supported by the record, and we agree with its findings.

Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's death sentence. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.

[77] As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. The appellant killed the victim during the course of a rape or an attempted rape. Similar crimes are being punished by death throughout this state. *See Brooks v. State,* 695 So.2d 176 (Ala.Cr.App.1996), aff'd, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997); *Freeman v. State,* 555 So.2d 196 (Ala.Cr.App.1988), aff'd, 555 So.2d 215, (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990); *Bradley v. State,* 494 So.2d 750 (Ala.Cr.App.1985), aff'd, 494 So.2d 772 (Ala.1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). Thus, we find that the sentence of death was neither disproportionate nor excessive.

Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have not found any. *See* Rule 45A, Ala. R.App. P. The appellant's arguments to the contrary are without merit.

Accordingly, we affirm the appellant's conviction and sentence of death by electrocution.

AFFIRMED.

LONG, P.J., and McMILLAN, COBB, and FRY, JJ., concur.

795 So.2d 753

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw Attached Printing Summary Report for THOMAS, JIM 4763785

244

| | |
|---|---|
| Your Search: | PROMISES OF LENIENCY IN EXCHANGE OF STATEMENT |
| | Restrictions: DA(AFT 11/06/1994) |
| Date/Time of Request: | Saturday, November 06, 2004 13:56:00 Central |
| Client Identifier: | 1000132761 |
| Database: | AL-CS |
| Citation Text: | 698 So.2d 1160 |
| Lines: | 346 |
| Documents: | 1 |
| Images: | 0 |

(C) 2004. Copyright is not claimed as to any part of the original work prepared by a U.S. government officer or employee as part of that person's official duties. All rights reserved. No part of a Westlaw transmission may be copied, downloaded, stored in a retrieval system, further transmitted or otherwise reproduced, stored, disseminated, transferred or used, in any form or by any means, except as permitted in the Westlaw Subscriber Agreement, the Additional Terms Governing Internet Access to Westlaw or by West's prior written agreement. Each reproduction of any part of a Westlaw transmission must contain notice of West's copyright as follows: "Copr. (C) 2004 West, a Thomson business. No claim to orig. U.S. govt. works." Registered in U.S. Patent and Trademark Office and used herein under license: KeyCite, Westlaw and WIN. WIN Natural Language is protected by U.S. Patent Nos. 5,265,065, 5,418,948 and 5,488,725.

# Westlaw.

698 So.2d 1160
698 So.2d 1160
(Cite as: 698 So.2d 1160)

Page 1

▷

Court of Criminal Appeals of Alabama.

Edward Jay ROBINSON, Emmette Robinson, and
Victor Keith Robinson
v.
STATE.

CR-94-1611.

Oct. 11, 1996.
Rehearing Denied Feb. 28, 1997.
Certiorari Denied June 27, 1997.
Alabama Supreme Court 1960954
(petitions of Edward Jay Robinson
and Emmette Robinson) and 1960962
(State's petition).

Defendants were convicted in the Jefferson Circuit
Court, Nos. CC-93-2207 to CC-93-2209, James
Garrett, J., of first-degree robbery, and they
appealed. The Court of Criminal Appeals, Patterson
, J., held that: (1) confessions by two defendants
were voluntary; but (2) other defendant's confession
was improperly obtained after he had requested
counsel; and (3) error in admission of that
confession was not harmless.

Affirmed in part, and reversed and remanded in
part.

State's certiorari petition denied, Ala., 698 So.2d
1165.

## West Headnotes

[1] Criminal Law ☞518(1)
110k518(1) Most Cited Cases
Generally for confession to be admissible, state
must show that defendant was advised of his
Miranda rights and that defendant gave statement
after making voluntary and knowing waiver of those
rights.
[2] Criminal Law ☞1144.12
110k1144.12 Most Cited Cases
[2] Criminal Law ☞1158(4)

110k1158(4) Most Cited Cases
In order to determine whether trial court erred in
overruling motions to suppress, Court of Criminal
Appeals must view all decisions based on
reasonable inferences from the evidence and
credibility of testimony in favor of trial court,
whose ruling shall not be overturned unless contrary
to great weight of evidence.
[3] Criminal Law ☞519(1)
110k519(1) Most Cited Cases
Defendants' confessions were voluntary, where
defendants signed Miranda form indicating that
they had read and understood Miranda rights, each
defendant stated that he had not been coerced into
deciding to confess, and both police officers who
were present during the confessions testified that
they had not offered defendants leniency, youthful
offender status, or reduced bond. U.S.C.A.
Const.Amend. 5.
[4] Criminal Law ☞412.2(4)
110k412.2(4) Most Cited Cases
After suspect has made clear and unequivocal
request that he or she does not wish to proceed with
interrogation until attorney is present, questioning
must cease until attorney has been made available
or suspect initiates contact with the authority and
voluntarily and knowingly waives right to be
represented by counsel. U.S.C.A. Const.Amend. 5.
[5] Criminal Law ☞531(1)
110k531(1) Most Cited Cases
If suspect makes confession after counsel has been
requested, burden is on prosecution to show that
suspect initiated further communication, exchanges,
or conversations with police and that suspect
voluntarily and knowingly waived previously
asserted right to be represented by counsel.
U.S.C.A. Const.Amend. 5.
[6] Criminal Law ☞412.2(4)
110k412.2(4) Most Cited Cases
[6] Criminal Law ☞412.2(5)
110k412.2(5) Most Cited Cases
Before admitting into evidence defendant's
confession that was made after he requested
counsel, trial court must look at totality of
circumstances in determining whether state has
satisfied its burden of showing that suspect initiated

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



698 So.2d 1160
698 So.2d 1160
(Cite as: 698 So.2d 1160)

further communication with police and that suspect voluntarily and knowingly waived previously asserted right to counsel. U.S.C.A. Const.Amend. 5.

[7] Criminal Law ⚖══412.2(4)
110k412.2(4) Most Cited Cases
Defendant's statement to detective that he did not want to answer any more questions until he had an attorney present was "clear and unequivocal request" for counsel, requiring that interrogation cease. U.S.C.A. Const.Amend. 5.

[8] Criminal Law ⚖══414
110k414 Most Cited Cases
Detective's hearsay testimony that defendant initiated further contact with detective after having asserted his right to counsel the preceding day was insufficient to satisfy state's burden of proving that defendant initiated contact with investigating officers on day that he confessed. U.S.C.A. Const.Amend. 5.

[9] Criminal Law ⚖══412.2(5)
110k412.2(5) Most Cited Cases
[9] Criminal Law ⚖══414
110k414 Most Cited Cases
In determining whether prosecution has satisfied its burden of proving that defendant initiated further contact with the investigating officers after asserting his right to counsel and that defendant voluntarily and knowingly waived his previously asserted right to counsel, court should indulge every reasonable presumption against waiver of fundamental constitutional rights, and doubts concerning whether there was valid waiver must be resolved in favor of protecting constitutional claim. U.S.C.A. Const.Amend. 5.

[10] Criminal Law ⚖══1169.12
110k1169.12 Most Cited Cases
Trial court's error of admitting defendant's confession was not harmless; defendant's trial testimony could not be considered as independent evidence of his guilt, since state did not satisfy its burden of showing that there was no causal connection between admission of defendant's confession and his decision to testify, and evidence remaining after defendant's testimony and his confession were excluded did not provide overwhelming indication of defendant's guilt. U.S.C.A. Const.Amend. 5.
*1162 Tamera K. Erskine, Alabaster, for Victor Keith Robinson.

Erskine R. Mathis, Birmingham, for Edward Jay Robinson and Emmette Robinson.

Jeff Sessions and Bill Pryor, attys. gen., and Rosa Davis, asst. atty. gen., for the State.

PATTERSON, Judge.

The issue presented in this case is whether the trial court properly denied the motions to suppress the confessions of the appellants, Edward Robinson, Emmette Robinson, and Victor Robinson.

The relevant facts show that around 11 a.m. on November 5, 1992, three masked men, one of whom was armed with a shotgun, robbed a First Alabama Bank in Birmingham. The appellants were picked up between noon and 1 p.m. that same day and were taken to police headquarters for questioning about the robbery. All three appellants were interviewed by the police that day; however, they all denied any involvement with the bank robbery. The next day, after another round of questioning, each of the appellants gave a confession, which was tape recorded, admitting his participation in the robbery. At trial, each of the appellants moved to suppress his confession, alleging that the police officers had improperly elicited the confession by promising if he confessed that he would be tried as a youthful offender, that bail would be set at lower amount, and that the police officers would recommend leniency. Victor Robinson also contended that his confession should have been suppressed, because, he says, it was elicited after he had requested counsel, who was not provided, and without his initiating further contact with the police; thus, he argues, it was obtained in violation of the United States Constitution. The trial court denied the appellants' motions to suppress and admitted the confessions into evidence. The appellants were found guilty of first degree robbery and were sentenced to 20 years' imprisonment. In this opinion, we will address the arguments raised by Edward Robinson and Emmette Robinson separately from the contentions raised by Victor Robinson.

I.

Edward and Emmette Robinson argue that their

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

698 So.2d 1160
698 So.2d 1160
(Cite as: 698 So.2d 1160)

Page 3

confessions were made as a result of promises and threats by the investigating officers. They claim that the questioning officers told them that if they did not confess they would each receive at least a 20-year sentence and if they did confess the officers would help them get a lighter sentence. Edward and Emmette also claim that they were promised that they would be tried as youthful offenders if they confessed. Further, they claim that one of the investigating officers, Detective Mike Fisher, told them that although they were eligible for bail, they could not get bail until they were transferred from city jail to county jail; that he had been granted an extension on the amount of time that he could hold them before he had to transfer them to county jail; and that he would not allow them to be transferred until they confessed.

[1][2] The general rule is that for a confession to be admissible the state must have proved that the defendant was advised of his rights, as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny, and that the defendant gave the statement after making a voluntary and knowing waiver of those rights. *Bush v. State,* 523 So.2d 538 (Ala.Cr.App.1988); *Magwood v. State,* 494 So.2d 124 (Ala.Cr.App.1985), *aff'd,* 494 So.2d 154 (Ala.1986), *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). However, Edward and Emmette are correct that certain types of promises may render a defendant's subsequent confession involuntary and, thus, inadmissible.

"The types of promises which *may* make a defendant's statement involuntary are, e.g., promises of leniency, promises to bring the *1163 defendant's cooperation to the attention of the prosecutor, the disclosure of incriminating evidence to the accused, and silence in response to the defendant's offer to talk if his statement will not be used against him."

*Siebert v. State,* 562 So.2d 586, 592 (Ala.Cr.App.1989), *aff'd,* 562 So.2d 600 (Ala.1990), *cert. denied,* 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990). (emphasis in original). In order to determine whether the trial court erred in overruling the motions to suppress; this Court must view all decisions based on reasonable inferences from the evidence and credibility of witness testimony in favor of the trial court, whose ruling shall not be overturned unless contrary to the great weight of the evidence. *Patterson v. State,* 659

So.2d 1014, 1017 (Ala.Crim.App.1995). *See also, Parker v. State,* 587 So.2d 1072 (Ala.Cr.App.1991).

[3] Considering the facts presented to the trial court in the suppression hearing and the standard of review that this Court must apply, we believe that the admission of the confessions of Edward and Emmette was proper. When they were initially questioned by the Birmingham Police, each was given a *Miranda* form, explaining his rights, and each signed this form, indicating that he had read and understood these rights. Before giving their confessions, which were tape-recorded, Edward and Emmette stated that they understood their rights, that they were giving their confessions voluntarily, and that they had not been coerced into deciding to confess. Further, both police officers who were present during the confessions testified that they had not offered any of the appellants leniency, youthful offender status, or reduced bond. These officers testified that Edward and Emmette confessed after being confronted with some of the incriminating evidence that had been obtained, e.g., a description of the automobile driven by one of the robbers at the scene of the crime, a license plate number given by a witness that matched that automobile, and the discovery of the stolen currency in a bag bearing the name and address of one of the appellants. Based on these facts, the trial court did not err in admitting into evidence the confessions of Edward and Emmette.

II.

Victor Robinson, in addition to arguing that his confession was involuntary because of the promises made by the Birmingham police before he have his confession, contends that his confession should have been suppressed because, he says, the prosecution did not satisfy its burden of showing that he initiated contact or communication with the investigating officers after he had made a valid request for counsel.

[4][5][6] In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

698 So.2d 1160
698 So.2d 1160
(Cite as: 698 So.2d 1160)

the use of unlawfully obtained confessions also prohibits the use of any testimony impelled thereby. *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). Such testimony would be subject to exclusion, as it would be the fruit of the poisonous tree. Thus, if appellant was impelled to testify in order to overcome the impact of the wrongfully admitted confession, his testimony was tainted by the same illegality that rendered the confession inadmissible. See *Harrison v. United States.* The question naturally arises as to whether appellant was, in fact, impelled to testify because of the wrongful admission of the confession or testified for another reason unrelated to the confession. The test is whether there is a reasonable possibility that the evidence complained of might have induced the appellant's judicial confession of guilt. *Harrison v. United States; Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963); *People v. Spencer,* 66 Cal.2d 158, 57 Cal.Rptr. 163, 424 P.2d 715 (1967). The state bears the burden of showing that there was no causal connection between the appellant's testimony and the prosecution's use of appellant's confession. *1165 *Harrison v. United States; People v. Spencer,* 57 Cal.Rptr. 163, 424 P.2d at 722. ...

"We find no basis in this case to apply the harmless error rule, even if we could constitutionally do so, since we neither believe that the state proved, beyond a reasonable doubt, that the error complained of here did not contribute to the verdict, see *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), nor find that the state established that the error complained of did not injuriously affect appellant's substantial rights, A.R.App.P.45. 'In determining the effect of defendant's extra-judicial confession upon the outcome of the instant trial, we must consider the likelihood that it contributed to the verdict by *inducing* the defendant to admit his guilt in open court.' *People v. Spencer,* 57 Cal.Rptr. at 167, 424 P.2d at 719 (emphasis in original, footnote omitted)."

Based on the record before us, we cannot say that the State has satisfied its burden of showing that there was no causal connection between the admission of Victor's confession and his decision to testify. Thus, because we must assume that

Victor's trial testimony was tainted by his illegal confession, we cannot consider his testimony as independent evidence of guilt for the purpose of the harmless error claim. Looking at the remaining evidence, i.e., the evidence remaining after his testimony and his confession are excluded, we cannot say beyond a reasonable doubt that Robinson's trial testimony and confession did not contribute to a finding of guilt nor can we find that the remaining evidence provides an overwhelming indication of Victor's guilt. See *Neelley v. State,* 494 So.2d 669, 674-75 (Ala.Cr.App.1985), *aff'd,* 494 So.2d 697 (Ala.1986), *cert. denied,* 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987). Accordingly, the issue of the admissibility of Victor's confession cannot be affirmed on the basis of harmless error. For this reason, his conviction must be reversed. *Jones.*

However, in reversing Victor's conviction, we do not hold that the convictions of Edward and Emmette are due to be reversed on this ground. These appellants did not raise the issue addressing whether their convictions should be reversed by the trial court's error in admitting Victor's confession into evidence. Therefore, this issue is not properly before the Court.

Accordingly, the judgments as to Edward Jay Robinson and Emmette Robinson are affirmed. The conviction of Victor Keith Robinson is reversed and that case is remanded.

AFFIRMED AS TO EDWARD JAY ROBINSON AND EMMETTE ROBINSON; REVERSED AND REMANDED AS TO VICTOR KEITH ROBINSON.

All the Judges concur.

698 So.2d 1160

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw Attached Printing Summary Report for THOMAS,JIM 4763785

**250**

| Your Search: | PROMISES OF LENIENCY IN EXCHANGE OF STATEMENT |
| | Restrictions: DA(AFT 11/06/1994) |
| Date/Time of Request: | Saturday, November 06, 2004 13:54:00 Central |
| Client Identifier: | 1000132761 |
| Database: | AL-CS |
| Citation Text: | 718 So.2d 727 |
| Lines: | 264 |
| Documents: | 1 |
| Images: | 0 |

(C) 2004. Copyright is not claimed as to any part of the original work prepared by a U.S. government officer or employee as part of that person's official duties. All rights reserved. No part of a Westlaw transmission may be copied, downloaded, stored in a retrieval system, further transmitted or otherwise reproduced, stored, disseminated, transferred or used, in any form or by any means, except as permitted in the Westlaw Subscriber Agreement, the Additional Terms Governing Internet Access to Westlaw or by West's prior written agreement. Each reproduction of any part of a Westlaw transmission must contain notice of West's copyright as follows: "Copr. (C) 2004 West, a Thomson business. No claim to orig. U.S. govt. works." Registered in U.S. Patent and Trademark Office and used herein under license: KeyCite, Westlaw and WIN. WIN Natural Language is protected by U.S. Patent Nos. 5,265,065, 5,418,948 and 5,488,725.

Westlaw.



718 So.2d 727                                                                                                    Page 1
718 So.2d 727
(Cite as: 718 So.2d 727)

H

Supreme Court of Alabama.

Ex parte State of Alabama.
(Re Leon McLEOD, Jr.
v.
STATE).

1960538.

Jan. 16, 1998.

Defendant was convicted in the Mobile Circuit
Court, No. CC-95-704, Chris N. Galanos, J., of
murder, and was sentenced to life in prison. He
appealed. The Court of Criminal Appeals, No.
CR-95-1280, reversed, 718 So.2d 723. Certiorari
review was granted. The Supreme Court, See, J.,
held that defendant's confession was voluntary,
despite statement by police that if defendant
cooperated, they would make his cooperation
known to district attorney and trial court.

Reversed and remanded.

Almon, Shores, Kennedy, and Butts, JJ., concurred
in result.

On remand to, Ala.Cr.App., 718 So.2d 731.

West Headnotes
[1] Criminal Law ⬤═➤414
110k414 Most Cited Cases
[1] Criminal Law ⬤═➤531(3)
110k531(3) Most Cited Cases
For confession, or inculpatory statement, to be
admissible, state must prove by preponderance of
evidence that it was voluntary. (Per See, J., with
three Justices concurring and four Justices
concurring in result.) U.S.C.A. Const.Amend. 5;
Const. Art. 1, § 6.
[2] Criminal Law ⬤═➤412.1(1)
110k412.1(1) Most Cited Cases
[2] Criminal Law ⬤═➤519(1)
110k519(1) Most Cited Cases

Test of involuntariness of confession, or other
inculpatory statement, is not whether defendant
bargained with police, but whether in his
discussions with police, which may have included
bargaining, defendant's will was overborne by
apprehension of harm or hope of favor. (Per See, J.,
with three Justices concurring and four Justices
concurring in result.) U.S.C.A. Const.Amend. 5;
Const. Art. 1, § 6.
[3] Criminal Law ⬤═➤520(2)
110k520(2) Most Cited Cases
Statement by police that if defendant cooperated,
they would make his cooperation known to district
attorney and court, did not taint defendant's
confession to murder, absent any evidence that
defendant was threatened with physical intimidation
or psychological pressure, that interrogation lasted
for extraordinary length of time or that defendant
was deprived of either food or sleep, or even that
defendant was under influence of alcohol or drugs,
and considering that defendant was adult who could
read and write, and who signed knowing,
intelligent, and voluntary waiver. (Per See, J., with
three Justices concurring and four Justices
concurring in result.) U.S.C.A. Const.Amend. 5;
Const. Art. 1, § 6.
*728 Bill Pryor, atty. gen., and James B. Prude,
asst. atty. gen., for petitioner.

John Grow II, Mobile, for respondent.

SEE, Justice.

A jury convicted Leon McLeod, Jr., of the murder
of James McKissick, and the trial court sentenced
McLeod to life in prison. The Court of Criminal
Appeals reversed McLeod's conviction, holding that
his confession was involuntary as having been
induced by an implied promise of leniency and,
therefore, that the confession should not have been
admitted at the trial. *McLeod v. State*, 718 So.2d
723 (Ala.1996). We granted certiorari review to
consider that holding in light of our subsequently
issued opinion in *Ex parte Gaddy*, 698 So.2d 1150
(Ala.1997). We reverse.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



718 So.2d 727
718 So.2d 727
(Cite as: 718 So.2d 727)

Page 2

## I.

The facts pertinent to McLeod's confession are as follows: Police officers, responding to James McKissick's killing, recovered a pistol and drugs from McLeod's residence, where McKissick had been killed. The police arrested McLeod on a drug charge and took him to the police station. Officer Paul Burch read McLeod his *Miranda* [FN1] rights. McLeod stated that he understood his rights. He signed a form stating that he understood what he was doing and stating that no threats or promises had been made to coerce or induce him to answer questions. He indicated to the police that he wanted to cooperate. Then, after discussing the drug charge with McLeod, Officer Burch asked McLeod if he had used the pistol recovered at the residence to kill McKissick. McLeod answered, "Yes." [FN2]

> FN1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

> FN2. There was evidence to indicate that McKissick and his girlfriend had visited McLeod's wife at McLeod's residence; that McLeod returned home and became angry when he saw McKissick sitting at the kitchen table; that McLeod exchanged words with McKissick and then pulled a pistol; and that McLeod shot McKissick three times in the head at point-blank range.

McLeod moved to suppress evidence of the confession. At the suppression hearing, Officer Burch testified as follows:
"Q: Did you or anyone in your presence threaten Mr. McLeod in any way?
"A: No ma'am.
"Q: Did you or anyone in your presence offer him any hope of immunity?
"A: No.
"....
"Q: Did you make him any promises of leniency?

"A: No, ma'am, other than he said he wanted to cooperate. And we said *if he cooperated we'd make his cooperation known* to the District Attorney and to the Court."
(Emphasis added.) The Court of Criminal Appeals held that because the police bargained with

McLeod ("if he cooperated we'd make his cooperation known"), his subsequent confession was improperly induced by an implied **promise** of **leniency.** We must determine whether a **statement** by the police indicating that "if" the defendant cooperates, then the police will make his cooperation known, taints a confession, or any inculpatory **statement,** as involuntary.

### *729 II.

[1] For a confession, or an inculpatory **statement,** to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. *Ex parte Singleton,* 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. *Singleton,* 465 So.2d at 445. The trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. *Marschke v. State,* 450 So.2d 177 (Ala.Crim.App.1984). The trial court held, based on Officer Burch's testimony and McLeod's signed waiver-of-rights form, that McLeod's confession was voluntary. The Court of Criminal Appeals reversed the conviction, holding that the confession was involuntary.

The Fifth Amendment to the Constitution of the United States provides in pertinent part: "No person ... shall be compelled in any criminal case to be a witness against himself...." Similarly, § 6 of the Alabama Constitution of 1901 provides that "in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Hubbard v. State,* 283 Ala. 183, 215 So.2d 261 (1968).

It has long been held that a confession, or any inculpatory **statement,** is involuntary if it is either coerced through force or induced through an express or implied **promise** of **leniency.** *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In *Culombe,* 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



718 So.2d 727
718 So.2d 727
(Cite as: 718 So.2d 727)

Page 3

own free will in choosing to confess. If his capacity has been impaired, that is, "if his *will has been overborne* " by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. *Id.* (emphasis added). [FN3]

>     FN3. In *Arizona v. Fulminante,* 499 U.S. 279, 286 n. 2, 111 S.Ct. 1246, 1252 n. 2, 113 L.Ed.2d 302 (1991), the Supreme Court reaffirmed that the test of voluntariness is whether "a defendant's will has been overborne" (citing *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)).

The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the "totality of the circumstances." *Boulden v. Holman,* 394 U.S. 478, 480, 89 S.Ct. 1138, 1139- 40, 22 L.Ed.2d 433 (1969); *Greenwald v. Wisconsin,* 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see *Beecher v. Alabama,* 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See *Ex parte Matthews,* 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); *Jackson v. State,* 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); *Eakes v. State,* 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is "whether the defendant's will was *overborne* at the time he confessed") (emphasis added). Thus, to determine whether McLeod's confession was improperly induced, we must determine if his will was "overborne" by an implied promise of leniency.

Instead of applying the "overborne" test, the Court of Criminal Appeals applied a more stringent "bargained with" test. It held that because Officer Burch "bargained with" McLeod to obtain his confession--if McLeod cooperated, the police would make his cooperation known to the district attorney--the confession "was improperly induced by a promise made by Officer Burch that reasonably engendered a hope of favor in McLeod's mind." *McLeod,* 718 So.2d at 727. We disagree.

[2] In *Gaddy,* 698 So.2d at 1154, this Court expressly disapproved the "bargained *730 with" test used by the Court of Criminal Appeals and held that a court should examine the totality of the circumstances to determine if an implied **promise of leniency** caused the defendant to make the confession-- i.e., if it overbore the will of the defendant. Thus, the test of involuntariness of a confession, or other inculpatory **statement**, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by "apprehension of harm or hope of favor." See *Gaddy,* 698 So.2d at 1154 (quoting *Ex parte Weeks,* 531 So.2d 643, 644 (Ala.1988)); *Culombe,* 367 U.S. at 602, 81 S.Ct. at 1879; *Jackson,* 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess "the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure"; "[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures." *Jackson,* 562 So.2d at 1380-81 (citations omitted).

[3] The evidence does not indicate that McLeod was threatened with physical intimidation or psychological pressure. The evidence does not show that the interrogation lasted for an extraordinary length of time or that he was deprived of either food or sleep for an unexplained and prolonged time. See, e.g., *Pardue v. State,* 695 So.2d 199 (Ala.Crim.App.1996) (holding that a confession obtained by interrogating the defendant for approximately 78 hours was involuntary). Further, the evidence does not show that McLeod was under the influence of alcohol or drugs when he confessed. See, e.g., *Boggan v. State,* 455 So.2d 228, 236 (Ala.Crim.App.1984) (stating that the defendant's intoxication may cause his inculpatory statement to be inadmissible).

The evidence indicates that although McLeod did not have a previous arrest record and thus may have

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

had little prior experience with the criminal justice system, he is an adult who can read and write, and he signed a waiver form indicating that he knowingly, intelligently, and voluntarily waived his rights. The evidence also indicates that the interrogation of McLeod was conducted in a civil manner free of displays of force, intimidation, or strong-arm tactics.

Moreover, as in *Gaddy,* 698 So.2d at 1155, the defendant in this case initiated the portion of the discussion that led to his confession. McLeod indicated that he wanted to cooperate with Officer Burch. Thus, this case is less like *Weeks,* 531 So.2d at 644, where the officer's inducement actually caused the defendant to make an inculpatory statement, and more like *Gaddy,* 698 So.2d at 1155, where the officer's inducement did not actually cause the defendant to confess.

Absent the exertion of physical or psychological force or any particular and peculiar susceptibility to inducement on the part of McLeod, the officer's stating that he would make McLeod's cooperation known to the district attorney was, under the totality of the circumstances, insufficient to taint McLeod's confession as involuntary. [FN4] Therefore, *731 we hold that the State carried its burden of proving that McLeod's confession was voluntary. We reverse the judgment of the Court of Criminal Appeals and remand the case for an order or proceedings consistent with this opinion.

FN4. Moreover, we note that the mere promise to make cooperation known to law enforcement authorities, as opposed to a direct promise of a reduced sentence, generally is not considered an illegal inducement. In *United States v. Nash,* 910 F.2d 749, 752-53 (11th Cir.1990), the United States Court of Appeals for the Eleventh Circuit held:
"We find that the district court was not clearly erroneous in accepting [the officer's] testimony that he only promised to make [the defendant's] cooperation known to the United States Attorney's office and gave no guarantee of a reduced sentence. Although [the officer] told [the defendant] that cooperating defendants generally 'fared better time-wise,' this

statement did not amount to an illegal inducement: 'telling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government.' "
(Quoting *United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir.1978)). Accord *United States v. Levy,* 955 F.2d 1098, 1105 (7th Cir.1992) (holding that federal agent's indication to defendant that his cooperation would be reported to the United States Attorney did not make defendant's confession involuntary); *United States v. Meirovitz,* 918 F.2d 1376, 1380 (8th Cir.1990) (holding that confession was voluntary although agents had promised to inform prosecutor of defendant's cooperation); *United States v. Guerrero,* 847 F.2d 1363 (9th Cir.1988) (holding that agent's promise to inform prosecutor of defendant's cooperation does not render a subsequent confession involuntary); *United States v. Baldacchino,* 762 F.2d 170, 179 (1st Cir.1985) (holding that an officer's promise to bring defendant's cooperation to the attention of the prosecutor did not make confession involuntary).

REVERSED AND REMANDED.

HOOPER, C.J., and MADDOX and HOUSTON, JJ., concur.

ALMON, SHORES, KENNEDY, and BUTTS, JJ., concur in the result.

718 So.2d 727

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



IN THE CIRCUIT COURT FOR
THE TWELFTH JUDICIAL CIRCUIT
PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                *

    Plaintiff,                  *

vs.                         *     CASE NO.    CC 2003-382

BOBBY WILLIAMS,            *

    Defendant.            *

## ORDER

After trial by properly struck petit jury, the jury returned a verdict of GUILTY of Robbery, First Degree. The court finds said verdict to be supported by competent and legal evidence.

The Defendant requesting a pre-sentence report and a sentencing hearing, the Pike County State Probation and Parole Officer is ORDERED to prepare a Pre-Sentence Investigation Report in this case with the original being filed with the Circuit Clerk and copies being provided to the Office of the District Attorney, Defendant's attorney and Defendant.

The Defendant's sentencing hearing is hereby scheduled for the 6th day of January, 2005, at 9:00 o'clock a.m., in the Pike County Courthouse, Troy, Alabama.

Judgment adjudication is delayed pending sentencing.

Notice shall issue to State, Hon. James Thomas and State Probation and Parole.

_____
STEVEN E. BLAIR
CIRCUIT JUDGE

NOV 2004
Brenda Meredith Peacock
Court Clerk
Pike Co., Ala.



IN THE CIRCUIT COURT FOR
THE TWELFTH JUDICIAL CIRCUIT
PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
    Plaintiff,                       *
                                     *
vs.                                  *        CASE NO.      CC 2003-383
                                     *
BOBBY WILLIAMS,                      *
                                     *
    Defendant.                       *

## <u>ORDER</u>

    After trial by properly struck petit jury, the jury returned a verdict of GUILTY of Robbery, First Degree. The court finds said verdict to be supported by competent and legal evidence.

    The Defendant requesting a pre-sentence report and a sentencing hearing, the Pike County State Probation and Parole Officer is ORDERED to prepare a Pre-Sentence Investigation Report in this case with the original being filed with the Circuit Clerk and copies being provided to the Office of the District Attorney, Defendant's attorney and Defendant.

    The Defendant's sentencing hearing is hereby scheduled for the 6th day of January, 2005, at 9:00 o'clock a.m., in the Pike County Courthouse, Troy, Alabama.

    Judgment adjudication is delayed pending sentencing.

    Notice shall issue to State, Hon. James Thomas and State Probation and Parole.

STEVEN E. BLAIR
CIRCUIT JUDGE

NOV 2004
Brenda ... Peacock
Cou... Clerk
Pike Co., Ala.



IN THE CIRCUIT COURT FOR
THE TWELFTH JUDICIAL CIRCUIT
PIKE COUNTY, ALABAMA

STATE OF ALABAMA,           *
                           *
   Plaintiff,            *
                           *
vs.                        *     CASE NO.     CC 2003-382
                           *     thru         CC 2003-383
BOBBY WILLIAMS,            *
                           *
   Defendant.            *

## ORDER

    The Defendant being incarcerated in a state penitentiary, the Sheriff of Pike County

shall arrange transportation of the Defendant from said penitentiary to Pike County for

sentencing hearings scheduled for the 6th day of January, 2005, at 9:00 o'clock a.m.  Notice

shall issue to State, Hon. James Thomas and the Sheriff of Pike County, Alabama.

    DONE THIS THE 10th day of November, 2004.


_____
STEVEN E. BLAIR
CIRCUIT JUDGE

NOV 2004

# SUBPOENA REQUEST FORM

State of Alabama ) Ca__ _umber
Unified Judicial System CC__ _382
Form C-12      Rev. 8/98

_IE_____ Circuit_____ COURT OF _____ PIKE_____, ALABAMA
(Circuit, District or Municipal)                              (County or Municipality)

Civil: _____ v. _____
Plaintiff                                        Defendant

Juvenile: In the matter of _____, a
child
Criminal: [X]State of Alabama
[ ]Municipality of _____ v. _____ Bobby Williams _____
Defendant

Court Date:  November 8, 2004     Court Time:    9:00 AM/PM    Date Requested:

## TO BE COMPLETED BY REQUESTER

The Clerk is requested to issue an Order to Appear (Subpoena) for each of the following witnesses for:
[ ]Plaintiff/State    [X]Defendant    [ ]Grand Jury    [ ]Other

Date issued          Date Executed

1. Name: Det. Greg Wright
   Home Address:  TPD
   Troy, AL                         Zip: 36081      *11-8-04*   Remarks:
   Telephone Number:
   Alternate Address:
   Troy, AL                         Zip:
       \ephone Number:

2. Name: Det. Larry Ross
   Home Address:  TPD              *11-8-04*
   Troy, AL                         Zip: 36081      Remarks:
   Telephone Number:
   Alternate Address:
   Troy, AL                         Zip: 36081
   Telephone Number:

3. Name:
   Home Address:
                                    Zip: 36081      Remarks:
   Telephone Number:
   Alternate Address:
   Troy, AL 36081                   Zip: 36081
   Telephone Number:

4. Name:
   Home Address:
                                    Zip:            Remarks:
   Telephone Number:
   Alternate Address:
   Troy, AL                         Zip: 36081
   Telephone Number:

NOV 2004
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala.

METHOD OF SERVICE REQUESTED:          Party Requesting Subpoena _____
   [x]Personal  [ ]Other                            Signature

                                                334-566-2181
_____ _____          Requester Phone Number
   Date              Clerk



# IN THE CIRCUIT COURT OF
# PIKE COUNTY, ALABAMA

|  |  |  |
|---|---|---|
| | * | |
| **STATE OF ALABAMA** | * | |
| Plaintiff | * | |
| | * | CASE NO:    CC 2003-S-382 |
| | * | AND 383 |
| **BOBBY WILLIAMS** | * | |
| Defendant. | * | |

## NOTICE OF APPEAL

Notice is hereby given that Bobby Williams appeals to the Court of Criminal of Appeals from the Judgement of Conviction entered by the Circuit Court in the above-styled case. The date of the Judgement setting forth the conviction is November 10, 2004 whereby the Defendant was convicted of 2 counts of Robbery 1st degree. At the present time, the defendant has not been sentenced.

The defendant was deemed indigent for the purposes of trial and granted court appointed counsel. A request is made for court appointed counsel on appeal.

RESPECTFULLY SUBMITTED:

_____
James N. Thomas, THO148
Attorney for the Defendant

OF COUNSEL:

James N. Thomas, LLC
James N. Thomas
P.O. Box 974
Troy, Alabama 36081
(334) 566-2181



## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion for Transfer was served upon the D.A. at the, Pike County Courthouse, Troy, Alabama, by hand delivery on this the 17th th Day of December, 2004.

James N. Thomas

| State of Alabama<br>Unified Judicial System<br>Form ARAP-26 (front)    8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br>_____ - _____ |
|---|---|---|

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF _____Pike_____ COUNTY

BOBBY WILLIAMS _____, Appellant

V.  ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number<br>CC-03-382 & 383 | Date of Complaint or Indictment<br>May 20, 2003 | Date of Judgment/Sentence/Order<br>to be 1-6-05 |
|---|---|---|
| Number of Days of Trial/Hearing<br>2 Days | Date of Notice of Appeal<br>Oral: | Written: 12-17-04 |

Indigent Status Requested: ☒ Yes ☐ No      Indigent Status Granted: ☒ Yes ☐ No

**B. REPRESENTATION:**

Is Attorney Appointed or Retained? ☒ Appointed ☐ Retained.    If no attorney, will appellant represent self? ☐ Yes ☐ No

| Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)<br>James N. Thomas | Telephone Number<br>334-566-2181 |
|---|---|
| Address<br>P. O. Box 974 | City<br>Troy | State<br>AL | Zip Code<br>36081 |

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
|---|---|
| Codefendant | Case Number |
| Codefendant | Case Number |

**D. TYPE OF APPEAL:** Please check the applicable block.

| 1 ☒ State Conviction | 4 ☐ Pretrial Order | 7 ☐ Juvenile Transfer Order | 10 ☐ Other (Specify) |
| 2 ☐ Post-Conviction Remedy | 5 ☐ Contempt Adjudication | 8 ☐ Juvenile Delinquency | |
| 3 ☐ Probation Revocation | 6 ☐ Municipal Conviction | 9 ☐ Habeas Corpus Petition | |

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

| 1 ☐ Capital Offense - § _____ | 6 ☐ Trafficking in Drugs - § _____ | 11 ☐ Fraudulent Practices - § _____ |
| 2 ☐ Homicide - § _____ | 7 ☐ Theft - § _____ | 12 ☐ Offense Against Family - § _____ |
| 3 ☐ Assault - § _____ | 8 ☐ Damage or Intrusion to Property - § _____ | 13 ☐ Traffic - DUI - § _____ |
| 4 ☐ Kidnapping/Unlawful Imprisonment - § _____ | 9 ☐ Escape - § _____ | 14 ☐ Traffic - Other - § _____ |
| 5 ☐ Drug Possession - § _____ | 10 ☐ Weapons/Firearms - § _____ | 15 ☒ Miscellaneous (Specify):<br>Robbery - § 13A-8-41 |

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes  ☒ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript?  ☒ Yes  ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed.  _12-17-04_
   (Date)
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes  ☒ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☐ Yes  ☒ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive

262

| Form ARAP-26 (back) | 8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT |
|---|---|---|

**ST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition ether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

Two counts of Robbery II.  Defendant identified by two eyewitnesses at trial.  Defendant contested eyewitness identification along with photo lineup.  Defendant also contested validity of statement.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

Weight of evidence.  Supression of Defendant's statement. Eyewitness identification.

**SIGNATURE:**

Date  12/17/04

Signature of Attorney/Party Filing this Form

DEC 2004
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala.

| State of Alabama Unified Judicial System Form ARAP-1C    8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL See Rules 10(c) and 11(b) of the Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number |
|---|---|---|

**TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.**

[X] CIRCUIT COURT  [ ] DISTRICT COURT  [ ] JUVENILE COURT OF _____ Pike _____ COUNTY

_____ BOBBY WILLIAMS _____, Appellant

V.  [X] STATE OF ALABAMA   [ ] MUNICIPALITY OF _____

| Case Number CC-03-382 & 383 | Date of Judgment/Sentence/Order to be held on January 6, 2005  11/10 |
|---|---|
| Date of Notice of Appeal Oral:                Written:  12-17-04 | Indigent Status Granted: [X] Yes  [ ] No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
 I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-72, *CODE OF ALABAMA 1975*).

_____        _____        _____
Signature                          Date                          Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                        COURT REPORTER(S)

A. [X] TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence          Sheila Hanson
 proceedings, a transcript of the organization of the jury and arguments of counsel must          _____
 be designated separately.          _____

B. [X] ORGANIZATION OF THE JURY - This designation will include voir dire examination and          Sheila Hanson
 challenges for cause. Note that in noncapital cases the voir dire of the jury will not be
 recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. [ ] ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will          _____
 not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL.. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D. Motion to Supress | 11/8/04 or 11/9 | same |
| E. | | |
| F. | | |
| G. | | |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must ~~be identified~~ on ~~this~~ form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER''S TRANSCRIPT:**
 I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

James M. Thomas        12/17/04        James M. Thomas
Signature                          Date                          Print or Type Name

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.



IN THE CIRCUIT COURT FOR
THE TWELFTH JUDICIAL CIRCUIT
PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
   Plaintiff,                    *
                                     *
vs.                                  *        CASE NO.      CC 2003-382
                                     *        and           CC 2003-383
BOBBY WILLIAMS,                      *
                                     *
   Defendant.                    *

## <u>ORDER</u>

    This matter comes before the court for sentencing hearing on January 6, 2005. The Defendant, BOBBY WILLIAMS, appeared and was represented by the Hon. JAMES THOMAS. The State was present and represented by the Hon. LARRY JARRELL, Assistant District Attorney for the Twelfth Judicial Circuit, State of Alabama.

    The Defendant was found guilty after trial by jury of two (2) counts of the offense of ROBBERY, FIRST DEGREE, in violation of Section 13A-008-041 of the <u>Code of Alabama, 1975</u>, on November 10, 2004.

    The Defendant at hearing was:

    1. Afforded an opportunity to make a statement in Defendant's own behalf before sentencing and was further asked if the Defendant had anything to say as to why the sentence of the law should not be imposed; and

    2. Given an opportunity to present evidence as to any matter probative in the issue of sentence and/or in mitigation of any penalty that is to be imposed.

PAGE TWO                                          CC 2003-382 and CC 2003-383 

The State was then afforded an opportunity to present evidence as to any matter

probative to the issue to sentence and/or facts in aggravation or mitigation of any penalty

that is to be imposed.

After considering the arguments of the parties, and any evidence presented:

IT IS ORDERED, ADJUDGED AND DECREED that the Defendant, BOBBY WILLIAMS,

is pronounced and declared **GUILTY** of two (2) counts of the offense of ROBBERY, FIRST

DEGREE, in violation of Section 13A-008-041 of the <u>Code of Alabama, 1975</u>.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Defendant is hereby

sentenced to serve twenty-five (25) years imprisonment in a Penitentiary of the State of

Alabama in each case, said sentences to run concurrent with each other and concurrent

with the Montgomery, Alabama, sentences the Defendant is presently serving.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED as follows:

1.  That the Defendant shall pay costs of court in each case.

2.  That the Defendant shall pay $50.00 in each case to the Clerk of Court to be

disbursed to the Alabama Crime Victims Compensation Commission.

3.  That the Defendant shall reimburse the State of Alabama for indigent attorney

fees in each case.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that should the Defendant

be incarcerated in an Alabama Penitentiary or Correctional Facility, and have income while

therein, the Alabama Department of Corrections is ORDERED to pay twenty-five percent

PAGE THREE                                        CC 2003-382 and CC 2003-383



(25%) of Defendant's said funds (which funds of the Defendant the Department may come into possession of) to the Clerk of Court, Pike County, Troy, Alabama, as is allowed by law and said Department is ordered to pay same to the Clerk of Court until such time as all costs, and above ordered fees are paid in full.

The Defendant was advised of the right to appeal, as long as the Defendant perfects same within a specified time; of the right, if declared indigent, to a free transcript for the purpose of pursuing any appeal and of the right to Court appointed legal representation, along with the Defendant's other appeal rights incident thereto.

The Defendant is given credit for the time in custody he has already served while awaiting trial and / or disposition in this case.

DONE THIS THE 14th day of January, 2005.

JAN 2005
Brenda ___ ___eacock
Court Clerk
Pike Co., Ala.

STEVEN E. BLAIR
CIRCUIT JUDGE



```
ACR359                ALABAMA JUDICIAL DATA CENTER
                           PIKE COUNTY
                      TRANSCRIPT OF RECORD
                      CONVICTION REPORT
                                         CC 2003 000382.00 01
                                          STEVEN E BLAIR
```

```
| CIRCUIT COURT OF PIKE COUNTY              COURT ORI: 055015 J  |
|                                                               |
| STATE OF ALABAMA      VS.               DC NO: GJ 2003 000073.00 |
| WILLIAMS BOBBY            ALIAS:        G J:   03-73           |
|                           ALIAS:        SSN:  423132904        |
| MONTGOMERY  AL  36110                   SID:  000000000        |
|                                         AIS:                  |
```

```
| DOB:  10/19/1982   SEX: M   HT: 6 01    WT: 150  HAIR: BLK  EYE: BRO |
| RACE: ( )W (X)B ( )O  COMPLEXION: ____ AGE: ____ FEATURES: ____ |
```

```
| DATE OFFENSE: 12/21/2002  ARREST DATE: 02/24/2003  ARREST ORI: 0550100 |
```

```
| CHARGES @ CONV    CITES          CT CL COURT ACTION        CA DATE |
| ROBBERY 1ST       13A-008-041    01 A  CONVICTED           01/06/2005 |
|                                  00                        00/00/0000 |
|                                  00                        00/00/0000 |
```

```
| JUDGE: STEVEN E BLAIR              PROSECUTOR: MCALILEY GARY L |
```

```
| PROBATION APPLIED   GRANTED   DATE      REARRESTED DATE   REVOKED   DATE |
| ( )Y ( )N     ( )Y ( )N _____      ( )Y ( )N _____   ( )Y ( )N _____ |
```

```
| 15-18-8, CODE OF ALA 1975   IMPOSED   SUSPENDED    TOTAL    JAIL CREDIT |
| ( )Y (X)N  CONFINEMENT:  25 00 000   00 00 000   25 00 000  00 00 026 |
|            PROBATION  :  00 00 000              00 00 000             |
| DATE SENTENCED: 01/06/2005   SENTENCE BEGINS: 01/06/2005 |
```

```
| PROVISIONS            COSTS/RESTITUTION        DUE        ORDERED |
|                                                                  |
|  PENITENTIARY        RESTITUTION           $0.00        $0.00    |
|  CONCURR SENT        ATTORNEY FEE          $0.00        $0.00    |
|                      CRIME VICTIMS         $50.00       $50.00   |
|                      COST                  $376.00      $376.00  |
|                      FINE                  $0.00        $0.00    |
|                      MUNICIPAL FEES        $0.00        $0.00    |
|                      DRUG FEES             $0.00        $0.00    |
|                      ADDTL DEFENDANT       $0.00        $0.00    |
|                      DA FEES               $0.00        $0.00    |
|                      COLLECTION ACCT       $0.00        $0.00    |
|                      JAIL FEES             $0.00        $0.00    |
|                                                                  |
|                      TOTAL                 $426.00      $426.00  |
```

```
| APPEAL DATE       SUSPENDED        AFFIRMED        REARREST |
| (X)Y( )N 12/17/2004 ( )Y( )N _____ ( )Y( )N _____ ( )Y( )N _____ |
```

```
| REMARKS:                    THIS IS TO CERTIFY THAT THE |
|                             ABOVE INFORMATION WAS EXTRACTED |
|                             FROM OFFICIAL COURT RECORDS |
|                             AND IS TRUE AND CORRECT. |
|                                                         |
|                                  Brenda M. Peacock      |
|                             BRENDA M. PEACOCK           |
|                                                         |
|                             01/19/2005                  |
```

```
OPERATOR: JOP
PREPARED: 01/19/2005
```

ACR359 

ALABAMA JUDICIAL DATA CENTER
PIKE COUNTY
TRANSCRIPT OF RECORD
CONVICTION REPORT

CC 2003 000383.00 01
STEVEN E BLAIR

CIRCUIT COURT OF PIKE COUNTY                    COURT ORI: 055015 J

STATE OF ALABAMA        VS.          DC NO: GJ 2003 000074.00
WILLIAMS BOBBY              ALIAS:    G J:    03-74
                           ALIAS:    SSN:    423132904
MONTGOMERY  AL  36110                 SID:   000000000
                                      AIS:

DOB:  10/19/1982    SEX: M    HT: 6 01    WT: 150  HAIR: BLK    EYE: BRO
RACE: ( )W (X)B ( )O   COMPLEXION: _____   AGE: _____  FEATURES: _____

DATE OFFENSE: 12/27/2002   ARREST DATE: 02/24/2003   ARREST ORI: 0550100

CHARGES @ CONV      CITES           CT CL COURT ACTION           CA DATE
ROBBERY 1ST         13A-008-041     01 A  CONVICTED             01/06/2005
                                    00                         00/00/0000
                                    00                         00/00/0000

JUDGE: STEVEN E BLAIR               PROSECUTOR: MCALILEY GARY L

PROBATION APPLIED   GRANTED  DATE      REARRESTED DATE  REVOKED  DATE
( )Y( )N _____ ( )Y( )N _____    ( )Y( )N _____  ( )Y( )N _____

15-18-8, CODE OF ALA 1975   IMPOSED    SUSPENDED    TOTAL     JAIL CREDIT
( )Y (X)N   CONFINEMENT:   25 00 000   00 00 000   25 00 000   00 00 026
            PROBATION  :   00 00 000               00 00 000
DATE SENTENCED: 01/06/2005   SENTENCE BEGINS: 01/06/2005

PROVISIONS                  COSTS/RESTITUTION         DUE        ORDERED

  PENITENTIARY              RESTITUTION             $0.00        $0.00
  CONCURR SENT              ATTORNEY FEE            $0.00        $0.00
                           CRIME VICTIMS           $50.00       $50.00
                           COST                   $304.00      $304.00
                           FINE                     $0.00        $0.00
                           MUNICIPAL FEES           $0.00        $0.00
                           DRUG FEES                $0.00        $0.00
                           ADDTL DEFENDANT          $0.00        $0.00
                           DA FEES                  $0.00        $0.00
                           COLLECTION ACCT          $0.00        $0.00
                           JAIL FEES                $0.00        $0.00

                           TOTAL                  $354.00      $354.00

APPEAL DATE       SUSPENDED          AFFIRMED          REARREST
(X)Y( )N 12/17/2004 ( )Y( )N _____  ( )Y( )N _____  ( )Y( )N _____

REMARKS:
                           THIS IS TO CERTIFY THAT THE
                           ABOVE INFORMATION WAS EXTRACTED
                           FROM OFFICIAL COURT RECORDS
                           AND IS TRUE AND CORRECT.


                           Brenda M. Peacock
                           BRENDA M. PEACOCK

                           01/19/2005

OPERATOR: JOP
PREPARED: 01/19/2005

269

Name: Bobby Williams                    Date: 1-26-05
AIS # 231810

---

Office of the Clerk
Pike            County Circuit Court
Troy          , Alabama 36081
City                        Zip Code

REF: Request for Court Records

Dear Court Clerk:

My case number is CC03-382, 383          , and I am preparing to
pursue a possible post-conviction remedies. There are some documents
that I need to prepare the petition.

It is already established in the Circuit Court that I am
indigent, and due to my incarceration my status has not changed.

Would you please send me the following:

___✓_(1)  Case Action Summary

___✓_(2)  Transcript of Record/Conviction Report

___✓_(3)  Arrest Report

___✓_(4)  Police Investigator's Report

___✓_(5)  Indictments

___✓_(6)  Warrants

___✓_(7)  Notice of Intent to Enhance as HFOA Status

___✓_(8)  Plea Argements

___✓_(9)  Ireland From

___✓_(10) Complaint/Affidavits

This is not a complete list of all my records, therefore I
would appreciate any part of my Court Record that you are able
to provide me.

1/26/05

Thank you in advance for your time, trouble and any help
that you may give in this matter

I on appeal
Who will receive
transcript when complete
Peacock

Sincerely,

Bobby Williams
Signature

ACR371
ALABAMA JUDICIAL DATA CENTER
NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
BY THE TRIAL COURT CLERK
IN THE CIRCUIT COURT OF    PIKE COUNTY
STATE OF ALABAMA VS WILLIAMS BOBBY        JUDGE: STEVEN E BLAIR

270

APPEAL DATE: 12/17/2004

INDIGENCY STATUS:
    GRANTED INDIGENCY STATUS AT TRIAL COURT:        __X__ YES    _____ NO
    APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:  _____ YES    __X__ NO
    INDIGENT STATUS REVOKED ON APPEAL:              _____ YES    __X__ NO
    INDIGENT STATUS GRANTED ON APPEAL:              __X__ YES    _____ NO

DEATH PENALTY: NO

APPEAL TYPE: STATE CONVICTION

THIS IS AN APPEAL FROM A CONVICTION.

DATE OF CONVICTION: 01/06/2005        DATE OF SENTENCE: 01/06/2005

YOUTHFUL OFFENDER STATUS: DENIED

CO/CASE NUMBER: 55/CC 2003 000382.00
CODE: ROB1    CONVICTION: ROBBERY 1ST          ACTION: CONVICTED
                                                STATUTE: 13A-008-041
SENTENCE:    CONF: 25 YRS 00 MOS 000 DAYS
SENTENCE:    PROB: 00 YRS 00 MOS 000 DAYS      LIFE: NO    LIFEWO: NO

POST-JUDGMENT MOTIONS FILED:    DT FILED        DT DENIED        CON BY AGREE
___ MOTION FOR NEW TRIAL        _____        _____        _____
___ MOTION FOR JUDG. OF ACQUIT  _____        _____        _____
___ MOTION TO W/D GUILTY PLEA   _____        _____        _____
___ MOTION FOR ATTY TO W/DRAW   _____        _____        _____
___ OTHER                       _____        _____        _____

COURT REPORTER(S):
ADDRESS:                        HANSON, SHEILA T.
                                C/O HON. GARY L. MCALILEY
                                ENTERPRISE    ,  AL  36331

APPELLATE COUNSEL #1:
ADDRESS:                        THOMAS JAMES NORMAN
                                P.O. BOX 974

PHONE NUMBER:                   TROY          ,  AL   36081
                                334-566-2181

APPELLATE COUNSEL #2:
ADDRESS:

PHONE NUMBER:

APPELLANT (PRO SE):
ADDRESS:                        WILLIAMS BOBBY
                                565 Bibb Lane D2-30T
AIS #: 231210                   MONTGOMERY     ,  AL  361480000
                                Brent, AL 35034

APPELLEE (IF CITY APPEAL):
ADDRESS:

I CERTIFY THAT THE INFORMATION PROVIDED                  OPERATOR: JAS
ABOVE IS ACCURATE TO THE BEST OF MY              PREPARED: 01/27/2005
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO     Brenda M. Peacock
THIS ACTION ON THIS 27 DAY OF January 2005      CIRCUIT COURT CLERK

cc: Ct. Cr. Appeals
    Atty General
    DA
    Thomas
    △ Wms
    Ct. Reporter Hanson

ACR371                    ALABAMA JUDICIAL DATA CENTER
           NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                        BY THE TRIAL COURT CLERK
                  IN THE CIRCUIT COURT  OF     PIKE COUNTY
STATE OF ALABAMA VS WILLIAMS BOBBY              JUDGE: STEVEN E BLAIR

APPEAL DATE: 12/17/2004

INDIGENCY STATUS:
    GRANTED INDIGENCY STATUS AT TRIAL COURT:        __X__ YES
    APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:  _____ YES  __X__ NO
    INDIGENT STATUS REVOKED ON APPEAL:              _____ YES  __X__ NO
    INDIGENT STATUS GRANTED ON APPEAL:              __X__ YES  _____ NO

DEATH PENALTY: NO

APPEAL TYPE: STATE CONVICTION

THIS IS AN APPEAL FROM A CONVICTION.

DATE OF CONVICTION: 01/06/2005        DATE OF SENTENCE: 01/06/2005

YOUTHFUL OFFENDER STATUS: DENIED

CC/CASE NUMBER: 55/CC 2003 000383.00
CODE: ROB1   CONVICTION: ROBBERY 1ST        ACTION: CONVICTED
                                            STATUTE: 13A-008-041
SENTENCE:   CONF: 25 YRS 00 MOS 000 DAYS
SENTENCE:   PROB: 00 YRS 00 MOS 000 DAYS      LIFE: NO   LIFEWO: NO

POST-JUDGMENT MOTIONS FILED:    DT FILED      DT DENIED     CON BY AGREE
___ MOTION FOR NEW TRIAL        _____     _____     _____
___ MOTION FOR JUDG. OF ACQUIT  _____     _____     _____
___ MOTION TO W/D GUILTY PLEA   _____     _____     _____
___ MOTION FOR ATTY TO W/DRAW   _____     _____     _____
___ OTHER                       _____     _____     _____

COURT REPORTER(S):              HANSON, SHEILA T.
ADDRESS:                        C/O HON. GARY L. MCALILEY
                                ENTERPRISE        ,  AL  36331

APPELLATE COUNSEL #1:           THOMAS JAMES NORMAN
ADDRESS:                        P.O. BOX 974

PHONE NUMBER:                   TROY              ,  AL   36081
                                334-566-2181

APPELLATE COUNSEL #2:           _____
ADDRESS:                        _____
                                _____
PHONE NUMBER:                   _____

APPELLANT (PRO SE):             WILLIAMS BOBBY
ADDRESS:                        5505 Bibb Lane  D2·30T
                                MONTGOMERY            AL  361400000
AIS #: 231210                   Brent, AL 35034

APPELLEE (IF CITY APPEAL):      _____
ADDRESS:                        _____
                                _____

I CERTIFY THAT THE INFORMATION PROVIDED                OPERATOR: JAS
ABOVE IS ACCURATE TO THE BEST OF MY            PREPARED: 01/27/2005
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO        Brenda M. Peacock
THIS ACTION ON THIS 27 DAY OF January, 2005    CIRCUIT COURT CLERK

cc: Ct. Cr. Appeals
    Atty General
    DA
    Thomas
    ▲ Wms
    Ct. Reporter Hanson

272

## IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

STATE OF ALABAMA,
     PLAINTIFF,

VS.

                 CASE NO.:  CC 2003-S-382, 383

BOBBY WILLIAMS,
     DEFENDANT.

### STATE'S MOTION TO SET RESTITUTION

COMES NOW, the State of Alabama, by and through the undersigned Assistant District Attorney and submits to this Court a Motion to Set Restitution and as grounds therefore shows as follows:

1. That the Defendant was found guilty of two counts of Robbery 1st and sentenced to 25 years for each case.

2. That the restitution is requested in the amount of $534.25 payable to the victim Sunny South LLC, ATTN:  Martha Norman Post Office Box 434, Troy, AL 36081

3. See attached Restitution Affidavit.

WHEREFORE, PREMISES CONSIDERED the State prays that the court will take into consideration this amount to be added as restitution.

DONE this the 10th February 2005.

                        Larry C. Jarrell (JAR001)
                        Assistant District Attorney
                        P.O. Box 812
                        Troy, Alabama 36081
                        (334) 566-6896

FEB 2005
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala.

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been placed in the receptacle reserved in the following name:  **HON. JAMES N. THOMAS** in the Pike County Office of the Circuit Clerk at the Pike County Courthouse on this the 10 February 2005.

                        Larry C. Jarrell
                        Assistant District Attorney

273

# IN THE CIRCUIT COURT OF
## PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
     PLAINTIFF,                      *
                                     *
VS.                                  *          CASE NO: CC-2003-382 & 383
                                     *
BOBBY WILLIAMS,                      *
                                     *
     DEFENDANT.                      *

## ORDER

    The State has filed a Motion to Set Restitution in this case. The motion is **DENIED** at this time as the Defendant has filed Notice of Appeal. Furthermore the Sentencing Order did not address the issue of restitution.

    Done this the _32nd_ day of _Febuary_, 2005.

<br>

JEFF W. KELLEY
CIRCUIT JUDGE



274

# IN THE CIRCUIT COURT OF
## PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
    PLAINTIFF,                   *
                                     *
VS.                                  *        CASE NO: CC-2003-382 & 383
                                     *
BOBBY WILLIAMS,                      *
                                     *
    DEFENDANT.                   *

## <u>ORDER</u>

    The Defendant has filed Notice of Appeal and Request for Court Appointed Counsel for Appeal. Hon. James N. Thomas appointed trial counsel shall continue to be appointed to represent the Defendant on his appeal.

    Done this the _____ day of _____, 2005.

_____
JEFF W. KELLEY
CIRCUIT JUDGE



DA
Thomas

215

CC03-382+383

Dear Mrs. Brenda M. Peacock

I am writing on concern of my sentence I am serving a 35 year sentence to run concurrent with my split but on my time sheet its ran consecutive so could you please file a motion on my behalf to the courts to get my sentences ran concurrent/coterminus so my EOS date will change on my time sheet. Also I would like for you to send me a copy of my motion from my trial hearing. Is there any way I could you to send me a copy of the information containing a court-date on my appeal.

Sincerely Yours,
Bobby Williams

p.s. I have enclosed a copy of the motion...

3-11-05
1) Copy of Sentence Order - Says concurrent. - enclosed
2) Copy of Transcripts - Both Say Concurrent - enclosed
3) What kind of Motion (Name) do you want?
4) Court of Criminal Appeals for the appeal dates.
5) Your problem about Concurrent is with your Montgomery Co. Case.

Brenda M. Peacock

**Court of Criminal Appeals**

State of Alabama

Judicial Building, 300 Dexter Avenue

**P. O. Box 301555**

Montgomery, AL 36130-1555

H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Sonja McKnight
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

March 9, 2005

Sheila Hanson
Court Reporter
8969 Highway 51
New Brockton  AL  36331-0251

Re: CR-04-0759

    Bobby Williams v. State of Alabama  (Appeal from Pike  Circuit Court: CC03-382;
    CC03-383)

Dear Ms. Hanson:

    Our records indicate that the transcript in the above referenced case was due to be filed with
the circuit clerk by March 3, 2005.  However, we have not yet received your certificate of
completion indicating that you have completed and filed said transcript.  If for some reason our
information is incomplete or incorrect, you should promptly contact this Court to resolve this
discrepancy.  Otherwise, to keep this court from remanding this cause to the trial court with
directions that it take specific action regarding the delinquent transcript, please be advised that
you should complete and file this transcript by no later than  March 30, 2005, and make sure that
a copy of your certificate of completion is filed with this Court.

                Sincerely yours,

                Lane W. Mann, Clerk
                Court of Criminal Appeals

cc: Hon. Steven E. Blair, Circuit Judge
      Hon. Brenda M. Peacock, Circuit Clerk
      James N. Thomas, Attorney
      Office of Attorney General





April 22, 2005


Mr. Lane W. Mann
Clerk
Court of Criminal Appeals
300 Dexter Avenue
Montgomery, AL  36130-1555

RE:  CR-04-0640, Richard Flowers v State of Alabama
     CR-04-00759, Bobby Williams v State of Alabama, CC-03-~~383~~, ~~389~~

Dear Mr. Mann:

I have been working full time with the District Attorney's Office in Enterprise.  I have been working on transcripts at night and on weekends, time allowing.  With all of the changes taking place recently in my career, I have not gotten above-referenced transcripts done.  I had hoped I would have them done by now.  I will be working all weekend on same.  My plan is to file above transcripts no later than Friday, April 29, 2005.

I apologize for the inconvenience.  Thank you for your consideration.  If you need to speak with me, my cell number is 334-313-1487.

Sincerely,

Sheila Hanson
Sheila Hanson

APR 2005
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala.

```
ACRO372                  ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2003 000382.00
OPER: JOP                      CASE ACTION SUMMARY
PAGE:   1                       CIRCUIT CRIMINAL                    RUN DATE: 07/08/2003
                                                                        JUDGE: SEB
  THE CIRCUIT COURT OF    PIKE
   E OF ALABAMA                    VS    WILLIAMS BOBBY   A15#231210
CASE: CC 2003 000382.00
                                               MONTGOMERY, AL  36110 0000

DOB: 10/19/1982         SEX: M  RACE: B  HT: 6 01  WT: 150   HR: BLK EYES: BRO
SSN: 423132904   ALIAS NAMES:
=============================================================================
CHARGE01: ROBBERY 1ST              CODE01: ROB1  LIT: ROBBERY 1ST   TYP: F #: 001
OFFENSE DATE: 12/21/2002                    AGENCY/OFFICER: 0550100 TPD ROS

DATE WAR/CAP ISS:
DATE    INDICTED: 05/19/2003        DATE ARRESTED: 02/24/2003
DATE    RELEASED:                   DATE    FILED: 07/08/2003
BOND     AMOUNT:       $50,000.00   DATE HEARING:
                                      SURETIES:
DATE 1: 07/09/2003  DESC: ARRG        TIME: 0900 A
DATE 2:             DESC:             TIME: 0000
TRACKING NOS: GJ 2003 000073 00  /  DC 2003 000145 00  /

  DEF/ATY: THOMAS JAMES NORMAN       TYPE: A
           P.O. BOX 974                                          TYPE:

       TROY          AL 36081
                                                      00000
PROSECUTOR: MCALILEY GARY L

=============================================================================
OTH CSE: GJ200300007300 CHK/TICKET NO:                    GRAND JURY: 03-73
COURT REPORTER:                     SID NO:   000000000
  STATUS: PRISON                    DEMAND: Y                    OPER: JOP
  E        ACTIONS, JUDGEMENTS, AND NOTES
```

| Date | Action |
|---|---|
| 7/9/03 | YO Application |
| 7-9-03 | YOA Order sets for 10-16-03  DA, Thomas, Prob |
| 7-29-03 | Motion For Discovery |
| 7-31-03 | Discovery Order — DA, Thomas |
| 8-18-03 | Issued State Subps |
| 9-3-03 | PSI report |
| 9-11-03 | State Response to Discovery |
| 10-20-03 | Continuance Order — DA, Thomas, Prob  (1-7-04) |
| 10-23-03 | Issued State Subps. |
| 1-8-04 | Order of Continuance YOA Until 2-2-04. DA, Thomas, Prob, Class, Prob |
| 2-2-04 | Order w/drawn YOA — DA, Thomas |
| 2-2-04 | Plea N/G + Waiver — DA, Thomas |
| 4-22-04 | Motion For Final Disposition |
| 4-22-04 | Motion For Fast + Speedy Trial |
| 4-28-04 | Order for Case to next Crim Jury Docket  DA, D, Thomas |

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number CC 03-382 |
|---|---|---|

Form C-7 Rev. 2/79

Style: *Bobby Williams*                                    Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 4-28-04 | Return of Inmate request - for 10-7-04 and 11-8-04 PCSO, Class. |
| 7-15-04 | Letter of Δ |
| 7-19-04 | Sent Copies to Δ |
| 9-8-04 | Docket of 11-8-04 to Thomas |
| 10-12-04 | Issued State Selp |
| 10-25-04 | Request for appointment of new counsel |
| 10-26-04 | Motion to transfer & proposed order |
| 10-28-04 | Order granting motion to transfer - cc: DA, Thomas, SO with transfer letter, & DOC w/transfer letter |
| 11-8-04 | Strike List |
| 11-10-04 | Charges |
| 11-10-04 | Verdict |
| 11-10-04 | Exhibit list |
| 11-10-04 | Order on Verdict - Sets Sentencing for 1-6-05 DA, Thomas, Prob |
| 11-10-04 | Transport order - DA, Thomas, PCSO, Class. |
| 12-17-04 | Notice of Appeal |
| 12-21-04 | Appeal Transmittal to Ct of Cr. Appeals, Atty Gen, Thomas, DA, Ct Reporter Hanson + ΔWms. |
| 12-27-04 | PSI - report |
| 1-14-05 | Guilty Sentence Order - DA, Thomas |
| 2-7-05 | Appeal Transmittal Form to Ct Cr. Appeals, Atty Gen, Thomas, DA, ΔWms & Ct Reporter Hanson |
| 2-14-05 | State Motion To Set Restitution |



ACRO369   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2003 000382.00
JUDGE ID:  SEB

STATE  OF  ALABAMA                    VS     WILLIAMS BOBBY

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|---|---|
| 2-24-05 | Orders Denying Restitution   – DA, Thomas |
| 2-24-05 | Order appealed  J. Thomas on appeal – DA, Thomas |
| 3-10-05 | Notice to S Hansen – Transcript was due on 3/3/05. |

```
ACR0372              ALABAMA JUDICIAL INFORMATION SYSTEM    CASE: CC 2003 000383.00
OPER: JOP                    CASE ACTION SUMMARY
PAGE:   1                     CIRCUIT  CRIMINAL              RUN DATE: 07/08/2003
================================================================================
  THE CIRCUIT COURT OF      PIKE                                    JUDGE: SEB
 ‾TE OF ALABAMA                  VS    WILLIAMS BOBBY
CASE: CC 2003 000383.00
                                       MONTGOMERY, AL  36110 0000

DOB: 10/17/1982      SEX: M  RACE: B  HT: 6 01  WT: 150   HR: BLK EYES: BRO
SSN: 423132904  ALIAS NAMES:
================================================================================
CHARGE01: ROBBERY 1ST         CODE01: ROB1  LIT: ROBBERY 1ST    TYP: F #: 001
OFFENSE DATE: 12/29/2002               AGENCY/OFFICER: 0550100 TPD WRI

DATE WAR/CAP ISS:                      DATE ARRESTED: 02/24/2003
DATE    INDICTED: 05/19/2003           DATE   FILED: 07/08/2003
DATE   RELEASED:                       DATE HEARING:
BOND    AMOUNT:        $50,000.00         SURETIES:

DATE 1: 07/09/2003  DESC: ARRG          TIME: 0900 A
DATE 2:             DESC:               TIME: 0000

TRACKING NOS: GJ 2003 000074 00 / DC 2003 000149 00 /

   DEF/ATY: THOMAS JAMES NORMAN        TYPE: A                        TYPE:
            P.O. BOX 974

        TROY            AL 36081                        00000

PROSECUTOR: MCALILEY GARY L

================================================================================
OTH CSE: GJ200300007400 CHK/TICKET NO:              GRAND JURY: 03-74
COURT REPORTER:              SID NO:    000000000
‾F STATUS: PRISON            DEMAND: Y                         OPER: JOP
================================================================================
 ‾TE      ACTIONS,  JUDGEMENTS,  AND  NOTES
```

| | |
|---|---|
| 7-9-03 | YO Application |
| 7-9-03 | YOA Order Sets for 10-16-03. DA, Thomas, Prob |
| 8-18-03 | Issued State Subps |
| 9-11-03 | State Response to Discovery |
| 10-20-03 | Continuance Order — DA, Thomas, Prob |
| 10-23-03 | Issued State Subps |
| 1-8-04 | Order & Continuance YOA until 2-2-04. DA, Thomas, PCSo, Class, Prob |
| 2-2-04 | Order — W/draw YOA — DA, Prob, Thomas |
| 2-2-04 | Plea N/St Waiver — DA, Thomas |
| 4-22-04 | Motion for Final Disposition |
| 4-22-04 | Motion for Fast & Speedy Trial |
| 4-28-04 | Order for Case to next Jury Docket — DA, Thomas |
| 9-8-04 | Docket 11-8-04 to Thomas |
| 2 | |

082

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number |
|---|---|---|
| Form C-7  Rev. 2/79 | | CC 03-383 |
| | | ID    YR    Number |

Style: *Bobby Williams*                                    Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 10-12-04 | Issued State Subps |
| 10-25-04 | Request for appointment of new counsel |
| 10-26-04 | Motion to Transfer |
| 11-10-04 | Verdict |
| 11-10-04 | Order on Verdict — Sets for Sentencing 1-6-05 DA, Thomas, Prob |
| 11-10-04 | Transport Order — DA, Thomas, PCSO, Class. |
| 12-31-04 | Ag |
| 12-17-04 | Notice of Appeal |
| 12-31-04 | Appeal Transmittal to Ct. Cr. Appeals, Atty General, Thomas, D.A., Ct Reporter Hanson + AWMS. |
| 1-14-05 | Guilty + Sentence Order — DA, Thomas |
| 1-27-05 | Appeal Transmittal Form to Ct Cr Appeals, Atty-Gen, DA, Thomas, AWMS & Ct Reporter Hanson. |
| 2-14-05 | State Motion To Set Restitution |
| 2-24-05 | Order Denying Restitution — DA, Thomas |
| 2-24-05 | Order appts J. Thomas — DA, Thomas |
| | |
| | |
| | |
| | |
| | |
| | |
| | |



**State of Alabama**

**vs.**                                           **CC 03-382 & 383**

**Bobby Williams**

### Judgment

This the 2nd day of February 2004, in open court came the State of Alabama by its District Attorney and the defendant in his own proper person, and with his appointed attorney, Jim Thomas, and the defendant in open court on this day being arraigned on the indictment in this case charging him with the two offenses of Robbery, 1st, and filed a Plea of Not Guilty and Waiver of Arraignment.

It is therefore ordered and adjudged by the court that the trial of this case be and the same is hereby set for the 8th day of November 2004.

This the 9th day of November 2004, in open court came the State of Alabama by its District Attorney, and the Defendant in his own proper person, and with his attorney, and the defendant having heretofore on the 2nd day of February 2004, having filed a Waiver of Arraignment on the indictment in this case charging him with two offenses of Robbery, 1st to which indictment on said arraignment the defendant plead not guilty, and the trial of this case having been regularly set for this day, thereupon, in open court on this day in the presence of the District Attorney, defendant's attorney, and the defendant, came a jury of good and lawful persons, to wit:  Wiley Stephen Sanders, and eleven others, who having been duly empaneled and sworn according to law, who, having heard the evidence and the charge of the court, upon their oaths, in  open court on this day in the presence of the District Attorney, defendant's attorney, and the defendant, do say: "WE, THE JURY, FIND THE DEFENDANT GUILTY OF ROBBERY, 1ST IN BOTH CASES AS CHARGED IN THE INDICTMENT."  A sentencing hearing is hereby set for the 6th day of January 2005.

Thereupon in open court on this day the defendant being asked by the court if he had anything to say why the judgment and sentence of the law should not be passed upon him, he replied, "he had not".  It is therefore considered and adjudged by the court that the defendant is guilty of the offense of Robbery, 1st in both cases as charged in the indictment and that the defendant be imprisoned in the Penitentiary of Alabama for the term of twenty-five (25) years.

Done and ordered this the 6th day of January 2005.

Steven E. Blair,
Circuit Court Judge

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP-14     Rev. 11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number<br>CR04-0759 |
|---|---|---|

| TO: THE CLERK OF<br>THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL: 12-17-04 |
|---|---|

APPELLANT   Bobby Williams

v.   STATE OF ALABAMA

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) ( 2 volumes of 200 pages each and one volume of 213 pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this   18th   day of   May , 2005 .

Brenda M. Peacock
Circuit Clerk

## IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

BOBBY WILLIAMS
     Appellant,

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

STATE OF ALABAMA
     Appellee.

Court of Criminal Appeals
No CR ~~03-383~~ 04-0759

Circuit Court No CC
2003-382 to 383

---

ON APPEAL FROM THE CIRCUIT COURT OF PIKE COUNTY ALABAMA

---

June 22, 2005

---

By:

James N. Thomas
Attorney at Law
Post Office Box 974
Troy, Alabama 36081
(334)566-2181

<u>ATTORNEY FOR APPELLANT</u>



EXHIBIT
B
PENGAD-Bayonne,N.J.

## TABLE OF AUTHORITIES

                                                                  Page No:

*McLeod v State,* 718 So. 2d 723                                      7

*McElroy's Alabama Evidence ,* 200.07 (6)                            9

*Deloach v State,* 356 So. 2d. 222                                   19

1

## STATEMENT OF THE CASE

The Defendant was charged with two counts of Armed Robbery in violation of <u>Alabama Code Section</u> 13A-8-41. The first robbery occurred on or about December 22, 2002 in which a store clerk named Edith Thomas was robbed at the Bee Line Convenience Store located on South Brundidge Street in Troy, Alabama. The second Robbery occurred on or about December 29, 2003 in which Rebecca Holly was robbed at a convenience store known as Sunny South on Highway 231 in Troy, Alabama. Almost no physical evidence exist from the Robberies which would tie Bobby Williams to the crime. The Troy Police Department was not able to develop any suspects based on the Descriptions provided by the Store Clerks. On or about January 13, 2003, the Montgomery Police Department contacted the Troy Police Department to let TPD know they had Bobby Williams in custody for some Robberies in Montgomery County for which he was a suspect. Detectives Larry Ross and Greg Wright from the Troy Police Department drove to Montgomery to meet with Mr. Bobby Williams about the Robberies in Troy. Detective Greg Wright met with the Defendant and obtained a statement. The statement was obtained by the use of promises to assist the Defendant if

Page 2

he would cooperate in giving a statement.  A suppression
hearing was held on the admissibility of the statement in
which the Court ruled the statement was admissible.  At the
Trial, it was shown that  both of the store clerks provided
questionable identifications of Mr. Bobby Williams to the
respective case detectives. Further, both store clerks
failed to provide credible pretrial identifications of Mr.
Bobby Williams.  Further, the evidence at trial showed that
the Sunny South  Store Clerk, Rebecca Holly, likely
identified another person as committing the crime through a
photogrephic line up that did not contain a photo graph of
Mr. Bobby Williams or any of the other Co-Defendants.  The
Troy police Department denied that there was ever more than
one line up conducted despite the victims consistent
testimony that she identfied  Bobby Williams within a three
days of the Robbery which would have been well before he was
ever developed as a suspect for the crime.  The Jury found
Bobby Williams guilty of two counts of Robbery 1st Degree
and he was sentenced to serve two 25 year concurrent terms.

## STATEMENT OF THE ISSUES

1.    Whether the Trial Court committed a reversible error  in allowing the admission

of the Defendant's statement.

2.       Whether the Defendant's convictions for Robbery were properly supported by the weight of the evidence adduced at trial given the lack of pysical evidence and questionable identifications.

## ARGUMENT

1.    The trial court committed reversible error when it admitted the statement of Bobby Williams into evidence as it was improperly obtained by promises of leniency.

A suppression hearing was held prior to the Trial based on the verbal motion of Defense Counsel. The statement in issue was taken by Detective Greg Wright at the Montgomery County Jail on or about January 13, 2003. The Defendant was 20 years old at the time of the offense and had no prior felony convictions (C. Trial Exhibits P. 152 application for Youthful Offender). Detective Greg Wright stated that he traveled to the Montgomery County Jail to interview the Defendant. Detective Wright stated that he first met with Bobby Williams to discuss the case without turning on his tape recorder (C. 7 lines 17-20). He stated that he waited about 20 minutes into the interview before starting the tape recorder on (C74 lines 8-11). During the interview with

Williams, prior to the tape being turned on, the Detective stated that he had helped Bobby's father out in the past and that he would like to help Mr. Williams as well. ( C 13 lines 20-25 and C15 lines 13-16).  The Detective stated in Court that he had helped Mr. John Foster, the farther of Bobby Williams, with some misdemeanor cases. (C14 line 16-22). During the course of the Trial Detective Wright was asked on cross examination about his promises to held Bobby Williams as follows Did you not tell him that you had helped his father in the past? Answer: Yes I did; Question: Did you not tell him that you would also like to help him out?; Answer Yes I did" (C122 lines 6-11). Once the Detective had obtained an unrecorded commitment from Mr. Williams to give a statement, based on the detectives assurances that he had helped his father and wanted to help him, he turned on the tape recorded and asked Mr. Williams the following question "Nobody made any promises to you are threats to you to make a statement? Is that Correct?" Reply: by Williams "No sir" © 16-17).  The Defendant in his own statement to the officer did not agree with the Detective's assessment that the detective had not made any promises by replying "no sir" meaning that is not correct.  The Defendant took the stand

Page 5

at the suppression hearing and was asked the following
question by defense counsel:

> Mr. Williams , what did the detective state to you
> that day prior to the interview beginning?
> Reply: "he told me that-he had asked me what my
> father's name was, and did I know any body in Troy
> previous, before the robberies took place.  And I
> told him that I had a father staying in Troy,
> which was John Foster.  And he told me that he
> knew my father from previously, helping him with
> incidents in the past.  And he told me that he was
> willing to help me if I was willing to make a
> statement.  And I was already so emotionally shook
> up about the situation I was already in.  So at
> the time, we was talking, he was like, well, tell
> me about your situation. (C20-21)

The Defendant went on to testify that "This was my first
time being in the system. I didn't know what he was capable
of doing" (C22 line 1-3). Mr. Williams also testified that
he would not have made the statement had he not been given
the detectives assurances to help him if he talked (C20
lines 3-6).

Page 6

Counsel for the Mr. Williams contends that the detective's admission that he told the 20 year old defendant that he knew his father and that he had helped him out in the past and that "he was willing to help me if I was willing to make a statement" was an improper and illegal inducement. The testimony by Bobby Williams that the detective would help him if he would give a statement went virtually unchallenged by the State.    In the case of McLeod v. State, 718 So. 2d. 723 at 726, the State asked the officer that interrogated McLeod, the defendant, the following question: "Did you make him any promises of leniency?  Answer no, ma'am other than he said he wanted to cooperate.  And we said if he cooperated we'd make his cooperation know district attorney and the court." The Court viewed the officer's statement to the Defendant as a condition precedent in that he would only receive assistance if he gave a statement.  The facts in McLeod or virtually identical to the case at hand in that no specific promise of a particular benefit was made and McLeod and Bobby both had little or no experience with law enforcement at the time of the interrogation.  Further, both were young, Williams being 2o and McLeod being 25. The court in McLeod went on to

state:

while no specific benefit was offered, we believe
that, under the circumstances, it was reasonable
for MacLeod to regard the offer as a way to help
himself.  At the time of the confession, McLeod
was 25 years old.  In addition, having never been
arrested before this arrest, he apparently had no
significant experience with the interrogation
procedures, which made it more reasonable for him
to believe that Officer Burch had the power to
affect the outcome of any subsequent proceedings.
We review the circumstances, under the  analysis
expressed in Jones v. state, 572 So. 2d 1305,
1307:

the pre sentence report filed in this case shows
no prior arrest.  The arrest that resulted in the
discovery of the murder weapon, the ultimate
confession of the appellate, any instant
proceeding resulted from the search Warrant
executed by Officer Burch.  The true test of
voluntariness of extrajudicial confessions is
whether, under all surrounding circumstances, they

have been induced by a threat or a promise,

express or implied, operating to produce in the

mind of the prisoner apprehension of harm or hope

of favor; and if so, whether true or false, such

confessions must be excluded from the

consideration of the jury as having been procured

by undue influence.


The court went on to state "where a suspect is subjected to

custodial questioning regarding alleged criminal activity,

such an express promise would necessarily engender a hope of

favor in the suspects mind." id at 727.  McElroy's Alabama

Evidence, 200.07(6), states the law as follows:

> A confession is not admissible if it was induced by a
> promise that the accused would not be prosecuted or
> would be released if the accused confessed.  The courts
> have taken the traditional stand that if inducement of
> profit or benefit is held out or if any hope is
> engendered or encouraged that the prisoner's case will
> be lightened, meliorated or more favorably dealt with
> if he will confess, a confession thereby induced is
> inadmissable.


**ARGUMENT 2**

The Defendant's conviction is not supported by the weight of

the evidence given the misidentifications that occurred

Page 9

prior to trial.

Both Rebecca Holly and Edith Thomas made in Court identifications of Bobby Williams at the trial. However, both pretrial identifications were questionable. The Robbery at the Bee Line store was caught on video tape and showed three black males enter the Bee Line store.  One of the three demanded the money holding a gun and another one walked around the counter and took the purse of Ms. Edith Thomas.  Ms. Edith Thomas testified that Bobby Williams was the person who held her at gun point and took the money from the store.  Ms. Rebecca Holley, the store clerk at the Sunny South,  testified that she was able to identify the defendant from the video tape made at the Beeline gas station. (C142 line, 14-16)  In the description that Ms. Holly provided to Detective Ross with the police department, prior to her seeing the Bee Line video, she identified Bobby Williams, the alleged gunman, as wearing bright blue pant,, a black jacket, and a black toboggan(C133 lines 13-25).  She also identified him as wearing a blue shirt. (C134 lines 16-19). In Court she was asked to ID the defendant from the video tape at the Bee Line store. (C146 lines 12-24).  The video showed three black males who came into the store.  One

Page 10

of the three black males in the video  was wearing a black leather jacket, dark pants and a black toboggan matching exactly  the description she provided to the police the night of or day after the Robbery.  Ms. Holly testified that she was able to pick Bobby Williams out of the Bee Line video after she was robbed at the Sunny South (C141 lines12-15). Yet, at trial she picked out an individual who did not match the previous description, as set out above, that she provided to the police.  In other word despite the fact that the Bee Line video taken just days from the Sunny South Robbery depicts one of the three black males wearing the exact same clothes she described Bobby Williams as wearing at the Sunny South,as set out above, she stated Bobby Williams was one of the other two individuals. (C146-150). After extensive cross examination, Ms. Holly finally agreed that the individual she described as Mr. Bobby Williams to the police was identical in dress to an individual in the Bee Line Video whom she <u>did not</u> identify as Mr. Bobby Williams (C150 lines 1-20). Again, Ms. Holly description to the police, after the incident, matches the description of the person she said was not Bobby Williams in the Video at Trial.

Page 11

The problem of the identification is further compounded by the fact that in the videotape, Rebecca Holley, from the Sunny South Store, identified a different individual from the video as Bobby Williams than Ms Edith Thomas who was working at the beeline store at the time of the Robbery. Ms. Thomas identified the person wearing the  the white pull over shirt in the video as being Mr. Bobby Williams to the police (C86 lin20-24 and page 87).  Ms. Rebecca Holley was very definitive in her position that the robber at the Sunny South, she identified as Bobby Williams, was wearing a black jacket when she was robbed.  Therefore, Ms Edith Thomas, who was robbed at the bee line, identified a completely different person in the video(that is the individual wearing the white sweat shirt as testified to by Wright at preliminary) as being Mr. Bobby Williams than Ms. Holly identified from the video as wearing the dark shirt and toboggan (C147) and (C150 L. 1-5).

The problems with the identification by Ms. Holly are further compounded by the fact that Ms.Holly, from the Sunny South, identified an individual in a photographic line up as being Bobby Williams over two weeks before the police ever had a picture of Bobby Williams. Ms. Holly testified that

Page 12

she was shown a photographic  lineup containing Mr. Bobby

Williams photograph in which she identified him on the

Monday  following the robbery (C 135 lines 1-21 and Page 137

L. 13-16). The robbery occurred on Saturday night on

December 21, 2002 (C. 151 lines 1-5). However,  the police

did not have in their possession a photograph of Mr. Bobby

Williams until January 13, 2003 (C. 207 lines 1-25 and P.

208). Further compounding the identification problem, Ms.

Rebecca Holly did not tell detective Ross that Bobby

Williams had facial hair, yet in the photographic line up

conducted approximattly 16 days after the Robbery, the

Defendant does have well grown facial mustache (C. 213 L. 7-

22 and Trial Exhibit page 16).  Further, according to

Detective Ross, Rebecca Holly stated that Bobby Williams was

dark complected black male, yet he is a very fair skinned

African American (C. 214 line 27 and C. 218-220).

In addition, per Detective Ross that handled the case,

there was no physical evidence to tie Bobby Williams to the

robbery at the Sunny South (C61 line 14-17).  Therefore, the

only evidence against Mr. Williams was a tainted statement

and questionable identification.

Edith Thomas identified  the person wearing the White

Pull Over Sweater in the video  as the Gunman, Bobby

Williams, in her first statement to Detective wright.  She

then changed her  identification at trial by stating Bobby

Williams was the one wearing the dark jacket © 165 L. 14-15)

and (C. 170 L. 125 and page 121).  This change was necessary

as it was obvious from the video that the gunman was the one

wearing the black jacket and not the white pull over shirt

she initially used to identify Bobby Williams with to

Detective Wright.  She disavowed the gentleman wearing the

white shirt by stating "The one with the white shirt, that

last one coming with the colored cap is not the one that had

the gun". (C. 170 lines 5-8).  Compare this to her testimony

at the Preliminary hearing taken just three and one-half

months after the Robbery.  Detective Wright testified at the

Preliminary Hearing that Edith Thomas gave him a statement

that Bobby Williams was the one wearing the white pull over

sweater (C86 line 24-25).  Further, we know that the

individual wearing the white pull over sweater was not the

individual that held the gun on Edith Thomas as the video

clearly shows the individual wearing the white pull over

sweater going around the desk to take the clerk's purse as

testified to. When asked about this, Edith Thomas stated as

Page 14

follows:

   Okay.  Do you know why in your statement to Detective
Wright, you did not state that the gunman was wearing a
black jacket?

A.    I do not know why.

•    Do you know why in your statement to Detective Wright
    you stated that he was wearing a white pullover
    sweater?

A.    I don't know.

Q.    Did you see the gentleman with the white pullover
    sweater walk behind the counter?

A.    Yes.

Q.    How can you be sure sitting here today that it was my
    client holding the gun, if the gentleman that was
    wearing the white pullover sweater was the gentleman
    that walked around the counter?

A.    I mean, I was nervous the night that I gave my
    statement, so I'm not for sure.  I just – that's the
    one I just saw.  I just told what I remembered.

•    Did you notice anybody in the video with afro-type
    hair?

A.    On the video, I couldn't tell.

Q.    Would you acknowledge in the video all three people
    were in fact wearing hats?

A.    Yes.  But, with a cap on, you could still see that on
    the side.  That's not covered up.

Q.    So your description at the preliminary hearing, without
    the benefit of the video being played for you, that
    they had large afro hair, is incorrect?

A.    You can still have a cap and see if someone's hair, see

if it's nappy or not.

Q.  You can tell if somebody has afro-type hair, and they
are wearing a hat?

A.  Afro-type hair is  - to me, it's not combed.  That's
the way I look at it.

Q.  I'm going to refer you to Page 82 of the transcript,
line 12.  In the preliminary hearing, do you recall
testifying as to what you see on line 12?

A.  I made the statement, so I mean  -

Q.  Was your testimony at the preliminary hearing that his
hair was standing up?

A.  Well, it can be standing out, and it could be outside
the hat.  That's why I'm not sure how I stated it here.

However, at trial Detective Wright changed his

testimony to states that Bobby Williams was the one in the

video wearing a "Button up short sleeve shirt with a white

thermal shirt" (C83 lines 10-13).  This leaves Detective

wright testifying at the preliminary hearing (which is part

of the record) that  Ms.Edith Thomas told him it was the one

wearing the white pull over shirt; then detective Wright

testified at trial the Edith Thomas told him Bobby Williams

was the one with the dark shirt, and then Edith Thomas

testifying at the trial that Bobby Williams was the one with

the dark coat and MS. Holly testifying at trial that Bobby

was the one with the toboggan and dark shirt, thus, Leaving

Page 16

not one single piece of consistent testimony on the
identification  of Bobby Williams. It was critical for the
prosecution to convince the Jury that Bobby Williams was the
one wearing the black jacket as the evidence was clear from
the tape  that Bobby Williams, if he was really the gunman,
could not have been the one wearing the white pull over
shirt. ( C. 102-103).

    Edith Thomas also told the detective that Bobby
Williams had "Bushy Afro Hair" (C87 lines 1-6). At trial
when shown the video tape, Detective Greg Wright testified
that everyone who entered the store was in fact wearing a
hat (C94 lines 11-25). Edith Thomas also stated at the
preliminary hearing that Bobby Williams, had bushy afro
style hair that was "standing up" ( C 101 lines 5-25 and
page 102). Yet, in the video tape all of the Defendants were
clearly wearing hats or tobaggans as acknowledged in Court
by Edith Thomas ( C. 171 Line 22-24 and C. 172 Line 1-25 and
C. 179 Line 15-20)  Interesting enough, the photographic
line up which the victim Edith Thomas was shown on or about
January 14, 2003, just a couple of weeks after the robbery
which occurred on December 29, 2002 (C. 173 line 13) ,
clearly shows Bobby Williams with large bushy afro hair( C.

Page 17

Page 16 Defendant Exhibit 1 suspect 2 top center row). Edith Thomas identified the suspect with afro style hair as being in the top row center (C. 180 Lines 21-25). While Ms. Edith Thomas oscillated under cross examination in the trial as to whether the person she identified from the video had hair standing up from underneath the hat, at the end of cross examination she finally stated in the trial that based on the video evidence presented she could not see any hair standing up from underneath the suspect's hat.(C.189 lines 4-6). This can clearly be seen by watching the video tape. Detective Wright testified at trial that Ms. Edith Thomas told him that Bobby Williams had facial hair or a mustache (C 84 lines 2-5). However, at the prelinmary hearing Counsel expressly asked the Detective if Ms. Edith Thomas told the detective if Bobby Williams had facial hair and Ms. Edith Thomas told the detective she could not remember whether or not Bobby Williams had facial hair. (C99 lines 7-20). Interesting, the photo of Bobby Williams used in the line up taken two weeks or less from the Bee Line Robbery clearly shows him with a mustache ( C trial exhibit page 16 Defendant's Exhibit 1 top center photo). Further, Ms. Thomas was not able to or did not produce a sketch of any of the three robbers event though none of the suspected wore masks or attempted to conceal their identity. Further,

Page 18

some of the robbers had been in the store multiple times that day (C125 lines 14-21).

In addition to the failed identificaions of Bobby Williams, Detective Wright testified there was no physical evidence tying him to the crime at the Bee Line. There was no gun recovered, prints found, or additional witnesses located. The victim did not or could not produce a identifying sketch of the perpetrators. (C80-81). Therefore, the only evidence against Bobby Williams is a statement induced by illegal statements from the detective and a questionable identification by both victims.

The Court established the criteria for the credibility of eye witness identificaion in the case of <u>Deloach v. State</u>, 35? So. 2d 222, at 227 by stating:

> The Trial Court, and this court on review, in evaluating the likelihood of misidentification, whether in court or out of Court, must consider certain factors as set out in Neil v. Biggers, 409 US 188, 93 S. Ct. 375, 34 L.E. 2d 401 (1972). Those factors include: the opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witnesses prior descriptions of the criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the confrontation and the crime.

In the case at hand the "accuracy" of the pre trial witness identificaions by the Holly and Thomas are so inconsistent with each other and the actual appearance and dress of Bobby Williams, the Court should make the finding the jury's verdict is against

the weight of the evidence.

## Conclusion:

The case is due to be reversed as the statement of
Bobby Williams was improperly induced and introduced
into evidence.  The Statements by the detective  as
quoted by the Defendant and unchalleged by the
prosecution stated:

"-he told me that-he had asked me what my father's
name was, and did I know any body in Troy
previous, before the robberies took place.  And I
told him that I had a father staying in Troy,
which was John Foster.  And he told me that he
knew my father from previously, helping him with
incidents in the past.  And he told me that he was
willing to help me if I was willing to make a
statement."

The promise by the detective to help him out was an improper
inducement to get the young, uneducated and inexperienced Bobby
Williams to make a statement.  The Detective used one of Mr.
William's closest family members, his father, to lead Mr.
Williams to believe he was trustworthy since he had helped his
family out in the past.

The weight of the evidence is also strongly against the conviction as both store clerks seriously mis identified the gunman as Bobby Williams in the trial.  As pointed out, all of the people who entered the store at the Bee Line in the video were wearing hats.  None of them had Afro hair.  Further, Edith Thomas initially identified Bobby Williams as the suspect wearing the white pull over shirt that held the gun on her.  It was not until the trial that she realized this was impossible as the video clearly showed the individual with the white pull over shirt taking her purse from behind the counter eliminating him as the gunman. Further, Rebecca Holly and Edith Thomas identified different people as being Bobby Williams in the video. The Court should totally disregard the identification of Bobby Williams given the numerous and irreconcilable conflicts in testimony. The Court should also consider the fact there was no physical evidence tying Williams to the Crime: no gun, no finger prints, no money recovered, and no eye witnesses besides the two clerks.

JAMES N. THOMAS

James N. Thomas (Tho 148)
Attorney for Petitioner
Post Office Box 97
Troy, Alabama 36081-1181
(334)566-2181

Page 21

I certify that I have this date served a copy of the
forgoing brief upon the appellant along with the Attorney
General for the State of Alabama by placing a true and
correct copy of the same in the United States Mail with
proper postage affixed thereto and properly addressed as
follows:

Mr. Bobbie Williams
AIS 231210
Limestone Correctional Facility
28779 Nickdavid Rd.
Harvest, Al 35749


Alabama Attorney General
11 South Union Street
Montgomery, Alabama 36104

Dated this 22nd day of June, 2005.

_James n. Thomas_____ OF
COUNSEL

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals
State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**

RELEASED
DEC 16 2005
CLERK
ALA COURT CRIMINAL APPEALS

**H.W."BUCKY" McMILLAN**
**Presiding Judge**
**SUE BELL COBB**
**PAMELA W. BASCHAB**
**GREG SHAW**
**A. KELLI WISE**
**Judges**

**Lane W. Mann**
**Clerk**
**Sonja McKnight**
**Assistant Clerk**
**(334) 242-4590**
**Fax (334) 242-4689**

## MEMORANDUM

CR-04-0759          Pike Circuit Court CC-03-382; CC-03-383

Bobby Williams v. State of Alabama

WISE, Judge.

The appellant, Bobby Williams, was convicted of two counts of robbery in the first degree, violations of § 13A-8-41, Ala. Code 1975. Williams was sentenced to 25 years' imprisonment for each conviction, with the sentences ordered to run concurrently. This appeal followed.

The evidence at trial tended to establish that on December 21, 2002, Williams and his accomplices entered the "Sunny South" convenience store on Highway 231 in Troy, Alabama and robbed the cashier at gunpoint. Rebecca Holley, the cashier at this store, initially identified Williams as the robber from a photographic lineup; she later made an in-

1



court identification of Williams as the man who robbed her.
On December 29, 2002, Williams and his accomplices entered the
Beeline convenience store on Brundidge Street in Troy, and
robbed the cashier at gunpoint.  Edith Thomas, the cashier at
the Beeline Store, identified Williams as the robber from a
photographic lineup, and again at trial, testifying that
Williams was the man who robbed her.  Later, Williams was
interviewed by Detectives Larry Ross and Greg Wright of Troy
Police Department at the Montgomery County Jail.  After being
advised of his right to remain silent and signing a waiver
form, Williams confessed that he had participated in the two
convenience-store robberies in Troy.  Finally, a videotape of
the robbery from the Beeline store was presented at trial,
which purportedly showed Williams present and participating in
the robbery.

At trial, Williams recalled several of the state's
witnesses in order to point out inconsistencies in Williams's
hairstyle and clothing.

On appeal, Williams asserts: (1) that the trial court
erred in denying his motion to suppress his statement because,
he said, it was unlawfully induced; and (2) that his
conviction for robbery in the first degree was not supported
by the weight of the evidence.

I.

Williams claims that the trial court erred in denying his
motion to suppress because, he says, that it was the product
of improper promises made by the interrogating officers.

In Maples v. State, 758 So. 2d 1, 41 (Ala.Crim.App.),
aff'd, Ex parte Maples, 758 So. 2d 81 (Ala. 1999), this Court
stated:

"'"'In reviewing the correctness of the trial
court's ruling on a motion to suppress, this Court
makes all the reasonable inferences and credibility
choices supportive of the decision of the trial
court.' Kennedy v. State, 640 So.2d 22, 26
(Ala.Cr.App.1993), quoting Bradley v. State, 494
So.2d 750, 761 (Ala.Cr.App.1985), aff'd, 494 So.2d
772 (Ala.1986), cert. denied, 480 U.S. 923, 107

2

S.Ct. 1385, 94 L.Ed.2d 699 (1987). A trial court's ruling on a motion to suppress will not be disturbed unless it is "palpably contrary to the great weight of the evidence." Parker v. State, 587 So.2d 1072, 1088 (Ala.Cr.App.1991)."

"Rutledge v. State, 680 So.2d 997, 1002 (Ala.Cr.App. 1996)."

758 So. 2d at 41.

Additionally, this Court has held:

"...[w]here the trial court finds on conflicting evidence that a confession was voluntarily made, such finding will not be disturbed on appeal unless it appears contrary to the great weight of evidence or is manifestly wrong." Burks v. State, 353 So.2d 539, 542 (Ala.Crim.App.1977).

"'[C]onflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court.' Atwell v. State, 594 So.2d 202, 212 (Ala.Cr.App.1991), cert. denied, 594 So.2d 214 (Ala.1992). '[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion.' Jackson v. State, 589 So.2d 781, 784 (Ala.Cr.App.1991) (citations omitted)."

"Rutledge, 651 So.2d at 1144-45.

"Although a promise of leniency or reward undermines the voluntariness of a confession, see Holmes v. State, 598 So.2d 24 (Ala.Cr.App.1992); Campbell v. State, 574 So.2d 937 (Ala.Cr.App.1990), when the evidence regarding whether a promise was made is in conflict, the trial court must make a credibility determination. 'Absent clear error, the [circuit] court's

3

credibility choices at suppression hearings are binding on this court.' <u>Walker v. State</u>, 551 So.2d 449, 451 (Ala.Cr.App.1989). The standard on review of conflicting evidence at a motion to suppress a confession is whether the trial court's finding was 'manifestly contrary to the great weight of the evidence.' <u>Ex parte Matthews</u>, 601 So.2d 52 (Ala.1992), cert. denied, [505] U.S. [1206], 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). See also <u>Ex parte Singleton</u>, 465 So.2d 443, 445 (Ala.1985) (whether the finding was 'palpably contrary to the weight of the evidence')."

<u>Thompson v. State</u>, 611 So.2d 476, 478 (Ala.Crim.App. 1992).

"Moreover, we note that the mere promise to make cooperation known to law enforcement authorities, as opposed to a direct promise of a reduced sentence, generally is not considered an illegal inducement. In <u>United States v. Nash</u>, 910 F.2d 749, 752-53 (11th Cir.1990), the United States Court of Appeals for the Eleventh Circuit held:

"'We find that the district court was not clearly erroneous in accepting [the officer's] testimony that he only promised to make [the defendant's] cooperation known to the United States Attorney's office and gave no guarantee of a reduced sentence. Although [the officer] told [the defendant] that cooperating defendants generally "fared better time-wise," this statement did not amount to an illegal inducement: "telling the [defendant] in a noncoercive manner of the realistically expected penalties and

4

encouraging [him] to tell the
truth is no more than affording
[him] the chance to make an
informed decision with respect to
[his] cooperation with the
government.'"

"(Quoting <u>United States v. Ballard</u>, 586
F.2d 1060, 1063 (5th Cir.1978)). Accord
<u>United States v. Levy</u>, 955 F.2d 1098, 1105
(7th Cir.1992)(holding that federal agent's
indication to defendant that his
cooperation would be reported to the United
States Attorney did not make defendant's
confession involuntary); <u>United States v.
Meirovitz</u>, 918 F.2d 1376, 1380 (8th
Cir.1990)(holding that confession was
voluntary although agents had promised to
inform prosecutor of defendant's
cooperation); <u>United States v. Guerrero</u>,
847 F.2d 1363 (9th Cir.1988) (holding that
agent's promise to inform prosecutor of
defendant's cooperation does not render a
subsequent confession involuntary); <u>United
States v. Baldacchino</u>, 762 F.2d 170, 179
(1st Cir.1985) (holding that an officer's
promise to bring defendant's cooperation to
the attention of the prosecutor did not
make confession involuntary)."

"<u>McLeod v. State</u>, 718 So.2d 727, 730-31 n. 4
(Ala.1998)."

<u>Robinson v. State</u>, 865 So. 2d 468-69 (Ala.Crim.App. 2003).

Here, testimony at the suppression hearing indicated that
Detective Wright did inform Williams that he knew Williams's
father, that he had helped Williams's father in the past, and
that he would also like to help Williams, if possible.
Detective Wright's comments, Williams argues, establishes
proof that his statement was the result of an improper
inducement. However, the trial court found otherwise,
stating:

5

"But the true test is whether or not any promise -- whether the defendant's will has been overborne by any inducement.

"And based upon the totality of the circumstances, the Court finds that the defendant's will was not overborne by the nature of the promise, nonspecific in nature. He testified there was not any promise of leniency or reduced sentence or anything like that.

"....

"I understand the defendant's position. But based upon the totality of the circumstances, the Court finds that the voluntariness of the statement is not vitiated and his will was not overborne by the nonspecific statement that he helped his father, and he would like to help him if he could."

(R. 30-31.)   Based on the conflicting evidence regarding voluntariness, we cannot say that the trial court abused its discretion in concluding that Williams's will was not overborne by Detective Wright's statement that he would like to help Williams, if he could.  See, e.g., Williams v. State, 795 So. 2d 753 (Ala.Crim.App. 1999), aff'd, 795 So. 2d 785 (Ala. 2001), and Davis v. State, 728 So. 2d 192 (Ala.Crim.App. 1997).  Accordingly, no basis for reversal exists concerning this claim.

II.

Williams next argues that his conviction for robbery in the first degree was not supported by the weight of the evidence.

Section 13A-8-41, Ala. Code 1975 states:

"(A) A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 [third-degree robbery] and he:

"(1) Is armed with a deadly weapon or dangerous instrument; or

6

"(2) Causes serious physical injury to
another."

<u>Childers v. State</u>, 899 So. 2d 1025, 1026 (Ala. 2004).

"'In determining the sufficiency of the evidence to
sustain a conviction, a reviewing court must accept as true
all evidence introduced by the State, accord the State all
legitimate inferences therefrom, and consider all evidence in
a light most favorable to the prosecution.'" <u>Ballenger v.
State</u>, 720 So. 2d 1033, 1034 (Ala. Crim. App. 1998), quoting
<u>Faircloth v. State</u>, 471 So. 2d 485, 488 (Ala. Crim. App.
1984), aff'd, 471 So. 2d 493 (Ala. 1985). "'The test used in
determining the sufficiency of evidence to sustain a
conviction is whether, viewing the evidence in the light most
favorable to the prosecution, a rational finder of fact could
have found the defendant guilty beyond a reasonable doubt.'"
<u>Nunn v. State</u>, 697 So. 2d 497, 498 (Ala. Crim. App. 1997),
quoting <u>O'Neal v. State</u>, 602 So. 2d 462, 464 (Ala. Crim. App.
1992). "'When there is legal evidence from which the jury
could, by fair inference, find the defendant guilty, the trial
court should submit [the case] to the jury, and in such a
case, this court will not disturb the trial court's
decision.'" <u>Farrior v. State</u>, 728 So. 2d 691, 696 (Ala. Crim.
App. 1998), quoting <u>Ward v. State</u>, 557 So. 2d 848, 850 (Ala.
Crim. App. 1990). "The role of appellate courts is not to say
what the facts are. Our role ... is to judge whether the
evidence is legally sufficient to allow submission of an issue
for decision [by] the jury." <u>Ex parte Bankston</u>, 358 So. 2d
1040, 1042 (Ala. 1978). (Emphasis in <u>Bankston</u>.)

Moreover, this Court has stated:

"In deciding whether there is sufficient
evidence to support the verdict of the jury and the
judgment of the trial court, the evidence must be
viewed in a light most favorable to the prosecution,
and conflicting evidence presents a jury question
not subject to review on appeal, provided the
State's evidence established a prima facie case.
<u>Williams v. State</u>, 710 So. 2d 1296, 1337
(Ala.Crim.App. 1996), <u>aff'd</u>, 710 So. 2d 1350 (Ala.
1997); <u>Cumbo v. State</u>, 368 So. 2d 871 (Ala.Crim.App.
1978). The action of the trial court in denying a

7

motion for judgment of acquittal or a motion for new
trial must be reviewed by determining whether there
existed legal evidence from which the jury by fair
inference could have found the defendant guilty
beyond a reasonable doubt. <u>Williams v. State</u>, 710
So. 2d at 1337; <u>Willis v. State</u>, 447 So. 2d 199
(Ala.Crim.App. 1983). When the evidence raised
questions of fact for the jury and such evidence, if
believed, was sufficient to sustain a conviction,
the denial of a motion for a judgment of acquittal
or a motion for new trial on the ground of
insufficiency of the evidence does not constitute
error. See <u>Williams</u>."

<u>Breckenridge v. State</u>, 628 So. 2d 1012, 1018 (Ala.Crim.App.
1993).

Lastly, any "inconsistencies and contradictions in the
State's evidence, as well as [any] conflict between the
State's evidence and that offered by the appellant, goes to
the weight of the evidence and [creates a question] of fact to
be resolved by the jury." <u>Roswell v. State</u>, 647 So. 2d 67, 69-
70 (Ala. Crim. App. 1994).

The evidence adduced at trial showed that the cashiers at
both of the convenience stores positively identified Williams
as the man who robbed them from photographic lineups and later
at trial. Additionally, a videotape was shown at trial which
purported to show Williams participating in the robbery at the
Beeline store. Moreover, Williams waived his right to remain
silent, signed a waiver, and confessed to participating in
both of these robberies. Based on the evidence presented at
trial, the jury could have reasonably concluded that Williams
committed both robberies.

Based on the foregoing, the judgment of the trial court
is affirmed.

**AFFIRMED.**

McMillan, P.J., and Cobb, J., concur. Baschab and Shaw,
JJ., concur in the result.

8

# IN THE SUPREME COURT OF ALABAMA



March 10, 2006

**1050563**

Ex parte Bobby Williams. PETITION FOR WRIT OF CERTIORARI TO THE
COURT OF CRIMINAL APPEALS (In re: Bobby Williams v. State of Alabama)
(Pike Circuit Court: CC03-382; CC03-383; Criminal Appeals : CR-04-0759).

## CERTIFICATE OF JUDGMENT

## Writ Denied

    The above cause having been duly submitted, IT IS CONSIDERED AND
ORDERED that the petition for writ of certiorari is denied.

    STUART, J. -  Nabers, C.J., and See, Harwood, and Bolin, JJ., concur.



I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appear(s) of record in said
Court.
Witness my hand this _10th_ day of ___March,___ _2006_

*Robert G. Esdale Sr.*

**Clerk, Supreme Court of Alabama**

EXHIBIT

/bb

# THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT
# THE ALABAMA COURT OF CRIMINAL APPEALS

**CR-04-0759**

Bobby Williams v. State of Alabama  (Appeal from Pike  Circuit Court: CC03-382; CC03-383)

## CERTIFICATE OF JUDGMENT

WHEREAS, the appeal in the above referenced cause has been duly submitted and considered by the Court of Criminal Appeals; and

WHEREAS, the judgment indicated below was entered in this cause on December 16th 2005:

### Affirmed by Memorandum.

NOW, THEREFORE, pursuant to Rule 41 of the Alabama Rules of Appellate Procedure, it is hereby certified that the aforesaid judgment is final.

**Witness. Lane W. Mann, Clerk**
**Court of Criminal Appeals, on this**
**the 10th day of March, 2006.**

**Clerk**
**Court of Criminal Appeals**
**State of Alabama**

cc: Hon. Steven E. Blair, Circuit Judge
    Hon. Brenda M. Peacock, Circuit Clerk
    James N. Thomas, Attorney
    Nancy M. Kirby, Dep. Atty. Gen.



EXHIBIT

E

PENGAD-Bayonne,N.J

COURT OF CRIMINAL APPEALS NO. _____ CR-05-2068 _____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

CIRCUIT COURT OF _____ PIKE _____ COUNTY, ALABAMA

CIRCUIT COURT NO     CC 03-382.60 & 383.60

CIRCUIT JUDGE     JEFF W. KELLEY

Type of Conviction/ Order Appealed From:     RULE 32 PETITION

Sentence Imposed:     PETITION DENIED/DISMISSED

Defendant Indigent:    ☑ YES   ☐ NO

## BOBBY WILLIAMS

NAME OF APPELLANT

Pro Se                    AIS#231210
(Appellant's Attorney)                    (Telephone No.)

565 Bibb Lane
(Address)

Brent,              AL          35034
(City)              (State)          (Zip Code)

**V.**

NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter

name and address of municipal attorney below.

_____

_____

Volume 1 of 1

(For Court of Criminal Appeals Use Only)



EXHIBIT

F

PENGAD-Bayonne/N.J

Index

Letter to Clerk...................................................... 1
In Forma Pauperis Declaration.....................................2-4
Order..................................................................5
Petition for Relief from Conviction or Sentence............... 6-30
Letter to Clerk.................................................... 31-32
State's Response to Rule 32 Petition............................ 33-41
Order............................................................... 42-44
Motion to Strike State's Response and Petitioners
        Objection to Dismissal of Rule 32.....................45-48
Motion for Extension of Time to Amend Rule 32.............49
Order............................................................... 50
Motion to Amend Rule 32 Petition............................51-58
Motion to Vacate and Amend Court's Order...................59-63
Order............................................................... 64
Order............................................................... 65
Notice of Appeal Package.......................................66-69
Appeal Transmittal Form........................................70-71
Case Action Summary............................................ 72-74
Certificate of Completion....................................... 75

BOBBY WILLIAMS # 231210

565 BIBB LANE
BRENT, AL 35034
MAY 4TH, 2006

TO: CIRCUIT CLERK
IN RE: Rule 32 PETITION FILED



MAY 2006
FILED
Brenda Mosley - Peacock
Court Clerk
Pike Co., Ala.

DEAR CLERK,
     I would Like to Request yor ASSISTANCE
IN THE ABOVE MATTER. THE Rule 32 which I
Filed I need TO HAVE NOTICE when it was
File IN Court, By CASE ACTION SUMMARY, oR Some
FORM OF FILING NOTICE.
     I AM Sending A Request IN Reference
To THE ATTACHED FACTS of My Rule PETITION
The LAST PAge I'M NOT SuRe if I Sign it. If
IT IS NOT Sign will you PLeAse ReTuRN, ANd oR
MAKe NOTICE THAT the Rule 32 FoRM was NOTARIZED
FoR The CoMPLEZE STATEMENTS.
     I Need the Following FoRMS (1) 2 SUBSTANIAL HARDSHIP
AFFIdAVITS, (2) 2 Civil CoveR SHeeTS. I THANK you FoR
Your ASSISTANCE.

5-9-06                                    SiNCerely
Received 5-1-06
to Judge on 5-9-06 - Needs to
Rule on Forma Pauperis Before we canfile.        BOBBY WILLIAMS

RULE OF CRIMINAL PROCEDURE                                    Rule 32.10

IN FORMA PAUPERIS DECLARATION

Pike County Circuit Court
[Insert appropriate court]

Bobby D. Williams                           CC03-382-382
(Petitioner)

v.

State of Alabama
(Respondent(s))

## DECLARATION IN SUPPORT OF REQUEST TO PROCEED IN FORMA PAUPERIS

I, Bobby D. Williams declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs, or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1. Are you presently employed?  Yes ☐   No ☒
   a. If the answer is "yes," state the amount of your salary or wages per month, and give the name and address of your employer.
      Incarcerated in State Prison

   b. If the answer is "no," state the date of last employment and the amount of the salary and wages per month which you received.

      Incarcerated in State Prison

2. Have you received within the past twelve months any money from any of the following sources?
   a. Business, profession, or other form of self-employment?
      Yes ☐   No ☒
   b. Rent payments, interest, or dividends?
      Yes ☐   No ☒
   c. Pensions, annuities, or life insurance payments?
      Yes ☐   No ☒
   d. Gifts or inheritances?
      Yes ☐   No ☒
   e. Any other sources?
      Yes ☐   No ☒
   If the answer to any of the above is "yes," describe each source of money and state the amount received from each during the past twelve months.
      None

3. Do you own cash, or do you have money in a checking or savings account?

211

● □   No ☒   *SEE PREVIOUS*   **3**

(Include any funds in prison accounts.)

If the answer is "yes," state the total value of the items owned.

_____ *NONE* _____

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?

   Yes □   No ☒

   If the answer is "yes," describe the property and state its approximate value.

   _____ *NONE* _____

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

   _____ *INCARCERATED IN STATE PRISON* _____

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on *4-4-06*

                                                                    (date)

                        *Bobby Williams*
                        Signature of Petitioner

## Certificate

I hereby certify that the petitioner herein has the sum of $*4.48* on account to his credit at the *B.L.CF* institution where he is confined. I further certify that petitioner likewise has the foregoing securities to his credit according to the records of said *B.L.CF* institution:

_____ *None* _____

_____          _____

*4/5/06*                          *Cynthia Stewart, Account Clerk*

DATE                              AUTHORIZED OFFICER OF
                                  INSTITUTION

Rule 32

212

4

STATE OF ALABAMA
DEPARTMENT OF CORRECTIONS
BIBB COUNTY CF

AIS #: 231210        NAME: WILLIAMS, BOBBY D              AS OF: 04/05/2006

| MONTH | # OF DAYS | AVG DAILY BALANCE | MONTHLY DEPOSITS |
|-------|-----------|-------------------|------------------|
| APR | 25 | $4.55 | $15.00 |
| MAY | 31 | $2.76 | $0.00 |
| JUN | 30 | $4.61 | $10.00 |
| JUL | 31 | $4.91 | $10.00 |
| AUG | 31 | $32.45 | $50.00 |
| SEP | 30 | $31.37 | $25.00 |
| OCT | 31 | $11.92 | $10.00 |
| NOV | 30 | $11.37 | $43.00 |
| DEC | 31 | $10.24 | $15.00 |
| JAN | 31 | $2.38 | $10.00 |
| FEB | 28 | $11.21 | $55.00 |
| MAR | 31 | $28.35 | $50.00 |
| APR | 5 | $8.60 | $0.00 |

5

# IN THE CIRCUIT COURT OF
## PIKE COUNTY, ALABAMA

BOBBY WILLIAMS,                             *
                                            *
     PETITIONER,                   *
                                            *
VS.                                         *   CASE NO: CC-2003-382 & 383. *60*
                                            *
STATE OF ALABAMA,                           *
                                            *
     RESPONDENT.                   *

## ORDER

    The Defendant/Petitioner has filed a Rule 32, Alabama Rules of Criminal Procedure Petition along with an In Forma Pauperis Declaration.   The court finds that the Defendant/Petitioner is entitled to proceed with*out* the prepayment of a filing fee.

    The Clerk of Court is ***ORDERED*** to forward a copy of the Rule 32 Petition to the District Attorney.  The District Attorney shall file a response within forty five (45) days.

    Done this the ***11**th* day of ***May, 2006.***

                            JEFF W. KELLEY
                            CIRCUIT JUDGE

MAY 2006

Brenda Meadows Peacock
Court Clerk
Pike Co. Ala.

6

# PETITION FOR RELIEF FROM CONVICTION OR SENTENCE
## (Pursuant to Rule 32,
## Alabama Rules of Criminal Procedure)

**Case Number**

<u>CC</u>   <u>03</u>   <u>382 & 383</u> .60
ID    YR    **NUMBER**

IN THE ____CIRCUIT____ COURT OF <u>PIKE</u>, ALABAMA

<u>BOBBY  WILLIAMS</u>  vs.  <u>STATE OF ALABAMA</u>
Petitioner (Full Name)                Respondent

[Indicate either the "State" or,
if filed in municipal court, the
name of the "Municipality"]

Prison Number ___231210___ Place of Confinement <u>BIBB COR. FACILITY</u>

County of conviction ___PIKE COUNTY, ALABAMA___

**NOTICE: BEFORE COMPLETING THIS FORM, READ CAREFULLY THE ACCOMPANYING INSTRUCTIONS.**

1. Name and location (city and county) of court which entered the judgment of conviction or sentence under attack ___PIKE COUNTY, AL. -- TROY, ALABAMA___

2. Date of judgment of conviction ___JANUARY 06, 2005___

3. Length of sentence ___25 YEARS___

4. Nature of offense involved (all counts) ___ROBBERY FIRST___

5. What was your plea?   (Check one)
   (a) Guilty _____
   (b) Not guilty __XX__
   (c) Not guilty by reason of mental disease or defect _____
   (d) Not guilty and not guilty by reason of mental disease or defect _____

6. Kind of trial: (Check one)

   (a)  Jury __XX__                    (b)  Judge only _____

7. Did you testify at the trial?

   Yes _____                        No __XX__

8. Did you appeal from the judgment of conviction?

   Yes __XX__                         No _____

9. If you did appeal, answer the following:

   (a)  As to the state court to which you first appealed, give the following information:

        (1)  Name of court __ALABAMA CRIMINAL APPEAL_____

        (2)  Result __AFFIRMED_____

        (3)  Date of result __SEE CLERKS RECORDS_____

   (b)  If you appealed to any other court, then as to the second court to which you appealed, give
        the following information:

        (1)  Name of court __APPLICATION FOR REHEARING CRIMINAL APPEALS__

        (2)  Result __DENIED_____

        (3)  Date of result __SEE CLERKS RECORDS_____

   (c)  If you appealed to any other court, then as to the third court to which you appealed, give the
        following information:

        (1)  Name of court __ALABAMA SUPREME COURT_____

        (2)  Result __DENIED_____

        (3)  Date of result __SEE CLERKS RECORDS_____

*10.  Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any court, state or federal?

Yes _____                    No __XX__

11.  If your answer to Question 10 was "yes", then give the following information in regard to the first such petition, application, or motion you filed:

(a)  (1)  Name of court ___XXXX___

     (2)  Nature of proceeding ___XXXX___

     (3)  Grounds raised ___XXXXXXX___

     _____

     _____

     _____

     _____

     (attach additional sheets if necessary)

     (4)  Did you receive an evidentiary hearing on your petition, application, or motion?

          Yes _____          No __XX__

     (5)  Result ___XXXXXXX___

     (6)  Date of result ___XXXXXX___

(b)  As to any second petition, application, or motion, give the same information:

     (1)  Name of court ___XXXXXXXXX___

     (2)  Nature of proceeding ___XXXXXXXXX___

     (3)  Grounds raised ___XXXXXXXX___

     _____

     _____

     _____

     _____

     (attach additional sheets if necessary)

     (4)  Did you receive an evidentiary hearing on your petition, application, or motion?

          Yes _____          No __N/A__

     (5)  Result ___N/A___

     (6)  Date of result ___N/A___

(c)  As to any third petition, application, or motion, give the same information (attach additional sheets giving the same information for any subsequent petitions, applications, or motions):

     (1)  Name of court ___N/A___

3

9

(2) Nature of proceeding _____ N/A ●_____

(3) Grounds raised _____ N/A _____

_____

_____

_____

_____

_____

(attach additional sheets if necessary)

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

   Yes _____           No N/A

(5) Result _____ N/A _____

(6) Date of result _____ N/A _____

(d) Did you appeal to any appellate court the result of the action taken on any petition, application, or motion?

   (1) First petition, etc.        Yes _____        No XX

   (2) Second petition, etc.       Yes _____        No XX

   (2) Third petition, etc.        Yes _____        No XX

**ATTACH ADDITIONAL SHEETS GIVING THE SAME INFORMATION
FOR ANY SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS.**

(e) If you did not appeal when you lost on any petition, application, or motion, explain briefly why you did not:

   _____ N/A _____

   _____

   _____

12. Specify every ground on which you claim that you are being held unlawfully, by placing a check mark on the appropriate line(s) below and providing the required information. Include all facts. If necessary, you may attach pages stating additional grounds and the facts supporting them.

# GROUNDS OF PETITION

**Listed below are the possible grounds for relief under Rule 32. Check the ground(s) that apply in your case, and follow the instruction under the ground(s):**

YES
_____ A.  The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

   For your information, the following is a list of the most frequently raised claims of constitutional violation:.

4

10

(1) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(2) Conviction obtained by use of coerced confession.

(3) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(4) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(5) Conviction obtained by a violation of the privilege against self-incrimination.

(6) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(7) Conviction obtained by a violation of the protection against double jeopardy.

(8) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

<u>YES</u>  (9) Denial of effective assistance of counsel.

**This list is not a complete listing of all possible constitutional violations.**

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each constitutional violation that you claim, whether or not it is one of the nine listed above, and include under it each and every fact you feel supports this claim. Be specific and give details.

_____ B. <u>The court was without jurisdiction to render the judgment or to impose the sentence.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____ C. <u>The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____ D. <u>Petitioner is being held in custody after his sentence has expired.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____ E. <u>Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:</u>

<u>The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable diligence; and</u>

<u>The facts are not merely cumulative to other facts that were known; and</u>

5

The facts do not merely amount to impeachment evidence; and

If the facts had been known at the time of trial or sentencing, the result would probably have been different; and

The facts establish that petitioner is innocent of the crime for which he was convicted or should not have received the sentence that he did.

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

F. **The petitioner failed to appeal within the prescribed time and that failure was without fault on petitioner's part.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

13. **IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS RULE 32.2(b) LIMITS YOU TO ONLY ONE PETITION IN MOST CIRCUMSTANCES. IT PROVIDES:**

> "Successive Petitions. The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exist why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

A. Other than an appeal to the Alabama Court of Criminal Appeals or the Alabama Supreme Court, have you filed in state court any petition attacking this conviction or sentence?

Yes _____          No __XX__

B. If you checked "Yes," give the following information as to earlier petition attacking this conviction or sentence:

(a) Name of court _____N/A_____

(b) Result _____N/A_____

(c) Date of result _____N/A_____
    (attach additional sheets if necessary)

C. If you checked the "Yes" line in 13A, above, and this petition contains a different ground or grounds of relief from an earlier petition or petitions you filed, attach a separate sheet or sheets labeled: "EXPLANATION FOR NEW GROUND(S) OF RELIEF."

On the separate sheet(s) explain why "good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and [why the] failure to entertain [this] petition will result in a miscarriage of justice."

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes _____          No __XX__

6

15. Give the name and address, if known, of each attorney who represented you at the following stages of the case that resulted in the judgment under attack:

(a) At preliminary hearing ____ JAMES NORMAN THOMAS _____

(b) At arraignment and plea ____ JAMES NORMAN THOMAS _____

(c) At trial _____ JAMES NORMAN THOMAS _____

(d) At sentencing _____ JAMES NORMAN THOMAS _____

(e) On appeal _____ JAMES NORMAN THOMAS _____

(f) In any post-conviction proceeding _____ N/A _____

(g) On appeal from adverse ruling in a post-conviction proceeding _____

    NONE AT ALL.

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes _XX___                    No _____

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes _XX___                    No _____

(a) If so, give name and location of court which imposed sentence to be served in the future: _____
    MONTGOMERY CIRCUIT COURT -SPLIT SENTENCE

(b) And give date and length of sentence to be served in the future: _____
    SPLIT SENTENCE

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes _____                    No _XX___

18. What date is this petition being mailed?
    APRIL 25, 2006

    Wherefore, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

13

# PETITIONER'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I swear (or affirm) under penalty of perjury that the foregoing is true and correct.

Executed on _____ 4/25/06 _____.
               (Date)

_____Bobby Williams_____
Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this the _25_ day of _April_ _2006_.

_____Vanessa A Toney_____
Notary Public 5/6/06

## OR *

## ATTORNEY'S VERIFICATION UNDER OATH SUBJECT TO PENALTY FOR PERJURY

I Swear (or affirm) under penalty of perjury that, upon information and belief, the foregoing is true and correct. Executed on _____.
                                                        (Date)

_____
Signature of Petitioner's Attorney

SWORN TO AND SUBSCRIBED before me this the _____ day of _____, _____.

_____
Notary Public

Name and address of attorney representing petitioner in this proceeding (if any)

_____

_____

_____

_____

_____

* If petitioner is represented by counsel, Rule 32.6(a) permits either petitioner or counsel to verify the petition.

# IN THE SUPREME COURT OF ALABAMA

14



March 10, 2006

**1050563**

Ex parte Bobby Williams.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: Bobby Williams v. State of Alabama) (Pike Circuit Court: CC03-382; CC03-383; Criminal Appeals : CR-04-0759).

## CERTIFICATE OF JUDGMENT

### Writ Denied

The above cause having been duly submitted, IT IS CONSIDERED AND ORDERED that the petition for writ of certiorari is denied.

STUART, J. –  Nabers, C.J., and See, Harwood, and Bolin, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this *10th* day of *March,*     *2006*

*Robert G Esdale Sr*

Clerk, Supreme Court of Alabama

/bb

15

## INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

I. BOBBY WILLIAMS FOR A CLEAR UNDERSTANDING OF THIS CLAIM, AND GROUND PROVIDES A BRIEF HISTORY OF THE CASE.

### PROCEDURAL HISTORY

BOBBY WILLIAMS (HEREAFTER WILLIAMS) WAS INDICTED BY THE MAY 2003 TERM OF THE GRAND JURY BY INDICTMENT FOR TWO COUNTS OF ROBBERY FIRST.

COUNT I. BOBBY WILLIAMS WHOSE NAME IS OTHERWISE UNKNOWN TO THE GRAND JURY, DID IN THE COURSE OF COMMITTING A THEFT OF PROPERTY TO WIT: LAWFUL UNITED STATES CURRENCY........ PROMARKETING L.L.C. DOING BUSINESS AS BEE LINE STORE #614..... (SEE EXHIBIT "A")

COUNT II. BOBBY WILLIAMS, WHOSE NAME IS OTHERWISE UNKNOWN TO THE GRAND JURY.. SUNNY SOUTH, L.L.C. (SEE EXHIBIT "A")

THE CIRCUMSTANCES AND FACTS OF THIS CASE SURROUNDS TWO ROBBERIES WHICH TOOK PLACE IN PIKE COUNTY, ALABAMA.

INTHAT THERE WERE A TOTAL OF AT LEAST (4) BLACK MALES INVOLVED, AND "ONLY ONE" (G)UN. THERE COULD HAVE BEEN ONLY ONE SPECIFIC INDIVIDUAL WHO WAS ARMED WITH A DEADLY WEAPON IN VIOLATION OF SECTION (13A-8-41).

WILLIAMS MAINTAINS HIS INNOCENCE FOR THE STATED CHARGE OF ROBBERY FIRST. THE STATE AVERS AND SAID IN OPENING STATEMENT THAT WILLIAMS COULD BE THE ACCOMPLICE IN THE ROBBERY CASES. THIS IN ITSELF PROVES THAT WILLIAMS, COULD BE INNOCENT OF THE GREATER, BUT GUILTY OF THE LESSOR OFFENSE.

THE FULL FACTS WHICH NOW COMES BACK BEFORE THIS COURT IS WILLIAMS SWORN OATH OF TRUTH;

SPECIFIC FACTS TOPROVE THAT WILLIAMS WHOLE OUTCOME OF TRIAL AND SENTENCING WOULD HAVE BEEN DIFFERENT HAD COUNSEL PERFORMED HIS PROFESSIONAL DUTIES AS REQUIRED BY ALABAMA LAW AND THE CONSTITUTION OF THESE UNITED STATES. WILLIAMS IN SUPPORT WILL PROVIDE EXHIBITS, AND FACTS. THE FOLLOWING NOW COMES:

### CLAIM ONE: INEFFECTIVE ASSISTANCE
### OF COUNSEL AT SENTENCING:

(1). WILLIAMS HAD WITNESSES WHO WERE VITAL FOR THE COURT. THE HONORABLE JUDGE STEVEN E. BLAIR TO HAVE HEARD AT SENTENCING. THE PASTOR OF BETHLEHEM MISSIONARY BAPTIST CHURCH TO INTERVIEW AND CONTACT.

16

(A). WILLIAMS GAVE MR. THOMAS THE FULL NAME OF THE PASTOR OF BETHLEHEM MISSIONARY. BAPTIST CHURCH. TO INTERVIEW AND CONTACT.

(B). WILLIAMS REQUESTED HIS COUNSEL TO SUBPOENA THE PASTOR FOR TESTIMONY PURPOSES IN HIS BEHALF.

(2). COUNSEL DID NOT CONTACT AND MAKE AN INTERVIEW WITH THE PASTOR OF THE CHURCH, NOR DID HE OBTAIN ANY EVIDENCE FROM ANY CHURCH FILES TO PRESENT BEFORE THE COURT FOR WILLIAMS INVOLVEMENT, AND ATTENDANCE WITH CHURCH PROGRAMS.

(3). COUNSELS CHOICE IN THIS WAS INDEPENDENTLY MADE NOT TO SUBPOENA, AND DIDN'T PRESENT THE TRUTH TO THE JUDGE THAT WILLIAMS HAD COMMUNITY TIES, CLOSE ASSOCIATED WITH THE CHURCH.

(4). COUNSELS FAILURE TO PUT BEFORE THE COURT THE PASTOR OF THE CHURCH CHANGED THE WHOLE OUTCOME OF SENTENCING.

(A). COUNSEL MR. THOMAS PLACED BEFORE THE COURT EVIDENCE TO SHOW THAT WILLIAMS DID GOOD, THAT WILLIAMS HAD NO ARREST RECORDS. THAT IT WAS ONLY UP UNTIL THESE CASES IN PIKE COUNTY, ALABAMA, AND MONTGOMERY COUNTY, ALABAMA THAT WILLIAMS HAD EVER HAD AS MUCH AS A SPITTING ON THE SIDE WALK.

(B). COUNSEL COULD NOT ESTABLISH AND PROVE WHAT HE HAD SET OUT TO DO FOR HIS CLIENT, BECAUSE COUNSEL DID NOT INTERVIEW THE PASTOR, NOR DID HE DO A FULL INTER-VIEW WITH ANY OF WILLIAMS OTHER WITNESSES TO KNOW, THAT THE PASTOR WAS THE EXPERT WITNESS. THE PASTOR KNEW WILLIAMS, AND KNEW WHY WILLIAMS HAD TURNED AWAY AND BECAME VICTUM TO THESE CRIMINAL ACTS.

THE RECORDS AT SENTENCING IS SILENT TO EXPERT TESTIMONY, BECAUSE WILLIAMS ATTORNEY REFUSED TO INTERVIEW AND PROVIDE EXPERT TESTIMONY.

(5). WILLIAMS OUTCOME WOULD HAVE BEEN DIFFERENT HAD COUNSEL DID HIS DUTY BY PRE-SENTENCE INVESTIGATION AND PREPARED THE CASE. WILLIAMS FOR PROOF ATTACH EXHIBIT "B".

(A). WILLIAS HAD NO BENEFITS OF HAVING THE FULL BODY OF THE CHURCH TO SUPPORT HIM IN HAVING THE BENEFITS OF THE SPLIT-SENTENCE SAID PROBATION IN PIKE COUNTY, ALABAMA.

(B). THE RECORD FOR CONSIDERATION FOR ALL FACTS ARE SILENT BEFORE THE HONORABLE JUDGE, BECAUSE COUNSEL DIDN'T CONTACT, SUBPOENA, NOR INTERVIEW EXPERT WITNESS.

(6). COUNSEL DID NOT SUBPOENA CHRISTOPHER L. McGHEE WHO GAVE A FULL STATEMENT JANUARY 16, 2003. McGHEE TESTIFIED THAT MARCUS HAD THE GUN. (SEE EXHIBIT "C")

(A). THE WHOLE OUTCOME OF SENTENCING WOULD HAVE BEEN DIFFERENT HAD COUNSEL SUBPOENA AND HAD SPECIFIC TESTIMONY SHOWING THAT HIA CLIENT DIDN'T HAVE THE GUN.

(B). THE COURTS FULL TESTIMONY, AND TO WHICH THE STATE REENTERED WAS THAT WILLIAMS PUT THE GUN IN THE FACE OF TWO FEMALES.

(C). COUNSEL THROUGHOUT TRIAL TRIED TO ESTABLISH THAT WILLIAMS WAS NOT THE MAN WITH THE GUN. COUNSEL BREACHED A FULL DUTY OWED WHEN HE DIDN'T PLACE STATES WIT-NESS C. McGHEE AT SENTENCING TO PROVE THAT WILLIAMS WASN'T THE ONE WITH THE GUN.

(7). COUNSEL DIDN'T PLACE BEFORE THE COURT EVIDENCE TO WHICH WAS VITAL AND REAL
FOR THE JUDGE TO CONSIDER IN IMPOSING THE SENTENCE. COUNSEL HAD FULL KNOWLEDGE
THAT HIS CLIENT HAD RECEIVED A SPLIT-SENTENCE FOR ROBBERY IN MONTGOMERY, ALABAMA.
THE COURT DIDN'T HEAR FROM THE STATE OF ALABAMA THE MITIGATING FACTS, AND THE
REAL EVIDENCE TO WHICH WAS CONSIDERED THAT GRANTED WILLIAMS A SPLIT-SENTENCE
WITH PROBATION.

(8). COUNSEL DIDN'T INTERVIEW AND CONTACT THE PROBATION OFFICER WHO PREPARED
WILLIAMS PROBATION REPORT. NONE OF THE EVIDENCE WHICH EXISTED THAT PROVES WILLIAMS
DESPITE HIS CONDUCT HAD POTENTIALS BY PROBATION OFFICER TO CORRECT HIS LIFE AND
TO MOVE FORWARD BY COURTS ORDERS OF ADHERING TO PROBATION RULES AND REGULATIONS.
(A). THE HONORABLE JUDGE DIDN'T HEAR ANY OF THIS EVIDENCE, AND WHAT'S SO ALARMING
THIS INFORMATION WAS MADE KNOWN TO COUNSEL AND NEVER ONCE DID MR. THOMAS INTRODUCE
IT BEFORE THE COURT.

THE WHOLE OUTCOME WOULD HAVE BEEN DIFFERENT AT SENTENCING IF MR. THOMAS WHO
HAS FULL KNOWLEDGE OF ALABAMA LAW WOULD HAVE PLACED IN THE COURT'S HEARING OF THE
ABOVE AND THESE SPECIFIC FACTUAL WITNESSES, AND DOCUMENTS.
(1). SCHOOL RECORDS FROM PIKE AND MONTGOMERY COUNTY, ALABAMA.
(2). EMPLOYMENT RECORDS FROM WILLIAMS JOBS.
(3). COMMUNITY RECORDS FROM CHURCH, BOYS CLUB, AND COMMUNITY CENTER MANAGER.

THE TWO PRONG TEST APPLIES WHERE PREJUDICE, AND THE ENTIRE OUTCOME WOULD
HAVE BEEN DIFFERENT IS A ISSUE. RULE 32.9 (d) SAYS A HEARING MUST BE GRANTED
WHEN SPECIFIC FACTS PROVE WILLIAMS IS ENTITLED TO RELIEF. HAD THE HONORABLE
JUDGE HEARD ALL OF THIS EVIDENCE, AND HEARD THE PLEA OF THE STATES VERY MERCY
FROM MONTGOMERY COUNTY, ALABAMA, WILLIAMS SENTENCING WOULD HAVE BEEN DIFFERENT
ALTOGETHER.


## CLAIM TWO: INEFFECTIVE ASSISTANCE
## OF COUNSEL AT TRIAL

(1). COUNSEL AT TRIAL MADE HIS SOLE DEFENSE THAT WILLIAMS WAS MISTAKENLY
IDENTIFIED.
(2). THE EVIDENCE WHICH COUNSEL USED TO MAKE HIS DEFENSE REST SOLELY ON THE
VIDEO OF THE ROBBERY WHICH TOOK PLACE FOR BOTH LOCATIONS.
(3). COUNSEL BREACHED HIS FULL DUTY AT TRIAL UNDER IDENTIFICATION TO WHICH
WAS HIS TRIAL DEFENSE. STATES WITNESSES WHO TESTIFIED COUNSEL COULD NOT
SUCCESSFULLY CHALLENGE, NOR MAKE A QUESTION OF PURE DOUBT FOR WILLIAMS
INNOCENCE AND DEFENSE.

(4). COUNSEL KNEW THAT IN ORDER FOR THE STATE TO PROVE IT'S CASE, IT MANDATED
FOR THE IDENTIFICATION, AND THAT WILLIAMS WAS ARMED WITH THE PISTOL.

(5). WILLIAMS GAVE HIS COUNSEL SPECIFIC FACTS, AND WITNESSES TO CONTACT TO
PROVE AND ESTABLISH THAT THERE WERE AND STILL EXIST A CASE OF MISTAKEN IDENTITY.

(A). COUNSEL REFUSED TO CONTACT AND INTERVIEW STATES WITNESSES WHO HAD GIVEN A
STATEMENT THAT WILLIAMS WAS NOT THE MAN WITH THE GUN IN THE ROBBERIES WHICH
TOOK PLACE IN TROY, ALABAMA.

(B). IF COUNSEL HAD CONDUCTED A INTERVIEW WITH THESE WITNESSES, OTHER LEADS AND
EVIDENCE WOULD HAVE PROVED THAT WILLIAMS WAS NOT THE GUN MAN, AND THAT WILLIAMS
DID NOT POINT A GUN AT ALL.

(C). THE WHOLE OUTCOME WOULD HAVE BEEEN DIFFERENT WHERE THE JURY WOULD HAVE HAD
REAL EVIDENCE OF REASONABLE DOUBT TO CONSIDER DURING DELIBERATION.

(D). THE OUT COME WOULD HAVE BEEN DIFFERENT WHERE THE JUDGE IN IT'S OPENING MADE
IT FACTUAL THAT THERE WERE ACCOMPLICES, AND ROBBERY 2nd COULD BE STATES EVIDENCE.

(E). THE OUTCOME WOULD HAVE BEEN DIFFERENT IF COUNSEL HAD MADE HIS FULL INVESTIGA-
TION, AND ESTABLISHED THAT IN FACT BOTH WITNESSES WERE TOLB THAT WILLIAMS HAD A
TATTOO. PRIOR TO TRIAL AND IN THE INITIAL POLICE REPORT THERE'S NOTHING WHICH BY
WITNESS IDENTIFICATION WHICH CONCLUSIVELY IDENTIFIED WILLIAMS. COUNSELS FAILURE
TO CHALLENGE BOTH VICTUMS CAUSED WILLIAMS TO BE FOUND GULITY OF ROBBERY 1st WHEN
WILLIAMS IS IN FACT INNOCENT OF ROBBERY 1st. AND THESE WERE ISSUES BY JURY
INSTRUCTIONS FOR THE JURY TO DETERMINE.

(6). THE ENTIRE TRIAL WAS UNFAIR WHERE COUNSEL DID NOT HAVE AND DEFENSE FACTUAL
EVIDENCE TO PRESENT FOR HIS CLIENT.

(7). THE ENTIRE TRIAL WAS DIFFERENT WHERE EVIDENCE EXIST TO WHICH WOULD HAVE
PROVED THAT WILLIAMS DID NOT PLAN ANY OF THESE ROBBERIES.

(8). THE ENTIRE TRIAL WOULD HAVE BEEN DIFFERENT IF WILLIAMS COUNSEL HAD ESTABLISH
THAT INVESTIGATING OFFICER MADE THE CASE PERSONAL AGAINST WILLLAMS.

(A). WILLIAMS REFUSAL TO POINT OUT THE GUN MAN, AND MADE IT KNOWN THAT THEY KNEW
WHOSE IDEA IT WAS AND WHO HAD THE ONLY GUN.

(B). FACTS BY REAL EVIDENCE SHOWS THAT THE OFFICER CONCEALED EVIDENCE IN THE CASE
AGAINST WILLIAMS. WHERE THE OFFICER HAD THE VICTUMS TO INTENTIONALLY POINT
WILLIAMS OUT TO BE THE GUN MAN. WHERE BOTH VICTUMS KNOW THAT IT WAS NOT WILLIAMS
WHO HAD THE GUM.

(C). COUNSEL ALLOWED TRICKERY BY DETECTIVE ROSS AND WRIGHT TO BE USED AND WOULD
NOT ESTABLISH BEFORE THE JURY FACTUAL EVIDENCE THAT WRIGHT FORMED HIS FULL PLAN
TO MAKE IT HARD ON WILLIAMS FOR PERSONAL MOTIVES AND WILLIAMS FATHER WHO WRIGHT
HAD BEEN INVOLVED WITH IN PRIOR CASE WORK IN PIKE COUNTY, ALABAMA.

-4-

(9). IF COUNSEL HAD DID HIS PROFESSIONAL DUTY HE WOULD HAVE SHOWN THAT WILLIAMS TOLD THE TRUTH TO BOTH OFFICERS TO OBTAIN MERCY OF THE STATE FOR HIS BEING WITH BAD ASSOCIATION.

(10). COUNSEL HAD FACTUAL EVIDENCE TO WHICH HE INDEPENDENTLY REFUSED TO ESTABLISH BEFORE THE JURY. COUNSEL DID NOT SUBPOENA AND CALL WILLIAMS FATHER TO TESTIFY TO SHOW THE JURY THAT WILLIAMS MADE A MISTAKE, BUT IT WAS NOT WILLIAMS WHO HAD THE GUN.

(A). WILLIAMS FATHER'S TESTIMONY, AND THAT OF THE STATES KEY WITNESS. THE JURY WOULD HAVE HAD REASONABLE DOUBT AND UNDER THE LESSOR INCLUDED OFFENSES THE GREAT POSSIBILITY OF THE OUTCOME WOULD HAVE BEEN A LESSOR INCLUDED OFFENSE.

## THE TWO PRONG TEST UNDER STRICKLAND SUPRA

THE TWO PRONG TEST UNDER STRICKLAND SUPRA APPLIES IN WILLAIMS CASE. COUNSEL WAS NOT ACTING UNDER HIS PROFESSIONAL NORMS. COUNSEL BREACHED A FULL DUTY OWED TO INVESTIGATE, TO PREPARE, AND SEEK OUT LEADS THAT EXISTED. THE JURY NEVER HEARD ANY PROFESSIONAL EVIDENCE PREPARED BY COUNSEL TO ESTABLISH A DEFENSE TO WHICH WAS CHOSEN BY WILLIAMS COUNSEL.

THE ENTIRE RESULTS OF TRIAL, AND SENTENCING WOULD HAVE BEEN DIFFERENT IF COUNSEL HAD DID WHAT ANY PRACTICING ATTORNEY WOULD HAVE DONE FOR A MAN WHO SAID HE HE DID NOT HAVE THE GUN AND HE DIDN'T ROB THE VICTUMS.

WILLIAMS ASKS THE HONORABLE JUDGE TO TAKE A FULL REVIEW OF THE AFFIDAVIT OF WILLIAMS, AND ALL EXHIBITS. WILLIAMS UNDER RULE 32.9 (a) CAN COME BEFORE THE HONORABLE JUDGE AND BEING THE CHANGED MAN ALTOGETHER AND TAKE THE STAND IN HIS OWN BEHALF AND TRUELY PROVE BEYOND DOUBT THAT IF NOT FOR COUNSELS ERRORS THE OUTCOME WOULD HAVE BEEN DIFFERENT.

RESPECTIVELY

BOBBY WILLIAMS
565 BIBB LANE
BRENT, AL. 35034

DONE THIS 26th DAY OF APRIL 2006.




INDICTMENT

# THE STATE OF ALABAMA
## PIKE COUNTY

IN CIRCUIT COURT
MAY TERM, 2003

The Grand Jury of said County charges that before the finding of this indictment that,

BOBBY WILLIAMS, whose name is otherwise unknown to the Grand Jury, did, in the course of committing a theft of property, to-wit: lawful United States currency and/or coinage, a better description of which is to the Grand Jury otherwise unknown, the property of, to-wit: ProMarketing L.L.C, doing business as Beeline Store #614, use force or threaten the imminent use of force against the person of the said Edith Thomas, or another person present, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said BOBBY WILLIAMS was armed with a deadly weapon or dangerous instrument, to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama, Against the Peace and Dignity of the State of Alabama; and,

### OFFENSE 2

The Grand Jury of said county charges that before the finding of this indictment that, BOBBY WILLIAMS, whose name is otherwise unknown to the Grand Jury, did, in the course of committing a theft of property, to-wit: lawful United States currency and/or coinage, a better description of which is to the Grand Jury otherwise unknown, the property of, to-wit: Sunny South, L.L.C., use force or threaten the imminent use of force against the person of the said Rebecca Holley, or another person present, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, while the said BOBBY WILLIAMS was armed with a deadly weapon or dangerous instrument, to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama,

Against the Peace and Dignity of the State of Alabama.

for Gary L. Mc Aliley District Attorney for
Twelfth Judicial Circuit

| | | |
|---|---|---|
| State of Alabama<br>Unified Judicial System | **CASE ACTION SUMMARY**<br>CONTINUATION | *"B"* 21<br>Case Number<br>CC-03-496 |
| Form C-7     Rev 2/79 | | |

Style: _Bobby D Williams_

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 8-28-03<br><br>Recd 3<br>9-3-03<br><br>Comp.<br>✓ | **Count 1**<br><br>Defendant & attorney appeared for sentencing. Court asked if he/she had anything to say why sentence should not now be pronounced and Defendant had his/her say.<br><br>HOA Enhancements Applicable    Yes/(No)<br>Defendant Admits _____ State Proves _____ priors<br><br>**IT IS ORDERED:**<br><br>Sentenced to ~~20~~ yrs./split to serve **4** yrs.<br>_____ reverse split postpone _____mo./year Review _____<br>Concurrent ~~consente~~ Consecutive _____<br><br>Suspended YES/(NO) Supervised/P.O/Court Probation _____ year<br>End of Split Sentence ___3___ years supervised probation<br>__✓__ DOC to give 60 day notice prior to E.O.S.<br><br>ENHANCEMENTS    $1000/2000 Enhancement Fine<br>_____ Remit portion completion of SAP<br>_____ Driver License suspended/revoked 6 mo/_____<br>_____ $100 DFS fee    _____ $100 Head Injury_____<br>_____ years School/ _____years Public Housing<br>_____ years Sale under 18<br><br>Boot Camp___ SAP___ Review upon completion-YES _____ GED<br>Work Release___Community Service _____hrs. Trash Pickup _____<br>**OTHER:**<br><br>Restitution $ 212.00 _____ Co-Defendant(s)_____<br>Jointly and Severally liable   Crime Victim $25.00 ($50.00)<br>Court Costs ✓ Attorney Fees ($150.00) _____ Fine $_____<br>Payment $_____ Mo/Week Begin_____/03 or 1/2 monies earned ✓<br>                                                                                 At DOC<br>Review/Other _____<br><br>Defendant advised right to appeal yes/(no) unless reserve issue withdraw plea; Defendant to be given credit for time served.<br>Appeal Bond set $_____<br><br>TRUMAN M. HOBBS, _ |

**22**

State of Alabama
Unified Judicial System

Form C-7    Rev 2/79

**CASE ACTION SUMMARY**
CONTINUATION

Case Number
CC-03-496?

Style: _Bobby D Williams_

Page Number _____ of _____ Pag

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|

Count 2

8-28-03

Defendant & attorney appeared for sentencing. Court asked if he/she had anything to say why sentence should not now be pronounced and Defendant had his/her say.

HOA Enhancements Applicable    Yes/No
Defendant Admits _____ State Proves _____ priors

**IT IS ORDERED:**

Sentenced to _20_ yrs./split to serve _4_ yrs.
_____ reverse split postpone _____ mo./year Review _____
Concurrent _amount_ Consecutive _____

Suspended YES/NO Supervised/P.O/Court Probation _____ yea
End of Split Sentence ___3___ years supervised probation
__✓__ DOC to give 60 day notice prior to E.O.S.

ENHANCEMENTS    $1000/2000 Enhancement Fine
_____ Remit portion completion of SAP
_____ Driver License suspended/revoked 6 mo/_____
_____ $100 DFS fee _____ $100 Head Injury _____
_____ years School/ _____ years Public Housing
_____ years Sale under 18

Boot Camp___ SAP___ Review upon completion-YES ___ GED ___
Work Release___ Community Service ___ hrs. Trash Pickup ___
OTHER:

Restitution $_____ Co-Defendant(s) _____
Jointly and Severally liable    Crime Victim $25.00/$50.00
Court Costs _____ Attorney Fees $150.00/_____ Fine $ _____
Payment $_____ Mo/Week Begin _____/03 or 1/2 monies earned ✓
                                                    at Doc.

Review/Other _____

Defendant advised right to appeal yes/no unless reserve issue
withdraw plea; Defendant to be given credit for time served.
Appeal Bond set $_____

TRUMAN M. HOBBS

**23**

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY CONTINUATION | Case Number CC-03-496 |
|---|---|---|
| Form C-7     Rev 2/79 | | |

Style: _____ Bobby D Williams _____

Page Number _____ of _____ Pag

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| | **Count 3** |
| 8-28-03 | Defendant & attorney appeared for sentencing. Court asked if he/she had anything to say why sentence should not now be pronounced and Defendant had his/her say. |

HOA Enhancements Applicable     Yes/No
Defendant Admits _____ State Proves _____ priors

**IT IS ORDERED:**

Sentenced to 20 yrs./split to serve 4 yrs.
_____reverse split postpone _____mo./year Review _____
Concurrent approots Consecutive _____

Suspended YES/NO Supervised/P.O/Court Probation _____ year
End of Split Sentence __3__ years supervised probation
__✓__ DOC to give 60 day notice prior to E.O.S.

ENHANCEMENTS     $1000/2000 Enhancement Fine
_____ Remit portion completion of SAP
_____ Driver License suspended/revoked 6 mo/_____
_____ $100 DFS fee _____ $100 Head Injury_____
_____ years School/ _____years Public Housing
_____ years Sale under 18

Boot Camp___ SAP___ Review upon completion-YES _____ GED
Work Release_____Community Service _____hrs. Trash Pickup
**OTHER:**

Restitution  $_____Co-Defendant(s)_____
Jointly and Severally liable  Crime Victim $25.00/$50.00
Court Costs _____Attorney Fees $150.00/_____ Fine $_____
Payment $_____Mo/Week Begin_____/03 or 1/2 monies earned ✓
                                                              Doc

Review/Other

Defendant advised right to appeal yes/no unless reserve issue
withdraw plea; Defendant to be given credit for time served.
Appeal Bond set $_____

TRUMAN M. HOBBS,

24

| State of Alabama Unified Judicial System | **CASE ACTION SUMMARY** CONTINUATION | Case Number CC-03-496T |
|---|---|---|
| Form C-7    Rev 2/79 | | |

Style: _Bobby D Williams_

Page Number _____ of _____ Page

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|

**Court 4**

8-28-03

Defendant & attorney appeared for sentencing. Court asked if he/she had anything to say why sentence should not now be pronounced and Defendant had his/her say.

HOA Enhancements Applicable   Yes/(No)
Defendant Admits _____ State Proves _____ priors

**IT IS ORDERED:**

Sentenced to **30** yrs./split to serve **4** yrs.
_____ reverse split postpone _____ mo./year Review _____
Concurrent _account_ Consecutive _____

Suspended YES/(NO) Supervised/P.O/Court Probation _____ year
End of Split Sentence **3** years supervised probation
____✓____ DOC to give 60 day notice prior to E.O.S.

ENHANCEMENTS    $1000/2000 Enhancement Fine
_____ Remit portion completion of SAP
_____ Driver License suspended/revoked 6 mo/
_____ $100 DFS fee _____ $100 Head Injury_____
_____ years School/_____ years Public Housing
_____ years Sale under 18

Boot Camp___ SAP___ Review upon completion-YES ___ GED ___
Work Release___Community Service ___hrs. Trash Pickup ___
**OTHER:**

Restitution $_____Co-Defendant(s)_____
Jointly and Severally liable   Crime Victim $25.00/($50.00)
Court Costs _____Attorney Fees $150.00/_____ Fine $_____
Payment $_____Mo/Week Begin_____/03 or 1/2 monies earned ✓
                                                                bec

Review/Other _____

Defendant advised right to appeal yes/(no) unless reserve issue o
withdraw plea; Defendant to be given credit for time served.
Appeal Bond set $_____

TRUMAN M HOBBS



WRIGHT:    This is Detective Greg Wright, the Troy Police Department, it is, date is 16 January 2003, uh I'm speaking with a Christopher L. McGhee, M-C-G-H-E-E, uh date of birth 7/29 of 80, black male, in reference to case number 0212-2840 and case number 0212-2060. Also present uh in and out of the room is Corporal Larry Ross uh who is also uh case agent on one of things uh robberies.  Chris, prior to turning the tape recorder on you've been read your rights, is that correct?

MCGHEE:    Yes.

WRIGHT:    Okay, you said you understood what your rights are, you had no problem giving us a statement, is that correct?

MCGHEE:    Yes.

WRIGHT:    Okay, uh we've got two robberies that we told you about uh we've talked to some other people, they're involved in the rob, in the robberies and we want to get your side of the story about what happened in the robberies and you said you're willing to give us your side of the story about what happened, is that correct?

MCGHEE:    Yes.

WRIGHT:    Okay, the first robbery we're talking about is the one at the Conoco Station uh it's the one that I described to you, it's across the street from uh, uh Kentucky Fried Chicken.  Prior to turning the tape recorder on we talked to you briefly uh you told me that Bobby, Marcus, Chris, which is yourself, and Dale is the one that was in on doing that one.  You know what I'm talking about?

MCGHEE:    (Unintelligible).

WRIGHT:    Tell me what happened on that one when y'all left Montgomery, when y'all came to Troy.  When y'all pulled into the gas station, what happened?

MCGHEE:    Uh Dale went in and purchased some pizza.

WRIGHT:    Dale went in and purchased some pizza, okay.  Who, who went in with Dale? He go in by himself?  The first time when he just went in and got the pizza and I think you said somebody got some beer also, did he go in by hisself?  You shaking your head yes?  You need to speak up where the tape recorder can hear you.

MCGHEE:    Yes.

WRIGHT:    So he went in by himself?  Y'all parked out front at the gas pumps.  Who went back in the second time?

Page 1 of 11 Pages



MCGHEE:      I believe Dale.

WRIGHT:      Dale went back in by himself the second time, huh?  I can't hear you.

MCGHEE:      Yes.

WRIGHT:      Okay, okay, at what point did you pull into the back of the store?

MCGHEE:      After

WRIGHT:      Did he go in more than two times?  Now he went in and got pizza, then he went back in and got some Black & Mild or something like that?

MCGHEE:      (Unintelligible).

WRIGHT:      Is that when you pulled back behind the store and y'all ate the pizza and drank the beer?

MCGHEE:      No, uh I was up at the uh he wanted when I first turned in, pulled up, he went in and purchased a pizza and came back.  I left and pulled behind the store.  All three of them got out then.

WRIGHT:      Which three got out?

MCGHEE:      Dale, Marcus and Bobby.

WRIGHT:      Okay.

MCGHEE:      And uh went to the store and that when uh Dale came back, all of them came back.  One with some pizza and beer, okay.  Dale, Dale stayed in the truck and, and Bobby and Marcus went back in the store.  Then that's when they committed it.

WRIGHT:      Okay, what, at what point did you see the uh the gun?  The one that you described in here earlier?

MCGHEE:      After.

WRIGHT:      After they did it?  Who had it?

MCGHEE:      I believe Marcus had it.

WRIGHT:      Why do you say you believe Marcus had it?

MCGHEE:      I seen Marcus have it.

 

IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                          )

      Plaintiff.                          )

VS.                                        )     CASE #CC-03-382 & 383

                                          )

BOBBY WILLIAMS,                            )

      Defendant.                          )

---

## REQUEST FOR APPOINTMENT OF NEW COUNSEL

COMES now the Defendant, pro se, and moves this Honorable Court to appoint Defendant new counsel to represent him in this cause. In support thereof, Defendant shows unto the Court as follows:

1. Defendant's current attorney, James N. Thomas, is not providing the assistance Defendant feels he needs given the seriousness of these charges. Defendant is receiving mixed signals from his attorney indicative that a working relationship is not possible between attorney and client.

2. In support of this motion, Defendant attaches hereto his sworn affidavit setting out his grounds and reasons for asking for another lawyer.

3. The Sixth Amendment requires effect representation creating an adversarial process. Defendant is not receiving representation sufficient to meet the Sixth Amendment standard.

**W H E R E F O R E**, premises considered, Defendant prays that the Court will remove James N. Thomas as counsel for the Defendant and appoint new counsel for good cause shown.

Respectfully submitted,

*Bobby Williams*
Bobby Williams #231210
Limestone C.F. Dorm
28779 Nick Davis Road
Harvest, Alabama 35749-7009

[2]

(29)

200

## CERTIFICATE OF SERVICE

I, Bobby Williams, do hereby certify that the foregoing motion was served upon the district attorney for Pike County, Alabama, by placing the same in the United States mail, postage prepaid and addressed correctly this _____ day of October, 2004.

Bobby Williams
Bobby Williams, Defendant, pro se
#231210 L.C.F. Dorm 8
28779 Nick Davis Road
Harvest,    Alabama    35749-7009



[3]

## AFFIDAVIT OF BOBBY WILLIAMS

STATE OF ALABAMA          )
COUNTY OF LIMESTONE    )

Before the undersigned authority, a NOTARY PUBLIC, in and for said county and state appears Bobby Williams, who after first being duly sworn, swears under oath that;

My name is Bobby Williams, and I am the Defendant is Pike County Circuit Court case #CC-03-382 & 383. I am asking to be appointed another lawyer in these cases. My appointed attorney, James N. Thomas, is not providing what I believe is the effective assistance to which I am entitled. I no longer trust Mr. Thomas to act in my best interest. I believe court appearances have been conducted without my knowledge or presence which have been detrimental to me. The mixed messages I have received from Mr. Thomas have me concerned that Mr. Thomas is indifferent to the seriousness of my situation and that Mr. Thomas and I can no longer exist in an attorney-client relationship. I am not attempting to delay the proceedings or cause trouble with the Court. I simply cannot put my trust in Mr. Thomas and no longer have faith in his ability to advocate my cause.

SWORN TO AND SUBSCRIBED BEFORE ME THIS 18th DAY OF OCTOBER, 2004.

NOTARY PUBLIC

MY COMMISSION EXPIRES 8 / 16 / 06

BOBBY WILLIAMS - AFFIANT

31

C. _____

Case No: 382-383

Vs.

Bobby Williams _____

## Letter to Circuit Clerk

Dear Mrs. Peacock

      I've written you a prior notice on behalf of a Rule 32 I filed in Court on 4/28/06 Somehow or another I believe I mistakenly forgot to sign my name on the petition. If you Can please send me some type of written notice Such as a Case Action Summary to inform me that the problem has been looki into I will appreciate it. But if not Can you pleas

Send me the petition back. So therefore I can 32 correct the mishap that occured. I apologize for such inconveince.<sup>Spell Check</sup> I ask that you please take care of this matter for me as soon as you can. I need to know if my signature was on the petition. Please send me a written notice to inform me it was. If not please mail the Rule 32 petition back and I'll gladly correct the carele mistake I made.

Thanking you in Advance,

Bobby Williams

Bobby Williams

5-15-06

Signature on Petition & Forma Pauperis.
Copy of order enclosed



*33*

IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

STATE OF ALABAMA,
      Plaintiff/Respondent,

VS.                                        CASE NO.S:  CC 2003-382 & 383

BOBBY WILLIAMS,
      Defendant/Petitioner.

STATE'S RESPONSE TO RULE-32 PETITION

Comes now the State of Alabama, by and through the undersigned Assistant

District Attorney, and hereby makes its response to said petition:

1. The Defendant was indicted by the Pike County Grand Jury on two counts of

   Robbery 1st Degree.

2. The Defendant was convicted on both counts January 6, 2005.

3. The Defendant unsuccessfully appealed his conviction and sentence to Alabama

   Court of Criminal Appeals.

4. The Defendant was denied a rehearing.

5. The Defendant was denied certiorari by the Alabama Supreme Court.


ISSUES PRESENTED

1. The Defendant claims ineffective assistance of counsel at sentencing.

2. The Defendant claims ineffective assistance of counsel at trial.

PRECLUSIONS

**RULE 32.2(a)**  A petitioner will not be given relief under this rule

based upon any ground:

(3) which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or

(4) which could have been but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b).

## CLAIMS OF INEFFECTIVE ASSISTANCE OF

COUNSEL: Any claim that counsel was ineffective must be raised as soon as practicable, either at trial, on direct appeal, or in the first Rule 32 petition, whichever is applicable.

The Defendant raises issues which are fully addressed by his counsel at trial and sentencing by affidavit attached hereto and incorporated as if set out at length herein. The counsel's attachments to his affidavit lends credibility to his affidavit and weakens the Defendant's allegations significantly.

The Defendant knew all of the specific incidences of is claims of ineffectiveness at the time they occurred. He fails to raise these until his court appointed lawyer has exhausted all appeal remedies. His failure to dismiss his trial/sentencing counsel immediately after sentencing when the last of his claimed incidents of ineffectiveness arose was derelict to protect this claim for relief. Therefore his claim of ineffectiveness is not timely and should be denied.

(3) which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or

(4) which could have been but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b).

**CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL**: Any claim that counsel was ineffective must be raised as soon as practicable, either at trial, on direct appeal, or in the first Rule 32 petition, whichever is applicable.

The Defendant raises issues which are fully addressed by his counsel at trial and sentencing by affidavit attached hereto and incorporated as if set out at length herein. The counsel's attachments to his affidavit lends credibility to his affidavit and weakens the Defendant's allegations significantly.

The Defendant knew all of the specific incidences of is claims of ineffectiveness at the time they occurred. He fails to raise these until his court appointed lawyer has exhausted all appeal remedies. His failure to dismiss his trial/sentencing counsel immediately after sentencing when the last of his claimed incidents of ineffectiveness arose was derelict to protect this claim for relief. Therefore his claim of ineffectiveness is not timely and should be denied.

*36*

The Defendant raises issues but fails to offer proof that would have changed the outcome of his case or of his sentencing.   Therefore is petition is due to be denied.




Larry C. Jarrell (JAR001)
Assistant District Attorney
12th Judicial Circuit
P.O. Box 812
Troy, Alabama 36081
(334) 566-6896

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the Defendant/Petitioner, by U.S. Mail, postage prepaid, at the following address:

Bobby Williams
#231210 L.C.F. Dorm 8
28779 Nick Davis Road
Harvest, Alabama 35749-7009

JUN 2006
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala.

*37*

## IN THE CIRCUIT COURT FOR
## PIKE COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| | ) | |
| Plaintiff/ | ) | |
| | ) | |
| | ) | |
| Vs. | ) | Case No. CC-2003-382 AND 383 |
| | ) | |
| BOBBY WILLIAMS | ) | |
| | ) | |
| Defendant/ | ) | |

### AFFIDAVIT IN RESPONSE TO RULE 32 PETITION

Before me, the undersigned authority, a notary public in and for said county and state, personally appeared JAMES N. THOMAS, who is known to me and who, being by me first duly sworn, deposes and states on oath as follows:

1.    My name is James N. Thomas and I am an attorney who is in good standing with the Alabama State Bar and am also licensed to practice law in all state and federal courts within the State of Alabama.  I make this affidavit based on my personal knowledge of the facts  in response to a Rule 32 Petition filed by the above named defendant.

2.    I have previously been appointed in this Circuit to represent Mr. Bobby Williams, the Defendant in the above-styled case, against two charges of Robbery in the First Degree.  Upon being appointed to represent this Defendant, my office proceeded to represent him to the best of my ability from the date of appointment up through his conviction, sentencing and appeal.

3.    In respect to paragraphs1, Counsel wrote the Defendant on December 29, 2004 requesting the names of witness he wanted called on his behalf at sentencing. Said letter is attached to this affidavit.  In his response Bobby Williams only provided the names of his mother, father, and brother who was incarcerated at the time.  In his letter,  the Defendant stated he did not believe calling witnesses at sentencing would make any difference.  Said response is attached to this affidavit. Counsel called Roy Brooks, a close family friend, the Defendant's father, John Foster, the Defendant's brother in law, Javonia Harris, and the Defendant's Mother, Donna Williams.  Further, Bobby Williams also took the stand at sentencing.  All of these witnesses were given ample opportunity to bring out the Defendant's Community and Church ties for consideration by the Judge.

38

4.  In respect to paragraphs 2, 3, and 4, at no point did Bobby Williams provide Counsel with the names of his church pastor or church members to call as a witness at sentencing. Again, please refer to the letter from the Defendant.

5.  In respect to paragraph 4, All relevant information respecting community ties and lack of prior criminal history was brought up at sentencing.

6.  In respect to paragraph 6, the Defendant asserted he was not present or involved in the crime as his defense. At the time of trial, Christopher McGhee had plead Guilty as a co-defendant. At the time of sentencing Counsel felt there was a strong possibility the appellate Courts may have found error by the Trial Court in admitting Bobby William's prior statements to the police. If McGhee has taken the stand and stated Williams was present at the Robbery, but did not hold the Gun, the State may have attempted to use his statements from sentencing in a new trial. Bobby Williams only decided to take the stand the day of sentencing in an effort to obtain leniency. Further, given the fact any new trial hinged on his prior statements being suppressed, he would not have taken the stand at trial given the facts he could have been impeached by the statements in a new trial.

7.  In respect to paragraph 7, Counsel requested the Court consider a split sentence in the hearing and pointed out to the Court he received a split sentence on his Montgomery County Cases which were a matter of public record.

## INEFFECTIVE ASSISTANCE OF COUNSEL

8.  In respect to paragraph three, the trial transcript is replete with challenges to the identification of the Defendant by both convenience store clerks. I would estimate that 80 percent of the entire 231 pages of testimony at trial are related to Defense Counsel's effort's to impeach the store clerks and detectives.

9.  In respect to paragraph 5, the Defendant did not provide counsel with the names of any witnesses who could refute the testimony of his presence at the robberies.

10. In respect to paragraph 5A, Counsel subpoenaed both store clerk witnesses for the preliminary hearing and subjected both to in depth and lengthy in Court examination.

11. In respect to paragraph 5 E, both detectives Ross and Wright were subpoenaed by Counsel and subject to extensive examination at the preliminary hearing regarding the identification of Bobby Williams by the Store Clerks. Both officers were also subject to extensive cross by Counsel at trial.

12. In respect to paragraph 8C- Counsel brought out in a pretrial suppression hearing and at trial the fact that Detective Wright had previous dealing with the father of the Defendant.

39

13.    In respect to paragraph 10, Williams maintained he had no involvement in the robbery and never presented his father's name to Counsel as an Albi witness to the robbery.

JAMES N. THOMAS

James N .Thomas (THO148)

Subscribed and sworn to before me this 6th day of June, 2006.

Notary Public

My commission expires:  4/8/10



JUN 2006
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala.

40

1-04-05

Dear Mr. Thomas

I recieved your letter and I think that would be good for my family to speak on my behalf but how we know that's going to make a big difference in my case the judge gone do what he wants to anyways didn't Chris do the same thing and Judge Blair gave him 35 years on the cases. Are they still trying to run my cases consecutive or is the judge going to run them concurrent. I wrote my mom and told her to call you so that she can see when was my court date. my mother's phone number is (334) 832-1851 and you can reach her throughout the day and explain the situation to her and she can contact a few people to speak on my behalf, my father's phone number is (334) 670-0152 If so you can't reach him due to daily job please leave message and explain the situation to him so that he can do what he can to talk to some local members on my behalf mr. Thomas I need you to subpoena my brother marcus williams to court also hrs statement or testimony will also speak good on my behalf I know he's at Easterland Prison Facility I need you to contact his whereabouts due to the fact I only have 2 years left in prison my favorable information is that I have 2 kids and since I've been incarcerated my kids are not making proper care due to my girl being young and stuck with two kids I need to be with my family. my family hasn't been the same since I've been in prison.

Sincerely

*41*

JAMES N. THOMAS, L.L.C.
ATTORNEY & COUNSELOR AT LAW
405 ELM STREET
POST OFFICE BOX 974
TROY, ALABAMA 36081-0974

TELEPHONE (334) 566-2181
FACSIMILE (334) 566-6004
E-MAIL attorney405@charter.net
December 29, 2004

Mr. Bobbie Williams
AIS 231210
Bibb Correctional Facility
565 Bibb Lane
Brent, Al 35034

Re:    Sentencing Hearing

Dear Mr. Williams:

I have filed an appeal on your case. Your sentencing hearing is set for January 6, 2005. I have enclosed a copy of your pre sentence report for your review. Please review it to make sure the information contained within the report is accurate. If there is any false or misleading information contained within the report, please write my office. It is important that you obtain character witnesses who are reputable in the community and can testify as to your good standing and worthiness of receiving leniency. These witness can be family members, close family friends, school teachers, and church leaders. Also, please let me know of any favorable information you can provide me regarding your life which may assist at sentencing.

At this time, I have not heard from your father or mother. Please have each call my office so I can prepare them to testify at your hearing.

I have enclosed a postage prepaid envelope you may use to enclose the needed information.

Sincerely yours,

James N. Thomas

42

## IN THE CIRCUIT COURT OF
## PIKE COUNTY, ALABAMA

STATE OF ALABAMA,                    *
                                     *
    PLAINTIFF/RESPONDENT,        *
                                     *
VS.                                  *     CASE NO:  CC-2003-382 & 383. 60
                                     *
BOBBY WILLIAMS,                      *
                                     *
    DEFENDANT/PETITIONER,        *

### ORDER

    This matter comes before the court by Petition for Relief from Conviction or Sentence, pursuant to Rule 32, Alabama Rules Criminal Procedure and the Response from the State.

### HISTORY

    The Defendant was indicted by a Pike County Grand Jury for two counts of Robbery 1st Degree.  A jury trial was held and the Defendant was found guilty on two counts of Robbery 1st Degree.  The Defendant was sentenced to twenty five (25) years imprisonment in each case and the sentences were to run concurrent with each other and current Montgomery County, Alabama sentences.

    The Defendant appealed his convictions to the Alabama Court of Criminal Appeals.  The Defendant raised the following issues on appeal.

    I.    That the trial court erred in denying his Motion to Suppress because, he says, that Police Officer made improper promises to get the Defendant to confess that he had participated in the two robberies.

    II.    That the convictions were not supported by the weight of the evidence.

    The Defendant's convictions were affirmed by the Court of Criminal

43

Appeals.  The Defendants Application for Rehearing was denied.  The Defendant was denied Certiorari by the Alabama Supreme Court.

## GROUND I OF RULE 32 PETITION

1.    The Petitioner claims ineffective assistance of counsel at sentencing.

Any claim that counsel was ineffective must be raised as soon as practicable, either at trial, or direct appeal or the first Rule 32 Petition, whichever is applicable.  Rule 32.2 Alabama Rules of Criminal Procedure.

The Petitioner alleges that counsel was ineffective at sentencing because counsel did not subpoena and call certain witnesses at the Sentencing Hearing.

The Petitioner further alleges that counsel did not inform the court about a conviction and split sentence in Montgomery County.  The Petitioner also alleges that counsel did not introduce school, church, employment and other records.

The State has submitted the Affidavit of Counsel.  The Affidavit states that counsel wrote the Defendant about the names of witnesses for the Sentencing Hearing.  The Petitioner provided the names of his father, mother and brother who were incarcerated at the time.  Counsel did not call as witnesses, Roy Brooks, a close family friend, the Petitioner's father and mother, John Foster, the Petitioners brother-in-law, Javonia Harris and Donna Williams.  The Petitioner also testified at the Sentencing Hearing.  Counsel states at no point did the Petitioner provide the names of the church pastor or members to be considered as witnesses.  Counsel also provides that he made the decision of trial strategy in not calling Christopher McGhee, co-defendant to testify.  Counsel pointed out to the court the split sentence in Montgomery County.

Upon consideration of the pleadings, the State's response and the court record the court finds that the Petitioner was not denied effective assistance and counsel.  The court further finds that no purpose will be served by any further proceedings in this matter as the Defendant was properly sentenced.

*44*

## GROUND II

The Petitioner alleges ineffective assistance of trial counsel.

Based upon the record the Petitioner has confessed to his participation in the two (2) robberies. Furthermore, the allegations of the Petitioner appears to attack the trial strategy of counsel.

The State has submitted the Affidavit of trial counsel wherein he states the record will show that he made a diligent effort to impeach the store clerks and police regarding any identification of the Petitioner.

The court finds that the Petitioner was not denied effective assistance of counsel. Furthermore, the Petitioner has failed to prove prejudice as the Defendant confessed to participation in the two (2) robberies.

Based upon the above, the relief sought in the Petitioner's Rule 32 is *denied*. This action is dismissed with cost remitted.

Done this the ____22nd____ day of _____, 2006.

JEFF W. KELLEY
CIRCUIT JUDGE



**45**

IN THE CIRCUIT OF PIKE

COUNTY, ALABAMA

Bobby Williams
Petitioner

vs

STATE OF ALABAMA
Respondent

CASE NO: CC03-382.383.60

# MOTION TO STRIKE STATES RESPONSE
## AND PETITIONER'S OBJECTION TO
### DISMISSAL OF RULE 32

Comes now Bobby Williams and in support of his
MOTION TO STRIKE STATES RESPONSE. And the Affidavit
of Attorney James N. Thomas Shows the Honorable Court specific
facts from States very motion filed. Williams Under ALABAMA
CIVIL RULES. RULE 56 (F)(G) Affidavits made in Bad Faith,
Points the Honorable Judge to facts to show there's full grounds
t strike and where the Material Issues are still in dispute.
Rule 32.9 (a) Provides for a full Evidentiary Hearing
THE Following:

46

1. THE STATE AVERS That Williams is not entitled to Ineffective Assistance of Counsel Where it states If it was not raised on Direct Appeal Exparte Williams 838 So 2d. 1028 Bell vs State 845 So 2d 856 ALABAMA LAW has long held See Exparte Ingram When Same Counsel at TRIAL and on APPEAL Petitioner's Relief under Ineffective Assistance of Counsel is by Rule 32 petition,

2. STATE ENTIRE Answering avers a procedural Bar is unfounded and lacks merits by law of ALABAMA

3. THE Affidavit By Counsel With his own attached Exhibit Proves Williams specific facts See paragraph # 4 Now see Williams letter for proof "I wrote my mother.... and she can contact a few people to speak on my behalf"

(A) THE SPECIFIC facts: To which has in his Rule 32 Still Stand Unrefuted. Counsel did not investigate, And talk With Williams witness at all

4. THE ATTORNEY● Affidavit is mad● Solely on Bad **47**
Faith to mislead the Court.

(A) Williams don't dispute that Counsel is outstanding
With the ALABAMA BAR

(B) Williams issues deal with specific performances and
issues with Williams Case. Counsel forming his own profes
Opinion Rendered him Ineffective and did nothing for
Williams Case to prove the defense to which Counsel
himself Chosed. Wherefore based on the issues that have
not been resolved, and Unrefuted facts must taken to
be true Exparte Floyd 457 So 2d 961 Williams is entitled
to a full Evidentiary Hearing to Call witnesses to prove his
Claim

Respectfully

*Bobby Williams*
Bobby Williams
565 Bibb Ln
Brent AL 35034

JUN 2006
FILED
Eunice Meadows Peacock
Court Clerk
Pike Co, Ala

48

# CERTIFICATE OF SERVICE

I Do Hereby Certify that I have served the District Attorney a Copy of the foregoing

Larry C. Jarrell

P.O. Box 812

Troy AL 36081

Done this 26th day June By U.S. Mail



Bobby Williams
Bobby Williams

IN THE CIRCUIT COURT
OF PIKE COUNTY, ALABAMA

49

Bobby Williams
  (petitioner)

Vs.

STATE OF ALABAMA
  (Respondent)

CASE NO: CC03-382, 383.6



MOTION FOR EXTENSION OF
TIME TO AMEND RULE 32

Comes Now Bobby Williams files the above Styled Motion. Williams for good Cause shows unto the Honorable Judge that Specific facts and issues are fourth Coming under Rule 32 which Supports Ineffective Assistance of Counsel. Williams is untrained in law and has did what he is able to do by limited time in Bibb's law Library. Granting Williams 30 days Will Not Prejudice the State, And Williams Will Not delay the orderly proceedings of this Court with an extension being granted.

Wherefore Williams prays the order will issue

Respectfully

## IN THE CIRCUIT COURT OF
## PIKE COUNTY, ALABAMA

BOBBY WILLIAMS,      *

    PETITIONER,      *

     *

VS.      *     CASE NO: CC-2003-382 & 383 -60

     *

STATE OF ALABAMA,      *

     *

    RESPONDENT.      *

### ORDER

The Petitioner has filed a Motion for Extension of Time to Amend his Rule 32 Petition. The Motion for Extension of Time was filed June 27, 2006. The court entered an Order on June 23, 2006, which ruled on the pending Rule 32 Petition.

Based upon the above the Petitioner's Motion for Extension of Time to Amend is denied.

Done this the **28**th day of **June, 2006.**

JEFF W. KELLEY
CIRCUIT JUDGE

JUN 2006
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala.

51

# IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

Bobby Williams
    (petitioner)

Vs.

STATE OF ALABAMA
    (Respondent)

Case No. CC03-382, 383

## MOTION TO AMEND Rule 32 pETITION

Comes Now Bobby Williams and pursuant to Rule 32 provisions Humbly Request the Honorable Judge to grant amending of the pending Rule 32. Williams states the followir for specifics:

## INEFFECTIVE ASSISTANCE OF COUNSEL

Counsel's failure to file and request the proper motion to object to Consolidation on the Cases for trial, Cause the whole outcome to be different.

(a) Williams was charged by indictments with two differer robberies and both having different dates and times.    **52**

(b) Williams by defense had evidence to prove that he was not the person who robbed the store clerks at gun point.

(C) Counsel's defense strategy centered around that Williams was the case of misidentification

2 Counsel's failure to object to having both cases tried together rendered the whole outcome of trial to be differe and prejudice Williams case

(d) The issue of positive identification came up in one cas and there was no evidence introduced to show that Williams was the man in the store who committed the robbery.

(B) If Counsel had placed, The full facts, And relevant Case law to support that Williams Would be denied a fair trial by Consolidating the cases. Where Counsel's full defense was that his client Was not the one who did robbed the Victim. The Jury Would have heard evidence from the clerk that she Could not identify Williams as the one who robbed her.

**53**

Evidence at trial by counsel himself on full Cross examination was to show that Williams was not the person who did the robbery.

(C) Prejudice attach where the jury heard evidence prejudical placing guilt for one robbery to make guilt for two Williams by a not guilty verdict for one robbery would not have had a Conviction at all

(D) Counsel's placing and fighting for williams defense to have Seperate trials would have placed the state to challenge, where Williams could have recieved a plea bargain to the same in Montgomery County Alabama Circuit Court.

3. William's Was denied Ineffective Assistance of Counsel Where Seperate indictments with different dates, and times were favorable for williams full defense. Counsel's acts to remain silent at a Crucial stage changed the entire outcome of Trial for Williams.

4. Counsel according to ALABAMA RULES OF COURT Criminal procedure Rule 13.3(a) Had full knowledge that Williams Indictments were Seperate and not a one court indictment.

(A) Counsel's refusal to file the Pretrial Motion to have Seperate trials resulted in Williams having Constructive amendment to the indictment for both robbery and theft.

**54**

(B) Counsel's refusal to file the Pretrial motion denied Williams a fair trial altogether for proper and correct jury instructions for the lessor offenses to which the Jury had ample evidence based on conflicting evidence as to whom was present and who was armed. The elements of intent not being proven by the state. agains Williams by mere presence Raised a question for the jur to decide. Consolidating both cases together denied Williar his fundamental Rights to a fair trial altogether. If Counsel had filed the Motion the jurors would have made a full fair decision and the outcome would have been different. Not guilty for 1st degree robbery but guilty of 3rd degree. robbery a lessor offense.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL FAILURE TO INVESTIGATE AND CALL KEY DEFENSE WITNESS

· Williams gave his attorney vital true facts for the defense Of his case, And to prove his actual innocence.

1) Counsel breached his full duty owed by making his own prefixe opinion of how he would defend Williams, And refused to provide the duty and care owed to williams to investigate all witness leads, And state's Discovery.

(b) Counsel chose and made his own independent choice to center all his defense on a prior statement to the police. **55**

2. Williams having a key witness to testify Christopher McGhee would have proved that Williams did not commit the robbery And never had prior knowledge of any robbery going down. Williams had enough factual proof to substantiate what he told his attorney at all times, And a witness to prove actual innocence.

(3) The whole outcome would have been different had Counsel did his professional duty.

3. Williams for proof refers the court to review the affidavit of attorney James N. Thomas where Attorney Thomas very admission is that he made his own choice not to call McGhee. There's nothing in the affidavit which states why Counsel did no investigation into these facts, And conduct a full interview with McGhee. Failure to investigate and interview the full defense to which gave, And Williams being locked up, this denied Williams a fair trial. The jury never heard the real truth to which would have proved the reason a full mistaken identification existed. Williams would have never been convicted of 1st degree robbery had Counsel did his professional duty and investigate, Call and subpoena McGhee to trial.

III    INEFFECTIVE ASSISTANCE OF COUNSEL
        TO CHALLENGE THE STATE PLACING THE
        TO PROVIDE A PROPER PLEA AGREEMENT.

56

1. Counsel who admits he is in good standing with THE ALABAM
   BAR. And Knows Trial Strategy, Denied his client Effective
   Assistance of Counsel at a crucial Stage.

2. Counsel had enough factual evidence to have submitted his
   witness list, And subponea to have level the odds for his
   client. Counsel's Acts to walk in the courtroom and to
   make his sole argument and Defense around a statement giver
   to the police, deprived Williams of his sixth Amendment Rights

3. Counsel just stood silent and did not challenge the state's ca:
   at all for Key witnesses who admitted to robbery, And know
   who had the Gun, knew who the look Alike was, And that
   Williams did not commit the crimes.

4. Counsel's silence rendered the whole outcome to be different

(a) without Williams having a Gun and being in the store. The st
    would have been placed in a situation to make Williams a reason:
    Plea offer The only reason the state didnt provide a plea offer wo
    because Counsel stood silent at crucial stages.

5. The sentence imposed from circuit Court of Montgomery
   County ALABAMA Counsel did not make any solid stand to

recieve, where he didn't place any motions, Any Defense interviews, Never Contacted Key Witnesses, Nor Challenged **57** the state in a timely manner to make a solid defense for his client.

(3) Counsel's silence meets both prongs of <u>Strickland V.</u> <u>Washington</u>, Where absolute silence Caused Williams to a Conviction for a crime he didn't do. Then Williams would have had a offer suitable to be Concurrent with his Montgomery Case

## CONCLUSION

Williams Only Way to prove he is entitled to a NEW TRIAL Under Ineffective Assistance of Counsel is to be given his ful due process Under Rule 32.9 (3) Appoint Counsel, And provic a full hearing. Williams entire Trial would have been different if Counsel had just removed his own prefixed Opinion, And made the interviews, Contacted Witnesses to which williams gave Counsel. SEE THOMAS V. HARRELSON; Fed (11th CIR) 942 F.2d 1530 the Court held that Counsel's ow. fixed opinion of how he thought it happen resulted in ineffective Assistance of counsel. Williams entire results woul

58

have been different had Mr. Thomas stepped up and did what he now says he is in God standing to have done at all times. The sentence and conviction would have been totally different. Williams is entitled to put on evidence to prove his claims.

Respectfully

Bobby Williams
Bobby Williams



IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

BOBBY WILLIAMS
    PETITIONER

VS.

STATE OF ALABAMA
    RESPONDENT

CASE NUMBER   CC03-382 & 383 . 60

MOTION TO VACATE AND AMEND COURT'S ORDER

Comes now Bobby Williams and petitions the Honorable judge to vacate the order denying Williams Rule 32, and for good cause as shown states there are facts and issues to which have not been resolved from the first filed Rule 32, which has been ruled on and facts which the Honorable Judge did not address in his order denying Williams Rule 32. The following reasons as stated :

1. Williams request the Honorable Judge consider the ruling held in EX PARTE LAND, 775 SO.2d 847 (Ala. 2000). The Court held petitioner was entitled to discovery under ineffective assistance of counsel to prove his claim. Williams shows to the Honorable Judge that he has evidence which will prove that a vital witness was never contacted and Counsel never even made any investigation into the facts which was made

Page 2.

known about Williams Brother who was incarcerated at Easterling
Correctional Facility. Williams has evidence which will prove
that had his Counsel conducted the first initial interview
and made an investigation into the criminal case Counsel would
have learned that Bobby Williams did not have a gun, and that
Bobby Williams had no idea, nor was a willing participant
at any of the Robberies which took place. The results would
have been different ahd the very likihood of the Jury's returing
a not guilty verdict and or fof a lessor offense than Robbery
First centers around the undisputed facts of Williams case.
2. Williams Rule 32 provided evidence by way of exhibits which
were not mention at all in the Judge's order denying Williams
Rule 32 petition. There's facts which have not been resolved.
(a). Willima presented facts to show by specifics that there
was mistaken identity, and that he was not in the store with
a gun. The facts remain that this was a crucial stage of the
proceedings and exactly what Counsel made his case under and
full defense around. In fact if you review, the affidavit
submitted before the Court by State's response. Counsel admits
that he made his decision not to call certain witnesses because
he wanted his client's appeal to go through. This is direct
ineffective assistance of Counsel, (1) the trial had not began,
(2) when Counsel mentions not calling the witness at sentence
hearing he made no mention as to why Williams Brother was

Page 3

subponea, nor interviewed for actual trial. The records are
silent before this Court for any crosss examination of Counsel
to which Rule 32.9(a) provides for Williams due process rights
under ineffective assistance of Counsel.

(b). The standards are under Alabama law when material issues
are still in dispute then Summary judgment, Summary Disposition
must not be granted. The State has not answered and thge Affidavit
by Counsel does not answer the full merits of Williams petition
which specifically shows exhibits to support his claims.

3. Williams made a full acknowledgement prior to trial that
his Court appointed Counsel was not making any investigation
into his case. Williams letter and Motion filed before this
Court was not considered under Rule 32 for ineffective assistance
of Counsel.

(a). There's no cross examination as to how many times Counsel
visited with Williams prior to trial to discuss the case,
and the full defense. Counsel's affidavit does not provide
any facts to show that he went and visited with Williams to
where he had full knowledge that Williams was confined in
State prison. Williams evidence by specific facts was not
address that prior to trial the Court had knowledge of a conflict
of interesy which exist between Williams and his Counsel.
But the Court's records are silent to any material facts under

Page 4.

specific stated fcacts presented and  meets the burden or
proof as required under Rule 32.3.. In BATTLE V. STATE, 801
SO.2d 41, 42 (Ala. Crim. App. 2001) The Court held that the
Court MUST make specific findings of relating to each issue.
In Williams case before the Court Honorable Judge there are
specific material issues under ineffective assistance of Counsel
to which the State did not refute nor address at all. There's
nothing in the Court's order by specific finding of facts
as required to provide due process as required under Rule
32.9(a).
(B). Was Williams the gun man in the Robbery case o which
he went to trila for. Did Williams by Rule 32 present evidence
to show had his Counsel contacted and interviewed witnesses
which were made known to Counsel, that the whole outcome of
trial would have been different. YES, and there's not one
word spoken before this Court by the State of Alabama where
Williams Rule 32 shows that he did not have the gun and there's
evidence which if the Jury would have heard it would have
changed the whole outcome of trial. The Court's ruling has
not one specific finding of facts to this issue, and there's
much more, but Williams was denied based on the sworn affidavit
of Counsel alone. There's nothing in the Court's findings
which acknowledge any facts as to Willimas sworn affidavit,

Page 5.

and the exhibits which were placed before the Court.

RELIEF WHICH EXISTS AND IS DUE

1. The Court to issue and order vacatibg the dismissal of
Williams Rule 32, and to allow the full 30 days to grant Williams
Motions where the Rule 32 was amended and placed in the U.S.
Mail by Prison Officals prior to William's receiving any dismissal,
and denial of his Rule 32 petition.

2. The Court to consider that Willimas Rule 32 has merits
under ineffective assistance of Counsel, and that the material
issues have not been resolved, where the Affidavit of Counsel
has no way of being cross examine, and there's no way Williams
can question Counsel as to why McGhee was not interviewed,
and in fact why Williams Brother were never interviewed, and
there evidence was crucial to the very defense which Counsel
himself made the choice to defend about mistaken identification.

3. The Court to set this Rule 32 for a full hearing, where
the Court can provide what Alabama law requires under a full
specific finding of facts to each material issue.

4. The Court to appoint and provide Williams with Counsel,
and to award the discovery which has been requested.

5. To any and all relief to which Williams is entitled.

Respectfully

*Bobby Y. Williams*

BOBBY WILLIAMS
565 BIBB LANE
BRENT, ALABAMA 35034
JULY 7th, 2006

104

## IN THE CIRCUIT COURT OF
## PIKE COUNTY, ALABAMA

STATE OF ALABAMA,              *

      PLAINTIFF,          *

VS.                         *     CASE NO:  CC-2003-382 & 383

BOBBY WILLIAMS,         *

      DEFENDANT.       *

## ORDER

The court has entered an Order on the 27th day of June, 2006 on Petitioner's Rule 32 Petition.  The Petitioner now seeks to amend his Rule 32 Petition.

The Petitioner's Motion to Amend is denied as the court has already ruled on the pending Rule 32 Petition.

Done this the *14th* day of *July, 2006.*

JEFF W. KELLEY
CIRCUIT JUDGE

JUL 2006
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala.

65

IN THE CIRCUIT COURT OF
PIKE COUNTY, ALABAMA

STATE OF ALABAMA,          *
                           *
    PLAINTIFF,             *
                           *
VS.                        *     CASE NO: CC-03-382.60
                           *               CC-03-383.60
BOBBY WILLIAMS,            *
                           *
    DEFENDANT.             *

## ORDER

    The Defendant's Motion to Vacate and Amend Court's Order is moot as the court has already entered an Order denying a previously filed Motion to Vacate and Amend Court's Order.

    Done this the *31ˢᵗ* day of *July, 2006.*



JEFF W. KELLEY
CIRCUIT JUDGE

JUL 2006
Brenda [illegible] Peacock
Court Clerk
Pike Co., Ala.

*SCANNED*

IN THE CIRCUIT COURT OF _Pike_____.COUNTY, ALABAMA
NOTICE OF APPEAL TO THE COURT OF CRIMINAL APPEALS OF ALABAMA

_Bobby D. Williams_____,  :
APPELLANT,

VS.                                          :

STATE OF ALABAMA,                            :     CASE NO. _CC: 03-382,383.60_
          APPELLEE.                          :     _July 14, 2006_
                                             :     DATE OF DENIAL

NOTICE OF APPEAL

Notice is hereby given that _Bobby D. Williams_
appeals to the above - named court from the judgment of denial
of _Motion to Amend_____
ENTERED IN THIS CAUSE ON THE _14th_ day of _July_____,
20_06_ :
_Motion to Vacate & Amend Court's Order_
_Petitioner has not recieved any order from the Judge on this rul._

Dated: _7-26-06_____

     I am, this date, serving a copy of the foregoing on all parties
required by the A.R.A.P., via United States Mail, first class and
proberly addressed.

                          Respectfully submitted

                          _Bobby D. Williams_

107

| State of Alabama<br>Unified Judicial System<br>Form ARAP-26 (front) · 8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br>_____ - _____ |
| --- | --- | --- |

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF  _PIKE_ _____ COUNTY

_BOBBY D. WILLIAMS_ _____, Appellant

V.  ☒ STATE OF ALABAMA  ☐ MUNICIPALITY OF  _STATE OF ALABAMA_

| Case Number<br>_CC-03-382-383_ | Date of Complaint or Indictment | Date of Judgment/Sentence/Order<br>_July 14, 2006_ |
| --- | --- | --- |
| Number of Days of Trial/Hearing<br>_0_ Days | Date of Notice of Appeal<br>Oral: | Written: _7-26-06_ |
| Indigent Status Requested:  ☒ Yes  ☐ No | Indigent Status Granted:  ☒ Yes  ☐ No | |

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?  ☐ Appointed  ☐ Retained.    If no attorney, will appellant represent self?  ☒ Yes  ☐ No

| Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)<br>_BOBBY D. WILLIAMS_ | Telephone Number |
| --- | --- |
| Address<br>_545 Robb Lane_ | City<br>_BRENT AL_ | State<br>_AL_ | Zip Code<br>_35034_ |

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
| --- | --- |
| Codefendant | Case Number |
| Codefendant | Case Number |

**D. TYPE OF APPEAL:** Please check the applicable block.

1 ☐ State Conviction     4 ☐ Pretrial Order          7 ☐ Juvenile Transfer Order   10 ☐ Other (Specify)
2 ☒ Post-Conviction Remedy  5 ☐ Contempt Adjudication   8 ☐ Juvenile Delinquency      _____
3 ☐ Probation Revocation   6 ☐ Municipal Conviction    9 ☐ Habeas Corpus Petition    _____

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____      6 ☐ Trafficking in Drugs - § _____    11 ☐ Fraudulent Practices - § _____
2 ☐ Homicide - § _____            7 ☒ Theft - § _Robbery_              12 ☐ Offense Against Family - § _____
3 ☐ Assault - § _____             8 ☐ Damage or Intrusion               13 ☐ Traffic - DUI - § _____
4 ☐ Kidnapping/Unlawful               to Property - § _____            14 ☐ Traffic - Other - § _____
    Imprisonment - § _____        9 ☐ Escape - § _____                 15 ☐ Miscellaneous (Specify):
5 ☐ Drug Possession - § _____    10 ☐ Weapons/Firearms - § _____        _____

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?   ☐ Yes   ☐ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript?   ☐ Yes   ☒ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed.
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk?   ☒ Yes   ☐ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?   ☐ Yes   ☐ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

| Form ARAP- 26 (back)    8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT |

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
| Month | Day | Year | | Month | Day | Year |
| 4 | 20 | 2006 | RULE 32 | 6 | 6 | 2006 |
| 7 | 7 | 2006 | MOTION TO VACATE AND AMEND | 7 | 14 | 2006 |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

CONVICTED OF ROBBERY 1st. APPELLANT IS INNOCENT OF
1st DEGREE ROBBERY. CONVECTION WAS DUE TO COUNSEL'S
ERRORS.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

1. WHETHER THE COURT ERRED IN DENYING RULE 32.

2. WHETHER APPELLANT WAS ENTITLED TO A HEARING.



**K. SIGNATURE:**

7-26-06
Date

*Bobby Williams*
Signature of Attorney/ Party Filing this Form

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP-1C    8/91 | **REPORTER'S TRANSCRIPT ORDER – CRIMINAL**<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R.App.P) | **Criminal Appeal Number** |
|---|---|---|

**TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.**

☒ CIRCUIT COURT ☐ DISTRICT COURT ☐ JUVENILE COURT OF _PINE_ COUNTY

_BOBBY D. WILLIAMS_, Appellant

v.  ☒ STATE OF ALABAMA  ☐ MUNICIPALITY OF _STATE OF ALABAMA_

| Case Number _CC03-382-383_ | Date of Judgment / Sentence / Order |
|---|---|

| Date of Notice of Appeal<br>Oral: | Written: _7-26-06_ | Indigent Status Granted:<br>☒ Yes ☐ No |
|---|---|---|

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE / DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

_7-26-06_                           _BOBBY D. WILLIAMS_
Signature              Date                              Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                       **COURT REPORTER(S)**

A. ☐  **TRIAL PROCEEDINGS** – Although this designation will include the judgment and sentence
proceedings, a transcript of the organization of the jury and arguments of counsel must be
designated separately.

B. ☐  **ORGANIZATION OF THE JURY** – This designation will include voir dire examination and
challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded
unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐  **ARGUMENTS OF COUNSEL** – Note that in noncapital cases the arguments of counsel will not
be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING
PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

ADDITIONAL PROCEEDINGS REQUESTED                    DATE                    COURT REPORTER(S)

D. _____    _____    _____

E. _____    _____    _____

F. _____    _____    _____

G. _____    _____    _____

**IMPORTANT NOTICE :** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be
effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the
case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not
sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL
ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S
TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT STATUS HAS NOT BEEN
REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

_____    _____    _____
Signature                            Date                              Print or Type Name

DISTRIBUTION :  Original filed with Clerk of Trial Court and copies mailed to : (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney,
(3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a
municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

AUG 2006
FILED
Brenda Meadows Peacock
Court Clerk
Pike Co., Ala

70

ACR371              ALABAMA JUDICIAL DATA CENTER
        NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                    BY THE TRIAL COURT CLERK
            IN THE CIRCUIT COURT OF    PIKE COUNTY
STATE OF ALABAMA VS WILLIAMS BOBBY            JUDGE: JEFFERY W KELLEY
-------------------------------------------------------------------
| APPEAL DATE: 08/01/2006
-------------------------------------------------------------------
  INDIGENCY STATUS:
    GRANTED INDIGENCY STATUS AT TRIAL COURT:          X   YES _____ NO
    APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL: ___X___ YES _____ NO
    INDIGENT STATUS REVOKED ON APPEAL:                    YES   X   NO
    INDIGENT STATUS GRANTED ON APPEAL:            ___X___ YES _____ NO

  DEATH PENALTY: NO

  APPEAL TYPE: RULE 32 PETITION
-------------------------------------------------------------------
  THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E., RULE 32 PETITION,
  WRIT OF HABEAS CORPUS, ETC) OR FROM ANY OTHER ISSUED BY THE TRIAL JUDGE.

  CO/CASE NUMBER: 55/CC 2003 000382.60

  ORDER ENTERED(DATE): 06222006 PETITION: ___ DISMISSED  X DENIED ___ GRANTED
-------------------------------------------------------------------
  POST-JUDGMENT MOTIONS FILED:    DT FILED        DT DENIED      CON BY AGREE
   X  MOTION FOR NEW TRIAL        07/10/2006      07/18/2006
  ___ MOTION FOR JUDG. OF ACQUIT  _____      _____     _____
  ___ MOTION TO W/D GUILTY PLEA   _____      _____     _____
  ___ MOTION FOR ATTY TO W/DRAW   _____      _____     _____
  ___ OTHER                       _____      _____     _____
-------------------------------------------------------------------
  COURT REPORTER(S):              _____
  ADDRESS:                        _____

  APPELLATE COUNSEL #1:           _____
  ADDRESS:                        _____
                                  _____
  PHONE NUMBER:                   _____

  APPELLATE COUNSEL #2:           _____
  ADDRESS:                        _____
                                  _____
  PHONE NUMBER:                   _____

  APPELLANT (PRO SE):             WILLIAMS BOBBY
  ADDRESS:                        565 BIBB LANE
                                  BRENT          ,  AL  350340000
  AIS #:                          231210

  APPELLEE (IF CITY APPEAL):      _____
  ADDRESS:                        _____
-------------------------------------------------------------------
  I CERTIFY THAT THE INFORMATION PROVIDED              OPERATOR: JAS
  ABOVE IS ACCURATE TO THE BEST OF MY              PREPARED: 08/02/2006
  KNOWLEDGE AND I HAVE SERVED A COPY OF
  THIS NOTICE OF APPEAL ON ALL PARTIES TO
  THIS ACTION ON THIS _2_ DAY OF _August_, 2006
                                              Brenda M. Peacock
                                              CIRCUIT COURT CLERK

Ct Cr. Appeals
Atty General
DA
S Williams

```
ACR371                  ALABAMA JUDICIAL DATA CENTER
            NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                          BY THE TRIAL COURT CLERK
                   IN THE CIRCUIT COURT OF    PIKE COUNTY
STATE OF ALABAMA VS WILLIAMS BOBBY            JUDGE: JEFFERY W KELLEY
```

------------------------------------------------------------------------

APPEAL DATE: 08/01/2006

------------------------------------------------------------------------

```
INDIGENCY STATUS:
    GRANTED INDIGENCY STATUS AT TRIAL COURT:        X   YES          NO
    APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:  X   YES          NO
    INDIGENT STATUS REVOKED ON APPEAL:                  YES     X    NO
    INDIGENT STATUS GRANTED ON APPEAL:              X   YES          NO

DEATH PENALTY: NO

APPEAL TYPE: RULE 32 PETITION
```

------------------------------------------------------------------------

THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E., RULE 32 PETITION, WRIT OF HABEAS CORPUS, ETC) OR FROM ANY OTHER ISSUED BY THE TRIAL JUDGE.

CO/CASE NUMBER: 55/CC 2003 000383.60

ORDER ENTERED(DATE): 06222006 PETITION: __DISMISSED  X DENIED  __GRANTED

------------------------------------------------------------------------

| POST-JUDGMENT MOTIONS FILED: | DT FILED | DT DENIED | CON BY AGREE |
|---|---|---|---|
| X  MOTION FOR NEW TRIAL | 07/10/2006 | 07/18/2006 | |
| ___ MOTION FOR JUDG. OF ACQUIT | | | |
| ___ MOTION TO W/D GUILTY PLEA | | | |
| ___ MOTION FOR ATTY TO W/DRAW | | | |
| ___ OTHER | | | |

------------------------------------------------------------------------

```
COURT REPORTER(S):
ADDRESS:                        _____

APPELLATE COUNSEL #1:
ADDRESS:                        _____
                                _____
PHONE NUMBER:                   _____

APPELLATE COUNSEL #2:
ADDRESS:                        _____
                                _____
PHONE NUMBER:                   _____

APPELLANT (PRO SE):             WILLIAMS BOBBY
ADDRESS:                        565 BIBB LANE
                                BRENT          ,  AL  350340000
AIS #:                          231210

APPELLEE (IF CITY APPEAL):
ADDRESS:                        _____
```

------------------------------------------------------------------------

```
I CERTIFY THAT THE INFORMATION PROVIDED            OPERATOR: JAS
ABOVE IS ACCURATE TO THE BEST OF MY        PREPARED: 08/02/2006
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS  2  DAY OF  August ,2006
                                           CIRCUIT COURT CLERK
```

```
ACRO370              ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2003 000382.60
OPER: JOP                    CASE ACTION SUMMARY
PAGE:    1                   CIRCUIT   CRIMINAL              RUN DATE: 05/15/2006
================================================================================
  THE CIRCUIT COURT OF      PIKE
                                                                    JUDGE: JWK
  STATE  OF  ALABAMA              VS      WILLIAMS BOBBY      #23/210
                                         565 BIBB LANE
  CASE: CC 2003 000382.60                 D2-30T
                                         BRENT, AL  35034 0000

DOB: 10/19/1982       SEX: M  RACE: B  HT: 6 01  WT: 150  HR: BLK EYES: BRO
SSN: 423132904  ALIAS NAMES:
--------------------------------------------------------------------------------
CHARGE01: RULE 32-FELONY        CODE01: RULE  LIT: RULE 32-FELONY TYP: F #: 001
OFFENSE DATE:                        AGENCY/OFFICER: 0550000

DATE WAR/CAP ISS:                    DATE ARRESTED:
DATE    INDICTED:                    DATE    FILED: 05/11/2006
DATE    RELEASED:                    DATE  HEARING:
     BOND AMOUNT:           $.00         SURETIES:

DATE 1:           DESC:                TIME: 0000
DATE 2:           DESC:                TIME: 0000
TRACKING NOS: CC 2003 000382 00  /                      /

   DEF/ATY:                    TYPE:                        TYPE:

                         00000                    00000

PROSECUTOR: MCALILEY GARY L
```

```
================================================================================
OTH CSE: CC200300038200 CHK/TICKET NO:                GRAND JURY:
COURT REPORTER: _____ SID NO:   000000000
   STATUS: PRISON            DEMAND: N                      OPER: JOP
  TRANS DATE     ACTIONS, JUDGEMENTS, AND NOTES                        OPE
|------------|----------------------------------------------------------|
| 05/15/2006 | ASSIGNED TO: (JWK) JEFFERY W KELLEY          (AR01)   JOP |
|------------|----------------------------------------------------------|
| 05/15/2006 | FILED ON: 05/11/2006                         (AR01)   JOP |
|------------|----------------------------------------------------------|
| 05/15/2006 | INITIAL STATUS SET TO: "P" - PRISON          (AR01)   JOP |
|------------|----------------------------------------------------------|
| 05/15/2006 | CHARGE 01: RULE 32-FELONY/#CNTS: 001         (AR01)   JOP |
|------------|----------------------------------------------------------|
| 05/15/2006 | CASE ACTION SUMMARY PRINTED                  (AR08)   JOP |
|------------|----------------------------------------------------------|
| 5-15-06    | Copy of Rule 32  to State                                |
| 5-15-06    | Order of 5-11-06 granting Forma Pauperis - DA, Δ         |
| 6-7-06     | Response to Rule 32                                      |
| 6-23-06    | Order-Deny                                               |
| 6-27-06    | Motion for Extension of Time to Amend                    |
| 6-27-06    | Motion To Strike States Response                         |
| 6-29-06    | Order denys time to Amend - DA, Δ                        |
| 7-7-06     | Motion To Amend Rule 32 ✓                                |
| 7-10-06    | Motion To Vacate + Amend ✓                               |
| 7-18-06    | Order denys Amend - DA, Δ ✓                              |
| 7-31-06    | Order - DA, Δ                                            |
```

SCANNED

73

ACRO369   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2003 000382.60
JUDGE ID:  JWK

STATE  OF  ALABAMA                    VS    WILLIAMS BOBBY

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 8-1-06 | Notice of Appeal/Docketing Statement/Transcript Order |
| 8-2-06 | Appeal Transmittal Form cc: Ct Cr App, Atty Gen, DA & Wms |

**74**

```
ACRO370           ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2003 000383.60
OPER: JOP                   CASE ACTION SUMMARY
P  E: 1                     CIRCUIT  CRIMINAL              RUN DATE: 05/15/2006
========================================================================================
  THE CIRCUIT COURT OF   PIKE                                          JUDGE: JWK

STATE  OF  ALABAMA                 VS        WILLIAMS BOBBY
                                             565 BIBB LANE
CASE: CC 2003 000383.60                      D2-30T
                                             BRENT, AL   35034 0000

DOB: 10/19/1982         SEX: M   RACE: B   HT: 6 01   WT: 150   HR: BLK EYES: BRO
SSN: 42312904   ALIAS NAMES:
========================================================================================
CHARGE01: RULE 32-FELONY        CODE01: RULE   LIT: RULE 32-FELONY TYP: F #: 001
OFFENSE DATE:                            AGENCY/OFFICER: 0550000

DATE WAR/CAP ISS:                    DATE ARRESTED:
DATE    INDICTED:                    DATE     FILED: 05/11/200
DATE    RELEASED:                    DATE   HEARING:
     BOND AMOUNT:          $.00       SURETIES:

DATE 1:           DESC:                  TIME: 0000
DATE 2:           DESC:                  TIME: 0000

TRACKING NOS: CC 2003 000383 00  /                        /

  DEF/ATY:                         TYPE:                        TYPE:

                        00000                         00000

PROSECUTOR: MCALILEY GARY L


========================================================================================
OTH CSE: CC200300038300 CHK/TICKET NO:                GRAND JURY:
C  RT REPORTER:                    SID NO:      000000000
STATUS : PRISON             DEMAND: N                       OPER: JOP
----------------------------------------------------------------------------------------
 TRANS DATE    ACTIONS, JUDGEMENTS, AND NOTES                             OPE
|-------------|----------------------------------------------------------|------|
| 05/15/2006  | ASSIGNED TO: (JWK) JEFFERY W KELLEY          (AR01)       | JOP  |
|-------------|----------------------------------------------------------|------|
| 05/15/2006  | CHARGE 01: RULE 32-FELONY/#CNTS: 001         (AR01)       | JOP  |
|-------------|----------------------------------------------------------|------|
| 05/15/2006  | FILED ON: 05/11/2006                         (AR01)       | JOP  |
|-------------|----------------------------------------------------------|------|
| 05/15/2006  | INITIAL STATUS SET TO: "P" - PRISON          (AR01)       | JOP  |
|-------------|----------------------------------------------------------|------|
| 05/15/2006  | CASE ACTION SUMMARY PRINTED                  (AR08)       | JOP  |
```

| 5-15-06 | Copy of Rule 32 to State |
| 5-15-06 | Order of 5-11-06 granting Forma Pauperis - DA, Δ |
| 6-7-06 | Response to Rule 32 |
| 6-27-06 | Motion For Extension of Time to Amend |
| 6-27-06 | Motion To Strike State's Response |

SCANNED

| 7-7-06 | Motion To Amend |
| 7-10-06 | Motion To ~~Amend~~ Vacate + Amend |
| 7-18-06 | Order — deny — DA ; Δ |
| 7-31-06 | Order — / DA Δ |
| ·1·06 | Not. of Appeal / Docketing Statement / Transcript Order |
| 8-2-06 | Appeal Transmittal cc: Ct Cr Appeals, Atty General, DA + Δ Williams |

75

| State of Alabama<br>Unified Judicial System<br>From ARAP - 14  Rev. 11 / 91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number<br>_____ |
| --- | --- | --- |

| TO: THE CLERK OF<br>     THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL:      8/1/2006 |
| --- | --- |
| APPELLANT                              BOBBY WILLIAMS | |
| v. STATE OF ALABAMA | |

     I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in ( a single volume of ___75___ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of brief.

     I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

    DATED this____8th____ day of _____August_____, __2006__ .


_Brenda M. Peacock_
Circuit Clerk

Attorney General Copy

CR - 05 - 2068

Court of Criminal Appeals State of Alabama

Bobby Williams
Appellant

-vs-

State of Alabama
Appellee

FILED

SEP 1 2 2006

CLERK
ALA COURT CRIMINAL APPEALS

On Appeal from Pike Circuit Court
( CC03-382.60 )

Brief and Argument of Bobby Williams

Bobby Williams
Pro Se
565 Bibb Lane
Brent, AL 35034
September 12, 2006



EXHIBIT
G

# TABLE OF CONTENTS

PAGES

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . i

TABLE OF CASES . . . . . . . . . . . . . . . . . ii

STATEMENT OF CASE AND FACTS . . . . . . . . . . . . . 1.- 2.

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . 3.

ARGUMENT I. . . . . . . . . . . . . . . . . 4-8.

CONCLUSION . . . . . . . . . . . . . . . . 9.

CERTIFICATE OF SERVICE . . . . . . . . . . . . . 10.

- i -

TABLE OF CASES

PAGES

EX PARTE BORTWRIGHT, 491 So. 2b 1257
(ALA. 1986) . . . . . . . . . . . . . . .     6.


EX PARTE MACEWAN, 860 So. 2d 896
(ALA 2002) . . . . . . . . . . . . .     8.


WILSON U. STATE, 598 So. 2d 1055
(ALA. CR. APP. 1992) . . . . . . . . . .     5.

-ii-

## STATEMENT OF CASE AND FACTS

WILLIAM'S FILED THIS RULE 32 PETITION FOR A CONVICTION ON TWO COUNTS OF ROBBERY 1ST DEGREE FROM A JURY TRIAL ON AND ABOUT JANUARY 6, 2005. THE RECORDS SUPPORT AND SHOW THAT A FULL DIRECT APPEAL WAS TAKEN BY WILLIAMS, AND FINAL DECISION ENTERED BY ALABAMA SUPREME COURT. THEREFORE WILLIAM'S RULE 32 COMES WITHIN THE ONE YEAR LIMITATION PERIOD, AND IS NOT PRECLUDED.

WILLIAM'S GROUNDS UNDER INEFFECTIVE ASSISTANCE OF COUNSEL WERE SPECIFICALLY STATED, WELL PROVEN, AND EXHIBITS ATTACHED TO PROVE THE MATERIAL FACTS TO BE TRUE. WILLIAMS PRIOR TO TRIAL FILED A MOTION REQUEST FOR APPOINTMENT OF NEW COUNSEL [TR-27] THE MATERIAL FACTS EXIST THAT WILLIAM MET HIS BURDEN OF PROOF. WILLIAM LISTED EXHIBIT IN PROOF [TR-30] THAT COUNSEL WAS NOT CONDUCTING WILLIAM'S CASE, AND WILLIAM'S TRUST WAS GONE IN COUNSEL [TR-30] THESE EXHIBITS MEETS THE BURDEN OF PROOF, AND THE SPECIFICITY UNDER A RULE 32 PETITION. WILLIAM'S RULE 32 PETITION LISTED WELL STATED SPECIFIC FACTS [TR-15-19] GROUND

ONE INEFFECTIVE ASSISTANCE OF COUNSEL AT
SENTENCING. FROM PARAGRAPHS NUMBER ONE (1)
THROUGH, EIGHT (8) LISTED SEPERATELY TEN CLAIMS
WERE WELL STATED, AND EXHIBITS ATTACHED FOR
STRICT PROOF. NONE OF THESE WERE REFUTED, NOR
RESOLVED BY THE COURT, WHERE THE STATE'S ANSWER,
AND AFFIDAVIT COULD NOT REFUTE, NOR RESOLVE THE
SWORN EVIDENCE OF WILLIAMS. WILLIAM'S WAS
DENIED CROSS EXAMINATION OF HIS COUNSEL, WHERE
THE STATE'S ANSWER CONTAINS AN AFFIDAVIT. [TR-37]

THE STATE ANSWER SAYS WILLIAM'S RULE 32 IS
DUE TO BE DENIED WHERE WILLIAMS UNDER RULE 32.2(d)
RULE 32.1(b). ANY CLAIM THAT COUNSEL WAS INEFFECTIVE
MUST BE RAISED AS SOON AS PRACTICABLE..... THE
STATE'S ANSWER IS CONTRARY TO LAW. THE STATE THEN
TURN AROUND AND SAID [TR-34] HE FAILED TO RAISE THESE
UNTIL HIS COURT APPOINTED LAWYER WAS EXHAUSTED ALL
APPEAL REMEDIES. WILLIAM'S RULE 32 PETITION BY
SPECIFIC FACTS, AND EXHIBITS REFUTE THE ANSWER
FILED BEFORE THE COURT. THE JUDGE ORDER HAS DENIED
WILLIAM FUNDAMENTAL DUE PROCESS.

WILLIAM REQUEST AFTER THE HONORABLE JUDGES
REVIEW THE TRANSCRIPT, AND THE LAWS WHICH GOVERN
RULE 32 A COMPLETE REVERSAL WILL ISSUE.

-2.-

# SUMMARY OF THE ARGUMENT

WILLIAMS RULE 32 BY PROCEDURAL HISTORY GAVE THE FULL FACTS TO WHICH TOOK PLACE. THE TRIAL COURT'S ORDER DISMISSING HAS NOTHING TO SATISFY DUE PROCESS UNDER FULL SPECIFIC FACTS TO WHICH WERE NEVER RESOLVED, NOR TO ALLOW WILLIAMS A RIGHT TO CROSS EXAMINE HIS COUNSEL WHO WAS DEFICIENT, AND CAUSED THE RESULTS OF TRIAL AND THE SENTENCING TO BE DIFFERENT.

1. FAILURE TO INVESTIGATE, INTERVIEW, AND SUBPONEA THE PASTOR OF BETHLEHEM MISSIONARY BAPTIST CHURCH [TR-15, 16]

2. THE ISSUE IS STILL IN DISPUTE, AND UNRESOLVED. IN THE RULE 32 WILLIAM'S SWORN EVIDENCE HAVE NOT BEEN RESOLVED. SEE STATE'S ANSWER [TR-No. 41] THE STATE'S ANSWER AND WILLIAM'S ANSWER ARE STILL IN DISPUTE. WILLIAM'S SWORN EVIDENCE IS UNREFUTED, WHERE WILLIAMS DERVEL [TR-40] CLEARLY STATED THAT THE ADDRESS AND INFORMATION COUNSEL COULD OBTAIN FROM WILLIAM'S MOTHER AND FATHER.

3. THE JUDGE'S ORDER DID NOT RESOLVE THE DISPUTED ISSUES, AND QUOTE THE ISSUES [TR-42] COUNSEL DID NOT CALL AS WITNESSES . . . . . . . WITHOUT CROSS EXAMINATION, AND WITHOUT THE COURT HEARING FULL TESTIMONY WILLIAM WAS DENIED DUE PROCESS.

4. WILLIAM'S GROUND II UNDER FULL SPECIFIC MATERIAL FACTS WERE NOT RESOLVED. WILLIAM'S FACTS ABOUT ACCOMPLICES, AND COUNSEL'S ACT WHICH CAUSED THE ENTIRE OUTCOME TO BE DIFFERENT JUROR'S WERE ENTITLED TO HEAR EVIDENCE, AND TO CONSIDER THE LESSOR CHARGE, AND TO DELIBERATE WHETHER WILLIAMS WILLINGLY AND KNOWINGLY PARTICIPATED, GUILT OF INNOCENCE AND OR LESSOR WITNESSES WHO COULD HAVE TESTIFIED WERE NOT CALLED, NOR CONTACTED.

ISSUES PRESENTED FOR REVIEW

1. WHETHER WILLIAMS WAS DENIED DUE
PROCESS UNDER RULE 32.9(a) TO CROSS
EXAMINE HIS COUNSEL "SEE"
EX PARTE MACEWAN, 860 SO. 2d 896 (ALA. 2003)

-- 3. --

1. WHETHER WILLIAMS WAS DENIED DUE PROCESS UNDER RULE 32.9(a) TO CROSS EXAMINE HIS COUNSEL. "YES"

EX PARTE MACEWAN, 860 So. 2d 896 (ALA. 2002)

WILLIAMS FILED A FULL SPECIFIC, FACTUAL RULE 32 PETITION. WILLIAM'S RULE 32 CONTAIN, EXHIBITS, AFFIDAVITS, AND SPECIFIC FACTS. [TR-6-30] IN THE PETITION WILLIAMS CLAIMS UNDER INEFFECTIVE ASSISTANCE OF COUNSEL WERE STATED SPECIFICALLY TO STATE HIS COUNSEL'S PERFORMANCE WAS DEFICIENT, AND SHOWED ACTUAL PREJUDICE. [TR-15-19] WILLIAM'S IN HIS RULE 32 PETITION STATED FACTS IN REFERENCE TO THE TWO PRONG TEST UNDER STRICKLAND SUPRA, [TR-19]. WELL STATED SPECIFIC FACTS IN WILLIAM'S RULE 32 [TR-15-12], COUNSEL'S FAILURE TO INVESTIGATE, INTERVIEW, AND SUBPOENA WITNESSES. IN SUPPORT WILLIAMS PROVIDED EXHIBIT "C". THE FACTS ARE STILL IN DISPUTE, AND UNRESOLVED. THE JUDGE'S ORDER HAS NOT ANSWERED THE ISSUES. CLAIMS TO WHICH WILLIAM'S RAISED, AND WELL STATED. THERE WAS EVIDENCE FAVORABLE FOR WILLIAMS WHICH WAS NOT PLACED BEFORE THE COURT, PASTOR OF BETHLEHEM MISSIONARY BAPTIST CHURCH. [TR-16] EXHIBIT "B" ATTACHED IN SUPPORT. WILLIAM SHOWED HOW THE

-4-

OUTCOME WOULD HAVE BEEN DIFFERENT. #5 AT
PAGE 16 OF TRANSCRIPT. WILLIAM'S FACTS FURTHER
SHOWED THAT CHRISTOPHER L. MC GHEE'S TESTIMONY
WAS VITAL AND WOULD HAVE CHANGED THE whole
OUTCOME OF TRIAL AT SENTENCING. [TR-16-12]

THE STATE'S ANSWER DID NOT REFUTE THE
SPECIFIC FACTS. THE AFFIDAVIT BY COUNSEL DID NOT
REFUTE SPECIFIC FACTS. THE JUDGE'S ORDER [TR-42]
No where IN the COURT'S ORDER IS these FACTS To
REFUTE WHAT WILLIAM'S RULE 32 WAS SPECIFICALLY
STATED. ALABAMA LAW HAS LONG HELD IF THE
ALLEGATIONS OF INEFFECTIVE ASSISTANCE OF COUNSEL;
IN POST CONVICTION PETITION were TRUE, PETITION
HAD MERIT. AND THEREFORE PETITIONER HAS RIGHT
To EVIDENTIARY HEARING ON THESE ALLEGATIONS. SEE
<u>WILSON V. STATE</u>, 598 So.2d 1055 (ALA. CR. APP. 1992)

IN WILLIAM'S RULE 32 PETITION WELL STATED
MERITOUS SPECIFIC FACTS ARE LISTED [TR 18-30] IN-
EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL. [TR 17-19]
MISTAKEN IDENTITY WAS COUNSEL'S DEFENSE CHOICE. THE
ISSUE OF MISTAKEN IDENTITY WAS Denied WILLIAMS.
WILLIAM STATED SPECIFIC FACTS THAT COUNSEL did NOT
CONTACT WITNESSES, DID NOT INTERVIEW WITNESSES, NOR
DID HE SUBPONEA THE WITNESSES who were REQUESTED.
[TR 18-19] A FULL LIST OF SPECIFIC FACTS. IN <u>EX PARTE</u>

BOATWRIGHT, 471 So. 2d 1257 (Ala 1985) ANYTIME A PETITION IS MERITOUS ON ITS FACE AND THE FACTS CONTAINED ARE SPECIFIC PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING.

RULE 32. 3  BURDEN OF PROOF. WILLIAMS MET. THE FULL PLEADING BY FULL EVIDENCE EXISTS [TR-6-30] RULE 32.6 (b) SPECIFICTY. THE PETITION BY WILLIAMS CONTAINS A CLEAR AND SPECIFIC STATEMENTS OF GROUNDS UNDER INEFFECTIVE ASSISTANCE OF COUNSEL, AND A TRUE CLAIM TO WHICH RELIEF EXIST. Rule 32.9 (a) PROVIDES AN EVIDENTIARY HEARING TO DETERMINE DISPUTED ISSUES OF MATERIAL FACTS.

WILLIAM'S SPECIFIC FACTS, EVIDENCE, AND ISSUES OF MATERIAL FACTS HAVE NOT BEEN RESOLVED. WILLIAM'S MOTION TO STRIKE. [TR-45-47] WILLIAMS MOTION FOR EXTENSION OF TIME TO AMEND Rule 32 PETITION. [TR-49]. MOTION TO AMEND Rule 32 PETITION [TR-51-58] WILLIAM'S MOTION TO VACATE AND AMEND COURT'S ORDER [TR-59-63] WILLIAM HAS PRESENTED, AND HIS Rule 32 PETITION HAS NOT HAD THE EQUAL PROTECTION UNDER DUE PROCESS. WILLIAM'S MATERIAL ISSUES ARE STILL UNRESOLVED. WILLIAM'S SWORN EVIDENCE, WILLIAM'S EXHIBITS. AND THE VERY EXHIBIT BY THE STATE PROVES A COMPLETE DENIAL OF DUE PROCESS. WILLIAM'S WAS NOT ALLOWED TO

CROSS EXAMINE HIS COUNSEL REGARDING THE
ASSERTIONS HE MADE IN HIS AFFIDAVIT ATTACHED
TO STATE'S MOTION TO DISMISS [TR-33-39] IN
THE AFFIDAVIT There's A LETTER ATTACHED
TO Which CLEARLY REFUTES WHAT COUNSEL ALLEGES.
[TR-40] IN FACT WILLIAM'S RULE 32 CONTAIN
A FULL LIST OF SPECIFIC FACTS WHICH HAVE
NOT BEEN ADDRESSED BY THE COURT, NOR ANY CROSS
EXAMINATION ALLOWED. WILLIAM'S EXHIBIT [TR-30]
THE JUDGE Allege THAT WILLIAM NEVER COMPLAIN, NOR
EVER MADE ANY DISPUTE ABOUT HIS ATTORNEY UNTIL
THE APPEAL WAS OVER. WILLIAM'S RULE 32 SHOWS THE
COURT'S ORDER IS CONTRARY TO ALL MATERIAL FACTS
STATED BY WILLIAMS [TR-27-29] WILLIAMS REQUEST
FOR APPOINTMENT OF NEW COUNSEL.

THE CIRCUIT COURT HAS NOT, REFUSED TO EXTEND
DUE PROCESS TO WILLIAMS UNDER RULE 32. WILLIAMS
WITNESSES, THE LISTED FACTS Which COUNSEL FAILED TO
PERFORM, THE INTERVIEWING OF WITNESSES, REFUSAL TO
SUBPOENA WITNESSES, AND REFUSAL TO PROVIDE JURY
INSTRUCTIONS. NOT ONE SINGLE DUE PROCESS RIGHT
GUARANTEED BY RULE 32 WAS GIVEN. WHERE THE UGLY
STATE AFFIDAVIT, AND WILLIAMS MATERIAL FACTS ARE
STILL UNRESOLVED. WILLIAMS UNABLE TO CROSS EXAMINE
DUE PROCESS WAS DENIED. DUE PROCESS EXIST IN THE
COURT'S ORDER WHERE MATERIAL ISSUES deserve A FULL

CROSS EXAMINATION, A RIGHT TO CALL WITNESSES, AND TO GRANT WILLIAMS A FULL FINDING OF FACTS UNDER MATERIAL ISSUES OF FACTS. Ex Parte MACEWAN, 860 So. 2d 896 (ALA. 2002)

THE ORDER ENTERED DENYING WILLIAM'S RULE 32 WITHOUT A HEARING WHEN FULL ISSUES STAND UNRESOLVED, AND NO CROSS EXAMINATION IS CONTRARY TO ALABAMA CONSTITUTION 1901 ARTICLE I SEC. 13 FOR THE INJURY DONE TO WILLIAM. WILLIAM PRAYS THE JUDGES OF THIS COURT WILL ISSUE AN OPINION AND REVERSE FOR A FULL HEARING.

-8-

# CONCLUSION

WILLIAM'S RULE 32 PETITION CONTAIN SPECIFIC FACTS WHICH MERIT RELIEF ALTOGETHER. THE ONLY REASON INEFFECTIVE ASSISTANCE OF COUNSEL HAS NOT BEEN RESOLVED IS DUE TO PLEA RIGHT.

WILLIAM'S RIGHT UNDER DUE PROCESS, AND TO CROSS EXAMINATION WERE DENIED BY TRIAL COURT, WHERE A FULL AFFIDAVIT WAS USED BY WILLIAM'S COUNSEL IN STATE'S ANSWER. THE MATERIAL ISSUES ARE STILL UNRESOLVED.

WILLIAM'S SEEK A FULL EVIDENTIARY HEARING FOR DUE PROCESS TO RESOLVE THE GROUNDS UNDER INEFFECTIVE ASSISTANCE OF COUNSEL.

RESPECTFULLY

*Bobby Williams*

BOBBY    WILLIAMS
565  BIBB LANE
BRENT, AL. 35034
SEPTEMBER 12, 2006

- 9 -

## CERTIFICATE OF SERVICE

I DO HEREBY CERTIFY AND SAY THAT I HAVE SERVED THE CLERK OF CRIMINAL COURT OF APPEALS WITH A COPY, PROPERLY LABLED ATTORNEY GENERAL COPY FOR ALTERNATE METHOD OF DELIVERY AND SERVICE. DONE THIS 12TH DAY OF SEPTEMBER, 2006. PLACED IN FREE LEGAL POSTAGE OF ALABAMA DEPARTMENT OF CORRECTIONS FOR MAILING. BY MY SIGNATURE BELOW.

*Bobby Williams*
BOBBY    WILLIAMS

- 10. -